IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Rodney Tow, Trustee<br>Plaintiff<br><br>vs.<br><br>John H. Speer, Amegy Bank, N. A., et al<br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:11-cv-03700 |

# Trustee's Third Amended Complaint

**TO THE UNITED STATES DISTRICT COURT JUDGE, LEE H. ROSENTHAL:**

Rodney Tow, the Chapter 7 Trustee (the "Trustee") of the estate of Royce Homes, LP (the "Debtor") files this Third Amended Complaint against John H. Speer, Amegy Bank, N. A., Amegy Mortgage Company LLC, Michael Manners, Donnie Lou Speer, Vestalia, LLC, Hammersmith Group, LLC f/k/a Hammersmith Group, Inc., Park Lake Communities, L.P., Watermark Land, LLC, Watermark Land, LP, Watermark Tortuga, LLC, Allard Investment Company, L.L.C., MGM Motor Sports, L.L.C., George Kopecky, Saracen Holdings, L.P., Saracen Holdings GP, L.L.C., DWM Holdings, L.P., DWM Holdings GP, L.L.C., and West Harris County Municipal Utility District No. 11 (collectively the "Defendants") and would show the Court as follows:

## Table of Contents

I. Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
A. Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
B. Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
1. Amegy Defendant(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Exhibit B

2. Speer Related Defendants . . . . 6
3. Royce Related Entity Defendants . . . . 6
4. Manners Related Defendants . . . . 7
5. Kopecky Defendant(s) . . . . 8
6. West Harris County Municipal Utility District No. 11 . . . . 8

III. Factual Background . . . . 9
A. The Bankruptcy Case . . . . 9
B. General Overview of Facts . . . . 9
C. Royce Homes . . . . 13

IV. Relationship of Primary Individuals . . . . 14
A. Amegy . . . . 14
B. Hammersmith . . . . 14
C. Royce Homes . . . . 15
D. Manners . . . . 16

V. General Assertions/Facts . . . . 16

VI. Claims . . . . 17
A. Breach of Partnership Agreement . . . . 17
1. Amegy Principal Payments . . . . 21
2. Amegy Interest Payments . . . . 37
3. Payments to Manners . . . . 43
4. Other Speer Distributions/Payments . . . . 45
5. Damages for Breach of Partnership Agreement . . . . 47
B. Breach of Fiduciary Duty . . . . 48
1. Legal Analysis . . . . 48
2. Additional Facts Relating to Breach of Fiduciary Duty . . . . 53
3. Westwood Gardens Asset Stripping . . . . 68
4. Watermark Asset Stripping . . . . 74
5. Allard Investment Asset Stripping . . . . 77
6. Conclusion and Damages Relating to Breach of Fiduciary Duty . . . . 80
C. Civil Theft/Conversion/Money had and Received . . . . 88
D. Additional Facts Relating to
Breach of Fiduciary Duty, Actual Intent to Hinder, Delay, and Defraud
and Amegy/Manners Knowing Participation in the Breach . . . . 97
1. Elements of Conspiracy/Aiding and Abetting/Act in Concert . . . . 97
2. Avoiding Reporting the Buyout Obligations
on the Royce Balance Sheets . . . . 100
3. Amegy's Complicity . . . . 100
4. Manners's Complicity . . . . 102
5. Failure to Disclose . . . . 104
6. Misleading Financial Statements . . . . 106

    7. Speer's Conduct Hindered, Delayed and Defrauded Royce Homes Lenders . . . . 108
8. Speer's Conduct Constitutes a Knowing Breach of Fiduciary Duty. Amegy and Manners Aided and Abetted, Conspired and Acted in Concert with Speer. . . . . 109
E. Declaratory Judgment and Turnover Against Manners, Saracen, and DWM Holdings as Trustee for Senior Debt . . . . 109
F. Declaratory Judgment and Turnover Against Donnie Lou Speer as Trustee for Senior Debt . . . . 115
G. Fraudulent Transfers . . . . 117
1. Fraudulent Transfers Under 11 USC §548 . . . . 117
2. Fraudulent Transfers Under 11 USC §544 and/or Tex. Bus. Comm. C. §§24.005, 24.006 and 24.010(a) (TUFTA) . . . . 118
3. Fraudulent Transfers Under 11 USC §544 and/or 6 Del.C. §§1304, 1305 and 1309 (DUFTA) . . . . 121
4. Recovery of Avoided Transfers Under 11 U.S.C. §550 . . . . 123
5. Recovery of Avoided Transfers Under Tex. Bus. Comm. C. §24.009 . . . . 123
6. Recovery of Avoided Transfers Under 6 Del.C. § 1308 . . . . 124
7. TUFTA/DUFTA Creditor Requirement . . . . 124
8. Actual Intent to Hinder, Delay, and Defraud . . . . 124
9. Unreasonably Small Capital . . . . 130
10. Incurring Debts Beyond Royce Homes's Ability to Pay . . . . 135
11. Insolvency of Royce Homes and Park Lake . . . . 136
12. Speer was the Agent for Amegy with Respect to Dividends, Distributions and Other Amounts Paid . . . . 137
13. Fraudulent Transfers to Amegy . . . . 144
14. Fraudulent Transfer to Manners, Saracen and DWM Holdings . . . . 146
15. Fraudulent Transfers to Allard Investments . . . . 148
16. Fraudulent Transfers to MGM Motor Sports . . . . 149
17. Fraudulent Transfers to Speer Relating to the Amegy Transfers and Manners Transfers . . . . 151
18. Additional Fraudulent Transfers to Speer . . . . 152
19. Fraudulent Transfers to Kopecky . . . . 155
20. Fraudulent Transfer Relating to Manners's Salary . . . . 157
21. Fraudulent Transfer of Westwood Gardens . . . . 160
22. Fraudulent Transfers to and Breach of Fiduciary Duty by Donnie Lou Speer . . . . 162
23. Fraudulent Transfer of Speer Compound . . . . 167
H. Unjust Enrichment . . . . 170
I. Equitable Subordination of Amegy Liens . . . . 173
J. Constructive Trust/Equitable Lien . . . . 179
1. Tax Distributions . . . . 180
2. Westwood Gardens MUD Reimbursements . . . . 181
3. West Harris County Municipal Utility District No. 11 . . . . 181

Exhibit B

       4. Speer Compound . . . . . . . . . . 185
K. Suit on Debt against Park Lake . . . . . . . . . . 185
L. Hammersmith Liability Under 11 U.S.C. §723 . . . . . . . . . . 186

Prayer . . . . . . . . . . 186

Gathmann 2004 Examination Excerpts . . . . . . . . . . 196

Denison 2004 Examination Excerpts . . . . . . . . . . 290

Manners 2004 Examination Excerpts . . . . . . . . . . 419

Speer 2004 Examination Excerpts . . . . . . . . . . 463

Exhibit B

## I. Jurisdiction and Venue

1. The Trustee brings this adversary proceeding pursuant to Bankruptcy Rule 7001 and sections 542, 543, 544, 548 and 550 of title 11 of the United States Code, as amended (the "Bankruptcy Code") and various state and common law causes of action.

2. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

3. Venue lies in this district pursuant to 28 U.S.C. § 1409.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) (F) (K) and (O).

## II. Parties

### A. Plaintiff

5. The Plaintiff is Rodney Tow (hereinafter referred to as "Trustee", or "Plaintiff") is the duly authorized and acting chapter 7 trustee of the estate of Royce Homes, L.P. and may be served through counsel of record herein.

### B. Defendants

#### 1. Amegy Defendant(s)

6. Amegy Bank, N. A. ("Amegy N.A.") is a Texas State Financial Institution with its principal place of business in Texas. Amegy N.A. has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through its counsel of record.

7. Amegy Mortgage Company LLC ("Amegy Mortgage") is a Texas limited liability company. Amegy Mortgage has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through its counsel of record.

8. Amegy, N.A. and Amegy Mortgage are collectively referred to as Amegy.

Exhibit B

**2. Speer Related Defendants**

9. John H. Speer ("Speer") is an individual residing in the State of Texas. Speer has appeared in this case and will be served a copy of the Third Amended Complaint through his counsel of record.

10. Donnie Lou Speer ("Donnie Lou Speer") is an individual residing in the State of Texas. Donnie Lou Speer has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

11. Vestalia, LLC ("Vestalia") is a Texas limited liability company. Vestalia has appeared in this case and will be served a copy of the Third Amended Complaint through his counsel of record.

**3. Royce Related Entity Defendants**

12. Hammersmith Group, LLC f/k/a Hammersmith Group, Inc. ("Hammersmith") is a Delaware limited liability company. Hammersmith has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

13. Park Lake Communities, L.P. ("Park Lake") is a Texas limited partnership. Park Lake has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

14. Watermark Land, LLC ("Watermark LLC") is a Delaware limited liability company. Watermark LLC has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

15. Watermark Land, LP ("Watermark LP") is a Delaware limited partnership. Watermark LP may be cited to appear by mailing a copy of the summons and Third Amended Complaint

to its registered agent George Kopecky at 21408 Provincial Blvd, Katy, Texas 77450.

16. Watermark Tortuga, LLC ("Watermark Tortuga") is a Delaware limited liability company. Watermark Tortuga has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

**4. Manners Related Defendants**

17. Michael Manners ("Manners") is an individual residing in the state of Texas. Manners has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

18. Allard Investment Company, L.L.C. ("Allard") is a Texas limited liability company. Allard has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

19. DWM Holdings, L.P. ("DWM Holdings") is a Delaware Limited Partnership which is successor in interest to DWM Holdings, Inc., a Delaware Corporation and may be cited to appear by mailing a copy of the summons and Third Amended Complaint to its registered agent Wilmington Trust SP Services (Delaware), Inc., 1105 Market Street, Suite 1300, Wilmington, DE 19801.

20. DWM Holdings GP, L.L.C. ("DWM GP") is a Delaware Limited Liability Company and may be cited to appear by mailing a copy of the summons and Third Amended Complaint to its registered agent Wilmington Trust SP Services (Delaware), Inc., 1105 Market Street, Suite 1300, Wilmington, DE 19801.

21. DWM Holdings and DWM GP will be collectively referred to as DWM.

22. MGM Motor Sports, L.L.C. ("MGM Motor Sports") is a Texas limited liability company.

Exhibit B

MGM Motor Sports has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

23. Saracen Holdings, L.P. ("Saracen Holdings, L.P.") is a Delaware Limited Partnership. Saracen Holdings, L.P. has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

24. Saracen Holdings GP, L.L.C. ("Saracen Holdings GP") is a Delaware Limited Liability Company. Saracen Holdings GP has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

**5. Kopecky Defendant(s)**

25. George Kopecky ("Kopecky") is an individual residing in the State of Texas. Kopecky has appeared and filed an answer in this case and will be served a copy of the Third Amended Complaint through her counsel of record.

**6. West Harris County Municipal Utility District No. 11**

26. West Harris County Municipal Utility District No. 11 is a municipal utility district formed in the State of Texas and may be cited to appear by mailing a copy of the summons and Third Amended Complaint to Andrew C. Johnson, Jr., President, West Harris County Municipal Utility District No. 11, 10497 Town & Country Way, Suite 910, Houston, TX 77024.

## III. Factual Background

### A. The Bankruptcy Case

27.   On April 7, 2009 (the "Petition Date"), four of Royce Homes's creditors, Wisenbaker Builder Services, Inc., Suncoast Post Tension, Ltd., Builders Mechanical, Inc., and Luxury Baths by Arrow (collectively, the "Petitioning Creditors") filed a chapter 7 involuntary petition against Royce Homes. On April 30, 2009, the Court entered the Order for Relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

28.   Rodney D. Tow serves as the duly qualified and acting Chapter 7 trustee of the Debtors' estate (the "Estate").

### B. General Overview of Facts

29.   Royce Homes was engaged in the business of building and selling single family homes from its inception in 1994 until it ceased operations in August 2008.

30.   Royce Homes sold homes primarily in Houston but also operated through its subsidiaries and related entities in the construction and sale of homes in other locations such as Phoenix, Dallas, and Atlanta.

31.   At all times relevant to this Third Amended Complaint, John Speer was the president, chief executive officer, and key employee of Royce Homes as well as the president, sole director, and sole owner of Royce Homes's general partner, Hammersmith.  In these roles, Speer was an insider and exercised control over Royce Homes as well as its related entities.  Manners as the representative of one of the owners, and after the Buyout, as an employee, control person, and Chairman Emeritus, and Kopecky as an officer, were insiders and exercised

Exhibit B

control over Royce Homes as well as its related entities.

32. In early to mid 2006, Speer contemplated the buyout of his partner Michael Manners's fifty percent interest in Royce Homes and its related entities through what was to be a leveraged buyout. This would allow Speer to own one-hundred percent of Royce Homes as well as most of the other related entities.

33. The Buyout price for Manners's interest was approximately $33 million dollars.

34. Speer, Amegy and Manners knew most of the partnership equity reflected on Royce Homes's balance sheet would be lost if the debt for the leveraged Buyout was disclosed on its balance sheet.

35. Partnership equity levels are essential to a homebuilder such as Royce Homes because they are a number used to calculate the all important debt-to-equity ratios used by lenders to determine the amount of money to lend to a home builder.

36. Without adequate partnership equity and debt-to-equity ratios within the range required by a lender, a homebuilder such as Royce Homes would be unable to borrow the funds needed to operate its business.

37. Speer, Amegy and Manners went to great lengths to devise a scheme by which they could take money out of Royce Homes to fund the Buyout without having to reflect the loss of equity on the balance sheet of Royce Homes.

38. The final scheme was for the Buyout notes to be in Speer's name with the understanding that the payments on the notes would come from Royce Homes. Thus, on paper the obligation under the Buyout notes would appear to be personal to Speer and the debt would not be reflected as a debt on the balance sheet of Royce Homes. Further, additional steps were

taken, as set forth in greater detail below, to either delay disclosure of, or misrepresent the true financial condition of Royce Homes to its creditors.

39.     This scheme could not have been carried out without the knowledge and cooperation of Speer, Manners and Amegy.

40.     On September 20, 2006, two obligations were created to fund the Buyout:[1]

    a.     $20,000,000 loan from Speer to Amegy (the "Amegy Loan"); and

    b.     $13,342,405 note to Michael Manners (the "Manners Note")

41.     Neither the Amegy Loan nor the Manners Note was disclosed on the Royce Homes balance sheet.  Both the Amegy Loan and the Manners Note were paid by Royce Homes.[2]

42.     The scheme was that the equity lost from these payments would be replaced by profits and balance sheet manipulations so creditors would never see the effect of paying the Buyout obligations from Royce Homes. The profit portion of the scheme required a brisk housing market and tremendous profits to offset the loss of equity.  The balance sheet portion required manipulating the books to conceal loss of equity.

43.     Royce Homes's business centered almost exclusively in the sub-prime housing market.  By mid-2006, the sub-prime housing market began to steadily decline and by the end of 2006 it started to crash.

---

[1]The purchase price was $33,342,405 plus a loan fee of $236,386 with Manners receiving $18,578,686 of the $20 million borrowed from Amegy plus a promissory note in the amount of $13,342,405. Manners had previously received $1,421,314 from Royce Homes which was credited to the purchase price so Speer kept $1,421,314 of the $20 million Amegy loan.

[2]Speer, Manners and Amegy were instrumental in having Royce Homes improperly  i) make $15,000,000 in principal payments on Speer's personal Amegy loan, ii) make $1,507,500.00 in monthly interest payment disbursements on Speer's personal Amegy loan, and iii) made $3,085,100.00 in  monthly principal and interest disbursements, until June 2007, on Speer's note to Manners.

Exhibit B

44. Speer represented to Royce Homes's lenders that distributions to make the payments on the Amegy Loan:

a. would be made from same year profits;

b. would not reduce equity below $40 million; and

c. would not cause Royce Homes to violate the lenders' debt-to-equity covenants contained within their loan documents.

45. The Manners Note and his compensation package appear to not have been disclosed. On information and belief the Donnie Lou Speer Note was not disclosed either.

46. The above representations were material and required by lenders before they would consent to the Buyout.

47. The Royce Homes Partnership Agreement[3] protected the financial condition of Royce Homes. Specifically, it prohibited distributions from borrowed funds, required the preservation of working capital reserves, prohibited distributions if debt-to-equity ratios were violated, only allowed the use of partnership funds for partnership purposes, and imposed fiduciary duties.

48. Royce Homes calculated its equity levels and debt-to-equity ratios on a monthly basis. Speer knew the first principal payment under the Amegy Loan in January 2007 breached the Partnership Agreement, Speer's fiduciary duty, and Speer's representations to Royce Homes's lenders. Speer compounded the damage to Royce Homes by actually borrowing against its lines of credit so the borrowed funds could be disbursed to satisfy his personal

---

[3] The First Amended and Restated Agreement of Limited Partnership of Royce Homes, L.P. was adopted on July 1, 1998. (Partnership Agreement). It continues to be the Partnership Agreement for Royce Homes. See Exhibit "A".

Exhibit B

obligations to Amegy and Manners, further breaching its debt-to-equity ratios.

49. When it was apparent that Royce Homes was distressed, Speer, Manners and Kopecky imprudently distributed approximately $39 million to themselves, their families, and their associates. In August 2008, Speer shut down Royce Homes leaving in excess of $41 million in creditor claims in this Estate.

50. After shutting the doors Speer continued, with the active participation of Amegy Bank, to take millions of dollars in equity that should have come to Royce Homes and its legitimate creditors and transferred the equity to a new home building company set up by Speer. Amegy and Speer benefitted financially from the transaction to the detriment of Royce Homes's creditors.

51. On April 7, 2009 an involuntary petition was filed against Royce Homes.

52. The Trustee seeks to recover the ill-gotten gains from all the offending parties through the causes of action set forth below.

**C. Royce Homes**

53. Royce Homes L.P. is a Delaware Limited Partnership formed on June 30, 1998.

54. It is Foreign Limited Partnership in Texas authorized to do business in Texas since July 8, 1998.

55. The general partner for Royce Homes, LP is Hammersmith Group, Inc. which was converted to Hammersmith Group, LLC in late 2008.

## IV. Relationship of Primary Individuals

### A. Amegy

56. Chris Denison–Amegy officer for the Royce Homes loan.

57. Paul Murphy–CEO of Amegy during the inception of the Royce Homes loan.

58. Dale Andreas–Amegy Executive.

59. Anna Mayer of Nathan Sommers–Amegy Attorney.

60. Ann Jacobs of Nathan Sommers–Amegy Attorney.

### B. Hammersmith

61. John Speer - President.

62. George Kopecky - Vice President.

63. Shonna Speer - Senior Vice President.

64. Shawn Speer - Division President.

65. James Hunter - Executive Vice President.

66. Bill Gathmann - Chief Financial Officer.

67. Sheryl Miesel - Vice President.

68. Stacy Modlin - Vice President.

69. Shay Shafie - Vice President.

70. Betty Woodruff - Vice President/Secretary/Treasurer.

71. John Zunker - Division President.

72. Rosalinda Nowak - Controller.

73. Murrah Mayberry - Controller.

74. Margaret Itzel - Assistant Secretary.

75. Kathy Kramer - Assistant Secretary.

**C. Royce Homes**

76. John Speer-President.

77. Michael Manners–Chairman Emeritus.

78. Donnie Lou Speer–Manager, Ex-wife of John Speer.

79. George Kopecky–officer of Royce Homes and Texas Colonial Homes.

80. Shonna Speer - Senior Vice President.

81. Shawn Speer - Division President.

82. James Hunter–Executive Vice President and Chief Operating Officer.

83. Jim Oyer–Chief Financial Officer of Royce Homes until June 30, 2006.

84. William Gathmann–Chief Financial Officer of Royce Homes October 2006 to June 2006.

85. Stacy Modlin - Vice President.

86. Pamela Mitchell aka Pamela Tyler - Director of Corporate Finance.

87. Betty Woodruff–Vice President/Secretary/Treasurer.

88. John Zunker–Division President.

89. Rosalinda Nowak - Controller.

90. Murrah Mayberry - Controller.

91. Kathy Kramer - Assistant Secretary.

92. John Ransom of Porter & Hedges–Attorney for Royce Homes and John Speer.

93. Sid Andrews of PricewaterHouse–Accountant for Royce Homes.

94. Joyce Soliman of Porter & Hedges–Attorney for Royce Homes.

### D. Manners

95. Michael Manners–former owner of Royce Homes.

96. Saracen Holdings, L.P.–company owned by Michael Manners.[4]

97. Saracen Holdings GP–company owned by Michael Manners.

98. DWM Holdings–company owned by Michael Manners and former limited partner of Royce Homes.

99. Allard Investments–company owned and created by Michael Manners for the purchase of homes from Royce Homes.

100. MGM Motorsports–a race car company of Michael Manners.

### V. General Assertions/Facts

101. All conditions precedent to recovery under all claims in this Third Amended Complaint have been met or performed by the Trustee.

102. All factual allegations stated in this Third Amended Complaint are adopted and incorporated as if fully set forth at length with respect to each claim.

103. When examining the substance of the transfer of funds from Royce Homes alleged throughout this Third Amended Complaint, it is clear that what may appear to be multiple transactions are really one transaction and the step transaction employed was merely a facade.[5]

---

[4] Saracen Holdings, L.P. and Saracen Holdings GP will be collectively referred to as "Saracen."

[5] In re Yazoo Pipeline Co., L.P., 08-38121, 2011 WL 1118467 (Bankr. S.D. Tex. Mar. 24, 2011). The step transaction doctrine, which is most commonly associated with tax cases but is also applicable in bankruptcy proceedings, provides that "multistep transactions can be collapsed when the steps of the transaction are 'part of one integrated transaction. Under the step-transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step for no other purpose than to avoid U.S. taxes. Courts must consider the substance over the form of the transactions at issue in

104. Speer, Manners, Kopecky, and Donnie Lou Speer were fiduciaries to Royce Homes at all times relevant to the claims asserted in this Third Amended Complaint.

## VI. Claims

### A. Breach of Partnership Agreement

105. The Trustee files this claim against Hammersmith Group, Inc., and Hammersmith Group, LLC ("Breach of Partnership Defendants").

106. With respect to every claim asserted in this Third Amended Complaint, the Breach of Partnership Defendants acted in bad faith.

107. A partnership may maintain an action against a partner for a breach of the partnership agreement, or for the violation of a duty to the partnership, causing harm to the partnership.[6]

108. The commencement of a [bankruptcy case] creates an estate. Such estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case.[7]

109. Under Delaware law, Royce Homes may maintain an action for breach of its partnership agreement. That claim becomes an asset of the bankruptcy estate once a bankruptcy is filed.

110. The Royce Homes Partnership Agreement (hereinafter referred to as Partnership Agreement):[8]

a. prohibits distributions made from loans to Royce Homes;

---

determining whether to treat what appear to be multiple transactions as one. Courts must consider the substance over the form of the transactions at issue in determining whether to treat what appear to be multiple transactions as one. Although taxpayers 'are entitled to structure their transactions in such a way as to minimize tax,' there must be a purpose for the 'business activity ... other than tax avoidance' and that purpose cannot be a 'facade. (Citing other cases).

[6] Del. Code Ann. tit. 6, § 15-405(a).

[7] 11 U.S.C.A. § 541 (a)(1) (Excerpted)

[8] Exhibit A–First Amended and Restated Agreement of Limited Partnership of Royce Homes, L.P.

b. requires distributions leave sufficient working capital reserve, including "amounts required to ensure full compliance with the terms of all loan covenants and agreements of [Royce Homes];"[9]

c. requires the General Partner to act consistently with its fiduciary responsibility for the safekeeping and use of all Partnership Property; and

d. limits the General Partner to expending the Partnership's capital and revenues in furtherance of the business of the Partnership.

111. The Partnership Agreement restricts Distributions[10] and Tax Distributions[11] such that they may only be paid from Available Cash.

112. Section 4.7, titled "Distributions," states in relevant part:

*Except as otherwise provided in Section 9.4 hereof, **distributions of Available Cash** shall be made as follows:*

> *(C ) Third, in the General Partner's sole discretion, to the extent there remains any **Available Cash**, it may be distributed to the Partners in proportion to their Partnership Interests." The General Partner has the authority to retain any amount of funds it deems advisable, in its sole discretion, in order to develop and expand the business of the Partnership. (Emphasis added).*

113. Tax Distributions are similarly limited to being paid from Available Cash. Section 4.8, titled "Tax Distributions" states in relevant part:

> *no later than (I) fifteen (15) days after the end of each period for which an individual estimated federal income tax payment is due, and (ii) one hundred twenty (120) days after the end of each Fiscal Year, the Partnership shall make a cash distribution from **Available Cash** to the Partners in accordance with their interests in the*

---

[9]Excerpted from Exhibit A, First Amended and Restated Agreement of Limited Partnership of Royce Homes, L.P., Section 1.1(f), *Available Cash*

[10]Section 4.7 of the Partnership Agreement.

[11]Section 4.8 of the Partnership Agreement

*smallest amount necessary so that the aggregate amount of distributions each Partner has received under this Agreement equals such Partner's Hypothetical Tax Amount."*[12] *(Emphasis added).*

114. Available Cash is defined in Section 1.1(f) of the Partnership Agreement. It states:

*'Available Cash' means all cash funds of the Partnership on hand from time to time (**other than** cash funds obtained as contributions to the capital of the Partnership by the Partners and **cash funds obtained from loans to the Partnership**) after (i) payment of all operating expenses of the Partnership as of such time, and (ii) **provision for a working capital reserve in an amount to be determined by the General Partner, including amounts required to ensure full compliance with the terms of all loan covenants and agreements of the Partnership**. (Emphasis added).*

115. The Partnership Agreement restricts the use of borrowed funds to a Partnership purpose. Section 3.4(a) states in relevant part:

***The proceeds of Partnership loans may be used for any Partnership purpose**, including, but not limited to, the payment of the costs related to partnership expenses or to refinance Partnership indebtedness. (Emphasis added).*

116. The Partnership Agreement describes the rights and duties of the General Partner in Article 5. Section 5.1(a) provides in relevant part:

*Except as otherwise provided in this Agreement but **consistent with the General Partner's fiduciary responsibility for the safekeeping and use of all Partnership Property**, the General Partner shall have the full and exclusive power and authority on behalf of the Partnership ....**to expend the Partnership's capital and revenues in furtherance of the business of the Partnership**. (Emphasis added).*

117. The Partnership Agreement is clear. Royce Homes could not make Distributions or Tax Distributions except from Available Cash. When distributions were made from borrowed funds, they were not made from Available Cash. When distributions were made without leaving a working capital reserve in an amount required to ensure full compliance with the

[12] The Tax Distribution is limited to the amount of tax due from the distributions of the partnership and does not include a tax due for other income of the partner.

Case 4:11-cv-03700 Document 71 Filed in TXSD on 08/22/12 Page 20 of 606

terms of all loan covenants and agreements of the Partnership, they were not made from Available Cash.

118. Proceeds from Partnership loans could only be used for Partnership purposes. The General Partner of Royce Homes was required to act consistently with its fiduciary duties and, except as allowed by the Partnership Agreement, could only expend the Partnership's capital and revenues in furtherance of the business of the Partnership.

119. At all times relevant to this Third Amended Complaint, the Breach of Partnership Defendants controlled Royce Homes and its General Partner, Hammersmith. The Breach of Partnership Defendants had a fiduciary duty to Royce Homes and Hammersmith. The Breach of Partnership Defendants breached the Partnership Agreement with respect to each of the preceding provisions.

120. The Breach of Partnership Defendants breached the Partnership Agreement when they made, or allowed to be made, the distributions for the Amegy principal payments of $10 million, $2.5 million, and another $2.5 million from January 2007 through January 2008. The Breach of Partnership Defendants breached the Partnership Agreement when they made, or allowed to be made, the distributions to make the Amegy interest payments beginning September 30, 2006 through the filing of this bankruptcy. The Breach of Partnership Defendants breached the Partnership Agreement in making, or allowing to be made, the payments to Manners beginning October 2, 2006 through the filing of this bankruptcy and the Allard and MGM transfers as alleged within the Complaint. Also, see all of the transfers set out in this Amended Complaint which are specifically detailed with dates, amounts, and other information supporting the allegations which were made in violation of the Partnership

Agreement.

**1. Amegy Principal Payments**

121. The $10 million Amegy payment in January 2007 was made from draws on the Royce Homes lines of credit. The distribution caused the debt-to-equity ratios to increase to a point where the leverage covenants of the loan agreements with Royce Homes's lenders were breached. The July 2007 $2.5 million payment was made from loaned funds at a time when the leverage ratios were already breached. The January 2008 payment was effectively made from borrowed funds, was made at a time when the Royce Homes lenders' leverage ratios were breached, and at a time when Royce Homes was not paying its debts as they became due.

122. Using the proceeds of Royce Homes loans to make distributions to Speer was not a use for partnership purposes and no exception exists in the Partnership Agreement for using loan proceeds to make distributions. The Breach of Partnership Defendants caused Royce Homes to borrow funds and pledged Royce Homes's assets in order to make these distributions to himself so he could pay his personal obligation to Amegy Bank.

123. Beginning with the $10 million distribution every distribution breached the loan covenants of Royce Homes's lenders regardless of whether the distribution was a Tax Distribution or a distribution to pay Speer, Manners, Kopecky or Amegy.

124. The Royce Homes emails, the Gathmann testimony, and the Royce Homes records present clear evidence the $10 million payment was made from borrowed funds.

125. On December 29, 2006, Speer submitted a wire request, with his "Commercial Loan Payment Coupon" attached, to Royce Homes's accounting department for the payment of

Exhibit B

the $10,000,000.00 principal installment on his personal loan with Amegy Bank. The following series of emails confirmed the use of Royce Homes's loans to make the distributions:

a. Friday, December 29, 2006 10:13 AM

*From: Bill Gathmann*
*To: Betty Woodruff; Rosalinda Nowak; Pamela Tyler*
*Cc: John Speer; James Hunter*

*Subject: $10 million distribution*

*Betty/Rosalinda,*

*Just to give you a reminder, the company needs to make a distribution to John Speer next week for about $10.2 mm related to the buyout of MGM.*[13] *Unless John suggests something different in response to this email, I suggest that we schedule the payment for Wednesday. Please start to give consideration to which bank lines you will need to draw on in order to make the payment. I will have Pamela determine the exact amount of the P&I that will need to be paid.*

*Please confirm by Tuesday morning that everything is ready to proceed on this.*

*Bill*
*William D. Gathmann*
*Chief Financial Officer*
*Royce Builders*
*7850 N. Sam Houston Parkway West*
*Houston, Texas 77064*
*(0) 281-569-1600*
*bgathmann@roycebuilders.com*

b. Friday, December 29, 2006 10:32 AM

*From: John Speer*
*To: Bill Gathmann*
*Cc: James Hunter*

*Subject: RE: $10 million distribution*

[13] MGM is a reference to Michael Manners.

Exhibit B

*Bill*

*I have given a copy of the P&I billing from Amegy----------I would like to send a check by runner to Amegy on Wednesday which means that I will have to have the funds wired into my account prior to them receiving my check*

*Thanks*
*John*

c.     Friday, December 29, 2006 10:43 AM

*From: Pamela Tyler*
*To: Bill Gathmann; Betty Woodruff; Rosalinda Nowak*
*Cc: John Speer; James Hunter*

*Subject: RE: $10 million distribution*

*Exact amount per invoice is $10,159,305.56: $10 million principal and $159,305.56 interest.*

*Wire request w/invoice for the partner distribution is ready for signature.*

*P*

d.     Friday, December 29, 2006 10:54 AM

*From: Bill Gathmann*
*To: John Speer*
*Cc: James Hunter*

*Subject: RE: $10 million distribution*

*ok. I will have them draw down the funds on Tuesday to make sure there are no snags. What is the amount that we need to distribute to you? Is $10.150 mm a good number to use?*

*William D. Gathmann*
*Chief Financial Officer*
*Royce Builders*
*7850 N. Sam Houston Parkway West*
*Houston, Texas 77064*
*(0) 281-569-1600*
*bgathmann@roycebuilders.com*

Third Amended Complaint                                                    Page 23
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd            Back to Table of Contents

Exhibit B

e.     Friday, December 29, 2006 10:56 AM

*From: Bill Gathmann*
*To: Betty Woodruff; Rosalinda Nowak*
*Cc: Pamela Tyler*

*Subject: FW: $10 million distribution*

*Betty/Rosalinda,*

*John wants to have the funds wire to his bank account the first think on Wednesday morning, so we should probably do the draw on Tuesday morning. Figure the you need about $10,150,000.*

*William D. Gathmann*
*Chief Financial Officer*
*Royce Builders*
*7850 N. Sam Houston Parkway West*
*Houston, Texas 77064*
*(0) 281-569-1600*
*bgathmann@roycebuilders.com*

f.     Friday, December 29, 2006 11 :56 AM

*From: Rosalinda Nowak*
*To: Bill Gathmann; Betty Woodruff*
*Cc: Pamela Tyler*

*Subject: RE: $10 million distribution*

*OK*

126.   The draw occurred on January 3, 2007 and Speer's check cleared to Amegy on January 4, 2007. The following email was received from Amegy.

a.     Friday, January 05, 2007 11:06 AM

*From: Natalie.Rodriguez@amegymortgage.com*
*[mailto:Natalie.Rodriguez@amegymortgage.com]*
*To: Nancy Boothe*
*Subject: John H. Speer*

*Please be advised Amegy Bank received your payments the amount of*

Exhibit B

*$10,159,305.56 and were credited Thank you for the opportunity to serve you at Amegy Bank.*

*Best Regards,*

*Natalie Rodriguez*
*Assistant to Chris Denison*
*Natalie Rodriguez*
*Amegy Mortgage Company*
*4576 Research Forest Dr.*
*The Woodlands, TX 77381*
*Phone: 281 297 7868*
*Fax: 281 297 7804*
*Email: natalie.rodriguez@amegymortgage.com*

127. Statements from the Royce Homes LP–Loan Account show draws on the Royce Homes secured lines of credit:

a. "Royce Homes LP-- Loan Account" account number 0000061174, statement date November 30, 2006 to December 29, 2006:

| **Date** | **Amount** | **Description** |
|---|---|---|
| 12/29 | 832,991.16 | WIRE/IN-200636303042;ORG LOANS IN PROCESS;OBI ROYCE HOMES 0571305004243 |
| 12/29 | 618,819.66 | WIRE/IN-200636304600;ORG GUARANTY BANK;OBI ROYCE HOMES LP AT |
| 12/29 | 625,358.80 | WIRE/IN-200636304709;ORG ROYCE HOMES 1305006421 |
| 12/29 | 406,595.35 | WIRE/IN-200636304176;ORG TEXAS RESIDENTIAL REAL ESTATE;OBI C1305005705 |

Exhibit B

b. "Royce Homes LP-- Loan Account" account number 0000061174, statement date December 30, 2006 to January 31, 2007:

| Date | Amount | Description |
|---|---|---|
| 01/02 | 1,893,017.23 | WIRE/IN-200700201282;ORG KEYBANK HOME BUILDER SERVICES;OBI C1306401777 |
| 01/02 | 1,193,949.29 | WIRE/IN-200700201651;ORG DAL483-TCB LOAN OPERATIONS;OBI ROYC 1306402249 |
| 01/02 | 913,808.48 | WIRE/IN-200700202453;ORG RBCC BANK/BUILDER FINANCE;OBI ROYCE1306403253 |
| 01/02 | 750,000.00 | PC BOOK XFER FROM DDA '"0168 ID: 20131 2308308754 |
| 01/02 | 515,013.62 | WIRE/IN-200700203499;ORG 90556;OBI ROYCE HOMES LP7850 NORTH 1306404563 |
| 01/02 | 300,000.00 | TELLER XFER FROM DDA '"6984 ID: 000000952 2308309988 |
| 01/02 | 200,000.00 | PC BOOK XFER FROM DDA PARK LAKE CO ID: 20130 2308308724 |
| 01/03 | 2,000,000.00 | WIRE/IN-200700301330;ORG CLA BIRMINGHAM FT SETTLEMENT;OBI CO 1304401743 |
| 01/03 | 115,940.96 | WIRE/IN-2007'Q0302286;ORG CLA BIRMINGHAM FT SETTLEMENT;OBI CO 1304402913 |

128. These loans total $10,365,512.55.

Exhibit B

129. The December 30, 2006 to January 31, 2007 statement from the Royce Homes LP–Loan Account shows the following wire transfer to Speer:

| Date | Amount | Description |
|---|---|---|
| 01/03 | 10,000,000.00 | WIRE/OUT-200700301381:BNF JOHN SPEER 1304401810 |

130. William D. Gathmann, the former Chief Financial Officer for Royce Homes LP, testified that the specific entries in the two bank statements referred to in Paragraph 127 show the credit lines Royce Homes used to make the $10 million Amegy payment distribution (Gathmann Excerpt 1) and that in order to make the distribution Royce Homes had to draw on its lines of credit. (Gathmann Excerpt 2).

131. The corresponding entry on John Speer's personal Amegy bank statement dated December 15, 2006 to January 16, 2007 reflects the wire of funds from Royce Home LP to Speer as follows:

| Date | Amount | Description |
|---|---|---|
| 01/03 | 10,000,000.00 | WIRE/IN-200700301436:ORG ROYCE HOME LP 1304401879 |

132. Speer then issued a check, backdated to December 29, 2006, payable to Amegy Bank for the payment of his personal obligation.

133. Amegy processed the check on January 4, 2007.

134. The January 2007 payment caused Royce Homes's loan covenants to be breached. After that payment, all distributions breached one or more of the Royce Homes lenders' loan covenants, including debt-to-equity ratios.

135. Royce Homes's calculations showed the debt-to-equity ratios were breached on and after the

$10 million payment was made. On May 24, 2007, Pamela Mitchell sent a spreadsheet to Gathmann showing debt-to-equity loan covenant violations beginning January 2007. (Gathmann Excerpt 4). The spreadsheet showed:

a. January 31, 2007 ten out of fifteen Royce Homes lenders' debt-to-equity ratios failed.

b. February 28, 2007 ten out of fifteen Royce Homes lenders' debt-to-equity ratios failed.

c. March 31, 2007 six out of fifteen Royce Homes lenders' debt-to-equity ratios failed.

d. April 30, 2007 ten out of fifteen Royce Homes lenders' debt-to-equity ratios failed.

136. Gathmann stated the unaudited financial statements prepared by Royce Homes overstated the equity by about $10 million. He further testified that, had the correct equity number been used, the debt-to-equity calculations in Paragraph 135 would have been worse. (Gathmann Excerpt 48).

137. Gathmann acknowledged in his 2004 examination that the Amegy payment distribution caused the covenant test failure, *e.g.* the breach of the leverage ratios. (Gathmann Excerpt 3) and that after the distribution there were not sufficient capital reserves to comply with the Royce Homes loan covenants with all the Royce Homes lenders. (Gathmann Excerpt 4).

138. The $10 million payment breached the Partnership Agreement because it was made with funds borrowed from Royce Homes loans, it breached Royce Homes's loan covenants, it was not for Partnership purposes, it was not consistent with the General Partner's fiduciary responsibility for the safekeeping and use of all Partnership Property, and it was not made in furtherance of the business of the Partnership.

139. The first $2.5 million Amegy principal payment occurred July 2007. Gathmann testified

Royce Homes was required to borrow money in order to make this payment. (Gathmann

Excerpt 2).  On May 11, 2007 Gathmann sent Speer and James Hunter, the Royce Homes

Chief Operating Officer, an email attaching a powerpoint presentation.

*Friday, May 11, 2007 11:13 AM*

*From: Bill Gathmann*
*To: John Speer; James Hunter*

*Subject: Bank Covenant Review*

*john,*

*Attached is a draft of a brief PowerPoint presentation to use in our review with the banks to discuss our financial covenants and a request for waivers/amendments to the loan agreements. In particular, please provide me with any comments you might have on the slide where we propose the various waivers and/or amendments to the loan documents. We should be sending out the March financial statements next week and then we should plan to start discussions with the banks shortly thereafter.*

*One thing to consider is how we meet with the banks. Possibly we should just reserve a conference room at a nearby hotel and have our discussion over lunch with all of them at one time.*

*William D. Gathmann*
*Chief Financial Officer*
*Royce Builders*
*7850 N. Sam Houston Parkway West*
*Houston, Texas 77064*
*(0) 28t -569- 1600*
*bgathmann@roycebuilders,com*

140.    The attachment was titled "Bank Review 2007 Financial Covenants, Royce Homes &

Related Entities May 2007" and it referred to the "1st Quarter 2007 Results." It stated, "For

some banks, leverage ratio covenant and spec ratio covenant are not in compliance."

141.    Gathmann testified he was preparing this presentation in anticipation of the upcoming

financial disclosures which would be the first financial disclosures since the December 2006

Exhibit B

reports.[14] The upcoming statements would show the loan covenants had been breached. (Gathmann Excerpt 5).

142. This presentation was never presented to the Royce Homes lenders.

143. Gathmann recreated the PowerPoint presentation in June 2007. As with the May 2007 presentation, this one was never seen by a Royce Homes lender. Instead, it was sent to Amegy, Speer's lender, on September 11, 2007.

144. The presentation was titled, "Bank Review 2007 Projected Performance, Royce Consolidated Entities, June 2007." It listed an updated "1st Quarter 2007 Results":

• ***Highlights***

*Increased levels of bust outs due mainly to sub-prime issues*

*Closings, margins and profits lower then expected*

*$12.5 million distributions for partner buyout loan repayment*

• ***Consequences***

*Company responded by reducing overhead by over $13 mm per year annualized and reducing new spec home starts*

*Company initiated Action Plan to align company with current market conditions*

145. The June 2007 changes from the May 2007 "Highlights" clarified that the bustouts were due mainly to sub-prime issues. It increased the $10 million distribution disclosure to $12.5 million to accommodate the Amegy $2.5 million principal payment due June 30, 2007.

146. Speer recognized making the payment caused a problem for Royce Homes and sought permission from Amegy to not make the July 2007 principal payment but, Amegy insisted

[14] It is important to note that the December 2006 financial disclosures did not show the January 2007 $10 million distribution.

the payment be made. Despite the fact that Royce Homes was continuously breaching its debt-to-equity ratios with its lenders, Speer made the $2.5 million principal payment on July 2, 2007.

147. An email from Amegy to Speer explains:

*From: Chris.Denison@amegymortgage.com [mailto:Chris.Denison@amegymortgage.com]*
*Sent: Fri 6/8/2007 11:15 AM*
*To: John Speer*

*Subject: Modification*

*John--*
*I'm running the traps on your modification request. I think that I can make a better case after the next payment comes in and after we see mid-year numbers.*

*How does that sound? We want to accommodate you, but I'm thinking through the best way to approach committee.*

*Please let me know your thoughts.*

*Thanks!*
*Chris*

---

*Chris Denison*
*chris.denison@amegymortgage.com*
*Amegy Mortgage*

148. The importance of this denial was not lost on Speer or Gathmann:

*From: John Speer*
*Sent: Friday, June 08, 2007 2:02 PM*
*To: Bill Gathmann*

*Subject: FW: Modification*

*I obviously need to talk to them some more*

Exhibit B

*From: Bill Gathmann*
*Sent: Friday, June 08, 2007 2:15 PM*
*To: John Speer*
*Subject: RE: Modification*

*sounds like it. Maybe go a little higher up in the organization.*

*William D. Gathmann*
*Chief Financial Officer*
*Royce Builders*
*7850 N. Sam Houston Parkway West*
*Houston, Texas 77064*
*(o) 281-569-1600*
*bgathmann@roycebuilders.com*

149. Speer and Denison then exchanged the following emails:

*"John Speer" <jspeer@roycebuilders.com>*
*To Chris.Denison@amegymortgage.com*
*06/11/2007 03:33 PM*
*Subject RE: Modification*

*Chris*

*Did you get push back from Joe or Paul or is this just what you are thinking?*

*If it is something that is doable I would like to get it resolved sooner rather than later.*

*How about this:*

*We agree to a modification that provides:*

*Make the upcoming next payment on time*

*Push the following payment back to the end of December and the final payment at the end of June 2008*

*Release the hold on the $2,000,000 plus for the letter of credit*

*Please give me an idea of what you are thinking*

*Thanks*

*John*

Exhibit B

*From: Chris.Denison@amegymortgage.com [mailto:Chris.Denison@amegymortgage.com]*
*Sent: Wednesday, June 13, 2007 3:56 PM*
*To: John Speer*
*Subject: RE: Modification*

*Mainly from Joe, but he has a very good pulse on the thinking of committee. We want to reiterate how important you are as a client, but are concerned about going back to the well so soon.*

*We have gone to committee with two fairly aggressive requests regarding the buyout financing and the letter of credit facility which is partially unsecured. In addition, shortly before closing we went back with a request to modify the principal reductions which was also approved. We were happy to step up with these aggressive structures that are untypical for many lenders (including us) and hope that you value our efforts and response.*

*There will be a point where we can go back to committee, but I'd like to do it later in the year (maybe after the summer sales are in) so we send the right message to committee and after we have seen (1) the reduction in the letter of credit facility and (2) the June paydown on your loan. Note that the cash security requirement reduces in step with the amount of the letter of credit.*

*I hope that this makes sense and look forward to your response.*

*Thanks*
*Chris*

---

*Chris Denison*
*chris.denison@amegymortgage.com*
*Amegy Mortgage*

150. Like the $10 million payment in January 2007, the $2.5 million payment in July 2007 was made using funds borrowed from Royce Homes lenders.

151. Below are excerpts from the Amegy Bank account entitled "Royce Homes, LP - Loan Account" Account Number 0000061174, Statement date May 31, 2007 to June 29, 2007:

| **Date** | **Amount** | **Description** |
|---|---|---|
| 06/25(07) | 358,365.52 | WIRE/IN-200717602080; ORG FIRST BANK-LOAN SERVICES; OBI ATTN 1304402983 |

Exhibit B

| | | |
|---|---|---|
| 06/26(07) | 550,000.00 | WIRE/IN-200717700950; ORG CITIBANK TEXAS NA; OBI ROYCE HOMES L 1307501387 |
| 06/27(07) | 660,000.00 | WIRE/IN-200717801621; ORG CITIBANK TEXAS NA; OBI CUSTOMER NAME 1304803597 |
| 06/29(07) | 1,099,425.50 | WIRE/IN-200718002398; ORG GUARANTY BANK; OBI ROYCE HOMES LP AT 1305503455 |

152. These draws on the Royce Homes loans total $2,667,791.02.

153. Speer had the funds wired to his account. Below are excerpts from the Amegy Bank account entitled "Royce Homes, LP - Loan Account" Account Number 0000061174, Statement date June 29, 2007 to July 31, 2007:

| **Date** | **Amount** | **Description** |
|---|---|---|
| 07/02(07) | 2,557,083.33 | WIRE/OUT-200718302299; BNF JOHN SPEER; OBI NOTE PAYMENT + INTEREST 1306003264 |

154. The corresponding entry on John Speer's personal Amegy bank statement dated June 15, 2007 to July 16, 2007 reflects the wire of funds from Royce Home LP to Speer as follows:

| **Date** | **Amount** | **Description** |
|---|---|---|
| 07/02 | 2,557,083.33 | WIRE/IN-200718302301:ORG ROYCE HOME LP: OBI NOTE PAYMENT + I 1306003267 |

155. Speer then made the July 2007 $2.5 million Amegy principal payment using funds of Royce Homes. Speer made the principal payment to Amegy in the amount of $2,500,000 by check number 2611 from the same account into which it was wired.

156. Gathmann testified these entries show this Amegy payment distribution was made from funds borrowed from Royce Homes lenders. (Gathmann Excerpt 6).

157.    The July 2007 $2.5 million payment breached the Partnership Agreement because it was made with funds borrowed from Royce Homes's loans, it was made at a time when the Royce Homes loan covenants were breached, it was not consistent with the Breach of Partnership Defendants's fiduciary responsibility for the safekeeping and use of all Partnership Property, and it was not made in furtherance of the business of the Partnership.

158.    Conditions at Royce Homes continued to deteriorate but in September 2007 another $2.5 million payment was due on Speer's personal Amegy loan. Speer requested and, this time, received, a reprieve from making the September payment. The Loan Agreement with Amegy was modified, making the September 2007 payment due on December 31, 2007 and a final principal payment due on June 30, 2008.

159.    In early September 2007, the Royce Homes auditors were trying to release the audited financial statements but needed Royce Homes to go to its lenders to seek a waiver of the breach of the debt-to-equity ratios. Some Royce Homes lenders provided the waivers or modified the loan covenants, temporarily, to accommodate the auditors' request. Though some lenders had granted temporary modifications, Royce Homes was not able to comply with the modified debt-to-equity ratios.

160.    Financial conditions continued to deteriorate. Speer knew Royce Homes would not have the funds to make his December 31, 2007 $2.5 million payment on his personal note with Amegy so he created a new financing arrangement. Speer created a new company, RH Model Homes 2007, Inc. to "purchase" model homes from Royce Homes. The purchases were financed by one of the Royce Homes lenders, RBC Bank. Based on information and belief, Royce Homes was a guarantor on the loan.   The transfer of the houses from Royce

Exhibit B

Homes to RH Model Homes was subsidized by funds from First Duval, another Speer company and the parent company to Royce Homes, and funds from the Speer Children's Trust, a co-owner of First Duval, along with Speer. In all, a net $2.8 million in proceeds were realized by Royce Homes at the closing on December 27, 2007.

161. By the end of December 2007, Royce Homes's debt-to-equity modifications had expired and Royce Homes was, once again, clearly breaching its loan covenants with it lenders. Speer was unyielding. He paid the Amegy principal payment of $2.5 million on January 4, 2008 using funds from Royce Homes.

162. Speer had the funds wired to his account from Royce Homes. Below are excerpts from the Amegy Bank account entitled "Royce Homes, LP - Loan Account" Account Number 0000061174, Statement date December 31, 2007 to January 31, 2008:

| **Date** | **Amount** | **Description** |
|---|---|---|
| 01/04(08) | 2,553,854.17 | WIRE/OUT-200800400691; BNF JOHN SPEER; 13044300970 |

163. The corresponding entry on John Speer's personal Amegy bank statement dated December 14, 2007 to January 16, 2008 reflects the wire of funds from Royce Home LP to Speer as follows:

| **Date** | **Amount** | **Description** |
|---|---|---|
| 01/04 | 2,553,854.17 | WIRE/IN-200800400697:ORG ROYCE HOME LP 1304300977 |

164. Speer then made the principal payment to Amegy in the amount of $2,500,000 by check number 3033 from the same account into which it was wired.

165. The January 2008 $2.5 million payment breached the Partnership Agreement because it was

Exhibit B

made, effectively, with funds borrowed from Royce Homes loans, it did not preserve adequate working capital reserves, it was made at a time when the Royce Homes's loan covenants were breached, it was not for Partnership purposes, it was not consistent with the Breach of Partnership Defendants' fiduciary responsibilities for the safekeeping and use of all Partnership Property, and it was not made in furtherance of the business of the Partnership.

166. All distributions to make the $12.5 million in principal payments to Amegy bank during the final eighteen months of Royce Homes were made in breach of the Partnership Agreement.

167. The Breach of Partnership Defendants are jointly and severally liable to the Trustee for $12.5 million for breaching the Partnership Agreement with respect to principal payments relating to Speer's personal obligation to Amegy.

**2. Amegy Interest Payments**

168. In addition to the $12.5 million in principal payments paid in breach of the Partnership Agreement, the Breach of Partnership Defendants caused or allowed Royce Homes to pay approximately $1.5 million in interest payments for Speer's personal loan at Amegy Bank.

169. Between October 2, 2006 and June 30, 2008 the Breach of Partnership Defendants caused or allowed Royce Homes to pay Speer's monthly interest payments on his personal loan with Amegy Bank in the total amount of $1,507,500.00.

170. The Amegy interest payments were booked in the Royce Homes ledgers as an expense of Royce Homes on the dates and in the amounts set out below.

| | | |
|---|---|---|
| 20061002 | $ | 46,250.00 |
| 20061030 | $ | 159,305.56 |
| 20061127 | $ | 154,166.66 |
| 20061227 | $ | 159,305.56 |

Exhibit B

| | | |
|---|---|---|
| 20070125 | $ | 87,361.11 |
| 20070221 | $ | 71,944.44 |
| 20070402 | $ | 79,652.78 |
| 20070425 | $ | 77,083.33 |
| 20070529 | $ | 79,652.78 |
| 20070702 | $ | 77,083.33 |
| 20070725 | $ | 62,951.39 |
| 20070830 | $ | 59,739.59 |
| 20070928 | $ | 57,812.50 |
| 20071102 | $ | 55,260.41 |
| 20071129 | $ | 53,125.00 |
| 20080104 | $ | 53,854.17 |
| 20080213 | $ | 40,104.17 |
| 20080227 | $ | 27,187.50 |
| 20080328 | $ | 28,784.72 |
| 20080506 | $ | 26,041.67 |
| 20080602 | $ | 25,833.33 |
| 20080630 | $ | 25,000.00 |
| | $ | 1,507,500.00 |

171. The funds to make the interest payments on Speer's personal loan with Amegy were wired from the Royce Homes bank account at Amegy to Speer's account at Amegy then to Amegy. The following notations appear on Royce Homes's and Speer's Amegy Bank statements corresponding to the wire transfers from Royce Homes:

a. Excerpts from the Amegy bank account entitled "Royce Homes LP-- Loan Account" account number ********4, statement date November 30, 2006 to June 30, 2008:

| **Date** | **Amount** | **Description** |
|---|---|---|
| 10/02(06) | 46,250.00 | WIRE/OUT-200627501950;BNF JOHN SPEER 1305402698 |
| 11/02(06) | 169,500.00 | WIRE/OUT-200630601392:BNF JOHN SPEER1303701930 |
| 11/27(06) | 154,166.66 | WIRE/OUT-200633102430:BNF JOHN SPEER1305703324 |

Exhibit B

| | | |
|---|---|---|
| 12/27(06) | 159,305.66 | WIRE/OUT-200633102430:BNF JOHN SPEER1305703324 |
| 01/25(07) | 87,361.11 | WIRE/OUT-2007:BNF JOHN SPEER; OBI ACCR #175515501579531304402586 |
| 02/21(07) | 71,944.44 | WIRE/OUT-200705202713:BNF JOHN SPEER; OBI INTEREST 1302403536 |
| 04/02(07) | 79,652.78 | WIRE/OUT-200709202464:BNF JOHN SPEER; OBI MARCH INTEREST 1305403424 |
| 04/25(07) | 77,083.33 | WIRE/OUT-200711502009:BNF JOHN SPEER; OBI INTEREST 1303402802 |
| 05/29(07) | 79,652.78 | WIRE/OUT-200714902887:BNF JOHN SPEER; OBI MAY INTEREST 1306704120 |
| 07/02(07) | 2,577,083.33 | WIRE/OUT-200718302299:BNF JOHN SPEER; OBI NOTE PAYMENT + INTE 1306003264[15] |
| 07/25(07) | 62,951.39 | WIRE/OUT-200720602914:BNF JOHN SPEER; OBI JULY INTEREST 1304604024 |
| 08/30(07) | 59,739.59 | WIRE/OUT-200724203210:BNF JOHN SPEER; OBI AUGUST INTEREST 1304504260 |
| 09/28(07) | 57,812.50 | WIRE/OUT-200727104147:BNF JOHN SPEER; OBI SEPTEMBER INTEREST 1304705532 |
| 11/02(07) | 55,260.41 | WIRE/OUT-200730601527:BNF JOHN SPEER; OBI OCTOBER INTEREST 1303902150 |

[15] $2,500,000.00 was wired to Speer as a Partnership Distribution to make the principal payment on his personal note with Amegy Bank and $77,083.33 was entered in the Royce Homes books as an expense of Royce Homes. These funds were wired to Speer to make his interest payment on his personal note to Amegy.

Exhibit B

| | | |
|---|---|---|
| 11/29(07) | 53,125.00 | WIRE/OUT-200733302486:BNF JOHN SPEER; OBI NOVEMBER INTEREST 1304003358 |
| 01/04(08) | 2,553,854.37 | WIRE/OUT-200800400691; BNF JOHN SPEER; 1304300970[16] |
| 02/13(08) | 40,104.17 | WIRE/OUT-200804400143; BNF JOHN SPEER; 1303400304 |
| 02/27(08) | 27,187.50 | WIRE/OUT-200805800412; BNF JOHN SPEER; 1303702398 |
| 03/28(08) | 28,784.72 | WIRE/OUT-200808803487; BNF JOHN SPEER; 1303304664 |
| 05/06(08) | 26,041.67 | WIRE/OUT-200812700355; BNF JOHN SPEER; 1303900606 |
| 06/02(08) | 25,833.33 | WIRE/OUT-200815403832; BNF JOHN SPEER; 1305005136 |
| 06/30(08) | 25,000.00 | WIRE/OUT-200818204087; BNF JOHN SPEER; 1305105430 |

b. Excerpts from Speer's personal Amegy account, account number ******5, statement date September 15, 2006 to July 16, 2008.

| **Date** | **Amount** | **Description** |
|---|---|---|
| 10/02(06) | 46,250.00 | WIRE/IN-2006275019616; ROYCE HOMES LP 1305402649 |
| 11/02(06) | 169,500.00 | WIRE/IN-200630601395; ORG ROYCE HOMES LP1303701933 |
| 11/27(06) | 154,166.66 | WIRE/IN-200633612433; ORG ROYCE HOMES LP 1305703329 |

[16] $2,500,000.00 was wired to Speer as a Partnership Distribution to make the principal payment on his personal note with Amegy Bank and $53,854.17 was entered in the Royce Home books as an expense of Royce Homes. These funds were wired to Speer to make his interest payment on his personal note to Amegy.

| | | |
|---|---|---|
| 12/27(06) | 159,305.56 | WIRE/IN-200636103333; ORG ROYCE HOMES LP 1305604175 |
| 01/25(07) | 87,361.11 | WIRE/IN-200702501837; ORG ROYCE HOMES LP;OBI ACCR#17551550157 |
| 02/21(07) | 71,944.44 | WIRE/IN-200705202716; ORG ROYCE HOMES LP;OBI INTEREST 1303403541 |
| 04/02(07) | 79,652.18 | WIRE/IN-200709202466; ORG ROYCE HOMES LP;OBI MARCH INTEREST 1305403427 |
| 04/25(07) | 77,083.33 | WIRE/IN-200709202466; ORG ROYCE HOMES LP;OBI INTEREST 13034028 |
| 05/29(07) | 79,652.78 | WIRE/IN-200714902896; ORG ROYCE HOMES LP;OBI MAY INTEREST 13034028 |
| 07/02(07) | 2,577,083.33 | WIRE/IN-200718302301; ORG ROYCE HOMES LP;OBI NOTE PAYMENT + INTEREST 13034028 |
| 07/25(07) | 62,951.39 | WIRE/IN-200720602918; ORG ROYCE HOMES LP;OBI JULY INTEREST 1304604029 |
| 08/30(07) | 59,739.59 | WIRE/IN-200724203212; ORG ROYCE HOMES LP;OBI AUGUST INTEREST 1304504263 |
| 09/28(07) | 57,812.50 | WIRE/IN-200727104150; ORG ROYCE HOMES LP;OBI SEPTEMBER INTEREST 1304705537 |
| 11/02(07) | 55,260.41 | WIRE/IN-200730601533; ORG ROYCE HOMES LP;OBI OCTOBER INTEREST 1303902155 (Amegy Bate Number 047846-002) |
| 11/29(07) | 53,125.00 | WIRE/IN-200733302494; ORG ROYCE HOMES LP;OBI NOVEMBER INTEREST |

| | | |
|---|---|---|
| | | 1304003371 (Amegy Bate Number 047842-002) |
| 01/04(08) | 2,553,854.17 | WIRE/IN-200800400697; ORG ROYCE HOMES LP; 130430097 (Amegy Bate Number 047842-002) |
| 02/27(08) | 27,187.50 | WIRE/IN-200805801761;ORG ROYCE HOMES LP 1303702401 |
| 03/28(08) | 28,784.72 | WIRE/IN-200808803490; ORG ROYCE HOMES LP; 1303304647 |
| 05/06(08) | 26,041.67 | WIRE/IN-200812700357; ORG ROYCE HOMES LP; 1303900609 |
| 06/02(08) | 25,833.33 | WIRE/IN-200815403834; ORG ROYCE HOMES LP; 1305005139 |
| 06/30(08) | 25,000.00 | WIRE/IN-200818204096; ORG ROYCE HOMES LP; 1305105443 |

172. In all, Royce Homes paid $1,507,500.00 in interest payments on the Speer personal Amegy note. The following checks were issued by Speer out of the same account receiving the Royce Homes funds to Amegy for interest payments:

| **Date** | **Check Number** | **Amount** |
|---|---|---|
| 10/5/06 | 2416 | $46,250.00 |
| 11/1/06 | 2436 | $159,305.56 |
| 11/29/06 | 2489 | $154,166.66 |
| 1/4/07 | 2546 | $159,305.56 |
| 1/30/07 | 2590 | $87,361.11 |
| 2/23/07 | 2764 | $71,944.44 |
| 3/23/07 | 2790 | $79,652.78 |
| 4/27/07 | 2840 | $77,083.33 |
| 5/31/07 | 2884 | $79,652.78 |
| 7/5/07 | 2612 | $77,083.33 |
| 7/27/07 | 2637 | $62,951.39 |
| 8/23/07 | 2698 | $59,739.59 |
| 10/31/07 | 2913 | $55,260.41 |
| 11/28/07 | 2966 | $53,125.00 |
| 1/8/08 | 3032 | $53,854.17 |

Exhibit B

| | | |
|---|---|---|
| 2/5/08 | 3073 | $40,104.17 |
| 2/29/08 | 3087 | $27,187.50 |
| 4/1/08 | 3112 | $28,784.72 |
| 5/5/08 | 3171 | $26,041.67 |
| 6/4/08 | 3164 | $25,833.33 |
| 6/30/08 | 3358 | $25,000.00 |

173. All distributions to make the $1,507,500.00 in interest payments to Amegy bank during the final eighteen months of Royce Homes were made in breach of the Partnership Agreement because the Breach of Partnership Defendants did not preserve adequate working capital reserves, made the payments at a time when the Royce Homes's loan covenants were breached, the payments were not for Partnership purposes, the payments were not consistent with the Breach of Partnership Defendants' fiduciary responsibility for the safekeeping and use of all Partnership Property, and the payments were not made in furtherance of the business of the Partnership.

174. The Breach of Partnership Defendants are jointly and severally liable to the Trustee for $1,507,500.00 for breaching the Partnership Agreement with respect to interest payments relating to Speer's personal obligation to Amegy.

**3. Payments to Manners**

175. As part of the buyout, Speer signed a promissory note to Manners in the amount of $13,342,406. Speer and Manners devised a plan to make the payments on Speer's note to Manners out of Royce Homes. (Gathmann Excerpt 7, 8 and 9). (Manners Excerpt 17, 18, 19, 20, 21, 22, 23, and 24).

176. The funds disbursed by Royce Homes to pay the Manners Note were borrowed by Royce Homes in violation of the Partnership Agreement. (Gathmann Excerpt 10). (Manners Excerpt 25). (Speer Excerpts 51 and 52).

Exhibit B

177.   Speer and Manners referred to the funds used to pay the Manners Note as a "management fee." According to Royce Homes's CFO, there were no services rendered for these fees. These funds came from Royce Homes. (Gathmann Excerpt 11). (Speer Excerpts 57 and 58).

178.   Manners acknowledged the payments on his note reduced the note balance from $13,342,406 to $11,165,661 by June 2007. Manners testified payments stopped in June 2007. Including interest, Manners received $3,085,100 in note payments. Exhibit B to the Third Amended Complaint shows each specific payment made from Royce Homes through distributions to pay Speer's personal obligation to Manners. The payments were made on a monthly basis as reflected in the Exhibit which shows a beginning balance of $13,342,405 and an ending balance after June 2007 of $11,165,681. Each of these payments were cloaked as a management fee.

179.   In addition, on October 2, 2006 Manners was paid $900,000 by Speer. This payment was derived from funds of Royce Homes. The distribution to Speer to make this payment to Manners was not from Available Cash.

180.   The payments to Manners breached the Partnership Agreement because they were made at a time when the capital reserves were not adequate, made with funds borrowed from Royce Homes loans, they were made at a time when the Royce Homes's loan covenants were breached, they were not for Partnership purposes, they were not consistent with the Breach of Partnership Defendants' fiduciary duty, and they were not made in furtherance of the business of the Partnership.

181.   The Breach of Partnership Defendants are jointly and severally liable to the Trustee for $3,640,540 for breaching the Partnership Agreement with respect to payments relating to

Exhibit B

Speer's personal obligation to Manners.

**4. Other Speer Distributions/Payments**

182. In addition to the Amegy and Manners payments, the Breach of Partnership Defendants distributed millions of dollars to Speer for various reasons, including Tax Distributions and payments to support his lavish lifestyle. (See Paragraph 570).

183. Specifically, the Trustee seeks to recover these Tax Distributions issued from Royce Homes account ********00176:

| Date | Check Number | Amount |
|---|---|---|
| 4/13/07 | 97006 | $1,587,009.00 |
| 4/13/07 | 97145 | $870,128.00 |

184. For example, beginning in September, 2006, Speer distributed money to himself in addition to his salary. These distributions were from accounts of Royce Homes and include but are not limited to:

| Date Issued | Date Dep. | Check No | Amount | Account |
|---|---|---|---|---|
| 09/01/06 | 09/01/06 | 85428 | 150,000.00 | Royce Homes |
| 10/02/06 | 10/06/06 | 87368 | 150,000.00 | Royce Homes |
| 10/31/06 | 10/31/06 | 9308 | 227,248.60 | Royce Homes |
| 11/01/06 | 11/06/06 | 89556 | 150,000.00 | Royce Homes |
| 12/01/06 | 12/01/06 | 92245 | 150,000.00 | Royce Homes |
| 01/02/07 | 01/04/07 | 94724 | 150,000.00 | Royce Homes |
| 02/01/07 | 02/02/07 | 93458 | 150,000.00 | Royce Homes |
| 03/01/07 | 03/13/07 | 94529 | 150,000.00 | Royce Homes |
| 04/02/07 | 04/04/07 | 03056 | 150,000.00 | Royce Homes |
| 05/01/07 | 05/01/07 | 05066 | 150,000.00 | Royce Homes |

Exhibit B

| | | | | |
|---|---|---|---|---|
| 07/02/07 | 07/05/07 | 08963 | 150,000.00 | Royce Homes |
| 08/01/07 | 08/06/07 | 01407 | 150,000.00 | Royce Homes |
| 09/04/07 | 09/04/07 | 12996 | 150,000.00 | Royce Homes |
| 10/01/07 | 10/02/07 | 14690 | 150,000.00 | Royce Homes |
| 11/01/07 | 11/02/07 | 4819 | 150,000.00 | Royce Homes |
| 12/03/07 | 12/04/07 | 18113 | 150,000.00 | Royce Homes |
| 12/07/07 | 12/11/07 | 18469 | 156,428.00 | Royce Homes |
| 01/02/08 | 01/04/08 | 6310 | 150,000.00 | Royce Homes |

185. Speer used Royce Homes's credit cards for the purchase of jewelry, furniture and other items. (Speer Excerpt 97).

186. Finally, Speer made distributions from Royce Homes to fund his personal obligations to Donnie Lou Speer.[17]

187. These funds belonged to Royce Homes and were in Royce Homes's bank accounts at the time they were improperly removed. These distributions breached the Partnership Agreement because they were at a time when the capital reserves were not adequate, made with funds borrowed from Royce Homes loans, they were made at a time when the Royce Homes's loan covenants were breached, they were not for Partnership purposes, they were not consistent with the Breach of Partnership Defendants' fiduciary responsibility for the safekeeping and use of all Partnership Property, and they were not made in furtherance of the business of the Partnership.

188. The Breach of Partnership Defendants are liable to the Trustee for a sum in excess of $5,240,813.60 plus any additional sums relating to all other distributions and payments

[17]See Fraudulent Transfer sections relating to Donnie Lou Speer.

Exhibit B

beginning September 2006 and thereafter.

**5. Damages for Breach of Partnership Agreement**

189. The following damages were proximately caused by the Breach of Partnership Defendants:

a. An amount of at least $5,240,813.60 in tax and other distributions made by Speer to himself or for his benefit.

b. $15,000,000.00 in principal payments made under the Speer personal loan to Amegy.

c. $1,507,500.00 in interest payments made under the Speer personal loan to Amegy.

d. At least $3,085,100.00 in interest and principal payments on Speer's personal note to Manners, DWM and Saracen.

e. The $900,000.00 paid to Manners, DWM, and Saracen on October 2, 2006.

f. The amounts paid from Royce to fund Speer's lavish lifestyle. Speer is asked to account for these payments.

g. The payments made for the purpose of paying Donnie Lou Speer.

**B. Breach of Fiduciary Duty**

190. This claim is asserted against Speer, Manners, Kopecky, Donnie Lou Speer and Hammersmith ("the Fiduciaries"), for breach of fiduciary duty and against Amegy, Speer, Manners, Kopecky, Donnie Lou Speer, and Hammersmith ("the Fiduciary Conspirators"), for conspiracy, aiding and abetting, and acting in concert in the breach. (collectively known as "the Fiduciary Defendants"). At all times relevant to this litigation Donnie Lou Speer was a fiduciary to Royce Homes.

191. With respect to every claim asserted in this Third Amended Complaint, the Fiduciary Defendants acted in bad faith and knowingly breached the Partnership Agreement.

192. The Trustee has standing to pursue breach of fiduciary duty claims.

### 1. Legal Analysis

193. In a breach of fiduciary duty case, the plaintiff must prove that: (1) a fiduciary duty exists; and (2) a fiduciary breached that duty.[18]

194. The Partnership Agreement imposes a fiduciary duty on the general partner in Section 5.1:

> *5.1* ***Management****. Except as otherwise provided in this Agreement but* ***consistent with the General Partner's fiduciary responsibility for the safekeeping and use of all Partnership Property****, the General Partner shall have the full and exclusive power and authority on behalf of the Partnership to manage, control, administer and operate the business and affairs of the Partnership, and to do or cause to be done any and all acts which it deems to be necessary or appropriate thereto, and the scope of such power and authority shall encompass all matters in any way connected with or incident to such business... (Emphasis added).*

195. The Partnership Agreement defines Partnership Property in Section 1.1:

> *(gg) "Partnership Property" means all interests, properties and rights of any type, whether real, personal, tangible or intangible, owned by the Partnership.*

196. The Partnership Agreement does not limit the liability of any employee, officer or director of the General Partner. At all times relevant to this Third Amended Complaint, the General Partner acted in bad faith and in a manner not reasonably believed to be within the scope of the authority granted to the General Partner by the Partnership Agreement.

197. The Partnership Agreement allows the general partner to retain employees on behalf of the Partnership as set out in Section 5.1(e):

> *(e) to employ or retain on behalf of the Partnership agents, employees, consultants, accountants, lawyers, appraisers, engineers, surveyors, land planners, architects, clerical personnel and such other assistance and services as may be necessary or convenient and to pay therefor such remuneration as the General Partner deems reasonable.*

---

[18] Pride Int'l, Inc. v. Bragg, 259 S.W.3d 839, 848-49 (Tex. App. 2008).

198. The Partnership Agreement does not limit the liability of any of the persons listed in Section 5.1(e).

199. As an employee, key employee and officer of Royce Homes and Chief Executive officer and director of Hammersmith, Speer owed a fiduciary duty to Royce Homes as well as to Hammersmith. At his 2004 examination, Speer testified he was the president and chief executive officer of Royce Homes (Speer Excerpts 2, and 3) and Hammersmith was the general partner for Royce Homes and he was the president of Hammersmith. (Speer Excerpt 1).

200. As an employee, key employee and officer of Royce Homes and a Vice President of Hammersmith, Kopecky owed a fiduciary duty to Royce Homes as well as to Hammersmith.

201. As Chairman Emeritus of Royce Homes, Manners owed a fiduciary duty to Royce Homes.

202. Donnie Lou Speer was a fiduciary of Royce Homes in that she was an employee of Royce Homes and contractually obligated to have a duty of care, loyalty and trust.

203. "To date, the fiduciary duties of officers have been assumed to be identical to those of directors. With respect to directors, those duties include the duty of care and the duty of loyalty. There has also been much discussion regarding a duty of good faith, which may or may not be subsumed under the duty of loyalty."[19] "Other courts have also applied the Delaware law and recognized that officers owe fiduciary duties to the corporation."[20] "The directors of Delaware corporations have a triad of primary fiduciary duties.... With respect to the obligation of officers to their own corporation and its stockholders, there is nothing

[19] In re World Health Alternatives, Inc., 385 B.R. 576, 592 (Bankr. D. Del. 2008)

[20] *Id* at 592.

Exhibit B

in any Delaware case which suggest that the fiduciary duty owed is different in the slightest from that owed by directors."[21]

204. The Fiduciaries owed the following fiduciary duties to Royce Homes:

a. The Duty of Loyalty. 6 Del C. § 15-404 (b)

b. The Duty of Care. 6 Del C. § 15-404 ( c)

205. Hammersmith's purpose was to carry out "any lawful act or activity." Article III of the Certificate of Incorporation, entitled "Purposes" provides:

> *The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the DGCL.*

206. Speer was the sole director of Hammersmith.

207. The Fiduciaries managed the business and affairs of Hammersmith.

208. As noted above, officers and directors share the same fiduciary duties. Hammersmith's Certificate of Incorporation specifically made the Director liable for breaches of loyalty, good faith, unlawful acts, and self-dealing. Article X, titled Limited Director Liability, stated:

> *No director of the Corporation shall be personally liable to the Corporation or to its stockholders for monetary damages for breach of fiduciary duty as a director, provided that this Article X shall not eliminate or limit the liability of a director:*
>
> > *(1) for any breach of the director's duty of loyalty to the Corporation or its stockholders,*
> >
> > *(2) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law,*
> >
> > *(3) under Section 174 of the DGCL, as it may hereafter be amended from time to time, for any unlawful payment of a dividend or unlawful stock*

[21] *Id* at 592.

*purchase or redemption, or*

*(4) for any transaction from which the director derived an improper personal benefit.*

209. At all times relevant to this Third Amended Complaint, the Fiduciaries were in control of Royce Homes.

210. The Fiduciaries' and Fiduciary Defendants' actions alleged in this Third Amended Complaint constitute intentional misconduct and conduct in which the Fiduciaries and Fiduciary Defendants derived an improper personal benefit. The Fiduciaries' and Fiduciary Defendants' conduct constitutes grossly negligent or reckless conduct, intentional misconduct, and a knowing violation of law.

211. "The essential elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[22] However, "merely proving a joint 'intent to engage in the conduct that resulted in the injury' is not sufficient to establish a cause of action for civil conspiracy.'"[23] "Instead, 'civil conspiracy requires specific intent' to agree 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.'"[24] "Civil conspiracy is a separate cause of action that requires, inter alia, an underlying tort and a 'meeting of the minds' among the co-conspirator[s] 'on the object or

---

[22]Massey v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983).

[23]Juhl v. Airington, 936 S.W.2d 640, 644 (Tex. 1996) (quoting Triplex Commc'ns Inc. v. Riley, 900 S.W.2d 716, 719 (Tex. 1995)).

[24]Id. (quoting Triplex, 900 S.W.2d at 719).

course of action' to be taken."[25] By contrast, a cause of action for aiding and abetting requires only the knowing participation of a party in a breach of a fiduciary duty and does not require a conspiratorial agreement.[26]

212. The purchase of Manners's interest in Royce Homes by Speer, the financing of that transaction, making distributions to repay Speer's personal obligations to Amegy and Manners, the sale to Allard, the tax distributions, the payments to Donnie Lou Speer, the redirection of tax benefits to Speer from the companies in late 2008, the 2008 to 2009 dealings with Westwood Gardens, and the Watermark transaction all breached the Fiduciaries' fiduciary duty to Royce Homes and Hammersmith, breached the Fiduciaries' duty of loyalty and duty of care, were self-dealing, and in bad faith. The business judgment rule does not apply to the Fiduciaries in the transactions mentioned above because the Fiduciaries were not disinterested parties, the Fiduciaries appeared on both sides of the transaction, they derived personal financial benefit from their self-dealing as opposed to legitimate benefit. These transactions do not meet the entire fairness standard. As set forth below, the Fiduciary Conspirators conspired and aided and abetted in the breaches of fiduciary duty. Distributions totaling approximately $39 million were paid in a little over two years of Royce Homes's final operations and left $40 million in creditor claims.[27]

---

[25]Floyd v. Hefner, 556 F. Supp. 2d 617, 659-60 (S.D. Tex. 2008) (citation omitted).

[26]Id. at 660 (citations omitted).

[27]The Court's claims docket lists $32,510.884.67 in general unsecured claims, $8,401,891.48 in secured claims, and $174,834.69 in priority claims for a total $41,087,610.84.

## 2. Additional Facts Relating to Breach of Fiduciary Duty

213. The Fiduciaries controlled Royce Homes for their personal benefit to the detriment of Royce Homes's creditors. The Fiduciaries depleted the Royce Homes assets knowing the dire financial conditions at the time. The Fiduciaries knew they did not have the authority under the Partnership Agreement to make these distributions and undertake the transactions stated below. The Fiduciaries failed to take reasonable steps to safeguard Royce Homes's assets.

214. Prior to the Buyout on September 20, 2006, Royce Homes experienced a reduction in sales activity. On June 18, 2006, Hunter, the Royce Homes Chief Operating Officer, sent the following email to Speer:

*From: James Hunter*
*Sent: Sunday, June 18, 2006 10:04 PM*
*To: John Speer*
*Cc: DivisionPresidents; Shonna Speer*
*Subject: sales*

*it would appear that in houston we had a 44% performance against forecast*

*each and every division was below 70% of their forecast and nhsc was below 50%*

*as for atlanta and dallas I cannot confirm the numbers until the morning*

*we shall go over last weeks projections in detail with each manager to assess any adjustments to this reported number as well as a discovery as to what went wrong*

*james*

215. Speer proceeded with the Buyout. By October 2006 sales had not improved. At 6:32 AM on Monday, October 2, 2006 Hunter sent the following email:

*From: James Hunter*
*Sent: Monday October 02, 2006 6:32 AM*
*To: Shawn Speer*
*Cc: John Speer; John Zunker*
*Subject: FW: Results for 10.1.06*

*we need to cover missed projections for both closings and sales*

*how can they be so wrong?*

*james*

216.   By October 23, 2006 Hunter was expressing concern, sending the "Red" flagged email:

*From: James Hunter*
*Sent: Monday, October 23, 2006 7:08 AM*
*To: Shawn Speer*
*Cc: John Zunker; John Speer; Shonna Speer*
*Subject: FW: Results 10.22.06*
*Follow Up Flag: Follow up*
*Flag Status: Red*

*we now officialy have an absolute crash in sales - the crash is consistent and it is real*

*immediate action is required to establish some srt of order and performance in our business model*

*we need this day a complete assesment by area manager of each and every community*

*we shall meet after the sales meeting*

*james*

217.   Gathmann, the Royce Homes Chief Financial Officer beginning in October 2006, realized the real estate market was in trouble and Royce Homes's sales were "falling apart" by the end of 2006.  He quickly realized the market was starting to crash. (Gathmann Excerpt 12).

218.   Royce Homes Phoenix was a sister company to Royce Homes.  It had its equity drained from partnership distributions in 2006.  LaSalle bank declared a default in November 2006, because Royce Homes Phoenix was in violation of its loan covenants. Gathmann testified that although the loan agreements had a leverage requirement of 5:1, Royce Home Phoenix was 43:1, Royce Homes Phoenix could not pay its bills, Royce Homes had to infuse millions of dollars into Royce Homes Phoenix thus damaging Royce Homes. (Gathmann Excerpts

Exhibit B

13, 14 and 39).

219. Later, Gathmann would write that at the end of 2006, because of the collapse of the sub-prime market and the tightening of credit, Royce Homes was aware that 2007 was not going to be a good year financially (Denison Excerpt 29 and 30).

220. Prior to closing the Buyout, Speer sought approval of the buyout from the Royce Homes lenders by sending a consent letter. Some Royce Homes lenders requested additional information regarding the Buyout and its debt. Speer approved sending Citibank, Comerica Bank, and, based on information and belief, other Royce Homes lenders the following representations:

a. Distributions from equity would enable John to pay the Amegy note;

b. The distributions would be covered primarily by net income in the year the distributions were to be made;

c. Equity would remain consistently over $40 million; and

d. Tangible Net Worth and Total Liabilities to Tangible Net Worth would remain very comfortably within the bank's requirements.

(Speer Excerpts 75, 76, 77, 78, and 79). (Gathmann Excerpt 42).

221. These representations proved to be wrong. By year end, Royce Homes had distributed millions of dollars more than its net income for 2006 without having made Speer's $10 million payment to Amegy. Royce Homes had to borrow money to make the $10 million payment. The company's equity had dropped below $40 million and, after the payment of the $10 million, the majority, if not all, of the Royce Homes lenders' debt-to-equity ratios were breached. (Gathmann Excerpt 15 and 48).

222. Gathmann testified that in comparing the August 2006 projections provided to its lenders to the December 2006 Audited Financial Statements, it appeared the equity projections were off by $20 million. The shortfall left Royce Homes equity levels lower than Speer had promised the Royce Homes lenders in August 2006 would be maintained. He also testified that projected net income was to be $25 million in 2006 but actual net income was only $16 million: (Gathmann Excerpt 15).

223. There were more differences between the August 2006 projections provided to the lenders and the audited financial statements.

a. The projections showed 2006 year-end inventory of $189,204,000 but the audited statement showed 2006 year-end inventory of $236,785,641, a difference of $47,581,641 in unsold assets.

b. The projections showed 2006 year-end liabilities of $164,459,000 but the audited statement shows 2006 year-end liabilities of $217,885,117, a difference of $53,426,117.

c. The projections showed 2006 year-end partnership distributions of $17,017,100 with the Speer/Amegy payment of $10 million included, but the audited statement shows 2006 year-end partnership distributions of $23,951,504 without including the $10,000,000 Speer/Amegy distribution, a difference of $16,934,404 when adjusted for the $10 million Speer/Amegy distribution.

d. In fact, according to the 2006 audited financial statements the partnership distributions of $28,951,504 exceeded the company's 2006 net income of $16,153,062. A difference of $12,798,442 in distributions over income.

224. Speer did not make his December 31, 2006 $10 million Amegy payment distribution in 2006. He waited until January 3, 2007. This distribution created even more problems.

225. Speer exceeded his authority by making the $10 million distribution from borrowed funds. The Partnership Agreement did not allow distributions from borrowed funds.[28] (Gathmann Excerpts 1 and 2). Speer pledged Royce Homes's assets to pay his personal debt.

226. Manners, Gathmann, Speer and Denison agreed that maintaining the Royce Homes debt-to-equity ratios were important. Royce Homes was heavily dependent on its ability to borrow money. All agree debt-to-equity ratios are an important factor in the ability to borrow. Manners stated without the ability to borrow, Royce Homes would be stifled or destroyed. Gathmann stated failing to maintain the ratios would put Royce Homes in peril. (Manners Excerpt 27). (Gathmann Excerpt 14). (Speer Excerpt 40). (Denison Excerpt 1).

227. Speer knew Royce Homes tracked its debt-to-equity ratio and he had access to this information. (Speer Excerpts 41 and 42). Speer knew or should have known that Royce Homes would be required to notify its lenders if it was in breach of its debt-to-equity loan covenants. (Speer Excerpt 43). Speer stated he did not check to determine if he was breaching Royce Homes's debt-to-equity by making his partnership distributions even though he understood that Royce Homes was likely out of compliance with its loan covenants. (Speer Excerpt 44 and 45). Speer was also aware the financial projections for Royce Homes fell short by a large degree for 2006 but, he made the distributions to pay his personal debt anyway. The projections for 2007 and 2008 were missed by an even greater degree. (Speer Excerpts 92 , 93 and 94).

[28] See Sections 1.1(f), 3.4(a), 4.7, 5.1(a) of the Partnership Agreement.

228.     The $10 million payment caused Royce Homes to violate its debt-to-equity ratios with its lenders in January 2007.  The capital reserves were insufficient to comply with the loan covenants with all of Royce Homes's lenders.[29]  Gathmann testified if he had the final "yes" or "no" regarding whether to make the distribution for the $10 million payment he probably would have said no because it would have deteriorated the financial covenants.[30] (Gathmann Excerpt 17).

229.     Gathmann testified the $10 million payment put a big hit on the equity in the balance sheet and the breached loan covenants, which was distressing to him as the chief financial officer. (Gathmann Excerpt 16).

230.     As Gathmann stated, the January 2007 payment caused Royce Homes's loan covenants to be breached.  After the $10 million distribution to Speer, all subsequent distributions breached one or more of the Royce Homes lenders' loan covenants, including the debt-to-equity ratios.  Royce Homes's calculations showed the debt-to-equity ratios were breached on and after the $10 million payment was made.  On May 24, 2007, Pamela Mitchell sent a spreadsheet to Gathmann showing debt-to-equity loan covenant violations beginning January 2007. (Gathmann Excerpt 4). The spreadsheet showed:

a.       January 31, 2007 ten out of fifteen Royce Homes lenders' debt-to-equity ratios failed.
b.       February 28, 2007 ten out of fifteen Royce Homes lenders' debt-to-equity ratios failed.

c.       March 31, 2007 six out of fifteen Royce Homes lenders' debt-to-equity ratios failed.

---

[29]The Partnership Agreement prohibited distributions which left insufficient working capital reserves to fully comply with the loan covenants including debt-to-equity ratios. See Sections 1.1(f), 4.7, 5.1(a) of the Partnership Agreement.

[30]Gathmann subsequently hedged on this statement regarding the $10 million payment.

Exhibit B

d. April 30, 2007 ten out of fifteen Royce Homes lenders' debt-to-equity ratios failed.

231. Gathmann stated the unaudited financial statements prepared by Royce Homes and used to calculate the debt-to-equity ratios overstated the equity by about $10 million. He further testified that, had the correct equity number been used, the debt-to-equity calculations in Paragraph 230 would have been worse. (Gathmann Excerpt 48).

232. Gathmann acknowledged in his Rule 2004 examination that the Amegy payment distribution caused the covenant test failure, *e.g*. the breach of the leverage ratios. (Gathmann Excerpt 3) and that after the distribution there were not sufficient capital reserves to comply with the Royce Homes loan covenants with all the Royce Homes lenders. (Gathmann Excerpt 4).

233. Gathmann testified that, given the financial conditions at the time including the increase in bustouts and lower margins, which were not under the control of Royce Homes, it was not a prudent decision at that time to make the $10 million distribution. (Gathmann Excerpt 20).

234. Gathmann added that "the market continued to fall off the cliff," it was not prudent to make the $10 million payment since the payment was not going to a company purpose but instead, to pay a debt of Speer. (Gathmann Excerpt 18).

235. After the January 2007 payment, Royce Homes remained out of compliance. Despite that fact, in April 2007 Speer made an approximate $5,240,813.60 Tax Distribution to himself from funds belonging to Royce Homes. Gathmann testified that if he had the final say, Royce Homes would not have made the Tax Distribution because the it was for Speer's individual liability, was not a Royce Homes obligation, and the Tax Distribution put Royce Homes further out of compliance with the loan covenants. (Gathmann Excerpt 19).

236. At his Rule 2004 examination, Gathmann was directed to look at a PowerPoint presentation

Exhibit B

he had prepared in May 2007 in anticipation of advising the banks of the Royce Homes problems. It addressed the following Highlights and Consequences:

***1st Quarter 2007 Results***

• ***Highlights***

- *Increased levels of bust outs*
- *Closings and margins lower then expected*
- *$10 million distribution for partner buyout loan repayment*

• ***Consequences***

- *For some banks, leverage ratio covenant and spec ratio covenant are not in compliance*
- *Company responded by reducing overhead and stopping additional spec home starts*
- *Company initiated Action Plan to achieved compliance with all covenants by December 2007.*

237. In May 2007 Gathman asked to meet with Speer about the loan covenant problems:

*From: Bill Gathmann*
*Sent: Monday, May 07, 2007 5:04 PM*
*To: John Speer*
*Cc: James Hunter; Pamela Mitchell*
*Subject: 2007 financial covenant review*

*John,*

*Do you have some time tomorrow afternoon or on later this week to review our march 2007 covenant performance and our action plan to get in compliance by year end?*

*Bill*
*William D. Gathmann*
*Chief Financial Officer*
*Royce Builders*
*7850 N. Sam Houston Parkway West*
*Houston, Texas 77064*
*(0) 281-569-1600*
*bgathmann@roycebuilders.com*

238. Gathmann asked to meet with Speer after he noticed that month after month they were out

of their loan covenants. (Gathmann Excerpt 21).

239. Gathmann testified he met with Speer in May 2007 because as CFO of Royce Homes he had concerns that, given the covenant breaches, Royce Homes could not pay the remaining $10 million balance on the Speer/Amegy debt. (Gathmann Excerpt 22).

240. Gathman testified that on May 11, 2007 when he put the PowerPoint presentation together the Royce Homes lenders were about to get the first quarter 2007 reports which would show Royce was out of compliance with its debt-to-equity ratios. The year end 2006 report, which was the last report sent to the lenders, was unaudited, overstated the equity by $10 million, and, in addition, did not show the January 2007 $10 million distribution to Speer. (Gathmann Excerpt 48).

241. Royce Homes had breached its debt-to-equity ratios with at least ten of its fifteen lenders, a fact that would be obvious once the audited financial statements were released. Gathmann testified he emailed Speer about his concerns and wanted to prepare a presentation for an anticipated meeting with the Royce Homes banks to discuss the loan covenant breaches. (Gathmann Excerpt 23).

242. “Bust outs” was the term used to describe when a home under contract failed to close. Gathmann testified bust outs began to rise in late 2006 but “exploded in 2007 as the housing market completely deteriorated.” At that time, the closings dropped as did the profit margin on the homes that did sell. The meeting with the banks to inform them of the breach of the loan covenants and the inaccurate financial reporting did not occur. (Gathmann Excerpt 24).

243. Gathmann testified it was evident Royce Homes fell severely short of its year-end 2006 projections. The housing market was in trouble beginning in 2006 and into 2007. A sharp

decline was occurring in the first quarter of 2007. The funds to make the distribution had to be borrowed. The distribution caused the debt-to-equity ratios to be breached. The distribution paid Speer's personal debt, not a Royce Homes obligation. (Gathmann Excerpt 25, 26, and 4).

244. The actual financial performance of Royce Homes fell far short of the projections in 2006, 2007 and 2008. Despite the shortfalls, Speer continued to make distributions to pay his personal debts. The distributions sealed the fate of failure for Royce Homes. (Speer Excerpt 92, 93, 94, 95 and 96)

245. During the 2004 examination, Gathmann calculated that Royce Homes's debt-to-equity ratios were over 6 to 1 and out of compliance with most loans before the January 2007 distribution. After the January distribution the ratios continued their fall. (Gathmann Excerpt 44).

246. Throughout 2007 conditions deteriorated. Even though the debt-to-equity ratios were breached, Royce Homes borrowed money to make the June 2007 Amegy payment distribution. By the end of 2007, the debt-to-equity ratios were extremely out of compliance yet Speer was about to make the January 2008 $2.5 million payment. Gathmann testified that equity had dropped in 2007 from $34,513,419 at the beginning of 2007 to $18,511,701 at the end of 2007. At this time, debt-to-equity ratios had fallen from 6.3:1 in the beginning of 2007 to 11.69:1 at the end of 2007 and all debt-to-equity covenants were breached. Gathmann testified that after the $10 million January 2007 distribution, things got progressively worse yet, throughout 2007 the Fiduciaries allowed Royce Homes to distribute a total of $19 million to Speer to pay his personal debt. He testified that the distributions to Speer were the main cause of the devastation of the debt-to-equity ratios for Royce Homes.

(Gathmann Excerpt 27).

247.  Amegy monitored depository accounts to watch for red flags. (Denison Excerpt 41). Amegy also monitored Royce Homes's debt-to-equity ratios. (Denison Excerpt 3).

248.  Amegy's Loan Agreement required Speer to provide monthly financial statements but he never did. Amegy never required him to comply with the Loan Agreement. Had Amegy required compliance, it would have had data to show Royce Homes was breaching its debt-to-equity ratios.

249.  In the last quarter of 2007, when Amegy was reviewing the financial information given to it by Speer to support the extension of his September 2007 payment, Amegy calculated that, as of December 31, 2006, Royce Homes's debt-to-equity ratios were 6.6 to 1. Amegy clearly knew Royce Homes had breached its debt-to-equity ratios before and after the January 2007 $10 million distribution and, despite the breach, Speer still made the distribution. (Denison Excerpts 5 and 6).

250.  Using the same data, Amegy calculated Royce Homes was breaching its debt-to-equity ratios with its lenders in all of 2007. Amegy calculated that by June 30, 2007 Royce Homes's debt-to-equity ratio was 10.44 to 1 yet Speer disbursed the $2.5 million for the payment on the Amegy loan. (Denison Excerpts 7 and 8).

251.  Gathmann explained to Denison in September 2007: (Denison Excerpts 29 and 30).

> *However, as 2006 ended and 2007 began, it became evident that 2007 would be a significantly different year from 2006. The collapse of the sub prime mortgage market and the continued tightening of loan underwriting standards has resulted in a significant decrease in the number of closings for homebuilders across the entire country.*

252.  The same Amegy September 2007 calculations showed Royce Homes's projections were

Exhibit B

being revised down 46% for year end 2007. (Denison Excerpt 31).

253. In fact, it was Speer's request for an extension of his September 2007 payment that caused Amegy to finally request financial information and make the calculations showing Royce Homes's dismal performance. In Speer's request for a deferral of the September and December 2007 payments, he stated:

> *Chris, I know that you are probably hoping not to hear from me again on this topic, but I really need to request a deferral in the next two principal payments on my loan. I know that you guys are anxious to get your money out of this loan, I am as well. If any of us had anticipated this perfect storm, we certainly would not have entered into the transaction but hindsight is much easier. Here's what I would like to request: One, continue payment of monthly interest. Two, deferral of September's principal reduction until 12 '07. Three, deferral of December's principal reduction until 6/30 '08. I need the deferrals to minimize the impact of the equity reductions from the company that would result in busting our debt equity covenants with our construction lenders. The time differential will allow us the time we need to both reduce our debt load and realize profits from several transactions that will shore-up the equity side of the equation. The only other thing I have to offer is to replace Amegy's LOC facility so you do not have that as part of the equation. I believe this can be accomplished by the end of the month and Bill has already initiated that process. Frankly, I'm not offering much here as this is something we will do anyway.*
>
> *Again, I realize this is not Amegy's typical loan (far from it) and that you need to get your money out as soon as possible. I want to get you paid as soon as possible but our world has changed dramatically in the last six months and due mostly to issues we have absolutely no control over it. Thanks.*

254. Denison acknowledged this could be referred to as the sub-prime crisis, that it was having an impact on Royce Homes's sales, and that Speer was concerned about pulling money out of the company. In fact, when asked his opinion of Speer's offer to move a Royce Homes letter of credit to another bank, Denison admitted that he "viewed that as positive." (Denison Excerpt 32).

255. In September 2007, to convince Amegy to extend his personal loan, Speer told Amegy

Exhibit B

Royce Homes had reduced its workforce by sixty people and he was planning to sell up to eighty model homes and approximately one thousand acres of Royce Homes's assets. (Denison Excerpt 33).

256. Also, in September 2007, Royce Homes had obtained temporary waivers with some lenders which allowed, until December 31, 2007, the higher debt-to-equity ratios. Gathmann testified that despite the fact that the Royce Homes lenders allowed the temporary waivers, by the end of 2007 and into 2008, the debt-to-equity ratios had not improved. (Gathmann Excerpt 47).

257. Speer told Denison Royce Homes was breaching basically all of its debt-to-equity ratios. According to Denison, by October 2007 some of Royce Homes's loans were modified to allow debt-to-equity ranging from 5.5 to 6.75 to 1. Amegy calculated that despite the modification, Royce Homes's ratios appeared to have jumped to 10 to 1. (Denison Excerpt 8).

258. By December 2007, Speer had sold, borrowed against, or in some way leveraged all of the Royce Homes assets except the furniture. Speer turned to Amegy, seeking a sale/leaseback of the Royce Homes furniture. Amegy declined, referring to Speer's efforts as "desperate financing." (Denison Excerpt 34). At that time, an Amegy employee referred to Royce Homes as "extremely highly leveraged." (Denison Excerpt 35).

259. Despite being told Royce Homes was "extremely highly leveraged" and seeking "desperate financing," Denison could not recall doing any further financial investigation. (Denison Excerpt 36).

260. In November 2007, Hunter sent an email to John Zunker advising him that "*dec looks*

*brutal*" a reference to December 2007 looks brutal for projected closings as clarified by Gathmann's testimony: (Gathmann Excerpt 28). Gathmann then testified that according to the consolidated financial statements as of December 2007, the group of Royce companies had a $1 million loss in 2007 from its homebuilding operations. (Gathmann Excerpt 29).

261. By early 2008 Royce was no longer able to obtain financing. (Gathmann Excerpts 30, 46 and 47).

262. In January 2008, Royce Homes could not pay its debts as they became due, leaving over $1.7 million in unpaid property taxes, but the Fiduciaries allowed Royce Homes to make the January 2008 $2.5 million distribution for the Speer/Amegy payment. (Gathmann Excerpt 31, 32 and 33).

263. Denison admitted that in the last quarter of 2007 he was monitoring Royce Homes's financials and things were not getting better yet, the Fiduciaries allowed Royce Homes to make the January 2008 distribution anyway. (Denison Excerpts 37 and 38).

264. Denison admitted he was told Royce Homes was deferring its principal payments on it construction lines of credit in 2008. (Denison Excerpt 39).

265. Speer's abuse of Royce Homes was best summarized in a lawsuit filed by George Kopecky, a Royce Homes officer. Kopecky stated, "*In addition to mounting losses experienced by the Royce entities, Speer individually exacerbated the company's cash flow positions by utilizing corporate and partnership resources to finance a lavish and highly publicized lifestyle, which included expensive homes and ranch property, the purchase of lavish and expensive purses, jewelry, and other personal expenses that were paid for with corporate and partnership funds*." (Speer Excerpt 97). Speer's lavish lifestyle was funded through

Exhibit B

$5,240,813.60 in distributions made by Speer to himself out of Royce Homes as described in paragraphs (184-186 above). This additional $5,240,813.60 was taken out of Royce Homes and appears to have been used to purchase jewelry, cars, furniture and many other extravagant personal items. These distributions were made when it was known by Speer that Royce Homes was misrepresenting its financial situation to its creditors, when it was imprudent to make the distributions given the financial condition and financial outlook for Royce Homes, when Royce Homes was in violation of it loan covenants, when Royce Homes was borrowing the funds on loans that were in violation of its loan covenants, and when Royce Homes was not paying its creditors.

266. In addition to all other breaches of fiduciary duty, Speer made distributions for the purpose of paying Donnie Lou Speer and settling his personal dispute with George Kopecky. These distributions are set forth throughout the Third Amended Complaint but specifically described in the fraudulent transfer sections relating to Donnie Lou Speer and George Kopecky. Donnie Lou Speer and George Kopecky conspired with, aided and abetted, and acted in concert with Speer in these breaches of fiduciary duty.

**3. Westwood Gardens Asset Stripping**

267. This claim is asserted against Speer ("the Westwood Fiduciary "), for breach of fiduciary duty and against Amegy, Speer, and Vestalia ("the Westwood Conspirators"), for conspiracy, aiding and abetting, and acting in concert in the breach (collectively known as "the Westwood Defendants").

268. Speer was the chief executive officer and fiduciary of Park Lake. Park Lake was insolvent at all times relevant to this claim. Upon insolvency, the fiduciary duty extends to protect

Exhibit B

the creditors of Park Lake. Royce Homes was a creditor of Park Lake at all times relevant to this claim.

269.   After Royce Homes closed its doors Speer continued his search for Royce Homes assets and assets of related entities which could be used to pay Speer's personal obligation to Amegy. Speer's efforts focused on Westwood Gardens.

270.   Westwood Gardens was a successful subdivision developed by Park Lake, a sister company to Royce Homes. Royce Homes was the guarantor of Park Lake's loans. Royce Homes was the largest of the Royce entities and possessed the revenues and equity needed to guarantee the Park Lake loans. (Speer Excerpt 7). Park Lake owed Royce Homes approximately $4.9 million. This debt was not repaid and remains unpaid today. (Speer Excerpt 9 and 14). Royce Homes was the primary purchaser of developed lots from Park Lake. (Speer Excerpt 5). (Denison Excerpt 43).

271.   Park Lake had developed Westwood Gardens which had 163 lots remaining to be sold. (Speer Excerpt 6). (Denison Excerpt 44 ). In addition, Westwood Gardens had an expected $2.9 million MUD reimbursement. MUD reimbursement refers to an instance where the developer installs utilities such as water, sanitary sewers, and storm sewers in a subdivision it develops. Once the subdivision is built the municipal utility district for the subdivision will reimburse the developer a portion of the development cost for the installation of the utilities. (Speer Excerpt 8). (Denison Excerpt 45).

272.   In approximately August 2008, Speer approached Denison about an opportunity for Speer and Amegy regarding Westwood Gardens. Speer advised Amegy about the existence of the lots and the $2.9 million MUD receivable. He advised that the proceeds from Westwood

Exhibit B

Gardens could be used to pay his personal loan. At this time, Speer still owed Amegy approximately $5 million. Royce Homes owed Amegy $975,000, which Amegy knew was not likely to be repaid since Royce Homes was closed. Speer advised he was going to set up a new company and transfer Westwood Gardens to the new company. Denison acknowledged the elements of the plan so Amegy and Speer could take advantage of the opportunity in Westwood Gardens. (Denison Excerpt 47 and 48).

273. The plan included Amegy purchasing the Wachovia Bank note secured by Westwood Gardens. Wachovia's lien included the MUD reimbursements. Amegy would then foreclose on Westwood Gardens, financing Speer through a new company so he could purchase the property at the foreclosure sale. Once purchased, Speer agreed to turn over a substantial portion of the equity to Amegy to satisfy the remaining $5 million of Speer's personal Amegy loan and the $975,000 debt Vestalia assumed from Royce Homes. Without the Westwood Gardens deal these debts were likely not collectible.

274. The repayment of Amegy was detailed in Denison's testimony. Speer and Amegy agreed that Vestalia would assume the $975,000 debt of Royce Homes and use the MUD reimbursement to pay this debt plus, if necessary, use the reimbursement to pay down Speer's personal Amegy loan. Also, it was agreed that the Westwood Gardens equity would be moved, through the foreclosure sale, to Vestalia. As Vestalia sold homes, it would pay down Speer's personal Amegy loan. (Denison Excerpts 49, 50, 51, 52, 53, and 54)

275. Amegy agreed to extend a loan to Speer for the purchase, at foreclosure, of the Westwood Gardens subdivision then provide Speer with a line of credit so he could continue building homes in Westwood Gardens. Denison testified Speer could do the deal because Amegy

Exhibit B

participated and that Amegy would not have done the deal without Speer being involved. (Denison Excerpt 55).

276.   Speer and Amegy then began negotiating the creation of the new company which would be used to purchase Westwood Gardens.  The new company was eventually named Vestalia.

277.   During these negotiations, Amegy was well aware of the fact that Speer was in control of and was the president of Hammersmith.   (Denison Excerpt 42). Hammersmith was the general partner for both Royce Homes and Park Lake.  (Speer Excerpt 1).  Speer was the chief executive officer of Park Lake. (Speer Excerpt 2, 3, and 4).  Amegy knew Speer was an officer of Park Lake. (Denison Excerpt 43). Amegy verified Park Lake owed Royce Homes approximately $4.9 million.  (Speer Excerpt 10). (Denison Excerpt 57).

278.   By August 2008, Park Lake was insolvent. (Speer Excerpt 11, and 12). Amegy investigated and discovered that Park Lake was insolvent and that Royce Homes was a creditor of Park Lake prior to entering into the Westwood Gardens transaction.   (Speer Excerpt 14). (Denison Excerpt 56).  Amegy clearly knew Speer, as chief executive officer of Park Lake, an insolvent corporation, owed a fiduciary duty to Royce Homes and to Park Lake's other creditors.  Speer testified he owed a duty to Park Lake to protect its interest but he chose Vestalia's interest over Park Lake's.  (Speer Excerpt 13, 19, 20, and 21).

279.   Amegy essentially sought to create a straw-man company to purchase Westwood Gardens giving the impression Speer was not involved.   (Denison Excerpt 61). Denison testified Amegy's attorneys strongly preferred Speer not be an owner of Vestalia and that its capitalization would come from a source other than Speer.  (Denison Excerpt 58 and 59). Speer guessed Amegy wanted no one from Royce Homes involved in the new company.

Exhibit B

(Speer Excerpt 15 and 16).   Amegy and Speer discussed different ways the new company could be established--Amegy did not want Speer to be an owner.  Amegy even helped plan how Speer could be compensated. (Denison Excerpt 62).  Denison acknowledged Amegy did not typically get involved in the ownership of companies.  He agreed this transaction was not typical because a) Speer was taking assets from Park Lake which he controlled and placing them in Vestalia, another company he controlled, b) Park Lake owed Royce Homes a substantial amount of money, and c) the asset being transferred from Park Lake to Vestalia had substantial equity.  (Denison Excerpt 60).

280.   Speer testified he ultimately created Vestalia with him, his wife Donna Speer, his son Shawn Speer, and his daughter-in-law Shonna Speer, as the owners.  (Speer Excerpt 23).

281.   By October 2008, Speer had retained bankruptcy counsel for Royce Homes and other entities.  Speer never filed either Royce Homes or Park Lake into bankruptcy.  Instead, he worked toward the completion of the Westwood Gardens transaction. (Speer Excerpt 90 and 91).

282.   Since the inception of the Westwood Gardens plan, Speer and Denison had been discussing the opportunity available through Westwood Gardens.  Part of that opportunity was an ability to negotiate down the price of the Wachovia note and lien. By December 2008, Speer and Amegy had almost completely succeeded in their negotiations to purchase the Wachovia note and they were working on the final purchase price.  Speer considered the final negotiated price a great deal for Amegy and Speer.  (Denison Excerpt 63).  Speer was disregarding his obligations to Park Lake and Royce Homes.

283.   The note purchase was closed in January 2009.  By January 27, 2009 Amegy detailed the

Exhibit B

steps of the plan in a Credit Modification. This modification clarified the plan was to move almost $3 million in equity from Park Lake to Vestalia and use it to pay off Speer's personal loan and the remaining $975,000 of the Royce Homes debt. (Denison Excerpt 64).

284. Speer and Amegy had negotiated the terms of the line of credit for Vestalia and the terms under which Speer would purchase Westwood Gardens at the foreclosure sale. Amegy provided Speer with bidding instructions to purchase of Westwood Gardens at the foreclosure sale. (Denison Excerpts 65, 66, 67, and 68). (Speer Excerpt 18). Amegy actually calculated the bid amount for Speer to bid at the foreclosure sale. (Denison Excerpt 69).

285. But, before the foreclosure could occur, Amegy required Speer pay a mechanics lien filed against the Westwood Gardens subdivision. (Denison Excerpt 71 and 72). Like he had done prior to the closing of Royce Homes, Speer went to the Royce Homes bank account to pay the Park Lake creditor but the creditor balked at taking the payment because it believed a Royce Homes bankruptcy was imminent. (Speer Excerpt 22).

286. By February, Westwood Gardens was posted for foreclosure and on March 3, 2009 a foreclosure sale occurred with Vestalia as the purchaser.[31] On that date, Amegy deposited $2,058,750 into Vestalia's account and then immediately pulled $2,633,953.28 out of the account. This included the Amegy loan proceeds plus Speer's added capital. (Denison Excerpt 70).

287. Denison testified that the Amegy loan committee approved the Speer/Amegy plan. (Denison Excerpt 73). He also testified that once the Royce Homes bankruptcy was filed, Amegy

[31] As stated below, the Trustee disputes the foreclosure sale and asserts it was a fraudulent transfer.

Exhibit B

sought advice from its counsel regarding the risks relating to the bankruptcy and the Westwood Gardens transaction. (Denison Excerpt 74).

288. At the inception of the plan, Amegy obtained an appraisal of the Westwood Gardens property and MUD reimbursement. In addition, Amegy prepared an internal verification of the appraisal. Finally, Speer counseled Amegy regarding the value of the property and MUD reimbursement. These establish the loss to Park Lake and, ultimately, Royce Homes as a result of the Westwood Gardens plan.

289. Denison testified the appraiser established a discounted value for the lots and MUD reimbursements of $5,405,000. The appraisal stated a willing purchaser existed for the lots at $3,872.550. That, added to the value of the MUD reimbursements of $2.9 million, established a value to Park Lake of $6,772,550. Denison testified that the Amegy internal review of the appraisal gave it a four out of possible five rating. As part of the review, Amegy internally a) verified the appraiser complied with USPAP, FIRREA, Amegy's reporting requirements, b) checked the adequacy and relevance of the data and the propriety of any adjustments, c) checked the adequacy and relevance of appropriate appraisal methods and techniques, and d) checked the reasonableness of the analysis and opinion value. (Denison Excerpt 75). Based on information and belief, Speer provided Amegy with an acquisition analysis establishing the equity in the lots and MUD reimbursement at a value of $3,542,550. (Denison Excerpt 76 and 77).

290. Notwithstanding the careful planning by Amegy and Speer, the notice of the foreclosure sale and the subsequent deed issued at the foreclosure sale had an error. They incorrectly referred to film code 617088 instead of 617091, which would cause confusion regarding

which property was foreclosed. The errors in the Notice of Appointment of Successor Trustee and Notice of Substitute Trustee's Foreclosure Sale were not corrected. The Substitute Trustee's Deed with Bill of Sale was corrected twice–February 24, 2010 and March 10, 2010-indicating the change of the film code number.

291. Amegy, Vestalia, Park Lake and Speer colluded to carry out the Westwood Gardens foreclosure, including fixing the price at the foreclosure sale, providing bidding instructions, and providing Vestalia with the funds to pay for Westwood Gardens.

292. The Trustee seeks to recover against the Westwood Fiduciaries and Westwood Conspirators for the equity transferred from Park Lake to Vestalia. The Trustee further seeks a constructive trust and equitable lien against the lots and the MUD Receivable.

**4. Watermark Asset Stripping**

293. This claim is asserted against Speer, Kopecky and Hammersmith ("the Watermark Fiduciaries") for breach of fiduciary duty. The claims are also asserted against Speer, Kopecky, Watermark Land, LLC, Watermark, LLC, Watermark Tortuga, LLC, and Hammersmith ("the Watermark Conspirators"), for conspiracy, aiding and abetting, and acting in concert in the breach. (collectively known as "the Watermark Defendants").

294. Speer and Kopecky as officers of Royce Homes and its general partner, Hammersmith, owed a fiduciary duty to Royce Homes. (Speer Excerpt 59).

295. Watermark Land's initial purpose was to acquire property along the coastal areas and develop resort properties. It was organized in Delaware on December 14, 2005 and qualified to operate in Texas on April 21, 2006. Hammersmith was its general partner. Hammersmith was the general partner for other entities such as Royce Homes, LP, and Park

Exhibit B

Lake. (Speer Excerpt 60).

296. The limited partners, as of December 14th of 2005, were John Speer, George Kopecky and James Hunter. (Speer Excerpt 60).

297. Park Lake, a Royce Homes affiliate, purchased lots located in the Pirates Beach area in Galveston from Lake Como Club on April 19, 2006, for $1,550,000. (Speer Excerpt 60).

298. Then Watermark purchased the Pirates Beach tracts from Park Lake on April 30th of 2007 for $ 1.8 million. (Speer Excerpt 60). Upon information and belief, Watermark purchased the Pirates Beach tracts using funds provided by Royce Homes. (Speer Excerpts 65, and 67).

299. Thereafter, pursuant to a contract dated December 29th, 2006, Watermark sold seventeen of the Pirates Beach lots to Royce Homes for $107,056 per lot for a total of $1,816,952 in a series of closings on June 4, 2007; June 22, 2007; and June 29, 2007. In the transaction George Kopecky signed for the Seller, Watermark Land, LP, and for the Buyer, Royce Homes, LP.

300. A dispute arose between Kopecky and Speer in late 2007 and 2008 involving Speer's alleged misrepresentation of the financial records and Speer's improper disbursement of $10 million from Royce Homes. (Speer Excerpt 62).

301. Mr Kopecky alleged:

> "Upon information and belief, Mr. Speer has wrongfully commingled and/or misappropriated over $10 million in available partnership cash resources and, otherwise, wrongfully converted partnership assets to fund a lavish and highly publicized personal lifestyle, including the ownership and operation of the Magueyitos Ranch property. Further, upon information and belief, Mr. Speer has diverted said funds to and through multiple entities he owns or controls, including but not limited" --…… [ a number of different Royce entities]

302. Kopecky also alleged he was provided financials with incorrect representations contained

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 75
Back to Table of Contents

Exhibit B

therein, a claim Speer does not appear to dispute. The alleged false financial statements were the same financial statements that were being sent to the Royce Homes lenders. It appears Speer used improper accounting to allow distributions to be made to himself to fund his personal debt and create a false impression of equity in Royce Homes. (Speer Excerpts 63 and 64).

303. Speer admits he controlled the issuance of Royce Homes's financial statements. (Speer Excerpt 69).

304. In an attempt to resolve this dispute Kopecky made an offer to Speer that Speer transfer his interest in Watermark to Kopecky. In the offer Kopecky acknowledges "……..some of the direct or indirect funding and/or recoupment of the initial 20-acre acquisition costs, inclusive of the 2-acre, 17-lot carve-out, was derived from Royce and may be at risk as a preference and/or fraudulent transfer in the event of any Royce chapter filing….and , in the event all or any portion of the settlement consideration is challenged or deemed to be a preference or fraudulent transfer, Mr. Speer will indemnify and hold Mr. Kopecky harmless of and from any liabilities and/or losses, including but not limited to attorney's fees."

305. Although the dispute did not initially close under these terms, the settlement ultimately did close using Speer's alleged tainted interest in Watermark as consideration. (Speer Excerpts 65, 66, 67 and 68).

306. Prior to the parties reaching the agreement for Speer to transfer his interest in Watermark to Kopecky, Speer had offered to alter the Royce Entities' tax returns to allow Kopecky to claim a loss that he would not otherwise be able to claim. Kopecky refused to become complicit in manipulation of tax returns and turned down the offer. (Speer Excerpts 70, 71

Exhibit B

and 72).

307. In the final settlement Kopecky agreed to take Speer's share of Watermark. In Kopecky's earlier settlement proposal he acknowledged that this asset is tainted because of the improper receipt of funding from Royce Homes. (Speer Excerpt 73).

308. Therefore the Trustee seeks to recover the alleged $1.8 million used by Kopecky and Speer to fund Watermark.

**5. Allard Investment Asset Stripping**

309. This claim is asserted against Speer, Manners, Kopecky and Hammersmith ("the Allard Fiduciaries") for breach of fiduciary duty. These claims are also asserted against Speer, Manners, Kopecky, Allard, and Hammersmith ("the Allard Conspirators"), for conspiracy, aiding and abetting, and acting in concert in the breach. (collectively known as "the Allard Defendants").

310. Speer and Kopecky as officers of Royce Homes and its general partner, Hammersmith, owed a fiduciary duty to Royce Homes. Manners as an employee, control person, Chairman Emeritus owed a fiduciary duty to Royce Homes.

311. By June of 2007 Speer had stopped paying Manners under the Manners Note. The Manners Note had a provision that allowed Speer to stop making payments for up to four months:

> *(f) Notwithstanding any provision hereof to the contrary, any payment of Closing Fee, interest or principal otherwise payable hereunder (other than any payment due and payable at final maturity) may be deferred for a period not exceeding four months at the option of Debtor to the extent, at the time such payment is due, if under the subordination provisions of this Note or any note, indenture, loan agreement or other similar arrangement or agreement to which any Royce Entity is a party (I) the Debtor is prohibited from making payments under this Note, (ii) any Royce Entity is prohibited from making dividends and other distributions, or (iii)* ***there is an event of default under any of this Note or any note, indenture, loan agreement or other similar arrangement or agreement to which any Royce Entity is a party.*** *(Emphasis*

Exhibit B

*added).*

312. Apparently no further monetary payments were made after June 2007 but at the end of four months, in November 2007, Speer caused Royce Homes to convey approximately twenty five homes to Manners's new company, Allard Investments, at a substantial discount. Royce Homes also conveyed another approximate twenty five homes to Allard at a substantial discount in December 2007.

313. Manners testified about his undated handwritten notes regarding Royce's financial issues. He said he was apparently trying to determine if Royce Homes's assets had been sold and if assets were available to be sold. (Manners Excerpt 1). Manners acknowledged that in November 2007 Speer owed him $11 million. Manners then asserted the statement "asset stripping" in his handwritten notes was a reference to Royce Homes selling its assets to make its balance sheet look better. He asserted the Allard Investment purchase in November and December 2007 of approximately fifty homes, at less than the amount of debt owed against them and far less than the listed price of the homes, improved the Royce Homes balance sheet. (Manners Excerpt 2). Apparently, he also considered purchasing MUD reimbursements. (Manners Excerpt 13). And, he even discussed the Westwood Gardens MUD reimbursements. (Manners Excerpt 14).

314. Manners formed Allard investments to buy homes from Royce and other builders. (Manners Excerpt 3).

315. Manners first purchased twenty five homes in November 2007. The base price on the homes, with options, was $3,917,274 but he received a $1,227,472 discount thus purchasing the houses for $48,716 less than the debt Royce Homes owed. (Manners Excerpt 4 and 5).

316.    The second set of homes were purchased in December 2007.  After the purchase, Royce

Homes continued to pay the utilities on the homes. (Manners Excerpt 6, 7, and 8). Manners

acknowledged his purchase price was $2,727,810 which was $161,192.05 less than the debt

Royce Homes owed. (Manners Excerpt 9). Manners testified Allard purchased fifty houses

at below the list price on the homes. (Manners Excerpt 10 and 11).

317.    In the December sale of houses to Allard, Manners paid $227,472 more than he wanted for

the homes.  In order to repay Manners for the extra $227,472, Speer and Manners agreed

Royce Homes would sponsor Manners's race car company, MGM Motor Sports, for $35,000

per month to repay the overpayment of the Allard properties. Speer structured the agreement

so it would not show up on the Royce Homes balance sheet.

318.    Manners's testimony began with the discussion of Exhibit 92.  Exhibit 92 was an email from

the Royce Homes controller, Murrah Mayberry:

> *From: Murrah Mayberry*
> *Sent: Monday, December 17, 2007 10:24 AM*
> *To: James Hunter; Bill Gathmann*
> *Cc: Murrah Mayberry*
> *Subject: Allarad investment, Transaction #1 - nov 2007*
>
> *Men,*
>
> *the attached SS details the final numbers for the 25 homes closed on 11/30/07 to Allarad Investments. On the spread sheet I have listed the amount of money we still owe Allard Investments. This liability is not on our balance sheet per previous discussions we have had with one another.*

319.    Manners claimed the repayment was not a debt but was a sponsorship which did not need

to be on the balance sheet. (Manners Excerpt 15).

320.    Manners explained he started charging Royce Homes the $35,000 sponsorship fee in January

2008, the month after the last Allard purchase.  This arrangement allowed him to show

Exhibit B

income in his race car company. (Manners Excerpt 16).

321. The Allard Fiduciaries breached their fiduciary duty to Royce Homes by selling these houses to Allard for less than fair market value and for paying MGM Motor Sports the alleged sponsorship fee. Manners aided and abetted and conspired with Speer to breach his fiduciary duty in this transaction.

322. The Trustee seeks to recover the difference between the consideration paid by Allard and the fair market value of the houses transferred to Allard. The Trustee also seeks to recover damages equal to the amount of money paid to MGM Motor Sports.

**6. Conclusion and Damages Relating to Breach of Fiduciary Duty**

323. The Fiduciaries' conduct was not authorized by the Partnership Agreement. In carrying out the scheme the Fiduciaries totally abandoned Royce Homes's interest. Their interests were adverse to Royce Homes and not for its benefit. The Fiduciaries and Fiduciary Conspirators intended to act solely for their own purpose or for the purposes of Amegy. On information and belief, other than the parties sued herein, there were relevant decision-makers in management for Hammersmith and Royce Homes who were innocent of the breach of fiduciary duty and fraud and if informed of the wrongful conduct could have stopped it.

324. All of the Fiduciaries, Westwood Fiduciary,[32] Watermark Fiduciaries, and the Allard Fiduciaries owed fiduciary duties to Royce Homes. They:

a. violated this duty in failing to care for Royce Homes and to safeguard its assets.

b. failed to care and safeguard Royce Homes's assets they removed assets when they were not authorized to do so under the Partnership Agreement.

[32]The Westwood Fiduciary owes a duty to Park Lake Creditors, including Royce Homes.

      i. The removal of these assets caused Royce to breach its loan covenants with its lenders.

ii. The assets were removed when it was evident that Royce Homes's financial condition and outlook was deteriorating.

c. brought Royce Homes's equity levels below the levels that Speer had represented to the creditors Royce Homes would maintain.

d. breached their duty of care and safeguarding when they transferred funds to themselves for their benefit.

e. caused Royce Homes to pledge its assets and borrowed funds, resulting in Royce Homes's deepening insolvency.

f. breached their fiduciary duty by creating a conflict of interest yet continuing to self deal.

325. As part of their fiduciary duty they had a duty of care. Under this duty of care they were to exercise, in the performance of their tasks, the care that a reasonably prudent person would use under similar circumstances. Their conduct breached this duty.

326. They also owed Royce Homes a duty of loyalty.[33] As part of their duty of loyalty they were to:

a. Not bring harm to Royce Homes–their unauthorized and unlawful transfer of Royce Homes's assets for their personal benefit caused harm to Royce Homes.

b. Refrain from self-dealing yet,

i. They engaged in self dealing because they appeared on both sides of the

[33] Cede & Co. v. Technicolor, 634 A.2d 345,361 (Del.1993).

Exhibit B

transactions described above[34] and

ii. They engaged in self dealing because they placed themselves in a position of conflicting loyalties and subsequently benefitted at the expense of Royce Homes.[35]

c. Avoid conflicts of interest–they operated under a conflict of interest in all the transfers and transactions described above. They chose their self interest over that of Royce Homes in all the transactions described above.

d. Maintain a duty of good faith[36]–they acted in bad faith because they engaged in the conduct described above which amounted to an "intentional dereliction of duty or the conscious disregard for their responsibilities."[37]

327. They are not protected by the "Business Judgment Rule" because they were not disinterested parties. They appeared on both sides of the transactions. They derived personal financial benefit from their self-dealing as opposed to legitimate benefit.

328. The transactions described above do not meet the "Entire Fairness Standard."[38]

329. The Fiduciary Conspirators conspired, aided and abetted, and acted in concert with the

---

[34] Cinerama, Inc.v. Technicolor, Inc., 663 A.2d 1156, 1169 (Del. 1995)

[35] U.S. v. Skeddle, 940 F.Supp. 1146, 1150 (N.D. Ohio 1996).

[36] Duty of Good Faith has been subsumed in the duty of loyalty. In re Walt Disney Co. 906 A.2d 27, 37 (Del. 2006).

[37] McPaddenv. Sidhu, 964 A.2d 1262, 1274 (Del.Ch. 2008). Also see Lyondell Chem. Co. v.Ryan, 970 A.2d 235, 240 (Del. 2009).

[38] Under the entire fairness doctrine, a self-dealing transaction by corporate directors must be justified under both elements of a two-pronged inquiry into the fair process and the fair price of the transaction. Thus, as a procedural matter, the court must consider whether the board made the necessary investigation and undertook due deliberation with respect to the decision the board made, and as a substantive matter, the court must consider whether the decision is defensible on the merits. In reAdelphia Commc'ns Corp., 323 B.R. 345, 385-86 (Bankr. S.D.N.Y. 2005).

Fiduciaries in the breaches described above. The Fiduciary Defendants had the specific intent and meeting of the mind to accomplish the payments of the Buyout debts from Royce Homes in a manner which was unlawful and unauthorized under the Partnership Agreement. The payments were made during a time when it was clear they would cause Royce Homes to suffer great financial harm and risk. The Fiduciary Defendants conspired to enter the payments into the financial records of Royce Homes in a manner which misrepresented the financial standing of Royce Homes. They also conspired to avoid reporting the Manners Note on the Royce Homes balance sheet.

330. The Allard Defendants transferred Royce Homes's assets to Allard, a Manners controlled entity, for less than reasonably equivalent value. This unlawful act could only be accomplished by the misuse of Allard Conspirators' control position with Royce Homes and with the participation of Allard Defendants.

331. In the alternative, the Allard Conspirators knowingly participated in these breaches of fiduciary duty by the Allard Fiduciaries and therefore aided and abetted and acted in concert with the Allard Fiduciaries.

332. The Fiduciary Conspirators conspired, aided and abetted and acted in concert to breach the duties described above. The Fiduciary Conspirators had the specific intent and the meeting of minds to accomplish the payment of the $20 million Speer personal Amegy loan from Royce Homes. These payments were unlawful since they were unauthorized under the Partnership Agreement and were made during a time frame that caused Royce great financial harm and risk. Further, by conspiring to avoid reporting the $20 million Amegy loan on the Royce Homes balance sheet, the Fiduciary Conspirators misrepresented the financial

standing of Royce Homes.

333. Royce Homes was a creditor of Park Lake. Park Lake was insolvent at the time Speer and Amegy planned, and carried out their plan, to denude Park Lake to the detriment of Royce Homes. The Westwood Fiduciary had a fiduciary duty to Royce Homes at the time the Westwood Conspirators planned and carried out the plan. Amegy knew of the Westwood Fiduciary's fiduciary duty. The Westwood Conspirators also had the specific intent and the meeting of minds to accomplish the transfer of assets and equity of Park Lake to a newly formed, Speer controlled entity, Vestalia. The sole purpose of the transfer was for the benefit of the Westwood Conspirators and in violation of the Westwood Fiduciaries' fiduciary duty. This unlawful act could only be accomplished by the misuse of Speer's control position with Royce Homes, Hammersmith and Park Lake and with the participation of Amegy.

334. In the alternative, the Westwood Conspirators knowingly participated in the breaches of fiduciary duty by the Westwood Fiduciaries and therefore aided and abetted and acted in concert with the Westwood Fiduciaries.

335. The Fiduciary Conspirators conspired, aided and abetted, and acted in concert with Kopecky in the breaches described above. Kopecky and Fiduciary Conspirators had the specific intent and the meeting of minds to accomplish the payments of distributions of funds to Kopecky from Royce Homes in a manner which was unlawful since they were unauthorized under the Partnership Agreement. The unlawful distributions were made during a time frame that caused Royce Homes great financial harm and risk.

336. In the alternative, Fiduciary Conspirators knowingly participated in the breaches of fiduciary

duty by Kopecky and therefore aided and abetted and acted in concert with Kopecky.

337.    The Watermark Conspirators conspired, aided and abetted, and acted in concert with Watermark Fiduciaries in the breaches described above. The Watermark Conspirators had the specific intent and the meeting of minds to accomplish the use Royce Homes's assets to fund Watermark and subsequently use Watermark as consideration for a settlement between Speer and Kopecky.

338.    The Watermark Conspirators had the specific intent and the meeting of minds to accomplish the use of approximately $1,800,000.00 in Royce Homes's assets to fund Watermark Land for their personal benefit.

339.    The following damages were proximately caused by the breaches of fiduciary duty:

  a.     An amount of at least $5,240,813.60 in Tax Distributions and other Distributions to Speer or for his benefit. The Fiduciary Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

  b.     $15,000,000.00 in principal payments made under the Speer personal loan to Amegy. The Fiduciary Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

  c.     $1,507,500.00 in interest payments made under the Speer personal loan to Amegy. The Fiduciary Defendants are jointly and severally liable for this amount as fiduciaries
       or as co-conspirators or because they aided and abetted or acted in concert in the

Exhibit B

conduct.

d. In excess of $3,000,000.00 in equity transferred by Speer and Amegy to Vestalia from Park Lake. The Westwood Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

e. At least $3,085,100.00 in interest and principal payments on Speer's personal note to Manners. The Fiduciary Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

f. The $900,000.00 paid to Manners on October 2, 2006. The Fiduciary Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

g. In excess of $2,345,000.00 which is believed to be the shortfall in consideration paid below fair market value for the Royce Homes properties involved in the Allard transaction. The Allard Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

h. In excess of $140,000 which represents the funds paid by Royce Homes to MGM Motor Sports. The Allard Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

i. In excess of $400,000.00 in alleged salary, benefit and sponsorship payments made

to Manners and entities controlled by him. The Fiduciary Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

j. $2,146,046.00 in transfers to Kopecky. The Fiduciary Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

k. Approximately $1,800,000.00 in Royce Homes's funds which appear to have been used to fund Watermark Land. The Watermark Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

l. The amounts paid from Royce Homes to fund Speer's lavish lifestyle and distributions to Donnie Lou Speer. Speer is asked to account for these payments. The Fiduciary Defendants are jointly and severally liable for this amount as fiduciaries or as co-conspirators or because they aided and abetted or acted in concert in the conduct.

340. The estate also requests punitive damages as a result of the Fiduciary Defendants, Westwood Defendants, Allard Defendants, and the Watermark Defendants knowingly and intentionally participating in these breaches of fiduciary duty. The conduct of the Fiduciary Defendants, Westwood Defendants, Allard Defendants, and the Watermark Defendants constitutes self dealing. The Fiduciary Defendants, Westwood Defendants, Allard Defendants, and the Watermark Defendants conduct was ratified and approved by their respective officers, directors and, where necessary, the appropriate committees or boards.

341. The estate further requests punitive damages against the Fiduciary Conspirators.

**C. Civil Theft/Conversion/Money had and Received**

342. The Trustee files this claim against Speer, Amegy, Manners, Kopecky and Donnie Lou Speer. ("Civil Theft Defendants").

343. The elements of Civil Theft as set out in Chapter 134 of the Civil Practice and Remedies Code titled Theft Liability Act.[39] Speer, Amegy, Manners, Kopecky and Donnie Lou Speer unlawfully appropriated property of Royce Homes with intent to deprive Royce Homes of its property[40] without its effective consent.[41] Speer, Amegy, Manners, Kopecky and Donnie Lou Speer knew at the time they received the funds that Speer was not legally authorized to act for Royce Homes in making non-salary distributions, tax distributions and distributions to pay the Amegy Loan, Manners Note, DLS Note and Kopecky Transfers.

344. Hammersmith, Speer, Manners, Kopecky, and Donnie Lou Speer owed a fiduciary duty to Royce Homes. The money Speer received was an asset of Royce Homes. Further, in making distributions to himself, Speer wrongfully converted the funds of Royce Homes. Speer, Amegy, Manners, Donnie Lou Speer, and Kopecky are jointly and severally liable for the funds they received.

345. Under Texas Law, the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights, is in law a conversion. Plaintiff must prove: (1) plaintiff owned, had legal

---

[39]Tex. Civ. Prac. & Rem. Code Ann. § 134.001 to 134.005.

[40]Tex. Penal Code Ann. § 31.03(a) and (b)(1) and (2).

[41]Tex. Penal Code Ann. § 31.01(3)(B).

Exhibit B

possession of, or was entitled to possession of the property; (2) defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with plaintiff's rights; (3) plaintiff made a demand for the property; and (4) defendant refused to return the property.[42] The recipient of converted funds may be liable for the funds received.[43]

346. An action for conversion of money has been held to lie where the money is: (1) delivered for safekeeping, (2) intended to be kept segregated, (3) substantially in the form in which it is received or an intact fund, and (4) not the subject of a title claim by its keeper.[44]

347. The elements of a cause of action for money had and received are the following: 1) The defendant holds money and 2) the money belongs to the plaintiff in equity and good conscience.[45] As shown in the Third Amended Complaint, Speer, Manners, Donnie Lou Speer, Kopecky, and Amegy hold funds which belong to Royce Homes in equity and good conscience.

348. As shown above, Hammersmith, Speer, Manners, Kopecky, and Donnie Lou Speer owed a fiduciary duty to Royce Homes. The funds subject to the civil theft, conversion, and money had and received were deposited in a specific Royce Homes bank account. The account was

---

[42] Ojeda v. Wal-Mart Stores, Inc., 956 S.W.2d 704, 707 (Tex. App. 1997)

[43] See, United States v. Boardwalk Motor Sports, Ltd., 4:08-CV-110, 2010 WL 1717994 (E.D. Tex. Jan. 29, 2010) Holding bank and initial transferee jointly and severally liable for funds transferred to bank from sale of car against which IRS held a lien.

[44] Paschal v. Great Western Drilling, Ltd., 215 S.W.3d 437 (Tex. App. Eastland 2006), reh'g overruled, (Dec. 14, 2006).

[45] Staats v. Miller, 243 S.W.2d 686, 687-88 (Tex. 1951); Edwards v. Mid-Continent Office Distribs., 252 S.W.3d 833, 837 (Tex.App.-Dallas 2008, pet . denied); Doss v. Homecoming Fin. Network, Inc., 210 S.W.3d 706, 710-11 (Tex.App.-Corpus Christi 2006, pet. denied); Hunt v. Baldwin, 68 S.W.3d 117, 132 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

owned by Royce Homes. Hammersmith, Speer, Manners, Kopecky, and Donnie Lou Speer owed a duty to safeguard partnership property, including the Royce Homes bank accounts. The funds in the Royce Homes account were segregated and kept for the benefit of the Partnership. The funds in this account which Speer, Manners, Kopecky, and Donnie Lou Speer converted are specifically identifiable and are identified in paragraphs 129 to 133, 153 to 157, 162 to 164, 169 to 172, 178 to 179, Exhibit B, 183 to 184, 348, 438 to 444, 579 to 586, and 614 to 628. The Trustee specifically identified each wire transfer or check constituting the civil theft, conversion, and money had and received . The wire transfers or checks are specifically identified as being removed from the Royce Homes bank account and deposited into a specific Speer account. As shown throughout this Third Amended Complaint, Speer did not have a claim of title to these funds.

349. Royce Homes owned, had legal possession of, or was entitled to possession of the funds the subject of this suit. Speer, Amegy, Manners, Kopecky and Donnie Lou Speer assumed and exercised dominion and control over the funds in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Royce Homes's rights. The Trustee made a demand for the funds. Speer, Amegy, Manners, Kopecky and Donnie Lou Speer refused to return the funds.

350. As set out in this Third Amended Complaint, Speer distributed millions of dollars in funds belonging to Royce Homes, without its consent, for the purpose of paying Amegy, Manners, Donnie Lou Speer and Kopecky. Speer, Amegy, Manners, Donnie Lou Speer and Kopecky took control of those funds, acting in concert. In fact, the entire payment process–from Royce Homes to Speer to Amegy, Manners, Donnie Lou Speer and Kopecky–was a step

transaction designed to pay Amegy, Manners, Donnie Lou Speer and Kopecky from Royce Homes with the facade of distributions to Speer.[46]

351. As shown in this Third Amended Complaint, the Partnership Agreement:

a. prohibited distributions from borrowed funds;

b. prohibited distributions when Royce Homes when there were not sufficient working capital reserves in an amount to ensure full compliance with the Royce Homes loan covenants, including debt-to-equity ratios

c. required the general partner, Hammersmith, to act consistently with its fiduciary obligations to Royce Homes;

d. required that proceeds from loans be used for partnership purposes; and

e. required that partnership property be used for partnership purposes.

352. The Hammersmith certificate of incorporation:

a. authorized the corporation to only act lawfully;

b. prohibited self dealing by directors.

353. In addition to breaching his fiduciary duties by making distributions to himself, Speer was self-dealing, breaching the Partnership Agreement and Hammersmith's Certificate of Incorporation and By-Laws. As a result, Speer was not authorized on behalf of Royce

[46] In re Yazoo Pipeline Co., L.P., 08-38121, 2011 WL 1118467 (Bankr. S.D. Tex. Mar. 24, 2011). The step transaction doctrine, which is most commonly associated with tax cases but is also applicable in bankruptcy proceedings, provides that "multistep transactions can be collapsed when the steps of the transaction are 'part of one integrated transaction. Under the step-transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step for no other purpose than to avoid U.S. taxes. Courts must consider the substance over the form of the transactions at issue in determining whether to treat what appear to be multiple transactions as one. Courts must consider the substance over the form of the transactions at issue in determining whether to treat what appear to be multiple transactions as one. Although taxpayers 'are entitled to structure their transactions in such a way as to minimize tax,' there must be a purpose for the 'business activity ... other than tax avoidance' and that purpose cannot be a 'facade. (Citing other cases).

Homes or Hammersmith to make these distributions.

354. The violations of the Theft Liability Act and conversion by Speer, Manners, Kopecky, and Donnie Lou Speer acting as a fiduciary, occurred at four different levels:

a. Speer, Manners, Kopecky, and Donnie Lou Speer were employees of Royce Homes. Speer was a key employee. Speer was the president of Royce Homes. The disbursements in violation of the Partnership Agreement were not authorized by the Partnership Agreement and therefore he had no effective consent to make disbursements.

b. Speer was an officer of Hammersmith. Hammersmith, as the general partner of Royce Homes, was required to act consistently with its "fiduciary responsibility. Hammersmith had full and exclusive power and authority to manage, control, administer, and operate Royce Homes but, subject to "as otherwise provided in this Agreement." Distributions were only allowed from "Available Cash." The definition of Available Cash in the Partnership Agreement specifically excluded "cash funds obtained from loans to the Partnership and working capital reserves sufficient to "ensure full compliance with the terms of all loan covenants and agreements of the Partnership." Speer's distributions violated these provisions of the Partnership Agreement. In light of specific provisions of the Partnership Agreement, Speer acted in bad faith when these distributions occurred. Speer simply had no authorization to make these distributions. Therefore, neither Hammersmith nor Speer had effective consent to make the distributions.

c. Speer was the sole director of Hammersmith. Hammersmith's Certificate of

Exhibit B

Incorporation specifically provided that the corporation only engage in a "lawful act or activity." The Certificate of Incorporation expressly states that Speer, as a director, has personal liability for monetary damages and breach of fiduciary duty as a director since he breached his duty of loyalty to Hammersmith, acted in bad faith, acted with intentional misconduct, and when he derived an improper personal benefit from the disbursements. Speer, as a director of Hammersmith, had no effective consent to make these distributions.

d.   Speer was misapplying assets he controlled as a fiduciary.

355.   By taking these funds, Speer, Manners, Kopecky, and Donnie Lou Speer committed fraud and defalcation while acting in a fiduciary capacity, misapplication of fiduciary property, embezzlement and larceny.

356.   Speer, Manners, Kopecky, and Donnie Lou Speer had an actual intent to hinder, delay, and defraud the Royce Homes creditors as set forth in the Fraudulent Transfers section and throughout this Third Amended Complaint.

357.   Speer, Manners, Kopecky, and Donnie Lou Speer breached their fiduciary duty to Royce Homes by allowing the distributions as set forth in the Breach of Fiduciary Duty section and throughout this Third Amended Complaint.

358.   Hammersmith breached the Partnership Agreement as set forth in the Breach of Partnership Agreement section and throughout this Third Amended Complaint.

359.   Based on information and belief, Royce Homes breached its loan agreements with its lenders when Speer used loan proceeds to make his disbursements and caused the debt-to-equity ratios with his lenders to be breached.

Exhibit B

360. Based on these facts, Speer did not have effective consent to make the distributions to himself, Amegy, Manners, Donnie Lou Speer and Kopecky and did not have effective consent to make Tax Distributions to or for himself and Donnie Lou Speer.

361. Speer, Manners, Kopecky, and Donnie Lou Speer had no authority under Delaware law to make these distributions.[47]

362. A partnership is a separate legal entity which is an entity distinct from its partners unless otherwise provided in a statement of partnership existence or a statement of qualification and in a partnership agreement.[48]

363. A limited partnership shall possess and may exercise all the powers and privileges granted by this chapter or by any other law or by its partnership agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the limited partnership.[49]

364. When read together, neither Delaware law nor the Partnership Agreement authorized Speer or Hammersmith to make any distribution from borrowed funds or at a time when the Royce Homes lenders' loan covenants were breached. Beginning no later than December 27, 2006, all distributions to Speer were in breach of the Partnership Agreement, were not authorized and, therefore, Speer had no effective consent to make the distributions.

---

[47]Del. Code Ann. tit. 6, § 17-1105. In any case not provided for in this chapter, the Delaware Uniform Partnership Law in effect on July 11, 1999 [6 Del. C. § 1501, et seq.] and the rules of law and equity, including the Law Merchant, shall govern.

[48]Del. Code Ann. tit. 6, § 15-201.

[49]Del. Code Ann. tit. 6, § 17-106.

Exhibit B

365. "In its 'Tentative Draft No. 1,' The American Law Institute, in its discussion on the subject, was careful to point out that until a fiduciary acts in some way inconsistent with his lawful authority, a theft conviction should not be permitted. However, when that person decides, for whatever reason, to unlawfully and permanently deprive the lawful owner of the property, he is then acting in an unauthorized capacity, i.e., he is then exercising unauthorized control over the property, and is not exercising authorized control over the property. In short, at that moment in time he has breached the trust that his employer placed in him, and has in turn committed the offense of theft. The line between lawful and unlawful activity by an employee is therefore a question of the scope of his authority.[50]

366. The fact that Speer owns the entities, either directly or indirectly, which are the limited and general partners of Royce Homes is of no consequence. He simply had no authority to distribute funds to himself.

367. Amegy, Manners, Donnie Lou Speer and Kopecky knew at the time they received funds from Speer that his ability to distribute funds was limited by the Partnership Agreement. Each knew the funds they received were from Royce Homes.

368. Speer, Amegy, Manners, Donnie Lou Speer and Kopecky are jointly and severally liable for the funds they received as a result of Speer's violation of the Texas Theft Liability Act. This includes all distributions relating to the Amegy Loan, the Manners Note, the DLS Note, payments to Kopecky, and Tax Distributions. Further, the Trustee is entitled to recover attorney fees pursuant to V.T.C.A., Civil Practice and Remedies Code §134.005(b).

---

[50]Freeman v. State, 707 S.W.2d 597, 605-06 (Tex. Crim. App. 1986).

Exhibit B

## D. Additional Facts Relating to Breach of Fiduciary Duty, Actual Intent to Hinder, Delay, and Defraud and Amegy/Manners Knowing Participation in the Breach

### 1. Elements of Conspiracy/Aiding and Abetting/Act in Concert

369. Throughout the Third Amended Complaint the Trustee has shown that Speer willfully and knowingly breached his fiduciary duty to Royce Homes; however, these additional facts show more instances which evidence Speer's conduct was committed willfully and knowingly and support claims of breach of fiduciary duty and the actual intent to hinder, delay, and defraud creditors relating to the fraudulent transfers.

370. As shown in the factual allegations in the Breach of Fiduciary Duty section as well as the facts set forth below, Amegy and Manners conspired, knowingly aided and abetted, and acted in concert with Speer in relation to his breach of fiduciary duty.

371. "The essential elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[51] However, "merely proving a joint 'intent to engage in the conduct that resulted in the injury' is not sufficient to establish a cause of action for civil conspiracy.'"[52] "Instead, 'civil conspiracy requires specific intent' to agree 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.'"[53] "Civil conspiracy is a separate cause of action that requires, inter alia, an underlying tort and a 'meeting of the minds' among the co-conspirator[s] 'on the object or

---

[51] Massey v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983).

[52] Juhl v. Airington, 936 S.W.2d 640, 644 (Tex. 1996) (quoting Triplex Commc'ns Inc. v. Riley, 900 S.W.2d 716, 719 (Tex. 1995)).

[53] Id. (quoting Triplex, 900 S.W.2d at 719).

Exhibit B

course of action' to be taken."[54] By contrast, a cause of action for aiding and abetting requires only the knowing participation of a party in a breach of a fiduciary duty and does not require a conspiratorial agreement.[55]

372. Two or more persons are jointly and severally liable when they jointly participate in concerted action to commit a common tort and accomplish their purpose.[56] There are three methods by which a person may become liable under an acting-in-concert theory as set forth in Section 876 of the Second Restatement of Torts: (1) by committing a tortious act in concert with the other or pursuant to a common design with the other; (2) by giving substantial assistance or encouragement to the other to conduct himself or herself in a way that constitutes a breach of duty; or (3) by giving substantial assistance to the other in accomplishing a tortious result and acting in such a way that the person's own conduct, separately considered, constitutes a breach of duty to a third person.[57] The following factors may be considered in determining whether a person gave substantial assistance to the other person:[58] (1) the nature of the wrongful act; (2) the kind and amount of the assistance; (3) the relation of the defendant and the actor; (4) the presence or absence of the defendant at the occurrence of the wrongful act; and (5) the defendant's state of mind.

373. Under the concert-of-action theory, each tortfeasor has direct, personal responsibility for the

---

[54]Floyd v. Hefner, 556 F. Supp. 2d 617, 659-60 (S.D. Tex. 2008) (citation omitted).

[55]Id. at 660 (citations omitted).

[56]McMillen Feeds, Inc. of Texas v. Harlow, 405 S.W.2d 123, 139 (Civ. App.--Austin 1966, ref. n.r.e.) ; Century 21 Page One Realty v. Naghad, 760 S.W.2d 305, 310 (Tex. App.--Texarkana 1988, no writ).

[57]Restatement (Second) of Torts § 876

[58]Shinn v. Allen, 984 S.W.2d 308, 311 (Tex. App.--Houston [1st Dist.] 1998, no pet.) (citing Restatement (Second) of Torts § 876, Comment d).

shared wrongdoing.[59] When parties act in concert, it is not necessary that they be in a master-servant or other agency relationship for each to be liable for the acts of the other.[60]

374. Speer and Manners as fiduciaries for Royce Homes had a duty of care and loyalty. They knowingly and willfully breached this duty by devising a plan whereby he could wrongfully withdraw Royce Homes's assets to satisfy his personal debts to Amegy and Manners as well as others.

375. As set forth below, Speer was clear to Amegy and Manners that he was going to liquidate assets of Royce Homes in order to pay his personal debt to them. They actively participated with Speer by agreeing to place their debts in his personal name so it would not be disclosed on the Royce Homes balance sheet.

376. As set forth below, Speer breached his fiduciary duty by initiating and maintaining the scheme set out below in order to fund the payments necessary to pay his personal obligations to purchase Manners's interest in Royce Homes while requiring Royce Homes and, ultimately, its creditors to pay for Speer's purchase. This breach of fiduciary duty led to the deepening insolvency of Royce Homes.

**2. Avoiding Reporting the Buyout Obligations on the Royce Balance Sheets**

377. Royce Homes's lenders required maximum debt-to-equity ratios and minimum equity levels. To evaluate risk in advancing credit, it was important that the financial information provided by Royce Homes fully and accurately disclosed the financial condition of Royce Homes and

---

[59]See Restatement (Second) of Torts § 876, Comment a.

[60]See Anderson v. Smith, 231 S.W. 142, 143-144 (Civ. App.--El Paso 1921).

its related entities.

378. In planning the Buyout, Speer realized the leveraged buyout debt would be reflected on the Royce Homes balance sheet, resulting in a loss of equity. The equity loss would impair Royce Homes's ability to borrow funds. Speer engaged John Ransom, an attorney at Porter & Hedges, and Sid Andrews, an accountant from Pricewaterhouse, to structure the Buyout so it would not appear as an obligation on the company balance sheets yet, Speer, Manners and Amegy knew the obligation was to be paid by Royce Homes.

379. Speer wanted to paper the Buyout debt so it would not be included in the financial reporting to Royce Homes's creditors. (Speer Excerpts 121 and 122).

**3. Amegy's Complicity**

380. Speer clearly explained to Amegy the plan was to structure the $20 million Amegy buyout loan so it would not be reflected on Royce Homes's balance sheet even though all payments on this loan would come from Royce Homes. Amegy understood the Buyout transaction was a "leveraged buyout." Denison admitted this loan transaction was not typical. Amegy also understood that if the buyout debt was reflected on the Royce Homes balance sheet it would affect Royce Homes's ability to borrow money. (Denison Excerpt 9, 10, 11, and 16).

381. Speer and Amegy explored ways to structure the $20 million Manners Buyout note so it would not be reported on Royce Homes's balance sheet. It was decided the debt would be put in Speer's name individually with payments being made from distributions from Royce Homes. Amegy aided, abetted, acted-in-concert, and conspired with Speer to breach his fiduciary duty and to hinder, delay and defraud the Royce Homes lenders by structuring the $20 million Amegy Loan so Royce Homes's creditors would be deceived and continue to

Exhibit B

lend Royce Homes money, relying upon false debt-to-equity ratios. (Denison Excerpt 19).

382. Amegy knew the importance of the debt-to-equity ratios to Royce Homes lenders. Denison testified Royce Homes was heavily dependent on its ability to borrow money and develop property. Denison stated that equity was an important factor for him and other lenders to make a loan to a company such as Royce Homes: (Denison Excerpt 1).

383. In Speer's loan application to Amegy, Speer specifically stated that all of the payments would be from distributions from Royce Homes but Speer wanted the debt in his personal name to avoid affecting the equity on Royce Homes's balance sheet. When questioned about the loan application, Denison testified Speer advised Amegy he wanted the Amegy note in his name personally so Royce Homes's equity would not be reduced by $25 million. Denison admitted that it was important for lenders to understand the debts of the company. He admitted the balance sheet should show all debts, liabilities, and equity of a company because it showed the financial condition of the company. Finally, Denison agreed that if a company like Royce Homes sought to borrow money, debt-to-equity ratios would be something he would want to look into. (Denison Excerpt 2).

384. Amegy's and Speer's plan was Royce Homes would borrow from Royce Homes's lenders, if necessary, to make distributions to Speer so he could pay his $20 million Amegy loan. The borrowing of funds to make partnership distributions was prohibited under the Royce Homes Partnership Agreement, was a breach of Speer's fiduciary duty to Royce Homes and facilitated by the use of financial statements which did not reflect Royce Homes's true financial condition. Amegy aided, abetted, acted-in-concert, and conspired with Speer to carry out the breach of fiduciary duty and the fraud scheme meant to hinder, delay, and

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 100
Back to Table of Contents

Exhibit B

defraud the Royce Homes lenders. (Denison Excerpt 20, 21, 22, 23, 24, and 25).

385. On May 9, 2006, the plan was to not include the buyout debt on the Royce balance sheet and hope the distribution to make the payments for the buyout would be offset by profits over time. (Speer Excerpts 125, 126, 127, and 128).

**4. Manners's Complicity**

386. Manners also understood that the transaction was a leveraged buyout. (Manners Excerpt 28). The plan to not reflect the Buyout debt on Royce Homes's balance sheet was devised and Manners was consulted on the plan and had no problem participating. Without Manners's aiding, abetting, acting-in-concert and conspiracy, the plan could not have been carried out. (Manners Excerpts 29, 30, 31, 32, 33, 34, 35, and 36).

387. Speer and Manners devised a plan to make the payments on Speer's note to Manners out of Royce Homes. (Gathmann Excerpt 7). (Manners Excerpt 17, 18, 19, 20, 21, 22, 23, and 24). Exhibit B to the Third Amended Complaint shows each specific payment made from Royce Homes through distributions to pay Speer's personal obligation to Manners. The payments were made on a monthly basis as reflected in the Exhibit which shows a beginning balance of $13,342,405 and an ending balance after June 2007 of $11,165,681. Each of these payments were cloaked as a management fee.

388. The funds disbursed by Royce Homes to pay the Manners Note were borrowed by Royce Homes in violation of the Partnership Agreement and breached Speer's and Manners's fiduciary duty. The borrowing and disbursement of the funds breached Speer's and Manners's fiduciary duty and were meant to hinder, delay, and defraud the Royce Homes lenders. (Gathmann Excerpt 10). (Manners Excerpt 25). (Speer Excerpts 51 and 52).

389.  Speer and Manners referred to the funds used to pay the Manners Note as a "management fee."  According to Royce Homes's CFO, there were no services rendered for these fees. These funds came from Royce Homes.  (Gathmann Excerpt 11).  (Speer Excerpts 57 and 58). Calling the disbursement a management fee allowed it to be inconspicuously capitalized into the lot value so each payment could increase the value of a lot by making it appear it was a cost associated with enhancing the value of the lot.

390.  Royce Homes's financial statements were manipulated to hide the loss in equity for each of the Manners Note payments and increase the equity on the balance sheet.  While each payment was recorded as a disbursement to Speer, thus decreasing equity, each payment was also recorded as an increase in a purported account receivable owed to Royce Homes and was capitalized into the lot inventory value.  This not only offset the loss of equity, it actually gave the appearance that lot inventory value was increasing and, thus, equity was increasing.  (Manners Excerpt 26). (Speer Excerpts 49, 53, 54, and 55). Speer admitted the creation of the account receivable was improper.  (Speer Excerpt 56).  Based on information and belief, the use of the name DWM on this ledger, instead of Park Lake, could have assisted in avoiding the elimination of this entry because DWM is an unrelated entity and Park Lake is a related entity.

391.  Payments to Manners were purportedly based on lot takedowns and home sales.  The payments were capitalized thus increasing the value of the lot on the Royce Homes books even though this was actually a distribution to Speer and an accounts receivable was created each time as well. (Gathmann Excerpt 34).

392.  Gathmann acknowledged lot values were increasing with each management fee payment.

Exhibit B

(Gathmann Excerpt 35 and 36). Although Gathmann denied he was involved in the accounting entries, he acknowledged inter-company accounts receivable were being created using the management fees paid to Manners. (Gathmann Excerpt 37).

393. By creating fictional sales, Speer would have Royce Homes record a profit in the sale, increase the asset value on Royce Homes's books for repurchase of lots it already owned, and bolster the Royce Homes balance sheet's equity. (Gathmann Excerpt 38).

394. The manipulation of the Royce Homes books in order to make disbursements to pay Speer's personal debt to Manners as set forth above was a breach of Speer's and Manners's fiduciary duty, was meant to hinder, delay, and defraud the Royce Homes lenders, and Manners aided, abetted, acted-in-concert and conspired with Speer in breach of Speer's fiduciary duty.

**5. Failure to Disclose**

395. In fact, in June 2006, Speer decided to not provide Royce Homes's cash flow projections that would show the distributions made to pay for the Buyout to a Royce Homes lender when renegotiating Royce Homes's line of credit with the lender. (Speer Excerpt 133).

396. Prior to closing the Buyout, Speer sought approval of the buyout from the Royce Homes lenders by sending a consent letter. Some Royce Homes lenders requested additional information regarding the Buyout and its debt. Speer approved sending Citibank, Comerica Bank, and, based on information and belief, other Royce Homes lenders the following representations:

a. Distributions from equity would enable John to pay both Amegy and Manners notes;

b. The distributions would be covered primarily by net income in the year the distributions were to be made;

Exhibit B

c. Equity would remain consistently over $40 million; and

d. Tangible Net Worth and Total Liabilities to Tangible Net Worth would remain very comfortably within the bank's requirements.

(Speer Excerpts 75, 76, 77, 78, and 79). (Gathmann Excerpt 42).

397. These representations proved to be wrong. By year end, Royce had distributed millions of dollars more than its net income for 2006 without having made Speer's $10 million payment to Amegy. Royce had to borrow money to make the $10 million payment. The company's equity had dropped below $40 million and, after the payment of the $10 million, the majority, if not all, debt-to-equity ratios were breached. (Gathmann Excerpt 15 and 48).

398. In 2007 Speer made in excess of 19 million in distributions resulting in a substantial reduction in capital. In August 2006, Speer had represented that the distributions would be made from profits and would not be made if it reduced the equity in Royce Homes. Despite the lack of profits, Speer made the distributions anyway. This conduct violated the representations made by Speer to the lenders. (Gathmann Excerpt 43).

399. Speer breached his fiduciary duty and hindered, delayed, and defrauded the Royce Homes lenders by making the distributions and failing to truthfully advise the lenders of the financial conditions of Royce Homes.

**6. Misleading Financial Statements**

400. Speer has a CPA background. On and after September 20, 2006, he controlled the Royce entities, controlled the accounting functions and controlled the issuance of the financial statements. (Speer Excerpts 25 and 26).

401. In April 2006 Royce's auditors and Royce's CFO told Speer that consolidated and not

Exhibit B

combined financial statements must be used for Royce's financial reporting. (Speer Excerpts 27 and 28).

402. Royce continued to use combined financial statements when reporting to its lenders. (Speer Excerpts 29, 30, 31, and 32). Continuing to use combined financial statements allowed Royce to appear to have more equity on its balance sheet through intercompany transactions and inclusion of minority interests. In a consolidated financial statement, those transactions would be eliminated. (Speer Excerpts 33 and 34).

403. Royce used combined financials to report to its lenders instead of consolidated. By using combined financials Royce's financial appearance was improperly enhanced. The use of combined financials improperly represented the equity levels, profits and debt-to-equity levels to the Royce lenders. (Speer Excerpt 35).

404. Mr. Speer explains how the related entities Royce Homes LP and Park Lake, under the control of Speer, would create intercompany transactions that had the net effect of inflating its financial reporting to its creditors under combined financial reporting. (Speer Excerpts 37, 38, and 39)

405. Speer admitted Park Lake should have been on a consolidated basis with Royce Homes. (Speer Excerpt 36).

406. Improper financial reporting was material, Mr. Speer knew the combined financials should not have been used in Royce's reporting. The lenders relied on these financial statements in their decision to advance credit and they advanced credit based upon the financial reporting provided leading to Royce's deepening insolvency. The improper financial reporting breached Speer's fiduciary duty and hindered, delayed, and defrauded the Royce Homes

lenders.

407. A dispute arose between Kopecky and Speer in late 2007 and 2008 involving Speer's alleged misrepresentation of the financial records and Speer's improper disbursement of $10 million from Royce. (Speer Excerpt 62). Mr Kopecky alleged:

> *Upon information and belief, Mr. Speer has wrongfully commingled and/or misappropriated over $10 million in available partnership cash resources and, otherwise, wrongfully converted partnership assets to fund a lavish and highly publicized personal lifestyle, including the ownership and operation of the Magueyitos Ranch property. Further, upon information and belief, Mr. Speer has diverted said funds to and through multiple entities he owns or controls, including but not limited --…… [ a number of different Royce entities]*

408. Kopecky also alleged he was provided financials with incorrect representations contained therein, a claim Speer does not appear to dispute. The alleged false financial statements were the same financial statements that were being sent to the Royce Homes lenders. It appears there was a commingling of funds. (Speer Excerpt 63 and 64).

409. Speer admits he controlled the issuance of Royce Homes's financial statements. (Speer Excerpt 69).

410. Since Speer voluntarily disclosed the financial reporting of Royce Homes, he had a duty to disclose the whole truth rather than making a partial disclosure that conveys a false impression. The improper financial reporting breached Speer's fiduciary duty and hindered, delayed, and defrauded the Royce Homes lenders.

**7. Speer's Conduct Hindered, Delayed and Defrauded Royce Homes Lenders**

411. Speer's conduct set forth above constitutes false, material misrepresentation of Royce Homes's financial condition that he knew to be false when made or was made without knowledge of its truth, was intended be acted upon, and was relied on, resulting in damage

to Royce Homes and its creditors.

412. Speer had a duty to disclose to the Royce Homes lenders. He breached the duty to disclose by not correcting his prior representations when he knew the representations were false. Royce Homes and its lenders relied on the representations.

413. The failure to disclose allowed Speer to deepen the insolvency of Royce Homes by artificially maintaining equity on the Royce Homes balance sheet thus making it possible for Royce Homes to borrow more money than it otherwise would have been able to do had the Buyout debt been properly reported on the Royce Homes balance sheet.

414. Further, Royce Homes's deepening insolvency was caused by Speer borrowing money from Royce Homes's lender to make his payments on the Buyout.

415. Speer had a duty to inform the Royce Homes lenders prior to make the $10 million payment that he would need to borrow money, the debt-to-equity ratios would be breached, and that the equity had dropped below $40 million. Speer failed to do so. Speer's conduct breached Speer's fiduciary duty and hindered, delayed, and defrauded the Royce Homes lenders.

416. Speer had a duty to disclose and failed to do so. Also Speer had a duty to not make additional distributions from Royce Homes once it became apparent that the representations made to the lenders would be violated by making the distributions. Speer's failure to disclose was fraud. Speer making the distributions to himself in violation of his representations resulted in additional improper borrowing by Royce Homes and its deepening insolvency.

**8. Speer's Conduct Constitutes a Knowing Breach of Fiduciary Duty. Amegy and Manners Aided and Abetted, Conspired and Acted in Concert with Speer.**

417. Speer's conduct as alleged this Third Amended Complaint constitutes a knowing breach of Speer's fiduciary duty. Amegy and Manners aided and abetted, conspired and acted-in-concert with Speer in his breach of fiduciary duty.

418. Speer's breach of fiduciary duty involved self dealing, willful, fraudulent and intentional conduct and Speer intended to gain a benefit for himself. Amegy and Manners aided and abetted, conspired, and acted-in-concert with Speer's breach of fiduciary duty, including his self dealing, willful and intentional conduct. Amegy and Manners conduct was willful, intentional, and they intended to gain a benefit for themselves through Speer's breach.

**E. Declaratory Judgment and Turnover Against Manners, Saracen, and DWM Holdings as Trustee for Senior Debt**

419. The Trustee seeks declaratory relief pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §2201 finding that, at all times relating to the Buyout, Manners, Saracen, and DWM Holdings held all funds they received originating from Royce Homes in trust. The Trustee seeks an order requiring Manners, Saracen, and DWM Holdings to turn over these funds pursuant to 11 U.S.C. §§542 and 543. (Manners, Saracen, and DWM Holdings will be collectively referred to in this claim as "Manners").

420. Manners agreed to accept his payments from Speer in trust for the Senior Debt of Royce Homes. The Manners Note, which Manners signed along with Speer, states in paragraph 6(b):

> *(b) No payment of principal or interest on this Note shall be made at any time (I) when a default or event of default (however defined) has occurred and is continuing under the terms of any Senior Debt (or if such a payment of principal or interest*

Exhibit B

*would result in such a default or event of default), and (ii) when a payment or distribution to the Debtor by one of its Controlled Entities is not permitted under the terms of any Senior Debt.* ***If, notwithstanding the foregoing provisions of this Section 6(b), any such payment is made, then the Holder of this Note will hold the same in trust and pay it over to the holders of the Senior Debt.*** *(Emphasis added).*

421. Senior Debt was defined under paragraph 6(a) of the Manners Note:

*(a) The Debtor's obligations with respect to the principal of and interest on this Note shall be subordinate and junior in right of payment, to the extent and in the manner set forth herein, to any indebtedness of the Debtor with respect to "Senior Debt," whether now existing or hereafter incurred. The term "**Senior Debt**" shall mean at any time **any and all obligations of the Debtor or any entity of which the Debtor owns, directly or indirectly, a majority equity interest** at such time with respect to any principal, interest (including interest accruing on or after the filing of any bankruptcy case or any case for reorganization relating to the Debtor or any such subsidiary, whether post-petition interest is allowed in any such case), premium, penalties, fees, indemnifications, reimbursements and other amounts owed with respect to **any Indebtedness of the Debtor or any such subsidiary** unless such indebtedness expressly provides that such Indebtedness is pari pasu or subordinate in right of payment to this Note. The term "**Indebtedness**" shall mean with respect to any specified Person, any indebtedness of such Person, whether or not contingent, in respect of: (I) borrowed money; (ii) evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof); (iii) banker's acceptances; (iv) any obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with generally accepted accounting principles; (v) the balance deferred and unpaid of the purchase price of any property, except any such balance that constitutes an accrued expense or trade payable; (vi) any obligations of such Person under: (x) interest rate swap agreements, interest rate cap agreements and interest rate collar agreements and (y) other agreements or arrangements designed to protect such Person against fluctuations in commodity prices, interest rates or the value of foreign currencies purchased or received by the such Person; (vii) obligations of special purpose entities formed to borrow money that are secured or financed by accounts receivable of such Person or any of its majority owned subsidiaries; (viii) all Indebtedness of others secured by a mortgage, lien or security interest on any asset of the specified Person (whether such Indebtedness is assumed by the specified Person); and (ix) to the extent not otherwise included, the guarantee by such Person of any Indebtedness of any other Person. The term "**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.*

422. Under this definition, all creditors of Royce Homes were Senior Debt.

423. Manners expressed his understanding of the subordination provision of his note in an email

Exhibit B

to Speer dated September 17, 2008:

*From: stalwartranch@hotmail.com*
*To: jspeer@roycebuilders.com; modonnell@ofmklaw.com*
*Subject: Royce group*
*Date: Wed, 17 Sep 2008 11:19:55 -0500*

*John*

*Further to our discussion this morning regarding my security for the loan on the Royce Group and your request that I email my understanding of the sale agreement for the Royce group I will state the following.*

*My security for the note we signed is that part of the Royce group you purchased from me in September of 2006 together with that part owned individually by you. My security was after the Royce lenders, vendors and trades, and after Amegy bank who had made a $20,000,000 personal loan to you and secured it ahead of me against the Royce Group and Hammersmith Financial. I will only seek to be paid from the collateral belonging to the Royce Group and Hammersmith.*

*Mike Manners*

424. The occurrence of either of two events caused Manners to hold his payments in trust pursuant to the terms of Section 6(b) of Manners's Note:

> *(I) when a default or event of default (however defined) has occurred and is continuing under the terms of any Senior Debt (or if such a payment of principal or interest would result in such a default or event of default), and*
>
> *(ii) when a payment or distribution to the Debtor by one of its Controlled Entities is not permitted under the terms of any Senior Debt.*

425. LaSalle Bank and RBC both noted that since June 2006 and September 2006 a default or event of default existed under the terms of their loans. Thus, beginning no later than September 30, 2006, a default or event of default existed in the LaSalle and RBC loans and payments received by Manners were received in trust for Senior Debt. As stated throughout this Amended Complaint, Royce Homes was not in compliance with its loan covenants. During all times Manners received payments, the requisite conditions under Section 6(b) had

Exhibit B

occurred with respect to Senior Debt. Pursuant to Manners's agreement under Section 6(b)(I) of the Manners Note, all payments he received are held in trust. As shown in the "Payments to Manners" section of the Third Amended Complaint,[61] Manners received a $900,000 payment on October 2, 2006 and millions of dollars in disbursements during this time.

426. Speer was prohibited by the Amegy Loan Agreement from making payments to Manners on or after October 31, 2006 so, Manners held payments received on or after October 31, 2006 in trust pursuant to the terms of the Manners Note, Section 6(b)(ii) and the Amegy Loan Agreement.

427. Section 8.4 of the Amegy Loan Agreement restricts payments which may be made when an Event of Default has occurred . Once an Event of Default occurred, among the prohibited restricted payments is Item 3 of Schedule 8.4 which states, *Distributions used to make principal and interest payments to Manners, DWM, and Saracen pursuant to the terms of the Manners Note.*

428. So payments to Manners were prohibited "if an Event of Default or Unmatured Event of Default exists or if an Event of Default or Unmatured Event of Default would arise as a result of such Distribution."

429. An event of default existed with respect to the Amegy Loan Agreement beginning and after October 31, 2006 and continued throughout the time of all payments to Manners.

430. Pursuant to Article VII of the Loan Agreement John Speer had certain "Affirmative Covenants." Article VII's opening states, *[Speer] covenants and agrees that, as long as the*

---

[61] See section VI(A)(3) of the Third Amended Complaint.

Exhibit B

*Obligations or any part thereof are outstanding, [Speer] will perform and observe the covenants set forth [in 7.1 through 7.12].*

431. Section 7.1(d), titled "Monthly Financial Statement–Royce Operating Entities" was clear:

> *As soon as available, and in any event within thirty (30) days after the end of each month, a copy of the financial statements of the Royce Operating Entities as of the end of such month and for the portion of the fiscal year then ended, containing balance sheets, statements of income and statements of cash flows, in each case setting forth in comparative form the figures for the corresponding period of the preceding fiscal year, all in reasonable detail and certified by an officer of Royce Operating acceptable to [Amegy] to have been prepared in accordance with GAAP and to fairly and accurately present the financial condition and results of operations of the Royce Operating Entities at the date and for the periods indicated therein.*

432. Speer never provided the required Monthly Financial Statements.

433. "Events of Default" are defined in Article IX of the Loan Agreement, entitled "Defaults." Section 9.1, entitled "Events of Default" states:

> *Section 9.1. Events of Default. Each of the following shall be deemed an "Event of Default":*
>
> *(C) Borrower shall fail to perform, observe or comply with (I) any covenant, agreement or term contained in Section 7.1 or Section 8.2 of this Agreement or (ii) any covenant, agreement or term contained in any other Section of this Agreement or any other Loan Document and, with respect to this clause (ii), a period of thirty (30) days shall have elapsed following the date on which Lender gave Borrower notice of such failure.*[62]

434. So, when Speer failed to deliver Monthly Financial Statements as well as other failures constituting Events of Default as required under Section 7.1 of the Amegy Loan Agreement, he triggered an Event of Default as defined by Section 9.1(c) of the Amegy Loan

[62] Part (ii) events require 30 days notice prior to becoming an Event of Default but part (I) events are an immediate Event of Default requiring no notice.

Agreement.[63] Manners agreed in the Manners Note, Section 6(b)(ii) that payments he received after an Event of Default would be held in trust and paid over to the holders of Senior Debt. All payments received by Manners after October 31, 2006 were made after an Event of Default under the Amegy Loan Agreement.

435. So, the payments Manners received after September 30, 2006 were held in trust because Royce was in default with respect to LaSalle and RBC. During the time these funds were held in trust, an Event of Default occurred in the Amegy Loan Agreement. At that time Manners began holding the funds in trust for three Events of Default–LaSalle, RBC, and Amegy. LaSalle's and RBC's events of default may have eventually been cured but Amegy's Event of Default was never cured. As stated throughout this Amended Complaint, Royce Homes was not in compliance with its loan covenants. As a result, every payment received by Manners was held in trust for Senior Debt.

436. Senior Debt was defined in the Manners Note to include all debt of Royce Homes. Senior Debt was later acknowledged by Manners to include all debt of Royce Homes. Those creditors have filed claims in this estate. The Trustee seeks to recover for the benefit of the Royce Homes's creditors the funds held in trust by Manners.

437. The Trustee seeks a judgment declaring Manners, Saracen, and DWM Holdings as the trustee for all Royce Homes creditors and a turn over judgement pursuant to 11 U.S.C. §542 and 543 for the turnover of all funds received by Manners on or after September 30, 2006.

**F. Declaratory Judgment and Turnover Against Donnie Lou Speer as Trustee for Senior Debt**

---

[63]See section VI(F)(12) of the Third Amended Complaint titled "Speer was the Agent for Amegy with Respect to Dividends, Distributions and Other Amounts Paid."

Exhibit B

438. The Trustee seeks declaratory relief pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §2201 finding that, at all times relating to the Buyout, Donnie Lou Speer held all funds she received originating from Royce Homes in trust. Donnie Lou Speer was a fiduciary to Royce Homes at all times relevant to this claim. The Trustee seeks an order requiring Donnie Lou Speer to turn over these funds pursuant to 11 U.S.C. §§542 and 543.

439. On December 11, 2005, Speer and Donnie Lou Speer entered into and signed the "Secured Non-Negotiable Promissory Note" in the original principal amount of $3,000,000. (DLS Note). The DLS Note specifically provided that the payments on the DLS Note would be derived from Royce Homes. Paragraph 8(a) of the DLS Note provides, in part:

> *...Notwithstanding the foregoing, Payee acknowledges that Debtor's payments of principal and accrued interest on this Note are to be funded by distributions to Debtor from First Duval Group, Inc., a Nevada corporation, which is in turn funded by distributions with respect to its limited partnership interests in Royce Homes, L.P. Consequently, to the extent that the failure or refusal of Debtor to pay all or any part of the principal amount of, or accrued interest on, this Note when same becomes due and payable in accordance with the terms hereof occurs as a result fo the failure of Royce Homes, L.P. to make distributions, then such failure by Debtor will not be considered an event of Default until after four consecutive months after written notice from the Holder...*

440. Donnie Lou Speer agreed to accept her payments from Speer in trust for the Senior Debt of Royce Homes. The DLS Note, which DLS signed along with Speer, states in paragraph 6(b):

> *(b) No payment of principal or interest on this Note shall be made at any time when a default has occurred and is continuing under the terms of any Senior Debt (or if such a payment of principal or interest would result in such a default), and, if any such payment is made, then* ***the Holder of this Note will hold the same in trust and pay it over to the holders of the Senior Debt****. (Emphasis added).*

Exhibit B

441. Senior Debt was defined under paragraph 6(a) of the DLS Note:

*(a) The Debtor's obligations with respect to the principal of and interest on this Note shall be subordinate and junior in right of payment, to the extent and in the manner set forth herein, to any indebtedness of the Debtor or Royce Homes, L.P. with respect to "Senior Debt," which is defined to mean loans to which Debtor or Royce Homes, L.P., a Texas limited partnership, is a party.*

442. LaSalle Bank and RBC both noted that since June 2006 and September 2006 a default or event of default existed under the terms of their loans. Thus, beginning no later than September 30, 2006, a default or event of default existed in the LaSalle and RBC loans and payments received by Donnie Lou Speer were received in trust for Senior Debt. Pursuant to Donnie Lou Speer's agreement under Section 6(b) of the DLS Note, all payments she received are held in trust. During that time, Donnie Lou Speer received hundreds of thousands of dollars in disbursements.

443. Further, as set forth in the Third Amended Complaint, Royce Homes was in default or an event of default had occurred, or such payment on the Manners Note would result in such a default, on its loans on and after January 2007.

444. The Trustee seeks a judgment declaring Donnie Lou Speer as the trustee on funds derived from Royce Homes and a turn over judgement pursuant to 11 U.S.C. §542 and 543 for the turnover of all funds received by Donnie Lou Speer on or after September 30, 2006.

## G. Fraudulent Transfers

### 1. Fraudulent Transfers Under 11 USC §548

445. 11 U.S.C. § 548(a)(1) states in pertinent part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or

Exhibit B

within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily–

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

446. In summary, to prevail on a claim for fraudulent transfer under § 548(a)(1)(A), the Trustee must prove the following elements of § 548(a)(1)(A): (1) a transfer was made of the Debtor's property; (2) the transfer was made within two years of the Petition Date; and (3) the transfer was made with actual intent to hinder, delay, or defraud the Debtor's creditors.[64]

447. In summary, to prevail on a claim for fraudulent transfer under § 548(a)(1)(B), the Trustee must demonstrate that: (1) a transfer was made of the Debtor's property; (2) the transfer was made within two years of the Petition Date; (3) the Debtor received less than reasonably equivalent value in exchange for such transfer; and (4) the Debtor was insolvent at the time

[64] See 11 U.S.C. § 548(a)(1)(A).

of such transfer or became insolvent as a result of such transfer, or was engaged in business with unreasonably small capital remaining, or intended to incur debts beyond the debtor's ability to pay as debts matured.[65]

**2. Fraudulent Transfers Under 11 USC §544 and/or Tex. Bus. Comm. C. §§24.005, 24.006 and 24.010(a) (TUFTA)**

448. Tex. Bus. & Comm. C. 24.005 states in pertinent part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
>
> (b) In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:
>
> > (1) the transfer or obligation was to an insider;
> >
> > (2) the debtor retained possession or control of the property transferred after the transfer;
> >
> > (3) the transfer or obligation was concealed;
> >
> > (4) before the transfer was made or obligation was incurred, the debtor had

[65] See 11 U.S.C. § 548(a)(1)(B)(i)-(iii).

Exhibit B

been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

449.    Tex. Bus. & Comm. C. 24.006 states in pertinent part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

450.    Tex. Bus. & Comm. C. 24.010(a) states in pertinent part:

(a) Except as provided by Subsection (b) of this section, a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:

(1) under Section 24.005(a)(1) of this code, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;

(2) under Section 24.005(a)(2) or 24.006(a) of this code, within four years after the transfer was made or the obligation was incurred; or

Exhibit B

> (3) under Section 24.006(b) of this code, within one year after the transfer was made.

451. In summary, under 11 U.S.C. § 544, the Trustee may avoid any transfer incurred by the Debtor that is voidable under the Texas Uniform Fraudulent Transfer Act (TUFTA). To prevail on a claim for fraudulent transfer under TUFTA, the Trustee must demonstrate that: (1) the transfers were made with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) the transfers were made without the Debtor receiving reasonably equivalent value in exchange for the transfers; and (3) the Debtor was insolvent at the time of the transfers, became insolvent as a result of the transfers, or for which unreasonably small capital remained; (4) a creditor exists whose claim arose before the occurrence of the transfers for whom the Trustee may act; and (5) the cause of action arose within four years after the transfers were made.

452. In addition to fraudulent transfer claims asserted under 11 U.S.C. § 544 and TUFTA, the Trustee is also asserting some fraudulent transfer claims under TUFTA alone. This section of the Third Amended Complaint sets out the same statutory predicate for the TUFTA claims independent of 11 U.S.C. § 544.

**3. Fraudulent Transfers Under 11 USC §544 and/or 6 Del.C. §§1304, 1305 and 1309 (DUFTA)**

453. 6 Del.C. § 1304 states in pertinent part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or
> >
> > (2) Without receiving a reasonably equivalent value in exchange for the

Exhibit B

transfer or obligation, and the debtor:

a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

454. **6 Del.C. § 1305 states in pertinent part:**

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

455. **6 Del.C. § 1309 states in pertinent part:**

A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:

(1) under Section 1304(a)(1) of this title, within 4 years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;

(2) under Section 1304(a)(2) or 1305(a) of this title, within 4 years after the transfer was made or the obligation was incurred; or

(3) under Section 1305(b) of this tile, within 1 year after the transfer was made or the obligation was incurred.

456. Under 11 U.S.C. § 544, the Trustee may avoid any transfer incurred by the Debtor that is voidable under the Delaware Uniform Fraudulent Transfer Act (DUFTA). To prevail on a claim for fraudulent transfer under DUFTA, the Trustee must demonstrate that: (1) the transfers were made with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) the transfers were made without the Debtor receiving reasonably equivalent value in exchange for the transfers; and (3) the Debtor was insolvent at the time of the transfers, became insolvent as a result of the transfers, or for which unreasonably small capital remained; (4) a creditor exists whose claim arose before the occurrence of the transfers for whom the Trustee may act; and (5) the cause of action arose within four years after the transfers were made.

457. In addition to fraudulent transfer claims asserted under 11 U.S.C. § 544 and DUFTA, the

Trustee is also asserting some fraudulent transfer claims under DUFTA alone. This section of the Third Amended Complaint sets out the same statutory predicate for the DUFTA claims independent of 11 U.S.C. § 544.

**4. Recovery of Avoided Transfers Under 11 U.S.C. §550**

458. 11 U.S.C. §550 states:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

**5. Recovery of Avoided Transfers Under Tex. Bus. Comm. C. §24.009**

459. Tex. Bus. & Comm. C. §24.009 states in pertinent part:

> (b) Except as otherwise provided in this section, to the extent a transfer is avoidable by a creditor under Section 24.008(a)(1) of this Code, the creditor may recover judgment for the value of the assets transferred, as adjusted under subsection © of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:
>
> > (1) the first transferee of the asset or the person for whose benefit the transfer was made; or
> >
> > (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

**6. Recovery of Avoided Transfers Under 6 Del.C. § 1308**

460. 6 Del.C. § 1308 states in pertinent part:

> (b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under § 1307(a)(1) of this title, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection © of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The

Exhibit B

judgment may be entered against:

(1) The 1st transferee of the asset or the person for whose benefit the transfer was made; or

(2) Any subsequent transferee other than a good-faith transferee or obligee who took for value or from any sub-sequent transferee or obligee.

**7. TUFTA/DUFTA Creditor Requirement**

461. As to each fraudulent transfer claim asserted in this Third Amended Complaint under TUFTA and DUFTA, there are creditors who could have asserted such claims on and before September 20, 2006 who have filed claims in this estate.

**8. Actual Intent to Hinder, Delay, and Defraud**

462. Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes. Speer and Hammersmith while in control of Royce Homes engaged in a series of actions starting in June 2006 and continuing through the date of the filing of this bankruptcy with the actual intent to hinder, delay and defraud the Royce Homes creditors.

463. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by arranging and consummating the alleged transactions which depleted assets available to creditors and increased the debts of Royce Homes with little or no corresponding benefit to Royce Homes thereby damaging all of the Royce Homes creditors.

464. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent

Exhibit B

to hinder, delay and defraud the creditors of Royce Homes by deliberately placing the Amegy/Manners obligation in Speer's personal name so it would not show up on the Royce Homes balance sheet in order to maintain the appearance of equity thus allowing Royce Homes to obtain credit it would not otherwise be allowed to do.[66]

465. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by manipulating the Royce Homes financial statements in order to create the impression of additional equity which facilitated his purported compliance with debt-to-equity ratios so Royce Homes could borrow money to make distributions to Speer to pay his personal debts.[67]

466. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by not disclosing the fact that Speer was going to use Royce Homes loans to make distributions to himself to pay the Buyout debt although he affirmatively represented to lenders the repayment would be from revenues.

467. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by representing to the Royce

---

[66]In re Allied Dev. Corp., 435 F.2d 372, 374-75 (7th Cir. 1970) stating that deliberately delaying the recording of a mortgage to not damage the debtor's credit was not only deliberate-the product of agreement- but it was accompanied by admitted purpose of concealing the obligation so other debt could be incurred and was sufficient to show actual intent to hinder, delay or defraud creditors of bankrupt.

[67]*Id.*

Exhibit B

Homes lenders that Speer would not deplete the capital of Royce Homes and would maintain the Royce Homes capital at $40 million when making distributions to himself to pay his Buyout debt yet the very first payment and all others thereafter reduced the capital to below the level

represented by Speer.

468. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by violating the Available Cash requirement for distributions in the Partnership Agreement. In particular, Royce Homes was required to borrow money to make distributions and failed to maintain working capital reserves sufficient to "ensure full compliance with the terms of all loan covenants and agreements of the Partnership."

469. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by using Speer's ability to control Royce Homes to his benefit and to the detriment of the Royce Homes creditors by borrowing funds and distributing the funds to himself.

470. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by causing Royce Homes's lenders to advance money to Royce Homes then immediately and improperly distributing the funds to Speer to pay his personal debt to Amegy and Manners thus increasing Royce

Homes's debt and depleting Royce Homes's assets available to pay its creditors.

471. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by causing Royce Homes to transfer houses to Allard Investments at a substantial discount to satisfy Speer's personal obligation to Manners to the detriment of the Royce Homes creditors.

472. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by using Royce Homes's assets to settle Speer's personal liability to Kopecky in the Watermark transaction.

473. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Park Lake and Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Park Lake and Royce Homes by transferring the Westwood Gardens lots and MUD reimbursements to Vestalia, a company controlled by Speer, through a collusive foreclosure.

474. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes through the MGM Motor Sports transaction by creating the fiction that the payments were an "advertising expense" of Royce Homes.

475. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent

to hinder, delay and defraud the creditors of Royce Homes by making the approximate $2,146,046 in transfers to Kopecky when the payments were not authorized under the Partnership Agreement and the payments depleted assets available to creditors with little or no corresponding benefit to Royce Homes and damaged all of the Royce Homes creditors.

476. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by using Speer's ability to control Royce Homes to his benefit and to the detriment of the Royce Homes creditors by making Tax

Distributions to Speer in violation of the Available Cash provision of the Partnership Agreement.

477. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes by using Speer's ability to control Royce Homes to his benefit and to the detriment of the Royce Homes creditors by making the Lavish Lifestyle Transfers as if Royce Homes funds were his personal funds and depleting assets otherwise available to Royce Homes's creditors.

478. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, Speer and Hammersmith while controlling Royce Homes acted with actual intent to hinder, delay and defraud the creditors of Royce Homes, including but not limited to, by:

a. making distributions to Speer as an insider.

b. concealing the distributions by:

i. delaying the $10 million payment into another year so it would not be disclosed on the 2006 financial statements;

ii. disguising the loss of equity by treating the Manners payments as a "Management Fee" and using this fee to increase the lot value thus deceitfully increasing equity on the Royce Homes balance sheet;

iii. expensing the payment of interest on the Amegy Loan on Royce Homes's books.

c. transferring substantially all of the Royce Homes assets through the series of liens, distributions and transfers set forth in the Third Amended Complaint;

d. removing funds and other assets from Royce Homes for Speer's personal benefit;

e. providing no reasonably equivalent value to Royce Homes for the distributions made to Speer from Royce Homes;

f. providing no reasonably equivalent value to Royce Homes when Speer caused Royce Homes to borrow money and increase liens on its assets to immediately distribute the borrowed funds to himself;

g. causing Royce Homes to become insolvent from the series of excessive distributions to pay Speer's personal debts;

h. causing the distributions to occur immediately after Royce Homes obtained funds from loans from its legitimate creditors to make distributions to Speer to pay his personal debt; and

i. otherwise wrongfully exercising control of Royce Homes by taking a substantial amount of Royce Homes's funds for personal use in breach of his fiduciary duty.

**9. Unreasonably Small Capital**

479. The Trustee incorporates by reference all facts set forth in this Third Amended Complaint, including but not limited to Paragraphs 213 to 265.

480. As to each constructive fraudulent transfer asserted in this Third Amended Complaint under TUFTA, DUFTA, or 11 U.S.C. § 548, Royce Homes had unreasonably small capital at the time of or as a result of the transfer.

481. Several factors demonstrate Royce Homes had unreasonably small capital. These include the fact that the Partnership Agreement set forth minimum levels of capital and capital reserves which were required to be maintained. Specifically, the Partnership Agreement required that Royce Homes not make distributions at times when Available Cash could not pay all operating expenses of the Partnership and did not have a sufficient provision for a working capital reserve in an amount to ensure full compliance with the terms of all loan covenants and agreements of the Partnership.

482. Further, Royce Homes's lenders and Amegy established debt-to-equity ratios and net worth covenants in their loan agreements which contractually established a point at which unreasonably small capital existed. It is undisputed that maintaining debt-to-equity ratios was critical to Royce Homes. As set forth in more detail above, Royce Homes began to breach debt-to-equity ratios as early as November 2006.

483. Based on all of the facts set forth throughout this Third Amended Complaint, specifically paragraphs 213 to 265, Royce Homes maintained unreasonably small capital as of and after the January 2007 $10 million distribution.

484. As a result of the Amegy Transfers,[68] Royce Homes had unreasonably small capital remaining. Royce Homes was left in a position in which it was unable, after the Amegy Transfers, to generate sufficient profits to sustain operations.[69]

485. It was reasonably foreseeable when viewed objectively at the time of the Amegy Transfers that Royce Homes would be left with unreasonably small capital. Royce Homes's cash flow projections were not reasonable and prudent when made because the market conditions at the time did not support the projections. It was clear, prior to and after the Buyout, that Royce Homes was experiencing a substantial failure in achieving its projections. James Hunter, the Chief Operating Officer wrote on June 18, 2006:[70]

> *it would appear that in houston we had a 44% performance against forecast. each and every division was below 70% of their forecast and nhsc was below 50%.*
>
> *as for atlanta and dallas i cannot confirm the numbers until the morning.*
>
> *we shall go over last weeks projections in detail with each manager to assess any adjustments to this reported number as well as a discovery as to what went wrong.*

486. Followed by on October 2, 2006:

> *we need to cover missed projections for both closings and sales*
> *how can they be so wrong?*

487. And, on October 23, 2006 Hunter was expressing concern, sending the "Red" flagged email:

> *we now officialy (sic) have an absolute crash in sales - the crash is consistent and it is real*
>
> *immediate action is required to establish some srt (sic) of order and performance in our business model*

---

[68] See Paragraph 527 for definition of Amegy Transfers.

[69] *See* Moody v. Security Pac. Business Credit, Inc., 971 F.2d 1056 (3d Cir.1992).

[70] See Paragraph 214.

*we need this day a complete assesment (sic) by area manager of each and every community*

*we shall meet after the sales meeting*

488. In October 2006, after the Buyout, Royce Homes hired a new Chief Financial Officer, William Gathmann. He testified:

a. beginning in October 2006 he realized the real estate market was in trouble and Royce Homes's sales were "falling apart" by the end of 2006.

b. He realized the market was starting to crash.

c. He confirmed the sub-prime problems were causing sales to slow down at the end of 2006. (Gathmann Excerpt 12).

489. In addition, by November 2006, Royce Homes Phoenix was failing. In fact it was never profitable and Royce Homes was required to infuse millions of dollars into Royce Homes Phoenix, further depleting Royce Homes. (Gathmann Excerpt 13 and 14). The failure of Royce Homes Phoenix was further evidence of the deteriorating market conditions, of which Speer and others were clearly aware.

490. At the end of 2006 Royce Homes knew of the collapse of the sub-prime market and the tightening of credit. Royce Homes knew that 2007 was not going to be a good year financially. (Denison Excerpt 29 and 30).

491. By year end, Royce had distributed millions of dollars more than its net income for 2006 without even having made Speer's $10 million payment to Amegy. Royce had to borrow money to make the $10 million payment in January 2007. Royce Homes's equity had dropped below $40 million and, after the payment of $10 million to Amegy, many of its debt-to-equity ratios were breached.

492. Gathman testified that in comparing the August 2006 projections provided to its lenders to

the December 2006 audited financial statements, it appeared the equity projections were off by $20 million. The shortfall left Royce Homes's equity levels lower than Speer had promised the Royce Homes lenders in August 2006. He also testified that projected net income would be $25 million in 2006 but actual net income was only $16 million: (Gathmann Excerpt 15).

493.    There were more differences between the August 2006 projections provided to the lenders and the December 2006 audited financial statements.

    a.    The projections showed 2006 year-end inventory of $189,204,000 but the audited statement showed 2006 year-end inventory of $236,785,641, a difference of $47,581,641 in unsold assets.

    b.    The projections showed 2006 year-end liabilities of $164,459,000 but the audited statement shows 2006 year-end liabilities of $217,885,117, a difference of $53,426,117.

    c.    The projections showed 2006 year-end partnership distributions of $17,017,100 with the Speer/Amegy payment of $10 million included, but the audited statement shows 2006 year-end partnership distributions of $23,951,504 without including the $10,000,000 Speer/Amegy distribution, a difference of $16,934,404 when adjusted for the $10 million Speer/Amegy distribution just three days after year-end.

    d.    In fact, according to the 2006 audited financial statements the partnership distributions of $28,951,504 exceeded the company's 2006 net income of only $16,153,062. A difference of $12,798,442 in distributions over income.

494.    Speer did not make his December 31, 2006 $10 million Amegy payment distribution in

Exhibit B

2006.  Instead, he waited until January 3, 2007. This slight delay allowed Speer to avoid reporting this distribution in the Royce Homes year end 2006 financial statements.  In fact, this $10 million distribution created even more problems from which Royce Homes never recovered.

495.    In the last quarter 2006 and in early 2007, Speer began creative financing efforts.  For example, in an effort to raise capital, Speer had Royce Homes enter into a land banking transaction in which it made a fictitious sale of its lots coupled with a contract to buy them back.  (Gathmann Excerpt 41).

496.    The Royce Homes's problems continued and worsened in 2007 yet Speer continued to make excessive distributions, including his $2.5 million July 2007 distribution.  In 2007 Royce Homes had a net loss of over $1 million.  Royce Homes breached its debt-to-equity ratios throughout 2007.

497.    In the last quarter of 2007 and in early 2008, Speer resorted to selling Royce Homes's furniture to raise capital.   By January 2008, Royce Homes could not pay its property taxes and its construction loans had been cut off so it could not borrow any money to operate.  Notwithstanding Royce Homes's desperate financial condition, in January 2008 Speer made a $2.5 million distribution to pay his Amegy Loan principal payment.  On information and belief, the funds for this payment came from a lending transactions involving a new Speer company, RH Model Homes 2007.

498.    Finally, in July 2008, Speer closed Royce Homes.  Royce Homes never recovered after the $10 million payment to Amegy in January 2007.

Exhibit B

**10. Incurring Debts Beyond Royce Homes's Ability to Pay**

499. Speer and Hammersmith while controlling Royce Homes made the fraudulent transfers set forth in this Third Amended Complaint for less than reasonably equivalent value and:

a. intended to incur, or believed that Royce Homes would incur, debts that would be beyond the debtor's ability to pay as such debts matured;[71] or

b. intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[72]

500. As set forth in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, it was apparent Royce Homes's financial performance was diminishing rapidly and the real estate market was crashing yet Royce Homes made each of the fraudulent transfers at a time when it believed or reasonably should have believed subsequent creditors likely would not be paid as their claims matured. Throughout 2007 and 2008, despite the failure in Royce Homes's financial performance and the complete crash of the real estate market, Royce Homes continued to make distributions and incur debt it would not pay until it collapsed leaving over $39 million in unpaid creditors.

**11. Insolvency of Royce Homes and Park Lake**

501. By December 2007, Speer had sold, borrowed against, or in some way leveraged all of the Royce Homes assets and was resorting to desperate financing by borrowing against its office

---

[71] 11 U.S.C. §548(B)(ii)(III).

[72] Tex. Bus. & Comm. C. 24.005(a)(2)(B) or 6 Del.C. § 1304(a)(2)(B).

Exhibit B

furniture.[73] By January 2008, it could no longer obtain financing.[74]

502. As set forth in paragraphs 258 to 264, and throughout the Third Amended Complaint, Royce Homes was not generally paying its debts as they became due beginning on or before January 2008.

503. As shown in the previous two paragraphs, Royce Homes is presumed to be insolvent on or about January 2008 under Texas and Delaware law.[75]

504. Park Lake was insolvent no later than August 2008 as shown in paragraphs 268 and 278 of the Third Amended Complaint. Westwood Gardens was the only significant asset in Park Lake. The transfer through a collusive foreclosure sale in March 2009 of Westwood Gardens and the MUD reimbursement deepened the insolvency of Park Lake.

**12. Speer was the Agent for Amegy with Respect to Dividends, Distributions and Other Amounts Paid by Royce Homes on and after October 31, 2006**

505. The Trustee incorporates by reference, all allegations set forth in this Third Amended Complaint.

506. Speer was the Agent of Amegy with respect to dividends, distributions and other amounts paid from Royce Homes on and after October 31, 2006.

507. Speer and Amegy agreed in that in the event Speer did not provide Amegy with monthly financial statements in a form required in the Loan Agreement that Speer would be Amegy's

[73]See Third Amended Complaint paragraph 259

[74]See Third Amended Complaint paragraph 261

[75]Tex. Bus. Comm. C. §24.003(b) Under TUFTA, a debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent. 6 Del.C. §1302 Under DUFTA, debtor who is generally not paying debts as they become due is presumed to be insolvent.

agent with respect to collection of dividends, distributions and other amounts paid. Speer never provided the required monthly financial statements. In addition to not providing monthly financial statements as required in Article 7 of the Loan Agreement, Speer failed to provide or timely provide i) annual financial statements, ii) tax returns, iii) notices of default for Royce entities, iv) notices of default under the DLS Note, v) notice of default under the Manners Note; vi) notices of material adverse effect, vii) notices of change in the Royce credit facilities, and viii) notices of default in the Royce credit facilities, all of which were defined and required under Section 7.1 of the Loan Agreement. Pursuant to the terms of the Speer's and Amegy's Security Agreement, Pledge, and Collateral Assignment and Loan Agreement the failure to provide the monthly financial statements created an Event of Default which resulted in Speer becoming the agent of Amegy with respect to dividends, distributions and other amounts. Speer's agency began no later than October 31, 2006.

508.  Pursuant to Article VII of the Loan Agreement John Speer had certain "Affirmative Covenants." Article VII's opening states, "[John Speer] covenants and agrees that, as long as the Obligations or any part thereof are outstanding, [John Speer] will perform and observe the covenants set forth [in 7.1 through 7.12]."

509.  Section 7.1 of the Loan Agreement titled Reporting Requirements states:

> Borrower will deliver, or will cause to be delivered, to Lender:
>
> (a) Annual Financial Statement-Borrower. As soon as available, and in any event within one hundred twenty (120) days after each end of the year, a copy of the financial statement of Borrower as of the preceding December 31, consisting of a balance sheet, a statement of income and expenses and a list of liabilities, including contingent liabilities (and stating the holder of such liabilities, the repayment terms thereof and any collateral therefor).
>
> (b) Annual Financial Statements-Royce Operating Entities. As soon as available, and

Exhibit B

in any event within one hundred twenty (120) days after the end of each fiscal year of Royce Homes, beginning with the fiscal year ending December 31, 2006, a copy of the annual audited financial statements of the Royce Operating Entities for such fiscal year containing balance sheets, statements of income, statements of partners' capital and statements of cash flows as at the end of such fiscal year and for the 12-month period then ended, in each case setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail, prepared in accordance with -CAAP, and audited -and certified -without qualification -by Pricewaterhouse Coopers or other independent certified public accountants of recognized standing reasonably acceptable to Lender.

(c) Annual Financial Statements-Royce Holdings. If such financial statements are prepared by Royce Holdings, as soon as available, and in any event within one hundred twenty (120) days after the end of each fiscal year of Royce Holdings, beginning with the fiscal year ending December 31, 2006, a copy of the annual financial statements of Royce Holdings and its Subsidiaries for such fiscal year containing balance sheets, statements of income, statements of partners' capital and statements of cash flows as at the end of such fiscal year and for the 12-month period then ended, in each case setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail and certified by John Speer or another officer of Hammersmith Group acceptable to Lender to have been prepared in accordance with GAAP and to fairly and accurately present the financial condition and results of operations of the Royce Holdings at the date and for the periods indicated therein.

(d) Monthly Financial Statement-Royce Operating Entities. As soon as available, and in any event within thirty (30) days after the end of each month, a copy of the financial statements of the Royce Operating Entities as of the end of such month and for the portion of the fiscal year then ended, containing balance sheets, statements of income and statements of cash flows, in each case setting forth in comparative form the figures for the corresponding period of the preceding fiscal year, all in reasonable detail and certified by an officer of Royce Operating acceptable to Lender to have been prepared in accordance with GAAP and to fairly and accurately present the financial condition and results of operations of the Royce Operating Entities at the date and for the periods indicated therein.

(e) Tax Returns. Within thirty (30) days following the filing thereof, copies of each federal income tax return filed by Borrower and Royce Homes.

(f) Notice of Litigation. Promptly after the commencement thereof, notice of all actions, suits and proceedings before any court or governmental department, commission, board, agency or instrumentality, domestic or foreign, affecting Borrower or any Royce Entity which, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

Exhibit B

(g) Judgments. Within ten (10) days of the rendering thereof, notice of any judgment entered against Borrower or any Royce Entity in an amount which is greater than $500,000.00 and which is not vacated, discharged, waived, stayed or bonded pending appeal.

(h) Notice of Default. As soon as possible and in any event within five (5) days after the Borrower becomes aware of the occurrence of each Event of Default and Unmatured Event of Default, a written notice setting forth the details of such Event of Default or Unmatured Event of Default or event and the action which Borrower has taken and proposes to take with respect thereto.

(i) Notice of Default - DLS Note. As soon as possible and in any event within five (5) days after the Borrower becomes aware of the occurrence of each Default (as defined in the DLS Note), a written notice setting forth the details of such Default and the action which Borrower has taken and proposes to take with respect thereto.

(j) Notice of Default - Manners Note. As soon as possible and in any event within five (5) days after the Borrower becomes aware of the occurrence of each Default (as defined in the Manners Note), a written notice setting forth the details of such Default and the action which Borrower has taken and proposes to take with respect thereto.

(k) Notice of Material Adverse Effect. As soon as possible, and in any event within ten (10) days after Borrower becomes aware thereof, notice of the occurrence of any event or the existence of any condition which could reasonably be expected to have a Material Adverse Effect.

(l) Notice of Change in Royce Credit Facilities. As soon as possible, and in any event within five (5) days after Borrower becomes aware thereof, notice of (i) any material change in the financial covenants contained in the Royce Credit Facilities, and (ii) any material change in the provisions regarding default, Default, event of default or Event of Default, however therein defined, contained in the Royce Credit Facilities.

(m) Notice of Default in Royce Credit Facilities. As soon as possible, and in any event within five (5) days after the thirty (30) day period referred to below has passed, notice of the occurrence of any default, Default, event of default, or Event of Default (a "Credit Facilities Default"), however therein defined, in any Royce Credit Facility which has remained uncured for thirty (30) days following receipt by Borrower or any Royce Entity of actual knowledge of such Credit Facilities Default.

510.    Neither Speer nor any Royce Operating Entity complied with the Reporting Requirements of Section 7.1(a) through (m). The Reporting Requirements were not waived or amended

Exhibit B

during 2006, 2007, or 2008.

511. Beginning on and after October 31, 2006, Speer acted as Amegy's agent with regard to all dividends, distributions and other amounts paid to him from the Royce Entities for the reasons set out below.

512. Article III of the "Security Agreement, Pledge and Collateral Assignment" is clear. Article III, entitled "Covenants" states, "[John Speer] covenants and agrees with [Amegy] that until the Obligations are satisfied and paid and performed in full: "Section 3.4 Ordinary Distributions. [John Speer] may accept, receive and retain all dividends, distributions and other amounts paid with respect to or arising from the Collateral only as provided in the Loan Agreement. If an Event of Default has occurred and is continuing, all dividends, distributions and other amounts paid with respect to or arising from the Collateral shall be accepted by [John Speer] as [Amegy's] agent, held by [John Speer] in trust for [Amegy] and promptly delivered by [John Speer] to [Amegy]." [76] Neither Article III nor Section 3.4 were waived or amended during 2006, 2007, or 2008.

513. Section 5.1 of the Security Agreement titled Events of Default says "The term "Event of Default" shall mean an Event of Default as defined in the Loan Agreement." Section 5.1 was not waived or amended during 2006, 2007, or 2008.

514. "Events of Default" are defined in Article IX of the Loan Agreement, entitled "Defaults." Section 9.1, entitled "Events of Default" states, "Each of the following shall be deemed an

[76]Also, Section 5.2(d) states, "Rights and Remedies: Upon the occurrence of an Event of Default, Secured Party shall have the following rights and remedies: (d) **Secured Party shall be entitled to receive all dividends, distributions and income payable in respect to the Collateral**, and Secured Party shall be entitled to notify the Non-Corporate Entities and the issuers of the Stock Collateral to pay all such amounts directly to Secured Party. Secured Party shall have the right to apply such amounts to the Obligations in such order as it may determine.

"Event of Default": (c) [John Speer] shall fail to perform, observe or comply with (i) any covenant, agreement or term contained in Section 7.1...of this Agreement."  Section 9.1 was not waived or amended during 2006, 2007, or 2008.

515.   Section 7.1 of the Loan Agreement requires Reporting Requirements which were not provided or complied with.

516.   Speer never provided, or failed to timely provide, the items required under the Section 7.1 Reporting Requirements in the Amegy Loan.

517.   By failing to provide or timely provide the items required under the Section 7.1 Reporting Requirements to Amegy, John Speer created an Event of Default which triggered Article III of the Security Agreement and Speer became the agent of Amegy when he collected dividends, distributions and other amounts paid to Speer from the Royce Entities. Thirty days after September 30, 2006, the agency relationship began and Speer became the agent for Amegy.

518.   Section 9.1(c)(i) places no time restriction on Section 7.1 Events of Default and does not require a default to be called or notice to be sent.  It is automatic.

519.   Based on the Amegy Loan Agreement which Speer and Amegy signed, Speer was Amegy's agent when he received distributions, dividends, or other amounts from Royce Homes.

520.   Amegy agreed Speer would act for Amegy.  Speer accepted that agency relationship.  They agreed Speer would accept funds from Royce Homes as Amegy's agent and promptly deliver the funds to Amegy.

521.   Speer and Amegy contractually agreed that Speer would act as Amegy's agent.  Under Texas law, agency is a legal relationship created by the express or implied agreement between the

Exhibit B

parties, or by operation of law, under which the agent is authorized to act for and on behalf of the principal, and subject to the principal's control.[77]

522. The Security Agreement specifically states that Speer will accept the dividends, distributions and other amounts as Amegy's agent and hold them in trust for Amegy and promptly deliver them to Amegy. An essential element of the principal-agent relationship is the alleged principal's right to control the actions of the alleged agent.[78]

523. The law is clear that a finding of agency alone is insufficient without further findings, actual or implied, that the acts resulting in the injury or damage in question were performed as agent and within the scope of the agent's authority.[79] An agent has only so much authority as is granted to him by his principal, and a principal is liable for an intentional tort of his agent only if he authorizes or ratifies the tort.[80]

524. It is clear that Speer, acting as Amegy's agent, had authority from Amegy and that Speer acted within the scope of that authority to breach the Partnership Agreement, breach Speer's fiduciary duty to Royce Homes, violate the Texas Theft Liability Act, and convert Royce Homes's funds. Amegy clearly encouraged Speer to borrow from Royce Homes lenders to pay the Amegy obligation. (Denison Excerpts 20 and 23). Amegy even modified its early drafts of the Loan Agreement such that it contractually agreed Speer could breach covenants

---

[77] Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 269 (5th Cir. 1980).

[78] Cardinal Health Solutions, Inc. v. Valley Baptist Med. Ctr., 643 F. Supp. 2d 883, 887 (S.D. Tex. 2008).

[79] Pasadena Associates v. Connor, 460 S.W.2d 473, 479 (Tex. Civ. App. 1970).

[80] Vinewood Capital, LLC v. Sheppard Mullin Richter & Hampton, LLP, 735 F. Supp. 2d 503, 514 (N.D. Tex. 2010). Citing Restatement (3d) of Agency §§ 2.02 (Scope of Actual Authority); 7.03 (Principal's Liability-In General); 7.04 (Agent Acts with Actual Authority).

with Royce Homes's lenders in order to make either Tax Distributions or Distributions to pay Amegy and it designated itself as the arbiter of when these breaches should stop. So, Speer could cause Royce Homes to breach its loan covenants to make distributions and Amegy would say when to stop. Amegy never directed Speer to stop.

525. Speer and Amegy are jointly and severally liable for all distributions to Speer. Once Speer became Amegy's agent, Amegy received all payments to Speer as an initial transferee under 11 U.S.C. §550 and TUFTA/DUFTA. In addition, Amegy is jointly and severally liable with Speer for all dividends, distributions or other amounts which Speer received from Royce Homes on or after September 30, 2006. Amegy is liable for its agent's (Speer's) conduct and is also jointly, and severally, liable with Speer for all other claims set forth in this Third Amended Complaint asserted by the Trustee against Speer relating to the moneys paid to Speer from Royce Homes.

**13. Fraudulent Transfers to Amegy**

526. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint.

527. In each month after September 20, 2006 and continuing to June 2008, Speer made interest payments on his personal loan to Amegy using Royce Homes's funds. The interest payments totaled $1,507,500.00. In addition, Speer made three principal payments to Amegy using Royce Homes's funds–$10 million in January 2007, $2.5 million in July 2007, and $2.5 million in January 2008. (These principal and interest payments will be collectively referred to as the Amegy Transfers).

528. All Amegy Transfers are avoidable under 11 U.S.C. §544, TUFTA, and DUFTA. All

Exhibit B

Amegy Transfers occurring on or after April 7, 2007 are also avoidable under 11 U.S.C. §548.

529. The Amegy Transfers were made from assets of Royce Homes.

530. The Trustee asserts in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint and also in the section titled "Actual Intent to Hinder, Delay, and Defraud" that Speer and Hammersmith acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes. The Trustee traced the loans from Royce Homes's lenders to Royce Homes and the distribution of those funds to Speer and subsequently to Amegy in paragraphs 121 to 174. By carrying out the scheme, Speer depleted Royce Homes's assets and created a circumstance in which millions of dollars of creditors were not paid.

531. The scheme set forth above was devised and carried out by Speer to the detriment of Royce Homes and its creditors.

532. Also, as set forth throughout this Third Amended Complaint, Royce Homes received less than a reasonably equivalent value in exchange for such transfer or obligation. Indeed, Royce Homes received nothing in exchange for the Amegy Transfers.

533. As set forth in more detail in the Third Amended Complaint, the Trustee asserts with respect to the Amegy Transfers:

a. Royce Homes was insolvent on or before January 2008.[81] The Amegy Transfers made on or after January 1, 2008 were made when Royce Homes was insolvent or became insolvent as a result of the Amegy Transfers;

b. Royce Homes was engaged in business or a transaction, or was about to engage in

[81] See Third Amended Complaint section titled "Insolvency of Royce Homes and Park Lake."

business or a transaction, for which any property remaining with Royce Homes was an unreasonably small capital;[82] or

c. Royce Homes intended to incur, or believed that it would incur, debts that would be beyond Royce Homes's ability to pay as such debts matured.[83]

534. As set forth in the Third Amended Complaint, the Amegy Transfers were made to or for the benefit of Amegy. Amegy was the initial transferee of the Amegy Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Alternatively, Amegy was an immediate or mediate transferee of the Amegy Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Accordingly, the Trustee seeks to avoid and recover the Amegy Transfers from Amegy.

**14. Fraudulent Transfer to Manners, Saracen and DWM Holdings**

535. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint.

536. In each month after September 20, 2006 and continuing to June 2008, Speer made principal and interest payments on the Manners Note using Royce Homes's funds. The payments totaled $3,640,540. These principal and interest payments will be collectively referred to as the Manners Transfers whether made to Manners individually, Saracen, DWM or any other Manners related entities.

537. All Manners Transfers are avoidable under 11 U.S.C. §544, TUFTA, and DUFTA. All Manners Transfers occurring on or after April 7, 2007 are also avoidable under 11 U.S.C. §548.

---

[82]See Third Amended Complaint section titled "Unreasonably Small Capital."

[83]See Third Amended Complaint section titled "Incurring Debts Beyond Royce Homes's Ability to Pay."

538. The Manners Transfers were made from assets of Royce Homes.

539. The Trustee asserts in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint and also in the section titled "Actual Intent to Hinder, Delay, and Defraud" that Speer and Hammersmith acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes. Speer's intent was to cause Royce Homes's lenders to advance money to Royce Homes.

540. The Trustee traced the loans to Royce Homes and the distribution of those funds to Speer and subsequently to Manners in paragraphs 176, 178, 387, and 388. By carrying out the scheme, Speer depleted Royce Homes's assets, increased its debt, and created a circumstance that millions of dollars of creditors were not paid.

541. The scheme set forth above was devised and carried out by Speer to the detriment of Royce Homes and its creditors.

542. Also, as set forth throughout this Third Amended Complaint, Royce Homes received less than a reasonably equivalent value in exchange for such transfer or obligation.

543. As set forth in more detail in the Third Amended Complaint, the Trustee asserts with respect to the Manners Transfers:

a. Royce Homes was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Royce Homes was an unreasonably small capital;[84] or

b. Royce Homes intended to incur, or believed that it would incur, debts that would be

[84] See Third Amended Complaint section titled "Unreasonably Small Capital."

Exhibit B

beyond Royce Homes's ability to pay as such debts matured.[85]

544. As set forth in the Third Amended Complaint, the Manners Transfers were made to or for the benefit of Manners, DWM, and Saracen, respectively. Manners, DWM, and Saracen were the initial transferees of the Manners Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Alternatively, Manners, DWM, and Saracen were immediate or mediate transferees of the Manners Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Accordingly, the Trustee seeks to avoid and recover the Manners Transfers from Manners, DWM and Saracen,

respectively.

**15. Fraudulent Transfers to Allard Investments**

545. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint.

546. As described in the section of the Third Amended Complaint titled "Allard Investment Asset Stripping," in November 2007 and December 2008, Royce Homes transferred approximately fifty homes to Allard Investments, a company owned and controlled by Manners. (Collectively referred to as the Allard Transfers).

547. All Allard Transfers are avoidable under 11 U.S.C. §544, TUFTA, and DUFTA as well as 11 U.S.C. §548.

548. The Allard Transfers were made from assets of Royce Homes.

549. The Trustee asserts in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint, also in the section titled "Actual Intent to Hinder, Delay, and Defraud" and the

[85] See Third Amended Complaint section titled "Incurring Debts Beyond Royce Homes's Ability to Pay."

Exhibit B

section titled "Allard Investment Asset Stripping" that Speer and Hammersmith acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes.

550. Also, as set forth throughout this Third Amended Complaint, Royce Homes received less than a reasonably equivalent value in exchange for such transfer or obligation. Royce Homes received nothing in exchange for the Allard Transfers. In fact, these houses were sold for less than the debt owed against them by Royce Homes.

551. As set forth in more detail in the Third Amended Complaint, the Trustee asserts with respect to the Allard Transfers:

a. Royce Homes was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Royce Homes was an unreasonably small capital;[86] or

b. Royce Homes intended to incur, or believed that it would incur, debts that would be beyond Royce Homes's ability to pay as such debts matured.[87]

552. As set forth in the Third Amended Complaint, the Allard Transfers were made to or for the benefit of Allard. Allard was the initial transferee of the Allard Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Alternatively, Allard was an immediate or mediate transferees of the Allard Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Accordingly, the Trustee seeks to avoid and recover the Allard Transfers from Allard.

---

[86] See Third Amended Complaint section titled "Unreasonably Small Capital."

[87] See Third Amended Complaint section titled "Incurring Debts Beyond Royce Homes's Ability to Pay."

Exhibit B

## 16. Fraudulent Transfers to MGM Motor Sports

553. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint and the facts and allegations in paragraph 317 to 322.

554. From January to March 2008, Royce Homes transferred approximately $35,000 per month to MGM, a company owned and controlled by Manners. (Collectively referred to as the MGM Transfers). In fact, these payments resulted from the Allard Investments asset stripping.[88]

555. All MGM Transfers are avoidable under 11 U.S.C. §544, TUFTA, and DUFTA as well as 11 U.S.C. §548.

556. The MGM Transfers were made from assets of Royce Homes.

557. The Trustee asserts in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint and also in the section titled "Actual Intent to Hinder, Delay, and Defraud" that Speer and Hammersmith acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes.

558. Also, as set forth throughout this Third Amended Complaint, Royce Homes received less than a reasonably equivalent value in exchange for such transfer or obligation. Royce Homes received nothing in exchange for the MGM Transfers.

559. As set forth in more detail in the Third Amended Complaint, the Trustee asserts with respect to the MGM Transfers:

a. Royce Homes was insolvent on or before January 2008.[89] The MGM Transfers made

[88] See Third Amended Complaint section titled "Allard Investment Asset Stripping."

[89] See Third Amended Complaint section titled "Insolvency of Royce Homes and Park Lake."

Exhibit B

on or after January 1, 2008 were made when Royce Homes was insolvent or became insolvent as a result of the MGM Transfers;

b. Royce Homes was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Royce Homes was an unreasonably small capital;[90] or

c. Royce Homes intended to incur, or believed that it would incur, debts that would be beyond Royce Homes's ability to pay as such debts matured.[91]

560. As set forth in the Third Amended Complaint, the MGM Transfers were made to or for the benefit of MGM. MGM was the initial transferee of the MGM Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Alternatively, MGM was an immediate or mediate transferee of the MGM Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Accordingly, the Trustee seeks to avoid and recover the MGM Transfers from MGM.

**17. Fraudulent Transfers to Speer Relating to the Amegy Transfers and Manners Transfers**

561. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint.

562. In the alternative, the Trustee seeks to avoid and recover the Amegy Transfers and the Manners Transfers as described above from Speer.

563. All Amegy Transfers and Manners Transfers are avoidable under 11 U.S.C. §544, TUFTA, and DUFTA. All Amegy Transfers and Manners Transfers occurring on or after April 7,

[90] See Third Amended Complaint section titled "Unreasonably Small Capital."

[91] See Third Amended Complaint section titled "Incurring Debts Beyond Royce Homes's Ability to Pay."

Exhibit B

2007 are also avoidable under 11 U.S.C. §548.

564. The Amegy Transfers and Manners Transfers were made from assets of Royce Homes.

565. The Trustee asserts in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint and also in the section titled "Actual Intent to Hinder, Delay, and Defraud" that Speer and Hammersmith acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes.

566. Also, as set forth throughout this Third Amended Complaint, Royce Homes received less than a reasonably equivalent value in exchange for such transfers or obligations. Royce Homes received nothing in exchange for the Amegy Transfers and the Manners Transfers.

567. As set forth in more detail in the Third Amended Complaint, the Trustee asserts with respect to the Amegy Transfers and Manners Transfers:

a. Royce Homes was insolvent on or before January 2008.[92] The Amegy Transfers and Manners Transfers made on or after January 1, 2008 were made when Royce Homes was insolvent or became insolvent as a result of the Amegy Transfers and Manners Transfers;

b. Royce Homes was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Royce Homes was an unreasonably small capital;[93] or

c. Royce Homes intended to incur, or believed that it would incur, debts that would be

[92]See Third Amended Complaint section titled "Insolvency of Royce Homes and Park Lake."

[93]See Third Amended Complaint section titled "Unreasonably Small Capital."

Exhibit B

beyond Royce Homes's ability to pay as such debts matured.[94]

568. In the event the Amegy Transfers are not recoverable from Amegy and/or the Manners Transfers are not recoverable from Manners, DWM, and Saracen, the Trustee pleads in the alternative that Speer is the initial transferee, immediate, or mediate transferee of the Amegy Transfers and Manners Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550 because the Amegy Transfers and Manners Transfers were alternatively made to or for the benefit of Speer. Accordingly, the Trustee seeks to avoid and recover the Amegy Transfers and Manners Transfers from Speer in the alternative.

**18. Additional Fraudulent Transfers to Speer**

569. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint.

570. The Trustee seeks recovery from Speer for all Distributions and Tax Distributions occurring on or after September 20, 2006 as well as the transfer of the house and real property on Telge Road, and all other transfers, other than salary, to Speer. On information and belief, Speer used funds of Royce Homes to finance a lavish and highly publicized lifestyle, which included expensive homes and ranch property, the purchase of lavish and expensive purses, jewelry, furniture and other personal expenses. (Collectively the Speer Tax and Lavish Lifestyle Transfers). The Trustee's belief is based upon Mr. Kopecky's pleading in his litigation against Speer and Royce Homes. Kopecky is a former officer of Hammersmith and Royce Homes and officer and partner in Texas Colonial Homes. Kopecky's pleading stated:

*Upon information and belief, Mr. Speer has wrongfully commingled and/or*

---

[94]See Third Amended Complaint section titled "Incurring Debts Beyond Royce Homes's Ability to Pay."

Third Amended Complaint Page 151
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd Back to Table of Contents

Exhibit B

*misappropriated over $10 million in available partnership cash resources and, otherwise, wrongfully converted partnership assets to fund a lavish and highly publicized personal lifestyle, including the ownership and operation of the Magueyitos Ranch property. Further, upon information and belief, Mr. Speer has diverted said funds to and through multiple entities he owns or controls, including but not limited --…… [ a number of different Royce entities]*

571. When asked about charges Speer made on the Royce Homes credit cards, Speer did not deny he made charges, he simply asserted that he repaid Royce Homes. (Speer Excerpt 97).

572. The Trustee continues to investigate these transfers and as part of this Third Amended Complaint demands an accounting from Speer relating to each credit card purchase using Royce Homes's credit cards together with proof of repayment of Royce Homes.

573. All Speer Tax and Lavish Lifestyle Transfers are avoidable under 11 U.S.C. §544, TUFTA, and DUFTA. All Speer Tax and Lavish Lifestyle Transfers occurring on or after April 7, 2007 are also avoidable under 11 U.S.C. §548.

574. The Speer Tax and Lavish Lifestyle Transfers were made from assets of Royce Homes.

575. The Trustee asserts in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint and also in the section titled "Actual Intent to Hinder, Delay, and Defraud" that Speer and Hammersmith acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes.

576. Also, as set forth throughout this Third Amended Complaint, Royce Homes received less than a reasonably equivalent value in exchange for such transfers or obligations. Indeed, Royce Homes received nothing in exchange for the Speer Tax and Lavish Lifestyle

Transfers.

577. As set forth in more detail in the Third Amended Complaint, the Trustee asserts with respect to the Speer Tax and Lavish Lifestyle Transfers:

a. Royce Homes was insolvent on or before January 2008.[95] The Speer Tax and Lavish Lifestyle Transfers made on or after January 1, 2008 were made when Royce Homes was insolvent or became insolvent as a result of the Speer Tax and Lavish Lifestyle Transfers ;

b. Royce Homes was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Royce Homes was an unreasonably small capital;[96] or

c. Royce Homes intended to incur, or believed that it would incur, debts that would be beyond Royce Homes's ability to pay as such debts matured.[97]

578. As set forth in the Third Amended Complaint, the Speer Tax and Lavish Lifestyle Transfers were made to or for the benefit of Speer. Speer was the initial transferee of the Speer Tax and Lavish Lifestyle Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Alternatively, Speer was an immediate or mediate transferee of the Speer Tax and Lavish Lifestyle Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Accordingly, the Trustee seeks to avoid and recover the Speer Tax and Lavish Lifestyle Transfers from Speer.

**19. Fraudulent Transfers to Kopecky**

---

[95]See Third Amended Complaint section titled "Insolvency of Royce Homes and Park Lake."

[96]See Third Amended Complaint section titled "Unreasonably Small Capital."

[97]See Third Amended Complaint section titled "Incurring Debts Beyond Royce Homes's Ability to Pay."

579. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint.

580. Kopecky received approximately $2,146,046 in funds from Royce Homes as follows (collectively, referred to as the Kopecky Transfers):

| | Date | Amount |
|---|---|---|
| a. | 4/12/06 | $599,254.00 |
| b. | 09/19/06 | $75,000.00 |
| c. | 10/30/06 | $18,103.00 |
| d. | 10/30/06 | $18,103.00 |
| e. | 12/01/06 | $249,750.00 |
| f. | 04/13/07 | $792,315.00 |
| g. | 05/15/07 | $25,000.00 |
| h. | 05/15/07 | $25,000.00 |
| i. | 05/31/07 | $50,000.00 |
| j. | 05/31/07 | $50,000.00 |
| k. | 07/05/07 | $75,000.00 |
| l. | 11/26/07 | $28,271.00 |
| m. | 01/18/08 | $40,000.00 |
| n. | 1/18/08 | $40,000.00 |
| o. | 02/06/08 | $30,000.00 |
| p. | 02/08/08 | $250,000.00 |
| q. | 03/04/08 | $30,000.00 |
| | **Total** | **$2,146,046.00** |

581. All Kopecky Transfers are avoidable under 11 U.S.C. §544, TUFTA, and DUFTA. All Kopecky Transfers occurring on or after April 7, 2007 are also avoidable under 11 U.S.C. §548.

582. The Kopecky Transfers were made from assets of Royce Homes.

583. The Trustee asserts in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint and also in the section titled "Actual Intent to Hinder, Delay, and Defraud" that Speer and Hammersmith acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes.

584. Also, as set forth throughout this Third Amended Complaint, Royce Homes received less than a reasonably equivalent value in exchange for such transfer or obligation. Royce Homes received nothing in exchange for the Kopecky Transfers.

585. As set forth in more detail in the Third Amended Complaint, the Trustee asserts with respect to the Kopecky Transfers:

a. Royce Homes was insolvent on or before January 2008.[98] The Kopecky Transfers made on or after January 1, 2008 were made when Royce Homes was insolvent or became insolvent as a result of the Kopecky Transfers ;

b. Royce Homes was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Royce Homes was an unreasonably small capital;[99] or

c. Royce Homes intended to incur, or believed that it would incur, debts that would be

[98]See Third Amended Complaint section titled "Insolvency of Royce Homes and Park Lake."

[99]See Third Amended Complaint section titled "Unreasonably Small Capital."

Exhibit B

beyond Royce Homes's ability to pay as such debts matured.[100]

586. As set forth in the Third Amended Complaint, the Kopecky Transfers were made to or for the benefit of Kopecky. Kopecky was the initial transferee of the Kopecky Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Alternatively, Kopecky was an immediate or mediate transferee of the Kopecky Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Accordingly, the Trustee seeks to avoid and recover the Kopecky Transfers from Kopecky.

**20. Fraudulent Transfer Relating to Manners's Salary**

587. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint.

588. Prior to and as part of the Buyout, Manners negotiated an agreement with Speer for Manners to receive a salary and benefits though Royce Homes for a period of 3 years after the September 20, 2006 closing of the Buyout. Manners would receive the salary and benefits, after the sale, under the title of "Chairman Emeritus" (Chairman Emeritus Agreement). (Manners Excerpt 37).

589. Manners benefitted from the Chairman Emeritus Agreement by receipt of the funds and other benefits from Royce Homes.

590. Speer benefitted from the Chairman Emeritus Agreement in that it allowed Speer to use Royce Homes's assets to pay for Speer's purchase of Manners's interest in Royce Homes.

591. The Chairman Emeritus Agreement did not require Manners to perform any services in exchange for salary and benefit payments. Manners did not perform any services for Royce Homes in exchange for the salary and benefits he received under the Chairman Emeritus

[100] See Third Amended Complaint section titled "Incurring Debts Beyond Royce Homes's Ability to Pay."

Agreement. (Manners Excerpt 37).

592. Royce Homes received no consideration in exchange for the salary and benefit payments to Manners under the Chairman Emeritus Agreement. Royce Homes received less than a reasonably equivalent value in exchange for the obligation to pay salary and benefits to Manners under the Chairman Emeritus Agreement.

593. As "Chairman Emeritus" Manners was an insider at all times relevant to this claim and the transfer of salary and benefit payments is avoidable under 11 U.S.C. § 548 even if Manners was not an insider at the time of the payments under the Chairman Emeritus Agreement were actually received.

594. The Chairman Emeritus Agreement to pay a salary and benefits without receiving any services in return was not done in the ordinary course of business for Royce Homes. His salary and benefits were made under an employment contract and not in the ordinary course of business for Royce Homes.

595. Under the Chairman Emeritus Agreement, Manners received a salary of $160,000.00 per year, a company car, all expenses related to the car and health insurance for a period of at least 3 years. Manners received such payments. (collectively referred to as the "Manners Salary Transfers"). (Manners Excerpt 37).

596. Manners received salary in 2006, 2007, and 2008. (Manners Excerpt 38). Manners performed no services for Royce Homes as Chairman Emeritus. (Manners Excerpt 39). Manners also received insurance benefits. (Manners Excerpt 40). He received a Royce Homes car with car expenses. (Manners Excerpt 41).

597. All Manners Salary Transfers are avoidable under 11 U.S.C. §544, TUFTA, and DUFTA.

All Manners Salary Transfers occurring on or after April 7, 2007 are also avoidable under 11 U.S.C. §548.

598. The Manners Salary Transfers were made from assets of Royce Homes.

599. The Trustee asserts in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint and also in the section titled "Actual Intent to Hinder, Delay, and Defraud" that Speer and Hammersmith acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes.

600. Also, as set forth throughout this Third Amended Complaint, Royce Homes received less than a reasonably equivalent value in exchange for such transfer or obligation. Indeed, Royce Homes received nothing in exchange for the Manners Salary Transfers.

601. As set forth in more detail in the Third Amended Complaint, the Trustee asserts with respect to the Manners Salary Transfers:

a. Royce Homes was insolvent on or before January 2008.[101] The Manners Salary Transfers made on or after January 1, 2008 were made when Royce Homes was insolvent or became insolvent as a result of the Manners Salary Transfers;

b. Royce Homes was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Royce Homes was an unreasonably small capital;[102] or

c. Royce Homes intended to incur, or believed that it would incur, debts that would be

[101] See Third Amended Complaint section titled "Insolvency of Royce Homes and Park Lake."

[102] See Third Amended Complaint section titled "Unreasonably Small Capital."

beyond Royce Homes's ability to pay as such debts matured.[103]

602. As set forth in the Third Amended Complaint, the Manners Salary Transfers were made to or for the benefit of Manners. Manners was the initial transferee of the Manners Salary Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Alternatively, Manners was the immediate or mediate transferees of the Manners Salary Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Accordingly, the Trustee seeks to avoid and recover the Manners Salary Transfers from Manners.

**21. Fraudulent Transfer of Westwood Gardens**

603. The Trustee incorporates by reference all facts set out in this Third Amended Complaint.

604. The Trustee seeks to avoid and recover from Amegy and Vestalia the value received in the Westwood Gardens foreclosure (Referred to as the Westwood Gardens Transfer).

605. The Westwood Gardens Transfer is avoidable under 11 U.S.C. §541, TUFTA, and DUFTA as an actual fraudulent transfer and a constructively fraudulent transfer.

606. The Westwood Gardens Transfer was made from assets of Park Lake. There was substantial equity in Westwood Gardens and the MUD reimbursements which was stripped from Park Lake through a collusive foreclosure sale.

607. Royce Homes is a creditor of Park Lake. Westwood Gardens was an asset of Park Lake.

608. The Trustee asserts in paragraphs 213 to 340, 377 to 418, including the section titled "Westwood Gardens Asset Stripping," in the section titled "Actual Intent to Hinder, Delay, and Defraud" and the section titled "Breach of Fiduciary Duty" and throughout the Third Amended Complaint that Speer and Hammersmith acted, with respect to the Westwood

[103] See Third Amended Complaint section titled "Incurring Debts Beyond Royce Homes's Ability to Pay."

Gardens Transfer, with the intent to hinder, delay and defraud creditors of Park Lake, including Royce Homes.

609. Also, as set forth throughout this Third Amended Complaint, Park Lake received less than a reasonably equivalent value in exchange for the transfer its interest in Westwood Gardens. The transfer of Westwood Gardens to Vestalia and the corresponding benefit to Amegy was made through a collusive foreclosure sale which did not comply with state law requirements in that it was collusive and had imperfections. Reasonable equivalence is not presumed in a collusive foreclosure sale. Park Lake received nothing.

610. The Trustee asserts:

    a.    Park Lake was insolvent on the date that the Westwood Gardens transfer occurred or became insolvent as a result of the Westwood Gardens transfer;

    b.    Park Lake was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Park Lake was an unreasonably small capital; or

    c.    Park Lake intended to incur, or believed that it would incur, debts that would be beyond Park Lake's ability to pay as such debts matured.

611. As a result of the Westwood Gardens Transfer, Vestalia "purchased" Westwood Gardens, including the MUD reimbursements, at the Amegy foreclosure sale for a lower price than its value. The sale was collusive and fraudulent in that Speer and Amegy conspired to breach Speer's fiduciary duty to allow Speer, Speer's new company, Vestalia, and Amegy to profit from Westwood Gardens and it MUD reimbursement as set out in Paragraphs 269 to 290.

Exhibit B

612. As set forth in the Third Amended Complaint, the Westwood Gardens Transfer was made to or for the benefit of Amegy and Vestalia. Amegy and Vestalia are initial transferees in this transaction or, alternatively, immediate or mediate transferees under TUFTA and DUFTA. Accordingly, the Trustee seeks to avoid and recover the Westwood Gardens Transfer from Amegy and Vestalia.

613. The Westwood Gardens Transfer is avoidable under 11 U.S.C. § 541, TUFTA, and DUFTA.

**22. Fraudulent Transfers to and Breach of Fiduciary Duty by Donnie Lou Speer**

614. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint. Prior to and as part of Speer's divorce, Speer agreed to employ his ex-wife Donnie Lou Speer, through Royce Homes, to pay his personal obligation to her under the divorce. (Speer Excerpt 87). Donnie Lou Speer received a $20,000 per month salary in 2006, 2007, and 2008.

615. Speer also testified that, to satisfy his personal obligation to Donnie Lou Speer, he paid Donnie Lou Speer $50,000 per month from derived from Royce Homes. These payments continued until Royce Homes closed its doors in August 2008. The Trustee seeks to recover each $50,000 monthly payment from January 2007 to August 2008.

616. Donnie Lou Speer also received Tax Distributions. The salary, benefits, $50,000 monthly payment, and Tax Distributions are collectively referred to as the Donnie Lou Speer Transfers.

617. The $50,000 per month payments were made from Royce Homes's funds. On December 11, 2005, as part of the divorce between John Speer and Donnie Lou Speer they each executed a promissory note to satisfy a personal obligation owed by John Speer to Donnie Lou Speer

in the amount of $3,000,000. The note was to be paid over 60 months starting December 1, 2010 at a rate of $50,000 per month. Speer and Donnie Lou Speer agreed the funds to pay the DLS Note would come from Royce Homes. The promissory note signed by both Speer and Donnie Lou Speer states:

> *…..Notwithstanding the foregoing, Payee acknowledges that the Debtor's payments of principal and accrued interest on this Note are to be funded by distributions to Debtor from First Duval Group, Inc, a Nevada corporation, which is in turn funded by distributions with respect to its limited partnership interest in Royce Homes L.P.. Consequently, to the extent that the failure or refusal of the Debtor to pay all or any part of the principal amount of, or accrued interest on, this Note when same becomes due and payable in accordance with the terms hereof occurs as a result of the failure of Royce Homes L.P. to make distributions, then such failure by Debtor will not be considered an event of Default until after four consecutive months after written notice from the Holder. ….*[104]

618. These distributions were made in violation of the Partnership Agreement (See section "Breach of Partnership Agreement") and in violation of Speer's fiduciary duty to Royce Homes (See sections "Breach of Fiduciary Duty" and "Additional Facts Relating to Breach of Fiduciary Duty, Actual Intent to Hinder, Delay, and Defraud and Amegy/Manners Knowing Participation in the Breach"). These distributions were made in breach of Donnie Lou Speer's fiduciary duty.

619. Donnie Lou Speer did not perform any significant services for the benefit of Royce Homes

[104]See DLS Note, paragraph 8(a), second sentence.

Exhibit B

in exchange for the Donnie Lou Speer Transfers. Royce Homes received no consideration or received less than a reasonably equivalent value in exchange for the obligation to pay the Donnie Lou Speer Transfers. Her salary and benefits were made under an employment contract and not in the ordinary course of business for Royce Homes.

620. Also, as set forth throughout this Third Amended Complaint, Royce Homes received less than a reasonably equivalent value in exchange for the $50,000 monthly transfers. Indeed, Royce Homes received nothing in exchange for the Donnie Lou Speer Transfers.

621. As a purported manager of Royce Homes, Donnie Lou Speer was an insider at all times relevant to this claim and the transfer of Donnie Lou Speer Transfers are avoidable under 11 U.S.C. § 548. Even if Donnie Lou Speer was not an insider at the time, the Donnie Lou Speer Transfers are recoverable under 11 U.S.C. §548. These payments are also recoverable under 11 U.S.C. §544, TUFTA, and DUFTA.

622. Speer claimed in his 2004 examination that in addition to her salary from Royce Homes, he paid her $50,000 per month from funds he received from Royce Homes. (Speer Excerpts 81, 82 and 83). She also received Tax Distributions. (Speer Excerpt 84, 85 and 86). Speer clearly testified he paid these funds from money he received from Royce Homes. Speer only received salary and distributions. According to the records the Trustee received, Speer's salary was only $10,000 per month. Therefore, the payment must have come from improper distributions to Speer from Royce Homes.

623. The Donnie Lou Speer Transfers were made from funds of Royce Homes. Royce Homes received nothing in return for these distributions made to pay John Speer's personal debt to Donnie Lou Speer.

Exhibit B

624. The Donnie Lou Speer Transfers are avoidable under 11 U.S.C. §544, TUFTA, and DUFTA. All Donnie Lou Speer Transfers received on or after April 7, 2007 are also avoidable under 11 U.S.C. §548. All Donnie Lou Speer Transfers made from Speer relating to funds he received from Royce Homes are avoidable under TUFTA, DUFTA and under 11 U.S.C. §548.

625. The Donnie Lou Speer Transfers were made from assets of Royce Homes.

626. The Trustee asserts in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint and also in the section titled "Actual Intent to Hinder, Delay, and Defraud" that Speer and Hammersmith acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes.

627. As set forth in more detail in the Third Amended Complaint, the Trustee asserts with respect to the Donnie Lou Speer Transfers:

a. Royce Homes was insolvent on or before January 2008.[105] The Donnie Lou Speer Transfers made on or after January 1, 2008 were made when Royce Homes was insolvent or became insolvent as a result of the Donnie Lou Speer Transfers;

b. Royce Homes was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Royce Homes was an unreasonably small capital;[106] or

c. Royce Homes intended to incur, or believed that it would incur, debts that would be

[105]See Third Amended Complaint section titled "Insolvency of Royce Homes and Park Lake."

[106]See Third Amended Complaint section titled "Unreasonably Small Capital."

Exhibit B

beyond Royce Homes's ability to pay as such debts matured.[107]

628. As set forth in the Third Amended Complaint, the Donnie Lou Speer Transfers were made to or for the benefit of Donnie Lou Speer. Donnie Lou Speer was the initial transferee of the Donnie Lou Speer Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. Alternatively, Donnie Lou Speer was the immediate or mediate transferees of the Donnie Lou Speer Transfers under TUFTA, DUFTA, and 11 U.S.C. § 550. To the extent these payments are not recoverable from Donnie Lou Speer, the Trustee seeks to recover these transfers from Speer as the initial, immediate or mediate transferee. Accordingly, the Trustee seeks to avoid and recover the Donnie Lou Speer Transfers from Donnie Lou Speer or, in the alternative, Speer.

629. Donnie Lou Speer was a fiduciary to Royce Homes at all times relevant to this claim. As a fiduciary, Donnie Lou Speer owed a duty of care and loyalty to Royce Homes. Donnie Lou Speer clearly understood that the payments Speer made on his personal obligation to her were derived from funds from Royce Homes. She knew this because the promissory note she and Speer signed specifically stated the funds would be derived from Royce Homes. As a fiduciary Donnie Lou Speer owed a duty to investigate propriety of the payments of Speer's debt to her from Royce Homes's assets.

630. Further, Donnie Lou Speer had a duty to refuse the salary she received from Royce Homes since she knew the payments were detrimental to Royce Homes in that she was not providing a service to Royce Homes for the $20,000 salary and benefits she received. As a fiduciary Donnie Lou Speer owed a duty to investigate propriety of her receiving an unearned salary

[107] See Third Amended Complaint section titled "Incurring Debts Beyond Royce Homes's Ability to Pay."

from Royce Homes's assets and of Speer paying her through a salary to satisfy his personal obligation to her under their divorce.

631. Donnie Lou Speer breached her fiduciary duty to Royce Homes by knowingly taking the $50,000 payments derived from Royce Homes to pay Speer's personal obligation to her and by taking an unearned salary and benefits from Royce Homes in satisfaction of Speer's personal obligation to her as alleged above.

632. The Trustee seeks recovery from Donnie Lou Speer for her breach of fiduciary duty and fraudulent transfers with respect to the $50,000 payments to her and her $20,000 per month salary and benefits, and the Tax Distributions. In addition, the Trustee seeks to recover punitive damages, pre and post judgment interest, and attorney fees.

**23. Fraudulent Transfer of Speer Compound**

633. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint.

634. During 2005 and 2006, Speer had Royce Homes build a compound for him on Telge Road. (The Compound). The intent was to transfer the Compound, including two houses and acreage, to Speer. The transfer of the Compound occurred in December 2006.

635. Speer testified that the Compound had a value of $5 million. He obtained a loan for approximately $3,500,000 from Amegy to purchase the Compound and paid in $900,000 at closing. Based on information and belief, the $900,000 was from funds Speer obtained from Royce Homes. Speer did not pay the approximate $1.4 million remaining balance of the purchase price in December 2006. In April 2007 Speer paid Royce Homes approximately $1.4 million, purportedly for the balance of the purchase price of the Compound. Based on

information and belief, the $1.4 million was derived from Royce Homes. (Speer Excerpts 114, 115, 116, and 117). The next day Speer withdrew approximately $1,587,009.00 as a Tax Distribution and a few days later, $870,128.00 as another tax distribution.[108] The $1.4 million was effectively not paid because it was immediately withdrawn through these improper Tax Distributions to Speer from Royce Homes therefore the consideration for the Compound has not been paid.

636. The Trustee seeks to avoid and recover the transfer of the Compound to Speer. (The Compound Transfer).

637. The Compound Transfer is avoidable under 11 U.S.C. §544, TUFTA, and DUFTA.

638. The Compound was an asset of Royce Homes.

639. The Trustee asserts in paragraphs 213 to 340, 377 to 418, and throughout the Third Amended Complaint and also in the section titled "Actual Intent to Hinder, Delay, and Defraud" that Speer and Hammersmith acted with actual intent to hinder, delay, or defraud the creditors of Royce Homes.

640. Also, as set forth throughout this Third Amended Complaint, Royce Homes received less than a reasonably equivalent value in exchange for the transfer its interest in the Compound.

641. The Trustee asserts:

a. Royce Homes was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Royce Homes was

[108] These funds belonged to Royce Homes and were in Royce Homes bank accounts at the time they were improperly removed. These distributions breached the Partnership Agreement because they were at a time when the capital reserves were not adequate, made with funds borrowed from Royce Homes loans, they were made at a time when the Royce Homes's loan covenants were breached, they were not for Partnership purposes, they were not consistent with the Breach of Partnership Defendants' fiduciary responsibility for the safekeeping and use of all Partnership Property, and they were not made in furtherance of the business of the Partnership.

an unreasonably small capital; or

b. Royce Homes intended to incur, or believed that it would incur, debts that would be beyond Royce Homes's ability to pay as such debts matured.

642. As a result of the Compound Transfer, Speer "purchased" Compound for a lower price than its value. The sale was collusive and fraudulent in that Speer breached his fiduciary duty to Royce Homes in making the Compound Transfer.

643. Speer is the initial transferee in this transaction or, alternatively, immediate or mediate transferees under TUFTA and DUFTA. Accordingly, the Trustee seeks to avoid and recover the Compound Transfers from Speer.

**H. Unjust Enrichment**

644. The Trustee incorporates by reference all facts and allegations set out in this Third Amended Complaint.

645. It is well established that the elements of unjust enrichment are 1) defendant obtained a benefit; 2) from the plaintiff; 3) by fraud, duress, or the taking of an undue advantage.[109]

646. Based upon all facts set forth in this Third Amended Complaint, each defendant listed below obtained from Royce Homes a benefit by fraud, duress, or the taking of an undue advantage. By obtaining this benefit by fraud, duress, or the taking of undue advantage, each of the defendants below, respectively, caused harm to Royce Homes as follows:

a. Speer: obtained benefit from Royce Homes in an amount of at least $5,240,813.60

[109] Matagorda County v. Texas Ass'n of Counties County Government Risk Management Pool, 975 S.W.2d 782, 785 (Tex. App. Corpus Christi 1998),judgment aff'd, 52 S.W.3d 128 (Tex. 2000); Waller v. DB3 Holdings, Inc., 2008 WL 373155, (N.D. Tex. 2008); In re Estate of Wallace, 2006 WL 3611277, (Tex. App. San Antonio 2006); RDG Ltd. Partnership v. Gexa Corp., Util. L. Rep. P 26915, 2005 WL 949171, (Tex. App. Houston 14th Dist. 2005).

in tax and other distributions made by Speer to himself or for his benefit from funds of Royce Homes.

b. Speer/Amegy/Manners: obtained benefit from Royce Homes in an amount of at least $15,000,000.00 in principal payments made under the Amegy Loan. Amegy is jointly and severally liable for this amount as a co-conspirator or because it aided and abetted or acted in concert in the conduct. Manners is jointly and severally liable for this amount as a co-conspirator or because he aided and abetted or acted in concert with Speer.

c. Speer/Amegy/Manners: obtained benefit from Royce Homes in an amount of at least $1,507,500.00 in interest payments made under the Amegy Loan. Amegy is jointly and severally liable for this amount as a co-conspirator or because it aided and abetted or acted in concert in the conduct. Manners is jointly and severally liable for this amount as a co-conspirator or because he aided and abetted or acted in concert with Speer.

d. Speer/Amegy/Vestalia: obtained benefit from Royce Homes in excess of $3,000,000.00 in equity transferred by Speer and Amegy to Vestalia from Park Lake. Amegy is jointly and severally liable for this amount as a co-conspirator or because it aided and abetted or acted in concert with Speer.

e. Speer/Manners/DWM/Saracen: obtained benefit from Royce Homes in at least the amount of $3,085,100.00 in interest and principal payments on Speer's personal note to Manners. Manners, DWM, and Saracen are jointly and severally liable for this amount as co-conspirators or because they aided and abetted or acted in concert with

Speer.

f. Speer/Manners/DWM/Saracen: obtained benefit from Royce Homes in at least the amount of $900,000.00 paid to Manners on October 2, 2006. Manners, DWM, Saracen are jointly and severally liable for this amount as co-conspirators or because they aided and abetted or acting in concert with Speer.

g. Speer/Manners/Allard: obtained benefit from Royce Homes in excess of $2,345,000.00 which is believed to be the shortfall in consideration paid below fair market value for the Royce Homes properties involved in the Allard transaction. Manners and Allard are jointly and severally liable for this amount as co-conspirators or because they aided and abetted or acted in concert with Speer.

h. Speer/Manners: obtained benefit from Royce Homes in excess of $400,000.00 in alleged salary, benefit and sponsorship payments made to Manners and entities controlled by him. Manners is jointly and severally liable for this amount as a co-conspirator or because he aided and abetted or acted in concert with Speer.

i. Speer/MGM: obtained benefit from Royce Homes in at least the amount of $105,000 in payments made to MGM Motor Sports from January to March 2008 ($35,000 per month).

j. Speer/Kopecky: obtained benefit from Royce Homes in at least the amount of $2,146,046.00 in transfers to Kopecky. Kopecky is jointly and severally liable for this amount as a co-conspirator or because he aided and abetted or acted in concert with Speer.

k. Speer/Kopecky: obtained benefit from Royce Homes of approximately

$1,800,000.00 in Royce Homes's funds which appear to have been used to fund Watermark Land. Kopecky is jointly and severally liable for this amount as a co-conspirator or because he aided and abetted or acted in concert with Speer.

l. Speer: obtained benefit from Royce Homes in the amounts paid from Royce to fund Speer's lavish lifestyle. Speer is asked to account for these payments.

m. Speer/Donnie Lou Speer: obtained benefit from Royce Homes in the amount of the salary and benefits paid to Donnie Lou Speer from Royce Homes 2005-2008, the $50,000 per month she received from Royce Homes 2005-2008, and any tax distributions she received from Royce Homes. Speer is jointly and severally liable with Donnie Lou Speer for these payments and is asked to account for them. Donnie Lou Speer and Speer are asked to account for these payments.

n. Speer: obtained benefit from Royce Homes in the amount of the value of Compound, including acreage and houses, on Telge Road transferred to Speer in December 2006.

647. Pursuant to the laws of the State of Texas, the Trustee is entitled to recover from each of the defendants above, respectively, the amount which they were unjustly enriched, which is set forth in subparagraphs (a) through (n).

**I. Equitable Subordination of Amegy Liens**

648. Equitable subordination is a remedy that is available to subordinate the prior lien of a party with a superior lien or claim engaged in false or inequitable conduct that conferred an unfair advantage on itself or injured third parties.[110] Typically, a prior lien gives a prior claim -

---

[110] See World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662, 673 (Tex. App. 1998); See First Heights Bank, FSB v. Gutierrez, 852 S.W.2d 596, 613 (Tex.App.—Corpus Christi 1993, writ denied) (bank's lien rights subordinated because its predecessor's president committed fraud); See Farm Credit Bank v. Ogden, 886 S.W.2d

unless the lien can be displaced by some act of the party holding it, which shall postpone it in a court of law or equity to a subsequent claimant.[111]

649. Lien priorities should be subordinated only to the extent necessary to offset the harm done by the inequitable conduct.[112] Whether inequitable conduct has occurred sufficient to warrant equitable subordination is a fact question.[113] Thus, a trial court's decision to subordinate lien rights under this doctrine must be based upon fact findings that inequitable conduct occurred and that the conduct was so inequitable that it warrants lien subordination.[114]

650. The Trustee incorporates by reference all allegations made in this Third Amended Complaint.

651. Through the filing of a UCC-1 Financing Statement with the Texas Secretary of State, Document No. 08-0032226154, on October 1, 2008, Amegy obtained liens on certain of Speer's assets, including:

  a. A 42.49 acre tract of land situated in the H.T.&B Co. Survey, Abstract 609, H.T.& B. RR Co Survey, Abstract 756 and the H.T.&B. RR. Co. Survey, Abstract 949,

---

305, 313 (Tex.App.—Houston [1st Dist.] 1994, no writ) (equitable subordination not available because lien holder did nothing inequitable); See Also In re Fabricators, Inc., 926 F.2d 1458, 1464–65 (5th Cir.1991) (applying equitable subordination to secured creditor's claims in bankruptcy proceeding).

[111] See First Heights Bank, 852 S.W.2d at 609 (quoting Rankin v. Scott, 25 U.S. 177, 179 (12 Wheat. 177), 6 L.Ed. 592 (1827)).

[112] See In re CTS Truss, Inc., 868 F.2d 146, 149 (5th Cir.1989) (citing In re Mobile Steel Co., 563 F.2d 692, 701 (5th Cir.1977))

[113] See In re Herby's Foods, Inc., 2 F.3d 128, 130 (5th Cir.1993); Fabricators, 926 F.2d at 1465.

[114] In re Orah Wall Fin. Corp., 84 B.R. 442, 444 (Bankr.W.D.Tex.1986) (To establish its entitlement to this remedy, the injured party must prove conduct so inequitable that it "shocks one's good conscience.")

Harris County, Texas and bein all of a called 42.5125 acre tract described under Harris County Clerk's File Number S210251; save and except a 7.501 acre tract of land situated in the H.T. & B. RR. Company Survey, Abstract 609, Harris County, Texas and being out of a called 42.5125 acre tract described under Harris County Clerk's File Number S210251

    i.    Including Land, Improvements, Fixtures and Personalty.

652.    Through the filing of a UCC-1 Financing Statement with the Texas Secretary of State, Document No. 09-0003117657, on February 2, 2009, Amegy obtained liens on certain of Speer's assets, including:

    a.    All of Speer's membership interests in Vestalia, LLC, a Texas limited liability company ("Vestalia"), now owned or hereafter acquired;

    b.    All of Speer's rights under the organizational documents of Vestalia (the "Vestalia Agreements);

    c.    All (i) profits, income, surplus, money, instruments, documents, chattel, paper, accounts, general intangibles, credits, claims, demands and other property (real or personal) and revenues of any kind or character now or hereafter relating to, accruing or arising under or in respect of Vestalia or any of the Vestalia Agreements, and (ii) by Vestalia or paid, payable or otherwise distributed or distributable or transferred or transferable to Debtor under, in connection with or otherwise in respect of Vestalia or any of the Vestalia Agreements (whether by reason of Debtor's ownership interest, loans by Debtor or otherwise); and

    d.    All products and proceeds from any and all of the foregoing.

Exhibit B

653. Through the filing of a UCC-1 Financing Statement with the Texas Secretary of State, Document No. 09-0022211249, also on August 14, 2009, Amegy obtained liens on certain of Speer's assets, including:

    a.      All of JOHN HOPKINS SPEER 2008 REVOCABLE INSURANCE TRUST's right, title and interest in and to that certain life insurance policy issued by Preach Life Insurance Company upon the life of JOHN H. SPEER, and all claims, options, privileges, rights, title and interest therein and thereunder, subject to all the terms and conditions of the Policy.

654. Through the filing of a UCC-1 Financing Statement with the Texas Secretary of State, Document Nos. 09-0028403167 and 09-0028410337, on October 9, 2009, Amegy obtained liens on certain of Speer's assets, including:

    a.      With respect to Watermark Tortuga, LLC:

        i.      All of Speer's membership interests in Watermark Tortuga, LLC, a Delaware limited liability company ("Watermark Tortuga"), now owned or hereafter acquired;

        ii.      All of Speer's rights under the organizational documents of Watermark Tortuga (the "Watermark Tortuga Agreements");

        iii.      All (I) profits, income, surplus, money, instruments, documents, chattel paper, accounts, general intangibles, credits, claims, demands and other property (real or personal) and revenues of any kind or character now or hereafter relating to, accruing or arising under or in respect of Watermark Tortuga or any of the Watermark Tortuga Agreements, and (ii) property, real

Exhibit B

or personal, now or hereafter owned by Watermark Tortuga or paid, payable or otherwise distributed or distributable or transferred or transferable to Debtor under, in connection with or otherwise in respect of Watermark Tortuga or any of the Watermark Tortuga Agreements (whether by reason of Debtor's ownership interests, loans by Debtor or otherwise);

iv. All products and proceeds from any and all of the foregoing.

b. With respect to Magueyitos Cattle Co., L.P.:

i. All of Debtor's title, rights and interests in and to the partnership interests in Magueyitos Cattle Co., L.P., a Texas limited partnership ("Magueyitos Cattle"), and Magueyitos Land & Minerals, L.P., a Texas limited partnership ("Magueyitos Land & Minerals", and together with Magueyitos Cattle, the "Magueyitos Entities"), now owned or hereafter acquired, including all the partnership interests bequeathed to Debtor pursuant to that certain Last Will of Katy Sue Dobie Hendrickson and that certain Last Will and Testament of Mary Katy Withers, and all right, title and interest of Debtor in the Magueyitos Entities;

ii. All of Debtor's title, rights and interest in, to and under the organizational documents of the Magueyitos Entities (the "Magueyitos Entities Agreements");

iii. All (i) profits, income, surplus, money, instruments, documents, chattel paper, accounts, general intangibles, credits, claims, demands and other property (real or personal) and revenues of any kind or character now or

hereafter relating to, accruing or arising under or in respect of any of the Magueyitos Entities or any of the Magueyitos Entities Agreements, and (ii) property, real or personal, now or hereafter owned by any of the Magueyitos Entities or paid, payable or otherwise distributed or distributable or transferred or transferable to Debtor under, in connection with or otherwise in respect of any of the Magueyitos Entities, or any of the Magueyitos Entities Agreements (whether by reason of Debtor's ownership interest, loans by Debtor or otherwise); and

  iv.  All products and proceeds from any and all of the foregoing.

c.  All the proceeds of all Debtor's tax returns filed with the Internal Revenue Service, and all general intangibles arising therefrom or related thereto, whether now owned or existing or hereafter arising or acquired, and all proceeds and products thereof.

d.  With respect to Magueyitos Management, L.L.C.:

  i.  All of Debtor's membership interests in Magueyitos Management, L.L.C., a Texas limited liability company (Magueyitos Management"), now owned or hereafter acquired;

  ii.  All of Debtor's rights under the organizational documents of Magueyitos Management (the "Magueyitos Management Agreements");

  iii.  All (i) profits, income, surplus, money, instruments, documents, chattel paper, accounts, general intangibles, credits, claims, demands and other property (real or personal) and revenues of any kind or character now or

Exhibit B

hereafter relating to, accruing or arising under or in respect of Magueyitos Management or any of the Magueyitos Management Agreements, and (iii) property, real or personal, now or hereafter owned by Magueyitos Management or paid, payable or otherwise distributed or distributable or transferred or transferable to Debtor under, in connection with or otherwise in respect of Magueyitos Management or any of the Magueitos Management Agreements (whether by reason of Debtor's ownership interest, loans by Debtor or otherwise); and

iv. All products and proceeds from any and all of the foregoing.

655. In addition to the UCC-1 Financing Statements listed above, Amegy also filed UCC-1 Financing Statements against Vestalia, LLC, a company owned by Speer and his family, essentially granting a "blanket lien" against all of the assets, both real and personal, of Vestalia, LLC. These UCC-1 Financing Statements were filed as follows:

a. On October 1, 2008 at File No. 08-0032226154;

b. On February 2, 2009 at File No. 09-0003120843; and,

c. On March 5, 2009 at File No. 09-0006364836.

656. Amegy's conduct as set forth in detail in this Third Amended Complaint was inequitable; especially with respect to the Westwood Gardens transaction. Amegy aided and abetted and conspired with Speer to (i) breach the Partnership Agreement, (ii) breach the Fiduciaries fiduciary duties, and (iii) commit fraud. Amegy's inequitable conduct has given Amegy a grossly unfair advantage over legitimate creditors of Speer, including this Estate with over $39 million in claims against Speer.

657. Amegy's liens on Speer's personal assets confers an unfair advantage on Amegy and further injures the Estate by preventing a recovery against Speer's non-exempt assets.

658. Accordingly, Amegy's liens on all of the assets set forth herein, should be subordinated to the judgment lien of the Trustee.

**J. Constructive Trust/Equitable Lien**

659. Three elements are required to be met when applying the equitable remedy of a constructive trust: (1) Breach of an informal relationship of special trust or confidence arising prior to and apart from the transaction in question, or actual fraud; (2) Unjust enrichment of the wrongdoer; and (3) Tracing to an identifiable res.[115]

**1. Tax Distributions**

660. As set forth in this Third Amended Complaint, in April 2007 and April 2008, Speer converted funds of Royce Homes by making Tax Distributions from Royce Homes in breach of the Partnership Agreement, in breach of his fiduciary duty, and in violation of the Theft Liability Act. Speer used these fund to pay the IRS for his purported tax liability.

661. As stated above, Speer received the distributions in violation of his fiduciary duty or as a result of fraud. Speer was unjustly enriched by the Tax Distributions. These funds are directly traceable through Speer's tax returns and his refunds and the payments to Amegy Bank.

662. After Royce Homes was closed, Speer received a multimillion refund related to the unlawful Tax Distributions. After the bankruptcy was filed, Speer and Amegy restructured the Speer/Amegy Loan so these refunds were collateral for the loan.

[115] Matter of Monnig's Dept. Stores, Inc., 929 F.2d 197, 201 (5th Cir. 1991).

Exhibit B

663. Based on information and belief, once Speer received his multimillion tax refund he paid those funds to Amegy.

664. The Trustee seeks an equitable lien and constructive trust against Speer and Amegy for these funds. In addition, these funds represent an asset of this bankruptcy estate. The Trustee seeks a turnover order pursuant to 11 U.S.C. §542 and 543 of these funds from Speer and Amegy.

**2. Westwood Gardens MUD Reimbursements**

665. When Speer breached his fiduciary duty by conspiring with Amegy to acquire the Westwood Gardens subdivision, he also breached his duty with respect to the MUD reimbursement resulting from Westwood Gardens. That MUD reimbursement is approximately $2.9 million and should have gone to Park Lake to pay its creditors including Royce Homes.

666. The action taken by Speer and Amegy relating to Westwood Gardens constitutes a breach of an informal relationship of special trust or confidence arising prior to and apart from the transaction in question, or actual fraud, resulted in unjust enrichment of Speer, Vestalia, and Amegy, and the funds can be traced to an identifiable res.

667. The Trustee seeks an equitable lien and constructive trust against Speer, Vestalia, and Amegy in the amount of the MUD reimbursement.

**3. West Harris County Municipal Utility District No. 11**

668. West Harris County Municipal Utility District No. 11 is currently holding and will soon disburse approximately $1 to $1.5 million of the Westwood Gardens MUD reimbursement. Unless prevented, these funds will be distributed to or paid for the benefit of Speer, Vestalia and Amegy. Speer, Vestalia, and Amegy wrongfully obtained their ability to receive these

Exhibit B

funds by the breaches of fiduciary duty and fraudulent transfers set forth throughout the complaint. These funds should rightfully be paid to Royce Homes.

669. Speer and Amegy conspired to breach Speer's fiduciary duty and committed actual fraud in completing the fraudulent transfer of the Westwood Gardens MUD reimbursements. As set forth in paragraphs 212, 267 to 292, 324 to 340, 462 to 478, 501 to 504, 603 to 612, 648 to 658, and 665 to 667, 679, Speer and Amegy conspired to strip Royce Homes of assets to which it is justly entitled.

670. The action taken by Speer and Amegy relating to Westwood Gardens constitutes a breach of an informal relationship of special trust or confidence arising prior to and apart from the transaction in question, or actual fraud, resulted in unjust enrichment of Speer, Vestalia, and Amegy, and the funds can be traced to an identifiable res.

671. The three elements required to be met when applying the equitable remedy of a constructive trust are: (1) breach of an informal relationship of special trust or confidence arising prior to and apart from the transaction in question, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable *res*.

672. Speer was a fiduciary to Royce Homes, Park Lake, and Park Lake's creditors. He had a fiduciary duty to pay the creditors of Park Lake when Park Lake became insolvent. It is undisputed that Park Lake was insolvent and that Royce Homes was a creditor of Park Lake during the relevant time frame.[116] It is also undisputed that Park Lake had significant equity in the Westwood Gardens lots and the MUD Reimbursement.[117] The transfer of Westwood

[116] *See* Third Amended Complaint at para. 268 to 278, 501-504.

[117] *See* Third Amended Complaint at para. 267 to 292.

Gardens and the MUD Reimbursements was a breach of Speer's fiduciary duty. Amegy and Vestalia aided and abetted Speer's breach of fiduciary duty. All three colluded in this fraudulent scheme to take these assets for themselves to the detriment of legitimate creditors.

673. As a result of this fraudulent scheme by Speer, Amegy, and Vestalia, they now hold the apparent legal right to receive the payment of the MUD Reimbursements despite the fact that Park Lake and its creditors, including Royce Homes, have an equitable interest in those assets.

674. The Westwood Gardens section of this Third Amended Complaint[118] sets forth a plausible claim that the Westwood Gardens transfer was fraudulent and constituted a breach of fiduciary duty by Speer who was aided and abetted by Vestalia and Amegy.[119] The Westwood Gardens section of this Third Amended Complaint states a plausible claim which shows that the transfer of the right to receive the MUD Reimbursements in connection with the Westwood Gardens transaction constituted fraud. The Trustee seeks to set aside these

---

[118]See Section VI(B)(3) of this Complaint.

[119]In its Order at Bankruptcy Adversary Docket No. 200, the Bankruptcy Court analyzed the Trustee's allegations of fraud against Amegy, Speer, and Vestalia:

> *In the Amended Complaint, in paragraphs 262 through 286, the Trustee alleges, with good detail, that Amegy, Speer, Park Lake and Vestalia formulated and carried out a plan to transfer Westwood Gardens from Park Lake to a new company created expressly for that purpose (i.e. Vestalia), so that Speer could pay off his personal loan to Amegy. [Adv. Doc. No. 89, paragraphs 266-86]. The Trustee also alleges, through attaching the transcript of certain testimony, deliberate dishonesty on the part of these particular defendants in concocting a scheme to use Park Lake's assets to pay off Speer's personal obligations to Amegy, instead of using these assets to pay Park Lake's legitimate creditors (such as Royce Homes). Indeed, the Trustee alleges, by attaching the transcript of certain testimony, that these defendants were aware that the Transfer would be problematic when Royce Homes filed for bankruptcy. (Adv. Doc. No. 89, Denison Excerpt 74]. These allegations, if taken as true, demonstrate a deliberate intent of Amegy, Speer, Park Lake, and Vestalia to defraud Park Lake's creditors; instead of paying off Park Lake's debts, the defendants purposefully conspired to transfer a $6.77 million asset with substantial equity (i.e. Westwood Gardens) to Vestalia so that Speer could use this equity to pay off his personal loan to Amegy.* (Bankruptcy Adversary Docket No. 200, page 14).

Exhibit B

transfers as a fraudulent conveyance. Therefore, the Trustee has alleged sufficient facts and evidence on the first element to establish a constructive trust.[120]

675. If Speer, Amegy and Vestalia were to receive the MUD Reimbursements, they would benefit from their bad acts. In other words, Speer, Vestilia and Amegy would be unjustly enriched.

676. The funds in the hands of MUD 11 are the proceeds of the fraud of Speer, Amegy and Vestalia. Although MUD 11 did not participate in the fraud or the breach of fiduciary duty, the Trustee seeks the imposition of a constructive trust on MUD 11 to prevent the enrichment of the fraudsters: Speer, Amegy and Vestalia. Since a constructive trust can be imposed against a totally innocent beneficiary, the Trustee is seeking imposition of a trust against MUD 11 to capture funds that would otherwise go to wrongdoers.[121]

677. Further, these proceeds are traceable to the actual fraudulent acts committed by Speer, Amegy and Vestalia. In the Westwood Gardens section of the Third Amended Complaint the Trustee set forth in detail the fraud committed by Speer, Amegy and Vestalia in the Westwood Gardens transaction. These allegations are supported by supporting testimony from Speer and the Amegy Bank representative Chris Denison.

678. The MUD Reimbursements were contractually owed from MUD 11 to Park Lake. The Westwood Gardens section of this Third Amended Complaint traces the right to receive the

---

[120] *See* Order Granting Trustee's Motion to Reconsider Order Granting In Part and Denying In Part Vestalia, LLC's Motion To Dismiss the Trustee's Amended Complaint (Bankruptcy Adversary Docket No. 200, page 14).

[121] See *Sun Life Assur. Co. of Canada v. Dunn,* 134 F. Supp. 2d 827, 835 (S.D. Tex. 2001) holding that a divorce decree granted ex-wife a legal interest in an insurance policy's proceeds, that the right to receive the policy proceeds was a property interest, and were sufficient to satisfy the traceable res requirement for a constructive trust even against a "totally innocent" beneficiary. Citing *Dyll v. Adams*, 167 F.3d 945, 948 (5th Cir. 1999). See also, *Ginther v. Taub*, 675 S.W.2d 724, 728 (Tex. 1984) and *Pope v. Garrett*, 147 Tex. 18, 25, 211 S.W.2d 559, 562 (1948).

Exhibit B

MUD Reimbursements out of Park Lake and into the hands of Speer, Amegy and Vestalia. The MUD Reimbursement are a traceable *res*, based on a contractual right, satisfying the third element of a constructive trust.

679. The Trustee seeks an equitable lien and constructive trust against West Harris County Municipal Utility District No. 11 in the amount of the Westwood Gardens MUD reimbursement. The Trustee asserts the funds presently in possession of West Harris County Municipal Utility District No. 11 relating to Westwood Gardens should be turned over to the Trustee.

**4. Speer Compound**

680. Speer breached his fiduciary duty by transferring the Compound to himself for less than its value.

681. The action taken by Speer with respect to the Compound constitutes a breach of an informal relationship of special trust or confidence arising prior to and apart from the transaction in question, or actual fraud, resulted in unjust enrichment of Speer.

682. The Trustee seeks an equitable lien and constructive trust against the Speer Compound.

**K. Suit on Debt against Park Lake**

683. The Trustee incorporates by reference all allegations set forth in this Third Amended Complaint.

684. Park Lake was a sister company to Royce Homes. Park Lake owed Royce Homes money.

685. In August 2008, Park Lake owed Royce Homes approximately $4,495,869.31 as an intercompany receivable. Park Lake never paid that debt.

686. The debt is due and owing and remains unpaid. As set forth throughout this Third Amended

Exhibit B

Complaint, Park Lake continues to owe Royce Homes.

687. The Trustee seeks a judgment against Park Lake for all funds it owes to Royce Homes, plus interest and attorney fees.

**L. Hammersmith Liability Under 11 U.S.C. §723**

688. Under 11 U.S.C. §723, if there is a deficiency of property of the estate to pay in full all claims which are allowed in a case under Chapter 7 of the Bankruptcy Code concerning a partnership and with respect to which a general partner of the partnership is personally liable, the Trustee shall have a claim against such general partner to the extend that under applicable nonbankruptcy law such general partner is personally liable for such deficiency.

689. As stated throughout this Complaint, there is a deficiency of property of the estate to pay in full all claims which are allowed in this bankruptcy estate. At this time, there are $40,366,284.01 in claims filed in this estate with less than $200,000 in assets in the estate.

690. Pursuant to Del. Code Ann. tit. 6, § 17-403 a general partner of a limited partnership has the liabilities of a partner in a partnership and therefore is liable for the deficiency in the Royce Homes case.

691. Therefore, the Trustee seeks judgment against Hammersmith for $40,366,284.01.

**Prayer**

WHEREFORE, the Trustee respectfully requests that this Court enter judgment against the defendants cited herein as follows:

1. The Trustee seeks a judgment against Speer and Hammersmith jointly and severally as follows:

   a. $5,240,813.60 for tax and other distributions made by Speer to himself or for his benefit from funds of Royce Homes;

Exhibit B

b. $15,000,000.00 for principal payments made under the Amegy Loan;

c. $1,507,500.00 for interest payments made under the Amegy Loan;

d. At least $3,085,100.00 for interest and principal payments on the Manners Note to Manners, DWM and Saracen;

e. $900,000.00 paid to Manners, DWM, and Saracen on October 2, 2006;

f. All amounts paid from Royce Homes to fund Speer's lavish lifestyle. Speer is asked to account for each of these payments;

g. In excess of $3,000,000.00 in equity transferred by Speer and Amegy to Vestalia from Park Lake;

h. In excess of $2,345,000.00, which is believed to be the shortfall in consideration paid below fair market value for the Royce Homes properties involved in the Allard transaction;

i. In excess of $400,000.00 in alleged salary, benefit and sponsorship payments made to Manners and entities controlled by him;

j. $2,146,046.00 for transfers to Kopecky;

k. Approximately $1,800,000.00 of Royce Homes's funds which appear to have been used to fund Watermark Land;

l. Awarding damages resulting from the deepening insolvency of Royce Homes caused by the fraud/fraud scheme as set forth in this Third Amended Complaint;

m. Imposing a constructive trust and equitable liens as set forth in the applicable sections of this Third Amended Complaint;

n. Equitably subordinating Amegy's lien on Speer's assets to that of the judgment lien of the Trustee;

o. Finding that Speer and Amegy are jointly and severally liable for all distributions to Speer because Speer was Amegy's agent when he received all distributions from Royce Homes;

p. Awarding punitive damages;

q. Awarding attorneys' fees and expenses; and

      r. Awarding pre and post judgment interest at the maximum legal rate allowable by law.

2. The Trustee seeks a judgment against Park Lake and Vestalia jointly and severally as follows:

a. In excess of $3,000,000.00 in equity transferred by Speer and Amegy to Vestalia from Park Lake;

b. Equitably subordinating Amegy's lien on Speer's assets to that of the judgment lien of the Trustee;

c. Finding that Speer and Amegy are jointly and severally liable for all distributions to Speer because Speer was Amegy's agent when he received all distributions from Royce Homes;

d. Awarding punitive damages;

e. Awarding attorneys' fees and expenses; and

f. Awarding pre and post judgment interest at the maximum legal rate allowable by law.

3. The Trustee seeks a judgment against Amegy and Amegy Mortgage jointly and severally as follows:

a. $15,000,000.00 for principal payments made under the Amegy Loan;

b. $1,507,500.00 for interest payments made under the Amegy Loan;

c. In excess of $3,000,000.00 in equity transferred by Speer and Amegy to Vestalia from Park Lake.

d. Imposing a constructive trust and equitable liens as set forth in the applicable sections set forth in this Third Amended Complaint;

e. Equitably subordinating Amegy's lien on Speer's assets to that of the judgment lien of the Trustee;

f. Awarding damages resulting from the deepening insolvency of Royce Homes caused by the fraud/fraud scheme as set forth in this Third Amended Complaint;

g. Awarding punitive damages;

h.      Awarding attorneys' fees and expenses; and

i.      Awarding pre and post judgment interest at the maximum legal rate allowable by law.

4.      The Trustee seeks a judgment against Kopecky as follows:

a.      $5,240,813.60 for tax and other distributions made by Speer to himself or for his benefit;

b.      $15,000,000.00 for principal payments made under the Amegy Loan;

c.      $1,507,500.00 for interest payments made under the Amegy Loan;

d.      At least $3,085,100.00 for interest and principal payments on the Manners Note to Manners, DWM and Saracen;

e.      $900,000.00 paid to Manners, DWM, and Saracen on October 2, 2006;

f.      All amounts paid from Royce Homes to fund Speer's lavish lifestyle. Speer is asked to account for each of these payments;

g.      In excess of $2,345,000.00, which is believed to be the shortfall in consideration paid below fair market value for the Royce Homes properties involved in the Allard transaction;

h.      In excess of $400,000.00 for alleged salary, benefit and sponsorship payments made to Manners and entities controlled by him;

i.      $2,146,046.00 for transfers to Kopecky;

j.      Approximately $1,800,000.00 of Royce Homes's funds which appear to have been used to fund Watermark Land;

k.      Awarding damages resulting from the deepening insolvency of Royce Homes caused by the fraud/fraud scheme as set forth in this Third Amended Complaint;

l.      Imposing a constructive trust and equitable liens as set forth in the applicable sections of this Third Amended Complaint;

m.      Equitably subordinating Amegy's lien on Speer's assets to that of the judgment lien of the Trustee;

Exhibit B

n. Finding that Speer and Amegy are jointly and severally liable for all distributions to Speer because Speer was Amegy's agent when he received all distributions from Royce Homes;

o. Awarding punitive damages;

p. Awarding attorneys' fees and expenses; and

q. Awarding pre and post judgment interest at the maximum legal rate allowable by law.

5. The Trustee seeks a judgment against Watermark LLC, Watermark , LP and Watermark Tortuga as follows:

a. Approximately $1,800,000.00 of Royce Homes's funds which appear to have been used to fund Watermark Land;

b. Awarding attorneys' fees and expenses; and

c. Awarding pre and post judgment interest at the maximum legal rate allowable by law.

6. The Trustee seeks a judgment against Manners and DWM Holdings as follows:

a. $5,240,813.60 for tax and other distributions made by Speer to himself or for his benefit;

b. $15,000,000.00 for principal payments made under the Amegy Loan;

c. $1,507,500.00 for interest payments made under the Amegy Loan;

d. At least $3,085,100.00 for interest and principal payments on the Manners Note to Manners, DWM and Saracen;

e. $900,000.00 paid to Manners, DWM, and Saracen on October 2, 2006;

f. All amounts paid from Royce Homes to fund Speer's lavish lifestyle. Speer is asked to account for each of these payments;

g. In excess of $3,000,000.00 in equity transferred by Speer and Amegy to Vestalia from Park Lake;

h. In excess of $2,345,000.00, which is believed to be the shortfall in consideration paid

below fair market value for the Royce Homes properties involved in the Allard transaction;

i. In excess of $400,000.00 for alleged salary, benefit and sponsorship payments made to Manners and entities controlled by him;

j. $2,146,046.00 for transfers to Kopecky;

k. Approximately $1,800,000.00 of Royce Homes's funds which appear to have been used to fund Watermark Land;

l. Awarding damages resulting from the deepening insolvency of Royce Homes caused by the fraud/fraud scheme as set forth in this Third Amended Complaint;

m. Imposing a constructive trust and equitable liens as set forth in the applicable sections set forth in this Third Amended Complaint;

n. Awarding punitive damages;

o. Awarding attorneys' fees and expenses; and

p. Awarding pre and post judgment interest at the maximum legal rate allowable by law.

7. The Trustee seeks a judgment against Saracen as follows:

a. Any portion of the $3,085,100.00 interest and principal payments on the Manners Note paid to Saracen;

b. Any portion of the $900,000.00 paid to Saracen on October 2, 2006;

c. Awarding attorneys' fees; and

d. Awarding pre and post judgment interest at the maximum legal rate allowable by law.

8. The Trustee seeks a judgment against Allard as follows:

a. In excess of $2,345,000.00, which is believed to be the shortfall in consideration paid below fair market value for the Royce Homes properties involved in the Allard transaction;

b. Awarding attorneys' fees and expenses; and

   c.  Awarding pre and post judgment interest at the maximum legal rate allowable by law.

9.  The Trustee seeks a judgment against MGM Motor Sports as follows:

   a.  The payments received by MGM as alleged sponsor fees from January to March 2008 of $35,000 per month;

   b.  Awarding attorneys' fees and expenses; and

   c.  Awarding pre and post judgment interest at the maximum legal rate allowable by law.

10.  The Trustee seeks a judgment against Donnie Lou Speer as follows:

   a.  For all claims asserted against the Fiduciary Defendants and Fiduciary Conspirators.

   b.  For breach of fiduciary duty;

   c.  For fraudulent transfers;

   d.  All payment received as alleged salary, benefits, Tax Distributions, and the $50,000 monthly payments. Donnie Lou Speer is asked to account for each of these payments;

   e.  Punitive damages;

   f.  Awarding attorneys' fees and expenses; and

   g.  Awarding pre and post judgment interest at the maximum legal rate allowable by law.

11.  The Trustee seeks a judgment avoiding and recovering the following fraudulent transfers or their value under 11 U.S.C. §548, 550, TUFTA, or DUFTA as set forth in detail in the Third Amended Complaint:

   a.  Amegy Transfers: the Trustee seeks to recover from Amegy in the amount of $15,000,000 and $1,507,500.00. Alternatively, the Trustee seeks to recover from Speer in the same amount.

   b.  Manners Transfers: the Trustee seeks to recover from Manners, DWM and Saracen in the amount of at least $3,085,100.00 and $900,000. Alternatively, the Trustee

Exhibit B

seeks to recover from Speer in the same amount.

c.    MGM Transfers: the Trustee seeks to recover from MGM each $35,000 monthly payment.

d.    Allard Transfers: the Trustee seeks to recover from Allard, $2,345,000.00, which is believed to be the shortfall in consideration paid below fair market value for the Royce Homes properties involved in the Allard transaction.

e.    Speer Tax and Lavish Lifestyle Transfers: the Trustee seeks to recover from Speer in an amount to be determined after an accounting provided by Speer.

f.    Kopecky Transfers: the Trustee seeks to recover from Kopecky in the amount of $2,146,046.00.

g.    Manners Salary Transfers: the Trustee seeks to recover from Manners in the amount of approximately $400,000.

h.    Westwood Gardens Transfer: the Trustee seeks to recover from Amegy and Vestalia in the amount of approximately $3,000,000.00.

i.    Donnie Lou Speer Transfer: the Trustee seeks to recover from Donnie Lou Speer in an amount to be determined after an accounting provided by Donnie Lou Speer or Speer.

j.    Speer Compound Transfer: the Trustee seeks to recover from Speer in the amount of $1,459,831.28.

12.    The Trustee seeks a judgment against Hammersmith for $40,366,284.01 pursuant to 11 U.S.C. §723.

13.    The Trustee seeks judgment against Park Lake for $4,495,869.31, plus interest and attorney fees.

14.    The Trustee seeks a judgment imposing an equitable lien and constructive trust against West Harris County Municipal Utility District No. 11 in the amount of the Westwood Gardens MUD reimbursement. The Trustee asserts the funds presently in possession of West Harris County Municipal Utility District No. 11 relating to Westwood Gardens MUD

Exhibit B

reimbursements should be turned over to the Trustee.

15. The Trustee also seeks such other and further relief upon which he shows himself entitled.

Respectfully submitted this ___th day of June, 2012.

**CAGE HILL & NIEHAUS, LLP**

By:/s/ Michael Duncan
Michael Duncan
Texas Bar No. 06218700
Cage, Hill & Niehaus, L.L.P.
5851 San Felipe, Suite 950
Houston, TX 77057
Telephone: (713) 789-0500
Telecopier: (713) 974-0344

**JONES MORRIS KLEVENHAGEN, LLP**

By:/s/ Erin E. Jones
Erin E. Jones
Texas Bar No. 24032478
Jones Morris Klevenhagen, LLP
6363 Woodway Suite 570
Houston, TX 77057
Telephone: (713) 589-5061
Telecopier: (713) 589-5513

**TOW & KOENIG, PLLC**

By: /s/ Julie Koenig
Julie Koenig
Texas Bar No. 14217300
Rodney Tow
Texas Bar No. 20152500
Fed. Id: 3196
26219 Oak Ridge Drive
The Woodlands, TX 77380
Telephone: (281) 681-9100
Telecopier: (832) 482-3979
**COUNSEL FOR RODNEY TOW, CHAPTER 7**

Exhibit B

**TRUSTEE FOR THE ESTATE OF ROYCE HOMES, L.P.**

Exhibit B

# Gathmann 2004 Examination Excerpts

Exhibit B

**Gathmann Excerpt 1** (Gathmann 2004 Examination, Volume 1, Page 37, Line 5 to Line 10.)

Q. And the credit -- the entries that I've just mentioned are the facilities, the credit facilities of Royce Homes, LP, that were drawn down in order to facilitate the making of the 10-million-dollar distribution to Mr. Speers; is that correct?

A. That's correct.

Back to Breach of Partnership Agreement
Back to Breach of Fiduciary Duty

**Gathmann Excerpt 2** (Gathmann 2004 Examination, Volume 2, Page 61, Line 16 to Page 62, Line 2.)

Q. We looked at the entries within the bank records of the company and showed the "distri" -- the drawdowns on the credit lines that were used to make that distribution, right?

A. Correct.

Q. Okay. So, the bottom line is just because --I'm -- that -- the bottom line is the company had to --Royce Homes, LP, had to borrow the money in order to make the distribution -- the 10 million and the 2.5 – that first 2.5 million, they had to borrow that money in order to make the distribution, right?

A. That's correct

Back to Breach of Partnership Agreement Borrow for $10 million
Back to Breach of Partnership Agreement Borrow for $2.5 million
Back to Breach of Fiduciary Duty

**Gathmann Excerpt 3** (Gathmann 2004 Examination, Volume 1, Page 159, Line 12 to Line 20.)

Q. Well, let's talk about this 10-million-dollar distribution.

A. Uh-huh.

Q. That money had to be borrowed, right?

A. It was borrowed, yes.

Q. Okay. And it caused the covenant tent -- test failure that we're talking about in Exhibit 31; is that correct?

A. It, it did.

Back to Breach of Partnership Agreement
Back to Breach of Fiduciary Duty

**Gathmann Excerpt 4** (Gathmann 2004 Examination, Volume 1, Page 160, Line 7 to Line 20.)

Q. Okay. Let's put it this way: The -- by taking the 10-million-dollar payment to -- in January of 2007, there wasn't enough capital reserves to comply with the loan covenants with all of your lenders, right?

A. That, that's correct.

Q. Okay. And this was -- this $10 million was for the personal debt of John Speers, right?

A. That's correct.

Q. It wasn't a company debt?

A. That's correct.

Q. And did Mr. Speers have the final say on whether that distribution was to be made?

A. I am assuming that was the case, yeah.

Back to Breach of Partnership Agreement Debt-to-equity Ratios
Back to Breach of Partnership Agreement Insufficient Capital Reserves
Back to Breach of Fiduciary Duty Debt-to-equity Ratios
Back to Breach of Fiduciary Duty Insufficient Capital Reserves
Back to Breach of Fiduciary Duty Not A Royce Homes Obligation

**Gathmann Excerpt 5** (Gathmann 2004 Examination, Volume 1, Page 152, Line 12, to Page 154, Line 2.)

Q. Okay. Now, by this point are you getting some negative feedback from your banks regarding your debt-to-equity ratio?

A. I don't recall whether this was prompted by feedback from them or just my concern about trying to address it.

Q. Okay. Because at some point if you're doing your quarterly reports –

A. Yeah.

Q. -- all of a sudden, it's going to become very evident that you're now severely out of

whack –

A.     Yeah, and –

Q.     -- with your covenants?

A.     And those were coming up. It says the --within the next week we'll probably send out the quarterly financials.

Q.     Okay. So, if we looked at -- the last quarterly report that they got was the report which would have come out on December 31st –

A.     As –

Q.     -- of 2006?

A.     It would have been the report as of December 2006, but probably, you know, a month or so later –

Q.     Right.

A.     -- they would have received it.

Q.     Okay. So, between that time frame a lot of things have happened financially. We've made -- well, we'll get into that –

A.     Sure.

Q.     -- in a second. Let's, let's look at the attachment to 35.

A.     Okay.

Q.     Okay. So, are you basically trying to figure out how to present this to the bank because they're, all of a sudden, they're going to find out that the covenants are out of compliance? You were trying to find the, the nicest way to present it to them?

A.     I don't recall to what extent we may have already been in discussions with some of them. Obviously, we worked with La Salle Bank and some of the other ones back in December, the Phoenix banks.

Back to Breach of Partnership Agreement.

Exhibit B

**Gathmann Excerpt 6** (Gathmann 2004 Examination, Volume 2, Page 61, Line 16 to Page 62, Line 2.)

Q.    We looked at the entries within the bank records of the company and showed the "distri" -- the drawdowns on the credit lines that were used to make that distribution, right?

A.    Correct.

Q.    Okay.  So, the bottom line is just because – I'm -- that -- the bottom line is the company had to – Royce Homes, LP, had to borrow the money in order to make the distribution -- the 10 million and the 2.5 – that first 2.5 million, they had to borrow that money in order to make the distribution, right?

A.    That's correct

Back to Breach of Partnership Agreement

**Gathmann Excerpt 7** (Gathmann 2004 Examination, Volume 1, Page 45, Line 6 to Line 23.)

Q.    Okay.  All right.  All right.  Now, we just  discussed the 20-million-dollar loan that John Speers had at Amegy Bank.  What I'd next like to discuss is there was also a 13-million-dollar note between Mr. Speers and Mike Manners.  Did you come to realize that when you were working at Royce Homes, LP?

A.    There -- I knew there was a, there was a, a second arrangement in addition to the 20 million as part of the buy-out of Mike Manners' interest --

Q.    Okay.

A.    -- by John Speer.  If it was a note from John -- I, I -- you know -- I mean, I know there was a second arrangement.

Q.    Okay.  And there was also an arrangement or a method devised to make the payments out of Royce Home, LP's account towards Mr. Speer's obligation to Mr. Manners on that 13-million-dollar note?

A.    Correct.  Correct.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd
Page 198
Back to Table of Contents

Exhibit B

**Gathmann Excerpt 8** (Gathmann 2004 Examination, Volume 1, Page 55, Line 12 to Page 56, Line 1.)

Q.      You understood that there was a starting balance on the note?

A.      There, there was one, yes.

Q.      Okay.  And if I -- if we go back for a second on Exhibit No. 13, that same schedule is attached to the e-mail that you had; is that –

A.      Right.

Q.      -- correct?

A.      That's correct.

Q.      Okay.  And as we look at this schedule, it appears that every month that Royce Homes, LP, was  making a payment out of its -- the loan account, the  principal amount is being reduced. Is that what it  appears to be?

A.      That's correct.  Yeah.

Back to Breach of Partnership Agreement

**Gathmann Excerpt 9** (Gathmann 2004 Examination, Volume 1, Page 57, Line 24 to Page 58, Line 17.)

[Q.]      Okay.  So, it appears that the John Speer's note to Mike Manners had been reduced, according to this schedule prepared by Pam Mitchell, by $2,176,754; is that correct?

A.      As of June of 2000 and –

Q.       '7?

A.      -- yeah, '7.

Q.      Okay.  And this appears to be from disbursements out of the Royce Homes, LP, loan 8  account –

A.      Correct.

Q.       -- is that correct?

A.      Correct.

Exhibit B

Q.    Okay.  Do you know if there was any payments after June of '07?

A.    I know at some point we discontinued making those payments.  I don't know if June was the cutoff date, but at some point we did discontinue making the payments.

Back to Breach of Partnership Agreement

**Gathmann Excerpt 10** (Gathmann 2004 Examination, Volume 1, Page 59, Line 6 to Page 61, Line 9.)

         (Exhibit No. 14 marked.)

Q.    (BY MR. DUNCAN)  Okay.  If you could go to Exhibit No. 14.  This is a newfangled notebook -- okay. Okay.  If you could, take a look at Exhibit No. 14, and does, does that appear to be a series of e-mails, the final one being from Pam Tyler to you?  Is that correct?

A.    That's correct.

Q.    And the subject matter is management fees; is that right?

A.    That, that's correct.

Q.    And that's on January 22nd, 2007; is that right?

A.    That's correct.

Q.    Can you read that -- okay.  Let me see where we're -- okay.  At the top, read that e-mail.

A.    The very first one?

Q.    Yeah.

A.    "Bill, are we now charging 3,000 dollar" -- "a  3,000-dollar management fee to each job at start but            only asking the banks for 1500 to PLC?"

Q.    Park Lake Community?

A.    That's correct.

Q.    Okay.  Go ahead.

A.    "If so, then we need to make sure accounting  knows how to book this additional

Exhibit B

1500 fee at start that won't show up on the HUDs. Perhaps one journal entry at month end for all starts in each city?"

Q.      Okay. We're going to take that one part at a time.

A.      Okay.

Q.      Why are you now charging a 3,000-dollar management fee?

A.      I don't recall.

Q.      Okay.

A.      I'm not sure.

Q.      All right.

A.      It was a question to me. I'm not sure what my response was, but I'm not sure why.

Q.      What does it mean at start but only ask the bank for 1500 to Park Lake Community?

A.      I, I re -- recollect, as I see this, that at a start of a construction on a house we would request, as part of our costs, $1500 for -- on the bank loan, and, so, that's what that last part means.

Q.      Okay. So, you increased the, the bank loan amount by –

A.      Our, our loan request.

Q.      Okay -- by $1500?

A.       Yeah.

Q.      Okay. And this would have been the Royce Homes –

A.      The various bank facilities for Royce Homes.

Q.      Royce Homes, LP?

A.      LP.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

Exhibit B

**Gathmann Excerpt 11** (Gathmann 2004 Examination, Volume 1, Page 75, Line 1 to Page 76, Line 6.)

Q.    Okay.  And would you also agree that if -- well, let's, let's -- can you tell me why the management fee was being paid to Mr. Manner?

A.    Well, I think it's -- the arrangement that I  recall was that, for that 13 -- roughly, 13-million-dollar additional obligation that John had to Mike as part of the buy-out, they had agreed that for every start Mike would receive 1500 and for every closing of a house Mike would receive 1500.

Q.    Okay.  So, it really wasn't a management fee. That's just what it was called.  It was actually –

A.    Right –

Q.    -- a payment on the note?

A.    That's right.

Q.    Okay.   So, there was no services rendered in regards to the, the so-called management fee?

A.    As far as I know.

Q.    Yeah.   And the -- would that be something that you might be aware of, that somebody's actually performing some type of service -- you're -- let me  just put it this way –

A.    Yeah

.

Q.    -- from your dealings with this situation, the management fee was basically a payment on the Mike Manners note?

A.    As, as far as I know, yeah.

Q.    Okay.

A.    That's correct.

Q.    All right.  And that money was coming from, apparently, the Royce Homes, LP, bank account?

A.    I -- correct

Third Amended Complaint                                                                                          Page 202
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd                    Back to Table of Contents

Exhibit B

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Gathmann Excerpt 12** (Gathmann 2004 Examination, Volume 1, Page 107, Line 6 to Page 108, Line 14.)

Q.     And when you walked in the door, did you kind of realize that there was some sort of urgency about -- starting to happen when you started working –

A.     Probably, probably not the first couple of weeks.

Q.     Not the couple of -- the couple of weeks. Okay.

A.     Yeah.

Q.     All right.  But thereafter things -- you could notice that there were --

A.     Towards --

Q.      -- some sort of problems?

A.     Yeah.  Towards later in that year, I think there was -- yeah, that the market was starting to, to crash.

Q.     Okay.  So, towards the end of -- this is October.  In maybe November just --

A.     December, yeah.  I think general market was go -- was starting to --

Q.     Disintegrate?

A.     -- fall apart, yeah.

Q.     Okay.

A.     Not only in Houston but elsewhere.

Q.     Okay.

A.     Yeah.

Q.     And that, that's -- we -- people hear about the subprime problem?

A.     Yeah.

Exhibit B

Q. Was that starting to hit the Royce –

A. That's -- yeah. I mean --

Q. Okay.

A. -- sales were starting to slow down.

Q. And that was towards the end of '06?

A. Yeah.

Back to Breach of Fiduciary Duty
Back to Unreasonably Small Capital

**Gathmann Excerpt 13** (Gathmann 2004 Examination, Volume 1, Page 123, Line 18 to Page 124, Line 18.)

Referring to exhibit 28

Q. What, what do you say?

A. "The loan agreements, the loan agreements require a maximum leverage ratio of no more than 7.5 times. As of September 31st, Phoenix had liabilities of 34.1 million and equity of $0.8 million, resulting in a leverage ratio of about 43 times. In order to get into compliance, we would need to inject about 3.7 million of new equity. However, we are proposing to sell to Holigan the lots in Coolidge Commons and the lots in Crestview Manor, which could reduce debt by about $11 million. This would reduce our new equity requirement to about 2.2 million."

Q. Okay. That's fine. Now, what you're saying is: Who's going to come up with the, the 3.7 or the 2.2? Which entity is going to have to fund that?

A. Well, it says, "We would need to inject." I presume it would be Royce Homes.

Q. LP?

A. LP.

Q. Okay. And as we were talking about earlier, Royce, Phoenix was kind of sucking some of the cash out of Royce, Houston or Royce Homes, LP –

A. Yeah.

Q. -- and worsening the, the financial position of Royce Homes, LP -- is that correct -- at this time?

A. That's correct.

Q. Royce Homes, LP, was basically –

A. Yes.

Q. -- funding the loans for –

A. Yeah.

Q. They -- Phoenix couldn't pay its own bills, basically?

A. That's right.

Q. Okay. And this was as early as 2 -- as we'll see shortly, I believe, the end of 2006, Royce Homes was required to come in and pay its bills for it, basically, and –

A. I'm sure.

Q. -- capitalize the company?

A. I'm sure.

Back to Breach of Fiduciary Duty
Back to Unreasonably Small Capital

**Gathmann Excerpt 14** (Gathmann 2004 Examination, Volume 1, Page 126, Line 16 to Page 128, Line 4.)

Q. (BY MR. DUNCAN) Yeah. Okay. If we could turn to Exhibit No. 29, now, this is a letter, apparently, from RBC Builder Financial?

A. Uh-huh.

Q. Is that right?

A. That's correct.

Q. And this is on December 15th; is that right?

A. December 15th, 2006.

Q. And this is basically a for -- what we would call a forbearance agreement?

A. Correct.

Q. Royce is out of compliance with -- there, there, there's problems with the -- let me start over.

Certain of the Royce entities are out of their leverage ratios with RBC; is that correct?

A. Yeah.

Q. Okay. And if we could look down to the second paragraph, it's saying the "lev" -- if -- towards the end of the paragraph, it's saying the leverage ratio covenants should be no more than three and a half to one. Do you see that? It's towards the end of the second –

A. Yes.

Q. -- paragraph. Okay. So, the -- what they were supposed to be is -- they weren't supposed to have more than 3 and a half to 1, and based on their September 30th Royce, Phoenix had -- what did they have, 4 -- 42 to 1and 42 -- 8.84 to 1; is that right?

A. Where is that?

Q. It's at little I.

A. Yeah.

Q. Okay.

A. There it is. Yeah.

Q. Okay. And then Park Lake, they were 15.7 to 1; is that –

A. That's correct.

Q. Okay.

A. That's correct.

Q. And the leverage ratios are very important for a company such as Royce Homes to maintain –

Exhibit B

A.      Yeah.

Q.      -- is that correct?

A.      Yeah.

Q.      And if you don't maintain them, it can put the company in peril?

A.      That's correct.

Back to Breach of Fiduciary Duty Royce Phoenix
Back to Breach of Fiduciary Duty Debt-to-equity is Vital
Back to Unreasonably Small Capital

**Gathmann Excerpt 15** (Gathmann 2004 Examination, Volume 1, Page 129, Line 23 to Page 133, Line 25.)

Q.      (BY MR. DUNCAN)  All right.  Now you have in front of you Exhibit 30 and Exhibit 23; is that correct?

A.      Correct.

Q.      All right.  And Exhibit No. 30 is the consolidated financial statement for year end 2006; is that right?

A.      That, that's correct.

Q.      Okay.  And what 23 is, is the projections, the projections that were made August -- the end of August of 2006, correct?

A.      Correct.

Q.      So, about three, four months earlier, they made -- Royce Homes, LP, makes projections -- Royce Homes makes projections as to what they believe their year end '06 is going to be and then what their year end '07 is going to be, and –

A.      Correct.

Q.      -- these were forwarded to, apparently, to the bank.  So, what I'd like you to do is take a look at the projected -- again, take a look at the projection for the -- let me go here -- for the total equity for the year end 2006.

A.      Uh-huh.

Q.      And what was the projection as represented in Exhibit No. 23?

Exhibit B

A.     $44,099,000.

Q.     Okay.  Now what I'd like you to do is go to Exhibit No. 30 and go to Page No. -- it's at the bottom -- Page No. 2.  That's actually the fourth page. And tell me what the total equity turned out to be.

A.     Just trying to compare apples to apples here –

Q.     Sure.

A.     -- whether minority interest is included in equity in this projection or not (indicating).

Q.     Yeah.  Go -- take a look.

A.     I'm trying to figure that out.  Assuming it's not, then it would be -- apples to apples number, I think, would be 34,513,419.

Q.     Okay.  So, they're about 10 million off; is that right?

A.     That's correct.

Q.     All right.  And one thing I want you to look up on -- is the projections in number 23 are after the 10-million-dollar partnership distribution; is that right?

A.     That's, that's correct.

Q.     Okay.  So, the projections that are being made in August -- the end of August of 2006 are saying that after we make the 10-million-dollar distribution to Mr. Speer for him to pay his note, that we project we will have 44 million in partnership -- in, in equity in the company –

A.     Right.

Q.     -- correct?

A.     Right.

Q.     The number that you're looking at on Exhibit No. 30 is before the $10 million, isn't it?

A.     That's -- that -- I'm assuming that's correct.

Q.     Yes.

Exhibit B

A.   They haven't, they haven't booked it –

Q.   The –

A.   -- before then.

Q.   The distribution -- I'm sorry. The distribution to Mr. Speers didn't happen until January of 2007 –

A.   Correct.

Q.   -- is that right?

A.   Right.

Q.   So, in essence, our projections, as put forth in Exhibit No. 23, are $20 million off; is that right?

A.   That's correct.

Q.   Okay.  And that's about 46 percent off the projections, if -- you're, you're the math man.  Is that about right?

A.   I'd have to see the numbers again, but –

Q.   Well, I, I actually did the calculation -

A.   Okay.

Q.   -- on it.  So -- but I -- that -- does that sound about right?  We're –

A.   True.

Q.   -- talking that you were projecting -- or the, the company, I'm sorry, was projecting 44 million, and if we subtract out the 10 from the, the audited amount –

A.   Yeah.

Q.   -- we got -- that would make it 24 million –

A.   Yeah.

Q.   -- if we had made that -- if the company had made that payment –

Exhibit B

A. Yeah.

Q. -- correct? Okay. What I'd next like you to take a look at is the -- if we go back to Exhibit No. 23, look at the net income projection.

A. 25,302,000.

Q. Okay. Now go to the, the Exhibit No. 30. What did that turn out to be?
A. 16,153,000.

Q. So, that one's off about 36 percent. Does that sound about right?

A. It's -- sure.

Back to Breach of Fiduciary Duty Debt-to-equity Ratios
Back to Breach of Fiduciary Duty Net Income
Back to Fraud/Fraud Scheme
Back to Unreasonably Small Capital

**Gathmann Excerpt 16** (Gathmann 2004 Examination, Volume 1, Page 146, Line 18 to Page 147, Line 12.)

Q. Okay. Earlier, in the earlier Exhibit No. 31, we saw that Royce Homes is out of its loan covenants, correct?

A. That's correct.

Q. And as the CFO of the company, is that somewhat distressing to the CFO?

A. It would be, yes.

Q. Okay. And one of the things that -- or one of the major problems you have is you're -- you just made a 10-million-dollar distribution to John Speers; is that correct?

A. The company did.

Q. The company?

A. I didn't.

Q. Okay. The company did. And did that put a big hit on the, the, the balance sheet –

A. The –

Q. -- of the company?

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd
Page 210
Back to Table of Contents

Exhibit B

A. The equity and the balance -- equity on the balance sheet. That's correct.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 17** (Gathmann 2004 Examination, Volume 1, Page 160, Line 7 to Page 161, Line 15.)

Q. Okay. Let's put it this way: The -- by taking the 10-million-dollar payment to -- in January of 2007, there wasn't enough capital reserves to comply with the loan covenants with all of your lenders, right?

A. That, that's correct.

Q. Okay. And this was -- this $10 million was for the personal debt of John Speers, right?

A. That's correct.

Q. It wasn't a company debt?

A. That's correct.

Q. And did Mr. Speers have the final say on whether that distribution was to be made?

A. I am assuming that was the case, yeah.

Q. And if it were your decision, would -- you know, if you had the final say on whether to make that 10-million-dollar distribution, would you have made it, given the –

A. If -

Q. -- the financial condition of –

A. If I was the owner or if I'm the CFO?

Q. If you're the person in charge with making the final decision on whether to make that –

A. As the CFO of the company –

MR. GIBSON: Objection. Form.

Q. (BY MR. DUNCAN) Yes.

A.     Do I -- can I respond?

       MR. TOW:  It's okay.  You can respond.

Q.     (BY MR. DUNCAN)  Yeah.  Ignore him.

A.     No.  As, as the CFO of the company, I would have -- well, if, if I had a "yes" or "no" -- ability to say yes or no, I probably would have said, "No, John," because it would deteriorate the financial covenants.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 18** (Gathmann 2004 Examination, Volume 1, Page 161, Line 24 to Page 162, Line 22.)

Q.     Well, you could, you could tell by the present financial conditions of where you were at that point?

A.     Yeah, but I think it -- I mean -- yeah, certainly at that point in time, but, you know, the, the market continued to fall off the cliff –

Q.     It got –

A.     -- going forward –

Q.      -- worse, not better?

A.     -- got worse, and nobody knew how much worse it would get.

Q.     But you knew at that point in time –

A.     I knew at that point that it did trigger some covenant violations.

Q.     Would you say that it wasn't prudent?

A.     It would, would not be prudent to do it.

Q.     Okay.  So, it wouldn't have been prudent in -- to make the 10-million-dollar distribution in January of 2007, given the financial condition at the time and since the, the $10 million wasn't even going to be used for company purposes, correct?

A.     It was used for -- to repay John's loan.

Q.     So, it wouldn't have been prudent to, to make that?

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 212
Back to Table of Contents

Exhibit B

A.     Yeah.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 19** (Gathmann 2004 Examination, Volume 1, Page 162, Line 23 to Page 163, Line 24.)

Q.     Okay.  Now, on our little presentation here for Exhibit No. 35, we talk about the 10-million-dollar distribution.  We don't talk about the 1-and-a-half-million-dollar distribution for Mr. Speer's tax payment, right?  We -- that was another factor that you were out of -- your, your company or the -- Royce Homes was out of compliance in, in April of –

A.     When, when was that made, though?  Was that April?

Q.     Yeah, April –

A.     Okay.

Q.     -- April 2007 –

A.     Yeah.

Q.     The company was out of compliance?

A.     Yeah.

Q.     Would you agree that the 1-and-a-half-million-dollar tax distribution and the 870,000-dollar tax distribution in -- in April of 2007 -- that was a similar situation where, if you had the final say, you wouldn't have made that because that's Mr. Speer's personal debt?

A.     That's, that's correct.

Q.     And it put the company even further in problems with its financial covenants –

A.     That's correct.

Q.     -- with its lenders?  Yeah.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 20** (Gathmann 2004 Examination, Volume 1, Page 163, Line 25 to Page 164, Line 23.)

Exhibit B

Q. Okay. Let's go back to the highlights on Exhibit No. 35 and the presentation, the third page of Exhibit No. 35. We have the highlights of the problem, okay? We have increased level of bust-outs. We have closing, closing margins and lower -- or lower than -- I'm sorry, closings and margins are lower than expected.

A. Right.

Q. And we have the 10-million-dollar distribution for partner buy-out loan repayment, correct?

A. That's correct.

Q. Out of those three, what factors could Royce Homes control?

A. Probably just the third one.

Q. The 10-million-dollar –

A. The 10-million-dollar buy-out, yeah.

Q. Okay. So, you know, the market was the market, right? You –

A. That's right.

Q. But in order to avoid the problem or not exacerbate the problem, Royce Homes could have made a prudent decision at the time frame and not made that 10-million-dollar distribution?

A. That's correct.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 21** (Gathmann 2004 Examination, Volume 1, Page 147, Line 25 to Page 149, Line 2.)

Q. (BY MR. DUNCAN) Number 33. Now, Exhibit No. 33, is that an e-mail from you to John Speer with a cc to Mr. Hunter and Pamela Mitchell?

A. It is.

Q. And it's on May 7th of '07?

A. That's correct.

Q. And the subject is the "2007 financial covenant review"; is that correct?

A. That's correct.

Q. And you're writing to John. What are you saying?

A. I say: John, do you have some time tomorrow afternoon or later this week to review our March 2007 covenant performance and our action plan to get in compliance by year end?

Q. Okay. Now, we had just talked about the covenant, Exhibit No. 31.[122]

A. That's right.

Q. Is that kind of -- is it -- do you believe that's what you're talking about, is –

A. Uh-huh. I'm sure it is, yeah.

Q. Okay. And what you're noticing is month after month you're out of, out of your loan covenants with your banks?

A. That's right.

Q. Okay. And you want to talk to Mr. Speer about that?

A. Yeah.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 22** (Gathmann 2004 Examination, Volume 1, Page 149, Line 3 to Page 150, Line 21.)

(Exhibit No. 34 marked.)

Q. (BY MR. DUNCAN) All right. Okay. Now we have Exhibit No. 34, again, an e-mail from you on May 9th of 2007 to John Speer, and the subject matter appears to be renegotiating the Amegy loan; is that correct?

A. That's correct.

Q. Can you read that? Your –

[122]Exhibit 31 is the spreadsheet showing the breach of lender covenants.

A.    Sure.

Q.    This is -- go ahead.

A.    "John, in our meeting today, you suggested that we follow through with Goldman and Wachovia to get term sheets from them for the remaining 10-million-dollar loan you owe Amegy Bank.  How would you like to proceed on this?  Do you want me to" -- I'm sorry.  "Do you want me to get you the appropriate contact information for each bank and let you deal with them, or do you want me to be more involved?  Let me know.  Bill."

Q.    Okay.  So, in 33 we have an e-mail where you're saying we need to meet, and it, it revolved around the financial -- the covenants –

A.    Uh-huh.

Q.    -- the breach of the covenants with the, the lenders, correct?

A.    Correct.

Q.    In that meeting, did Mr. Speer's loan come up as part of the subject matter?

A.    I'm not sure if we ever met, but this was two days later and refers to a meeting.

Q.    Okay.  And it says -- and, so, did you have a meeting with Mr. Speer to discuss trying to find another way to pay –

A.    We –

Q.    -- the loan –

A.    I must have had a meeting, and this is the result of that meeting (indicating).

Q.    Okay.  And you recognized, as the CFO, that the company could not afford to pay the $10 million out of the company to pay his personal debt; is that correct?

A.    There was, there was a concern that -- yeah.

Q.    Okay.

A.    Yeah.

Back to Breach of Fiduciary Duty

Exhibit B

**Gathmann Excerpt 23** (Gathmann 2004 Examination, Volume 1, Page 151, Line 14 to Page 154, Line 19.)

(Exhibit No. 35 marked.)

Q. (BY MR. DUNCAN) Okay. What I'd like you to do is take a look at Exhibit No. 35, and is this an e-mail from you to John Speers and Mr. Hunter, dated May 11th of 2007?

A. It is.

Q. And what is the subject matter of the e-mail?

A. "Bank covenant review."

Q. Okay. And can you read that?

A. Sure. "John, attached is a draft of a brief PowerPoint presentation to you in our review with the banks to discuss our financial covenants and a request for waivers/amendments to the loan agreements. In particular, please provide me with any comments you might have on the slide where we propose the various waivers and/or amendments to the loan documents. We should be sending out the March financial statements next week, and then we should plan to start discussions with the banks shortly thereafter.

"One thing to consider is how we meet with the banks. Possibly we should just reserve a conference room at a nearby hotel and have our discussion over lunch with all of them at one time."

Q. Okay. Now, by this point are you getting some negative feedback from your banks regarding your debt-to-equity ratio?

A. I don't recall whether this was prompted by feedback from them or just my concern about trying to address it.

Q. Okay. Because at some point if you're doing your quarterly reports –

A. Yeah.

Q. -- all of a sudden, it's going to become very evident that you're now severely out of whack –

A. Yeah, and –

Q. -- with your covenants?

A.    And those were coming up.  It says the - within the next week we'll probably send out the quarterly financials.

Q.    Okay.  So, if we looked at -- the last quarterly report that they got was the report which would have come out on December 31st –

A.    As –

Q.    -- of 2006?

A.    It would have been the report as of December 2006, but probably, you know, a month or so later –

Q.    Right.

A.    -- they would have received it.

Q.    Okay.  So, between that time frame a lot of things have happened financially.  We've made -- well, we'll get into that –

A.    Sure.

Q.    -- in a second.  Let's, let's look at the attachment to 35.

A.    Okay.

Q.    Okay.  So, are you basically trying to figure out how to present this to the bank because they're, all of a sudden, they're going to find out that the covenants are out of compliance?  You were trying to find the, the nicest way to present it to them?

A.    I don't recall to what extent we may have already been in discussions with some of them. Obviously, we worked with La Salle Bank and some of the other ones back in December, the Phoenix banks.

Q.    Yeah.

A.    But this is really just to kind of summarize the quarterly results and our request for waivers and amendments.

Q.    Okay.  All right.  Let's look at the attachment Page 1, and it says "Bank Review, 2007" --

A.    You're talking about –

Exhibit B

Q.      -- "Financial Covenants"?

A.      You're talking about the –

Q.      Yeah.

A.      -- the cover?

Q.      The cover?

A.      Okay.

Q.      Is that correct?

A.      That's, that's correct.

Q.      And it says May of 2007, correct?

A.      That's correct.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 24** (Gathmann 2004 Examination, Volume 1, Page 154, Line 20 to Page 157, Line 14.)

Q.      All right.  Go to the next page, and it says "First Quarter 2007 Results," correct?

A.      That's correct.

Q.      And let's go over the highlights.  What's the first highlight?

A.      "Increased level of bust-outs."

Q.      What is that?

A.      I think a bust-out is, is when somebody contracts to buy a house but then they don't close.

Q.      They back out?

A.      They back out.

Q.      So, in other words, your -- the, the people backing out on their, their contracts is increasing?

Exhibit B

A.     It's increasing, yeah.

Q.     And this actually began in -- when -- in 2006, didn't it?

A.     I, I think it was beginning late 2006, but it really, I think, exploded in 2007 as the housing market –

Q.     Right.

A.     -- completely deteriorated.

Q.     The first quarter, it was getting –

A.     Yes.

Q.     -- pretty brutal –

A.     Yeah.

Q.     -- is that correct?

A.     That's my recollection.

Q.     Okay.  And the closings and margins lower than expected is the next highlight; is that correct?

A.     That's correct.
Q.     All right.  Give me an idea of what that means.

A.     The closings are the number of sales that you have.

Q.     Uh-huh.

A.     And margins are the profit margin on those sales, and, so, both are lower than what we had projected.

Q.     Okay.  In other words, so, you're selling less houses, and the money you're making on each of those houses is less?

A.     That's correct.

Q.     Okay.  So, the first thing you got is people are backing out on their contracts, you're selling your -- you're selling less houses, and the houses you're selling are making less money?

Exhibit B

A. That's correct.

Q. All right. And then what's the next highlight of the presentation?

A. It's a 10-million-dollar distribution for the partner buy-out loan repayment –

Q. Okay.

A. -- which we made in January 2007 –

Q. All right.

A. -- which we talked about.

Q. Okay. And then we have -- what's the, the first consequence?

A. "For some" -- and "some" is underlined in italics. "For some banks leverage ratio covenant and spec ratio covenants are not in compliance."

Q. Well, we just looked at it. You had 10, 10 of your -- I think it was about 10 of the 15, you were – about two-thirds of your, your loans are out of compliance?

A. Roughly.

Q. Okay. Did you actually have the meeting in May?

A. I don't think we did. I think we met with some of the individual banks after that, but we didn't have one big meeting, meeting.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 25** (Gathmann 2004 Examination, Volume 1, Page 157, Line 15 to Line 22.)

Q. Okay. Is it true that you have this 10-million-dollar distribution that really helped put you out of compliance with your, your loan companies?

A. I'm sure that was a big part of it.

Q. Yeah. Okay. So, let me, let me start here. Now, John Speers was the CEO and the president of Royce Homes, LP; is that correct?

A. And the owner.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 26** (Gathmann 2004 Examination, Volume 1, Page 158, Line 9 to Page 160, Line 6.)

Q. Okay. And what we have here -- basically at the end of the day, John Speers was the, the boss, and he made the final decision. Was that true?

A. I would say that was true, yeah.

Q. Okay. And, now, we, we know that the company fell pretty severely short of its 2006 projections; is that correct?

A. That's correct.

Q. And we know that the housing market is in trouble even at the beginning of 2006; is that correct?

A. 2007?

Q. 2000 -- I'm sorry. Yeah. No. At the end of 2006, we know that the, the market –
A. Okay.

Q. -- is cooling off; is that right?

A. Okay. You said the beginning of 2006.

Q. I've got -

A. I just want to make sure which –

Q. Sure.

A. -- period we're talking about. So, it was the end of 2006?

Q. Right.

A. Okay. We knew it was starting to cool off.

Q. And then for sure in the first quarter of 2007, there was a pretty sharp decline?

A. It was, it was continuing.

Q. Yeah.

A. Yeah.

Q.      Well, let's talk about this 10-million-dollar distribution.

A.      Uh-huh.

Q.      That money had to be borrowed, right?

A.      It was borrowed, yes.

Q.      Okay.  And it caused the covenant tent -- test failure that we're talking about in Exhibit 31; is that correct?

A.      It, it did.

Q.      Okay.  And by making the 10-million-dollar distribution –

A.      Let me just say it's, it's -- it certainly was one of the causes.

Q.      Right.

A.      Certainly net income was lower during that quarter, also, which had not been projected.

Q.      Okay.  So, in other words, you didn't have enough money, and taking out the $10 million threw you down below the, the covenant levels?

A.      It, it -- yeah.

Back to Breach of Fiduciary Duty


**Gathmann Excerpt 27**        (Gathmann 2004 Examination, Volume 1, Page 181, Line 11 to Page 182, Line 1 followed by Gathmann 2004 Examination, Volume 1, Page 183, Line 11 to Page 189, Line 13.)

        (Exhibit No. 40 marked.)

Q.      (BY MR. DUNCAN)  Okay.  All right.  Okay. Let's look at Exhibit No. 40.  Now, this appears to be -- do you know who Evans & Chastain is?

A.      They were the auditing firm we engaged to prepare the 2007 financial statements –

Q.      Okay.

A.      -- to audit them.

Exhibit B

Q. All right. And does this appear to be prepared by Evans & Chastain, the auditors?

A. I –

Q. Okay.

A. I don't -- well, I don't –

Q. That –

A. -- know.

Q. Well, that, that's what it appears?

*****************************

Q. All right. There you go. Now, does that appear to be from the work papers of Evans & Chastain?

A. Yes.

Q. Okay. And if you can go to the first page and –

A. But, but this page is blank.

Q. Yeah. That's just what it attaches to -- you know, when they're putting it in their work papers, they –

A. On okay.

Q. -- put it on the back saying that they –

A. Okay.

Q. -- prepared it.

A. Okay.

Q. Okay. We'll, we'll go from here.

A. Okay.

Q. All right. The first page of Exhibit 40 shows that at the end of 2006 the partnership equity was what?

A. $34,513,419.

Q. Okay. And then it's showing, at the end of '07?

A. It was $18,511,701.

Q. Okay. Now, we -- is it your understanding that the audit never got finished for this year?

A. It -- that's -- I think I left before that ever was resolved, but –

Q. Yeah.

A. -- it's –

Q. By the time you left there?

A. As of the time I left, it had not been completed.

Q. Okay.

A. Let me put it that way.

Q. And, you know, there may be further information on these numbers that were called into question, but these are -- this is –

A. Okay.

Q. -- basically what we have at that point. Can you tell me -- now, here's your math skills again.

A. Okay.

Q. I want you to do a debt-to-equity ratio for 2006, a simple one.

A. It's eight to -- seven to one, eight to one.

Q. Six to one?

A. Six to one.

Q. 6.3 to 1?

A. Okay.

Q.      So, at the end of 2006, by, by December, I guess, 31st –

A.      Yeah.

Q.      -- of 2006, we got a 6 point -- 6.13 to 1 debt-to-equity ratio, correct, if that's –

A.      Wait.

Q.      -- the right calculation?

A.      I'm sorry.  I was looking at the wrong numbers, but I'll take your word for it.

Q.      Okay.  Now, if we go to 2007 and we do a debt-to-equity ratio, where does it appear we're at?

A.      It's probably about twice that high.

Q.      Yeah.  It's probably about 11.69 to 1?

A.      Yeah.

Q.      Okay.  That is not a good debt-to-equity ratio -

A.      No.

Q.      -- is it?

A.      No.

Q.      And that's going to put you out of compliance with basically all of your –

A.      That's –

Q.      -- loan covenants –

A.      That's, that's –

Q.      -- correct?

A.      -- correct.

Q.      Okay.  Now, what we, now, what we have is during that year we're decreasing our equity in the company by about $16 million; is that correct –

Exhibit B

A.    That's correct.

Q.    -- according to these numbers?

A.    Yeah.

Q.    Now, let's think back.  At the end of 2006, we have 34 million?

A.    Yeah.

Q.    What happens about three, four days later, major event?

A.    We distributed $10 million to John.

Q.    Okay.  So, of that 16 million, the debt-to-equity ratio drops pretty substantially within a couple of days into the, the year, correct?

A.    That's correct.

Q.    And that's where you get into your problem for the rest of the year –

A.    Yeah.

Q.    -- with your debt-to-equity ratio going forward?

A.    That's correct.

Q.    And apparently you never recovered from that; it actually got worse?

A.    Yeah.

Q.    And a big part of that was we have about $19 million or over $19 million in partnership distributions or partnership payments going out for Mr. Speer's personal debt, correct?

A.    Yeah.

Q.    Okay.

A.    I'm not sure if we have a schedule on that, but –

Q.    We will.

A.    Okay.

Exhibit B

Q. We'll, we'll get there. Would you agree with me, by distributing 19 to $20 million in partnership distributions, that it totally devastated the company's debt-to-equity ratio?

A. It, it, it was one of the causes of it, yeah.

Q. Right. If it hadn't been done, you wouldn't be at a –

A. If, if it had been a normal business year, it probably would have, have had no effect.

Q. Right.

A. But during this particular year, it –

Q. Right. But –

A. -- it was the main, main cause of it.

Q. Okay. At the beginning of the year, we -- you -- there were signs that –

A. Yeah.

Q. -- it was not a good year?

A. That's right.

Q. Okay. What happens when you go to your lenders and you tell them you're, you're trying to renegotiate your loans or you're trying to extend your loans and you now tell them your debt-to-equity ratio is through the roof?

A. Well, I think we went to our lenders during the course of that year and sought out waivers for the ratios. As you saw in the presentation, we, we presented things that were action plans –

Q. Right.

A. -- things that we were trying to do to -- both things that we have done in terms of reducing costs, laying off people, and stuff to, to try to recover that -- the deterioration of the equity plus action plans for things to try to build it back up again.

Q. Okay. So, one of the things you were doing was you were laying off people, right?

A. Because of the market conditions, yeah.

Q.     Right.  One of the -- probably if you were a prudent -- a more prudent thing would be stop making partnership distributions.  Would that be –

A.     That was certainly something that's more in control –

Q.     Right.

A.     -- of the company.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 28** (Gathmann 2004 Examination, Volume 1, Page 173, Line 25 to Page 175, Line 12.)

Q.     (BY MR. DUNCAN)  All right.  I'd like you to take a look at Exhibit No. 38.
MR. GIBSON:  We skipped 37?

MR. DUNCAN:  Yeah.

MR. GIBSON:  Okay.

Q.     (BY MR. DUNCAN)  This one isn't too long. This is an e-mail from James Hunter to John Zunker.

A.     Correct.

Q.     Who is John?

A.     John was -- I think he was Houston sales manager.

Q.     Okay.

A.     But he, he covered Houston.

Q.     All right.  And it says "November closing meeting notes," correct?

A.     Correct.

Q.     And it's not real long.  Can you read that one?

A.     Yeah.  "December looks brutal."

Q.     Do you know whether he's talking about the weather or what -- what do you think he was talking about there?

Exhibit B

A.     I think he was talking about projected closings.  This was an e-mail in the -- early November. So, I think he's looking forward to what kind of projected closings they currently had on the books for possible December closings.

Q.     Okay.  So, in November, you know what's going on in November.

A.     Yeah.

Q.     But you can also look into the future, into December on what you have scheduled to close?

A.     Yeah.

Q.     Okay.  And what he's saying is it looks real bad?

A.     That's right.

Q.     And you were there at the time, right?

A.     I was working for the company, yes.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 29** (Gathmann 2004 Examination, Volume 1, Page 194, Line 9 to Page 195, Line 17.)

Q.     (BY MR. DUNCAN) Okay. We're back on the record.
       I'd like you to take a look at Exhibit 41.  Does that appear to be a consolidated balance sheet for the -- Royce Operating and its subsidiaries?

A.     As of December 2007, yes.

Q.     December 31st of 2007 –

A.     Yeah.

Q.     -- correct?

A.     Yeah.

Q.     And what does it show as the partnership equity?

A.     18,000 -- I'm sorry, 18,511,701.

Exhibit B

Q.      Okay.  And that corresponds to -- pretty closely to what we had on Exhibit No. 40; is that right?

A.      That's correct.

Q.      Okay.  And if you could go to Page 2, this is what I was talking to you earlier about. Now, how much money did the Royce entities make from operations?

A.      During 2007?

Q.      2007.

A.      It looks like there's a loss from operations of slightly over $1 million.

Q.      Okay.  So, Royce is in the build -- the business of acquiring lots and building homes and selling them on the market –

A.      That's correct.

Q.      -- correct?

A.      That's correct.

Q.      So, in that operation they actually lost over a million dollars; is that right?

A.      I presume that's all homebuilding, yes.

Back to Breach of Fiduciary Duty


**Gathmann Excerpt 30** (Gathmann 2004 Examination, Volume 1, Page 206, Line 18 to Page 207, Line 3.)

Q.      Okay.  By this point were you getting your ratio of available financing, your, your -- you would have, for example, $270 million worth of available credit, and were you basically maxing out the credit card by this point?

A.      I, I -- yeah, I would think by early 2008 it was -- yeah, we had probably tapped most of our lines, and we were just able to draw -- well, we had used up the excess capacity –

Q.      Yeah.

A.      -- in our lines.

Back to Breach of Fiduciary Duty Unable to Get Financing

Exhibit B

**Gathmann Excerpt 31** (Gathmann 2004 Examination, Volume 1, Page 207, Line 7 to Page 210, Line 16.)

(Exhibit No. 43 marked.)

Q. (BY MR. DUNCAN) Okay. I'd like you to take a look at Exhibit No. 43. And if you could, go to the fourth page of Exhibit No. 43.

A. Okay.

Q. And look at Paragraph C and this is on Bates Stamp 7024 and read that out loud.

A. Sure. "The client has not paid the property tax due January 2008 for 2007; management made the decision to, to delay the payment of these taxes because cash was tight. If the taxes are paid by June 30, 2008, then an additional fee of approximately 15 percent of the taxes due will be owed, as well. To determine the amount of this accrual, client obtained listings of taxes due per their outside consultant. See our testing of this accrual at BB-1/1. When client made this entry, they did not take into account whether the home was complete on the assessment date; client was able to provide us with substantial completion dates for completed homes, and we proposed an entry to expenses those" -- "to" expense "those taxes on homes completed before 12/31/06 that were still in inventory as of 12/31/07. See this entry and further discussion at C-3. We traced the tax rates and assessment values of five of the homes included in this accrual to the tax bills without exception.

Q. Okay. Let, let me -- let's go to the first page. If you see a -- in the first -- for Royce Homes, it says December of '07, and it says accrued property tax two oh seven. Do you see that? It's the third-from-bottom entry for Royce Homes.

A. Okay. Yeah, I see it.

Q. And there's taxes owed of 1,378,466 -- thousand dollar -- or let me start that over. We have taxes that were owed of $1,378,466; is that right?

A. That's correct.

Q. Okay. And they -- in -- what we have -- when they're talking about the client, that's Royce Homes, right?

A. That's correct.

Q. And that's Royce Homes, LP, and what we're saying here is we're not going to pay the taxes now, correct, we're going to try to pay them six months from now?

A. During, during the -- yeah.

Q. And be -- and we're going to incur the penalties?

A. That's right.

Q. All right. All right. Let -- what -- this is 12/31. That's the end of '07, right? And we have, before that, we have -- on January 4th they're talking about -- well, let -- what happens after the, the first week in 2008? And -- 2 and -- 2.5-million-dollar distribution to Mr. Speers again; is that correct?

A. I don't recall, but –

Q. Okay.

A. -- I'm sure –
Q. So –

A. -- you'll refresh my memory.

Q. All right. I will. If you recall, we just talked about not paying the –

A. Yeah.

Q. -- taxes that were owed -- is that right -- for $1.3 million?

A. Yeah.

Q. And we have, on January 4th, we have that 2.5-million-dollar partnership distribution payment so Mr. Speer can pay his personal loan at Amegy Bank, correct?

A. Correct.

Q. Okay. As the CFO of Royce Homes, LP, would you agree that not paying your taxes and making a partnership payment so the partner can make his personal debt would not be prudent –

MR. GIBSON: Objection. Form.

Q. (BY MR. DUNCAN) -- if –

A. Sure.

Q. Okay.

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd
Page 233
Back to Table of Contents

Exhibit B

A. Yes.

Q. Yeah. And you were also aware of the financial conditions of Royce Homes, LP, during that -- in, in January of 2008, correct?

A. Correct.

Q. Given the financial conditions as you observed them in January of 2008, would you agree with me that it was not prudent to disburse 2 and a half million dollars to Mr. Speers so he could pay his personal debt?

MR. GIBSON: Objection. Form.

A. Correct.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 32** (Gathmann 2004 Examination, Volume 1, Page 217, Line 1 to Line 24.)

A. I'm sorry. Okay. "Secondly, we made the 2.5 million payment to Amegy Bank in early January, and this, in combination with a slow January and February, have contributed to lower than planned liquidity reserves for Royce."

Q. Okay. Let's stop there. Why did Royce Homes, LP, "make" this $2.5 million to Speer in this period of time?

A. Because the owner requested that we make the 2.5 million.

Q. Okay. And that's -- the CFO -- that was not the CFO's decision, correct?

A. That's correct.

Q. That was Mr. Speer's decision?

A. That's correct.

Q. And if it were your decision, you would not have made it?

A. I –

MR. GIBSON: Objection. Form.

A. -- probably would not have made it. Yeah.

Q.    (BY MR. DUNCAN)  Well, you, given –

A.    Yeah.  Yeah.  Given all the facts, it would probably not be prudent to make it.

Q.    Yes.  Okay.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 33** (Gathmann 2004 Examination, Volume 1, Page 169, Line 3 to Page 171, Line 23.)

Q.    (BY MR. DUNCAN) Okay. Did you ever talk to Mr. Speers about that these distributions may not be helpful to the company?

A.    I, I believe I probably -- we probably had a conversation.

Q.    Or two?

A.    Or two.

Q.    Okay.

A.    Yeah.

Q.    And we've got –

A.    I don't, I don't recall a specific one, but I'm sure, between myself and James, we probably had discussions with John on it.

Q.    Okay. So, you and Mr. Hunter, you, you probably had conversations, going back as far as the –

A.    Yeah.

Q.    -- the first 10-million-dollar distribution, that it might not be reasonable or prudent to make that given the impact on the company?

A.    I'm not sure about that particular one, but probably during the course of 2007 and as the financial condition was worsening –

Q.    Okay.

A.    -- I'm sure we had more conversations.

Exhibit B

Q. Okay. To the effect that it, it wasn't the – reasonable, it wasn't prudent to make these distributions to pay your personal debt with the –

A. Yeah.

Q. -- present financial condition of the company?

A. Yeah.

Q. Okay. Now, you talked to Mr. Denison, too –

A. Yes.

Q. -- correct? And he's the representative for Amegy Bank?

A. That's correct.

Q. And he was the lead person on Mr. Speer's personal 20-million-dollar loan, correct?

A. That's, that's correct.

Q. And over time did you indicate to him, in trying to, you know, redo this loan, the impact that making these payments was having upon Royce Homes, LP?

A. I'm sure we did.

Q. Okay. Is that -- when was the first time you met with Mr. Denison or talked to him?

A. I wouldn't -- I do not know.

Q. Was it shortly -- was it in 2006?

A. I really don't know.

Q. Okay. Was it -- for sure in 2007, right?

A. Yeah, definitely 2007.

Q. Okay. And would it have been early on when you're trying to -- in the first half of the year, when you're trying to discuss with him reformulating the, the loan?

A. I, I'm sure it was.

Q. Okay. All right. And the indication is -- did you let him know that you were having

Exhibit B

loan covenant problems?

A.    I believe so. I, you know, I totally don't recall the, the conversations, but I, I'm sure we went to, to -- talked to Chris about changing the repayment date, stretching it out further, doing things like that because it was hurting, you know, the, the company's finances.

Q.    Right. And your -- the one thing that was clear is you had covenant problems with your loans –

A.    Yeah.

Q.    -- right? And when would that have been?

A.    My guess it's in the first six months of 2007 (indicating).

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 34** (Gathmann 2004 Examination, Volume 1, Page 79, Line 10 to Line 19.)

Q.    It appears that the lot values were increased by the amount of the management fee. Was that what we saw?

A.    We, we did see that increase.

Q.    Okay. And we also saw what was apparently accounts receivable created for the -- each time a payment was made, there was an accounts receivable created for an -- as an asset of Royce Homes, LP, correct?

A.    Correct. We saw that.

Back to Fraud/Fraud Scheme

**Gathmann Excerpt 35** (Gathmann 2004 Examination, Volume 1, Page 61, Line 25 to Page 63, Line 19.)

Q.    (BY MR. DUNCAN) Do you have a schedule attached to the back of your --

A.    I do.

Q.    Okay. Now, what we're doing -- we have a schedule here that's attached to Exhibit No. 14, and it's called "Royce Homes, LP, Proposed Generic Lot Pricing"; is that correct?

Exhibit B

A.      That's correct.

Q.      And in the first column, it talks about a subdivision number; is that correct?

A.      That's correct.

Q.      All right.  The second one is a subdivision name?

A.      That's correct.

Q.      The third is the total lot cost?

A.      Correct.

Q.      Okay.  And then we have the new lot cost, correct?

A.      Correct.

Q.      And then the final column is lots available; is that right?

A.      That's correct.

Q.      Okay.  So, we have -- say, for example, the Arbor Trails subdivision, we have 64 lots available there, correct?

A.      That's correct.

Q.      And the lots are appraised or valued at $23,000, correct?

A.      Correct.

Q.      And what the proposal is, is to mark up those lots or to capitalize, I guess, those lots with the additional either 1500 or $3,000 per lot; is that right?

A.      Each, each -- the new lot costs are $1500 higher than the original total lot cost.

Q.      Okay.  So, when we look at Arbor Trails, we got 23,000, and that lot is now going to be marked up to 24,500?

A.      That's correct.

Q.      And you're adding on this additional $1500 to the, the cost of the lot?

A.      That's -- there is $1500 being added on to each cost of the lot --

Exhibit B

Q. Okay.

A. -- of the lots.

Back to Fraud/Fraud Scheme

**Gathmann Excerpt 36** (Gathmann 2004 Examination, Volume 1, Page 64, Line 3 to Page 66, Line 11.)

Q. Right. Okay. So, what I -- I'm just trying to clear this up. We have the original price or the original appraised value of the lot. Maybe -- let's, let's go back.

A. Yeah.

Q. When you have -- when you acquire a lot, say, for $23,000 --

A. Yeah.

Q. -- okay, when you're booking that on your books, the, the Royce Homes books -- and I'm going to make it real simple here.

A. Yeah.

Q. -- as time goes on, you can add things such as interest --

A. Yeah.

Q. -- taxes. Those type of things can be, what we call, capitalized into the, the price of the lot --

A. Correct.

Q. -- is that right?

A. Correct.

Q. So, basically is -- what is occurring here is we have this additional management fee that is going to be capitalized into the value of the lot. Is that what we're doing here?

A. I was not -- again, I do not know -- I -- to confirm that. I wasn't involved in these discussions.

Q. Well --

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 239
Back to Table of Contents

Exhibit B

A.     So --

Q.      -- they're, they're sending it to you as the CFO; is that right?

A.     I don't know.  Was this, this was attached --

Q.     Yeah.

A.      -- to the e-mail?

Q.     Yeah.  See the --

A.     Yeah.

Q.      -- the attachment?

A.     Yeah.

Q.     Yeah.

A.     So --

Q.     Basically what was occurring was Royce Homes was going to capitalize this management fee into the value of the, the lots --

A.     Okay.

Q.     -- for the, the book purposes, correct?

A.     I, I'll say I assume so.

Q.     Okay.

A.     Yeah.  I'm at the very tail end of this, this chain.  So –

Q.     What is -- go ahead.

A.     No.  I'm just saying -- I, I wasn't involved in any of these discussions leading up to that point.   I just copied it -- got copied at the very end with a question about how to account for it.  So, I'm just saying I, I wasn't involved in the discussions leading up to what went into the --

Q.     Okay.

Exhibit B

A.      -- change of pricing --

Q.      So --

A.      -- of the lots.

Back to Fraud/Fraud Scheme

**Gathmann Excerpt 37**      (Gathmann 2004 Examination, Volume 1, Page 70, Line 4 Line 22 followed by Gathmann 2004 Examination, Volume 1, Page 71, Line 4 to Page 72, Line 17 and then Gathmann 2004 Examination, Volume 1, Page 73, Line 3 to Line 6.)

Q.      Did you understand where they were creating an accounts receivable between -- where Park Lake would owe Royce Homes an accounts receivable based upon the amount that was paid out under these management fees?

A.      I don't recall that.

        (Exhibit No. 16 marked.)

Q.      (BY MR. DUNCAN)  Okay.  Well, let's see if we can get there.  If you could, take a look at Exhibit No. 16, and you're going to keep that --

A.      Okay.

Q.      -- 15 out.

A.      Okay.

Q.      And if you can go back to your Page 2 of 17  Exhibit No. 15 --

A.      Okay.

Q.      -- and if you see the entry for the end of  2006, for 12/31 of 2006, does it appear to be $13,944,945.76?

A.      Yes.

        *************

Q.      (BY MR. DUNCAN)  Okay.  Does this Exhibit No. 16 appear to be the partnership tax return for Royce Homes, LP, for 2006?

A.      Yes, it does.

Exhibit B

Q. Okay. And, again, this is an excerpt from the tax return. If you could, turn to Page No. 2 --

A. Of –

Q. -- of --

A. Of the tax return?

Q. -- Exhibit No. 16.

A. Okay.

Q. And do you see where -- this top is the schedule of current assets; is that correct?

A. That's correct.

Q. All right. And under A/R, which is an accounts receivable -- that would be an accounts receivable, money owing to Royce Homes, correct?

A. Yeah.

Q. Okay. Do you see an entry for DWM Holdings, Inc.?

A. Yes, about two-thirds of the way down.

Q. Okay. And the dollar amount at the end of 2006 is 13 million, 944 dollars and -- I'm sorry, $13,944,946, correct?

A. That's correct.

Q. And does that correspond to the schedule we have that you're holding for Exhibit No. --

A. 15.

Q. -- 15 for the end of 2006?

A. Yes, it does.

Q. Okay. So, does it appear that the -- Exhibit No. 15 is recording as an accounts receivable each time that these payments are being paid out, these management fees that were, were creating an accounts receivable from DMW Holdings, Inc., to Royce Homes? Isn't -- every time a payment is made --

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 242
Back to Table of Contents

Exhibit B

A.      It's --

Q.       -- it increases the accounts receivable?

A.      That's -- appears to be correct.

        ************

Q.      Okay.  All right.  Now, the, the items on the other current assets, that would be
        reflected on the, the company's balance sheet as an asset, correct?

A.      Correct.

Back to Fraud/Fraud Scheme


**Gathmann Excerpt 38**          (Gathmann 2004 Examination, Volume 1, Page 108, Line 15 to Page 109, Line 13
                                 followed by Gathmann 2004 Examination, Volume 1, Page 114, Line 23 to Page
                                 117, Line 9, then Gathmann 2004 Examination, Volume 1, Page 74, Line 1 to Line
                                 6.)

                  (Exhibit No. 26 marked.)

Q.      (BY MR. DUNCAN)  Okay.  Let's see.  I'd like you to take a look at Exhibit No. 26,
        and we have your name on this one.

A.      Okay.

Q.      This Exhibit No. 26, this is an exhibit from you, correct?  There's a chain in here.  I
        think –

A.      Okay.  Yeah.  There's two different e-mail --

Q.      Yeah.

A.      -- headings here.  So, which --

Q.      You're on the second heading.

A.      It's the second one.  Okay.

Q.      Okay.  Let's look at that one.  It's from you, November 6th, 2006, correct?

A.      Let me find the date here.  Yes.

Exhibit B

Q. Okay. And it's to Pam Tyler?

A. Yes.

Q. And who is Kathy --

A Kathy Kramer was in our accounting group. She managed the -- she, she managed kind of the, the communications with the lenders --

Q. Okay.

A. -- the accounting groups with the lenders to request draws and keep track of everything.

******************

Q. Okay. Go ahead and read number four.

A. "Four, What price do we record on our books for lot costs? Is it the same as the transfer price with the bank?"

Answer from Pamela, "Yes. Our lots-owned balance on the balance sheet is comprised of contract base price plus interest plus closing costs. We do not mark up our inventory to market. We would have to sell them to a third party and then buy them back to do that. Hmmm" --

Q. "Hmmm."

A. -- period.

Q. Okay. Now, do you know what she's talking about there?

A. Let's see. "What price do we" -- I mean, she's basically saying that the, the lots that we record on our books is the contract base price, and I'm not sure what that reference is --

Q. Well, is –

A. -- to.

Q. Tell, tell me if this is correct. What she's talking about is how you capitalize the costs for your asset -- your, your lot inventory on your balance sheet, correct?

A. Yeah.

Exhibit B

Q.      Okay.  So, in order to get there, you get your purchase price, basically, or your, your --

A.      Your land –

Q.       -- your acquisition cost?

A.      Your land cost plus the cost of building out the sub -- the infrastructure in the subdivision.

Q.      Okay.  And then on --

A.      The --

Q.       -- top of that, you can include interest and --

A.      Yeah.  You probably divide it by the number of lots, and you get a base contract price.

Q.      Okay.  Now this next sentence is a little interesting, though.  What she's saying is that, well,  if we sold the lots to a third party and then buy them back, that we could, you know, in essence, increase the value on our balance sheet; is that correct?

A.      You could, you could increase the, yeah, the,the booked price on the balance sheet.

Q.      Okay.  And you could fluff up your balance sheet to, to make it look better?

A.      I'm not sure --

Q.      I -- and that's my words, but --

A.      Yeah.  I'm not sure what, what that would accomplish, but –

Q.      Well, you could make, you could make your assets look larger --

A.      But you'd, but you'd have to bring in the equity to do that.  So, they both, both go up (indicating).

Q.      Right.  In other words, if you borrowed the money, you'd have to reflect the borrowed --

A.      Yeah.

Q.       -- money?

Exhibit B

A. Yeah. It would go to both sides of the --

Q. Okay.

A. -- of the ledger (indicating).

******************

Q. Okay. But if you see where we're increasing the amount of the accounts receivable --

A. The --

Q. -- is that --

A. The amount of -- on this statement is increasing.

Back to Fraud/Fraud Scheme

**Gathmann Excerpt 39** (Gathmann 2004 Examination, Volume 1, Page 109, Line 14 to Page 114, Line 22 followed by Gathmann 2004 Examination, Volume 1, Page 125, Line 9 to Line 24.)

Q. Okay. Now, we have the title -- the subject is "La Salle Phoenix question," correct?

A. Correct.

Q. Okay. And were you -- are you familiar with what this was about? Would --

A. I'd have to read it.

Q. Okay.

A. La Salle was one of our bankers --

Q. Okay. And they --

A. -- our, our Phoenix --

Q. That was one of your credit lines; is that right?

A. It, it was a banker for, specifically, for one of the Phoenix properties.

Q Okay.

A.      Yeah.

Q.      All right.  Now, I've read this e-mail, and it appears that what happened was somebody sent some questions and then on each entry somebody's responding to that question.

A.      Okay.

Q.      Does that appear to be what it is?

A.      I -- give me a second to read it.

Q.      Okay.  And you know what?  We're going to read it out loud.  So you --

A.      Okay.

Q.      -- might as well --

A.      Okay.

Q.       -- read it out loud, and then we can figure out --

A.      Okay.  Yeah.  The --

Q.       -- what we got.

A.      The, the answer to your question, yes, it appears to be a question-and-answer --

Q.      Okay.

A.       -- because --

Q.      Let's –

A.      But --

Q.       -- start reading it.

A.      Okay.  "Pamela/Kathy, can you help me with the answers to the following questions or forward this e-mail to who might be able to answer these questions? "Number one, the" 10 -- "December" 5 --" '05 balance sheet for Phoenix showed 4.3 million of equity. The June '06 balance sheet shows 951,000 of equity.  What happened to all of the equity in Phoenix?"

Exhibit B

Q.      And --

A.      Answer --

Q.      -- apparently -- okay.  The answer?  Yeah.

A.      Answer, "There was a 1.7 million tax distribution in April; a 2 million other partner distribution in May of 2006; and 375,000 net income for the current year."

Q.      Okay.  So, in other words, paid out a whole lot more money than they brought in?  Is that --

A.      That's correct.

Q.      -- basically the answer?

A.      For, for Phoenix, that's correct.

Q.      Okay.  All right.  And the other one deals  with engineering, and we don't need to -- let's see. All right.      Go to -- yeah, you can –just might as well read it.

A.      Okay.

Q.      Just read each one.

A.      "Number two, the engineer's original estimate for completion of Dominion Creek was September '06, and he is now saying that it is delayed by 60 to 90 days. What is causing the, the delay?"

        Answer, "Ask Shay when he returns from his site visit."

Q.      Okay.  All right.  Next?

A.      "Number 3, so far we have taken down 13 lots in Crestfield Manor. What is the schedule for  additional lot takedowns for both Crestfield Manor and Dominion Creek?"

        Answer from Pamela, "Ideally, we would like to take these down with construction loans after our sales have recovered in Phoenix.  It would be expensive for us to take down lots with lot loans."

Q.      Okay.

A.      "Assign both to LB."

Exhibit B

Q. Okay. Let's, let's talk about this one a second.

A. Okay.

Q. Did Phoenix ever recover?

A. Phoenix never recovered –

Q. Okay.

A. -- while I was, while I was there.

Q. Okay. And I -- to your knowledge, has it recovered today?

A. Not that I --

Q. Okay.

A. -- I'm aware of.

Q. So, at the end of 2006 -- we're in November of --

A. Yeah.

Q. -- 2006.

A. Yeah.

Q. And you had been there a short period of time. Could you tell that Royce Homes, Phoenix was pretty much not going to survive?

A. I don't know if I could make that assessment then, but there --

Q. At what point could you?

A. Well, I think over the course of, you know, the next year, not seeing any additional sales or not any substantial sales occurring in Phoenix, it became evident that, you know, it was a, a struggle --

Q. Okay.

A. -- to, to try to make that market happen.

Q. And was it kind of sucking the blood out of Royce Homes, LP?

A. We were re -- we had two or three subdivisions that had just been developed. I think they reference them here (indicating), a Dominion -- and -- Creek and Crestfield Manor. I think there was maybe just two of them, but they had loans on them that required them to be serviced, and obviously the cash had to come from Royce Homes to take care of it.

Q. Royce Homes, LP, was basically --

A. Yes.

Q. -- funding the loans for --

A. Yeah.

Q. They -- Phoenix couldn't pay its own bills, basically?

A. That's right.

Q. Okay. And this was as early as 2 -- as we'll see shortly, I believe, the end of 2006, Royce Homes was required to come in and pay its bills for it, basically, and --

A. I'm sure.

Q. -- capitalize the company?

A. I'm sure.

*****************

Q. Okay. All right. Let's see. All right. Now go to -- John apparently is sending an e-mail to you, starting on the first page of 28 where it says "Bill," and then on the next page what is John saying to you?

A. It says, "Bill, looking at the notices, I am concerned that they will be looking for a way to force us to pay them off in Phoenix to limit their position there due to market softness."

Q. Was Phoenix soft at this point?

A. It was, it was soft.

Q. Okay. In other words, they, they were really -- Royce, Houston was in -- had some problems, but Phoenix was really in problems at the end of '06; is that right?

A.     There, there were, as I recall, very few sales occurring.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 40** (Gathmann 2004 Examination, Volume 1, Page 176, Line 12 to Page 179, Line 5.)

        (Exhibit No. 39 marked.)

Q.     (BY MR. DUNCAN) All right. Okay. I want you to take a look at Exhibit No. 39, and we're -- if we could go to the e-mail that begins at the -- let me just make sure I'm on the right one here. All right. Go to Page 2, and the bottom e-mail is from who?

A.     The bottom e-mail?

Q.     Sherri --

A.     Yeah. Pavlicek.

Q.     -- Pavlicek. Okay. And she's one of -- she's from Capital --

A.     She's with Capital One Bank.

Q.     Capital One Bank.

A.     Yeah.

Q.     And this is December 27th of 2007, correct?

A.     That's correct.

Q.     And it's an e-mail to you?

A.     Yeah.

Q.     And is David Gresham --

A.     David Graham --

Q.     -- Graham -- I'm sorry.

A.     -- Graham is her boss --

Exhibit B

Q.      Her boss.

A.      -- at the bank.

Q.      And the title is: Payoff, we are still waiting on model homes transaction, right?

A.      That's correct.

Q.      Okay. If you can go to the, the one paragraph starting with "I have" and read that one?

A.      Sure. "I have another question" -- I'm sorry. This is from, yeah, Sherri to me. Okay. "I have another question: Is the" 14,000 –

Q.      14 million.

A.      Yeah. Yeah. There's an "M" there. Yeah --"14,650,000 note payable to Mike Manners in Royce's financial statements, or was this a personal note from John? Is this still being paid through a 3,000-dollar premium per house? How much" --

Q.      Okay. That's --

A.      -- "is remaining on the note?"

Q.      All right.  Now, whose note -- I -- what we've  seen is Royce Homes is making the payments on the Mike Manners note for the, you know –

A.      Correct.  Correct.

Q.      Okay.  Whose note is it?  I, I think her question is a good question.

A.      I believe it was Mike to John, but I don't have that note in front of me to confirm it.

Q.      Okay.  So -- but you can see why she may be asking that question, if –

A.      Yeah.  Yeah.

Q.      -- Royce Homes –

A.      Yeah.

Q.       -- is paying the note?

A.      Yeah.

Exhibit B

Q. And how about the 20-million-dollar note –

A. Oh, that was –

Q. -- with Amegy?

A. That was definitely a -- John borrowing the money from Amegy.

Q. Okay. But Royce Homes, LP, making the payments on the loan, both the principal payments as well as the interest payments?

A. They were –

MR. GIBSON: Objection. Form.

A. They were making distributions to John so he could make them.

Q. (BY MR. DUNCAN) Okay.

A. Yeah.

**Gathmann Excerpt 41** (Gathmann 2004 Examination, Volume 1, Page 195, Line 18 to Page 204, Line 6.)

Q. Okay. However, on the balance sheet, on the -- yeah, on the balance sheet, it shows that there's other income which brings you out to a net income of $3 million, correct?

A. That's correct.

Q. Okay. If we recall earlier, I had asked you the projections that you -- that were made for the bank, for Amegy Bank. Let me just get that number.

MR. TOW: Oh, I'm sorry. Do you need that exhibit?

MR. DUNCAN: I'm just trying to figure out which one it is, yeah.

A. Was it this one?

Q. (BY MR. DUNCAN) You got it.

A. This spreadsheet?

Q.        No. 36.  If we look at the projections in the back again of Exhibit No. 36 –

A.        Yeah.

Q.        what did we have -- which one are you on? You're on -- is that the -- income, yeah.

A.        Yeah.

Q.        What was the projected income for 2007?

A.        15 million –

Q.        Okay.

A.        -- and -- a little over 15 million.

Q.        Okay.  And we know from operations that there was a loss that year of 1 million –

A.        That's correct.

Q.        -- over, and then there's this other income -- and I'm going to ask you about that in a second.

A.        Sure.

Q.        -- that resulted in 3 million in income, correct?

A.        Other –

Q.        In that –

A.        Other, other income was five million –

Q.        Right, and then there's some –

A.        -- forty-six.  There are some minority  interest losses, which I'm not sure what those are, but –

Q.        All right.  If you could turn to -- on Exhibit 41, it's going to be Page -- as they – they have it as Page 6 of the consolidated financials, but  if you look at the bottom, it's David Jones Bate 12  No. 2733.

A .       Okay.

Exhibit B

Q.      And if you look down at the bottom, the last paragraph, can you read that?

A.      Sure. "During 2007 a related party, RH Models 17 2007, purchased a portion of the completed model inventory owned by Royce. The inventory was purchased at appraised values for a total sales price of 20 7,368,000. Royce's cost of the models was 5,129,944.The net amount of the transaction has been recorded in 22 other income for 2007."

Q.      Okay. Let's just look at that for a second.

A.      Yeah.

Q.      What -- and tell me if I got this right. Royce, under the control of Mr. Speers, has a number of model homes in its inventory, correct?

A.      That's right. That's right.

Q.      And what we do -- or what Mr. Speers does is he creates another company called Royce Homes Model 2007, correct?

A.      That's correct.

Q.      Okay. And what he does is he takes that inventory of model homes, and he sells them to Royce Homes, Royce Homes Models –

A.      RH –

Q.       -- 2007?

A.      RH Models 2007.

Q.      And there's a profit on that sale, correct?

A.      That is correct.

Q.      And that profit is booked as other income on the balance sheet, correct?

A.      That's correct.

Q.      So, we have -- and I don't want to get too into this, but basically Mr. Speers is entering into a transaction with himself through the -- his different entities where he pays more for the model homes and he books that as a profit with the company, correct?

Exhibit B

A.     He appraised -- he paid appraised value for the model homes, yeah.

Q.     Okay.  So, what we do is we take -- on the balance sheet, on the present balance sheet, you have those homes at X.  You have them, say -- let's -- for -- say –

A.     Yeah.

Q.     -- for example, they're on the --

A.     They're on the current balance sheet at 5 million, which is their cost.

Q.     Right.  So, what you get to do is you get to increase the value on the balance sheet to the 7  million, right, 7.3 million?

A.     On Royce Homes' balance sheet?

Q.     Well –

A.     On Royce Home -- Royce Homes LP balance sheet –

Q.     Right.

A.     -- you -- no, the -- I don't believe the -- the net result of that is a booking of income of the  difference between the two.  So, it would be about 2.2 million.

Q.     Okay.  So, in other words –

A.      You take –

Q.     -- it was a way to get a couple million dollars –

A.     And then, then we recorded some cash, too, the cash difference between the –

Q.     Right.

A.     -- the buy and the sale.

Q.     Now, if you recall, this -- didn't this  transaction take place right at the end of 2007?

A.     I don't, I don't recall the date.  It was, it  was one of -- on our list in the bank presentations here as  one of our courses of actions –

Q.     Right.

Exhibit B

A. -- to help improve the balance sheet of Royce Homes.

Q. So, back in June, you were talking about that as a method by which you would raise some additional –

A. That's correct.

Q. -- liquidity?

A. That's correct.

Q. Okay.

A. Yeah.

Q. And that was a way that you would be able to pay Mr. Speer's loan, by -- you were trying to tell the bank, "We have methods by which we can service this loan," correct –

A. It –

Q. -- the action plan?

A. Well, the, well, the loan had -- the $10 million had already gone out the door.

Q. Right.

A. It was just a way to, to, to reverse the default we had in some of the covenant ratios by improving the financial position of the company.

Q. Well, you also needed cash, right?

A. Well, there was cash involved in that. So, yes.

Q. Yeah. And one of the cash requirements you had in the beginning of January was Mr. Speers had another 2.5-million-dollar loan payment on for -- with Amegy Bank, correct?

A. In, in 2000 –

Q. -- and 8. January of 2008.

A. Coming, coming up in 2008, yeah.

Q. And one of the ways that you could raise that cash to make that 2.5-million-dollar loan payment on Mr. Speer's loan with Amegy Bank was by doing the Royce model homes deal, correct?

A. I don't recall if the linkage was to that or just to improve the balance sheet as we told the banks here we were going to do as part of our action plan.

Q. Okay.

A. But, but certainly the cash was available at year end to do that.

Q. Okay.

A. But whether it's cause versus action or action versus cause, I'm not sure which one.

Q. Got you. But this other income on the balance sheet is related to –

A. A portion –

Q. -- that one thing?

A. A portion of it, yeah.

Q. Was, was there also a Holigan transaction?

A. There -- if I recall, we -- I know we had a lot of discussions with them. I'm just trying to think of whether we actually closed something with them or not. You probably have it.

Q. Yeah, we do.

A. Okay.

Q. Do you recall whether this other income related to Holigan?

A. Yeah.

Q. Okay.

MR. GIBSON: Sir, can you speak up just a little bit, please?

THE WITNESS: Sure.

MR. GIBSON: Thank you.

THE WITNESS:  Sure.  I'm sorry.  I'm kind of talking to him.

Q.      BY MR. DUNCAN)  And -- all right.  So, we have these–

A.      And to answer that question whether this related to the Holigan transaction, I don't know, but if we did that in 2007, then it was a chance that it did –

Q.      Because –

A.      -- relate to that.

Q.       -- you did the same thing.  You realized some type of revenue, some kind of –

A.      I think we sold –

Q.       -- profit?

A.      Yeah.  I think we sold lots to the Holigan organization.

Q.      And that resulted in a profit; is that –

A.      It resulted in profit and cash flow, yes.

Q.      Okay.  And if that happened in 2007, that would explain where this 5 million came from?

A.      It --

MR. GIBSON:  Objection.

A.      It was --

MR. GIBSON:  Leading.  Objection.  Form.

A.      -- probably -- it probably included part of that, too, if that happened during 2007.

Q.      (BY MR. DUNCAN)  Okay.  So, the 5 million, where would you -- where do you believe that that came from in other income?

A.      Well, part of it is from the model home transaction (indicating) sale, leaseback, and if we closed the Holigan transaction during 2007, I'm sure part of it would have been from that, too.

Exhibit B

Back to Fraudulent Transfers

**Gathmann Excerpt 42** (Gathmann 2004 Examination, Volume 1, Page 169, Line 3 to Page 103, Line 24.)

Q. (BY MR. DUNCAN) Okay. I've provided you with Exhibit No. 22. Now, I understand this was shortly before you got there to Royce Homes, but I just wanted to get this in front of us so we could deal with the later information that deals with the same subject when you were there.

If we could look at the bottom e-mail, it appears to be an August 28th, 2006, e-mail from a Lloyd Bolton from Citigroup; is that correct?

A. That's correct.

Q. And are you familiar with who that is?

A. I, I am.

Q. Okay. And is that somebody that you dealt with?

A. He was the Citibank account officer –

Q. Okay. And –

A. -- for Royce Homes.

Q. All right. And if you -- on loan matters, he would be the guy that you would check with; is that correct?

A. Yeah.

Q. Okay. And this e-mail was sent at the time to Pam Tyler; is that right?

A. To Pam, yes.

Q. All right. And we've already discussed who she is. She's with Royce Homes. Who are these other people, the cc's –

A. Oh, I'm sorry. Let me just correct that. The -- the one I dealt with was Steve Oglesby –

Exhibit B

Q. Okay.

A. -- who was in the cc. Lloyd may be his boss or somebody under him. I'm, I'm not sure of the relationship.

Q. Okay. And, so, Oglesby is being cc'd?

A. Yeah.

Q. And who are these other people; do you know?

A. I –

Q. One appears –

A. I do.

Q. -- to be John Adkins of -- a lawyer; is that right?

A. That's –

Q. Yeah.

A. I, I do not know –

Q. Okay.

A. -- who Strasburger is.

Q. All right. Just so we get it on the table, if you could, just read from "Dear John" forward.

A. Okay. "Dear John, thanks for your letters of August 16th and August 18th, 2006, regarding your plan to acquire the interest of Mike Manners in Royce Homes,LP, and related entities. Steve Oglesby asked me to be your contact person on this matter. My telephone number is (713) 260-3072."

Q. You can just drop down to -- well, yeah. Go ahead. Just read all of them.

A. "We asked our attorney, John Adkins of Strasburger & Price, LLP, to review your request along with the contribution agreement and the interest purchase agreement referenced in your letter of August 16th. He has requested drafts of these documents from Joyce Soliman, who indicated last week that she was checking with you before releasing these documents to Citibank.

Exhibit B

"Other information that we need is quarterly financial statements for Royce Homes, LP, as of June 30, 2006. We also would like to see detailed projections and how anticipated distributions to you as the 100 percent owner of Royce Homes, LP, would enable you to pay the Amegy and Manners notes in 2006 and 2007. What effect to the provisions of the loan agreement relating to tangible net worth, Section 6.15, and ratio of total liabilities to tangible net worth, Section 6.12, would these payments have?

"We appreciate your assistance in this matter, and many thanks for sending the information requested."

Q.      Okay. So, apparently this is one of your --one of Royce Homes' lenders, correct?

A.      That's, that's correct.

Q.      And they're -- they appear to be knowing that there's going to be this buy-out happening?

A.       Yes.

Q.      And they're concerned over what effect the, the pay-outs will have on the debt-to-equity ratios, leverage ratios?

A.      That's right.

Q.      Okay. All right. And if you could, go up to the top e-mail and –

A.      Okay.

Q.      -- read that one. That's from Pam Tyler to Mr. Speer; is that correct?

A.      That's correct.

Q.      And that was on the next day, August 29th, 2006?

A.      Yes.

Q.      Can you read that?

A.      It says, "John, in response to Chuck's e-mail below, Chuck received our June financials yesterday afternoon. Regarding his request for projections illustrating that their covenants are maintained, I am attaching projections for your review. We are comfortably well within the covenant restrictions. James has reviewed them.

Exhibit B

"If you approve the attached projections, then I will forward them to Chuck and get an ETA on our consent letter."

Q.     Okay.

A.     "Hard copy is in your box."

Q.     All right.  So, apparently Pam is handling this request for projections by sending the proposed projections to Mr. Speer for his review and if he approves them, that they were going to forward them on to the bank?

A.     That's what it says.

Q.     Okay.  And attached are actual project -- it's  a two-year projection for 2006-2007.

A.     Okay.

Q.     Does that appear to be what they are?

A.     That's -- yes.

Q.     Okay.  And then if you can go to Exhibit  No. 23 -- oh, well, okay.  Did I write on -- I don't want to use one I wrote on, but that's fine.  That's just -- good. (Exhibit No. 23 marked.)

Q.     (BY MR. DUNCAN)  All right.  I've got in front of you Exhibit No. 23, and this -- does this appear to be Pamela Ty -- Pamela Tyler sending information to Chuck -- what's his last name?

A.     To Lloyd Bolton.

Q.     Lloyd Bolton.  And this is in response to that request for the projections that we just spoke of in  the previous e-mail.  Does that appear to be what it is?

A.     Yes.

Q.     Okay.  And if you could, just read the e-mail.

A.     Sure.  "Chuck, attached please find our 2006 and 2007 projections as requested.  The distributions from equity that would, would enable John to pay both Amegy and Manners' notes are covered primarily by net income in those years, and as a result, equity remains   consistently over $40 million.  In addition, both  tangible" -- "tangible net worth and total liabilities  to" net -- I'm sorry, "total liabilities to tangible net worth are also projected to remain very comfortably within the bank's

Exhibit B

requirements.

"The June financials were distributed on Monday afternoon, but please let me know if you did not receive them.

"If you have any, if you have any further requests, please do not hesitate to call me at the number below. I would also appreciate your updating me on when we may anticipate receiving your signed consent letter. I look forward to speaking with you again soon."

Q. Okay. In our previous e-mail, number they're saying, okay, we're concerned on whether -- if there's money taken out of this company by John Speers to pay this particular Amegy note, will they be able to maintain their debt-to-equity -- their leverage ratios, basically; is that correct?

A. That's right.

Q. Okay.

A. Well, I, I don't know if it was a concern. They just wanted to -- us to -- the company to demonstrate that they would remain within their covenants.

Q. Right.

A. Yeah.

Q. And we have here -- apparently Mr. Speers has reviewed the -- apparently he's reviewed the projections --

MR. SHURN: Objection. It's not in evidence.

MR. DUNCAN: Well, just object to the form.

MR. SHURN: I object to the form. It assumes facts that are not in evidence.

MR. DUNCAN: Well –

MR. SHURN: That's –

MR. DUNCAN: "Object to the form" is fine.

MR. SHURN: I, I did.

Q. (BY MR. DUNCAN) Okay. All right. In our previous e-mail that we just

Exhibit B

mentioned, Pam had provided the projections to Mr. Speers; is that correct, it appears?

A.     Yes.

Q.     Okay.   Then we go to the next page, and now Pam is forwarding projections on to –

A.     Which -- I'm sorry.  Which page are you at?  Which –

Q.     We're on 23.

A.     You're back –

Q.     On 23 –

A.      -- back to 23?  Okay.

Q.     Yeah.  Pam is forwarding projections on to the Citibank representative, correct?

A.     Correct.

Q.     Okay.  Let's go to the attached projections, and what it -- what is -- Pam is saying here is they're  going to be able to make these payments out of net  income, that it isn't going to reduce the equity levels, basically, it's just –

A.     Right.

Q.     -- going to be, basically, the profits.  We will have net income, and that can be serviced out of  the net income?

A.     That's correct.

Q.     And that we're -- even after making these note payments, that we're consistently going to have equity over $40 million; is that right?

A.     That's what she says, yeah.

Q.     Okay.  And if we go to the attachment, which is the actual projections -- and, now, these are August –

A.     And this is –

Q.     -- 30th –

Exhibit B

A.    -- on Exhibit 23 versus –

Q.    Yes.

A.    -- 22?

Q.    23, yes.  They were apparently updated –

A.    Okay.

Q.    -- for sending out –

A.    Okay.

Q.    -- on 23.

A.    Okay.

Q.    All right.  These -- the attachment to 23 is  projections as of August 30th, 2006.  Does that appear  to be what they are?

A.    That's the date at the bottom of the schedule.

Q.    And –

A.    Oh, on the first -- that page?  Yeah.

Q.    Okay.  So, let's turn to the second page of  the projections and what are the projections for year end 2006 as the total equity in the company?

A.    It's forty-four million, nine -- ninety-nine thousand.

Q.    Okay.  And what is the projection of the equity for year end 2007?

A.    44,956,000.

Q.    All right.  And then if you could go to Page 3 of the projections, what are the projections for net   income for 2006?  Is it 25,302,000?

A.    Yeah.  I'm sorry.

Q.    Okay.

A.    Just took me a while to find it.  Yeah,  25,302,000.

Exhibit B

Q. And then for 2007 it appears that they're going to -- the projection is they're going to improve to thirty-two million, eight hundred and eight –

A. That's correct.

Q. -- thousand, correct?

A. That's correct.

Q. Okay. All right. And this is apparently what's being sent to the banks –

A. That's –

Q. -- along with a statement that by -- the money's going to come out of net income and that even after making the payments we're consistently going to stay over 40 million in equity in the company –

A. Correct.

Q. -- correct? Okay.

Back to Fraud/Fraud Scheme

**Gathmann Excerpt 43** (Gathmann 2004 Examination, Volume 1, Page 179, Line 6 to Page 181, Line 10.)

Q. All right. If we could go to the e-mail starting at the bottom of Page 1 of Exhibit 39, so, if you go back –

A. I'm sorry.

Q. -- one page.

A. I'm sorry.

Q. Or the first page.

A. First page. Okay. I'm sorry.

Q. And at the bottom. And that again is from who? It's from –

A. Sherri Pavlicek.

Q.      To you and her boss, David, on December 27th, correct?

A.      That's correct.

Q.      Okay.  Can you read that e-mail?

A.      Sure.  It says, "No problem.  I have one more  to add.  We really are close to finalizing this.  Can we get a roll forward or explanation for the decrease in equity from year end to 9/30/07," open paren,"41 million to 27 million," close paren.

Q.      It appears she's wondering where all the equity in the company went –

A.      Yeah.

Q.       -- correct?

A.      Yeah, why it decreased from 41 to 27.

Q.      And do you go, in your next e-mail up, and explain?

A.       I do.

Q.      And what, what's -- there's an e-mail from you December 27th, 2007, to Sherri Pavlicek and David Graham?

A.      Yeah.

Q.      And what do you say?

A.      "Off the top of my head, the major changes to equity are as follows:  12.5 million reduction for distributions to Speer to repay the Amegy note; 1.4 million reduction for distributions to Speer to repay the note to Mike Manners; 4 million reduction in April for tax payments; 5 million increase for nine months of profits."

Q.      Okay.  Now, we don't have a -- some of the other -- there was a couple other distributions in  there, too, but this is off the top of the head –

A.      Yeah.

Q.      -- I, I'm sure, but we also have probably about a million and a half in interest being paid on Mr. Speer's note?

A.      Yeah.

Exhibit B

Q. We have about 2 or $3 million in other distributions. I think for the year we're talking about 19 -- over 19, maybe $20 million in –

A. Yeah.

Q. -- distributions to Mr. Speers; is that correct?

A. That's, that's correct.

Back to Fraud/Fraud Scheme

**Gathmann Excerpt 44** (Gathmann 2004 Examination, Volume 1, Page 181, Line 11 to Page 182, Line 1 then skipping to Gathmann 2004 Examination, Volume 1, Page 183, Line 11 to Page 189, Line 13.)

(Exhibit No. 40 marked.)

Q. (BY MR. DUNCAN) Okay. All right. Okay. Let's look at Exhibit No. 40. Now, this appears to be -- do you know who Evans & Chastain is?

A. They were the auditing firm we engaged to prepare the 2007 financial statements–

Q. Okay.

A. -- to audit them.

Q. All right. And does this appear to be prepared by Evans & Chastain, the auditors?

A. I –

Q. Okay.

A. I don't -- well, I don't –

Q. That –

A. -- know.

Q. Well, that, that's what it appears?

************************

Q. All right. There you go. Now, does that appear to be from the work papers of Evans

Exhibit B

& Chastain?

A.      Yes.

Q.      Okay.  And if you can go to the first page and –

A.      But, but this page is blank.

Q.      Yeah.  That's just what it attaches to -- you  know, when they're putting it in their work papers, they –

A.      On okay.

Q.      -- put it on the back saying that they –

A.      Okay.

Q.       -- prepared it.

A.      Okay.

Q.      Okay.  We'll, we'll go from here.

A.      Okay.

Q.      All right.  The first page of Exhibit 40 shows that at the end of 2006 the partnership equity was what?

A.      $34,513,419.

Q.      Okay.  And then it's showing, at the end of  '07?

A.      It was $18,511,701.

Q.      Okay.  Now, we -- is it your understanding that the audit never got finished for this year?

A.      It -- that's -- I think I left before that ever was resolved, but –

Q.      Yeah.

A.      -- it's –

Q.      By the time you left there?

Exhibit B

A. As of the time I left, it had not been completed.

Q. Okay.

A. Let me put it that way.

Q. And, you know, there may be further information on these numbers that were called into question, but these are -- this is –

A. Okay.

Q. -- basically what we have at that point.

Can you tell me -- now, here's your math skills again.

A. Okay.

Q. I want you to do a debt-to-equity ratio for 2006, a simple one.

A. It's eight to -- seven to one, eight to one.

Q. Six to one?

A. Six to one.

Q. 6.3 to 1?

A. Okay.

Q. So, at the end of 2006, by, by December, I guess, 31st –

A. Yeah.

Q. -- of 2006, we got a 6 point -- 6.13 to 1 debt-to-equity ratio, correct, if that's –

A. Wait.

Q. -- the right calculation?

A. I'm sorry. I was looking at the wrong numbers, but I'll take your word for it.

Q. Okay. Now, if we go to 2007 and we do a debt-to-equity ratio, where does it appear we're at?

A.     It's probably about twice that high.

Q.     Yeah.  It's probably about 11.69 to 1?

A.     Yeah.

Q.     Okay.  That is not a good debt-to-equity ratio –

A.     No.

Q.      -- is it?

A.     No.

Q.     And that's going to put you out of compliance with basically all of your –

A.     That's –

Q.     -- loan covenants –

A.     That's, that's –

Q.      -- correct?

A.     -- correct.

Q.     Okay.  Now, what we, now, what we have is during that year we're decreasing our equity in the company by about $16 million; is that correct –

A.     That's correct.

Q.     -- according to these numbers?

A.     Yeah.

Q.     Now, let's think back.  At the end of 2006, we  have 34 million?

A.     Yeah.

Q.     What happens about three, four days later, major event?

A.     We distributed $10 million to John.

Q.     Okay.  So, of that 16 million, the debt-to-equity ratio drops pretty substantially

Exhibit B

within a couple of days into the, the year, correct?

A.    That's correct.

Q.    And that's where you get into your problem for the rest of the year –

A.    Yeah.

Q.    -- with your debt-to-equity ratio going forward?

A.    That's correct.

Q.    And apparently you never recovered from that; it actually got worse?

A.    Yeah.

Q.    And a big part of that was we have about $19 million or over $19 million in partnership distributions or partnership payments going out for Mr. Speer's personal debt, correct?

A.    Yeah.

Q.    Okay.

A.    I'm not sure if we have a schedule on that, but –

Q.    We will.

A.    Okay.

Q.    We'll, we'll get there. Would you agree with me, by distributing 19 to $20 million in partnership distributions, that it totally devastated the company's debt-to-equity ratio?

A.    It, it, it was one of the causes of it, yeah.

Q .    Right. If it hadn't been done, you wouldn't be at a –

A.    If, if it had been a normal business year, it probably would have, have had no effect.

Q.    Right.

A.    But during this particular year, it –

Exhibit B

Q. Right. But –

A. -- it was the main, main cause of it.

Q. Okay. At the beginning of the year, we -- you -- there were signs that --

A. Yeah.

Q. -- it was not a good year?

A. That's right.

Q. Okay. What happens when you go to your lenders and you tell them you're, you're trying to renegotiate your loans or you're trying to extend your loans and you now tell them your debt-to-equity ratio is through the roof?

A. Well, I think we went to our lenders during the course of that year and sought out waivers for the ratios. As you saw in the presentation, we, we presented things that were action plans –

Q. Right.

A. -- things that we were trying to do to -- both things that we have done in terms of reducing costs, laying off people, and stuff to, to try to recover that -- the deterioration of the equity plus action plans for things to try to build it back up again.

Q. Okay. So, one of the things you were doing was you were laying off people, right?

A. Because of the market conditions, yeah.

Q. Right. One of the -- probably if you were a prudent -- a more prudent thing would be stop making partnership distributions. Would that be –

A. That was certainly something that's more in control –

Q. Right.

A. -- of the company.

Back to Breach of Fiduciary Duty

**Gathmann Excerpt 45** (Gathmann 2004 Examination, Volume 1, Page 104, Line 1 to Page 17, Line 5.)

(Exhibit No. 24 marked.)

Q. (BY MR. DUNCAN) Okay. If you could, take a look at Exhibit No. 24. Okay. We're on Exhibit No. 24. Is this -- October 2nd, is that about when you came on board with Royce Homes?

A. Sometime -- well, I saw that last e-mail was October 7th. So, sometime just before then.

Q. Yeah. Okay.

A. So, it was probably pretty close to October 2nd.

Q. Okay. And what we have here as 24 is James Hunter sending an e-mail to Shawn Speer and John Speer and John Zunker?

A. Zunker.

Q. Who's John Zunker?

A. He was a manager of -- I think, on the sales side –

Q. Okay.

A. -- sales and construction manager.

Q. Okay. Okay. And this was on October 2nd, 2006, at 6:32 a.m. Can you tell -- can you read that e-mail?

A. Sure. It says: We need to cover missing projections for both closings and sales.

Q. Well, I -- go back. "We have to cover missed projections" -- is that –

A. Oh, I'm sorry.

Q. Yeah.

A. I'm sorry. "We need to cover missed projections for both closings and sales." How can we, we be so wrong? Or, "How can they be so wrong?"

Q. "James"?

A. "James."

Exhibit B

Q. Okay. Can you tell me what basically they're talking about here?

A. I don't know what time frame they're talking about, but obviously it may have been the prior month or something.

Q. Look at "results for 10/1/06."

A. Oh, okay.

Q. Okay?

A. Result -- but, again, I'm not sure if that's for the prior month or prior quarter, but obviously we -- the company had not met their projections forclosings and sales during some period of time.

Q. Okay. And it says: How can we be so wrong?" Does that kind of give you the indication that they weren't one or two off?

A. The word "so" kind of emphasizes it.

Q. Okay. You were, you were coming in as an employee of Royce Homes, LP, at that point?

A. Right about this time, yeah –

Q. Okay.

A. -- probably this week sometime.

(Exhibit No. 25 marked.)

Q. (BY MR. DUNCAN) Okay. All right. If you can, take a look at Exhibit No. 25, and this is again an e-mail from James Hunter to Shawn Speers, John Zunker, John Speers, Shonna Speers, and now we're talking about results 10/22 of '06; is that correct?

A. That's correct.

Q. And it's a follow-up flag, and it's flag status red; is that right?

A. Yes.

Q. Okay. And you were for sure -- or pretty much for sure at the company at this point in time?

A.      I was, I was at the company.

Q.      Okay.  Can you read the e-mail?

A.      Yeah.  "We now officially have an absolute crash in sales.  The crash is consistent, and it is  real.  Immediate action is required to establish some sort of order and performance in our business model.  We need this day a complete assessment by area manager of each and every community.  We shall       meet after the sales meeting.  James."

Q.      And then the, the words "this day" are bolded?

A.      Bolded.  That's correct.

Q.      Does this indicate to you that there may be some sort of urgency?

A.      That's -- it sounds like there's a sense of  urgency.

**Gathmann Excerpt 46** (Gathmann 2004 Examination, Volume 1, Page 205, Line 19 to Page 207, Line 6.)

(Exhibit No. 42 marked.)

Q.      (BY MR. DUNCAN)  Okay.  I'd like you to take a look at Exhibit No. 42, and this is an e-mail from Mr. Hunter to you on January 3rd of 2008; is that correct?

A.      That's correct.

Q.      Okay.  And if you could, read what the e-mail says.

A.      Sure.  "Bill, it seems that we are still struggling over draws and finance available.  I have asked Murrah to get with you to review the draws that we are unable to take."

Q.      Tell me what that means.

A.      The -- we keep -- kept track with each of our loan agreements how much we thought we had available to draw down on them and that would be your finance available from our perspective, but then the banks would, would, would acknowledge a slightly lower number, a lower number, and             that would be the amount of the draw.

Q.      Okay.

Exhibit B

A.      And, so, there's a discrepancy by what we thought was available versus what they would actually fund.

Q.      Okay.  By this point were you getting your ratio of available financing, your, your -- you would have, for example, $270 million worth of available credit, and were you basically maxing out the credit card by this point?

A.      I, I -- yeah, I would think by early 2008 it was -- yeah, we had probably tapped most of our lines,     and we were just able to draw -- well, we had used up the excess capacity –

Q.      Yeah.

A.       -- in our lines.

Q.      Okay.  That, that's –

A.      We were just able to draw the amount of current production.

Back to Breach of Fiduciary Duties Unable to Get Financing

**Gathmann Excerpt 47** (Gathmann 2004 Examination, Volume 1, Page 190, Line 3 to Page 192, Line 13.)

Q.      Okay.  Now, with some of your lenders, you got temporary waivers?

A.      Waivers, we did.

Q.      Temporary waivers, though?

A.      We did.

Q.      Okay.  And let's take a look at one of those.

A.      Okay.

        (Exhibit No. 37 marked.)

Q.      (BY MR. DUNCAN)  Let's take a look at Exhibit No. 37.

        MR. DUNCAN:  I'll get it to you. Here you go.

Q.      (BY MR. DUNCAN)  Now, Exhibit No. 37, is that an instance where you went to a lender?  And it looks like this was done on September 14th of 2007, correct?

Exhibit B

A.    I'm sorry.  I'm just trying to find the dates.

Q.    Second line.

A.    Yeah, up at the top.  Yeah.

Q.    Okay.

A.    September 14th, 2007.

Q.    And Royce Homes, LP, is one of the entities that is involved in this loan, correct?

A.    That is correct.

Q.    And if we look at the bottom of the page, at Paragraph 2.1, do you see that?

A.    Yeah.

Q.    What does that say?

A.    It says, "Borrower is currently out of compliance with the following financial" covenants -- "covenant under the loan agreement."

Q.    Okay.  And the one that is listed is debt to worth not to exceed 5.5 to 1, correct?

A.    That's correct.

Q.    So, what you were supposed to be at is 5.5 to 1.  You had to be lower than that –

A.    That's correct.

Q.    -- correct?

A.    That's correct.

Q.    Okay.  And if we go down to Section B on Page 2 of Exhibit No. 37 where it talks about the financial covenants, what the -- tell me if I'm right here -- what the bank is doing is saying, okay, we will allow you to not exceed 9 to 1, but that's only going to be up to December 31st of 2007; is that correct?

A.    That's correct.

Q.    And then what happens?

Exhibit B

A. Then it changes back to the original –

Q. The -

A. -- covenant.

Q. -- 5.5?

A. That's correct.

Q. And what we know is things didn't improve, did they?

A. They did not improve.

Q. Okay.

A. Yeah.

Q. And at -- in 2008 the company is out of -- it, it's -- it runs out of its ability to obtain financing -- is that correct -- is ultimately what happens?

A. Correct.

Back to Breach of Fiduciary Duty Release of Financial Statements
Back to Breach of Fiduciary Duty Temporary Waivers
Back to Breach of Fiduciary Duties Unable to Get Financing

**Gathmann Excerpt 48** (Gathmann 2004 Examination, Volume 2, Page 65, Line 5 to Page 71, Line 10)

Q. Okay. What I'd like to do is take out Exhibit No. 31 again, and let's talk about those loan covenants just -- I want to get a clarification on that.
You got that one out?

A. I --

Q. Okay.

A. I do.

Q. All right. If you could, go to Page 42 of Exhibit No. 31.

A. Fine print here.

Q. Yeah. I know what you're talking about there.

A. Okay.

Q. All right. All right. Now, does this represent the con -- the financial statement as of December 31st, 2006? Is that what it appears to be?

A. That's correct.

Q. Okay. If you look down in the bottom right-hand corner, does it state the total equity? Are you on --

A. Yes. 44,500,000.

Q. Okay. Now, if you could, go to the audit, which is Exhibit No. -- leave that open there.

A. Yeah.

Q. -- No. 30.

A. Got it.

Q. Okay. Go to Page 4.

A. Okay.

Q. And what was the real equity --

MR. GIBSON: Objection.

Q. (BY MR. DUNCAN) -- as of --

A. Wait.

Q. I'm sorry -- the real equity as of the end of December of 2006?

A. 34 --

MR. GIBSON: Objection. Form.

MR. SHURN: Object to form.

A. 34,500, roughly, I'm sorry, 34,500,000.

Q. (BY MR. DUNCAN) Okay. So, the number in the Exhibit No. 31 is --

A.      Yeah.

Q.      -- basically overstated for the equity by about $10 million --

A.      That --

Q.       -- is that correct?

A.      That's correct.

Q.      All right.  Now, this audit, if you go back to Page 3 of the audit, which is Exhibit No. 30 -- so, you got to go back to the beginning here a couple pages -- that wasn't prepared or entered until August of 2007; is that correct?

A.      That's correct.

Q.      All right.  Now, so, up to August 14th of 2007, Royce was working off this, if we could call it, overstated equity, this 10-million-dollar overstated equity number until they were corrected by Ernst & Young; is that correct?

            MR. GIBSON:  Objection.  Form.

            MR. SHURN:  Objection.  Form.

A.      I do not know if, if -- at what point --

Q.      (BY MR. DUNCAN)  We can go, we can go through, and we will.

A.      Yeah.  If we -- okay.

Q.      But if -- you didn't have that information until August of 2 --

A.      We did not have the final audit issued until this time.

Q.      Right.

A.      But it was probably in a draft form sometime prior to this.

Q.      Okay.

A.      Yeah.

Q.      Well, what I'd like you to do is go to Exhibit 31, Page 30.

Exhibit B

A.      This -- okay.

Q.      Okay.  Now, as of the end of the month -- this shows the balance -- the, the equity as of the end of January 31st, 2007, right?

A.      Correct.

Q.      Now, we know we -- that you just made a -- or the company made a 10-million-dollar distribution; is that right?

A.      Correct.

Q.      So, if we look, the equity has dropped, basically, from 44 to 33 million; is that correct?

A.      That's correct.

Q.      All right.  But in order to get to Exhibit No. 31, Page 30, which is the January number, you're starting from the year-end number in 2006, which is 10,000 -- or $10 million overstated, correct?

        MR. GIBSON:  Objection.  Form.

A.      I'm -- could you repeat that?

Q.      (BY MR. DUNCAN) Yeah.  Let's, let's --

A.      I --

Q.      -- try to get this clear.

A.      Yeah.

Q.      When you're figuring up -- when, when you're figuring up the end of January -- the January 31st  number to come up with that 34 -- is it --

A.      33.4.

Q.      -- 33 million --

A.      Yeah.

Q.      -- you basically started from the year-end number for 2006, and then everything that happened from December 31st, 2006, through January 31st of 2007 is  how you

Exhibit B

come up with that calculation as to what the equity is?

MR. SHURN: Objection. Form.

MR. GIBSON: Objection. Form.

A. That should be what it is.

Q. (BY MR. DUNCAN) Okay.

A. I didn't prepare these, but, yeah, that's --

Q. So, that's, that's basically it?

A. Yeah. Yeah.

Q. So, if we're using the, the number from 2006 and it turns out that it's $10 million off –

A. Yeah.

Q. -- right, we now have a number on Exhibit 31, Page 30, for equity that is overstated by $10 million; is that correct?

A. That's correct.

MR. SHURN: Objection. Form.

MR. GIBSON: Objection. Form.

Q. (BY MR. DUNCAN) Okay. So, if we go a couple pages back, when we're doing our -- or one page back, when we're doing -- when you're doing the equity -- or the, the covenant test --

A. Yeah.

Q. -- they're a whole lot worse, aren't they?

MR. SHURN: Objection. Form.

A. They, they would be.

MR. GIBSON: Objection. Form.

Q. (BY MR. DUNCAN) Okay. So, you may be out of compliance with all your, your loan covenants; is that correct?

A. No.

Q. You have to do the calculations.

A. They -- the, the -- not all of them. The network[123] covenants would not be out of compliance, but --

Q. Well, no, I'm saying the leverage --

A. -- the leverage -- yeah.

Q. -- the debt-to-equity ratio. So, what we have is -- Exhibit 31, the numbers that you're doing the -- that whoever's doing them for Royce is doing it with are, are probably off at least 10 -- or about $10 million; is that correct?

MR. GIBSON: Objection. Form.

MR. SHURN: Objection. Form.

A. That's what it appears to be.

Q. (BY MR. DUNCAN) Okay. And, so, it's -- even though they're off, they're not off to show something better?

A. Right.

Q. They're off to -- they're actually worse, the, the covenant testing; is that correct?

A. That's correct.

Back to Breach of Partnership Agreement
Back to Breach of Fiduciary Duty Debt-to-Equity Ratios
Back to Breach of Fiduciary Duty Debt-to-Equity Would Have Been Worse
Back to Breach of Fiduciary Duty Lender Presentation
Back to Fraud/Fraud Scheme

[123] Transcription error. This should be "net worth."

# Denison 2004 Examination Excerpts

Exhibit B

**Denison Excerpt 1** (Denison 2004 Examination, Volume 2, Page 149, Line 10 to Page 150, Line 23.)

Q.     Now, we know -- and we've gone over this, Royce Homes is a homebuilder -- Royce Homes, L.P., was a homebuilder, correct?

A.     Correct.

Q.     And in the homebuilding industry, companies such as Royce Homes, L.P., were heavily dependent on their ability to borrow money to acquire and develop property?

       MR. GIBSON:  Objection; form.

       MR. SHURN:  Objection; form.

A.     Royce Homes was.

Q.     (BY MR. DUNCAN)  Okay.  And from your experience -- you -- you've dealt with homebuilders in the past; is that correct?

A.     Correct.

Q.     And from your experience, the equity in a company is a factor that you as a lender would look at in order to determine whether you would loan money to him?

       MR. GIBSON: Objection; form;

       MR. SHURN:  Objection; form.

A      One of several factors.

Q.     (BY MR. DUNCAN)  All right.  From your experience  in the industry, equity in a company is an important factor that lenders look at to determine if they're going to loan money?

A.     One of several, yes.

       MR. GIBSON:  Objection; form.

Q.     (BY MR. DUNCAN)  And an important ratio is the debt to equity ratio?

A.     One of several, yes.

Q.     Okay.  And without a proper debt to equity ratio, it can be difficult, if not impossible, to borrow funds?

Exhibit B

MR. GIBSON:  Objection; form.

A.      I'm not sure what "proper" means.

Q.      (BY MR. DUNCAN)  Well, without an adequate --  there is -- if you don't have a -- let me put it this  way:  You need a -- you need equity in the company typically to borrow money; is that correct?

MR. GIBSON:  Objection; form.

A.      That's correct.

Back to Fraud/Fraud Scheme
Back to Breach of Fiduciary Duty

**Denison Excerpt 2** (Denison 2004 Examination, Volume 2, Page 151, Line 6 to Page 153, Line 22.)

Q.      (BY MR. DUNCAN) Okay. And if we look at Exhibit 115, Mr. Speers is expressing concern about the possible loss of equity in Royce Homes if -- through this buyout transaction, correct?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A.      All I know is what he's saying here.  I don't know if it was -- I wouldn't -- I wouldn't know if I'd call it a concern.

Q.      (BY MR. DUNCAN)  Well, he's saying it's a difficult concept to digest, almost 25 million in equity goes puff.  I guess it is what it is, right?

A.      That's what it says.

Q.      Now, as a lender, you believe it's important to know the debts of the company, correct, the actual debts of the company?

A.      Specifically to Royce Homes or –

Q.      Sure.

A.      Yes.

Q.      Okay.  And it's important to understand the debts of the company to determine, if you

Exhibit B

will, you know, advance money to the company, correct?

A      Talking about Royce Homes, yes.

Q.     Okay.  And is it your experience in the industry that lenders will look at the balance sheet to determine what the debts are of a company?

A      Yes.

Q.     Okay.  And the balance sheet is a tool which you  and the industry would use to protect itself in determining whether they should make a loan?

MR. GIBSON:  Objection; form.

A.     A balance sheet doesn't protect us –

Q.     (BY MR. DUNCAN)  It's a tool?

A.     It explains to us the financial condition of a company.

Q.     And you would expect that balance sheet to disclose all liabilities that a company expects to pay, correct?

MR. SHURN:  Objection; form.

MR. GIBSON:  Objection; form.

A.     I would expect a balance sheet to include all liabilities and assets and owner's equity.

Q.     (BY MR. DUNCAN)  All right.  Now, another important factor that you will look at as a lender is cash flow of a company, correct?

A      Correct.

Q.     And if cash flow is low, sometimes a company is  going to need to borrow money to sustain itself?

MR. GIBSON:  Objection; form.

A.     It depends.

Q.     (BY MR. DUNCAN)  Okay.  Would you agree that if a  company has to borrow money at the same time it's breaching its debt to equity ratios with its lenders that that puts up a red flag?

Exhibit B

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. Can you rephrase the question?

Q. (BY MR. DUNCAN) If you see a company that you're dealing with that is borrowing money which results in them breaching their debt to equity ratios with their lenders, that's a red flag?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. You'd have to look into the reasons behind it.

Q. (BY MR. DUNCAN) That's why I said a red flag, that would be something you'd want to look into, correct?

A. It would be something you'd want to look into.

Back to Fraud/Fraud Scheme

**Denison Excerpt 3** (Denison 2004 Examination, Volume 1, Page 95, Line 22 to Page 96, Line 4 followed by Denison 2004 Examination, Volume 1, Page 97, Line 10 to Page 98, Line 15.)

Q. And you understood that the 20 million dollar loan agreement was cross defaulted with Royce's other lenders' covenants?

A. Correct.

Q. So if Royce was not in compliance with the leverage ratios with its other lenders, that would be a default under the 20 million dollar loan?

A. Correct.

***************************

Q. Okay. So is it true that leverage ratios for Royce were very important to Amegy?

A. Yes.

Q. Okay. And the way that you would monitor leverage ratios for Royce would be by

looking at their monthly financials?

A.    Monthly and annually, yes.

Q.    Okay.  All right.  And you wanted to make sure that they didn't -- the leverage ratios didn't go materially higher, correct?

A.    That's what we said here, yes.

Q.    Okay.  If you go to Page 1 of Exhibit 119, and at the top, that's a response by Mr. Gathmann to you and it was CCed to Mr. Speer apparently, correct?

A.    Yes.

Q.    And that again is also on December 18th of 2006?

A.    Yes.

Q.    Okay.  And in this e-mail, Mr. Gathmann is telling you that their leverage ratios with their lenders are anywhere between zero times to 5.5 times; is that correct?

A.    That's apparently what Bill's saying.

Q.    Okay.  And you basically knew that, if we look at  the earlier -- Exhibit No. 118, that's what was actually in the credit authorization, apparently, the five point five, right?

A.    Reference to the 5.5, yes.

Q.    Right. So Amegy was aware that basically the maximum leverage ratios that Royce was to maintain with its other lenders was 5.5?

A.    That was Amegy's understanding, yes.

Back to Breach of Fiduciary Duty


**Denison Excerpt 4**    (Denison 2004 Examination, Volume 2, Page 118, Line 4 to Line 24 followed by Denison 2004 Examination, Volume 2, Page 120, Line 3 to Line 8.)

Q.    All right.  If you go down to loan agreement --  well, let's go down to "Covenants."  Can you read under covenants, what that says on Page 5 of Exhibit 157?

A.    The Credit Facility will be cross-defaulted to Royce's construction credit facilities.

Exhibit B

In the event that a material unsecured default exists in any of the Royce senior secured lines of credit, a default will trigger under the subject facility. Customary notice and right to cure provisions will be included."

Q. Okay. And this is what you had talked about in some of the earlier documents that we talked about, and if you look below, we have the five point five to one ratio for the tangible networth; is that right?

MR. GIBSON: Objection; form.

A. Maximum debt to tangible networth, 5.5 to one is shown as their tightest covenant.

Q. (BY MR. DUNCAN) Okay. And you were saying that there was a cross default if they had defaulted on other credit facilities or other construction lines that would be default under your loan?

A. Material unsecured [uncured]defaults, yes.

*********************

Q. Okay. If you go to Exhibit 157, Amegy Bate No. 6343 and it has another page number of 80650. Does that contain the information on the different debt to equity ratios for the different construction lines or other lenders to Royce Homes?

A. It appears to be so, yes.

**Denison Excerpt 5** (Denison 2004 Examination, Volume 2, Page 137, Line 15 to Page 138, Line 6 followed by Denison 2004 Examination, Volume 2, Page 139, Line 5 to Line 20.)

Q. Okay. Let's move on to the next question. Let's look at the -- on Exhibit 158, Bate No. 77846, under the column for December 31st of 2006, do you see that?

A. I do.

Q. And it says under the column "Debt to Tangible Networth," what is the ratio as of December 31st of 2006 for Royce Homes, L.P., according to the calculations by Amegy Bank?

MR. GIBSON: Objection; form.

A. The calculations would have been performed by the spreadsheet program based on

Back to Table of Contents

input put in by an employee at Amegy Bank.

Q. (BY MR. DUNCAN) Right.

A. Small type. I believe it says "5.50."

Q. Does it say 6.50?

A. I can't read it. I don't know if that's a five or a six.

********************************

Q. (BY MR. DUNCAN) All right. Here, do me a favor here. We have blown it up for you. Can you see it better now?

A. It appears to say 6.10.

Q. Okay. All right.

MR. GIBSON: For the record, this is based on Mr. Tow pulling up the document which he represents to be the same, and I don't doubt it, blowing it up on the computer.

Q. (BY MR. DUNCAN) Okay. We're magnifying it so we can see. So it appears that the debt to equity ratio for Royce Homes, L.P., as of December 31st, 2006, would have been 6.6, correct?

MR. GIBSON: Objection; form.

A. Based on the way the data was input into the spreadsheet program.

Back to Breach of Fiduciary Duty

**Denison Excerpt 6** (Denison 2004 Examination, Volume 2, Page 153, Line 13 to Line 22.)

Q. (BY MR. DUNCAN) If you see a company that you're dealing with that is borrowing money which results in them breaching their debt to equity ratios with their lenders, that's a red flag?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. You'd have to look into the reasons behind it.

Q. (BY MR. DUNCAN) That's why I said a red flag, that would be something you'd want to look into, correct?

A. It would be something you'd want to look into.

Back to Breach of Fiduciary Duty

**Denison Excerpt 7** (Denison 2004 Examination, Volume 2, Page 133, Line 13 to Page 134, Line 18 followed by Denison 2004 Examination, Volume 2, Page 135, Line 20 to Page 136, Line 11.)

Q. (BY MR. DUNCAN) Okay. And, again, on Page 77812, Bate No. of Exhibit 158, under the covenants, we're again talking about -- we had talked about this earlier, where the credit facilities will be cross defaulted to Royce's Construction Credit Facilities in the event of a material uncured default existing in any of the Royce Senior secured lines of credit, a default will trigger under the subject facility; is that correct?

A. That's what it says.

Q. Okay. And again, there's reference to the difference -- the tightest covenant of 5.5 and there's apparently some that now are 6.75?

A. That's what it says.

Q. All right.

A. Maximum debt to tangible networth.

Q. Then if you could go to the second to last page of Exhibit 158, which is Bate No. 77846, and this involves Royce Homes, L.P.; is that correct?

A. That's what it says, yes.

Q. And what we have is in the different columns we're dealing with different time frames; is that correct? The financial figures apply to different time-frames, correct?

A. That's correct.

Q. And the final timeframe on there is from June 30th of 2007, correct?

A. Correct.

Q. And if you go down the column as of June 30th of 2007, and tell me what the debt

to tangible networth was.

A. What it shows here is debt to tangible networth of 10 point 44.

*************************

Q. Okay. If you can look at -- and also, that would be a breach of the 20 million dollar loan agreement, correct?

A. As a cross default, yes.

Q. And if you could look at the -- so let's go back to that for a second. So as of June 30th, 2007, we have a 10.44 debt to tangible networth ratio level, correct?

A. That's what this states.

Q. And this is a document that would have been prepared by Amegy Bank, correct?

A. This document, yes.

Q. And the 10.44 would be a breach of the 20 million dollar loan agreement, if as of June 30th, 2007, the - construction line loan agreements had not provided a waiver to the debt to equity ratio, correct?

MR. GIBSON: Objection; form.

A. Correct.

Back to Breach of Fiduciary Duty

**Denison Excerpt 8** (Denison 2004 Examination, Volume 1, Page 134, Line 19 to Page 136, Line 11.)

Q. Right. But we understand that the maximum debt to equity ratio that you understood that Royce was to have with its lenders, including you, was a 5.5 debt to equity ratio, correct?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. Correct.

Q. (BY MR. DUNCAN) All right. And what Mr. Speer is telling you in September of

2007 in Exhibit 122 is that as of March 31st, 2007, they had breached basically all their covenants?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

Q. (BY MR. DUNCAN) Their loan -- the debt to equity ratio, correct?

A. It would appear that way.

Q. Okay. And the projections that Mr. Speer was making was that by the end of 2007, the hope was that they would be within their debt to equity ratio by achieving a 5.15 to one ratio; is that correct?

A. Correct.

Q. Let's look at Exhibit 123.

(Marked Denison Exhibit No. 123.)

Q. (BY MR. DUNCAN) Now, Exhibit 123 is an e-mail from Steve Barnhart to you, October 10th of 2007, right?

A. Correct.

Q. Can you read that e-mail into the record, please?

A. "When priorities allow, it would be good to understand a couple of points as it relates to the covenants. We should be monitoring these on the bank side so we will need to provide the explanation. The CA covenant page indicates Debt/TNW covenanted at 5.5 to 6.75 times but the spread indicates somewhere close to 10. There's no sub debt that I see to effect the networth calculation so the difference must be in the classification of an asset or debt category. Not a rush but something we should try to understand better."

Q. All right. So it appears that the debt to networth covenants allow now 5.5 to 6.75; is that correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. It appears that way. I could verify if I could see my CA.

Exhibit B

Back to Breach of Fiduciary Duty Amegy Calculated June 2007 Ratios
Back to Breach of Fiduciary Duty Amegy Calculated 10 to 1 Ratios

**Denison Excerpt 9** (Denison 2004 Examination, Volume 1, Page 69, Line 23 to Page 72, Line 5 followed by Denison 2004 Examination, Volume 1, Page 72, Line 23 to Page 76, Line 20, then Denison 2004 Examination, Volume 1, Page 80, Line 21 to Page 84, Line 7.)

Q. (BY MR. DUNCAN) Okay. We're back on Exhibit 115, and this is a loan request submitted to Amegy Bank by Mr. Speers regarding the 20 million dollar loan; is that right?

A. Yes.

Q. And this would have been a document that you would be reviewing in determining -- one of the items that you would review in determining whether the 20 million dollar loan would be made by Amegy Bank?

A. Yes.

Q. If you could turn -- now, if you look at the bottom of Exhibit 115, they have on here what we call Bates Stamp numbers, and that's at the bottom right-hand corner. Do you see that, the first page of 115 is 76009.

You see that?

A. Yes.

Q. And what I'd like you to do is turn to -- on Exhibit 115, Bate No. 76011. Now, it appears -- this is called an executive summary; is that correct?

A. That's what this says, correct.

Q. And the first three paragraphs are basically saying that Mr. Speers wants to buy out his partner, Mike Manner, correct?

A. Correct.

Q. All right. And then let's look at the fourth paragraph on Exhibit 115, Bate No. 76011. And if you could read paragraph four into the record.

A. "I currently have the opportunity to achieve this objective via a Senior Subordinate Debt Offering of 150 million dollars in the Capital Markets. I am going to continue to pursue this avenue for potential" -- I'm sorry -- "pursue this avenue for operational funding of future growth opportunities. I seek to bifurcate the purchase of Mike's

Exhibit B

interest due to GAAP Purchase Accounting issues. If I purchase his interests personally rather than through a Company entity, these rules are not applicable. The accounting effect of purchasing his interests via a Company entity is simple; the significant equity position that we have built over the almost eight years would be cut in half. That is a difficult concept to digest; almost 25 million dollars in equity goes 'puff' due solely to accounting treatment."

Q. Okay. And then right underneath there it says "Maker, John Speer," is that correct?

A. Yes.

Q. Is that your handwriting?

A. Yes.

Q. Okay. And what you're -- what you're noting is, the maker then would be John Speer as opposed to Royce; is that correct?

A. Correct.

Q. Okay. And the reason that John Speers is the maker instead of Royce Homes is for the reasons that are in paragraph four above on Page -- on Exhibit 115, Bate number 76011; is that correct?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. That was his reason it appears, yes.

****************************

Q. Well, let's -- maybe we need to read it again then. "If I purchase his interests personally rather than through a Company entity, these rules do not apply. The accounting effect of purchasing his interests via a Company entity is simple; the significant equity position that was" -- "that we have built over the last almost eight years would be cut in half. This concept" -- I'm a sorry -- "that is a difficult concept to digest; almost 25 million dollars in equity goes 'puff' due solely to accounting treatment."

So, in other words, if we reflect the twenty-five million dollar debt to buy out Manner on the Royce balance sheet, that would affect the balance sheet because it would -- you would have less equity in the company, right?

MR. GIBSON: Objection; form.

MR. SHURN: objection; form.

A. More debt on a balance sheet without offsetting asset would affect equity.

Q. (BY MR. DUNCAN) Right. If the asset was going to Mr. Speer and the company was paying the debt, then you would have a extreme negative impact on the balance sheet?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. You would have a negative impact, I'm not sure how extreme it would be based on the size of the balance sheet.

Q. (BY MR. DUNCAN) Well, you're familiar with the Royce balance sheet. If you're losing -- he's saying that half the equity in the company would be gone, right?

A. If they did it that way.

Q. Right. And if you reduce the equity on the a balance sheet, that would affect your debt to equity ratios, right?

A. If you reduce equity on a balance sheet, it does affect it if there's not offsetting assets.

Q. Right. Okay. And this is what Mr. Speers is telling the bank in the -- the loan application process, is the reason he wants to structure the deal the way that he's saying here is, he wants to make sure they don't lose the equity on the balance sheet?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. That's what he appears to be telling us in this paragraph, yes.

Q. (BY MR. DUNCAN) Okay. All right. If you could turn on Exhibit 115, Bate No. 76012, which is the next page. All right. On that page, it says "Royce Operations." Do you see that?

A. Yes.

Q. Could you read out loud the first paragraph?

Exhibit B

A.      "Although Royce and related entities will not be the guarantor of the note, the source of repayment will be distributions from the company."

Q.      So Mr. Speers is making it clear to the bank that the source of the repayment will be from Royce Homes; is that correct?

        MR. GIBSON:  Objection; form.

Q.      (BY MR. DUNCAN)  Repayment of the 20 million dollar loan?

A.      That's what he's saying here.

        MR. GIBSON:  Objection; form.

Q.      (BY MR. DUNCAN) All right.  Okay.  Then if you could read on Exhibit 115, Bate No. 76012, the paragraph where it starts with "Attached."

A.      "Attached you will find financials and projected financial results through 2010, as well as some summary operational information."

Q.      All right.  Now, if you could turn on Exhibit 115, Bate No. 76116.  I'm sorry.  76016. Did I do it wrong?

        MR. TOW:  76016.

        MR. DUNCAN:  There you go.

Q.      (BY MR. DUNCAN)  Do you see that?

A.      I do.

Q.      And whose financials are they?

A.      It says Royce Homes, L.P.

Q.      All right.  So what Mr. Speer is providing to you in applying for this loan, he's telling you that he wants to keep the debt off the balance sheet, correct, by putting it in his personal name?

A.      That's what he's saying.

Q.      Okay.  However, he's also telling you that the Royce Homes will be making the payments through distributions to Mr. Speer, correct?

Exhibit B

A.      That's what it says.

        MR. GIBSON:  Objection; form.

Q.      (BY MR. DUNCAN)  And they -- he is actually providing you the financials for Royce Homes, L.P., in showing you the ability to make those payments; is that correct?

        MR. SHURN:  Objection; form.

        MR. GIBSON:  Objection; form.

A.      He's showing us the financials of Royce Homes,  L.P.

Q.      (BY MR. DUNCAN)  Yes.  So the loan was put in John Speer's name ultimately, right?

A.      Correct.

        *************************

Q.      Okay.  But it was tied to -- it will be paid from company distribution?

A.      That's what this say.

Q.      Sir, it doesn't say it's going to be paid from anything other than company distributions, correct?

A.      That's what this says.

Q.      And if we go back down to Royce Operating, it says "Although Royce and related entities will not be the guarantor on the note, the source of repayment will be distributions from the company."  It doesn't say it's going -- coming from any other source, it is telling the  bank that the source of repayment will be distributions  from Royce Homes, L.P., correct?

A.      That's what this says.

Q.      Okay.  And we're talking about the 20 million dollar note, correct?

A.      Yes.

Q.      Okay.  And the reason -- if we go back to Exhibit 115, Bate No. 76011, the reason that Mr. Speer is telling the bank that he wants to structure the transaction the way

Exhibit B

he did was because he was attempting to keep the buyout debt off the balance sheet, right?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. What he's saying here is he doesn't want to cut the equity in the company -- the company in half.

Q. (BY MR. DUNCAN) Right. Because if he had to reflect it on the balance sheet, it's going to cut the equity in half, correct?

A. That's what he's saying, yes.

Q. And one of the impacts of having reduced equity in the company is you can borrow less money, that's one of the factors that a bank is going to look at is how much equity is in the company, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. One of the factors, yes.

Q. (BY MR. DUNCAN) What I'd -- go to the first page of Exhibit 115. That's your handwriting on the front, right?

A. Yes.

Q. And what does that say?

A. "Mark leveraged section."

Q. What does that mean?

A. On our credit authorizations, there is a indication if it's considered to be a leveraged loan. Leverage meaning you're loaning money to purchase a company. It's a designation that the examiners like to see.

Q. Is this a leverage buyout, in other words, is that what you're talking about?

A. Right.

Q.    Okay.  And so that says what?

A.    Marked leveraged section.

Q.    So in other words, you wanted to mark on the document that this was a leveraged buyout?

A.    On the credit authorization.

Q.    All right.  So the indication, after you evaluated the 20 million dollar loan transaction, you  considered this basically a leverage buyout?

A.    I recall that there's a gray area and I'm not an expert on leverage buyouts, I've done one, if this is even one, but I recall people in our credit area having a question as to what it was so if there's a question, then we'd mark it as yes.

Q.    Okay.  And your -- your determination after you evaluated the transaction that the 20 million dollar loan was a leveraged buyout debt?

A.    Could be, so we marked it as such.

Q.    And why did you believe that this may be a  leveraged buyout transaction?

A.    If I recall correctly, people in our credit  committee -- again, I stated -- viewed that it could be, so we marked it as such.

Q.    All right.  And what is your understanding of what a leveraged buyout is?

A.    I couldn't find it.

Q.    Well, it's using the company's assets to finance the buyout of one of the principals in the company, correct?

      MR. GIBSON:  Objection; form.

A.    That could be correct.

Q.    (BY MR. DUNCAN)  Okay.  So when you or your loan  committee looked at the 20 million dollar transaction, here was a determination that they should mark the -- the  loan document as a leveraged buyout transaction, correct?

A.    Correct.

Back to Fraud/Fraud Scheme

Exhibit B

**Denison Excerpt 10** (Denison 2004 Examination, Volume 1, Page 100, Line 16 to Page 101, Line 3 followed by Denison 2004 Examination, Volume 1, Page 111, Line 22 to Page 112, Line 14.)

Q. (BY MR. DUNCAN) Okay. All right. How does a loan get put on a leverage loan report?

A. If we mark it as a leveraged loan on the credit authorization.

Q. And -- oh, that. Oh, okay, I gotcha. So Amegy would be on this -- I'm sorry. The 20 million dollar loan would be on the leveraged loan report because what we talked about earlier, you had decided that this was a -- a leveraged loan or the credit committee had decided that the 20 million dollar loan was a leveraged loan, correct?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. Correct.

***************

Q. Okay. Now, you're saying this was an untypical loan. Why -- why are you saying it's untypical?

A. Many lenders don't do -- you know, provide buyout financing.

Q. Okay.

A. And I don't believe we do a lot of it either.

Q. Okay. So the reason this was untypical for you or probably in the industry was this was basically a loan, a buyout loan?

A. Correct.

Q. Okay. And when you have these -- these leveraged buyout transactions, they -- typically that's not done in a traditional bank or mortgage company such as Amegy, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. In speaking of Amegy, I believe that's correct. We don't do -- I don't think we do a lot of it.

Back to Fraud/Fraud Scheme

**Denison Excerpt 11** (Denison 2004 Examination, Volume 2, Page 120, Line 9 to Page 120, Line 20 followed by Denison 2004 Examination, Volume 2, Page 121, Line 15 to Page 122, Line 7.)

Q. All right. Go back to Page 1 of Exhibit 157, and the leveraged finance category at the top of Page 1 of Exhibit 157 was changed from no to yes; is that correct?

A. Yes.

Q. And that was done by the loan committee, correct?

A. Correct.

Q. And tell me what leveraged financing means.

MR. SHURN: Objection;form.

A. I can't cite a specific definition, it's complicated. But it includes when an individual is borrowing money to purchase interest in a company, that's considered by regulatory definition as leverage financing.

*************************

Q. All right. So apparently, when the loan committee looked at the overall transaction, they determined that this was basically a leverage buyout; is that correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. They concluded that the box marked leverage financing should be checked, yes.

Q. (BY MR. DUNCAN) Okay. And did you have any discussions with anyone on why that was changed?

A. I don't recall a specific discussion. I know it was discussed because it was changed. I do recall a debate within committee as to whether or not it should be yes or no and they decided to mark it yes.

Q. And if it's a leveraged buyout financing type of transaction, is there any other reporting requirements, to your knowledge?

A. I believe they report those to bank examiners.

Back to Fraud/Fraud Scheme

**Denison Excerpt 12** (Denison 2004 Examination, Volume 1, Page 124, Line 16 to Line 20 followed by Denison 2004 Examination, Volume 1, Page 129, Line 20 to Page 130, Line 14.)

Q. Okay. All right. So we have Mr. Speer telling you that he believes the perfect storm has hit. We have im telling you that the world has changed dramatically over the last six months, correct?

A. Yes.

*******************************

Q. All right. Now, go to the third page of Exhibit 122 and let's go through -- this says first quarter, 2007 results. So what he's telling you, apparently, is what happened in the first three months of 2007, correct?

A. Yes.

Q. And these are the highlights. And can you read the highlights?

A. "Increased levels of bust outs due mainly to sub-prime issues. Closings, margins and profits lower than expected. 12.5 million dollar distributions for partner buyout loan repayment."

Q. So he's telling you in the first three quarters of 2007, basically they're selling fewer houses and they're making less money on the homes, right?

A. That's what he's saying.

Q. Okay. And one of the things the highlights he puts in there is that he also made 12 and a half million dollar distributions to pay the 20 million dollar loan, right?

A. That's what he's saying, yeah.

**Denison Excerpt 13** (Denison 2004 Examination, Volume 1, Page 133, Line 1 to Line 7.)

Exhibit B

Q. All right. Now, we have on Page 4 of Exhibit 122, what he calls an action plan; is that correct?

A. Correct.

Q. And it appears what Mr. Speer is telling you is they were going to raise cash through the sale of certain Royce assets, correct?

A. Correct.

**Denison Excerpt 14** (Denison 2004 Examination, Volume 1, Page 125, Line 10 to Page 126, Line 5 followed by Denison 2004 Examination, Volume 1, Page 127, Line 2 to Line 6.)

Q. (BY MR. DUNCAN) Well, let's -- you're skipping over something. What Mr. Speer is telling you is that the company has certain problems and he doesn't want -- and he shouldn't take the money out because it will cause breaches of agreements with lenders and there's all these problems with the company. Why don't you say -- why didn't you go to Mr. Speer and say, well, then pay your -- your personal loan with your personal funds?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. We discussed the requesting committee and this is what the committee decided to do.

Q. (BY MR. DUNCAN) What did you discuss in the committee then? Let's hear this.

A. I'd have to see my credit authorization.

Q. Well, you're saying that there was never -- you never went to Mr. Speer and said "I want you to use your personal funds to pay the 20 million dollar loan; is that correct.

A. I don't recall any -- I don't recall conversations.

*******************************

Q. (BY MR. DUNCAN) But his excuse seems to be that Royce Homes has problems, so he can't take the money out of Royce Homes. You never asked him to make the payments out of his personal funds; is that correct?

A. I don't recall.

MR. SHURN: Objection; form.

Q. (BY MR. DUNCAN) The -- you don't recall any e-mails from you to Mr. Speers ever mentioning using assets other than Royce Homes' assets to pay this 20 million dollar loan?

A. I don't recall.

**Denison Excerpt 15** (Denison 2004 Examination, Volume 1, Page 212, Line 25 to Page 213, Line 15.)

Q. And what John Speer told you is that his understanding was Mr. Manners did not believe Mr. Speers was personally liable on the 13 million dollar buyout note; is that correct?

A. Correct.

Q. And this is something that he indicated to you in your discussions?

A. Yes. And I recall an e-mail from Mike, I don't know if I got it directly or indirectly, stating that -- stating that.

Q. Okay. So you -- in addition to Mr. Speer telling you that he was informed by Mr. Manner that Mr. Manner did not consider John personally liable on the 13 million dollar note, you also got confirmation from Mr. Manner himself?

A. Yes.

**Denison Excerpt 16** (Denison 2004 Examination, Volume 1, Page 219, Line 11 to Line 17.)

Q. So the bottom line is, from the very beginning, you realized that the source of repayment, if it was going to happen, for the 20 million dollar loan, was disbursements from Royce Homes, L.P.?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. That was our primary source of repayment.

Back to Fraud/Fraud Scheme

**Denison Excerpt 17** (Denison 2004 Examination, Volume 2, Page 110, Line 7 to Page 113, Line 8.)

Q Okay. Now, if you go to Page 2 of Exhibit 157, and under "collateral," what is listed as the collateral for the 20 million dollar loan?

A. Assignment of 100 percent ownership interest in Royce Homes.

Q. And that would have been Royce Homes, L.P.?

A. Yes. Clearly yes.

Q. Okay. If you can go back to Page 1 of Exhibit 157, and it says "repayment." Do you see that at the very bottom?

A. Yes.

Q. Can you read that?

A. "Interest only monthly with 10 million dollar in principal due December 31st, 2006; 2.5 million dollars due March 31, 2007; 2.5 million dollars due June 30th, 2007; 2.5 million due September 30th, 2007; and 2.5 million due on December 31, 2007."

Q. All right. Now, on Page 2, the -- the only collateral listed for the 20 million dollar loan on the credit authorization was an assignment of 100 percent ownership in Royce Homes, L.P.; is that correct?

A. It says assignment of 100 percent ownership interest in Royce Homes.

Q. Okay. And that's what's listed on the credit authorization.

A. That's what's shown here on Page 2, yes.

Q. All right. Now, if we go to Page 3 of Exhibit 157, and it has the source of repayment for the 20 million dollar loan, correct?

A. Correct.

Q. And what is the primary source of repayment of the 20 million dollar loan according to the Amegy credit authorization?

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd
Page 309
Back to Table of Contents

Exhibit B

A.      It says "cash distributions from Royce Homes."

Q.      Okay.

A.      "And secondary liquidation of collateral."

Q.      And that collateral was what?

A.      Assignment of 100 percent ownership interest from Royce Homes.

Q.      Okay.  So we got the listed sources of repayment  for the 20 million dollar loan according to the credit authorization signed by the loan committee was going to be cash distributions from Royce Homes, which is Royce  Homes, L.P., correct?

A.      Yes.

Q       Okay.

A.      To John, and John would repay the note.

Q.      Well, I'm reading from the authorization.  You're adding to what is said on the authorization, correct?

A.      Yes.

Q.      Okay.  If we read what the credit committee approved in Exhibit 157, the source of repayment of the 20 million dollar loan was cash distributions from Royce Homes, L.P., correct?

A.      It says cash distribution from Royce Homes, a  secondary liquidation of collateral.

Q.      Okay.  So if the primary source does not pay, which is cash distributions from Royce Homes, then the –

        MR. SHURN:  Objection; form.  Sorry, Mike.

Q.      (BY MR. DUNCAN)  Then the -- let's start that over.  If the primary source of repayment of the 20 million dollar loan, which is the cash distributions from  Royce Homes does not occur, then the backup plan would be  to foreclose on -- to foreclose on Royce Homes' ownership;  is that correct?

        MR. GIBSON:  Objection; form.

        MR. SHURN:  Objection; form.

Exhibit B

A. That's correct.

Q. (BY MR. DUNCAN) And is there a third alternative listed for repayment of the 20 million dollar loan by the loan committee?

A. There's not one shown.

Q. Okay. It doesn't say, it doesn't even mention that John Speer's personal assets would be looked at as a source of repayment of the 20 million dollar loan; is that correct?

A. It doesn't say that on Page 3 of this form.

**Denison Excerpt 18** (Denison 2004 Examination, Volume 2, Page 123, Line 24 to Page 124, Line 12 followed by Denison 2004 Examination, Volume 2, Page 125, Line 14 to Page 126, Line 1.)

Q. (BY MR. DUNCAN) Okay. Exhibit 158, is this also a credit authorization that involves the 20 million dollar loan?

A. Yes.

Q. Okay. And this one is -- it looks like it was prepared 9/17 of '07 and approved by the loan committee on 9/25 of '07; is that correct?

A. Correct.

Q. All right. And if you could do the same thing, and tell me on Page 1 of Exhibit 158, up by where it says "approved," these would be the officers -- the loan officers that approved -- the committee officers that approved the authorization; is that correct?

A. That's correct.

*****************************************

Q. Okay. Let's go to Page 2 of Exhibit 158, and under the title "Collateral," can you tell me what is listed as collateral on 9/25 of '07 for the 20 million dollar loan?

A. "The assignment of approximately 80 percent ownership interest and assignment of all distribution of Royce Homes Management, Inc., and all subsidiaries, specifically Royce Homes, L.P.

Q. So again, we have the emphasis on Royce Homes, L.P., and the ownership interest

and the fact that there's an assignment of all distributions coming from that entity?

A     That's what it says.

**Denison Excerpt 19** (Denison 2004 Examination, Volume 2, Page 141, Line 5 to Page 147, Line 16.)

Q.     (BY MR. DUNCAN) Okay. If you could pull out Exhibit 115 again. On Exhibit 115, if you look at the Bate No. 76031 through 38, they appear to be what we might refer to as organizational charts, is that correct, is that a fair term?

A.     Yes.

Q.     Okay. And these were supplied to you by Mr. Speer; is that correct?

A.     That's correct.

Q.     And these organizational charts, which are represented by Exhibit 115, the -- basically the last nine pages, other than the final page, are scenarios that Mr. Speer was proposing on how to structure the buyout; is that correct?

A.     Different scenarios including an existing structure.

Q.     Okay. So one of the charts is -- attached to Exhibit 115 is the existing and then there's other scenarios on which the buyout transaction might be structured, correct?

A.     That looks correct.

Q.     Excuse me?

A.     That looks correct.

Q.     Okay. All right. In these charts, these different scenarios regarding how the buyout might be structured are attached to the John Speer's loan request; is that correct?

A.     That's correct.

Q.     And if we go back to Page 3 of Exhibit 115, there's -- the paragraph -- in the fourth paragraph, it states "the accounting effects of purchasing his interest via a company entity is simple. The significant equity position that we have built over the last almost eight years would be cut in half. This is a difficult concept to digest; almost 25 million in equity goes 'puff' due solely to accounting treatment." Do you see

Exhibit B

that?

A.     We talked about this yesterday, yes.

Q.     Okay.  Now, what Mr. Speers was providing you is these different scenarios which are attached to Exhibit 115, correct, the different ways that the deal could be structured?

A.     Yes.

Q.     Okay.  And the concept behind the different structures is ways in which the debt would not be reflected on Royce Home, L.P.'s balance sheet; is that  correct?

       MR. GIBSON:  Objection; form.

       MR. SHURN:  Objection; form.

A.     I don't know that to be true.

Q.     (BY MR. DUNCAN)  Well, let's look at it then.  All right.  Let's look at, for example, on Exhibit 115 the third to last page.

       MR. GIBSON:  Can we give a number for clarity.

       MR. DUNCAN:  Oh, yeah, sure.  It is 76037 is the Bate No.

       MR. GIBSON:  Thank you.

Q      (BY MR. DUNCAN)  Now, there's actually some handwriting on this document; is that correct?

A.     Yes.

Q.     And whose handwriting is that?

A.     That appears to be mine.

Q.     All right.  So what we have -- and just correct me if I am wrong, originally it looked like Credit Swiss was going to do this bond offering; is that correct?

A.     Credit Swiss and bonds is written on this form in cross word.

Q.     All right.  And it looks like that debt was going to be on a Roycebuilder.com LP level, correct.?

Exhibit B

A.      That's what this chart shows.

Q.      And that wouldn't be with Royce Homes, L.P., it would be a couple of levels away from Royce Homes, L.P., correct?

A.      Shows it to be three steps up.

Q.      Okay.  So in other words, instead of reporting the debt on Royce Home, L.P.'s balance sheet, we would be reporting it on Roycebuilder.com LP's balance sheet, correct?

        MR. GIBSON:  Objection; form.

        MR. SHURN:  Objection; form.

A.      Can you rephrase the question?

Q       (BY MR. DUNCAN)  Sure.  Now, maybe you could help me out here, because you're actually making modifications  to this particular chart, which is Exhibit 15, Bate No.  76037, correct?

A.      I'd have to see our loan documents and the final organizational chart, but I believe our closing -- what we closed was different than this.

Q.      Yes, it is.  But tell me what you are -- the  purpose of your making the modifications to this page.

A.      I don't know.

Q.      Well, it says now Amegy is going to be in the  place of where Credit Swiss was going to be, right?

A.      That's what a note on this page says.

Q.      Exact -- go ahead.

A.      I don't believe that's what happened.  I'd have to see the final organizational chart.

Q.      Right.  But you made that change, correct?

A.      I wrote that in.

Q.      Okay.  And then it says debt to Speer, correct?

Exhibit B

A. That's what I wrote.

Q. And then apparently, it looks that you're -- looks like Mr. Speer would take that cash and put it into Roycebuilder.com, correct?

MR. GIBSON: Objection; form.

A. That's what that note says.

Q. (BY MR. DUNCAN) And that was what you were indicating when you made that note on that page, correct?

A. This is based on a first discussion without understanding the transaction.

Q. And this was a discussion with who?

A. This would have been in our first meeting with Paul and John.

Q. Paul who?

A. Murphy.

Q Okay. And what would happen under the scenario that you're putting forth here is, Amegy would make a loan to Mr. Speer, Mr. Speer would put that money into this entity that is called Roycebuilders.com LP, correct?

A. As it's written on this page, yes.

Q. And then what would happen is, Royce Builders would pay Mike Manners and his entities the money that was obtained from the loan, correct?

A. That's what would be indicated on this page and it didn't happen that way.

Q. Okay. There was a different scenario that was entered into than the one that is represented on 76037, right?

A. We lent the money to John and John paid Mike.

Q. Okay.

A. Directly.

Q. But what we have -- All right. Let's look at the next page, 76038. Tell me what you understand this structure to be.

A.  A document prepared by John.

Q.  Okay.

A.  I'm not sure why.

Q.  All right.  This is another scenario on how to  structure the buyout; is that correct?

MR. SHURN:  Objection; form.

MR. GIBSON:  Objection; form.

A.  I don't know.

Q.  (BY MR. DUNCAN)  But you understood and  Mr. Speers was telling you on Page 76011 of Exhibit 15  that his intent was not to reflect the buyout debt on the balance sheet of Royce Homes, L.P., correct?

MR. SHURN:  Objection; form.

MR. GIBSON:  Objection; form.

Q.  (BY MR. DUNCAN)  Because that would cause the  equity to go puff; is that correct?

MR. SHURN:  Objection; form.

MR. GIBSON:  Objection; form.

A.  He doesn't say Royce Homes, L.P.  He says, "If I  purchase his interest personally rather than through a company entity, those rules are not applicable."  Frankly,  we didn't spend a lot of time on these charts because that's not how the transaction proceeded.

Q.  (BY MR. DUNCAN)  Because if you look right below on Exhibit 115, Page 3, you write in there "maker John Speer."  It was decided that the transaction would be put in John Speer's name; is that correct?

A.  The loan would be made to John.

Back to Fraud/Fraud Scheme

Exhibit B

**Denison Excerpt 20** (Denison 2004 Examination, Volume 1, Page 23, Line 17 to Page 25, Line 21 followed by Denison 2004 Examination, Volume 1, Page 33, Line 3 Line 7.)

(Marked Denison Exhibit No. 110.)

Q. (BY MR. DUNCAN) Okay. Now, I'd like you to take a look at what has been marked as Exhibit 110. Is that an e-mail from you to John Speer? And I'll just let -- you know, up here, ignore that, that's just for internal purposes. I'm talking about the original message there. Do you see that?

A. Yes, it appears to be.

Q. And that -- so this is a e-mail from you to John Speers dated June 1st of 2006; is that correct?

A. That's what it says.

Q. And it is regarding the 20 million dollar loan, is that correct, where you're requesting information?

A. Yes.

Q. All right. What I'd like you to do is read from "John" on to the end into the record.

A. "John, thanks for the message -- we are making great progress and I have been able to have several additional positive conversations this morning. Based on this morning's conversations, please forward the following at your earliest convenience. We are now in the cash flow analysis -- one of our guys requested a more detailed analysis of Royce's ability to access additional cash if needed to cover your distribution. I want to show that this is an easy item. We are putting together an analysis of 'free cash flow' -- please send your thoughts and numbers on additional sources of cash that you could access if needed. For example, how much could you draw under your construction lines at this time if you really eeded to access additional cash. Also, are there any restrictions on distributions per your credit agreements, (as long as your covenants aren't broken). We need to ascertain how much cash you could distribute -- I realize that there are numerous agreements, so a general statement from your legal counsel, (who handles your credit facilities) would suffice...something along the lines that there are no restrictions per your credit agreements as long as your D/TNW and minimum net worth covenants are maintained."

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 317
Back to Table of Contents

Exhibit B

Q. And D/TNW means debit potential[124] networth?

A. Yes.

Q. That's a leverage ratio?

A. Yes.

Q. All right. Let's go back up to paragraph two, sentence two of Exhibit 110. It says "We are now in the cash flow analysis, one of our guys requested a more detailed analysis of Royce's ability to access additional cash if needed to cover your distributions." Before you make the 20 million dollar loan, you want to make sure that it can get repaid, is that a very general concept?

A. Correct.

Q. Okay. And what someone has done is, they want a cash flow analysis for Royce; is that correct?

A. Correct.

************************

Q. All right. The plan was -- your plan and Mr. Speer's plan was, that, if needed, there would be draw downs on the line of credit at Royce Homes to make distributions in order to fund the 20 million dollar loan?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. Correct.

Back to Fraud/Fraud Scheme
Back to Speer as Amegy's Agent

**Denison Excerpt 21** (Denison 2004 Examination, Volume 1, Page 35, Line 3 to Page 40, Line 6.)

Q. Okay. And this is about four days after our Exhibit No. 110. You see that? It's on June 5th, 2006, correct?

---

[124]This is an apparent transcription error. The term should be "debt to tangible net worth."

A.      Yes, that's what it says.

Q.      And it says as the subject, "Revised 12 month cash flow forecast"; is that correct?

A.      Correct.

Q.      Okay.  And it appears that what Mr. Speers is  doing is complying with your request in Exhibit 110 to provide a cash flow forecast; is that correct?

A.      That appears to be correct.

Q.      Okay.  And the cash flow forecast that he  provided to you was for the Royce Entities; is that correct?

A.      That's what this says, yes.

Q.      Okay.  It isn't his personal cash flow, it is  Royce Home Entities cash flow, correct?

A.      This is, yes.

Q.      Okay.  Go to Page 3 of Exhibit 111.  And if we  look at the top of the chart, this is the cash flow analysis; is that correct?

A.      Yes.  I don't know if this is the full analysis,  but this would be at least part of it.

Q.      The 12th month.  Okay.  And what we have is -- at   the top it says "actuals" and it appears that the actual  numbers are from March 2006 through May of 2006 in the first three columns; is that correct?

A.      Yes.

Q.      Okay.  And then we have -- after that, we have  projections for June 2006 through March of 2007; is that  right?

A.      Yes.

Q.      Okay.  Now, look at the bottom of the chart.  The  next to the bottom figure, it says -- well, the title is "Cash"; is that correct?

A.      Correct.

Q.      And that's for over a one-year period, there's  either the actuals or the forecast of the cash that Royce will have on hand, is that what that's indicating?

Exhibit B

A.    I don't know what that indicates.

Q.    You are unfamiliar with cash flow projection?

A.    I don't recall seeing this one.

Q.    You don't have any doubt that Mr. Speer sent you  this, do you?

A.    Or someone in his office.

Q.    Okay.  All right. Because it appears that you  responded to him later on and you said, "Got it." Look at the first page of 111.  See that?

A.    Yes.

Q.    Okay.  And that was -- the first page of 111,  it's an e-mail from you to John Speers regarding the revised 12-month cash flow forecast, and it says, "Got  it.  Let's touch base sometime this afternoon, we are  putting final touches on our presentation.  I'll have one last round of questions.  Thanks." Is that correct?

A.    Correct.

Q.    All right.  So let's go back to Page 3 of Exhibit 110, and at the bottom, it said there's a column for cash,  is that correct, or row -- there's a row that involves cash, it's the second from bottom entry.

A.    Yes.

Q.    All right.  Now, if you go all the way across, each month, does it show any positive numbers that they planned on having cash?

      MR. GIBSON:  Objection; form.

Q.    (BY MR. DUNCAN)  And we're talking about Royce  Homes from March of 2006 through March of 2007.

      MR. GIBSON:  Objection; form.

A.    The numbers are negative.

Q.    (BY MR. DUNCAN)  Okay.  And the average number,  it appears, is about -- under the projections           or the -- they project a negative four million dollars a month in  actual cash; is that right?

Exhibit B

A. Correct. As of, I believe, each month's end day.

Q. Right. So the projections are from June of 2006 through March of 2007, that Royce is projecting that they will have a negative cash level of four million dollars each month?

A. As of a particular day of the month.

Q. Okay. Now, the fourth -- we're on -- again, we're on Page 3 of Exhibit 110. I'd like you to look up to the fourth row where it talks about draw -- draws available. Do you see that?

A. Yes.

Q. Okay. This means that Royce had assets which they could borrow against, if necessary, to that level; is that correct?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. That would be my understanding.

Q. (BY MR. DUNCAN) Okay. So we know that at least with the projections that you've been provided by Mr. Speer, that Royce could borrow money on its construction lines to make the 20 million dollar loan payment, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. Well, John would make the payment, not the company. It appears they could draw that and what they do with that cash is up to the company.

Q. (BY MR. DUNCAN) Well, again, let's look at what we have here. You asked Mr. Speer for cash flow projection, right?

A. Yes.

Q. Okay. And the reason you asked for the cash flow projection was to determine if the 20 million dollar loan could be repaid, correct?

A. Was to determine the cash flow of the company.

Q To determine if the -- you're asking for cash flow analysis in relation to the 20 million dollar loan, correct?

A. Correct.

Q Okay. And the reason you're asking for a cash flow projection in relationship to the 20 million dollar loan is because you want to make sure that if you're going to make the loan, that there's an ability to repay it, correct?

A. Trying to understand the cash flow of the company.

Q. To determine if the loan could be repaid?

A. Is one of the factors to determine if the loan could be repaid.

Q. Okay. And you understood from Exhibit 111 that there was assets available at Royce Homes in which borrowing could occur if needed to repay the 20 million dollar loan?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. There were draws available.

Back to Fraud/Fraud Scheme

**Denison Excerpt 22** (Denison 2004 Examination, Volume 1, Page 42, Line 10 to Page 43, Line 19.)

Q. (BY MR. DUNCAN) Okay. But you didn't answer my question though. I had a specific question. Now, listen so we don't have to keep going over and over it again.

You understood that Mr. Speer was going to have a 10 million dollar loan payment, principal payment, on the 20 million dollar loan at the end of December of 2006, correct?

A. Correct.

Q. All right. Mr. Speer has provided you projections in Exhibit 111, correct?

A. Correct.

Q. And this is cash flow projections for Royce Homes, correct?

A. Correct.

Q. And he is telling you through these projections that he believes that at the end of December of 2006 that they will have a negative four million dollars in cash; is that correct?

MR. GIBSON: Objection; form.

A. That's what this says.

Q (BY MR. DUNCAN) Okay. And that's -- and the reason it says that is, he's trying to indicate to you that the cash to -- within Royce will be negative four million dollars –

MR. GIBSON: Objection; form.

Q. (BY MR. DUNCAN) -- at the end of December 2006?

A. That's what this would appear to say.

Q. Okay. And -- but it does indicate that there may be sufficient assets that can be borrowed against under the construction lines in order to fund the distribution necessary to make that 10 million dollar payment at the end of December of 2006, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. It would appear to say that.

Back to Fraud/Fraud Scheme

**Denison Excerpt 23** (Denison 2004 Examination, Volume 1, Page 23, Line 17 to Page 25, Line 21 followed by Denison 2004 Examination, Volume 1, Page 33, Line 3 Line 7.)

(Marked Denison Exhibit No. 110.)

Q. (BY MR. DUNCAN) Okay. Now, I'd like you to take a look at what has been marked as Exhibit 110. Is that an e-mail from you to John Speer? And I'll just let -- you know, up here, ignore that, that's just for internal purposes. I'm talking about the original message there. Do you see that?

A. Yes, it appears to be.

Q. And that -- so this is a e-mail from you to John Speers dated June 1st of 2006; is that correct?

A. That's what it says.

Q. And it is regarding the 20 million dollar loan, is that correct, where you're requesting information?

A. Yes.

Q. All right. What I'd like you to do is read from "John" on to the end into the record.

A. "John, thanks for the message -- we are making great progress and I have been able to have several additional positive conversations this morning. Based on this morning's conversations, please forward the following at your earliest convenience. We are now in the cash flow analysis -- one of our guys requested a more detailed analysis of Royce's ability to access additional cash if needed to cover your distribution. I want to show that this is an easy item. We are putting together an analysis of 'free cash flow' -- please send your thoughts and numbers on additional sources of cash that you could access if needed. For example, how much could you draw under your construction lines at this time if you really eeded to access additional cash. Also, are there any restrictions on distributions per your credit agreements, (as long as your covenants aren't broken). We need to ascertain how much cash you could distribute -- I realize that there are numerous agreements, so a general statement from your legal counsel, (who handles your credit facilities) would suffice...something along the lines that there are no restrictions per your credit agreements as long as your D/TNW and minimum net worth covenants are maintained."

Q. And D/TNW means debit potential[125] networth?

A. Yes.

Q. That's a leverage ratio?

A. Yes.

Q. All right. Let's go back up to paragraph two, sentence two of Exhibit 110. It says "We are now in the cash flow analysis, one of our guys requested a more detailed

[125]This is an apparent transcription error. The term should be “debt to tangible net worth.”

analysis of Royce's ability to access additional cash if needed to cover your distributions." Before you make the 20 million dollar loan, you want to make sure that it can get repaid, is that a very general concept?

A. Correct.

Q. Okay. And what someone has done is, they want a cash flow analysis for Royce; is that correct?

A. Correct.

************************

Q. All right. The plan was -- your plan and Mr. Speer's plan was, that, if needed, there would be draw downs on the line of credit at Royce Homes to make distributions in order to fund the 20 million dollar loan?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. Correct.

Back to Fraud/Fraud Scheme
Back to Speer as Amegy's Agent

**Denison Excerpt 24** (Denison 2004 Examination, Volume 1, Page 35, Line 3 to Page 40, Line 6.)

Q. Okay. And this is about four days after our Exhibit No. 110. You see that? It's on June 5th, 2006, correct?

A. Yes, that's what it says.

Q. And it says as the subject, "Revised 12 month cash flow forecast"; is that correct?

A. Correct.

Q. Okay. And it appears that what Mr. Speers is doing is complying with your request in Exhibit 110 to provide a cash flow forecast; is that correct?

A. That appears to be correct.

Q. Okay. And the cash flow forecast that he provided to you was for the Royce

Entities; is that correct?

A.     That's what this says, yes.

Q.     Okay.  It isn't his personal cash flow, it is  Royce Home Entities cash flow, correct?

A.     This is, yes.

Q.     Okay.  Go to Page 3 of Exhibit 111.  And if we  look at the top of the chart, this is the cash flow analysis; is that correct?

A.     Yes.  I don't know if this is the full analysis,  but this would be at least part of it.

Q.     The 12th month.  Okay.  And what we have is -- at  the top it says "actuals" and it appears that the actual  numbers are from March 2006 through May of 2006 in the first three columns; is that correct?

A.     Yes.

Q.     Okay.  And then we have -- after that, we have  projections for June 2006 through March of 2007; is that  right?

A.     Yes.

Q.     Okay.  Now, look at the bottom of the chart.  The  next to the bottom figure, it says -- well, the title is "Cash"; is that correct?

A.     Correct.

Q.     And that's for over a one-year period, there's  either the actuals or the forecast of the cash that Royce will have on hand, is that what that's indicating?

A.     I don't know what that indicates.

Q.     You are unfamiliar with cash flow projection?

A.     I don't recall seeing this one.

Q.     You don't have any doubt that Mr. Speer sent you  this, do you?

A.     Or someone in his office.

Q.     Okay.  All right. Because it appears that you  responded to him later on and you said, "Got it." Look at the first page of 111.  See that?

Exhibit B

A.     Yes.

Q.     Okay.  And that was -- the first page of 111,  it's an e-mail from you to John Speers regarding the revised 12-month cash flow forecast, and it says, "Got  it.  Let's touch base sometime this afternoon, we are  putting final touches on our presentation.  I'll have one last round of questions.  Thanks." Is that correct?

A.     Correct.

Q.     All right.  So let's go back to Page 3 of Exhibit 110, and at the bottom, it said there's a column for cash,  is that correct, or row -- there's a row that involves cash, it's the second from bottom entry.

A.     Yes.

Q.     All right.  Now, if you go all the way across, each month, does it show any positive numbers that they planned on having cash?

MR. GIBSON:  Objection; form.

Q.     (BY MR. DUNCAN)  And we're talking about Royce  Homes from March of 2006 through March of 2007.

MR. GIBSON:  Objection; form.

A.     The numbers are negative.

Q.     (BY MR. DUNCAN)  Okay.  And the average number,  it appears, is about -- under the projections          or the -- they project a negative four million dollars a month in  actual cash; is that right?

A.     Correct.  As of, I believe, each month's end day.

Q.     Right.  So the projections are from June of 2006  through March of 2007, that Royce is projecting that they will have a negative cash level of four million dollars  each month?

A.     As of a particular day of the month.

Q.     Okay.  Now, the fourth -- we're on -- again, we're on Page 3 of Exhibit 110.  I'd like you to look up to the fourth row where it talks about draw -- draws available.  Do you see that?

A.     Yes.

Exhibit B

Q.   Okay.  This means that Royce had assets which they could borrow against, if necessary, to that level; is that correct?

MR. SHURN:  Objection; form.

MR. GIBSON:  Objection; form.

A.   That would be my understanding.

Q.   (BY MR. DUNCAN)  Okay.  So we know that at least with the projections that you've been provided by Mr. Speer, that Royce could borrow money on its construction lines to make the 20 million dollar loan payment, correct?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.   Well, John would make the payment, not the company.  It appears they could draw that and what they do with that cash is up to the company.

Q.   (BY MR. DUNCAN)  Well, again, let's look at what  we have here.  You asked Mr. Speer for cash flow projection, right?

A.   Yes.

Q.   Okay.  And the reason you asked for the cash flow projection was to determine if the 20 million dollar loan  could be repaid, correct?

A.   Was to determine the cash flow of the company.

Q   To determine if the -- you're asking for cash flow analysis in relation to the 20 million dollar loan, correct?

A.   Correct.

Q   Okay.  And the reason you're asking for a cash flow projection in relationship to the 20 million dollar loan is because you want to make sure that if you're going  to make the loan, that there's an ability to repay it, correct?

A.   Trying to understand the cash flow of the  company.

Q.   To determine if the loan could be repaid?

A.   Is one of the factors to determine if the loan could be repaid.

Exhibit B

Q.      Okay. And you understood from Exhibit 111 that there was assets available at Royce Homes in which borrowing could occur if needed to repay the 20 million dollar loan?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A.      There were draws available.

Back to Fraud/Fraud Scheme

**Denison Excerpt 25** (Denison 2004 Examination, Volume 1, Page 42, Line 10 to Page 43, Line 19.)

Q.      (BY MR. DUNCAN) Okay. But you didn't answer my question though. I had a specific question. Now, listen so we don't have to keep going over and over it again.

You understood that Mr. Speer was going to have a 10 million dollar loan payment, principal payment, on the 20 million dollar loan at the end of December of 2006, correct?

A.      Correct.

Q.      All right. Mr. Speer has provided you projections in Exhibit 111, correct?

A.      Correct.

Q.      And this is cash flow projections for Royce Homes, correct?

A.      Correct.

Q.      And he is telling you through these projections that he believes that at the end of December of 2006 that they will have a negative four million dollars in cash; is that correct?

MR. GIBSON: Objection; form.

A.      That's what this says.

Q       (BY MR. DUNCAN) Okay. And that's -- and the reason it says that is, he's trying to indicate to you that the cash to -- within Royce will be negative four million dollars –

Exhibit B

MR. GIBSON:  Objection; form.

Q.     (BY MR. DUNCAN) -- at the end of December 2006?

A.     That's what this would appear to say.

Q.     Okay.  And -- but it does indicate that there may be sufficient assets that can be borrowed against under  the construction lines in order to fund the distribution necessary to make that 10 million dollar payment at the  end of December of 2006, correct?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.     It would appear to say that.

Back to Fraud/Fraud Scheme


**Denison Excerpt 26** (Denison 2004 Examination, Volume 1, Page 105, Line 7 to Line 13.)

Q.     (BY MR. DUNCAN)  Okay.  But you're not aware of  any written notification that was provided to you by Royce, any of the Royce entities or Mr. Speer or anybody on his behalf, that the loan covenants were -- the leverage ratios were in default with any of its other lenders?

A.     That's my recollection.


**Denison Excerpt 27** (Denison 2004 Examination, Volume 2, Page 154, Line 20 to Line 25.)

Q.     (BY MR. DUNCAN) And I think we covered this earlier. You do not recall Mr. Speer or Royce providing  you with any notices of default in regards to their loan to covenant ratios, their loan to -- their debt to equity  ratios; is that correct?

A.   Correct.


**Denison Excerpt 28** (Denison 2004 Examination, Volume 1, Page 106, Line 15 to Page 107, Line 1.)

Exhibit B

Q. (BY MR. DUNCAN) Okay. That's some -- does that ring a bell there, that you weren't receiving monthly financial statements for Royce Homes and the -- that term under the loan agreement wasn't modified until probably the mid part of 2007 –

MR. GIBSON: Objection; form.

Q. (BY MR. DUNCAN) -- where they could actually provide quarterly reports?

A. Yes.

Q. Okay. And when I talk about mid, I'm talking about maybe mid July, August time frame of 2007?

A. That sounds accurate.

**Denison Excerpt 29** (Denison 2004 Examination, Volume 1, Page 140, Line 10 to Page 141, Line 1 followed by Denison 2004 Examination, Volume 1, Page 141, Line 20 to Page 142, Line 1.)

Q. Okay. Let's go to Exhibit 125.

(Marked Denison Exhibit No. 125.)

Q. (BY MR. DUNCAN) All right. If you could take a look at Exhibit 125 and this is a e-mail from Mr. Gathmann to you and Mr. Speer, correct?

A. Appears to be, yes.

Q. All right. And it's dated September 11th, 2007, correct?

A. Correct.

Q. And the subject is "Royce Narrative;" is that correct?

A. Correct.

Q. And this was sent to you during the time frame -- the Exhibit 125 was sent to you during the time frame in which Mr. Speer was asking Amegy to defer the payments on the 20 million dollar loan, correct?

A. I believe so, yes.

**************************

Q. All right. So in September of 2007, Mr. Gathmann, the CFO Of Royce Homes, L.P., is telling you that at the end of 2006, Royce knew that 2007 was not going to be a good year financially, correct?

MR. GIBSON: Objection; form.

A. He's saying it would be a significantly different year.

Back to Unreasonably Small Capital
Back to Breach of Fiduciary Duty Not Good Year Financially
Back to Breach of Fiduciary Duty Gathman Explanation to Denison

**Denison Excerpt 30** (Denison 2004 Examination, Volume 1, Page 143, Line 5 to Page 144, Line 19.)

Q. (BY MR. DUNCAN) Well, the words "the collapse of the sub prime market and the continued tightening of the loan underwriting standards has significantly" -- "has resulted in a significant decrease in the number of closings across the entire country."

A. He's saying as 2006 ended and 2007 began.

Q. Right. That that was the condition that was existent?

A. That's what he's saying, correct.

Q. Yeah. Okay. Now, given the fact that -- are you -- do you understand that they're telling you that they're in the sub prime market and the sub prime market collapse is hurting Royce Homes?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. I understand that is a factor.

Q. (BY MR. DUNCAN) Okay. And this trend was evident at the end of 2006?
MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. That's what he's saying.

Exhibit B

Q. (BY MR. DUNCAN) Okay. All right. That's his words, though. I'm sorry. You know, it says the collapse of the sub prime market. He's telling you that, correct?

A. That's what Bill's telling us, yes.

Q. Okay. You have no reason to doubt what he's telling you, do you, that the market was collapsing at the end of 2006 into 2007, the sub prime market?

A. No.

Q. Okay. And did you understand that the sub prime market continued to deteriorate in 2007?

A. Yes.

Back to Unreasonably Small Capital
Back to Breach of Fiduciary Duty Not Good Year Financially
Back to Breach of Fiduciary Duty Gathman Explanation to Denison

**Denison Excerpt 31** (Denison 2004 Examination, Volume 2, Page 129, Line 17 to Page 130, Line 9.)

Q. All right. Go to Exhibit 158, Bate No. 77811. Now, at the top of the page, tell me what the difference between a projection for year-end 2007 is and a pro forma for year-end 2007 is.

A. This would have been information provided to us by John or the company, the projections for FYE 2007. This would indicate their original projections were the middle column and their revised projections were the column on the right.

Q. Read right below the chart on Exhibit 158, Bate No. 77811, read that first sentence.

A. "The pro forma estimates revenues to be 239 million, a 46 percent decline from the original estimated projection submitted in 2006."

Q. Okay. So what this is telling us is, they're, you know, pretty simply, that their projections were off 46 percent; is that correct?

A. They were revising the projections by 46 percent.

Back to Breach of Fiduciary Duty

**Denison Excerpt 32** (Denison 2004 Examination, Volume 1, Page 115, Line 18 to Page 121, Line 16.)

Q.     Now, Mr. Speer had come back again in September and asked for a modification of the 20 million dollar loan, correct?

A.     That's what this e-mail is requesting.

Q.     All right. Now, if you could read starting on the first page of Exhibit 121 at the bottom, Mr. Speer's e-mail to you on 9/11 of 2007.

A.     Chris, I know that you are probably hoping not to hear from me again on this topic, but I really need to request a deferral in the next two principal payments on my loan. I know that you guys are anxious to get your money out of this loan, I am as well. If any of us had anticipated this perfect storm, we certainly would not have entered into the transaction but hindsight is much easier. Here's what I would like to request: One, continue payment of monthly interest. Two, deferral of September's principal reduction until 12 '07. Three, deferral of December's principal reduction until 6/30 '08. I need the deferrals to minimize the impact of the equity reductions from the company that would result in busting our debt equity covenants with our construction lenders. The time differential will allow us the time we need to both reduce our debt load and realize profits from several transactions that will shore-up the equity side of the equation. The only other thing I have to offer is to replace Amegy's LOC facility so you do not have that as part of the equation. I believe this can be accomplished by the end of the month and Bill has already initiated that process. Frankly, I'm not offering much here as this is something we will do anyway.

       Again, I realize this is not Amegy's typical loan (far from it) and that you need to get your money out as soon as possible. I want to get you paid as soon as possible but our world has changed dramatically in the last six months and due mostly to issues we have absolutely no control over it. Thanks."

Q.     All right. So let's go back to Page 2 of Exhibit 121 and look at the first paragraph. And it says, "If any of us had anticipated this perfect storm," in quotation marks, "we certainly would not have entertained" -- "entered into the transaction but hindsight is much easier." What did you understand that the perfect storm meant?

       MR. GIBSON: Objection; form.

A.     I'm not sure what he meant by it.

Q.     (BY MR. DUNCAN) Okay. What did you understand from reading this that Mr. Speer was referring to?

       MR. GIBSON: Objection; form.

Exhibit B

A.      Slower sales due to people having more trouble getting financing.

Q.      (BY MR. DUNCAN)  Okay.  This is something we refer to as the subprime crisis?

A.      You could.

Q.      Okay.  And apparently that was having a financial impact on Royce Homes, correct?

A.      On sales.

Q.      Okay.  And what Mr. Speer is requesting is a deferral of his payments again?

A.      Correct.

Q.      And what was your understanding of the basis for the deferral?

A.      Slowing its compensation.

Q.      Okay.  In other words, it would -- if Mr. Speer were to take the disbursement out of Royce Homes to make the payment that it would have a serious impact on the financial standing of the company?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.      Can you say that again?

Q.      (BY MR. DUNCAN)  Sure.  Well, let's go down a little bit further.  It says so -- let's see.  "I need the deferral to minimize the impact of the equity reduction from the company that would result in busting our debt to equity covenants with our construction lenders."  You see that?

A.      Yes.

Q.      So what Mr. Speer is telling you is that if they make the distribution to pay his personal loan, that this is going to cause them to be in violation of their construction lender; is that correct?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.      I don't know that that one thing would cause a bust, but he was showing concern

Exhibit B

about pulling money out of the company.

Q. (BY MR. DUNCAN) Okay. Now, Mr. Speer is offering to move the letter of credit out of Royce -- out of Amegy, correct?

A. That's what he's saying here.

Q. All right. That means that he is offering to take Royce's -- Royce Homes' business to another bank, correct?

MR. SHURN: Objection; form.

A. The letter of credit.

Q. (BY MR. DUNCAN) Is this to the benefit of Amegy?

MR. GIBSON: Objection; form.

A. I don't know.

Q. (BY MR. DUNCAN) Well, let's -- let's stay on very common sense. You're in the business of lending money, Amegy, right?

A. Yes.

Q. And when your customer is telling you "I will take my business somewhere else," is that a good thing for Amegy?

A. Depends on the situation.

Q. How about this situation, is that a good -- the fact that Mr. Speer is offering to take Royce Homes' business, this letter of credit, to another bank, is that a positive or a negative thing for Amegy?

A. I would have viewed that as positive.

Q. Why?

A. Because we had an unsecured credit, partially unsecured credit, and he was requesting payment reductions on his loan.

Q. Royce was in trouble, wasn't it, at -- in September of 2007?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. If I can refer to my credit authorization, I can answer that.

Q. (BY MR. DUNCAN) Well, I'm not asking you to quote numbers but I'm asking you by September of 2007, you understood that Royce was in trouble?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. I understood that Royce had slower sales and I was being assured by Royce that they were going to work through it, and I guess it depends on how you define "trouble."

Q. (BY MR. DUNCAN) Well, trouble means that you didn't have a problem and you thought it was a good thing if Royce took its business elsewhere as of September of 2007, correct?

A. Not all of its business.

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

Q. (BY MR. DUNCAN) Well, you didn't mind having their deposits there, but loans, you wanted somewhere else; is that right?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. I can't speculate as to that.

Q. (BY MR. DUNCAN) Well, you just told me that you felt it was a good thing that Royce take its letter of credit to another bank, correct?

A. That's what I said.

Back to Breach of Fiduciary Duty

**Denison Excerpt 33** (Denison 2004 Examination, Volume 1, Page 153, Line 16 to Page 155, Line 2.)

Q. All right. So in September of 2007, when Mr. Speer is telling you or giving you

information as to why you should extend the Amegy loan, he's telling you, one, that they've reduced their workforce by 60 people; is that correct?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. That's what he's saying.

Q. (BY MR. DUNCAN) Right. And he's saying that Royce Homes has -- it was going to liquidate over a thousand acres of land?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

Q. (BY MR. DUNCAN) If you add up the different –

A. Right, that's what he's saying.

Q. And they're going to sell 10 model homes, maybe as many as 80 more model homes?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. That's what he's saying.

Q. BY MR. DUNCAN) Okay. So what Mr. Gathmann and what Mr. Speer are telling you are, we now have 60 people that are unemployed, right?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

Q. (BY MR. DUNCAN) We have -- they are liquidating the company's assets, and he's telling you this in order to tell you why you should extend his personal loan; is that right?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. He's -- I don't know why he was telling us, but we were asking for information to

Exhibit B

understand the financial condition of his employer.

Q. (BY MR. DUNCAN) Okay. And again, this is Mr. Speer's personal debt, this 20 million dollar loan?

A. Correct.

Back to Breach of Fiduciary Duty

**Denison Excerpt 34** (Denison 2004 Examination, Volume 1, Page 170, Line 18 to Page 172, Line 9.)

(Marked Denison Exhibit No. 128.)

Q. (BY MR. DUNCAN) All right. If you could look on the first page, that's an e-mail from you to Mr. Argue dated December 12th, 2007 at, 11:00 a.m., correct?

A. The one at the bottom, yes.

Q. Yeah, and would you read that bottom e-mail on the first page of Exhibit 128?

A. “Please see below and let's discuss. Royce is asking us to provide a lease for their model home furniture. Apparently, we (Zions) has a new policy forbidding this for any homebuilders. Would we be open to considering the issuance of an Amegy LC to back this, seems like an odd request but if we pass, I'll have to figure out a way to tell Royce without offending them. Note that they have a four point two million dollar net profit through the end of September. Thanks."

Q. Now, read the e-mail just above that, the one dated September 12th, 2007, at 6:42 p.m.

A. 6:24 p.m.?

Q. Yeah.

A. "Sounds too much like they are considering desperate financial alternatives. I don't think I want to finance furniture to a builder in this environment. They will not be immune to the downturn, but hopefully it won't be too bad for them." That's from Joe Argue to me.

Q. Okay. So by December 12th of 2007, even Amegy is referring to Royce as desperate; is that correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. Joe is stating that he thinks they're considering desperate financial alternatives.

Q. (BY MR. DUNCAN) Okay. He considers what they're doing to be a desperate financing attempt?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. That's what he states here.

Q. (BY MR. DUNCAN) All right. And who, again, is Joe Argue?

A. He sits on loan committee, he's the chief lending officer.

Q. At Amegy --

A. Amegy Bank.

Back to Breach of Fiduciary Duty

**Denison Excerpt 35** (Denison 2004 Examination, Volume 1, Page 173, Line 9 to Line 25.)

Q. Okay. So there's an indication that Royce is extremely highly leveraged; is that correct?

A. That's Omar's opinion.

Q. And who is Omar?

A. Omar handles -- handled leasing for Amegy.

Q. Okay. So Omar's a -- Omar Khan is a Amegy employee?

A. Yes.

Q. Okay. And -- okay. Who is Brian Campbell?

A. I don't know Brian, but he works for Zions, which is our parent company.

Q. Okay. So it's an Amegy affiliate or your parent company -- Amegy's -- okay.

Exhibit B

A. Yes.

Q. And in his opinion, Royce is extremely highly leveraged by December of 2007?

A. In Omar's opinion.

Back to Breach of Fiduciary Duty

**Denison Excerpt 36** (Denison 2004 Examination, Volume 1, Page 174, Line 24 to Page 176, Line 9.)

Q. (BY MR. DUNCAN) Now, when you're being told that Royce is extremely highly leveraged, as the loan officer in charge of this 20 million dollar loan, is that something that you would have investigated?

A. I wouldn't have taken Omar's word for it, I would look at financials of the company and make that determination.

Q. Okay. Do you recall doing that?

A. In what time frame?

Q. Well, let's start with December of 2007.

A. I don't recall specifically in December of 2007.

Q. But you would agree that in December of 2007, there was factors in place that would put you on notice that you might want to look and investigate the financial affairs of Royce Homes, right?

MR. GIBSON: Objection; form.

A. I would look at financials of the company.

Q. (BY MR. DUNCAN) You had a number of factors that people are telling you certain things that you should investigate doing your due diligence in December of 2007?

MR. GIBSON: Objection; form.

A. I have a person giving me his opinion that they're highly leveraged.

Q. (BY MR. DUNCAN) Okay. And you had your other officer at your bank saying that he felt that they were making desperate financing attempts; is that correct?

Exhibit B

           MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. That was his opinion, yes.

Q. (BY MR. DUNCAN) And that's in December of 2007?

A. Yes.

Back to Breach of Fiduciary Duty

**Denison Excerpt 37** (Denison 2004 Examination, Volume 1, Page 156, Line 2 to Page 157, Line 10.)

Q. (BY MR. DUNCAN) If you can go back to Exhibit 125, Page 3 right there, and you're going to look at that book soon. Now, in the bottom paragraph on Page 3 of Exhibit 125, it says that we are projected to earn 15 million in profit for the year of 2007, you see that?

A. Yes.

Q. Okay. Were you aware that that did not come to pass?

A. Yes.

Q. Okay. And actually, if you could open that book right here to Exhibit 41. Okay. Go to Page 2 of Exhibit No. 41, and does this appear to be a Royce operating and subsidiary balance sheet?

A. Page -- Page 1?

Q. Yeah, that's the balance sheet.

A. Yes.

Q. And this is as of December 31st, 2007. And if you look at the second page, that is -- it tells us the revenue for and the profits and losses for the year; is that correct?

MR. GIBSON: It's 2725?

Q. BY MR. DUNCAN) Yeah, it's 2725 which is Exhibit 41, second page.

A. Revenues and net income.

Q.     Right. And can you tell me what the profits or losses were from operations for the year of 2007 for the Royce entities?

A.     Shows a loss from operations of $1,085,572.

Q.     Okay. So that was from their homebuilding industry, they actually lost well over a million dollars; is that correct?

     MR. GIBSON: Objection; form.

A.     It shows they have a loss of operations of just over a million dollars.

Back to Breach of Fiduciary Duty

**Denison Excerpt 38**  (Denison 2004 Examination, Volume 1, Page 159, Line 12 to Line 21 followed by Denison 2004 Examination, Volume 1, Page 160, Line 6 to Page 161, Line 17.)

Q.     All right. But what we can -- we can look at is, the projections were by the end of 2007, they were hoping to make 15 million dollars in net income, correct?

A.     That's what their projections were.

Q.     And that -- they didn't come close?

     MR. GIBSON: Objection; form.

A.     They didn't make 15 million dollars profit.

Q.     (BY MR. DUNCAN) Well, they lost over a million from operations, correct?

A.     That's what this financial is saying.

     ***************************

Q.     Okay. Now, you monitored -- at the end of the last half of 2007, you were monitoring Royce Homes financial affairs, correct, through the financials?

A.     Yes, from the financials we received.

Q.     Okay. And so you could tell that things weren't getting better for Royce Homes as 2007 progressed?

A.     Sales were slowing.

Exhibit B

Q.      Well, sales were slowing and their financial results were getting worse; is that correct?

        MR. SHURN:  Objection; form.

        MR. GIBSON:  Objection; form.

A.      Based on this?

Q.      BY MR. DUNCAN)  Well, based on the financials you were receiving.

A.      I'd have to look at those financials.

Q.      All right.  But is it your recollection that things were not getting better for Royce Homes towards the end of 2007?

A.      Yes.

Q.      Okay.  And at the -- in September of 2007, Mr. Speer, through Exhibit 125, at least, was indicating  that the beginning of the year was not too good either?

        MR. GIBSON:  Objection; form.

        MR. SHURN:  Objection; form.

A.      That's what they're saying in this exhibit.

Q.      (BY MR. DUNCAN)  And things from your observation  actually got worse towards the end of 2007; is that correct?

        MR. SHURN:  Objection; form.

        MR. GIBSON:  Objection; form.

A.      I'd have to look at financials to answer that question.

Q.      (BY MR. DUNCAN)  But I mean, from your recollection, things did not get better at Royce Homes towards the end of 2007, would that be accurate?

        MR. GIBSON:  Objection; form.

A.      Not better.

Back to Breach of Fiduciary Duty

Exhibit B

**Denison Excerpt 39** (Denison 2004 Examination, Volume 1, Page 168, Line 12 to Line 22.)

Q. (BY MR. DUNCAN) Were you aware that they had a -- for example, over a million dollar tax bill that was due the first week of 2007 and they didn't make that payment?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. Was not aware of that.

Q. (BY MR. DUNCAN) Okay. Were you aware that Royce went to its lenders to defer making principal payments on their construction loans?

A. I recall hearing that.

Back to Breach of Fiduciary Duty

**Denison Excerpt 40** (Denison 2004 Examination, Volume 1, Page 178, Line 1 to Page 179, Line 25.)

(Marked Denison Exhibit No. 130.)

Q. (BY MR. DUNCAN) I'd like you to look at Exhibit 130, Page 2, the bottom e-mail, which is -- appears to be from Mr. Gathmann to you on May 8th of 2008; is that correct?

A. Yes.

Q. And, again, here, it looks like Mr. Gathmann is seeking to have Amegy release its UCC lien against the furniture so Royce could borrow money against it, is that what it appears to be?

A. That's what this appears, yes.

Q. Now, if we look on Page 2 of Exhibit 130, you're responding to Bill Gathmann, and can you read your response to his request?

A. "Bill, I am okay with this in concept subject to, one, seeing and incorporating the list of furniture and equipment that we are releasing; and, two, Anna's (our legal counsel) review and approval.

Q. All right. So in other words, you don't have a problem apparently with the concept

of releasing Amegy's lien on the furniture so that they can borrow some more money against it; is that correct?

MR. SHURN:  Objection; form.

A.  I say I am okay with this in concept.  Now, they would be leasing -- they wouldn't be borrowing more money, they would be leasing equipment and furniture.

Q.  (BY MR. DUNCAN)  Okay.  What's your understanding of why a transaction like this is done?

A.  I'm not sure why they particularly wanted to do it.

Q.  Okay.  But what's your understanding of why you would sell your furniture to somebody and then lease it  back?  What's the -- what is the financial benefit of doing that?

A.  To raise cash.

Q.  There you go.  Okay.  And you didn't have a  problem with them raising cash because you were -- your  hope was, by selling the furniture and leasing it back, because you were hoping that they could use that money to  pay down the 20 million dollar loan, correct?

A.  Not directly.

MR. GIBSON: Objection; form.

Q.  (BY MR. DUNCAN)  You said not directly?

A.  I didn't understand that they would use that cash to pay down our loan.  They didn't pay down our loan, they would -- John would pay down our loan.

Q.  All right.  Let's look at the big picture here. Amegy has a lien on collateral including this furniture, correct?

A.  Yes.

**Denison Excerpt 41**  (Denison 2004 Examination, Volume 1, Page 17, Line 11 to Page 18, Line 8 followed by Denison 2004 Examination, Volume 1, Page 18, Line 17 to Page 19, Line 15.)

Exhibit B

Q. Okay. So early to mid '90s, you had a prior business relationship with Royce and you dealt with Mr. Speer in relationship to that, is that what you're saying?

A. Correct.

Q. And this had to do with they had certain depository accounts at Amegy?

MR. SHURN: Objection; form.

A. Correct. It was Southwest Bank of Texas at the time but, correct.

Q. (BY MR. DUNCAN) Right. Right. Okay. And when you have depository accounts at a bank that you're working at, is that something that you monitor to see what the levels are or what do you do when you have accounts there as the person in charge?

A. Can you be more specific?

Q. Right. Well, you say that you had a prior business relationship with Mr. Speer through Royce having its depository accounts. When you have a client's depository account at your bank, what do you do in order to maintain the relationship with the client or to service that account? Do you monitor the accounts?

A. Yes.

*************************

Q. All right. What do you monitor then, tell me the monitoring that you typically do on -- if you have depository accounts of a client at Amegy.

A. We would monitor past due -- or overdraft activity.

Q. Okay. What else?

A. I would say levels of deposits in general.

Q. Okay. All right. Anything else?

A. That's probably about it.

Q. And why do you monitor?

A. Why do I monitor –

Q. The depository accounts that are at Amegy Bank.

A. Can you be more specific?

Q. Well, what's the purpose of monitoring the accounts?

A. Mainly to watch for red flags.

Q. And what would an indication of a red flag be?

A. A steep decrease.

Q. Okay. So if their deposit -- their average deposits are decreasing over time, you want to try to address whatever that issue might be, whether it's they're taking their business somewhere else or the business may not be doing as well or something along those lines?

A. Yes.

Back to Breach of Fiduciary Duty

**Denison Excerpt 42** (Denison 2004 Examination, Volume 1, Page 187, Line 12 to Page 188, Line 8.)

Q. Now, you dealt with Mr. Speer in regards to the Westwood Gardens Subdivision and the MUD receivables, correct?

MR. SHURN: Objection; form.

Q. (BY MR. DUNCAN) And these Westwood Gardens and its MUD receivables were previously owned by Park Lake Communities, right?

A. Yes.

Q. And Westwood Gardens and its MUD reimbursements were ultimately acquired by a company called Vestalia, correct?

A. Correct.

Q. And from your dealings with Westwood Gardens, you understood that Park Lake's general partner was Hammersmith group, Inc.?

A. I believe that's correct.

Q. And John Speer was the president of Hammersmith Group, correct?

A. I believe so.

Q And John Speer, in essence, controlled Hammersmith Group, he owned it and controlled it?

A. I believe so.

***************************

Back to Breach of Fiduciary Duty

**Denison Excerpt 43** (Denison 2004 Examination, Volume 1, Page 188, Line 13 to Line 24 followed by Denison 2004 Examination, Volume 1, Page 189, Line 22 to Page 190, Line 1.)

Q. Okay. You understood that John Speers was the general partner -- represented the general partner of Park Lake?

A. I believe that's true.

Q. And he is also an officer or the -- he was the president and CEO Of Park Lake?

A. I don't recall his exact title, but close.

Q. All right. And Vestalia was another John Speer company, correct?

A. John and investors, yes.

Q. All right. Who were the other investors?

A. Family members and family trusts.

******************************

Q. (BY MR. DUNCAN) Okay. You don't -- you have no idea or do you have some understanding of who Park Lake's customers were?

A. I would say mainly Royce, but I don't know if it was exclusively Royce.

Back to Westwood Gardens Facts Royce Homes primary purchaser from Park Lake
Back to Westwood Gardens Facts Speer was officer of Park Lake

**Denison Excerpt 44** (Denison 2004 Examination, Volume 1, Page 190, Line 12 to Page 191, Line 18.)

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd
Page 349
Back to Table of Contents

Exhibit B

Q.      (BY MR. DUNCAN)  Okay.  Let's take a look at  Exhibit 133.  Is it true that Amegy
        retained an appraiser  to value the Westwood Gardens lots and MUD receivables?

A.      Yes.

Q.      And is this a copy of the appraisal obtained by Amegy?

A.      I believe so, yes.

Q.      And if you could turn to, on Exhibit 133, Bate No. 38613.

A.      I'm sorry.  What was that number again?

Q.      38613, it's an Amegy number.

A.      Okay.

Q.      Does that appear to be a description of the lots subject to the appraisal?

A.      Yes.

Q.      All right.  And the tracts were developed into 252 single family residential lots
        known as Westwood  Gardens, right?

A.      Yes, with 163 remaining.

Q.      Right.  There was 163 lots out of the 252 remaining?

A.      Correct.

Q.      And these are the lots that were ultimately transferred to Vestalia, correct?

A.      Vestalia purchased them, yes.

Q       And these were the ones that were previously owned by Park Lake?

A.      Yes.

Q.      All right.  And the original tract, the 51.66  acres were acquired by Park Lake with
        a loan  from Wachovia  Bank; is that right?

A.      Yes.

Back to Westwood Gardens Facts

Exhibit B

**Denison Excerpt 45** (Denison 2004 Examination, Volume 1, Page 192, Line 5 to Page 194, Line 1.)

Q.     Okay.  If you could turn to Bate No. 38617 of Exhibit 133.  That was 38617.  Do you see that?

A     Yes.

Q.     Okay.  If you could read that first paragraph.

A.     "The subject 163 lots of 252 total lots within the subject subdivision were developed by Park Lake Communities LP and development was purportedly completed by January 2008? Originally, Royce Homes was contracted to purchase all 252 lots in the subject subdivision to construct their starter Espree Homes product line.  Royce Homes began taking lots in March 2008, and the last take down occurred in July 2008.  Royce Homes reportedly defaulted on their takedown contract and they abandoned several partially built homes.  Royce Homes currently owns 350 foot vacant developed lots in Section 1 and 634 foot vacant built lots in Section 2, in addition to several other partially built homes (approximately 20 to 30 between the two sections.)"

Q.     Okay.  And basically what we have is a description of the tracts that were previously owned by Park Lake on or about July of 2008, right?  This is the tracts that we're talking about?

A.     Correct.

Q.     Okay.  And then we have MUD receivables.  And are MUD receivables typically a portion of the developers' costs for installing utilities such as water, sewer, and storm -- well, sanitary sewers and storm sewers?

A.     Yes.

Q.     Okay.  And Park Lake owned a MUD reimbursement owed to it by the West Harris County Municipal Utility District Number 11; is that correct?

A.     I believe that's correct.

Q.     Okay.  And this MUD receivable was related to the Westwood Gardens, right?

A.     Correct.

Q.     And Westwood Gardens was expecting to receive a MUD reimbursement for its

Exhibit B

MUD related improvements in the approximate amount of about 2.9 million?

A.     That's what the appraiser valued them at, yes.

Q.     Okay.

A.     I'm sorry.  2.66.

Q.     What he did there was, he discounted it; is that correct?

A.     Correct.

Q.     But the actual reimbursement was supposed to be 2.9 million?

A.     Thereabouts, I believe, yes.

Back to Westwood Gardens Facts

**Denison Excerpt 46** (Denison 2004 Examination, Volume 1, Page 199, Line 17 to Page 200, Line 24.)

Q.     Okay.  Let me just summarize and see if we can  come to an agreement.  What happened here is, Park Lake --I'm sorry -- Amegy purchased a note owed to Wachovia Bank  by Park Lake, right?

A.     Correct.

Q.     And then Amegy then posted the -- a foreclosure of the Westwood Gardens property and receivables, which was owned by Park Lake?

A      Correct.

Q.     This -- and that foreclosure included the MUD  receivables for Westwood Gardens?

A.     Correct.

Q.     And Mr. Speers set up a new company called Vestalia?

A.     Correct.

Q.     And Amegy provided Mr. Speer a loan to purchase the Westwood Garden lots at the foreclosure sale?

MR. GIBSON:  Objection; form.

Exhibit B

A. Provide -- provided a loan to Vestalia.

Q. (BY MR. DUNCAN) Okay. For Mr. Speer's company to purchase the property?

MR. GIBSON: Objection; form.

A. Mr. Speer and others, yes.

Q. (BY MR. DUNCAN) And in addition to the lots, Mr. Speer would receive the approximate 2.9 million in MUD receivables?

MR. GIBSON: Objection; form.

A. Vestalia would.

Q. (BY MR. DUNCAN) Okay. Now, according to Amegy's appraisal of the real estate and the MUD reimbursements, the property had a value in excess of five million dollars; is that correct?

A. The property along with the MUD receivables, yes.

**Denison Excerpt 47** (Denison 2004 Examination, Volume 1, Page 202, Line 8 to Page 203, Line 1.)

Q. All right. All right. Turn to the second page on Exhibit 135. And this is an e-mail from you to Mr. Speers dated August 28th, 2008, correct?

A. Yes.

Q. And it's regarding Westwood Gardens?

A. Regarding Vestalia.

Q. Right. You wanted -- you're inquiring into the new company which is eventually going to be called Vestalia. It's called New Corp here or NewCo?

A. Yes.

Q. All right. And Vestalia is going to be a homebuilder, right?

A. Yes.

Q.     And it was created in part to build homes in Westwood Gardens?

A.     Yes.

Q.     Just like Royce Homes had done prior to this point?

A.     Royce had built homes in Westwood Gardens.

Back to Westwood Gardens Facts

**Denison Excerpt 48** (Denison 2004 Examination, Volume 1, Page 205, Line 11 to Page 209, Line 18.)

Q.     Okay.  Now, on 9/2 of 2008, Mr. Speer is saying, "If you have time, I think we need to get together and work out details so we can get going.  This would be a big opportunity for us to miss," do you see that?

A.     Yes.

Q.     All right.  So he's saying this is a big opportunity for us to miss, correct?

       MR. SHURN:  Objection; form.

       MR. GIBSON:  Objection; form.

A      That's what he says.

Q.     (BY MR. DUNCAN)  All right.  What is your understanding of "this opportunity"?

A.     My understanding was that Wachovia was willing to sell the note at a discount, and that was an opportunity.

Q.     Okay.  And "it was an opportunity for us," and I assume he's meaning Amegy and Mr. Speer; is that correct?

       MR. GIBSON:  Objection; form.

A.     I don't know why he would think that, but we were now September of 2008 in clear work-out mode.

Q.     (BY MR. DUNCAN)  Okay.  Explain to me what you meant by that.

A      The company was closing or had closed, we had, I think, five million dollars left outstanding, plus we had a million dollars unsecured lent to Royce that was the

Exhibit B

residual of the letter of credit transaction, and we wanted to know how we were going to get repaid.

Q. Okay. So you're -- you had this five million left on the 20 million dollar note?

A. Yes.

Q. And you had 975,000 still owed under the letter of credit through the Holigan transaction; is that correct?

A. Correct.

Q. All right. And there was an opportunity here, is what Mr. Speer was telling you, to take care of those particular debts?

A. Not to take care of them, but to buy a note at a discount from a lender who wanted to sell it.

Q. And Mr. Speer was presenting you with this opportunity?

A. Yes.

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

Q. (BY MR. DUNCAN) And how is that going to benefit him -- you're saying -- or he's saying, I guess, it's going to benefit both of you by doing this deal; is that correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. In terms of how we analyzed it, it would provide him a means for income that could eventually repay the debts he owed us.

Q. (BY MR. DUNCAN) And he could use the collateral, the equity that was in the Park Lake asset, to reduce the five million dollar loan for one thing, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A.    Potentially.

Q.    (BY MR. DUNCAN)  And you could -- you have a debt that's in Royce Homes, L.P., that is defunct right now, right?

A.    Yes.

Q.    And this would give you an opportunity to figure out a way to get that particular debt paid?

A.    Potentially, yes.

Q.    Okay.  Because if you -- if that $975,000 debt was left in Royce Homes, you would basically have to either share with the remaining creditors in Park -- in Royce Homes or probably not get anything on that debt; is that right?

      MR. GIBSON:  Objection; form.

      MR. SHURN:  Objection; form.

A.    We were an unsecured creditor to Royce Homes, yes.

Q.    (BY MR. DUNCAN)  Okay.  So you were pretty -- in  pretty bad shape on the 975?

      MR. GIBSON:  Objection form.

      MR. SHURN:  Objection; form.

A.    We were an unsecured creditor of Royce Homes.

Q.    (BY MR. DUNCAN)  Okay.  Let's take a look at Exhibit 136.

      (Marked Denison Exhibit No. 136.)

Q     (BY MR. DUNCAN)  All right.  We're looking at Exhibit 136 and that is dated September 8th of 2008, correct?

A.    Yes.

Q.    And the title is "Subject to Credit Committee Approval"?

A.    Yes.

Q.    Now, we recall in Exhibit 135 we just looked at, there was talk about a big

Exhibit B

opportunity for Mr. Speer and for Amegy Bank, correct?

MR. GIBSON: Objection; form.

A. That's what he called it, yes.

Q. (BY MR. DUNCAN) Okay. All right. Now, between Exhibit -- Exhibit [1]35[126] was on September 2nd of 2008 and you have this memo on September 8th of 2008, correct?

A. Correct.

Q. Between September 2nd of 2008 and September 8th of 2008, you and Mr. Speer discussed the opportunity available to Mr. Speer and Amegy, correct?

A. We discussed a potential transaction, yes.

Q. All right. And Exhibit 136 is an internal memorandum to Amegy's credit transition committee discussing a work-out of Speer's personal 20 million dollar loan balance using Park Lake's assets?

A. No. The loan balance was four million nine at the time, the original amount was 20 million.

*************************

Back to Westwood Gardens Facts

**Denison Excerpt 49** (Denison 2004 Examination, Volume 1, Page 210, Line 3 to Line 24.)

Q. (BY MR. DUNCAN) Okay. Well, we look at the subject of the memo on the first page and there's a part where it says John Speer, Royce buyout loan, correct?

A. Correct.

Q. And the subject of the whole memorandum is Speer Royce work-out plan, right?

A. That's what the subject line says, yes.

Q. Okay. And the Royce -- the John Speer Royce buyout loan, is that the 20 million

[126] The transcript refers to Exhibit 35. Actually, it is Exhibit 135 being discussed.

Exhibit B

dollar loan that we've been speaking of?

A.     The original 20 million dollar loan.

Q.     And it states "the current principal balance is 4.9 million with 100,000 principal plus interest due monthly.  This loan is secured by an assignment of stock of Royce Homes.  Royce Homes is currently in liquidation  and the stock has lost its entire value."  Do you see  that?

A.     Yes.

Q.     So since Royce Homes, L.P., was in liquidation, there was a concern that the 20 million dollar loan was not going to be repaid; is that correct?

A.     Yes.

Back to Westwood Gardens Facts

**Denison Excerpt 50** (Denison 2004 Examination, Volume 1, Page 213, Line 21 to Page 215, Line 18.)

Q.     (BY MR. DUNCAN)   All right.  We're on  Exhibit 136, go to Page No. 2, and at the top it's -- the title is "NewCo Proposed Credit Facility," correct?

A.     Correct.

Q.     And we know NewCo became Vestalia, didn't it?

A.     Yes.

Q.     And that was Mr. Speer's new company?

MR. SHURN:  Objection; form.

MR. GIBSON:  Objection; form.

A.     Mr. Speer and others, yes.

Q.     (BY MR. DUNCAN)  Yeah.  And the -- this is  outlining the plan to realize taking the Park Lake assets for the benefit of Mr. Speer and Amegy, right; these are the things they were planning on doing with those particular assets?

MR. SHURN:  Objection; form.

Exhibit B

MR. GIBSON: Objection; form.

A. That's an outline of a potential plan, yes.

Q. (BY MR. DUNCAN) Okay. And what you're -- it says here is there's going to be a three and a half million dollar loan; at that point, it was going to be three and a half million dollars to purchase 163 lots in Westwood Gardens from Royce Homes; is that correct?

A. Yes. No. It says from Royce, which is a typo, should have said Park Lake. It says that but it's a typo.

Q. Got it. And then we have Amegy is going to advance -- Amegy's advance would fund the 3.1 million towards the lot purchase and then you'd have a $270,000 interest reserve, correct?

A. Yes.

Q. And the interest reserve would be until Mr. Speer got the company up and going, he could use that money to service the loan?

A. Yes.

Q. That's the general concept of an interest reserve?

A. Yes.

Q. Okay. And the current loan at Wachovia was virtually free of any liens; it looked like there was maybe a $15,000 lien that might have existed?

A. Correct.

Q. Okay.

A. Other than the first lien.

Q. Right, right. Yeah. And what Amegy was proposing was to purchase the Wachovia note and foreclose on the collateral at which point Vestalia would purchase the assets?

A. Correct.

Back to Westwood Gardens Facts

**Denison Excerpt 51** (Denison 2004 Examination, Volume 1, Page 216, Line 12 to Page 218, Line 12.)

Q. Okay. Now, what we're saying -- what you're saying in your memo is that Amegy would benefit from your and Mr. Speer's plan by having this 2.9 million dollar MUD receivable which should have been available in early 2009, because you could use that to pay down the -- pay off, basically, the $975,000 loan for one thing, right?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. It was the plan that was brought to us and we don't know when or if the MUD receivables would come to be paid.

Q. (BY MR. DUNCAN) But you're understanding was these MUD receivables were owed, correct?

A. Yes.

Q. And at some point, they would realize that 2.9 million dollars, right?

A. Hopefully.

Q. And using those MUD receivables, you could pay off this $975,000 loan that was owed by Royce Homes, L.P.?

A. Yes.

Q. Okay.

A. Well, not directly. Vestalia agreed to take on that obligation on its balance sheet and it would potentially pay it off from Vestalia. Royce Homes would be free of that $975,000 debt.

Q. Okay. So in other words, for this to work, for your plan to work, Vestalia would have to assume the $975,000 loan previously in the name of Royce Homes?

A. Pay it off with a new loan to Vestalia.

Q. Right. They would basically take on that obligation through a new loan?

A. Yes.

Q. All right. And the idea was that the 2.9 million dollar MUD receivable could be used to pay off that obligation which was the 975,000?

A. Could be, yes.

Q. All right. And in addition to that, you're going to have John use the 2.9 million MUD receivables to pay down his personal loan, the 20 million dollar loan?

A. Potentially, if it had not been paid off prior.

Q. Okay. And you understood you had downgraded the John Speer loan to -- what was it, what level, substandard?

A. At this point, substandard.

Q. And I guess the -- where did you have the Royce 975 at, what grade did you have on that 975?

A. It was also substandard.

Q. Okay. So that was on the same level -- the $975,000 loan from Royce Homes was at the same level of rating as the 20 million dollar loan?

A. Yes.

Back to Westwood Gardens Facts

**Denison Excerpt 52** (Denison 2004 Examination, Volume 1, Page 222, Line 12 to Page 223, Line 2.)

Q. Okay. Let's go to Page 3 of Exhibit 136 and that's Bate No. 79887. Now, there were certain limitations Amegy was going to impose on Vestalia, is that correct, if you look at the third paragraph?

A. Correct.

Q. And in the third paragraph, Vestalia must use the Park Lake assets and Amegy loan to repay the 975, for one thing?

A Correct.

Q. Okay. And it must use the Park Lake MUD receivables to pay at least one point seven five million against the 20 million dollar personal loan, the buyout loan,

correct?

A. If the sale of his house hadn't occurred first.

Q. Yeah.

A. Or if he had not paid it off from other sources.

Back to Westwood Gardens Facts

**Denison Excerpt 53** (Denison 2004 Examination, Volume 2, Page 93, Line 4 to Line 15.)

Q. Now, let's go through the Westwood transaction. Between August of 2008 and March of 2009, Amegy and Mr. Speer agreed to, one, Mr. Speer or his family would set up this new company called Vestalia, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. Correct.

Q. BY MR. DUNCAN) All right. Amegy would buy the Wachovia note on the Westwood Gardens at a discount?

MR. GIBSON: Objection form.

MR. SHURN: Objection; form.

A. Correct.

Back to Westwood Gardens Facts

**Denison Excerpt 54** (Denison 2004 Examination, Volume 2, Page 98, Line 22 to Page 99, Line 14.)

Q. (BY MR. DUNCAN) Well, Royce -- Royce Homes, L.P. was a homebuilder, correct?

A. Correct.

Q. And that's what Vestalia does now?

A. Vestalia is a homebuilder.

Q And they're using the same lots to build homes on that Royce Homes did previously?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

Q. (BY MR. DUNCAN) The Westwood lots?

A. They're building on Westwood lots and others.

Q. Okay. And Amegy knew that Speers was the -- the controlling person, the president, the general -- represented the general partner for Park Lake, correct?

A. Yes.

Q. Okay. And Amegy knew that Mr. Speer controlled Royce Homes, L.P., and its general --

A. Yes.

Back to Westwood Gardens Facts

**Denison Excerpt 55** (Denison 2004 Examination, Volume 1, Page 221, Line 4 to Line 12.)

Q. (BY MR. DUNCAN) All right. But he could do the transaction because Amegy was involved in participating in the transaction?

A. Yes.

Q. Okay. And obviously Amegy could not do the Westwood transaction without Mr. Speers being involved?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. I don't think we would have done it.

Back to Westwood Gardens Facts

**Denison Excerpt 56** (Denison 2004 Examination, Volume 1, Page 197, Line 1 to Line 25.)

Q. (BY MR. DUNCAN) Okay. If you can take a look at Exhibit 134, and this appears to be a financial statement as of August 31st of 2008 provided to Amegy Bank; is that correct?

A. Yes.

Q. All right. And as of January 31st, 2008, it appears that Mr. Speer is valuing his investment in Park Lake at zero dollars; is that right?

MR. GIBSON: Objection; form.

A. That's what he's showing.

Q. (BY MR. DUNCAN) Okay. Now, Park Lake, we -- we, I believe, and I think you agree, was the main customer, if not the only customer, of Royce Homes, L.P., correct?

MR. GIBSON: Objection; form.

A. I would say main customer.

Q. (BY MR. DUNCAN) All right.

A. I don't know if it was the only one.

Q. All right. And at this point in time, in August 31st of 2008, Royce Homes was, in essence, shut down; is that correct?

A. August, September, I don't know exactly when, but in this time frame, yes.

Q. Okay. And Royce Homes obviously was no longer purchasing lots from Park Lake?

A. I believe that to be true.

Back to Westwood Gardens Facts

**Denison Excerpt 57** (Denison 2004 Examination, Volume 2, Page 6, Line 11 to Page 14, Line 3.)

(Marked Denison Exhibit No. 156.)

Q. (BY MR. DUNCAN) All right. If you'd take a look at Exhibit 156, and at the bottom of 156, this appears to be an e-mail -- all right -- there's a number of e-mails. This is an e-mail chain that originates from Nick Sorenson to -- all right. Hold on. Let's go to Page 2, let's start on Page 2 of Exhibit 156. And this is an e-mail from Anna Mayer, to Nick Sorensen and CC John Speer, and it appears to be a list of outstanding items, is that correct, and you are also a recipient of this e-mail.

A. Yes. That's what this says, yes.

Q. All right. And it says "Nick and John, below is a list of items which we need to receive and review. Please send them at your earliest convenience." And this is on September 19th of 2008; is that correct?

A. Yes.

Q. All right. And who is Ann Mayer?

A. Anna Mayer.

Q. Anna Mayer.

A. She's an attorney at Nathan Sommers.

Q. And she was representing Amegy Bank; is that correct?

A. Correct.

Q. And what she's doing is, she's sending to the attorney for John Speer a request for information; is that correct?

A. Yes.

Q. All right. And you were CCed on this particular request?

A. That's what this shows, yes.

Q. And if we look at the list of items, it looks like there is about 22 different items that they -- that Amegy Bank's attorney requested from Mr. Speer; is that right.

A. Correct.

Q. And number two on the list is Park Lake's financial statement for the past two years,

Exhibit B

is that one  item?

A.      That's what this says, yes.

Q.      And then if we look at Number 14 on the list, it says "Information regarding advances and loans between Park Lake and Royce Homes in the last year," correct?

A.      That's what this says.

Q.      And then another one on the list is Number 16,  which is the Withers Group, Inc., financial statements for  the past two years.

A.      That's what this says.

Q.      All right.  So amongst the information that Amegy Bank's attorney is requesting, is the financials for Park Lake and how much money is owed between Park Lake and Royce Homes, L.P.; is that correct?

A.      That's one of the items that was requested.

Q.      All right.  Okay.  If we can take a look at  Exhibit 137.

       (Marked Denison Exhibit No. 137.)

Q.      (BY MR. DUNCAN)  All right.  On the first page of  Exhibit 137, again, this is a e-mail from Anna Mayer to Mr. -- and that's Amegy Bank's counsel, right?

A.      Yes.

Q.       -- to Mr. Speer and his counsel; is that correct?

A.      I believe that's correct.  I don't recognize all  the names, but I believe that's correct.

Q.      Okay.  All right.  And again, we're dealing with  Speer's list of outstanding items, correct?

A.      That's what this says or mine says.

Q.      Now, number five on the list of outstanding items, what is that one, if you could read?

A.      You'd like me to read it?

Q.      Yeah.

Exhibit B

A. "Please confirm if Park Lake owes Royce Homes any money, what was the date of their last transaction."

Q. All right. So it appears that Amegy is concerned about whether Park Lake owes any money to Royce Homes, L.P., correct?

MR. GIBSON: Objection; form.

A. I don't know if we would characterize it as concern, it's just asking a question.

Q. (BY MR. DUNCAN) Okay. And do you know why they were asking that question?

A. No.

Q. Now, let's take a look at Exhibits 138 and 139.

(Marked Denison Exhibit Nos. 138 and 139.)

(Discussion off the record.)

Q. (BY MR. DUNCAN) All right. If you could take a look at Exhibit 138, if you look at the bottom of Exhibit 138, this is an e-mail from John Speer to you; is that correct?

A. That's what this says.

Q. And the date is 9/25 of 2008, correct?

A. Says 9/26 of 2008.

Q. Okay. 9/26 of 2008. And the subject is Park Lake financials and N/P to Royce, right?

A. That's what this say.

Q. And N/P would be notes payable to Royce?

A. I would think so.

Q. Okay. And the e-mail, if you could read that in.

A. "Chris, here are Park Lake's financials. I will forward tax returns next. John."

Q. Okay. And it appears that that was forwarded on to other people in relationship to

Amegy, correct?  It was -- let's see.  You send it to the attorney and then Ann Jackson -- who is Ann Jackson?

A.    Ann is a lady in my department.

Q.    Okay.  All right.  And then attached, it appears that we have financial statements, is that correct, and it's -- in the name Consolidated Land Company, but then if you look at it, we have Park Lake Community.  Is it your understanding that Park Lake's previous name was Consolidated Land Company?

A.    I don't know.

Q.    You don't know.  All right.  But apparently, what John Speer is sending you is, he's saying here are the Park Lake financials, right?

A.    That's what he's saying in the e-mail, yes.

Q.    Okay.  And if you recall in our earlier e-mails,  a couple of days earlier, these were requested by Amegy; is that correct?

A.    Through our attorney, yes.

    MR. GIBSON:        Mike, these set of financials don't have Bates labels on them.
                      Are they --

    MR. DUNCAN:       Oh, they got cut off.  Let me tell you what the Bate No. labels
                      are.  It is Amegy's Bate No. 058307-002 through Amegy
                      58312-002.

    MR. GIBSON: Thank you.

Q.    BY MR. DUNCAN)  All right.  The next item I'd like you to take a look at is Exhibit 139.  All right.  Exhibit 139 is an e-mail from John Speer to you; is that correct?

A.    That's what this say.

Q.    And that's a day later from this Exhibit 138 --  well, it's on the same date, September 26th of 2008, correct?

A.    Correct.

Q.    And it says "e-mailing PLC 2069/19/'06," right?

A.    That's what it says.

Exhibit B

Q. And does it appear that what Mr. Speer -- and let me just make a clarification. The whole tax return was attached and what I did was, I just took excerpts, the applicable pages that we want to look at in the tax return. All right. So apparently what Mr. Speer was sending you was the Park Lake tax return that Amegy had requested, correct?

A. That's -- yes.

Q. All right. All right. What I want you to do -- and again, Exhibit 139 is -- the attachment is an excerpt because it was a full tax return and I -- there's only a certain part that I want to talk to you about. There was a request from Amegy Bank asking what money was owed between Park Lake to Royce Homes, correct?

A. Through our attorney, yes.

Q. All right. If we turn to Page 3 of Exhibit 139, this is apparently the '06 tax return, correct?

A. That's what this says.

Q. All right. How much money is owed by Park Lake to Royce Homes, L.P., according to the tax return as of the end of 2006?

A. This says N/P-Royce Homes, L.P., 12,314,816.

Q. Okay. So apparently at the end of 2006, Park Lake owed -- and I guess N/P is notes payable, is that the -- what you would think that would mean?

A. Yes.

MR. SHURN: Objection; form.

Q. (BY MR. DUNCAN) Okay. And it's under current liabilities on the tax return, correct? It's the title right above where it says Royce Homes?

A. That's what this says, yes.

Q. All right. So at the end of 2006, according to the tax returns of Park Lake, Park Lake owes Royce Homes $12,314,816, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 369
Back to Table of Contents

Exhibit B

A. That's what this says. That's what this says.

Q. (BY MR. DUNCAN) Okay. So what Mr. Speer appears to be informing Amegy in response to its request for information on debts owed between Park Lake and Royce Homes is that there was over 12 million dollars owed to Royce Homes by Park Lake at the end of 2006?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. That's what this says.

Q. (BY MR. DUNCAN) Okay. And if we go back to Exhibit 138 and if we go to the second to last page of Exhibit 138, it appears that there's a note payable for $4,495,869.31 as of May 31st of 2008; is that correct?

A. That's what this says.

Q. And this document was supplied to you or to Amegy Bank in response to the Amegy Bank's attorney's request for information that would show how much money was owed between Park Lake and Royce Homes; is that correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. That appears to be the case.

Back to Westwood Gardens Facts

**Denison Excerpt 58** (Denison 2004 Examination, Volume 2, Page 18, Line 7 to Line 24.)

Q. Okay. Are you aware of any conversations or any requests by Amegy as to how to set up or how to structure, who's the owners, who's going to -- how the company is to be capitalized, any discussions like that between Amegy and Mr. Speer?

A. We may have had some if legal counsel advised us to do so.

Q. I don't want to know anything about what you and your counselor are talking about. I'm just asking you as the officer in charge of the Westwood Gardens transaction for Amegy, we understand that, I'm asking you?

A. Yes.

Q. And my question is: Did Amegy request or require Mr. Speer to set up Vestalia in a manner in which Amegy wanted it set up?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. We may have, based on advice of legal counsel.

Back to Westwood Gardens Facts

**Denison Excerpt 59** (Denison 2004 Examination, Volume 2, Page 19, Line 13 to Page 20, Line 24.)

(Marked Denison Exhibit No. 141.)

Q. (BY MR. DUNCAN) If you could go to the third page of Exhibit 141, and this is Bate Stamp Amegy 43728- 002. And the e-mail is from Ann Jacobs who is Amegy's counsel, correct?

A. Correct.

Q. And it is to counsel for Mr. Speer; is that correct?

A. I believe so.

Q. All right. And the subject is "Amegy's response to open items," correct?

A. Yes.

Q. And it is sent 9/25 of 2008, correct?

A. Yes, that's what this says.

Q. All right. Let's start at the top. If you could just read and stop after item number one.

A. "Nick and David, we spoke with Chris and Dale after our call. Below are Amegy's preferences with respect to several open issues. One, Amegy would strongly prefer that John not be an owner of NewCo."

Exhibit B

Q. Why?

A That's a legal question. I'd have to defer to legal counsel.

Q. Well, what was your understanding? You were the person in charge of this particular transaction for Amegy. What is your understanding of why Amegy did not want John to be an owner of New -- of Vestalia?

A. That's a legal question I'd have to defer to counsel.

Q. I'm not asking for some legal opinion. I'm asking for you, as the representative, the person in charge of this transaction for Amegy Bank, for the Westwood transaction, why did Amegy not want John to be an owner of NewCorp -- of Vestalia?

A. That's something legal counsel advised us on.

Q. And you have no idea why that was?

A. I don't recall exactly.

Back to Westwood Gardens Facts

**Denison Excerpt 60** (Denison 2004 Examination, Volume 2, Page 22, Line 9 to Page 23, Line 24.)

Q. Okay. You understand. But is it a typical situation where Amegy will say who they prefer to be the owner of the company?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. No. But this is not a typical transaction.

Q. (BY MR. DUNCAN) And why is this not a typical transaction?

A. Because we're rarely involved in a start-up company.

Q. Okay.

A. Most of the financing we provide are to existing companies that are already formed.

Q. Okay. So that's why this transaction is not typical, is because you have a start-up

company, and is that the only untypical item about the Westwood transaction?

MR. GIBSON: Objection; form.

A. No. The other thing I would say is that it's a workout.

Q. (BY MR. DUNCAN) Okay. And it's a workout taking assets from a company that is controlled by Mr. Speer and putting it into another company that's controlled by Mr. Speer, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. Correct.

Q. (BY MR. DUNCAN) Okay. And this company, the Park Lake, owed apparently Royce Homes a substantial amount of money, is what it appears, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. That's what those documents showed, yes.

Q. (BY MR. DUNCAN) Okay. And the asset that is being transferred from Park Lake to Vestalia appears to have substantial equity in it; is that correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. That asset was financed by another lender.

Q. (BY MR. DUNCAN) Okay.

A. And it appeared to have equity in it, yes.

Back to Westwood Gardens Facts

**Denison Excerpt 61** (Denison 2004 Examination, Volume 2, Page 25, Line 19 to Page 28, Line 5 followed by Denison 2004 Examination, Volume 2, Page 30, Line 2 to Line 11.)

Q. All right. Well, let's see -- let's take a look at this then. All right. If you take a look at Exhibit No. 141, Page 3, item five in the e-mail, and if you could read that.

A. "Amegy does not want the equity to come from Hammersmith. Amegy would consider making a loan to a third person with new collateral to fund the equity."

Q. Okay. Explain to me why you were -- you wanted to make the loan to a third party, why not just make it to Mr. Speer?

A. I don't know.

Q. You don't know. What would be the purpose of trying to maybe distance Mr. Speer from the transaction?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. I believe that's a legal issue and I don't understand it fully.

Q. (BY MR. DUNCAN) Well, have you ever heard of a strawman transaction?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. I haven't heard that term.

Q. (BY MR. DUNCAN) Okay. Where you have -- since you don't want Mr. Spear -- it looks like you're trying to distance Mr. Speer from this transaction, is that what it looks like here?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. I don't know.

Q. (BY MR. DUNCAN) Well, what is your understanding of why Amegy would consider making a loan to a third person with new collateral to fund the equity?

A. I don't recall that and that didn't happen, so I don't know.

Q. Okay. What happened was, the -- Mr. Speer set up a new company, Vestalia, right?

A. Correct.

Q. And the loan was actually made to Vestalia, correct?

A. Which loan?

Q. The loan to acquire the Westwood Gardens property and the MUD receivables.

A. Correct.

Q. And you just told me earlier that you didn't know if Mr. Speer was going to show up to the foreclosure sale?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

Q. (BY MR. DUNCAN) Well, I'm trying to get a clarification. Is it your testimony that you didn't know if Mr. Speer was going to show up to the foreclosure sale until that morning of the sale?

A. Correct. We knew it was a possibility but we were prepared to foreclose directly if he didn't show up. And in fact, he didn't show up.

Q. Who showed up?

A. An employee of Vestalia.

Q. Okay. And in fact, didn't you have a loan in place already to fund this thing before the sale?

A. We were prepared for that possibility, but we didn't know until that day what their plans would be.

Q. Okay. All right. We'll look at this. All right.

*************************

Q. (BY MR. DUNCAN) All right. If you could take a look at Exhibit 153, and this appears to be an e-mail between Mr. Speer and his counsel and -- is that correct?

A. Yes, it appears to be so.

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 375
Back to Table of Contents

Exhibit B

Q. And this deals -- the subject matter is "Speer Amegy," correct?

A. That's what this says.

Q. And the first -- this appears to be items in which Amegy is requesting from Mr. Speer; is that correct?

A. That appears to be correct, yes.

Back to Westwood Gardens Facts

**Denison Excerpt 62** (Denison 2004 Examination, Volume 2, Page 31, Line 9 to Page 36, Line 13.)

Q. And then again, we have that item under number four, Park Lake, they have requested financials and income returns for the last two year, correct?

A. That's what it says.

Q. All right. And if we go to Page 2 of Exhibit 153, item number seven, can you read that one in?

A. "NewCo Structure; NewCo will be a Texas LLC, it will be manager managed. We intend to make you the manager or you and Donna the managers. Amegy does not want you to be an owner. NewCo will be owned by your wife, Donna, and a certain" -- "and by certain of your children. Amegy is okay with you having a salary and bonus package. Also, they are okay with you changing" -- "charging NewCo a guaranty fee. You will contribute the 42 acres to NewCo; however, if you are not an owner, we have to determine what you are receiving in exchange for the contribution. The $500,000 in working capital is still being discussed."

Q. All right. Now, we're looking at Page 2 of Exhibit 153, item number 7. Again, we're running into this "Amegy does not want you to be an owner." Do you see that?

A. That's what John's counsel is saying to him.

Q. Okay. And do you have any idea where he may have gotten that impression from?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. Would have been with discussion of with our legal counsel.

Q.    (BY MR. DUNCAN)  Okay.  Again, do you have any recollection or any idea as to why Amegy does not want Mr. Speer to be an owner and they're discussing having some other third party step in to be the owner of Vestalia?

MR. GIBSON:  Objection; form.

MR. SHURN: Objection; form.

A.    I don't recall.

Q.    (BY MR. DUNCAN) And it also says that "Amegy is okay with you having a salary and bonus package." Do you recall having those discussions with Mr. Speer or anyone on his behalf?

A.    I don't recall a specific discussion in that regard.

Q.    And what is -- also "they are okay with you charging a NewCo guaranty fee."  Tell me what a guaranty fee would be.

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.    I don't recall this, so I don't know.

Q.    (BY MR. DUNCAN)  Well, you're a banker, right?

A.    Yes.

Q.    Okay.  What is a guaranty fee that someone would charge?

A.    I've never been involved in a transaction where I knew that somebody was charging a guaranty fee, as far as I know.

Q.    But you understand what a guaranty fee is, don't you?

A.    It would be a fee for guaranteeing the loan.

Q.    Okay.  So in other words, if one way to structure the deal might be where you have somebody else as the -- the stated owner of Vestalia, but you need to get some money to Mr.  Speer, and one structure that's suggested here, apparently, is that Mr. Speer could charge the company for guaranteeing the debt.  Is that kind of what it appears to be?

Exhibit B

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. This says "They're okay with you charging NewCo a guaranty fee.

Q. (BY MR. DUNCAN) And you have no idea what that means?

A I think it means what it says.

Q. Tell me what your understanding of what it says.

A. They're okay with you charging a guaranty fee.

Q. And how would that happen? How would you -- from your reading this, what's your understanding of what Amegy is okay in doing?

A. It says they are okay with you charging a guaranty fee.

Q. And would that result in basically Mr. Speer getting some money out of the transaction?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. If that were to happen, Vestalia would pay John a guaranty fee.

Q. (BY MR. DUNCAN) Okay.

A. I don't know if that happened.

Q. All right. Well, you -- didn't it ultimately come down where Mr. Speer -- what's your understanding of the present or the ownership of Vestalia, how is it set up now?

A. I'd have to see the Vestalia organizational chart, but I believe the owners include John, his wife Donna, and other family members.

Q. Okay.

A. I don't recall specific percentages without seeing it.

Q. Okay. And was Amegy okay with that structure?

Exhibit B

A.     We closed the loan, so yes.

Q.     Okay. And was that discussed on who would be the owner, ultimate owners of the company between Mr. Speer and Amegy Bank?

A.     I'm sure it was. We approved the transaction, so I'm sure it was.

Q.     Okay. All right. And do you know why it wasn't just Mr. Speer but his wife and certain of his kids were involved?

A.     That's what they elected to do.

Q.     Did it have anything to do with Amegy did not want just Mr. Speer to be the owner?

A.     I don't know.

Q.     All right. Did you have an objection to Mr. Speer being the owner of Vestalia?

       MR. GIBSON: Objection; form.

A.     I don't recall, but I do listen to legal counsel's advice.

Q.     (BY MR. DUNCAN) All right. So any objection that you might have had would have been because somebody else told you that that probably wouldn't be a good thing to do, that Mr. Speer be an owner of Vestalia?

       MR. GIBSON: Objection; form.

       MR. SHURN: Objection; form.

A.     I would have listened to legal counsel's advice at the time.

Q.     (BY MR. DUNCAN) And your legal counsel is the firm where we're sitting right now; is that right?

A.     That's correct.

Q.     Nathan Sommer?

A.     Nathan, Sommers, Jacobs

Back to Westwood Gardens Facts

Exhibit B

**Denison Excerpt 63** (Denison 2004 Examination, Volume 2, Page 37, Line 7 to Page 39, Line 17.)

Q. (BY MR. DUNCAN) But earlier you told -- yesterday you said that when Mr. Speer came to you and you were discussing the opportunity, part of the opportunity was to negotiate down the purchase price of the Wachovia note, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. To buy the note at a discount, yes.

Q. (BY MR. DUNCAN) Okay. All right. And that was so -- All right. Let's take a look at Exhibit 142. And if we start at the bottom, this is an e-mail from you to Mr. Speer; is that correct.

A. It appears to be, yes.

Q. And it involves -- the subject is Wachovia?

A. That's what this says.

Q And again, we're in January 2nd of 2009 now. And this involves the Westwood Gardens lots and MUD receivable, correct, purchasing the note that involves that?

A. Appears to be, yes.

Q. All right. And if you could read the bottom e-mail on 142, which is the e-mail from you to Mr. Speer.

A. "They're at 2,470,000, which would require about 675,000 in equity."

Q. All right. Stop there. The original note or the balance on the note was networth of three million, right?

MR. GIBSON: You're talking about the Wachovia note?

MR. DUNCAN: The Wachovia note.

A. I don't recall exactly, I'd have to see it.

Q. (BY MR. DUNCAN) Okay. Well, we'll get to that. What does Mr. Speer respond to your e-mail, which was 10:40 p.m. on 1/2 of '09?

A.      It says, "Let's try to split it with them at 2,235,000.  If we buy the note and foreclose, there is no question about the receivables.  If we wait, we have to get approval from the MUD."

Q.      All right.  And then you come back on that same day and how do you respond?

A.      "She says that 2,470,000 is as low as they will go at this point."

Q.      And then Mr. Speer responds to your e-mail and says?

A.      "That would be about 15,000 a lot which we think would be a great deal plus the receivables.  Maybe we give her a written offer for 2,300,000 and see if she turns it down."

Q.      Okay.  So what Mr. Speers is telling you, that if you purchase the note and they get -- you get the collateral, if -- you know, we get the collateral here, that the lots would be at about $15,000 per lot, right?

A.      That's what he's saying, yes.

Q.      And then on top of that, you got this 2.9 million dollar receivable, correct?

A.      Corrects.

Q.      Okay.  And that $15,000 for these lots was a great deal?

A.      That's what he's saying, yes.

Q.      And these are completed lots, right?

A.      Yes.

Back to Westwood Gardens Facts


**Denison Excerpt 64** (Denison 2004 Examination, Volume 2, Page 40, Line 16 to Page 42, Line 23.)

(Marked Denison Exhibit No. 143.)

Q.      (BY MR. DUNCAN)  Now, this is a -- Exhibit 143 is  a Amegy Bank -- Amegy Mortgage credit modification; is  that correct?

A.      Yes.

Exhibit B

Q.    And it is dated January 27th, 2009, right?

A.    Correct, sir.

Q.    And this is explaining the -- basically the Amegy Speer Westwood Gardens plan or transaction, correct?

A.    Correct.  I doubt this is the full credit  modification.  They're usually more than one page, but this would be the first page of one.

Q.    Okay.  All right.  The -- it says that the purchase price was 2,470,000; is that correct?

A.    Yes.

Q.    And we're talking about the purchase price of the Wachovia note?

A.    Correct.

Q.    And the purpose of this CA mod is to clarify the  process associated with the bulk loan to Vestalia LC approved 1/19 of '09, correct?

A.    That's what that says, yes.

Q.    And when we're talking about it's the purpose of this credit authorization modification, is that what the CA mod means?

A.    Correct.

Q.    All right.  And then it says "Amegy will purchase a note and the associated note and collateral documents  from Wachovia Bank which is currently in default," right?

A.    Correct.

Q.    And the note is currently in the name of Park Lake Community, a related entity to Royce Homes, correct?

A.    That's what it says, yes.

Q.    And the purchase price for the note will be 2,470,000, correct?

A.    Correct.

Q.    And the collateral is valued at 2,745,000 plus 2,660,000 in MUD receivable, correct?

Exhibit B

A.      Correct.

Q.      And the plan was for Amegy to foreclose on the lots and then sell them to Vestalia, correct?

A.      Correct.

Q.      All right.  So to clarify that -- what the plan was between Amegy and Speer, is to take the Park Lake -- there was 2.9 -- let's see -- 2,935,000 in equity and put that in Vestalia to be            used to reduce Mr. Speer's 20 million dollar personal loan and Royce Home, L.P.'s. Debt of 975,000, correct?

        MR. GIBSON:  Objection; form.

        MR. SHURN:  Objection; form.

A.      First to the Royce Homes 975, and then if any is remaining on the second loan, then yes.

Q.      (BY MR. DUNCAN) Okay.  So we understand that  there was close to three million dollars in equity in the collateral after paying off the underlying debt, correct?

        MR. GIBSON:  Objection; form.

        MR. SHURN:  Objection; form.

A.      Assuming the underlying debt is fully repaid, yes.

Back to Westwood Gardens Facts

**Denison Excerpt 65** (Denison 2004 Examination, Volume 2, Page 43, Line 1 to Line 15.)

Q.      (BY MR. DUNCAN) Okay.  I'd like you to take a look at Exhibit 154, and this is a document produced to us by Amegy.  And is this your handwriting?

A.      Yes.

Q.      Okay.  And these are notes -- these notes are for  your upcoming meeting with Mr. Speers to discuss the Westwood Gardens transaction, correct?

A.      These are in regard to the Westwood Gardens.  I'm not sure if it was in preparation for a meeting or just questions I had.

Exhibit B

Q.      All right.  Well, let's look at it.  Let's go through it then.  It appears what you're doing is, you're working through the mechanism for the foreclosure sale; is  that correct?

A.      Yes.

Back to Westwood Gardens

**Denison Excerpt 66** (Denison 2004 Examination, Volume 2, Page 45, Line 8 to Line 20.)

Q.      Okay.  So on 154, in the middle of the page, it  says "real property" and right below that it says "bid up to" and you have a blank there, correct?

A.      Correct.

Q.      And what you needed to do was have a dialogue with Mr. Speer to see how much that blank was going to be filled in for, right?

A.      Yes.

Q.      Okay.  And then the next thing you are going to  have to do is, you're going to have to figure out how much you're going to lend to Mr. Speer in order to facilitate making that bid?

A.      Correct.

Back to Westwood Gardens

**Denison Excerpt 67** (Denison 2004 Examination, Volume 2, Page 46, Line 6 to Page 47, Line 3.)

Q.      All right.  Got it.  Then on Exhibit 154 -- and  let me just clarify this.  At the top it says 2/17 of '09, is that the date that you prepared this apparently?

A.      Correct.

Q.      All right.  And that's Exhibit 154, correct?

A.      Correct.

Q.      All right.  At the bottom of Exhibit 154, it says "John, cashier check or authorize hold on account for" -- you read it.  It's your handwriting.

A.      I know.  "John, cashiers check or authorized hold  on account for variance between

our loan value versus how high he wants to go."

Q. Okay. So in other words, what you're trying to do is figure out the foreclosure sale was going to be coming up in the next month or so, correct?

A. Correct.

Q. And what you're trying to figure out is the mechanism, basically, the bid instructions on how this transaction is going to occur, if it occurs?

A. Correct.

Q. Okay. And you have to coordinate that with Mr. Speer obviously, correct?

A. Correct.

Back to Westwood Gardens Facts

**Denison Excerpt 68** (Denison 2004 Examination, Volume 2, Page 47, Line 16 to Line 20.)

Q. (BY MR. DUNCAN) Gotcha. So you're just basically going through the mechanism on Exhibit 154, the bid instructions of the transaction to -- to complete the Westwood Gardens transaction, correct?

A. Yes.

Back to Westwood Gardens Facts

**Denison Excerpt 69** (Denison 2004 Examination, Volume 2, Page 49, Line 19 to Page 52, Line 5.)

Q. (BY MR. DUNCAN) All right. So Amegy did foreclose on Park Lake, correct?

A. Vestalia purchased the lots at foreclosure.

Q. Okay. And if we could look at Exhibit 144. All right. Amegy did foreclose on the loan with Park Lake?

A. Yes.

Q. And the buyer at the sale was Vestalia?

A. Correct.

Q. All right. Okay. And if you could take a look at Exhibit 144, and this is an e-mail from Ann Mayer; is that correct?

A. Anna Mayer, yes.

Q. Anna Mayer. And the -- what we have is a discussion -- And this is on March 3rd of 2009, correct?

A. Correct.

Q. And this is a discussion of the bidding price and how it was calculated by Amegy up to that date; is that correct?

A. Correct.

Q. And the purchase price was calculated based on an e-mail from Ms. -- from Mayer to you dated March 3rd, 2009, with the subject being the "bid analysis," correct?

A. Correct.

Q. And what we do is, it says, "Chris, below is our bid analysis, do you have any comments, have you received the appraisal amount yet. We are planning to meet at the Family Law Center at 10:00 a.m.," correct?

A. Correct.

Q. All right. And then what we do is, we go through or Amegy went through the different costs that they had into the project, correct? The purchase price of the note and all its different costs that it had either incurred or would be incurred in the Westwood Gardens transaction.

A. Costs incurred or would be incurred, yes.

Q. And that's where it comes up with the $2,627,650.47?

A. Correct.

Q. All right. If you could turn to the next page, Page No. 2 of Exhibit No. 144, and this is Amegy's calculations of the actual bid price for the -- what we were talking about earlier, the bid instruction for Mr. Speer, correct, to determine how much he would bid at the sale?

Exhibit B

A.    How much Vestalia would bid if they elected to.

Q.    Okay.  And it shows how the money is going to be allocated also, doesn't it?

A.    Appears to, yes.

Q.    Okay.  It shows how much was going to be paid to Wachovia, correct?  Well, how much was being attributed to how much you paid for the note, the discounted amount.  Let me ask that again, clear it up.  In the middle of the page, it says "Wachovia note, principal balance," correct?

A.    Correct.

Q.    And it was in the amount of a little over 3.2 million?

A.    Correct.

Q.    And you were able to get a discount of over 750,000?

A.    Correct.

Q.    And that came up to the note purchase price of 2,470,000?

A.    That's what this says, yes.

Back to Westwood Gardens Facts

**Denison Excerpt 70** (Denison 2004 Examination, Volume 2, Page 52, Line 20 to Page 55, Line 25.)

Q.    Right.  Okay.  Well, let's take a look -- if you  could go to Page 3 and 4 of Exhibit 144, and these are Amegy 36980-002 and 36981-002, Amegy Bate Stamps.  And tell me what these items are.  You know, generally, what  are these called?

A.    The top one is a check request, the bottom one - I'm on -- I guess the third page, is a checking debit, I believe.  It's hard to read.

Q.    Okay.  And the next -- on the fourth page, what are they?

A.    Check request.  I'm sorry.  It just says  "customer copy of a checking credit."  The bottom -- it's hard to read, but I think it says "DDA checking debit withdrawal."

Q.    So we have credit -- we have credits and debits from accounts; is that correct?

Exhibit B

A.    Yes.

Q.    All right.  And if we look at it, let's see, it appears that on March 3rd of 2009, Amegy funded a loan to Vestalia in the amount of 2,058,750; is that correct?

A.    I believe so, yes.

Q.    Now, was this the date of the foreclosure sale, to your knowledge?

A.    I don't know.  I'd have to look at a calendar.

Q.    All right.

A.    Would have been the first Tuesday of March.

Q.    All right.  And also on that date, which we're looking at Page 3 of Exhibit 144, $2,633,953.28 went from Vestalia to an account at Amegy Mortgage, correct?

A.    Correct.

Q.    All right.  And the purchase price -- that was the purchase price of the foreclosure, isn't it?  If you're --  I think you're on the wrong document.  If you look at Page 2 of Exhibit 144, that's -- if you look at Page 2 of Exhibit 144, is that the -- basically the price that, you know, Amegy was saying that they needed to get  in the transaction –

      MR. GIBSON:  Objection; form.

Q.    (BY MR. DUNCAN)  -- or the foreclosure?

A.    That was the foreclosure bid price, yes, the winning bid.

Q.    All right.  And the -- how long did it appear  that these funds sat in Vestalia's account, can  you look at the timing of the transaction before -- they were transferred into Vestalia's account and then they were transferred back to Amegy Bank; is that correct?

A.    I don't know.  Can you rephrase that?

Q.    Yeah.  All right.  Look at the -- what do we got  here?  If you look at the credit slip on the  third page of  Exhibit 144, is the top item, is that the money going from Amegy Bank into Vestalia's bank account or checking account?

A.    Yes.

Exhibit B

Q. And that is done on 3/3 of '09, correct?

A. Yes.

Q. And at what time of the day? See 11:45 right below the dollar sign?

A. Yes. Yes.

Q. Okay. So the funds come from Amegy Bank on March 3rd of 2009 at 11:45 a.m. into Vestalia's account, correct?

A. Correct.

Q. If we turn to the fourth page of Exhibit 144, and the top item is a -- a debit or -- taking the money out of Vestalia's account and back into an Amegy account, correct?

A. Correct.

Q. And that is also done on 3/3 of '09, correct?

A. Correct.

Q. And that's done at 11:46 a.m.; is that correct?

A. Correct.

Q. So the funds for this particular transaction to do this foreclosure, in essence, goes from Amegy's account into Vestalia's account, sets there for about a minute and then goes right back to Amegy; is that correct?

A. Amegy Mortgage who was making the loan, correct.

Q. Okay. Let's go to Exhibit 145.

(Marked Denison Exhibit No. 145.)

Q. BY MR. DUNCAN) Oh, and one thing. The first Tuesday in 2009 -- March of 2009 was what date?

A. March 3rd.

Back to Westwood Gardens Facts

Third Amended Complaint Page 389
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd Back to Table of Contents

Exhibit B

**Denison Excerpt 71** (Denison 2004 Examination, Volume 2, Page 56, Line 12 to Page 61, Line 5.)

Q. (BY MR. DUNCAN) All right. What I'd like you to do is take a look at Exhibit 145, go to the second page, and the bottom e-mail, it appears, is from Anna Mayer, right?

A. That's what this says, correct.

MR. GIBSON: You're on the second page?

MR. DUNCAN: Second page of Exhibit 145.

Q. (BY MR. DUNCAN) And that's dated January 12th of 2009, correct?

A. Correct.

Q. And could you please read that e-mail?

A. "Chris, attached is the paperwork on the Park Lake M&M lien."

Q. Okay. Now, go to on Exhibit 145, the top e-mail, and that's from you to John Speer sending that earlier e-mail; is that correct?

A. I believe so, yes.

Q. And that's also dated January 12th of 2009, correct?

A. Yes.

Q. Please read that e-mail.

A. "John, we have to require that this be paid off and the lien released by Wednesday. Can you make that happen?"

Q. Okay. Now, go to the first page of Exhibit No. 145, and this is an e-mail from John Speer to you dated January 12th of 2009, correct?

A. Appears to be, yes.

Q. And can you please read that e-mail?

A. "Chris, this is the one that I mentioned earlier that I wanted to make sure it got paid. Park Lake does not have the funds to pay this. All their funds had been moved into Royce and those got garnished. I do not want to pay it personally or through Vestalia for obvious reasons. Suggestions?"

Q.      Do you know what the obvious reasons were?

A.      I don't.

Q.      They weren't that obvious to you?

A.      No.

Q.      Okay.  Did you ask Mr. Speer why?

A.      I don't recall.

Q.      All right.  So you know that there's an M&M lien, though, correct, on the Westwood Garden property?

A.      Yes.

Q.      Correct?

A.      Correct.

Q.      And this -- we know prior to January 12th of 2009, Park Lake could not pay its bills, is that apparent?

A.      That's apparent.

Q.      Okay.  And prior to August of 2009, Park Lake could not pay the Wachovia loan either, right?

A.      Don't know the date they stopped paying, but they stopped paying us.

Q.      Okay.  And it was sometime in 2008, correct, from  your observation of the transaction?

A.      From my recollection, yes.

Q.      And were you aware that Park Lake was not paying Regions Bank either?

        MR. GIBSON:  Objection; form.

A.      I don't recall Regions specifically.  It's possible.

Q       (BY MR. DUNCAN)  Okay.  And Park Lake was not paying the debt it owed to Royce Homes, L.P., correct?

Exhibit B

A.      I don't know.

Q.      Okay.  Well, isn't -- didn't you get all the financials and didn't Amegy inquire into that?

A.      I don't recall that we did.

Q.      Okay.  So for sure, though, Park Lake had bills that were due and it could not pay them,   right?

        MR. GIBSON:  Objection; form.

        MR. SHURN:  Objection; form.

Q.      (BY MR. DUNCAN)  From what you had observed?

A.      Yes.

Q.      Okay.  All right.

        (Ms. Koenig entered the deposition room.)

        MR. DUNCAN:  Let's do 146.  (Marked Denison Exhibit No. 146.)

Q.      (BY MR. DUNCAN)  Okay.  If you could take a look  at Exhibit 146, and this appears to be an e-mail between Jason Walker and Anna Mayer, who is Amegy's counsel; is  that correct?

A       Correct.

Q.      And do you know who Jason Walker is?

A.      I don't.

Q.      Okay.  He's not counsel for, to your knowledge,  for Royce or for Park Lake or for Amegy; is that correct?

A.      I don't believe he's counsel for Amegy, I don't know if he's counsel for the other entities.

Q.      Okay.  Now, this is dated March 2nd of 2009, correct?

A.      Correct.

Exhibit B

Q. This is prior to the foreclosure sale, correct?

A. Correct.

Q. And could you please read the subject of the e-mail, what's the subject line?

A. "Park Lake Communities/Hammersmith Financial Group, Hammersmith Group, Westwood Gardens settlement offer."

Q. Okay. So we've got a settlement offer here. Can you read the e-mail itself?

A. "Anna, I left you a message regarding my concerns over the check. The check is from Royce Homes which could file for bankruptcy or be put into involuntary bankruptcy any day now. Any payments from Royce are subject to a 90 day look back for the preference period. I'll either need a check from Amegy (the current owner of the property) or need to cash the check and wait 90 days before I can provide you a release. If the bankruptcy is filed within that 90 days, then the deal will be off unless the trustee agrees to waive any claim of preference to settlement funds which is unlikely. I really prefer a check from Amegy. It makes it a lot cleaner for all of us. Thanks, Jason."

Q. So this e-mail, again, is before the foreclosure sale, correct?

A. Correct.

Q. And the Westwood Gardens still belongs to Park Lake, correct?

A. Yes.

Back to Westwood Gardens Facts

**Denison Excerpt 72** (Denison 2004 Examination, Volume 2, Page 61, Line 20 to Page 63, Line 5.)

Q. (BY MR. DUNCAN) Yeah. Does it appear -- and I think it's, you know -- does it appear that Amegy's counsel is dealing with a creditor's -- a Park Lake creditor's attorney?

MR. GIBSON: Objection; form.

A. Yes.

Q.  (BY MR. DUNCAN) Okay.  And also, does it appear that Mr. Speer is now using money from Royce Homes, L.P., to pay the Park Lake debt to make sure that your -- the  plan was not disrupted by this creditor?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.  It say the check is from Royce Homes, I'm not  sure who wrote the check.

Q.  (BY MR. DUNCAN) Okay.  But it appears that these Royce Homes funds are being used for this Westwood Gardens transaction?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.  Yes.

Q.  (BY MR. DUNCAN)  Okay.  And earlier, you had sent  an e-mail saying that this lien on the Park Lake property had to be cleared up, correct?

A.  I believe so, yes.

Q.  And it appears that somebody used Royce Homes, L.P.'s money to try to clear that matter up?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.  The check is from Royce Homes, is what this says, yes.

Q.  (BY MR. DUNCAN)  And the creditor or this Mr. Walker is concerned that Royce was pretty close to  filing bankruptcy, correct?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.  That's what he says.

Back to Westwood Gardens Facts

Exhibit B

**Denison Excerpt 73** (Denison 2004 Examination, Volume 1, Page 212, Line 4 to Line 13.)

    Q.      Yeah.  And it was approved by -- the Westwood  Gardens transaction was approved
            by the Amegy Bank loan committee?

    A.      Correct.

    Q.      Okay.

    A.      I don't know if these exact terms were what was approved, it would be in my CA.

    Q.      Right.  But the final deal was approved by the Amegy Bank loan committee?

    A.      Yes.

Back to Westwood Gardens Facts

**Denison Excerpt 74** (Denison 2004 Examination, Volume 2, Page 63, Line 20 to Page 64, Line 22.)

    Q.      (BY MR. DUNCAN)  Now, Exhibit 147 is a 7/15 of '09 e-mail from you, correct?

    A.      Correct.

    Q.      And can you read the e-mail?

    A.      "Are you available tomorrow afternoon for a call to review our situation with Speer,
            specifically want to assess the risk to John in regards to the Royce bankruptcy,
            understand preference periods, et cetera.   Please let me know if you are available,
            thanks."

    Q.      Why were you concerned about preference periods?

            MR. SHURN:  Objection; form.

            MR. GIBSON:  Objection; form.

    A.      Because we believe -- I view them as complicated, I don't understand them
            completely, and so we were trying  to get our hands around the risk to John of -- on
            Royce bankruptcy.

    Q.      (BY MR. DUNCAN)  And one of the items that you were concerned about was the

Exhibit B

Westwood Gardens transaction, correct?

MR. GIBSON: Objection;

MR. SHURN: Objection; form.

A We were concerned about all the risk to John and to Vestalia.

Q. (BY MR. DUNCAN) Okay. And that included the Westwood Gardens transaction whereby they -- Vestalia acquired the -- the Westwood Garden lots and the MUD receivables, correct?

A. Yes.

Back to Westwood Gardens Facts

**Denison Excerpt 75** (Denison 2004 Examination, Volume 2, Page 65, Line 4 to Page 71, Line 21.)

Q. (BY MR. DUNCAN) Exhibit 133 is an appraisal commission to buy[by] Amegy; is that right?

A. Correct.

Q. And who is the appraiser company in this?

A. Barletta and Associates, Inc.

Q. All right. And they were commissioned to prepare an appraisal of the Westwood Garden lots and MUD receivables, correct?

A. Correct.

Q. And this appraisal is dated September 30th of 2008?

A. Correct.

Q. And according to the appraisal, the discounted MUD receivables, as is, had a value of 2,660,000; is that correct?

A. Correct.

Q. And the 125 lots which had -- Well, let's see. 125 lot -- describe to me what those are

there.

A.    125 34-foot single family residential lots as is.

Q.    And how much was that value?

A.    1,830,000.

Q.    And the next item?

A.    38 50-foot single family residential lots, as is, 915,000.

Q.    All right.  So if we add all those up, the discounted value by the appraiser that you commissioned, that Amegy commissioned, that value is $5,405,000; is that correct?

A.    Without checking the math, that appears to be correct, yes.

Q.    All right.  And if we look back at Exhibit 143,  that is the credit authorization, it appears that that's the value that was adopted by Amegy Bank; is that correct?

A.    Correct.

Q.    All right.  Now, go to Page 14 of Exhibit 133,  and that's Amegy Bate 38617.

        MR. SHURN:  Mike, what's that page again?

        MR. DUNCAN:  It was Page 14 of the actual report and it's Bate No. 38617.

        MR. GIBSON:  Great.  Thank you.

Q.    (BY MR. DUNCAN)  Now, what I'd like you to do is read the paragraph starting with "Wither Brothers Builders."

A.    "Withers Brothers Builders, LLC, DBA Dobie Homes,  has expressed an intent to purchase all 163 of the  remaining subject lots.  They plan to purchase the 125 34-foot lots for $21,450 per lot; and the 38 50-foot lots will be purchased for 31,350 per lot.  The escalation rate will be six percent per annum.  Dobie Homes will begin taking down lots in November 2008, and they will take six  50-foot lots per quarter and 10 34-foot lots per quarter, (a total of 16 lots per quarter.)"

Q.    Okay.  So if we do the math there, it appears that Wither Brothers was willing to purchase all of the lots for a total price of 3,872,550?

        MR. SHURN:  Objection; form.

Exhibit B

MR. GIBSON:  Objection; form.

A.     Without verifying the math, yes.

Q.     (BY MR. DUNCAN)  Okay.  Now, go to paragraph four on Page 14 of Exhibit No. 133.  And does it appear that on top of the sale price, Park Lake was still expecting to receive the 2.9 million in MUD receivables?

A.     That's what this says, yes.

Q.     Okay.  And so if Park Lake had sold the property, it would have received the $3,872,550 plus the 2.9 million dollars MUD receivable, for a total of $6,772,550; correct?

MR. SHURN:  Objection; form.

MR. GIBSON:  Objection; form.

A.     If they had purchased those lots at those prices and if the MUD receivable came in at that amount, yes.

Q.     (BY MR. DUNCAN)  Okay.  I'd like you to take a look at Exhibit 148.

(Marked Denison Exhibit No. 148.)

Q.     (BY MR. DUNCAN)  Now, what Amegy did was, they took Exhibit 133, which is this -- this appraisal that we just talked about with Barletta and Associates and they did a internal technical review of that appraisal; is that correct?

A.     That's what this says, yes.

Q.     Okay.  Now, look down at the appraisal rating on Page 1 of Exhibit 148.

A.     I've never seen this, so let me get my bearings  here.

Q.     Okay.  It's about three quarters of the way down under "review of information."

A.     Got it.

Q.     Okay.  And the appraisal rating goes from one to five, correct?

A.     Correct.

Q.     And out of one to five, internally, Amegy rated this appraisal by Barletta that we just

Exhibit B

-- Exhibit 133, Page 4, correct?

A.     Correct.

Q.     Now, go down to the "scope of review" on the bottom of the first page of Exhibit 148, and read the "scope of review."

A.     "Scope of review. One, read and analyze the appraisal report. Two, check the report for compliance with USPAP, FIRREA, and Amegy Bank reporting requirements. Three, check the adequacy and relevance of the data and the propriority of any adjustments. Four, check the appropriateness of the appraisal methods and techniques used. Five, check the reasonableness of the analysis and develop an opinion of value. Six, I have not inspected the subject property."

Q.     All right. Now, go to the second page of Exhibit 148, which is Bate No. 111804 and look at the second paragraph of "comments." Do you see that?

A.     Yes.

Q.     All right. And read that paragraph from the Amegy Technical Review.

A.     "Withers Brothers Builders (Dobie Homes) has expressed intent to purchase all 163 of the remaining subject lots at prices of $21,450 for the 34-foot lots, and $31,350 for the 50-foot lots. They will take a total of 16 lots per quarter."

Q.     So part of the Amegy internal technical review was to check the accuracy of the information related to the sale to the Withers Brothers, correct?

A.     I don't know if they would check that specifically.

Q.     Well, that was -- that information was part of the actual appraisal, correct?

A.     Correct.

Q.     And the job of Amegy, the personnel within Amegy, is to check the accuracy of the appraisal, correct?

A.     The job would be. I don't know if they checked that one specifically.

Q.     Okay. But they're actually commenting on it in the internal review?

A.     Yes, it's commented; but again, I don't know if they actually just took that from the appraisal or if they verified that.

Exhibit B

Q. Okay. But if there was a problem with it, would you expect them to make a comment about the sale if they had a problem with it?

MR. GIBSON: Objection; form.

A. Can you repeat the question?

Q. (BY MR. DUNCAN) Sure. You have a department or personnel within Amegy Bank that checks appraisals that have been commissioned by Amegy, correct?

A. Correct.

Q. And the department goes through and makes sure it complies with all the appraisal standards and reviews the information contained within the appraisal to determine if it's a good appraisal, correct?

A. Correct.

Q. And out of a one to five rating, they rated this particular appraisal from Barletta and Associates a four out of five, correct?

A. Correct.

Q. And they said that they read and analyzed the appraisal report, correct?

A. Correct.

Q. And they made sure that it complied with the different appraisal standards, correct?

A. Correct.

Q. And they checked the accuracy and the relevance of the data and the propriety of any adjustments, correct?

A. Checked the adequacy and relevance of the data, correct.

Q. Okay. And they checked the appropriateness of the appraisal methods and the techniques used?

A. Correct.

Q. And checked the reasonableness of the analysis and developed an opinion of value?

A. Correct.

Back to Westwood Gardens Facts

**Denison Excerpt 76** (Denison 2004 Examination, Volume 2, Page 72, Line 6 to Page 73, Line 4.)

Q.   (BY MR. DUNCAN)  All right.  We're back, and what I'd like you to do is take a look at Exhibit 149.(Marked Denison Exhibit No. 149.)

(Discussion off the record.)

Q.   (BY MR. DUNCAN)  All right.  Now, Exhibit 149,  this is an acquisition analysis related to Westwood Gardens transaction; is that correct?

A.   That's what it says, yes.

Q.   And this document was produced to us by Amegy Bank, the Bates Stamp No. is 44791, the Amegy Bates Stamp number.  And what we have at the top of this, it appears that that 3,230,000, that's the original payoff amount of the note; is that correct?

A.   That's what that says.

Q.   Yeah.  And then we -- if you recall, you were  able to negotiate that down over 750,000; is     that correct?

A.   I believe so, yes.

Q.   Okay.  All right.  So we have the original amount of the note was really 2,470,000, the purchase price of the loan, the payoff, the Wachovia note was 2,470,000, correct?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.   Correct.

Back to Westwood Gardens Facts

Exhibit B

**Denison Excerpt 77** (Denison 2004 Examination, Volume 2, Page 73, Line 21 to Page 78, Line 24.)

Q. Okay. Well, apparently they have the value of the lots at $3,872,550, correct?

A. That's what this sheet says.

Q. And then we have the MUD receivables at 2.9 million, correct?

A. That's what this sheet says.

Q. For a total value of $6,772,550, correct?

A. That's what this sheet says.

Q. All right. And then we're -- someone is attempting to find out the excess value after paying off the Wachovia note, correct? They come up with an excess value here of $3,542,550?

A. That's what this paper says.

Q. Right. And as we know, you were able to get an additional 700 and -- over 750,000 off the note, so that number of excess value would actually increase to -- close to two point four -- I'm sorry. That value would increase to over three and a half million, correct?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. If you add those two numbers together, yes.

Q. (BY MR. DUNCAN) All right. And then below the excess value, it appears that there's a determination of what is going to be done with that excess value. Does that appear what it is?

MR. GIBSON: Objection; form.

A. It says "interest reserve, 270,000, LLC shortfall assumption, and then personal note principal reduction."

Q. (BY MR. DUNCAN) All right. So it appears that the letter of credit shortfall assumption, that's the 975,000, which was going to be assumed by Vestalia, correct?

MR. GIBSON: Objection; form.

MR. SHURN:  Objection; form.

A.     I'm not sure what this is, but –

Q.     (BY MR. DUNCAN) Well, it's a document produced by Amegy Bank for Westwood Gardens and it's called an  acquisition analysis.  Is that something that, you know, Amegy Bank would prepare?

A.     This would not have been prepared by Amegy, I don't believe.

Q.     Are you thinking it may have been prepared by Mr. Speer?

A.     That's possible.

Q.     Okay.  So it's a -- it appears that we're trying  to determine how much excess value there is in the acquired collateral.  Does that look like what we have  here?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.     That's what that says.

Q.     (BY MR. DUNCAN)  Okay.  And then there's a  determination that -- from that excess value, there's going to be a principal reduction on the 20 million dollar note about two million dollars correct?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.     It says personal note reduction, two million dollars.

Q.     (BY MR. DUNCAN)  And would you assume that that would be the 20 million dollar note --

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

Q.     (BY MR. DUNCAN)  -- from your dealings in this transaction?

MR. GIBSON: Objection; form.

Exhibit B

MR. SHURN: Objection; form.

A.     It's possible.

Q.     (BY MR. DUNCAN)  Okay.  And you know what the letter of credit shortfall is, correct?

A.     Yes.

Q.     And that's that 975,000 which was previously with Royce Homes which was ultimately assumed by Vestalia, correct?

A.     I believe so, yes.

Q.     And then in this transaction, there was an interest reserve established; is that correct?

A.     Yes.

Q.     And it was in the amount of $270,000?

A.     I'd have to see it, but that sounds close.

Q.     All right.  So in essence, what we're trying to figure out is, what is going to be done with all this equity that is in this property, according to this sheet; is that right?

MR. SHURN:  Objection; form.

MR. GIBSON:  Objection; form.

A.     This is someone's analysis of excess value.

Q.     (BY MR. DUNCAN)  And in this transaction, if we look at this analysis, it appears that Amegy would benefit from the transaction because you're taking this letter of credit, which you previously were not going to get paid on, correct, and you are now going to get paid on it?

MR. GIBSON:  Objection; form.

MR. SHURN:  Objection; form.

A.     Can you rephrase the question?

Q.     (BY MR. DUNCAN)  Sure.  Let's look at the letter of credit again.  The $975,000 shortfall on the letter of credit, that was a Royce Homes, L.P., loan, correct?

Exhibit B

A.     Correct.

Q.     And Royce Homes was out of business at this point in time?

A.     At what point in time?

       MR. SHURN:  Objection; form.

       MR. GIBSON:  Objection; form.

Q.     (BY MR. DUNCAN)  As of August of 2008.

A.     I understand it to be August or September of 2008.

Q.     Okay.  They were out of business by September --  Royce Homes, L.P., was out of
       business by September of 2008, correct?

A.     I believe that's correct.

Q.     And your prospects of getting that $975,000 repaid by Royce Homes at that point
       were minimal or absent at that point, would you agree?

A.     Probably so.

Q.     Okay.  And by doing the Westwood Gardens transaction, you found a way where that
       975,000 could now be repaid, correct?

       MR. GIBSON:  Objection; form.

       MR. SHURN:  Objection; form.

A.     Vestalia offered to take that debt -- to pay off  the Royce debt and take -- and take
       over the debt in Vestalia.

Q.     (BY MR. DUNCAN)  And the reason they were willing to do that was, they were
       going to get the lots, the Westwood Garden lots, and the MUD receivables, correct?

       MR. GIBSON:  Objection; form.

       MR. SHURN:  Objection; form.

A.     I don't know the reason they decided to do that.

Back to Westwood Gardens Facts

Exhibit B

**Denison Excerpt 78** (Denison 2004 Examination, Volume 2, Page 81, Line 1 to Page 82, Line 25.)

Q.     (BY MR. DUNCAN)  Okay.  Now, Exhibit 151 is  entitled "Fourth Amendment to the Loan Agreement."  Is  this the fourth amendment to the 20 million dollar loan transaction?  And I think you can probably tell by reading the recital, it's between John Speer and Amegy Bank, the original loan appears to be September 20th of 2006, and there were a number of modifications, correct?

A.     Yes.

Q.     So would this appear to be the modification to  the 20 million dollar loan?

A.     Yes.

Q.     All right.  And attached to the loan document is a security agreement and pledge and collateral assignment, correct?  If you go –

        MR. GIBSON:        Are you saying is that attached  to the exhibit or attached to the document?

        MR. DUNCAN:        It's attached to the exhibit, correct.

A.     Yes.

Q.     (BY MR. DUNCAN)  Okay.  And just, in essence, what you did on the 20 million dollar loan in January of 2009 is, you changed from Royce Homes to Vestalia as the collateral on that particular loan; is that correct?

        MR. GIBSON:  Objection; form.

        MR. SHURN:  Objection; form.

Q.     (BY MR. DUNCAN)  Do you follow what I'm saying?

A.     I don't believe that's correct.

Q.     All right.  What the -- Royce Homes was out of  business by January of 2009, correct?

A.     Correct.

Q.     And that had been the -- that was the main  collateral on the 20 million dollar loan?

Exhibit B

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. An assignment of the ownership in Royce Homes, yes.

Q. (BY MR. DUNCAN) Right. And as we saw in earlier e-mails, your reports, that stock -- that the value of Royce Homes had diminished basically nothing by January of 2009. Would you agree?

A. Correct.

Q. And what you did was in January of 2009, you now substituted where we previously had Royce and you put in Vestalia, in essence, in its place?

MR. GIBSON: Objection; form.

MR. SHURN: Objection; form.

A. I don't know that I would couch it that way but –

Q. (BY MR. DUNCAN) Well, how would you couch it?

A. Vestalia became the new collateral.

**Denison Excerpt 79** (Denison 2004 Examination, Volume 2, Page 103, Line 14 to Line 24.)

Q. (BY MR. DUNCAN) Do you have an understanding of who owns Wither Brothers Builders?

A. Not without seeing documentation.

Q. Do you have any idea?

A. Not without seeing documentation.

Q Okay. Do you know if Mr. Speers has any involvement in that company?

A. It's possible.

Q. Okay. Have you had any discussions with Mr. Speer in regards to Wither Brother

Builders?

A.      Not that I recall.

**Denison Excerpt 80** (Denison 2004 Examination, Volume 1, Page 20, Line 2 to Page 21, Line 7.)

Q.      All right.  Who's Paul Murphy?

A.      Paul was CEO of Amegy Bank.

Q.      And where did he fit in the chain of command, you  know, in relationship to you?

A.      He was my boss's boss.

Q.      Okay.  So we have Dale Andrews?

A.      Andreas.

Q.      And then we had Paul Murphy above him?

A.      Yes.

Q       All right.  And that would be somebody that you would have to report or he would --
        he'd be your superior at Amegy Bank, Paul Murray?

A.      Murphy.

Q.      Murphy.

A.      Correct.

Q.      All right.  I'll get it.  All right.  To your  knowledge, did Mr. Speer and Mr. Murphy
        know each other prior to the 20 million dollar loan?

A.      Yes.

Q.      Okay.  And was it a -- to your knowledge, was it a business relationship or a social
        basis?

A.      I know it was a business relationship, I'm not sure if it was social or not.

Q.      And what is your understanding of what the business relationship was with Mr.

Exhibit B

Speer and Mr. Murphy prior to the 20 million dollar loan?

A. Can you –

Q. Was their business at Amegy Bank or was it elsewhere?

A. As far as I know, it was at Amegy Bank and Southwest Bank of Texas, the predecessor of Amegy.

**Denison Excerpt 81** (Denison 2004 Examination, Volume 1, Page 23, Line 7 to Line 10.)

Q. Okay. But the bottom line is, you were the officer, the agent, the employer, whatever, that was in charge of the 20 million dollar loan for Amegy Bank?

A. Officer on the account, yes.

**Denison Excerpt 82** Denison 2004 Examination, Volume 2, Page 118, Line 25 to Page 119, Line 11.

Q. All right. Go to Page 6 of Exhibit 157. All right. If you look at the last sentence on Page 6, it says "Since 1998 Royce Homes has been controlled and actively managed by Mr. Speer, the president and chief executive officer." Do you see that?

A. I see that.

Q. Do you know where you obtained that information from?

A. Would have been the information given to us by the company.

Q. All right.

A. Or by John personally.

**Denison Excerpt 83** (Denison 2004 Examination, Volume 1, Page 6, Line 12 to Page 7, Line 20 followed by Denison 2004 Examination, Volume 1, Page 8, Line 3 to Line 6.)

Q. Okay. And could you please state your full name for the record?

A. Christopher McKee Denison.

Q. Okay. What is your position at Amegy Bank?

A. Senior Vice President of Construction Lending.

Q. All right. And how long have you held that position?

A. About seven years, I think.

Q. So that would take us back to –

MR. TOW: 2004.

Q. -- 2004, is that right, approximately?

A. Approximately.

********************************

Q. Okay. All right. And now you're with Amegy Bank?

A. I am an officer of both Amegy Bank and Amegy Mortgage.

**Denison Excerpt 84** (Denison 2004 Examination, Volume 1, Page 8, Line 16 to Line 22 followed by Denison 2004 Examination, Volume 1, Page 9, Line 21 to Page 10, Line 23.)

Q. All right. Now, as a senior vice president of construction lending, can you give me a job description of what that entails generally?

A. I manage our homebuilder lending group.

Q. All right. Do you originate, service or are you over all those areas of the lending process?

A. Yes.

***********************

Q. All right. And your compensation arrangement with the bank, with Amegy Mortgage, is it a salary plus bonus or how is that set up?

A. Salary plus bonus.

Q. Okay. Is that a performance-based bonus?

A. What do you mean by that?

Q. Well, tell me how your bonus is based.

A. Based on achieving certain goals.

Q. All right. And what are those in the general category, what are the goals that you must reach in order to maximize your bonus?

A. To meet the bonus, I guess the main goal would be overall financial performance of my team at Amegy Mortgage.

Q. All right. When you say performance, is that origination and one thing would be how much -- how many loans you originate, is that one part of the performance?

A. In terms of dollars, yes.

Q. Right. Right, yeah. You have a dollar performance level that you want to reach, that would be one thing?

A. (Moving head up and down.).

Q. And how about the performance of the loans that you bring in, is that another factor?

A. It would be, yes. It would be in terms of one of the performance managers' net income, so there are no losses that's taken away from the net income of the loans.

Exhibit B

# Manners 2004 Examination Excerpts

Exhibit B

**Manners Excerpt 1** (Manners 2004 Examination, Page 113, Line 5 to Line 21.)

Q. Again, you're looking for ways you may get payments under the buyout note?

A. No. I think at this point -- and there's no date on there so that -- I can't put it into that context. But I think at this point it was, did I have any ideas with the position that Royce was in to help solve their problems. And, of course, if they had liquid assets, those can be bought or whatever. You know, if the income from Royce is continuing at a fairly high level, that makes a difference. Ultimate deal, yeah, hopefully Royce survives and I get paid another $11 million.

Q. Okay. All right. And then we have, "Sale of assets." See that?

A Uh-huh.

Q. What are you talking about there?

A. I don't know. Is there any assets that could be sold or is there assets that have been sold?

Back to Breach of Fiduciary Duty

**Manners Excerpt 2** (Manners 2004 Examination, Page 115, Line 23 to Page 116, Line 13, referring to Exhibit 107 Bates stamp page 195018.)

Q (BY MR. DUNCAN) Okay. But for some reason, John -- John owed you, you're saying, $11 million?

A. Yes.

Q. And he controlled Royce Homes?

A. Yes.

Q. And he saw fit to sell 50 of those homes that they had in their inventory to you --

A. Yes.

Q. Okay. And we'll get into the refunds in a second. The next one is real interesting to me. It says, "asset stripping"?

A. Uh-huh.

Q. What does that mean?

A. Asset stripping is where you can take assets out of one entity, put them in another, sell them for more. You know, if you took Royce and sold 100 houses to somebody, just strip those assets out of there, it may make the -- it may improve the balance sheet.

Q. Kind of like the Allard situation?

A. Oh, the Allard situation definitely made the balance sheet look a little bit better.

Back to Breach of Fiduciary Duty

**Manners Excerpt 3** (Manners 2004 Examination, Page 81, Line 23 to Page 82, Line 2.)

Q. Let's -- tell me, are you the sole shareholder in Allard Investments?

A. Yes.

Q. Okay. And you were the manager, the controlling person for that particular company?

A. Yes. Yes, I am.

Q. And Allard Investment was formed on September 25th of 2007; is that correct?

A. Correct.

Q. And it's -- it was formed for the purpose of buying homes from Royce Homes; is that correct?

A. From Royce and other builders.

Back to Breach of Fiduciary Duty

**Manners Excerpt 4** (Manners 2004 Examination, Page 83, Line 18 to Line 25.)

Q. All right. Let's -- let's break that down here. Was there -- apparently, there was more than one transaction where you purchased homes from Royce Homes through Allard Investment; is that correct?

A. Correct.

Q.      In this particular one, we're talking about 25 finished homes; is that correct?

A.      Presume it to be so.

Back to Breach of Fiduciary Duty

**Manners Excerpt 5** (Manners 2004 Examination, Page 85, Line 24 to Page 88, Line 11.)

Q.      Of that particular -- of Exhibit No. 92.

A.      Uh-huh.

Q.      And this is entitled Allard Investment Transaction 1, November 30th, 2007, correct?

A.      Yes.

Q.      And as we just went through, it appears to be the list of the 25 homes that you purchased in November of 2007?

A.      Yeah.

Q.      Okay.  Now, let's look at the different columns here.  And what we have for the numbers at the bottom, the first number is for the base price, is that right, the 3 1/2 million?

A.      Yes.

Q.      Okay.  Then we have options that are included and that's approximately 218,000?

A.      Uh-huh.

Q.      And then we have the current price which is -- if we add in this additional home -- they had left one off and it's handwritten in.

A.      Yeah.

Q.      The current price, the list price on these homes appears to be 3 million 917 dollars -- I'm sorry -- $3,917,274?

A.      Yes.

Q.      And then there's a discount applied of $1,167,472?

Exhibit B

A.     Correct.  Uh-huh.

Q.     And that offer price is 2,571,576; is that correct?

A.     Yes.

Q.     And that's the price that you were offering?

A.     Yes.

Q.     All right.  And then what it shows is that by making this sale to you, that Royce was actually taking a gross loss; is that correct?

A.     Yes.

Q.     And if we look at the debt that existed on this  property --

A.     Uh-huh.

Q.     Your eyesight might be better than mine.  Can you read that number?

A.     The debt?

Q.     Yeah.

A.     2,620,290.

Q.     All right.  So in order to make the sale to you from Royce, they're making no profit --

A.     Right.

Q.     -- and they're going to have to come out-of-pocket to pay their debt on it of $48,716, is that right, net cash?

A.     Yes.

Q.     All right.  And let's go down to the bottom here.  That $1,227,472 discount --

A.     Uh-huh.

Q.     -- tell me what that is.

A.     That's the discount that's typed plus the $60,000 house that's handwritten.

Exhibit B

Q.      Okay.  So they're giving you that -- a million two -- I'm sorry -- $1,227,472 discount off what --

A.      That's what I was asking for, yes.

Back to Breach of Fiduciary Duty


**Manners Excerpt 6** (Manners 2004 Examination, Page 88, Line 25 to Page 89, Line 17.)

Q.      Okay.  All right.  Okay.  Let's go to Exhibit No. 93.  (Marked Manners Exhibit No. 93.)

Q.      (BY MR. DUNCAN)  And this is an e-mail -- Exhibit No. 93, this is an e-mail from Murrah Mayberry again.

A.      Uh-huh.

Q.      It's dated September 17th.  And it's to Julie Stevens, Joyce Osborne, Jenny Li, Leana Mitchell, Kathy Kramer, and Jennifer Ali, I guess.  And it involves the  Allard Investment (Mike Manners) second set of homes; is that correct?

A.      Uh-huh.

        MR. TOW:  He has to answer verbally.

Q.      (BY MR. DUNCAN)  Is that correct?

A.      Yes.  Sorry.

Q.      And this is -- there was a second purchase of homes that you made from Royce Homes; is that correct?

A.      Correct.

Back to Breach of Fiduciary Duty


**Manners Excerpt 7** (Manners 2004 Examination, Page 90, Line 6 to Line 9.)

Q.      So on the homes that you were purchasing, Royce was going to keep paying the utilities on the home -- on the homes?

A.      For a short while, yes.

Exhibit B

Back to Breach of Fiduciary Duty

**Manners Excerpt 8** (Manners 2004 Examination, Page 90, Line 12 to Line 22.)

Q. (BY MR. DUNCAN) All right. We have as the borrower Allard Investment Company, we have the seller as Royce Homes, L.P. --

MR. DUNCAN: And remember to substitute in the clean copy of this.

Q. (BY MR. DUNCAN) And it says -- the lender, it says "cash?"

A. Uh-huh.

Q. And it's talking about 25 lots in numerous subdivisions; do you see that?

A. Yes.

Q. All right. And the settlement date, it said on here would be December 17th of 2007.

A. Yes.

Back to Breach of Fiduciary Duty

**Manners Excerpt 9** (Manners 2004 Examination, Page 93, Line 1 to Line 19).

Q. All right. And the contract price is $2,727,810, correct?

A. Yes. Uh-huh.

Q. And the payoff for the -- the mortgage is 2 million, 819 dollars -- I'm sorry -- $2,819,624.65; do you see that?

A. Yes.

Q. And then at the bottom of the HUD statement, the cash from seller, it says $161,192.05; do you see that?

A. Yes.

Q. So in order to do this deal with you –

A. Uh-huh.

Exhibit B

Q.      -- Royce, again, was going to make no profit –

A.      Right.


Q.      -- and they were going to have to come out-of-pocket for $161,192.05?

A.      Yes.

Q.      And these, again, were finished homes; is that correct?

A.      Correct

Back to Breach of Fiduciary Duty


**Manners Excerpt 10** (Manners 2004 Examination, Page 99, Line 4 to Page 100, Line 2).

Q.      On Exhibit 93 and the attachment to Exhibit 94 are the only two transactions that you purchased homes  from Royce?

A.      I believe so.

Q.      All right.  And I think we can count those up here. The one I recall was 25 homes, correct?

A.      Yes.

Q.      And the second transaction is represented by Exhibit No. 24?

A.      Uh-huh.

Q.      And that has also 25 homes; does that sound right?

A.      Yes.

Q.      Okay.  And if we look at the schedule for Allard  Homes, I believe -- and I believe there is 67 homes that are on the Allard sheet; does that sound right?  Do you  know how many rent homes you have in Allard?

A.      No.  But that sounds about right.

Q.      Okay. So approximately 50 out of the approximate 67 --

Exhibit B

A.     Yes.

Q.      -- are homes that you purchased from Royce Homes to put in Allard?

A.     Correct.

Back to Breach of Fiduciary Duty

**Manners Excerpt 11** (Manners 2004 Examination, Page 104, Line 25 to Page 105, Line 10).

Q      John -- John Speers controlled Royce Homes, correct?

A.     Yes.

Q.     Okay.  And we know that Royce Homes transferred or sold these two lots of homes, these 50 homes to your newly created entity --

A.     Yes.

Q.     -- in 2007?

A.     Uh-huh.

Q.     And they sold it below the list price; is that  correct?

A.     Correct.

Back to Breach of Fiduciary Duty

**Manners Excerpt 12** (Manners 2004 Examination, Page 105, Line 20 to Page 106, Line 9.)

Q.     Okay.  The amount that you paid was below the loan -- the amount you paid Royce Homes for these 50 homes was even below the loan payoff; is that correct?

A.     Correct.

Q.     Now, you have -- you got about 67 homes in this Allard Investment, correct?

A.     Yes.

Q.     And is it true that you're making over $900,00 in  annual revenue off the houses?

A.     I wish it was.

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 420
Back to Table of Contents

Exhibit B

Q.      In the annual revenue, the gross revenue?

A.      Oh, gross revenues?

Q.      Yes

A.      I'm sorry. I thought you meant profit.

Q.      Yeah.

A.      I can't recall what the number is but --

Q.      Does that sound about right?

A.      No. That sounds too high.

Q.      We can just look at your tax return I guess --

A.      Oh, yeah.

**Manners Excerpt 13** (Manners 2004 Examination, Page 117, Line 25 to Page 119, Line 9.)

Q.      Okay.  All right.  And then we have, "Sale of assets," on -- is the title on Exhibit 107, last page. Tell me about -- what assets are you talking about there?

A.      None specifically, that any assets be sold.  It's  really going back to that asset stripping thing, anything that could be sold.

Q.      Okay.  And in parenthesis, what does that say over there, next to asset stripping?

A.      "Park Lake Reimbursables."

Q.      Okay.  And does that have something to do with HUD?

A.      No.

Q.      What are you talking about then?

A.      Can we sell Park Lake Reimbursables, for instance.

Q.      And what do you mean by "reimbursables"?

Exhibit B

A. Whenever you do any land development, the developer is responsible for putting in the sewer and water and those sorts of things.

Q. I used the wrong term MUD, not HUD.

A. Oh, I'm sorry. MUD, yes.

Q. MUD reimbursables?

A. MUD reimbursables.

Q. Okay. So John was talking to you about there are certain assets that have some value that they may be able to squeeze some cash out of?

A. I don't think --

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. I don't think John was talking to me about anything. This was just some ideas that I put together. I'm assuming that this was in mid '08, looking at it.

Q. (BY MR. DUNCAN) Okay. And you knew that Park Lake had some MUD receivables; is that right?

A. Yeah. Yeah.

Back to Breach of Fiduciary Duty

**Manners Excerpt 14** (Manners 2004 Examination, Page 121, Line 11 to Page 123, Line 6.)

Q. (BY MR. DUNCAN) Okay. And did you talk to James Hunter about the Westwood Garden subdivision?

A. Yes, I think I did.

Q. Okay. And did he describe to you or did you already have knowledge about the large MUD receivable?

A. No.

Q. Did he describe to you the size of the MUD receivable that Westwood Gardens had?

A. At that time, I don't recall that I did; but if I remember now, it's something like three or four million.

Q. Yeah. And that the -- the actual property out there had equity in it also after paying off the initial loan; is that correct?

A. I don't know.

Q. You don't know. That wasn't discussed -

A. No.

Q. -- with Mr. Hunter?

A. No.

Q. What was -- what else do you recall that Mr. Hunter told you about the Westwood Garden subdivision?

A. I think on that occasion talking about some other situation -- some of the opportunities that might be there. Westwood Gardens was a very, very successful community for Royce Homes. I -- I seem to remember there was a loan on there, that one was not free and clear and that might have been something that I might have been interested in buying, but I never liked that community, I didn't know how it worked.

Q. Okay. So is -- would it be true that you told Mr. Hunter that you may not have been interested in that, you're going to let John handle that one?

A. Yeah.

Q. Okay. Let's go to Exhibit 106. (Marked Manners Exhibit No. 106.)

Q. (BY MR. DUNCAN) Did you understand that Mr. Speer went ahead and did acquire the Westwood Gardens properties?

A. No, not -- not specifically. But I kind of heard through the rumor mill that he did, yes.

Q. Okay. And what did you hear through the rumor mill?

A. That his new company had purchased the lots.

Q. Vestelia?

A. I thought it was WG Homes.

Q. Okay.

A. But I think he's building in their name.

Back to Allard Investment Asset Stripping

**Manners Excerpt 15** (Manners 2004 Examination, Page 85, Line 7 to Line 20.)

Q. Okay. We'll talk about your -- your sponsorship in a -- so this -- you're -- let me just go over that briefly. You were getting, like, $35,000 a month from Royce Homes for your race cars, correct?

A Correct, yes.

Q. Okay. All right. So the -- apparently, there is this debt for your race cars and they're not reflecting that on their balance sheet, Royce's balance sheet; is that a reasonable assumption?

A. No, it wasn't a debt. It was a sponsorship agreement which was a monthly deal.

Q. Okay.

A. So I don't think they would have needed to put it on that.

Back to Allard Investment Asset Stripping

**Manners Excerpt 16** (Manners 2004 Examination, Page 168, Line 21 to Page 172, Line 19.)

Q Okay. Okay. Let's talk about your racing car.

A. Uh-huh.

Q. All right. You were being paid $35,000 a month from Royce, correct?

A. Yes.

Q. And when did that start?

A. I think it was January of '07. No, I'm sorry. I think it was January of '08.

Q. '08?

A.      Uh-huh.

Q.      Are you sure about that? Because didn't you apply part of the money to the -- what's the -- Allure?

MR. TOW: Allard.

Q.      (BY MR. DUNCAN) -- Allard Investment in 2006?  Remember you were --

A.      It was 2007.

Q.      2007. Let me start all over again. It is getting late in the day.

A.      I know.

Q.      Okay. If you recall on the Allard transaction --

A       Yeah.

Q.       -- you had like $262,000 approximately that you were saying that Royce owed you for the race car?

A.      Yes.

Q.      All right.

A.      Well -- yeah.

Q.      Okay. When did the -- when did you start charging or attributing $35,000 a month to Royce Homes, L.P.?

A.      I think it was January of '08.

Q.      Why would you be applying -- why would you say  that Royce owed you 35 or $262,000 for the race car in November of 2007?

A.      Sorry? Say again.

Q.      You're not following me here?

A.      I'm not sure what you're doing with the dates, what your question is.

Q.      Well, the Allard buyout was in 2007, right?

Exhibit B

A.      Late 2007, yes.

Q.      Okay. And you were saying that you -- you felt that there was a $262,000 debt owed to you for the race car?

A.      No.

Q.      What was the 262 for?

A.      I paid 262,000 more for those houses than -- that I wanted to and we did a deal where Royce would give me some sponsorship on -- for marketing for a race car.

Q.      All right. We're going to -- we're going to talk about that because I don't understand it here.

A.      Okay.

Q.      So the 262 was owed to you -- 226 -- let's get the document out so we're clear. Which -- do you know which one it is?

        MR. TOW: No.

        MR. DUNCAN: Okay. I can find it.

A.      I can find it real quick if it was from those Allard closings. Here it is.

Q.      (BY MR. DUNCAN) What number is that?

A.      92.

Q.      Okay. Let's go to Exhibit No. 92. And you're saying that $227,472 was owed to you by Royce out of the Allard transaction, correct?

A.      Yes.

Q.      All right. And then you're telling me that Royce was going to pay you a sponsorship fee of -- how much -- 35,000 a month?

A.      Correct. Yes.

Q.      If they owed you the money, why were they going to have to pay it to you as a sponsorship fee?

A.      I didn't want it paid as this. I paid the higher price for the -- for the houses and then

Exhibit B

they sponsored me and I can show some income under the racing entity.

Q. Well, you could write off the 35,000 if it went into a losing entity; is that correct?

A. Yeah, that's correct. Which would have been better off not -- not paying it in the first place, of course.

Q. Right. Okay. But you were receiving $35,000 a month from Royce Homes to support your -- your racing car starting in January of 2008?

A. Yeah. For a marketing fee, yes.

Q. Okay. What kind of car was this?

A. Actually, back then I think it was two cars. It was a Top Dragster and a Top Sportsman.

Q. Okay. And the 35,000 a month, you would use to maintain your vehicle?

A. Yes.

Q. And to -- for your transportation costs and all your costs associated with your racing?

A. Correct.

Q. Okay. Now, who paid -- who paid for the racing car?

A. I did.

Q. Okay. When did the payment end for the 35,000 a month for -- from Royce Homes to you for the race car?

A. I think it was March of '08.

Q. So it was January, February, March; three months?

A. For some reason I'm remembering that they paid four months but I'd have to check the notes.

Back to Allard Investment Asset Stripping

**Manners Excerpt 17** (Manners 2004 Examination, Page 27, Line 9 to Line 18.)

Q.      Okay. And tell me who Pamela is.

A.      Pamela was one of the accounts over at the Royce companies.

Q.      And I think her name changed, it was originally Pam Tyler and then it went to Pam Mitchell after she got married; is that your recollection?

A       I wasn't aware she got married.

Q.      Okay. But that's -- she's a Royce Homes employee, correct?

A.      Yes.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme


**Manners Excerpt 18** (Manners 2004 Examination, Page 29, Line 25 to Page 30, Line 7.)

Q       Okay. All right. So basically, what you and Pam are trying to do is coordinate how the accounting is going to be done for the payments that are going to be made to you on the -- on the buyout note; is that correct?

A.      I would not say accounting, I would say just how -- how the note breaks down.

Q.      And how they're going to report it to you each month; is that right?

A.      How they're going to pay it to me each month, correct.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme


**Manners Excerpt 19** (Manners 2004 Examination, Page 32, Line 15 to Page 33, Line 13.)

Q.      (BY MR. DUNCAN) Now, Exhibit 83 appears to be --  have been received by you on December 12th, 2006; is that correct?

A.      Yes.

Q.      And this is a detail provided to you by Pam Mitchell?

A.      Looks like it.

Q.      Okay. And it relates to the November starts and closings? If you read the first line

Exhibit B

of the first page?

A Yes.

Q. Okay.

A. Sorry.

Q. And then it shows the amount that's going to be paid on the starts and closings, is that right, for November?

A. Correct.

Q. And that's 219,000?

A. Correct.

Q. And that's to be applied as a payment from Royce on the buyout note; is that correct?

A. No.

Q. It's -- the 219 is going to be applied to the buyout note?

A. Correct.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Manners Excerpt 20** (Manners 2004 Examination, Page 33, Line 22 to Page 34, Line 2.)

Q. Okay. So when she receives this revision to the note, she's going to give you additional breakdown on the principal interest that -- how that 219,000 is going to be applied to the principal and interest?

A. I guess, yeah.

Q. Okay. Go to Exhibit No. 84.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Manners Excerpt 21** (Manners 2004 Examination, Page 35, Line 2 to Line 9; followed by Page 35, Line 19 to Page 36, Line 18.)

Q.      All right. You were receiving monthly reports up to a certain point --

A.      Yes.

Q.      -- from Royce?

A.      I was, yes.

Q.      And this would have been an example of such a  report that you would have been receiving from Royce?

A.      Yes.

        (Line 19)

Q.      Okay. And what we have at the top of 84, first page, is you received 364,500 for the December starts and closings for Royce; is that correct?

A.      Correct, yes.

Q.      All right. And on the -- the next columns over, we're at the top and there's a 364, there's a breakdown of  how the checks are going to be cut to you, to DWM, and Saracen, correct?

A.      Correct.

Q.      And then on the -- the right-hand side of that  column it says, "Original note;" is that correct?

A       Correct.

Q.      And that's -- we're talking about the $13 million buyout note; is that correct?

A       Correct.

Q.      And it's showing that they're going to be applied  to that particular note?

A.      Correct.

Q.      All right. And if we go to Page 4 of Exhibit No. 84, does it appear that what we have here is --  there's further refining of how the reporting is going to  happen on the monthly interest and principal that Royce is  paying out, how it's going to be reported against the note?

Exhibit B

A Yes.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Manners Excerpt 22** (Manners 2004 Examination, Page 40, Line 9 to Line 19.)

Q. And that shows that for that time frame the fee was going to be $169 -- I'm sorry -- $169,500 correct?

A. Correct, yes.

Q. All right. Then what we have, if you could go back to the fifth page of Exhibit No. 11 -- and that's Bate No. JHS 73963 -- that shows a wire transfer detail; is that correct?

A. Appears to.

Q. And it's coming from a Royce Homes, L.P., loan account, correct?

A. Yes.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Manners Excerpt 23** (Manners 2004 Examination, Page 43, Line 25 to Page 44, Line 7.)

Q. Sure. All right. You can read it into the record. What exhibit number are you on?

A. Exhibit 80.

Q. Okay. And the section of that, if you could read that in?

A. It's a note from Pam to me, "Also, my instruction from John Speer is that he will be signing checks for me to send to you monthly."

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Manners Excerpt 24** (Manners 2004 Examination, Page 45, Line 15 to Page 47, Line 18.)

Q. All right. Who is DWM? Is that a company that's owned -- DWM Holdings Inc., is that a company you own?

A. Yes.

Q. Okay. And also Saracen, is that a company that you own?

A. Yes.

Q. And are you the 100 percent owner in these companies?

A. I think so.

Q. Okay. And you're the president or CEO, the chief operating officer of these companies?
A Yes.

Q. Okay. All right. What I'd like you to do is go back to the big notebook, Exhibit No. 2. One more. There you go.

A. All right.

Q. And go to Page 2. And this is entitled, "MGM Note Schedule;" is that correct?

A. Yes.

Q. And this document, if you look at the bottom appears to be prepared by Pam Mitchell; is that correct?

A. Yes.

Q. And if we could go back to Exhibit No. 79 -- let me get you there -- and you go to Page 2, does this appear to be based upon the proposed spreadsheet that you had prepared earlier?

A. Yes.

Q Okay. So what Pam is doing is, she's keeping track of the payments for disbursement on your buyout note according to -- based upon the schedule that you had prepared that we have attached to Exhibit 79 as Page 2; is that --

A. Yes.

Q. Okay.

A. Uh-huh.

Q.      All right. And if we start at the top, we have the original amount of the note which is -- it says -- it's the $13,342,406 balance; is that correct?

A.      $405.

Q.      405, my eyesight is not that good.

A.      Join the club.

Q.      And then at the bottom, as of, I guess, the end of June or the beginning of June -- is that -- we have a balance, a remaining balance of $11,165,661; is that correct?

A.      Correct, yes.

Q.      Okay. And what we have in between those two numbers are the disbursements that were intended to be applied to the $13 million buyout note?

A.      Correct.

Q.      All right. So between -- from the first payment on, there's -- there was -- the note was brought down to this $11 million number?

A.      Yes.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Manners Excerpt 25** (Manners 2004 Examination, Page 58, Line 7 to Page 59, Line 8.)

Q.      Do you know what they're talking about when they're saying that won't show up on the HUDs, that they want to --

        MR. SHURN: Objection; form.

A.      They're saying -- I'm guessing what they're doing is they're charging the 3,000 management fee, asking the banks for 1,500 so there would be 1,500 that's not on the HUD.

Q.      Well, there -- when you -- when it says that the -- when they're asking the bank for the $1,500, correct --

A.      Yeah.

Exhibit B

Q. -- does that -- they're not -- would you assume that they're asking the bank for a loan, they're not just going in there saying, "Can I have $1,500?" Does that make sense?

A. That makes sense, yes.

Q. Okay. So apparently, half the management fee, half of the $3,000 management fee on these lots --

A. Uh-huh.

Q. -- appear to be obtained by a loan; is that correct?

A. May be.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Manners Excerpt 26** (Manners 2004 Examination, Page 65, Line 1 to Page 67, Line 8.)

Q. And, again, does that appear that they are adding that to an accounts receivable owed to Royce Homes?

A. Appears to be.

Q. All right. What I'd like you to do is go to Exhibit No. 16.

A. Okay.

Q. And does this appear to be the Royce Homes, L.P., tax return excerpts for 2006?

A. For part of 2006, yes.

Q. All right. Now, if you could turn to the second page.

A. Yeah.

Q. And there it appears that there is A/R from DWM Holdings Inc. Do you see that?

A. Yeah.

Q. All right. Now, it says that as of the end of 2006, $13,944,946 are owed for an accounts receivable to Royce Homes, L.P., from DWM Holdings Inc., correct?

A.      Appears to be that, yes.

Q.      Okay. Did your -- you're the owner of that company, right?

A.      Of DWM?

Q.      Yes.

A.      Yes.

Q.      Did that company owe Royce that money?

A.      Absolutely not.

Q.      Okay. And if we go back to Exhibit -- you can keep your hand in that page there.

A.      Okay.

Q.      Just flip back to Exhibit No. 15. And if we go to -- on Exhibit 15 if we go to Page 73 of 90 -- all  right? You got 73 of 90?

A.      Yeah.

Q.      Okay. Now, if you look at the last entry for 2006, which is 12/31 of 2006?

A.      Yeah.

Q.      And can you tell me what the balance on this  particular ledger sheet is for the end of 2006?

A.      $13,944,945.76.

Q.      Does that correspond to what is on Exhibit 16?

A       Yes.

Q.      All right. And you're telling me that at the end of 2006, your company, DWM Holdings Inc., did not owe Royce Homes almost $14 million?

A       Correct.

Q.      All right. If you could also go to the final  page -- well, let's see. If you could go to Page 90 of 90 on Exhibit No. 15. It's not there, is it?

Exhibit B

A. It's not here.

Q. Okay. Well, let me tell you the -- if the Page 90 of Page 90 reflects that as of September 17th of 2008, that there is a receivable of 4,653,114.67 --

A. Uh-huh.

Q. -- did DM -- DWM Holdings owe Royce Homes that amount of money?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. No.

Back to Fraud/Fraud Scheme

**Manners Excerpt 27** (Manners 2004 Examination, Page 133, Line 16 to Page 134, Line 18.)

Q. (BY MR. DUNCAN) Well, we're not -- let me ask a couple of basic questions up front. We know Royce Homes is a -- or was a home builder, right?

A. Yes.

Q. And in the home building industry, companies such as Royce were typically heavily dependant on their ability to borrow money and to acquire and develop property; would that be a fair statement?

A. Yes.

Q. Okay. And you've borrowed money as a home builder; is that correct?

A. Yes.

Q. And from your experience, the equity in the company was a factor that lenders would look at to lend money, from your experience?

A. Yes.

Q. Okay. And one important factor that lenders would typically look at when you're going to them would be your debt to equity ratio?

A.      Yes.

Q.      All right.  And without a proper debt to equity ratio, it could be difficult if not impossible to borrow  money?

A.      Maybe.

Q.      Okay. And without borrowing capacity, a home  builder such as Royce can be stifled or even destroyed; would that be correct?

A.      Yes.  Yeah.

Back to Breach of Fiduciary


**Manners Excerpt 28**   (Manners 2004 Examination, Page 13, Line 4 to Line 10)

Q.      Well, was the -- the original intent was that the 3,000 per lot was going to come from Royce Homes; is that correct?

A.      No.  It was a leverage buyout.  John was buying the company and this was one way of speeding -- it was a  mechanism to speed up or slow down the pay off of the  note.

Back to Fraud/Fraud Scheme

**Manners Excerpt 29**   (Manners 2004 Examination, Page 15, Line 1 to  Line 4)

Q.      Okay.  So does it appear that the original idea  at least as of May 7th was that the payments to you for the buyout were going to come from Royce?

A.      Does it appear that way?  Yes.

Back to Fraud/Fraud Scheme

**Manners Excerpt 30**   (Manners 2004 Examination, Page 17, Line 25 to Page 18 Line 3)

Q.      Well, obviously, my point is, the May 7th, 2006, document reflects that Royce is going to make the  payments; is that correct?

A.      The draft of May 7th says Royce and the draft of June 21st says John.

Back to Fraud/Fraud Scheme

Exhibit B

**Manners Excerpt 31** (Manners 2004 Examination, Page 137, Line 14 to Page 138 Line 16 )

A. Okay. "I need you to specify for Royce how we can structure the terms of the notes from Royce Holdings to Mike Manners so it is not required to be included in the financial statements of Roycebuilders.com and its subsidiaries. Please see the attached schematic for reference."

Q. All right. So what we have here is they're -- they're -- were trying to device[127] a method by which they will not need to put your note on the balance sheet of Royce; is that correct?

A. Looks like it, yes.

Q. And they're going through certain different possibilities in the next six bullet points, apparently, correct?

A. Yes.

Q. And then at the bottom, it says -- in the final paragraph it says, "We are discussing terms of the note with Mike on Wednesday the 10th" --

A. Uh-huh.

Q. -- "so need to" -- "need your creative input on this by the end of the day Monday." Do you see that?

A. Yes.

Q. Okay. So, apparently, they're brainstorming as to how they can keep your debt off of the balance sheet of Royce and they're going to discuss that with you?

A. Okay.

Q. Does that appear to be where we're at?

A. Yes.

Back to Fraud/Fraud Scheme

**Manners Excerpt 32** (Manners 2004 Examination, Page 140, Line 4 to Page 141 Line 8)

---

[127] This is a transcription error. It should state, "devise."

Exhibit B

Q. Okay. Why would they be trying to keep -- do you understand why they would be trying to keep your debt off the balance sheet?

A. Yeah, separate the two things. But, you know, my memory is that it was always John that was going to be buying it, not an internal leverage buyout. And, yeah, definitely the balance sheet would look much worse with that on there.

Q. In other words, if they stuck $33 million or $34 million onto their balance sheet –

A. Yeah.

Q. -- that would wipe out all the equity in the company, wouldn't it?

MR. GIBSON: Objection; form.

MR. JOHNSON: Objection; form.

A. No, it would not.

Q. (BY MR. DUNCAN) Well, it would take off -- well, let's put it real simple.

A. Yeah.

Q. If you took $33 million and you put it on the balance sheet, you'd have $33 million left[128] in equity in the company?

A. No, because --

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. -- at least part of that would be goodwill. I'm not quite sure how that accounting would be.

Q. (BY MR. DUNCAN) But, obviously, there's a concern about the leverage ratios?

A. Yes, there is.

Back to Fraud/Fraud Scheme

[128] Transcription error. This word was "less."

Exhibit B

**Manners Excerpt 33**   (Manners 2004 Examination, Page 145, Line 5 to Page 146 Line 15)

Q.   Now, if you could read on Exhibit No. 100 the e-mail on the last page that we're talking about.

A.   "John, You realize that while we are leaving the equity in the entities of their original carrying value, the balance over time will in essence shrink to probably where John would have been on a purchase accounting and push down the debt due to the additional distributions he will talk out of the company to pay the personal debt.  We are just buying a little extra time so hopefully we can offset with future profits.  At least we don't have to deal with purchase accounting.  One of my guys said it would be later on this evening before he could give any comments.  What time is John meeting with Mike?"

Q.   And Mike -- "John" would be John Speer?

A.   Yeah.

Q.   And "Mike" would be you?

A.   I'm sure it is, yes.

Q.   Okay.  And what they're talking about is using the distributions from the company to pay his personal debt; is that correct?

A.   Yes.

Q.   And what we're talking about is the -- if it's his personal debt, he's getting the equity, correct?

A.   He's withdrawing equity, yes.

Q.   Okay.  Well, he's -- he's the one that's going to get the interest in -- we're taught -- if it was the company that was acquiring the –

A.   Oh, yeah.

Q.   You follow what I'm saying?

A.   Yeah.  He's buying the equity.  Yes.

Q.   He's buying the equity and we're going to have the company paying for the purchase price?

Exhibit B

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

MR. JOHNSON: Objection; form.

A. Correct.

Back to Fraud/Fraud Scheme

**Manners Excerpt 34** (Manners 2004 Examination, Page 147, Line 4 to Page 147 Line 14 followed by Manners 2004 Examination, Page 147, Line 21 to Page 150 Line 9)

Q. All right. What is your understanding of what they're talking about, "pushing down the debt due to the additional distributions," what does that mean?

A. To show the purchase debt on the consolidated balance sheets.

Q. So eventually, it's going to have to be shown on the balance sheet --

A. Yes.

Q. -- that the company is actually paying the debt; is that correct?

A. Yes.

********************

Q. (BY MR. DUNCAN) All right. Let's go to Exhibit 100 –

A. We're still on it.

Q. -- the second -- second page. And, again, this looks like it was done on May 9th of 2006; is that correct? It's on the top of the page there, Page 2. "May 9th," in small print.

A. Okay.

Q. And this, again, is, "Royce- Commercial Bank Buyout Alternative;" is that right?

A. Yes.

Q. And if you could read that e-mail?

A. Sure. "Dear Sid, we met with Mike Wednesday at 1:00 p.m. And yes, any distributions to John funded with Royce level debt will pull down partners' capital but this will occur after the debt funds. The historic balance sheet will not reflect purchase accounting and there will be no minority interest carve out for Royce Phoenix and PLC. As and when any Royce level debt is paid off with Royce level earnings, partners capital will rebuild. Query what is involved issuing 'consolidated' financials for Royce Homes" -- sorry -- "Royce Holdings once it holds all of John and Mike's interests? And can prior periods be restated to include Phoenix and PLC in the consolidated financials without a minority interest carve out?"

Q. All right. So apparently, they met with you on the 1st; is that right? Wednesday -- it says, "We met with Mike -- " and "Mike" would be you?

A. Yeah.

Q. " -- Wednesday at 1 p.m."

A. Yeah.

Q. All right. And there was discussions about this problem with the -- including the debt on the balance sheet of Royce; is that correct?

A. I cannot recall.

MR. SHURN: Object to form.

MR. GIBSON: Objection; form.

Q. (BY MR. DUNCAN) All right. You can't recall, but does that seem reasonable that that would be the subject of conversation?

A. Not necessarily. I don't know that this was necessarily anything to do with me and what John's putting together.

Q. Well, they have to decide how they're going to structure the deal because they're concerned about –

A. Yeah.

Q. -- reflecting it on the balance sheet of Royce; is that correct?

A. Sounds like it, yes.

Exhibit B

Q. And in order to do it otherwise, you're the other party in the transaction, correct?

A. I am, yes.

Q. And in order to -- instead of having Royce as the person reflecting the debt and having John as reflecting the debt, you have to be involved in it because you're going to have to sign the paperwork, correct?

A. That would be correct.

Q. So they would be explaining to you why they want to change it from Royce to John Speers as the person reflected on the debt, correct?

A. If that was where we were at, yes.

Back to Fraud/Fraud Scheme

**Manners Excerpt 35** (Manners 2004 Examination, Page 193, Line 10 to Line 17)

Q. Okay. And you realize -- well, you had no problem in changing from having on the documents that it was John Speer that was obligated as opposed to Royce Homes; is that correct?

MR. JOHNSON: Objection; form.

A. I don't have a problem with that, correct.

Q. (BY MR. DUNCAN) You didn't at the time?

A. I don't now.

Back to Fraud/Fraud Scheme

**Manners Excerpt 36** (Manners 2004 Examination, Page 194, Line 12 to Page 197 Line 7)

Q. Right. So in order for this to occur where we don't have Royce on -- on the obligation –

A. Uh-huh.

Q. -- even though Royce, apparently, is paying the consideration, you had to say, "Yes, I will allow the documents to be papered the way they are."?

MR. JOHNSON: Objection; form.

MR. SHURN:  Objection; form.

MR. GIBSON:  Objection; form.

A.      Are you saying otherwise the deal would not have happened?

Q.      (BY MR. DUNCAN)  Yeah, you could have said, "No, I will not cooperate in that."

A.      Well, I could have done; but I don't think it would have made any difference how it was presented, it would have still happened.

Q.      But if it was done the other way, it would have had to have been reflected on the balance sheet if Royce was actually going to make the payments.

A.      I don't believe for one second that all of John's lenders were not fully aware of the deal that he was doing.

Q.      Okay.  And you're guessing on that, right?

A.      I'm guessing, but I'm projecting from our first deal where we went to all of the lenders and showed them what we were doing and they agreed to it.

Q.      Okay.  And that was in the first deal?

A.      That was the first deal, yes.

Q.      And the understanding was that it wasn't going to affect the equity.  In fact, in the first deal, if it brought the equity below a certain level, you -- the money had to be put back in the company; is that right?

A.      May well have had to, yes.

Q.      Right.  And this is a different deal?

A.      No, it is a different deal; but I don't think that this was done without any knowledge of any lenders.

Q.      But the difference though is, in the first deal -- when you were involved in that first deal, it was put in the paperwork that if it affected the equity in the company –

A.      Yeah.

Q.       -- that the money would actually have to be put  back in the company in order to maintain the equity?

Exhibit B

A. Or not be withdrawn, yes.

Q. And the reason for that was because if the equity had dropped below a certain level, it would affect the company's ability to conduct business?

A. Yes.

Q. And that conducting of a business was to borrow money so you could acquire and develop property?

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. Correct.

Q. (BY MR. DUNCAN) Okay. And in this transaction, we didn't have that situation; is that correct? The equity --

A. Which transaction? I mean, what situation?

Q. I'm talking about the second, the 2006 transaction.

A. No, I understand that. What situation?

Q. Well, the fact that, here, the equity was being drawn down on the company; is that correct?

A. John was making withdrawals on the company and taking the equity down, yes.

Q. Right. And that ultimately led to, to put it bluntly, the destruction of the company, that the equity levels had dropped too low?

MR. JOHNSON: Objection; form.

MR. SHURN: Objection; form.

MR. GIBSON: Objection; form.

A. That could be one of the factors, yes.

Back to Fraud/Fraud Scheme

**Manners Excerpt 37** (Manners 2004 Examination, Volume 1, Page 153, Line 6 to Page 155 Line 21)

Q.     Now, 75 is what we call -- well, it's titled, "Salient Facts for the Purchase of M G Manners Interest in Royce Homes, LP and Related Affiliates," correct?

A.     Yes.

Q.     If you could go to the second page and there's a title, "Chairman Emeritus;" is that correct?

A.     That's correct, yes.

Q.     Can you read that?

A.     "MGM will serve as Chairman Emeritus retain current salary and benefits for a minimum of three years."

Q.     Okay. So after the company was sold -- the 100 percent interest was sold to John –

A.     Yes.

Q.     -- you wanted to retain getting paid a salary and benefits for another three years after that; is that correct?

A.     Yes.

Q.     Now, you weren't going to perform any services, is that right, it was kind of a honorary position?

A.     Correct.

Q.     Okay. And you did not perform any services after the -- or did you?

A.     I don't think I did

Q.     Well, okay. Let's take a look at Exhibit 101.
       (Marked Manners Exhibit No. 101.)

       THE WITNESS: Thank you.

Q.     (BY MR. DUNCAN) All right. Now, if we look at Exhibit 101, there's two e-mails on here. The first e-mail starts on the second page, pretty much. Well, we have at the bottom of Page 1 of Exhibit 101 we see that there's -- this is a August 2nd, 2006, e-mail, correct?

A.     Yes.

Exhibit B

Q.     And this, again, was from you to John Ransom; is that right?

A.     Yes.

Q.     And John Ransom, can you tell me who he was?

A.     He's an attorney with Porter & Hedges.

Q.     Okay. And was he putting together some of the paperwork for this -- the buyout?

A.     Well, he did, yeah.

Q.     Okay. On Page 2, at the first paragraph, can you read that?

A.     Yes. "It is the intention of my agreement with John Speer that Royce will pay me a salary of $160,000 p.a. and provide me with medical insurance, a vehicle and credit card for motor expenses."

Q.     Okay. And then if you go to Page 1, at the top e-mail it looks like Mr. Ransom is responding to you on August 7th -- 2nd of 2006?

A.     Yes.

Q.     And what does he say?

A.     "Thanks for the info. I will integrate into the documents."

Q.     Say that one more time.

A.     "Thanks for the info. I will integrate into the documents."

Q.     So he's responding to you, saying, okay, we will -- we're going to pay the 160 salary, we're going to give you medical insurance, vehicle, and credit card for the -- the motor expenses, correct?

A.     Correct. Yes.

Q.     Okay. And that's kind of what you had asked for earlier in – I think it was 75 –

A.     Yeah. That's what we'd agreed.

Q.     –under the "Chairman Emeritus"?

A.     Yes.

Exhibit B

Back to Fraudulent Transfer Chairman Emeritus
Back to Fraudulent Transfer Performed No Service
Back to Fraudulent Transfer Salary and Benefits

**Manners Excerpt 38** (Manners 2004 Examination, Page 156, Line 14 to Line 16 followed by Page 157 Line 10 to Page 159, Line 17, followed by Manners 2004 Examination, Page 160, Line 1 to Line 7)

Q.     Okay. So you were serving after the buyout as a Chairman Emeritus of Royce Homes, L.P.?

A.     Correct.

(Marked Manners Exhibit 103.)

Q.     (BY MR. DUNCAN) Okay. And does Exhibit 103 appear to be your W2s or your -- the money that you had received as salary from Royce Homes, L.P., from 2006 through 2008?

A.     2006, 2007, yes. And I guess it appears to be for 2008 as well. I don't see a date on that one though.

Q.     Okay. Yeah. That's -- okay. Let's go through them one at a time here.

A.     Okay.

Q.     Page 1 of Exhibit 103 appears to be a W2 issued to you by Royce Homes, L.P.?

A.     Yes.

Q.     And it shows that you made how much that year?

A.     It shows -- this one's really blurred. Wages, tips and other compensation, looks like it's 141,800.

Q.     Maybe 80; is that right?

A.     On the second one it's 80 but this looks like 820 here.

Q.     Okay. So $141,820.08 it appears to be?

A.     Yeah.

Q.     And for the last -- the last three months of the year that was -- that part of your salary was under this Chairman Emeritus situation; is that correct?

Exhibit B

A.     Yes.

Q.     Okay. And then we have Page 2 of Exhibit No. 102 --

A.     Uh-huh.

Q.     -- appears to be a W2 from Royce holdings to -- okay. We're looking at Exhibit 103 –

A.     Yes.

Q.     -- page 2 –

A.     Yes.

Q.     And it appears to be a W2 from Royce Homes, L.P., to you for the year 2007; is that correct?

A.     Correct.

Q.     And how much does it show that you made that year?

A.     Wages tips and other compensation $141,080.08.

Q.     All right. And is that the amount that you got paid by Royce Homes, L.P. in 2007?

A.     No.

Q.     How much?

A.     160,000.

Q.     And how was that? Why was it 160?

A.     Because that was what we agreed to. I'm assuming that's what I got. The difference between this and the 160 would be 401k contributions.

Q.     Oh, okay. This is this is your taxable income?

A.     Yeah, because the medicare wages shows 156,000.

Q.     All right. So actually in 2007 you got 161,000; is that your recollection?

A.     160.

Exhibit B

Q. 160,000 from Royce Homes, L.P.?

A. I'm sure I did, yes.

Q. And that would be under the Chairman Emeritus arrangement you had?

A. Yes.

Q. Yeah. The final year, you got approximately 87,533 paid by Royce to you?

A. I -- I don't know what the exact amount would be. 13,000, I don't think that came from Royce. So I think the 74,000 came from Royce Homes, L.P., but even that would have been slightly higher due to the 401k contributions.

Back to Fraudulent Transfer

**Manners Excerpt 39** (Manners 2004 Examination, Page 162, Line 19 to Line 24)

Q. Okay. Now, did you -- I might have asked this, but you didn't do anything to earn the 161,000 you were receiving each year; is that correct?

A. Not as Chairman Emeritus.

Q. The 160?

A. Yeah.

Back to Fraudulent Transfer

**Manners Excerpt 40** (Manners 2004 Examination, Page 164, Line 2 to Line 20)

Q. Okay. And you were receiving insurance benefits paid by Royce Homes after the buyout; is that correct?

A. Correct.

Q. And these -- this continues all the way up to the time the company shut down; is that right?

A. No. It was before then that it stopped.

Q. Do you know how far into the process?

A. Just a ballpark guess?

Q. Yeah.

A. I think March of '08, something like that.

Q. Okay. And why did they tell you they were ending it for you?

A. They couldn't afford to pay me anymore.

Q. Okay. And this wasn't a month -- I -- I -- I understand that Royce was also paying Elan employees benefits but you were reimbursing those; is that correct?

A. Yes, that is correct.

Q. But yours was not in that page?

A. No, mine was not reimbursed.

Back to Fraudulent Transfer

**Manners Excerpt 41** (Manners 2004 Examination, Page 165, Line 9 to Page 168 Line 16)

Q. Okay. Now, this was pulled from the ledgers of Royce Homes. And if you look on the first page it says, "Autos & Trucks Account" -- well -- "AC1720." And then it -- if you look across the title there, it has the balance as of 12/31 of '06 and then it goes to '07; do you see that?

A. Yes.

Q. Okay. Now, if you turn to the second page, there is an account set up for you and Mr. Speer; but let's talk about yours here.

A. Yeah.

Q. It shows that for an -- I guess for an auto -- you had an auto, a $36,000 auto; is that correct?

A. I did at one time, yes.

Q. And it also shows that in 2007 there's still a balance on the auto?

A. Yes.

Q.     When -- how long did you keep the Royce Homes company car?

A.     I think I got rid of it in '06.

Q.     '06?

A.     Uh-huh.

Q.     But they're still reflecting it on the books?

A.     Yes, they are.

Q.     Okay. And how did you get rid of it?

A.     I traded it in against a new vehicle.

Q.     Okay. And you used the equity in that vehicle to purchase a new one?

A.     Yes.

Q.     Okay. So you kept the equity and you applied it to your new vehicle that you acquired?

A.     Yes, I did.

Q.     All right. Did you reimburse Royce Homes for the equity you applied?

A.     No. They were supposed to reimburse me for the equity of the vehicle that I bought.

Q.     Oh, okay. So you got a new vehicle?

A.     Yes, I did.

Q.     And you -- you expected them to pay your car payment?

A.     No. Pay for the capital, we did the financing.

Q.     Okay. So you bought the new vehicle?

A.     Yes.

Q.     All right. And what year was the car that you had and the model that you had when you -- before you traded it in?

Exhibit B

A.     I can't remember the year, it was probably an '03 and it was a Cadillac Escalade.

Q.     Okay. And how much did you get as a trade in?

A.     I think it was about 15,000, something like that.

Q.     Okay. And you think that was in late '06?

A.     Sorry. I've got to try -- yes.

Q.     Okay. What did you replace the car with?

A.     A Hummer.

Q.     Okay. A Hummer 2, 3, which one?

A.     2.

Q.     2. Okay. Did Royce ultimately reimburse you for the difference?

A.     No.

Q.     Okay. Okay. Now, Royce was to pay your expenses in regards to your vehicle; is that correct?

A.     Correct.

Q.     Did you get a card or did you submit them?

A.     No, I had a card.

Q.     Okay. So you had a Royce credit card?

A.     Yeah.

Q.     Was it like American Express, Visa?

A.     No. It was American Express.

Q.     Okay. And how long did you have that for?

A.     I think through about May of '08.

Q.     Okay. And what type of expenses would you submit in regards to that?

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 453
Back to Table of Contents

Exhibit B

A. I didn't submit, charged.

Q. I'm sorry. Charged. Yeah.

A. I think gas was about it.

Q. Okay. And do you have a copy of those statements?

A. No, I don't.

Q. Would they -- I guess they were billed directly to Royce?

A. Correct.

Q. And Royce would pay them?

A. Yes.

Back to Fraudulent Transfer

Exhibit B

# Speer 2004 Examination Excerpts

Exhibit B

**Speer Excerpt 1** (Speer 2004 Examination, Volume 2, Page 129, Line 12 to Line 24.)

Q. Now, Hammersmith Group was the general partner for both Royce Homes, LP, and Park Lake, correct?

A. Hammersmith Group, Inc., I believe, was the general partner for both.

Q. And you were the president of Hammersmith Group, Inc., correct?

A. I believe so.

Q. And you owned a hundred percent interest in Hammersmith Group, Inc.?

A. I, I'd have to go back and check the schedules, but I believe so.

Back to Breach of Fiduciary Duty
Back to Westwood Gardens Facts

**Speer Excerpt 2** (Speer 2004 Examination, Volume 1, Page 12, Line 3 to Line 12.)

Q. (BY MR. DUNCAN) All right. In 2006, 2007, 2008, does Page 2 of Exhibit 159 represent the officers of Royce Homes, LP?

A. It appears to.

Q. Okay. And you were, you were the president of Royce Homes, LP; is that correct?

A. Yes, sir.

Q. All right. And that was in 2006, 2007, and 2008?

A. Yes, sir.

Back to Breach of Fiduciary Duty
Back to Westwood Gardens Facts

**Speer Excerpt 3** (Speer 2004 Examination, Volume 1, Page 13, Line 3 to Line 19.)

Q. (BY MR. DUNCAN) All right. And you are the president and chief executive officer for Royce Homes, LP, from 2006 through 2008; is that correct?

A. Yes.

Q.      And you were also -- for Park Lake Community, you were the president and CEO -- or you were the CEO of Park Lake Community; is that correct?

A.      Yes.

Q.      Okay.  And that was for –

A.      Let me clarify that I was the CEO.  I wasn't the president.

Q.      Right.  You were the chief executive officer for Park Lake Community in 2006, 2007, and 2008; is that correct?

A.      I don't remember the exact dates, but I wouldn't disagree with that.

Q.      Okay.  Well, you were for sure in 2007 and 2008?

A.      I believe so.

Back to Breach of Fiduciary Duty
Back to Westwood Gardens Facts


**Speer Excerpt 4** (Speer 2004 Examination, Volume 1, Page 14, Line 3 to Line 14.)

Q.      Okay.  If you go to -- on Page -- I'm sorry.  Exhibit 160, go to Bates Stamp No. 8499, and, again, if you look down at the bottom, this is a list of employees and their titles for Royce Homes, LP, that was provided by your counsel, Mr. Stephen –

A.      Okay.

Q.      -- Shurn.

        MR. HARRELL: Object to the form.

Q.      (BY MR. DUNCAN) You were the -- again, you were the president and CEO of Royce Homes, LP; is that correct?

A.      Yes, sir.

Back to Westwood Gardens Facts

Exhibit B

**Speer Excerpt 5** (Speer 2004 Examination, Volume 1, Page 129, Line 25 to Page 130, Line 11.)

Q. All right. Now -- and I, I -- let's just get the parameters here. Royce Homes, LP, was engaged primarily in the construction and sale of single-family homes, correct?

A. Yes, sir.

Q. And Park Lake was engaged in the development of land and the sale of finished lots?

A. That and, and acquiring lots on behalf -- on -- negotiating lot contracts on behalf of Royce Homes and Texas Colonial.

Q. All right. And Park Lake sold lots to Royce Homes?

A. To a variety of the entities.

Q. How many different entity -- what percentage would you say of Park Lake's business was Royce Homes, LP?

A. I would guess a high percentage. I have no way of calculating that.

Q. Would it be close to 90 percent?

A . I, I don't know. There's no way to know that.

Q. Well, is –

A. If you're talking -- are you talking about inside versus -- inside the Royce entities versus outside the Royce entities? Inside the Royce entities, I would say a hundred percent.

Q. Okay. And then they did some other outside deals, are you saying, Park Lake did?

A. I think they looked at it every once in a while. I think they might have sold some lots at one time. I don't remember enough details to be able to speak to it.

Q. Okay. But in 2008 was Royce Homes primarily -- Royce Homes, LP, the primary customer of Park Lake Community?

A. It would be -- certainly be a primary one. The other entities, Texas Colonial Homes and some of the others, might have also been in that chain.

Back to Westwood Gardens Facts

**Speer Excerpt 6** (Speer 2004 Examination, Volume 2, Page 131, Line 12 to Page 133, Line 10.)

Q. Okay. Now, Park Lake acquired the Westwood tract of land in early of 2006. Does that sound right?

A. Sometime in 2005, 2006 is the time frame. I'm not sure of the exact time.

Q. If you could, go to Bates No. 38613 of 11 Exhibit 133.

MR. SHURN: And, Mike, mine are cut off. I'm not saying that y'all –

MR. DUNCAN: Okay. I'll give you a page number when I get there.

MR. SHURN: Please.

THE WITNESS: Page 10 at the top.

MR. SHURN: Page 10 at the top? Thank you.

Q. (BY MR. DUNCAN) Okay. Now, I'm just trying to get a description of the lots that we're talking about. There was basically -- it says here 163 lots out of about 252. There -- was there 163 lots that you -- that Vestalia eventually obtained through the foreclosure sale?

A. I believe that that is accurate.

Q. Okay. And does Page 10 appear to be a legal description or a description of those particular lots?

A. I have no way of knowing that unless I sat and compared them.

Q. Okay.

A. But I have no reason to believe it isn't.

Q. All right. And the, the lender to Park Lake, do you recall that was Wachovia?

A. Yes, sir.

Back to Westwood Gardens Facts

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 459
Back to Table of Contents

Exhibit B

**Speer Excerpt 7** (Speer 2004 Examination, Volume 2, Page 134, Line 9 to Page 135, Line 11.)

Q. Let me make the clarification there.

You said that, for example, on the Westwood Gardens property, that you believe that it was not -- it wouldn't be unusual for Royce Homes, LP, to be either a codebtor or a guarantor on the, the debt; is that correct?

A. Yes, sir.

Q. Is that because Royce Homes was -- out of all the entities, it was probably the most -- it had the most equity in –

A. I think it was more because initially when those entities were first started and first started borrowing money they didn't have much equity at all in them, you know, and, so, when loan agreements were established, you know, a, a -- cross guarantee -- would be provided as a courtesy to the lender –

Q. Okay.

A. -- and certainly at their request.

Q. And that cross-guarantee would typically come from Royce Homes, LP?

A. Yes, sir.

Q. Okay. And that's because that's where most of the revenue was generated out of the related entities; is that correct?

A. It was –

MR. HARRELL: Object to form.

A. It was certainly the largest of the operating entities.

Back to Westwood Gardens Facts

**Speer Excerpt 8** (Speer 2004 Examination, Volume 2, Page 135, Line 12 Line 25.)

Q.      (BY MR. DUNCAN)  Okay.  And are MUD receivables typically a reimbursement of a, a portion of the developer's cost for installing the utilities, such as water, sanitary sewers, and storm sewers?

A.      Generally speaking.

Q.      Okay.  And Park Lake owned MUD reimbursements owed to it by the Westwood -- I'm sorry, by the West Harris County Municipal Utility District No. 11; is  that correct?

A.      Up and to the point that it lost them, yes, sir.

Q.      Okay.  And these MUD receivables related to the Westwood Gardens?

A.      In that particular instance, yes, sir.

Back to Westwood Gardens Facts


**Speer Excerpt 9** (Speer 2004 Examination, Volume 2, Page 136, Line 7 to Line 14.)

Q.      Okay.  Now, you're aware that during the course of Royce's dealings with Park Lake, that Royce would advance funds to Park Lake; is that correct?

A.      Yes, sir.

Q.      And you're aware that in September of 2008, that Royce Homes, LP, was a creditor of Park Lake, correct?

A.      Yes, sir.

Back to Westwood Gardens Facts


**Speer Excerpt 10** (Speer 2004 Examination, Volume 2, Page 136, Line 15 to Page 137, Line 4.)

Q.      And, actually, Amegy had requested information related to the debt that was owed between Royce Homes, LP, and Park Lake.

Exhibit B

MR. GIBSON:  Objection.  Form.

Q.     (BY MR. DUNCAN)  Do you recall that?

A.     I, I believe I remember that from the Chris Denison deposition.

Q.     Okay.  And you actually provided Amegy Bank with the information that showed that as of September 24  2008 Park Lake owed a debt to Royce Homes?

MR. GIBSON:  Objection.  Form.

A.     As of when?

Q.     (BY MR. DUNCAN)  September of 2008.

A.     Either I or maybe an accountant might have provided that at the time.

Back to Westwood Gardens Facts

**Speer Excerpt 11** (Speer 2004 Examination, Volume 2, Page 137, Line 19 to Page 138, Line 18.)

Q.     All right.  Take a look at Exhibit 134.  And I  think we looked at this in another exhibit -- this is part of another exhibit that we looked at this morning, but Exhibit 134 appears to be a financial statement as of 8/31 of 2008; is that correct?

A.     Yes, sir.

Q.     And that's your financial statement?

A.     Yes, sir.

Q.     And it is signed by you at the bottom?

A.     Yes, sir.

Q.     And it lists Park Lake Communities and TCH Land at a value of zero dollars; is that correct?

A.     Yes, sir.

Q.     And is that because of as of September -- well, as of August 31st of 2008 you valued the investment in Park Lake at zero dollars?

Exhibit B

A. Yes, sir.

Q. And, again, Park Lake's main customer was Royce Homes, LP, correct?

A. Yes, sir.

Q. And at that point Royce Homes was shut down?

A. Yes, sir.

Q. And Royce Homes was no longer purchase, purchasing lots from Park Lake, correct?

A. Or anybody else.

Back to Westwood Gardens Facts

**Speer Excerpt 12** (Speer 2004 Examination, Volume 2, Page 139, Line 12 to Page 140, Line 8.)

Q. Park Lake had ceased business in 2000 -- in August of 2008; is that correct?

A. Yes, sir, and I apologize if I missed that, also.

Q. Yeah. All right.

A. If I'm –

THE WITNESS: Good, good catch, Rodney.Thank you. I appreciate the help.

Q. (BY MR. DUNCAN) And Park Lake was not paying its lenders by August of 2008?

MR. GIBSON: Objection. Form.

A. Or anybody else, to my knowledge.

Q. (BY MR. DUNCAN) All right. And was Park Lake beginning to liquidate or sell off its -- or attempting to sell off its assets by August of 2008?

A. It wasn't doing anything one way or the other.

Q. Okay. It was just sitting there, basically; is that –

A. Yes, sir.

Q. Okay. But Park Lake was not operating by August of 2008; is that correct?

A. Yes, sir.

Back to Westwood Gardens Facts

**Speer Excerpt 13** (Speer 2004 Examination, Volume 2, Page 159, Line 1 to Page 160, Line 11.)

Q. Why didn't you buy the lots from Park Lake?

A. Park Lake was in severe default with Wachovia, and Wachovia was in -- I -- they had control over the lots.

Q. Okay. But you could have bought the lots for the amount of the, the note, right?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. Frankly, the thought never occurred to me. I don't know.

Q. (BY MR. DUNCAN) You never thought about buying the lots from Park Lake for the amount of the note –

MR. HARRELL: Object to form.

Q. (BY MR. DUNCAN) -- instead of going through this whole process?

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. No, sir.

Q. (BY MR. DUNCAN) Now, you were the chief executive officer of Park Lake, correct?

A. I'm sure at that point in time I -- it certainly wasn't operating anymore.

Q. But you were still the chief executive officer of this -- of Park Lake in September of 2008, correct?

A. I believe that was the case.

Q. And you were also the chief executive officer and president of Royce Homes, LP, correct –

A. Yes, sir.

Q. -- in September of 2008?

A. I'm sorry. Yes, sir.

Q. Okay. And you just never thought of possibly buying the note directly from Park Lake?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. Frankly, no.

Q. (BY MR. DUNCAN) The -- I'm talking about the lots and the, the MUD receivables.

MR. HARRELL: Object. Form.

A. Frankly, no.

Back to Westwood Gardens

**Speer Excerpt 14** (Speer 2004 Examination, Volume 2, Page 164, Line 12 to Page 166, Line 25.)

Q. And if we -- let's, let's look at the, the e-mail, e-mail that starts on the first page, and that, that was sent to you -- is that correct -- on Exhibit 137?

A. Yes, sir.

Q. And if you turn to the second page of Exhibit 137, what does number five say?

A. "Number five" -- you want me to read it?

Q. Yes.

A. -- "Please confirm if Park Lake owes Royce Homes any money. What was the date of their last transaction?"

Q.      Do you know why Amegy was interested in whether Park Lake owed Royce Homes any money?

        MR. GIBSON:  Objection.  Form.

A.      This was from their attorneys.  So, I'm sure they had some point of reference for it, but it was something they asked for.  So, I probably provided for it or had somebody provide it to them.

Q.      (BY MR. DUNCAN)  Okay.  But never gained any understanding of why they wanted that info?

A.      There was a lot of information that they wanted, and I tried to provide whatever I could.

Q.      Did you ever inquire as to why they wanted to know how much was owed by Park Lake to Royce Homes?

A.      Not that I can recall.

Q.      Okay.  Let's look at Exhibit 138, and if you look at the bottom of 138, does it appear that you are sending on 9/26 of 2008 the information that they had requested, the subject matter being Park Lake's financial and N/P to Royce?

A.      Yes, sir, it does.

Q.      Okay.  And, "N/P," is that notes payable, basically?  Does that sound about right?

A.      I'm guessing that's probably what it was.

Q.      Okay.  And you say:  "Here are Park Lake's  financials.  I will forward you tax returns next." Is that right?

A.      Yes, sir.

Q.      And –

        MR. GIBSON: What exhibit number are we on?

        MR. DUNCAN: We're on 138. There you go.

        MR. GIBSON: This is the one where we're missing the first page --

        MR. DUNCAN: Okay.

Exhibit B

MR. GIBSON: -- because we hadn't gotten our copy yet from the court reporter.

MR. DUNCAN: All right.

MR. GIBSON: Can I come over and look over your shoulder?

MR. DUNCAN:     Sure.  It just basically says:  Here are Park Lake's financials, and I'll  forward you tax returns next.  John.

MR. GIBSON:     Okay.  Thanks.

Q.     (BY MR. DUNCAN)  And then attached to that e-mail is financials; isn't that correct?

A.     Yes, sir, that appears to be the case.

Q.     And if you go to Bate No. 58311 –

A.     They're cut off.

Q     Oh, they are?  All right.  Go to the second-to-last page of Exhibit 138.  And does it appear  that there's a note payable of $4,495,869.31?

A.     Yes, sir, it does.

Back to Westwood Gardens $4.9 Million
Back to Westwood Gardens Amegy Knew Royce Homes a Creditor


**Speer Excerpt 15** (Speer 2004 Examination, Volume 2, Page 172, Line 11 to Line 14.)

Q.     (BY MR. DUNCAN)  Did anybody, did anybody ever tell you that Amegy didn't want you to be an owner of NewCo or –

A.     They might have.

Q.      -- Vestalia?

MR. GIBSON:  Objection.  Form.

A.     They might have.

Back to Westwood Gardens Facts

Exhibit B

**Speer Excerpt 16** (Speer 2004 Examination, Volume 2, Page 173, Line 25 to Page 174, Line 8.)

    Q.      Well, what is -- what would be your understanding of why?

              MR. HARRELL:  Object.  Form.

              MR. GIBSON:  Objection.  Form.

    A.      There's a difference between understanding and guessing.  I told you I could guess at that.

    Q.      (BY MR. DUNCAN)  Give me your guess.

    A.      I would guess that it would be simpler for  them if nobody was related to Royce Homes that was a part of NewCo.

Back to Westwood Gardens Facts

**Speer Excerpt 17** (Speer 2004 Examination, Volume 2, Page 182, Line 24 to Page 184, Line 5.)

    Q.      (BY MR. DUNCAN)  Okay.  So, let me get it right, then.  You're saying that your understanding is that on 9/25 of 2008 Amegy was considering making the loan to a third party and not to you –

              MR. GIBSON:  Objection.  Form.

              MR. HARRELL:  Object.  Form.

    Q.      (BY MR. DUNCAN)  -- for the funding of, of  Vestalia?

              MR. HARRELL:  Object.  Form.

               MR. GIBSON:  Objection.  Form.

    A.      I don't have -- in the entirety of number five, I have no understanding one way or the other  about this.  I don't have any recollection discussing any of the factors in it.

    Q.      (BY MR. DUNCAN) Okay.  But you don't think this relates to the foreclosure of the lots and the MUD receivables?

    A.      No.  And I don't see any reference point to imply that.

Exhibit B

Q.   Well, take a look -- just move up one sentence.

A.   Yes, sir.

Q.   What does that say?

A.   "Amegy will agree to foreclose on the lots and MUD receivable by credit bid at the sale."

Q.   What lots and MUD receivables do you think they're talking about?

A.   Again, I can't guess, but I'll -- in this particular case, I would presume that they're referring -- that -- if the one that was anticipated at the time, which was the Westwood Gardens one, would come to fruition.

**Speer Excerpt 18** (Speer 2004 Examination, Volume 2, Page 190, Line 4 to Page 192, Line 24.)

Q.   All right.  And it -- if you go to Page 2 of Exhibit 144, it says "Bid amount" at the top of the page, and there's a bunch of different numbers included in that calculation; is that correct?

A.   Okay.

Q.   And it comes out to be $2,633,952.28; is that correct?

A.   Yes, sir.

Q.   And it says property sold for that amount plus $1; is that correct?

A.   That's what it says.

Q.   Is that your recollection of how the property sold?

A.   I wasn't there.  I don't, I don't have any recollection.

Q.   Who was there as a representative of Vestalia?

     MR. HARRELL:  Object.  Form.

     MR. GIBSON:  Objection.  Form.

A.      It would have been either Shawn Speer or Ryan Gresham or both.  I'm not sure.

Q.      (BY MR. DUNCAN)  Did you provide them with bidding instructions when they went to bid at the foreclosure sale?

A.      I think I had told them to bid up to a certain dollar amount, and I've by now forgotten what that amount would have been.

Q.      Okay.  If you could, take a look at Exhibit 144, Page 3 and 4, the third and fourth page. These look like there's credits and debits from certain accounts; is that correct?

A.      I'm not familiar with these documents.  That would be -- one says "credit account with funds."  The other says "debit account to transfer funds to" -- it's very difficult to read.

Q.      Okay.  If you look on the last page, we have the -- the dollar amounts are 2,633,935 -- is that --  I'm sorry -- $2,633,953.24; is that correct?

A.      I personally cannot read that amount.  The one above it, two million, six -- I think, thirty-three, nine fifty-three, seventy-eight or twenty-eight –

Q.      Okay.

A.      -- something like that.

Q.      All right.

A.      Oh, I'm sorry.  I was trying to look at the handwritten deal.  It says, in the printed deposit  amount, 2,633,953.28.

Q.      Okay.  And if you look at the second page of Exhibit 144, does that correspond to the amount where it says "property sold for"?

A.      It appears to, yes, sir.

Q.      Prior to going down to the foreclosure sale, did you make arrangements with Amegy Bank where you didn't have to come down there with a cashier's checks or with cash in order to facilitate the bid that was going to be made at the foreclosure sale for the Westwood lots and --

        MR. GIBSON:  Object.

Q.      (BY MR. DUNCAN)  -- MUD receivables?

Exhibit B

MR. GIBSON:  Objection.  Form.

A.     I don't recall if we had anything like that. It was my perception that, you know, we would  agree to pay for it and it would be part of our loan proceeds.

Q.     Okay.  So, the understanding prior to going to the foreclosure sale is that there was this loan authorization at Amegy Bank that could be used to facilitate the purchase of the Westwood Gardens lots and MUD receivables; is that correct?

A.     Well –

MR. GIBSON:  Objection.  Form.

A.      -- whatever, whatever was being bought at foreclosure.

Back to Westwood Gardens Facts

**Speer Excerpt 19** (Speer 2004 Examination, Volume 2, Page 205, Line 3 to Line 8.)

Q.     (BY MR. DUNCAN)  Well, you could have made -- expressed an intent to Park Lake, couldn't you?

A.     But I didn't.

Q.     Well, they were the ones that owned it, correct?

A.     Yes, they were.

Back to Westwood Gardens Facts

**Speer Excerpt 20** (Speer 2004 Examination, Volume 2, Page 208, Line 18 to Page 210, Line 11.)

Q.     All right.  You understood as the chief executive officer of Park Lake that you owed a duty to the company, correct, a fiduciary duty?

MR. HARRELL:  Object to the form.

A.     A variety of duties.

Q.     BY MR. DUNCAN)  And one of them is to protect Park Lake, correct?

Exhibit B

MR. HARRELL:  Object to the form.

A.     I don't –

Q.     (BY MR. DUNCAN)  Protect its interest?

A.     Yes, sir.

MR. HARRELL:  Object to the form.

Q.     (BY MR. DUNCAN)  And you chose to, instead of  buying the note through -- or buying the property through Park Lake, you chose to create a new company and purchase it through that company, correct?

MR. HARRELL:  Object to the form.

MR. GIBSON:  Objection.  Form.

A.     That has nothing to do with Park Lake or its interest.

Q.     BY MR. DUNCAN)  Well, if you bought the lots through Park Lake, the additional equity could have been used to pay its other creditors, couldn't it?

MR. HARRELL:  Object to the form.

MR. GIBSON:  Objection.  Form.

A.     I also had an, an obligation to whatever other entity that was there to buy lots at the best price that I could, and that was severely different -- distressed market times.

Q.     (BY MR. DUNCAN)  Okay.  So, as the chief executive officer of Vestalia, you felt that you had an obligation to that entity to get the best price you could to purchase the Westwood Garden lots and the MUD receivables?

A.     Any lots, wherever I bought them from, we had that obligation.

Q.     Including the Westwood Gardens lots?

A.     Or any others.

Q.     Okay.  And you were also the chief executive officer of Royce Homes, correct?

A.     Yes, sir.

Exhibit B

Q. And Royce Homes was owed money by Park Lake, correct?

A. I believe we went over that.

Back to Westwood Gardens Facts

**Speer Excerpt 21** (Speer 2004 Examination, Volume 2, Page 212, Line 22 to Page 213, Line 13.)

Q. (BY MR. DUNCAN) Okay. But what did occur is you put the -- you got -- you worked this deal out with Amegy Bank where you could get these lots and the MUD receivables into Vestalia, correct?

MR. HARRELL: Object to the form.

MR. GIBSON: Objection. Form.

A. I worked out to arrange a line of credit with Amegy Bank so we could purchase lots. Eventually they purchased a note from Wachovia and foreclosed on it, and we purchased lots at foreclosure.

Q. (BY MR. DUNCAN) And the equity that now exists in those -- the, the MUD receivables and the, the lots, that can be used by you and by Amegy; is that correct?

MR. HARRELL: Object to the form.

MR. GIBSON: Objection. Form.

A. If any equity comes to fruition.

Back to Westwood Gardens Facts

**Speer Excerpt 22** (Speer 2004 Examination, Volume 2, Page 194, Line 3 to Page 197, Line 18.)

Q. And then if you look at the top e-mail, on the second page of 1 -- Exhibit 145, this is an e-mail from Chris Denison to you on January 12th of 2009; is that correct?

A. Yes, sir.

Q. And it says, "We have to require that this be paid off and the lien released by Wednesday." Is that -- "Can you make that happen? Chris Denison."

A. Yes, sir.

Q. Okay. And this was before the property was foreclosed upon, is that correct, the –

A. I –

Q. -- Westwood Gardens?

A. I believe so.

Q. All right. If you can, go to the first page of Exhibit 145 and this is an e-mail from you to Chris Denison on 1/12/2009, subject "M & M Lien" and can you read that?

A. "Chris, this is the one that I had mentioned earlier that I wanted to make sure it got paid. Park Lake does not have the funds to pay this. All their funds had been moved into Royce, and those got garnished. I do not want to pay it personally or through Vestalia for obvious reasons," dot, dot, dot, "suggestions," question mark, question mark, question mark, question mark.

Q. And what was the obvious reasons?

A. Because it wasn't, it wasn't our obligation.

Q. It wasn't whose obligation?

A. Either mine or Vestalia's.

Q. Okay. Whose obligation was it?

A. Park Lake's –

Q. All right.

A. -- or Wachovia's, one, and now Amegy's.

Q. Well, they didn't, they didn't own the land. Park Lake did, right?

A. I, I -- at this point, they owned the note.

Q. Right. Let's go to Exhibit 146. That's an e-mail from Jason Walker to Ann Mayer; is that correct? And it's dated March 2nd of 2009?

A. It says -- yes, sir.

Q. Well, let's go back to 145 for a second.There was an M & M lien on the, the Westwood Gardens property. Who paid that lien off?

A. I think that I did.

Q. Out of -- where did you get the funds?

A. Probably a personal bank account. I don't -- I -- let me clarify that. I don't remember.

Q. All right. Go to Exhibit 146, and this is an e-mail from a Jason Walker, who -- and it's to Ann Mayer, "Subject: Park Lake Communities/Hammersmith Group: Westwood Gardens Detention Pond, Settlement Offer." Can you read that?

A. "Anna, I left you a message regarding my concerns over the check. The check is from Royce Homes, which could file for bankruptcy or be put into" -- "bankruptcy 'in' day now. Any payments from Royce are subject to a 90-day look back for the preference period. I'll either need a check from Amegy, the current owner of the property, or I'll need to cash the check and wait 90 days before I can provide you with a release. If a bankruptcy is filed within that 90 days, then the deal will be off unless the trustee agrees to waive any claim of preference to the settlement funds, which is unlikely. I really prefer a check from Amegy. It makes it a lot cleaner for all of us."

Q. Now, this e-mail is before the foreclosure sale took place on the Westwood Gardens property; is that correct?

A. It appears to be the day before.

Q. Okay. And Westwood Gardens still belonged to Park Lake at that point -- is that correct - before the sale?

A. I, I, I don't know.

Q. Why -- did you issue a check from Royce Homes to pay for this, this obligation on the Westwood Gardens property?

A. I must have.

Q. And why would you take a check out of Royce Homes to pay the obligation of Park Lake?

A. Because Park Lake's funds would have already -- had already been transferred, it said in previous deals -- so, I guess that's what happened -- into, into Royce Homes.

Q. And how much, approximately, was this check?

A. I believe this check was for 15 or 17,000, something like that.

Q. Okay. Is that the M & M lien we were talking about earlier?

A. Yes, sir.

Back to Westwood Gardens Facts

**Speer Excerpt 23** (Speer 2004 Examination, Volume 2, Page 127, Line 15 to Page 128, Line 20.)

Q. Now, you dealt with Mr. Denison as your loan officer at Amegy Bank in regards to the Westwood ardens subdivision and MUD receivables; is that correct?

MR. GIBSON: Objection. Form.

A. Yes, sir.

Q. (BY MR. DUNCAN) Okay. And Westwood Gardens and its MUD reimbursement rates were previously owned by Park Lake Community?

A. At one point in time in history.

Q. Okay. And Westwood Gardens and its MUD reimbursements were ultimately acquired by Vestalia, correct?

A. I believe in 2009 –

Q. All right.

A. -- if I'm not mistaken.

Q. And what is your ownership interest in Vestalia?

A. I don't know the exact percentage, but I think it's, I think it's about either 50 or 60 percent. I'm not sure.

Q. And who else is in that entity as an owner?

A. My wife, Donna Speer, is a separate owner and –

Q.      How much does she own?

A.      I, I'm not sure of percentages and hate to speak to it without knowing exactly. And then Shawn Speer and Shonna Speer.

Q.      Tell me who Shawn and Shonna are.

A.      Shawn is William Shawn Speer.  He's my son. Shonna is his wife.

Back to Westwood Gardens Facts

**Speer Excerpt 24** (Speer 2004 Examination, Volume 2, Page 142, Line 13 to Page 144, Line 6.)

Q.      Let me try to cut this short.  The -- let me summarize, and you tell me if you agree or not. Amegy purchased the note owed to Wachovia Bank by Park Lake; is that right?

A.      I believe that that happened.  I'm not sure what the timing on it is.

Q.      All right.  And then Amegy then posted a  foreclosure on the Westwood Gardens, which was owned by Park Lake, correct?

A.      It wasn't to that -- well, I guess,theoretically, it was still owned by them because they hadn't brought it into their ownership.

Q.      Okay.  So, the answer is yes, that what happened was Park -- what happened was Amegy posted a foreclosure of the Westwood Gardens, which was at the time owned by Park Lake?

A.       I, I -- that may, that may very well be.

Q.      Okay.  And the foreclosure also included the MUD reimbursements related to the Westwood Gardens –

        MR. HARRELL:  Object –

Q.      (BY MR. DUNCAN)  -- property?

        MR. HARRELL:  -- to form.

A.      That was part of the collateral that had been pledged to Wachovia.

Exhibit B

Q. (BY MR. DUNCAN) Okay. You had set up a new company called Vestalia; is that correct?

A. Yeah, some year and a half before that point in time, I believe.

Q. A year and a half before?

A. Before the foreclosure.

Q. Okay. Now, the foreclosure took place in, like –

A. I, I –

Q. Go ahead.

A. Maybe six months beforehand. I, I'm sorry.

Q. Okay. That's –

A. I apologize.

Q. So, you --

A. My math skills aren't very good today.

Q. Got you. You set up a company -- a new company called Vestalia in -- sometime in late 2008; is that correct?

A. Yes, sir. I believe that was the end of September.

**Speer Excerpt 25** (Speer 2004 Examination, Volume 2, Page 82, Line 2 to Line 20.)

Q. (BY MR. DUNCAN) Okay. If you could, read Paragraph 18 on Page 4 of 2000 and -- I'm sorry, 210, Exhibit 210.

A. It says, "Speer, a former certified public accountant, controlled the accounting functions of the partnership from Royce's corporate offices, controlled the issuance of consolidated financial statements for all the Royce entities, including the partnership." You want me to continue?

Q. What is your position on that statement?

MR. HARRELL:  Object.  Form.

MR. GIBSON:  Objection.  Form.

A.     I was a former certified accountant, and I controlled the company.  So, I guess I controlled the accounting functions, and I -- and, thereby, I guess I controlled the issuance of consolidated financial statements.

Q.     For the Royce entities?

A.     Yes, sir.

Back to Fraud/Fraud Scheme

**Speer Excerpt 26** (Speer 2004 Examination, Volume 2, Page 93, Line 9 to Page 94, Line 10.)

Q.     All right.  If you could, look at Page 6, Paragraph 24, of Exhibit 210, and read that, one  sentence at a time here.

A.     Yes, sir.  "Number 24, Speer exercised complete control over Hammersmith and Royce, including total accounting and operational control over the partnership's bank accounts and assets."

Q.     Is that correct?

A.     Well, I was in charge of the company. Everything was -- everything accountingwise and bank  accountswise was a perfunctory operation of the accounting department.

Q.     And you were in charge?

MR. HARRELL:  Object to form.

A.     I was CEO of the company.

Q.     (BY MR. DUNCAN)  And you oversaw -- you had complete control over what could occur because you were in charge?

MR. HARRELL:  Object to the form.

A.      I, I –

MR. GIBSON:  Form.

Exhibit B

A.       I was in charge.

Q.       (BY MR. DUNCAN)  And when they're talking about Royce, we're talking about Royce Homes, LP; is that correct?

A.       I think that's who he referenced Royce as in here.

Back to Fraud/Fraud Scheme

**Speer Excerpt 27** (Speer 2004 Examination, Volume 1, Page 41, Line 11 to Page 43, Line 20.)

Q.       (BY MR. DUNCAN)  All right.  Let's look at Exhibit 162.  It is the fourth page of the exhibit, and the Bate number is 14187.  Now, this is an e-mail from Patricia McConnell of PriceWaterhouse; is that correct?

A.       Yes, sir.

Q.       Okay.  And it is dated 4/27 of '06 –

A.       Yes, sir.

Q.       -- April 27th of '06, and the subject is FIN 46-R questions asked today, correct?

A.       Yes, sir.

Q.       All right.  If you could read -- let me just get to our -- now, first of all, let -- PriceWaterhouse, they were -- who was PriceWaterhouse  in relationship to Royce Homes?

A.       Off and on, they were auditors.

Q.       They were the auditors for Royce Homes; is that correct?

A.       At different times, yes.

Q.       All right.  And during this time frame of April of 2006, they were the auditors for "Price" --  for Royce Homes, correct?

A.        No, sir.

Q.       Okay.  What was their role at this time frame?

A.       They were -- in this case, they were, they were auditors for 2005.  Our 2006 auditors

Exhibit B

were Ernst & Young. In this case, they were giving us some professional opinions –

Q. All right.

A. -- or giving John Ransom some professional opinions.

Q. Okay. If you could, read the e-mail on Exhibit 162, the fourth page, Bate No. 144187, at the bottom of the page.

A. The one that starts with "John and Nick"?

Q. Yes.

A. Okay. "John and Nick, we have discussed the questions that you raised today with our national office. I want to start out by stating that the 2005, 2004 financial statements are correct. I believe that there are three questions that you needed answered.

"Number one, FIN 46-R requires an entity, Royce Homes, to consolidate VIEs when it is the primary beneficiary. Additionally, the AICPA released a technical practice aid today, timely of them, that addressed this very question.

"Number two, Combined financial statements are allowed for companies that are under common ownership and that there is not a primary beneficiary relationship that would require" consolidations. "For example" -- I'm sorry, "consolidation. For example, Royce Homes could present consolidated/combined financial statements with Hammersmith Financial. Hammersmith Financial is a standalone entity and does not rely on Royce for their business or funding of their operations and an entity that ultimately has the same owners. Royce Homes would still present the consolidated financial statements as they currently are presented, and Hammersmith would be added to that presentation with no elimination entries."

Back to Fraud/Fraud Scheme

**Speer Excerpt 28** (Speer 2004 Examination, Volume 1, Page 45, Line 15 to Page 50, Line 22.)

Q. (BY MR. DUNCAN) Yeah. All right. And in the middle of the page, it says that this is an e-mail from John Ransom to Patricia McConnell and others, including you; is that correct?

A. There's a "car" -- there's a cc to me, yes.

Q. All right. And again the subject is "FIN 46-R question asked today," correct?

A. Yes.

Q. All right. If you could, read that e-mail in.

A. The one down at the bottom of the page?

Q. Yes.

A. Dear Sid and Pam, the key question is whether combined financials for the Royce entities under common control can" pre -- "can be presented and if so, would the huge minority interest elimination for Mike and John's interest in Phoenix and PLC be required?

"Mike and John own Royce Homes, Phoenix, and PLC in the same proportion. Combining these with only an elimination for George's one-third of TCH seemsthe only fair presentation.

"No one really cares about Hammersmith Financial at this point. Regards."

Q. All right. Then at the top of -- on Exhibit 162, Page 3, which is Bate No. 144186, we have again an e-mail, and that is from Sid Andrews, who is with PriceWaterhouse -- is that correct?

A. Sid Andrews was with PriceWaterhouse.

Q. -- to John Ransom and others, including you; is that correct?

A. Yes, I'm cc'd on this.

Q. Okay. And again, this appears to be in the chain of the e-mails regarding FIN 46-R questions asked today, correct?

A. It says "Subject: Re: FIN 46-R question asked today."

Q. Okay. And if you could, read that e-mail.

A. It says, "We have determined that all of the affiliated entities under common control which are presented in the financial statements are VIEs due to the financial support and guarantees that are provided by Royce, excluding Hammersmith. As a result, consolidation principles according to ARB 51 trumps the combining principles. In consolidation since Royce does not have the direct ownership interest in those affiliates, the related capital is moved to minority interest. I had the same question

when we started this exercise at the beginning of the audit. John was negotiating with Wachovia, and I actually discussed this situation with another of our consultants in national who gave the same response that Pam and Patricia have given. Sid."

Q.     Okay. Now, Sid Andrews again is apparently saying you need to use consolidated financials; is that correct?

       MR. HARRELL:  Object to form.

       MR. GIBSON:  Objection.  Form.

A.     He's discussing what will happen in the process of using consolidation. I don't say that he's saying that you have to have -- he's just -- he's describing what will happen, you know, when you do use it under FIN 46.

Q.     (BY MR. DUNCAN)  Well, let's go to Page 2 of Exhibit 162, which is Bate No. 144185.  Now, this is an e-mail from Jim Oyer; is that correct?

A.     At the top of the page?

Q.     Yes.

A.     Yes.

Q.     And Jim Oyer was the C -- the chief financial officer for Royce Homes; is that correct?

A.     At this point in time.

Q.     In, in April of -- April 28th of '06, Jim Oyer was the chief financial officer of Royce Homes?

A.     Right.

Q.     And he is writing an e-mail to you, the chief executive officer of Royce Homes; is that correct?

A.     The -- it appears to be, yes, sir.

Q.     And others within the company?

A.     And outside the company.

Q.     Okay.  And again this is in regards to FIN 46-R questions asked today, correct?

Exhibit B

A.    Yes, sir.

Q.    Can you read that e-mail?

A.    It says:  John, since I believe you are not  aware of this issue, which resurfaced yesterday, at  least three months ago I challenged PWC on the requirement to consolidate rather than combine the VIEs, Phoenix and PLC, et cetera.  The consolidation requires the reclassification of the equity of the VIEs to minority interest and the elimination of intercompany profit; whereas, the combination would leave all of the equity intact.  PWC took this issue to the national level, and the final decision was that a consolidation is required, and our -- the -- I'm not  sure -- and our -- the current draft of the financials reflect this decision. Therefore, the consolidating balance sheet reflects equity of 36.1 million and minority interest of 10.7 million rather than the combined equity, which is shown, of 52.9 million.

Q.    Keep going.

A.    Porter & Hedges challenged the decision yesterday in our morning meeting, and the e-mails below reflect the discussion on this point.

       Number one, While I would prefer a  combination, I think we've run the course on this issue twice.

       Number two, When we disclose our pro  forma balance in the PPO with the buy-out of Mike and step-up, addition of the debt, and the reorganization, the equity/minority issue will go away with the exception of GK's equity in TCH and Fogarty's interest in his projects.  It will not be an issue going forward.

       Three, Based on your recent conversation with Credit Suisse re the equity requirements, I don't think we jeopardize our deal by this decision.

       As you know, our audit statements are due to the lenders at the end of this month, basically on  Monday.  I would like to consider this issue resolved.

       We got final clearance on Wednesday from PWC on the financial statements, and then this issue surfaced yesterday.  Unless you have any comments on the financials, I would like to give PWC the authorization to issue.  If you would like to review further or discuss, please let me know.  Jim.

Q.    Okay.  So, in -- on April 28th the chief financial officer of Royce Homes, Mr. Oyer, is telling  you that even though he'd prefer to use combined financials for Royce financials -- for their financial statements he thinks you have run the course, actually, twice on that issue, correct?

Exhibit B

           MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. That's what it says.

Back to Fraud/Fraud Scheme

**Speer Excerpt 29** (Speer 2004 Examination, Volume 1, Page 27, Line 24 to Page 28, Line 4.)

Q. (BY MR. DUNCAN) Okay. We're looking at Exhibit 161. In the bottom e-mail is an e-mail from you to Mr. Gathmann -- is that correct -- all the way down at the bottom of the page?

A. Yes, sir.

Q. Okay.

A. That appears to be the case.

Q. All right. And can you read that e-mail?

A. It says, "We need to begin producing consolidated statements ASAP even if the consolidation is performed on an Excel spreadsheet."

Q. All right. If you can read on Exhibit 161, we have an e-mail from Mr. Gathmann back to you on December 26 of 2006; is that correct?

A. You mean further up?

Q. Yes.

A. Yes, sir.

Q. Okay. And can you read that e-mail?

A. It says, "As you know, we currently produce the attached 'combined' financial statement, which is a 'simplified estimate' of what a true consolidated financial statement would look like. We are working with IT to write a program that will produce true consolidated financial statements each month for Royce Operating, LP. I think that they are getting pretty close, but Betty mentioned to me last week that there would be some changes to our standard format for the regional entity financial statements. I need to sit down with the accountants next week to understand how

they will change. If it entails a significant change, then we will have to review them with you and James."

Back to Fraud/Fraud Scheme

**Speer Excerpt 30** (Speer 2004 Examination, Volume 1, Page 29, Line 15 to Page 30, Line 18.)

Q. Let's go piece by piece here.

Exhibit 161 is saying that you -- as of December 26, 2006, you're producing combined financials; is that correct?

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. It says we need to begin producing consolidated financial statements.

Q. (BY MR. DUNCAN) Right. But if you look at –

A. So –

Q. Let's -- okay. Go ahead.

A. So, I -- it's my understanding that prior to that we were producing combined.

Q. Okay. So, prior to December 26th of 2006, you were producing combined financial statements, correct?

A. Yes, sir.

Q. And you made a request that you pro -- you begin producing consolidated statements, correct?

A. Yes, sir.

Q. All right. We're going to Exhibit 130 -- I'm sorry, Exhibit 31.

A. Back to the book?

Q. Yeah. Now, this is an e-mail from Pam Mitchell, formerly Pam Tyler, I guess, to Bill Gathmann, who was the CFO of Royce Homes, correct?

A.   Yes, sir.

Q.   And the subject is update combined financial statement attached; is that correct?

A.   It says "updated combined F/S attached."

Back to Fraud/Fraud Scheme

**Speer Excerpt 31** (Speer 2004 Examination, Volume 1, Page 31, Line 2 to Page 32, Line 11.)

Q.   (BY MR. DUNCAN)  All right.  Let me start that over again.  Slow start today.  If you could, take a  look at Exhibit 31, Page 4.

A.   The fourth Page?

Q.   The fourth page.

A.   All right.

Q.   And at the top what is -- what kind of  financial statement are we referring to here?

     MR. HARRELL:  Object.  Form.

A.   It says "Royce family of builders combined financials, cash flow summary, for the 12 months ending December 31st, 2006."

Q.   (BY MR. DUNCAN)  All right.  Now go to Page 9 of Exhibit 31.

     R. TOW:  The bottom right corner has the  page numbers.

Q.   (BY MR. DUNCAN)  And what type of financial statements are you producing as of April 30th of 2007?

     MR. HARRELL:  Object.  Form.

     MR. GIBSON:  Objection.  Form.

A.   This says "Royce family of builders combined  financials for the four months ended April 30th, 2007."

Q.   BY MR. DUNCAN)  Okay.  And if you go to  Page 10 of Exhibit 31, what type of financials are you producing as of April 30th, 2007?

Exhibit B

        MR. HARRELL:  Object.  Form.

        MR. GIBSON:  Objection.  Form.

A.      Well, for this purpose, it looks like, for whatever this was produced for, says "Royce family of builders combined financials, April 30th, 2007."

Q.      (BY MR. DUNCAN)  Okay.  Can you tell me when Royce Homes -- Royce began producing consolidated financial statements?

A.      It's my presumption it would have been at the beginning of 2007.

Back to Fraud/Fraud Scheme

**Speer Excerpt 32** (Speer 2004 Examination, Volume 1, Page 32, Line 18 to Page 33, Line 10.)

Q.      Do you have any reason to doubt that they weren't produced until late 2007?

        MR. HARRELL:  Object to form.

        MR. GIBSON:  Objection.  Form.

A.      I don't have a basis for knowing.

Q.      (BY MR. DUNCAN)  Okay.

        (Sotto voce discussion off the record.)

Q.      (BY MR. DUNCAN)  What would be the -- you said there was a variety of purposes for producing the financial statements.  Can you tell me what those varieties would be?

A.      Well, the most important one to us was operating the company.

Q.      Okay.  How about going out to your creditors?

        MR. HARRELL:  Object.  Form.

        MR. GIBSON:  Objection.  Form.

A.      The only people we sent financial statements out were to lenders.

Back to Fraud/Fraud Scheme

Exhibit B

**Speer Excerpt 33** (Speer 2004 Examination, Volume 1, Page 34, Line 9 to Page 37, Line 20.)

(Exhibit No. 162 marked.)

Q. (BY MR. DUNCAN) So, your point, though -- let me get this straight, though. You're saying there's really no difference if you were to report on a consolidated or a combined basis as to, say, for example, what the equity level would be represented in the financial statement?

A. I didn't say that.

Q. Okay. Well, that's, that's one of the things -- I want you to tell me your understanding of what the difference in the outcome of the reporting would be whether you go under a combined or a consolidated financial.

A. Well, the difference between –

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

Q. (BY MR. DUNCAN) Okay.

A. The primary difference would be when you're combining the financial statements you're simply combining them (indicating) and, and a consolidated basis, you take into -- consider any intercompany transactions and you eliminate those in the process.

Q. All right. Okay. So, one thing you would do is -- if you had, say, for example, Park Lake and Royce Homes entering into sales transactions between the two of them –

A. Yes, sir.

Q. -- would that be a transaction that would be eliminated under a consolidated financial?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection to form.

A. In some instances, it might be.

Q. (BY MR. DUNCAN) How about under a combined financial?

MR. HARRELL:  Object to form.

MR. GIBSON:  Objection.  Form.

A.      I don't think so.

Q.      (BY MR. DUNCAN)  All right.  So, if you're reporting on a combined financial, intercompany transactions between, for example, Park Lake and Royce Homes, would not be eliminated, correct?

MR. HARRELL:  Object -

A.      I'm –

MR. HARRELL:  -- to form.

MR. GIBSON:  Objection.  Form.

A.      I'm sorry.  Could you –

Q.      (BY MR. DUNCAN)  Sure.

A.      -- repeat, repeat the question?

Q.      Sure.  Under a combined financial –

A.      Yes, sir.

Q.      -- all right, an intercompany transaction between Park Lake and Royce Homes, LP, would not be eliminated in a combined financial?

A.      Generally speaking –

MR. HARRELL:  Objection.  Form.

MR. GIBSON:  Object.  Form.

A.      -- no.

Q.      (BY MR. DUNCAN)  In a consolidated financial, intercompany transactions between, for example, Park Lake and Royce Homes would generally not be eliminated –

MR. HARRELL:  Object.  Form.

Exhibit B

Q.     (BY MR. DUNCAN)  -- correct –

MR. GIBSON:  Objection.  Form.

Q.     (BY MR. DUNCAN)  -- would be eliminated, would be eliminated, correct?

MR. HARRELL:  Object.  Form.

MR. GIBSON:  Objection.  Form.

A.     It would be dependent on the transaction.

Q.     (BY MR. DUNCAN) Okay.  And what factors would you look at to determine that?

MR. HARRELL:  Object.  Form.

A.     Primarily whether or not the transaction ultimately closed to an outside consumer.

Q.     (BY MR. DUNCAN)  Okay.  So, before it, it -- before it was sold to a third party, would it be on the books?

MR. GIBSON:  Objection to form.

A.     It would be on the books until it sold to a third party.

Q.     (BY MR. DUNCAN)  Okay.  So, in other words, until -- for example, if a lot was sold, sold by Park Lake to Royce Homes –

A.     Yes, sir.

Q.     -- and, say, for example, there was a profit  realized –

A.     Yes, sir.

Back to Fraud/Fraud Scheme

**Speer Excerpt 34** (Speer 2004 Examination, Volume 1, Page 38, Line 15 to Page 39, Line 5.)

Q.     (BY MR. DUNCAN)  It would be listed as a profit if there was a profit made.  There would be possibly an increase in equity on the balance sheet if –

A.     Not on a consolidated statement.  It would be on a combined.

Exhibit B

Q. Okay. That's, that's exactly the point. Okay. So, we agree that under a consolidated financial the increase -- the, the profit and the increase in equity on the balance sheet from that transaction between Park Lake and Royce Homes, under a consolidated financial, should not appear on the, the financials?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection to form.

A. Generally speaking, it wouldn't until it closed, you know, to the ultimate consumer.

Back to Fraud/Fraud Scheme

**Speer Excerpt 35** (Speer 2004 Examination, Volume 1, Page 53, Line 8 to Page 54, Line 17.)

Q. (BY MR. DUNCAN) So, the bottom line is: If you use the consolidated balance sheet, the company doesn't look as good financially as if you would use -- you were using a combined financial, correct?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. It's a matter of presentation. We always want to be conservative, but it's a matter of timing until those transactions cleared through the company.

Q. (BY MR. DUNCAN) Okay. Let's try that again. The bottom line is: If you were to use a consolidated balance sheet, the company would not look as good financially as if you were using a combined financial statement?

A. We prepared con –

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. We prepared consolidated financials for our audits and prepared combined statements at that time for our reporting to our lenders.

Q. (BY MR. DUNCAN) Okay. But that isn't what I asked you, okay? Listen to my question. The bottom line is: If you report using a consolidated balance sheet, the company doesn't look as good financially as if you were to use a combined financial?

A. Of course not.

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. Of course not. There's profits that are trapped in those transactions that have not cleared the company yet.

Q. (BY MR. DUNCAN) Okay. And you would also be including minority interest in the reporting, correct?

A. Well, of, of course.

Back to Fraud/Fraud Scheme

**Speer Excerpt 36** (Speer 2004 Examination, Volume 1, Page 56, Line 2 to Page 58, Line 21.)

MR. HARRELL: Object to your sidebar.

Q. (BY MR. DUNCAN) Okay. Let's go to Page 1 of Exhibit 162, and this is an e-mail from Mr. Oyer to you -- is that correct -- and, and others?

A. This is an e-mail from Jim Oyer to John Ransom and, and me.

Q. Yeah. And this again is April 28th of 2006?

A. Yes, sir.

Q. And if you could, read the e-mail into the record.

A. It says, "I agree that their written response was weak at best, but I sat in on the discussions with Pam yesterday, who, by the way, has been great in helping us out while she -- on 'vacation,' and heard her support the consolidation and talk at some length about the committee meeting to be held next week that addresses the private company concerns about this issue. Unfortunately, the committee meeting will corroborate the consolidation point."I am comfortable having the discussion that the same guys own both the equity and the minority interests, and I think everyone is familiar with the brain damage of FIN 46" -- "FIN No. 46, whether it be lot options or entities.

"If you are out here at 9:00, let's stick a knife in this, especially if John is here."

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 493
Back to Table of Contents

Exhibit B

Q.    Again, Mr. Oyer, the Royce CFO, is confirming that he believes the proper balance sheet reporting method is a consolidated basis rather than a combined; is that correct?

MR. HARRELL:  Object to form.

MR. GIBSON:  Objection.  Form.

A.    And that the same guys own the equity and the minority interests.

Q.    (BY MR. DUNCAN)  Okay.  It says:  I am  comfortable having the discussion that the same guys own both the equity and the minority interests, and I  think everybody is familiar with the brain damage of FIN 46, whether it be lot options or entities.  What's your understanding of "the brain damage of FIN 46, whether it be lot options or equity"?

MR. HARRELL:  Object to form.

MR. GIBSON:  Objection.  Form.

A.    I can best describe that by giving you an example.

Q.    (BY MR. DUNCAN)  Okay.

A.    If I buy lots from you and you have a company that developed lots and I buy half of the lots in a subdivision from you, then under FIN 46 we're required to consolidate your financial statements onto our balance sheet.  That's the brain damage they're referring to.

Q.    Okay.  So, in other words –

A.     And you probably wouldn't give us that information.

Q.    All right.  So, in other words, if, for Park Lake, if you're buying most of their lots, then that  would be somebody that you would want to consolidate?

MR. GIBSON:  Objection.  Form.

A.    Park Lake wasn't the issue at hand in this case.

Q.    (BY MR. DUNCAN)  I, I know, but that -- I'm starting there, that obviously Park Lake -- the, the main, if not only, customer of Park Lake was Royce  Homes, LP, correct?

Exhibit B

A.      Correct.

Q.      And that would be somebody that you just  referred to under, under FIN 46 that would need to be consolidated?

A.      Absolutely.

Back to Fraud/Fraud Scheme

**Speer Excerpt 37** (Speer 2004 Examination, Volume 1, Page 63, Line 24 to Page 69, Line 15.)

Q.      (BY MR. DUNCAN)  Okay.  Exhibit 164, Page 2, which is Bate No. 144329?

A.      328 or 329?

Q.      Yeah.

A.      Page 2?

Q.      Yeah.

        MR. TOW:  29.

Q.      (BY MR. DUNCAN)  Now, who is Karen Blair?

A.      She worked in the accounting department.

Q.      For Royce Homes?

A.      Yes, sir.

Q.      All right.  And who is Rosalinda Nowak?

A.      She was our controller.

Q.      All right.  Please read, if you can, the e-mail that is on Exhibit 164, Page 2, and this is on April 7th of 2006.

A.      Okay.  I appreciate you putting up with me here.

Q.      Yeah.

A.      "We bought 77 Forestwood lots in March of 2006.

Exhibit B

"In the past PLC" -- "purchased these lots from the developer for 13,600 and then immediately sold them to Royce Houston for 21,000. The purchase of these 77 lots was structured a little differently.

"The 77 lots were purchased all at once. We were able to get a 100 percent lot loan for all of the lots through Texas State Bank. This is not one of the banks that we have a relationship" -- "So, the purchase was made by Houston at the developer price of 13,600.

"The issue this has caused is that PLC has not received the revenue agreed to with the purchase of these lots. In addition, the lots are booked into the jobs at 13,600. This is creating erroneous cost information for the field. Should they pull the lot report, the lots will look to be costed at an amount much lower than they should be.

"After discussion with Jim and Kathy, we thought that we should just adjust Houston and PLC's books to what we know should be the correct amounts. Here is what I would like to do." Excuse me.

"Houston entry: I have identified the 77 jobs in question and confirmed that the lot cost listed on each job is $13,600. I would like to book an entry debiting land cost on the jobs for $7,400 per lot and crediting the intercompany receivable. This will allow the cost to be reflected accurately on Houston's books at $21,000, and the profit will flow through to PLC via the intercompany account.

"Park Lake entry: I would like to book an entry as if the activity had flowed through ParkLake. I would credit revenue for $21,000 per lot and debit cost of sale for $13,600 per lot. I would book the $7,400 profit earned per lot to the intercompany account. This will allow the profit earned to reduce the amount owed to" Royce -- "to Houston.

"Going forward, Houston's land cost will be correct. When a construction loan is taken out, the above-mentioned lots, the value of the lot draw will be $21,000. In addition as always, PLC will receive their management fee of $1500 when the house starts.

"Please review the above and let me knowyour thoughts/concerns, Karen."

Q. Okay. Now, your -- you were the CEO of both Royce Homes, LP, and Park Lake Communities during this time frame; is that correct?

A. Yes, sir.

Q. All right. Why didn't Royce buy the lots originally?

Exhibit B

                    MR. HARRELL:  Object to form.

                    MR. GIBSON:  Objection.  Form.

A          I'm sorry?

Q.        (BY MR. DUNCAN)  Well, let's -- maybe we need to reread this.  It appears what's happening here is Park Lake would buy the lots and then immediately sell them over to Royce; is that correct?

A.        Park Lake contracted for all lot purchases for us, yes.

Q.        And then they'd be flipped over to, to Royce after that, correct?

A.        I'm not sure if "flipped" is the right word, but they would, they would be sold in to Royce.

Q.        Well, doesn't it say immediately sold them -- let's read this here:  In the past Park Lake has  purchased these lots from the developer for 13,600 and  then immediately sold them to Royce Home -- Houston for 21,000.Is that correct?

A.        Well, what would happen is they would buy one  lot, you know, from the developer and then sell it to Royce Homes.

Q.        Okay.  And instantaneously you're creating a  profit from that sale of $7,400, correct?

                    MR. GIBSON:  Objection.  Form.

Q.        To –

A.        (BY MR. DUNCAN)  Well, in this case, we were  recognizing market value of the lots.  We had negotiated a very good deal.

Q.        Okay.  So, you, you take a lot that is purchased from the -- this third party.  You buy it at 13,600 for, for Park Lake, correct?


A.        Yes, sir.

Q.        And then immediately you sold that over to Royce Houston for 21,000?

A.        Yes, sir.

Exhibit B

Q.    All right.  And that would -- as a result of that, you could show a profit of $7400 on that -- on each of these lot sales on the Park Lake financials, correct?

MR. HARRELL:  Object.  Form.

A.    Yes, sir.

Q.    (BY MR. DUNCAN) Okay.  And you could also reflect on the Royce balance sheet -- instead of being 13,600 as the purchase price, you could reflect the purchase price as 21,000, correct?

MR. HARRELL:  Object.  Form.

A.    Well, the purchase price would be 21,000 at that point.

Q.    (BY MR. DUNCAN) Yeah.  Right.  So, when you are -- when we're looking at a balance sheet and you have your lot inventory, when you record this particular lot that we're referring to here, for example, in Exhibit 164, Page 2, instead of reflecting that asset at 13,600 book value, you are now reflecting it at 21,000, correct?

MR. HARRELL:  Object to form.

A.    Well, we purchased it –

MR. GIBSON:  Objection.  Form.

A.    -- at 21,000.

Q.    (BY MR. DUNCAN)  Well, so, the answer to my question is yes; is that correct?

A.     Yes, sir.

MR. HARRELL:  Object to form.

Q.    (BY MR. DUNCAN)  Okay.  All right.  And is it your understanding that under a combined financial statement Park Lake would be able to claim this 7400-dollar-per-lot profit and Royce could reflect the 21,000-dollar lot value?

MR. HARRELL:  Object to form.

MR. GIBSON:  Objection.  Form.

A.    Yes, sir, that's what would happen.

Exhibit B

Back to Fraud/Fraud Scheme

**Speer Excerpt 38** (Speer 2004 Examination, Volume 1, Page 71, Line 14 to Page 72, Line 3.)

Q. (BY MR. DUNCAN) So, the answer to my question is: The transaction that is described on Page 2 of Exhibit 164, which is -- we just talked about, under a combined financial, you could keep the profit and the step-up in value of the lot on a combined financial statement –

MR. HARRELL: Object. Form.

Q. (BY MR. DUNCAN) -- correct?

MR. GIBSON: Objection. Form.

A. Well, what we were preparing was combined financial statements, yes, sir.

Q. (BY MR. DUNCAN) So, you could keep it on that statement?

A. Well, we did.

MR. HARRELL: Object to form.

Back to Fraud/Fraud Scheme

**Speer Excerpt 39** (Speer 2004 Examination, Volume 1, Page 72, Line 16 to Page 73, Line 4.)

Q. (BY MR. DUNCAN) All right. Let's put it this way: On a consolidated balance sheet, the value of thelot would be 13,600 for the transaction we're talking about in Exhibit 6 -- 164?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. Yes, sir.

Q. (BY MR. DUNCAN) On a combined balance sheet, the value would be reflected as 21,000, correct?

MR. HARRELL: Object to form.

Exhibit B

MR. GIBSON: Objection. Form.

A. On which entity?

Q. (BY MR. DUNCAN) For Royce Homes, the, the –

A. Yes, sir.

Back to Fraud/Fraud Scheme

**Speer Excerpt 40** (Speer 2004 Examination, Volume 2, Page 213, Line 14 to Page 214, Line 9.)

Q. (BY MR. DUNCAN) Okay. Would you agree that in the homebuilding industry where Royce was, that it, it was heavily dependent on its ability to borrow money to acquire and develop property?

A. I would agree that the homebuilding industry in general is, is a leveraged business much like the banking business is.

Q. And they are -- they're dependant on their ability to then borrow money to acquire and develop property?

A. Sure.

Q. Okay. And as a homebuilder, you've dealt with lenders on real property and construction loans, correct?

A. Yes, sir.

Q. And from your experience, the equity in a company is a factor that a lender looks at to determine if they loan money?

MR. HARRELL: Object to the form.

MR. GIBSON: Objection. Form.

A. Well, one of many.

Back to Breach of Fiduciary Duty

**Speer Excerpt 41** (Speer 2004 Examination, Volume 2, Page 216, Line 7 to Line 19.)

Q. (BY MR. DUNCAN) All right. Now, were you aware as the chief executive officer that the company kept track of the -- its compliance with its construction line lenders' debt-to-equity ratios on a monthly basis?

A. Generally speaking, yes, sir.

Q. All right. And why did you do that?

MR. HARRELL: Object to form.

Q. (BY MR. DUNCAN) Why did the company keep track of the debt-to-equity ratios with its lenders?

A. Just like we kept track of loan balances and whatever else, a variety of, a variety of things. We kept track of a lot of things.

Back to Breach of Fiduciary Duty

**Speer Excerpt 42** (Speer 2004 Examination, Volume 2, Page 217, Line 13 to Line 17.)

Q. Okay. But you had access to it if you needed it as chief executive officer of Royce Homes, LP, correct?

A. Actually, if I, you know, was curious about it, I'd simply ask them, and they'd tell me.

Back to Breach of Fiduciary Duty

**Speer Excerpt 43** (Speer 2004 Examination, Volume 2, Page 219, Line 11 to Line 19.)

Q. Did you understand that if you went outside your debt-to-equity ratios with your construction line lenders, that you were required to notify the lender?

MR. HARRELL: Object to the form.

MR. ALTSULER: Objection. Form.

A. That may have been some -- a case. I don't, I don't recall. It may have been some of -- the case in loan -- some of the loan documents. It's been a very long time since I looked at the loan documents.

Back to Breach of Fiduciary Duty

**Speer Excerpt 44** (Speer 2004 Examination, Volume 2, Page 221, Line 1 to Line 17.)

    Q.    You didn't check to determine if, by making a partnership distribution through Royce Homes, LP, there would be a violation -- whether there would be a violation of your debt-to-equity ratios with your construction line lenders?

    MR. HARRELL:  Object to the form.

    Q.    (BY MR. DUNCAN)  Is that correct?

    MR. ALTSULER:  Objection.  Form.

    A.    Yes.

    Q.    (BY MR. DUNCAN)  Okay.  Would you agree with me that, from reviewing the records of Royce Homes, that Royce Homes -- would -- LP, was out of compliance with its debt-to-equity ratios for a good portion of 2007?

    MR. HARRELL:  Object to the form.

    A.    It, it had been often out of compliance for the entirety of its existence, as far as I know.

Back to Breach of Fiduciary Duty

**Speer Excerpt 45** (Speer 2004 Examination, Volume 2, Page 228, Line 13 to Line 20.)

    Q.    (BY MR. DUNCAN)  Okay.  And you never made that determination -- you never determined whether you were in compliance with your, your debt-to-equity ratios prior to making any distributions from Royce Homes, LP; is that correct?

    MR. HARRELL:  Object.  Form.

    MR. GIBSON:  Objection.  Form.

    A.    No, sir.  I wouldn't have any reason to.

Back to Breach of Fiduciary Duty

Exhibit B

**Speer Excerpt 46** (Speer 2004 Examination, Volume 2, Page 222, Line 13 to Page 225, Line 5.)

Q.     Now, you had talked about going to the lenders, and, you know, if you were out of compliance with your, your, your debt-to-equity ratios, you would  either get a waiver or an amendment of the, the loan agreement, correct?

MR. HARRELL:  Object to the form.

A.      That did happen sometimes.

Q.     (BY MR. DUNCAN)  All right.  If you could take  a look at Exhibit 37, does that appear to be an example of when Royce Homes, LP, went to its lender because it was out of compliance with its debt-to-equity ratios?

MR. HARRELL:  Object to the form.

A.     This actually -- well, this looks like an amendment to the construction loan.  I don't know what  the, I don't know what the genesis of this is or what -- how, how it -- it might have just simply been  an annual renewal.  I don't know.

Q.     (BY MR. DUNCAN)  All right.  Well, maybe we  can just take a little closer look at it.

A.     Okay.

Q.     Would you agree that this is dated September 14th of 2007?

A.      Yes, sir.

Q.     And it's between Royce Homes, LP, and some of  its subsidiaries and KeyBank?

A.     There might be some sister companies and, and KeyBank.  I'm not, not sure about any, you know –

Q.     But Royce Homes?

A.      -- subsidiary, Royce entities.

Q.     Royce Homes, LP, is a party to the agreement, correct?

A.     Yes, sir.

Q.     And they're -- Royce Homes is under -- Royce  Homes, LP, is under the borrower category?

Exhibit B

A.      Yes, sir.

Q.      If you could, go down to Paragraph 2.1 at the  bottom of Page 1 of Exhibit 37 and read that.

A.      It says, "financial Covenant Default Waiver.

        Borrower is currently out of compliance with the following financial covenant under the" -- "agreement."

Q.      And what is the covenant?

A.      "A consolidated debt-to-worth ratio not exceeding 5.5 to 1."

Q.      All right.  And then if you go down to Section B on Page 2 of Exhibit No. 37 –

A.      Yes, sir.

Q.      -- what is the concession that they are willing to make or would -- that they made in regards  to the debt-to-equity ratio?

        MR. HARRELL:  Object to form.

A.      It appears a modification to 9 to 1.

Q.      (BY MR. DUNCAN)  For when?

A.      Through December 31st, 2007.

Q.      And then what happens?

A.      Then it changes to -- it reverts back to what  it was through the maturity date.

Q.      5.5 to 1; is that right?

A.      Yes, sir.

Q.      So, they gave a couple-of-month waiver, starting September 12th of 2007; is that correct?

A.      Yes, sir.

Q.      And are you aware of any other waiver in regard to this debt-to-equity ratio for, say, example, KeyBank?

Exhibit B

MR. HARRELL: Object. Form.

A. I would not be surprised if there was a variety of other lenders that agreed to something similar.

**Speer Excerpt 47** (Speer 2004 Examination, Volume 2, Page 30, Line 15 to Page 32, Line 10.)

Q. (BY MR. DUNCAN) Is it your understanding that Mr. Kopecky also received a refund for loss carryback?

A. It was my understanding that he received a refund in 2008.

Q. Okay. And did you discuss that with him?

A. I didn't have any personal discussions with George about that.

Q. Where did you come to that understanding?

A. In settlement discussions his CPA or attorney, somewhere, mentioned it.

Q. Okay. And you were going to -- all right.

We'll get to that in a second. What was your understanding of the amount that he received?

A. I was told a million and a half.

Q. Okay. And that was -- is it your understanding that those re -- that refund was similar to yours where there was a carryback and -- for the tax years 2006, 2007, and 2008?

A. My understanding was -- is he filed it relative to the year 2007 so that he could go back to '6 and '5. I understood he, he filed it as of December 31st, 2007, and received a refund in October of, of 2008.

Q. Okay. And Mr. Kopecky had a similar arrangement to you in regards to receiving tax distributions from Royce in order to pay his pro rata share of taxes?

MR. HARRELL: Object to form.

Q. (BY MR. DUNCAN) Is that correct?

A. He and I both received distributions from our relative capital accounts to pay amounts related to whatever prior year income there was.

Q. Okay. So, in -- for example, for tax year 2006, he would have received the distribution in 2007 from Royce in order to facilitate him paying his pro rata share of the tax liability?

A. Yes, sir.

MR. HARRELL: Object to form.

Q. (BY MR. DUNCAN) Okay. And your understanding is that he received approximately a million and a half dollars in the tax refund?

A. That's just the comment that was mentioned by his CPA.

Q. Okay. And that was Mr. Kopecky's CPA?

A. Yes, sir.

**Speer Excerpt 48** (Speer 2004 Examination, Volume 2, Page 228, Line 21 to Page 231, Line 2.)

Q. (BY MR. DUNCAN) All right. Tell me, on the Mike Manners note, the 13-million-dollar note, what was the procedure that was supposed to be followed in order to make the payments on that particular note? How was that done?

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. It's my recollection that $1500 per closing was the calculation that was used to determine -- and per start was a calculation that was used to determine how much I would pay him during each periodic assessment.

Q. (BY MR. DUNCAN) And, coincidentally, the company, Royce Homes, LP, would make a distribution to you in the exact amount based on that calculation; is that correct?

MR. HARRELL: Object to form.

Exhibit B

MR. GIBSON: Objection. Form.

A. During the time period that I was making those payments, yes, sir.

Q. (BY MR. DUNCAN) And then you would take that, that amount that had been disbursed to you, and you would forward that to Mr. Manners, correct?

MR. JOHNSON: Objection. Form.

MR. GIBSON: Objection. Form.

A. No, sir.

Q. (BY MR. DUNCAN) What would you do?

A. I'd write a check.

Q. Okay. All right. So, you'd write a check to -- from -- you would get -- what would happen is that Royce Homes, LP, would make the calculation based upon the number of starts and closings, and they'd do $1500 per each start and each closing; is that correct?

MR. HARRELL: Object to the form.

Q. (BY MR. DUNCAN) That's, that's what the calculation was based upon?

MR. GIBSON: Objection. Form.

A. Yes, sir.

Q. (BY MR. DUNCAN) And then based upon the number of starts and closings that month, they'd make the calculation and they'd disburse that money to you and then you would forward -- you would write a check to Mr. Manners in that amount?

MR. JOHNSON: Objection. Form.

A. That calculation would be -- would determine the minimum distribution I would need to make to make that payment, and I would, I would then make that payment.

Q. (BY MR. DUNCAN) Okay. To Mr. Manners?

A. Or his entities, whatever might be appropriate.

Q. What -- how he had directed you to do it; is that correct?

A. Well, how we had agreed upon.

Q. Okay.

A. Whatever it was on a pro rata basis for each entity.

**Speer Excerpt 49** (Speer 2004 Examination, Volume 2, Page 250, Line 14 to Line 17.)

Q. (BY MR. DUNCAN) Well, the management fee was the basis on which you got paid, isn't it?

A. That was simply a calculating factor. It had nothing to do with the reality of it.

Back to Fraud/Fraud Scheme

**Speer Excerpt 50** (Speer 2004 Examination, Volume 2, Page 252, Line 8 to Line 20.)

Q. Okay. But you would -- you don't, you don't think that you were receiving each month distributions from Royce Homes based upon the amount of starts and closings in the amount of $1500 per start and $1500 per closing?

A. There was a time period when I did, yes.

Q. And that money was used to pay Mike Manners' note, correct?

MR. HARRELL: Object. Form.

A. There was a time when I received distributions, and we happened to incidentally use that as a calculating factor for how much and the timing of those payments.

**Speer Excerpt 51** (Speer 2004 Examination, Volume 2, Page 234, Line 8 to Page 235, Line 21.)

Q. All right. Let me get this clear, that Park Lake would have lots in its inventory, and they are selling lots to Royce Homes, LP. We have that scenario.

A. Yes, sir.

Q. And in that transaction, when Royce Homes takes out its loan to acquire the lot, is there an additional $1500 that is tacked onto the, the purchase price?

MR. HARRELL: Object. Form.

A. The purchase price is calculated up front and inclusive of the $1500.

Q. (BY MR. DUNCAN) All right. So, there's an additional $1500 borrowed on that particular lot, based upon the management fee?

MR. HARRELL: Objection. Form.

A. Whatever the process for purchasing that lot -- and there's a variety of ways of calculating the purchase price and the price that's set, but everything involved in the purchase price, you know, is part of that.

Q. (BY MR. DUNCAN) Okay. And then that $1500 in the management fee would be capitalized into the, the lot for your -- to be reflected on your balance sheet; is that correct?

A. Whatever the purchase price for that lot was, it was an -- agreed upon contractually between Park Lake and Royce Homes, LP, would then be closed through a construction loan and put on the balance sheet as part of the accounting of that transaction.

Q. And that would include the 1500-dollar management fee, correct?

A. It in -- would include everything related to the purchase price.

Q. Including the $1500 management fee, correct?

A. Well, the purchase price is part, is part -- it would certainly include the, the $1500 –

Q. Okay.

A. -- in and of itself.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Speer Excerpt 52** (Speer 2004 Examination, Volume 2, Page 237, Line 20 to Page 238, Line 14.)

Exhibit B

Q. All right. Then, let me get it -- let me -- I'm starting to get there. You -- when you purchased the property from Park Lake, was there a 3,000-dollar management fee that was included in the, the purchase price?

MR. HARRELL: Object. Form.

A. I think at some point that became the case.

Q. (BY MR. DUNCAN) Okay. When you say "at some point," at some point that's the procedure that was used that -- at the purchase, at the time of purchase,there was a 3,000-dollar management fee that was part of the purchase price?

A. At some point, yes, sir –

Q. Okay.

A. -- as far as I remember.

Q. All right. And that was included in the acquisition loan, that $3,000?

A. The lot acquisition loan for the construction loan -- the lot acquisition part of the construction loan for the house.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Speer Excerpt 53** (Speer 2004 Examination, Volume 2, Page 238, Line 15 to Page 239, Line 5.)

Q. Okay. So, what I was talking about, the $1500 being capitalized, we were really talking about $3,000 on the acquisition of the property by Royce Homes from Park Lake. Part of the value that is now reflected on the Royce Homes, LP, balance sheet is the 3,000-dollar management fee? That's part of the, the amount of, of the dollar amount that is reflected for that particular asset?

MR. HARRELL: Object. Form.

A. I believe -- the entirety of the purchase price would have been reflected on the -- on -- and all of it -- the inherent components, I guess, would have been included in that asset value.

Q. (BY MR. DUNCAN) And that would include the 3,000-dollar management fee?

Exhibit B

A.     Sure, however they priced the lots.

Back to Fraud/Fraud Scheme

**Speer Excerpt 54** (Speer 2004 Examination, Volume 2, Page 239, Line 6 to Page 240, Line 1.)

Q.     Okay.  Okay.  Turn to Exhibit No. 15.  Now,  this is a ledger sheet for Account 1152 and it's off the Royce Homes, LP, ledger and it's for "Other  Receivables, Royce" Home -- "Royce Land, LP, Name is A/R DWM Holdings on Tax Return."  Now –

A.     Okay.

Q.      -- can you explain to me who Royce Homes is saying owes it this receivable?

A.     It's my -- I -- whoever's on Royce Homes' financial statements would be the accurate one.

Q.     Okay.  So, do you understand that there is a conflict at the top of that piece of paper there?

A.     Yes, sir.

Q.     And one is basically saying it's Park Lake's receivable, and the other one's saying it's -- Mike  Manners' company is the receivable, correct?

A.     It, it says the "Name is A/R DWM Holdings on Tax Returns."  That can only be a typo.

Q.     All right.  So, is it your understanding that this is a Park Lake receivable ledger sheet?

A      That is my understanding.

Back to Fraud/Fraud Scheme

**Speer Excerpt 55** (Speer 2004 Examination, Volume 2, Page 241, Line 15 to Page 242, Line 5.)

Q.     Okay.  So, what we're saying is there was an amount of $900,000 paid out; 169,500; and, also, a 219,000 paid out related to October, November, and December wires for MGM.  And we now have a receivable created on the Royce Homes, LP's ledger sheet.

Exhibit B

MR. HARRELL: Object. Form.

A. I disagree with the way they've described this. It should have been for my equity distribution.

Q. (BY MR. DUNCAN) Okay. But the way they have it entered in here is at -- you know, regardless of how they have it entered in here, the -- they are creating a receivable between -- a receivable owed by Park Lake to Royce Homes; is that correct?

A. It appears that that's how they did the initial accounting. I'm not sure how it all washed out because you can't tell from this.

Back to Fraud/Fraud Scheme

**Speer Excerpt 56** (Speer 2004 Examination, Volume 2, Page 249, Line 18 to Page 250, Line 2.)

Q. All right. And would you agree that it would not be a proper accounting entry in that instance to reflect on the Royce Homes balance sheet an increase in an accounts receivable from Park Lake in the amount that they had just distributed to you? Is that -- would that be a proper accounting entry?

MR. HARRELL: Object. Form.

A. Under the circumstances where I gave the specific instructions on how to handle a transaction, if they did it any -- otherwise, it would be improper.

Back to Fraud/Fraud Scheme

**Speer Excerpt 57** (Speer 2004 Examination, Volume 2, Page 250, Line 14 to Line 17.)

Q. (BY MR. DUNCAN) Well, the management fee was the basis on which you got paid, isn't it?

A. That was simply a calculating factor. It had nothing to do with the reality of it.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme

**Speer Excerpt 58** (Speer 2004 Examination, Volume 2, Page 252, Line 8 to Line 20.)

Q.     Okay.  But you would -- you don't, you don't think that you were receiving each month distributions from Royce Homes based upon the amount of starts and closings in the amount of $1500 per start and $1500 per closing?

A .    There was a time period when I did, yes.

Q.     And that money was used to pay Mike Manners' note, correct?

       MR. HARRELL:  Object.  Form.

A.     There was a time when I received distributions, and we happened to incidentally use that as a calculating factor for how much and the timing of those payments.

Back to Breach of Partnership Agreement
Back to Fraud/Fraud Scheme


**Speer Excerpt 59** (Speer 2004 Examination, Volume 2, Page 81, Line 15 to Line 19.)

Q.     Okay.  But up until what -- until the doors  were shut, was he -- was Mr. Kopecky an officer of Royce Homes, LP?

A.     Yes, sir.  I believe that he was terminated before the doors were shut by a few weeks.

Back to Watermark Asset Stripping


**Speer Excerpt 60** (Speer 2004 Examination, Volume 2, Page 37, Line 4 to Page 246, Line 16.)

Q.     (BY MR. DUNCAN)  I'm going to have you take a  look at Exhibit 203.  Now, this is a document that was produced to us by George Kopecky in relation to the Watermark Land, LP, summary of the transactions, and just so we can try to walk through the transaction a little bit, I'm going to, I'm going to try to use this as a template.  And if you could, tell me if you agree with the way that he has represented it in this exhibit. What was the initial purpose of Watermark Land, LP?

A.     To acquire properties along the coastal areas and develop resort properties.

Q.     Okay.  And you had an interest in that entity; is that correct?

A.     Yes, sir.

Q.     All right.  And let's start with number one on  Exhibit 203.  It states that Watermark Land, LP, was organized in Delaware on December 13th, 2005.  Do you  have any

Exhibit B

reason to doubt that?

A.     No, sir.

Q.     Okay.  And Hammersmith Group, Inc., is the sole general partner, which corporation is solely owned by John Speer and holds one unit for a hundred dollars. Does that sound correct?

A      Yes, sir.

Q.     And wasn't Hammersmith Group the, basically, general partner for a lot of the entities that you were involved in?

A.     Yes, sir.

Q.     Such as Royce Homes, LP, it was their general partner?

A.     That was one of them.

Q.     And Park Lake Community?

A.     I believe so.

Q.     All right.  And was it also, also the general partner for Texas Colonial Home?

A.     I believe so.

Q.     All right.  And it says the limited partners, as of December 14th of 2005, and it lists you, I guess, with -- John Speer, 39 Class A units; George Kopecky with 40 Class B units; and James Hunter with 20 Class B units.  Does that sound correct?

A.     That's what it says.  I wouldn't have any reason to disagree with that.

Q.     Okay.  And that was the interest of the -- the -- what -- those interests were for Watermark Land, LP; is that correct?

A.     Yes, sir.

Q.     Okay.  And then it appears that it was a  Delaware company, and then it qualified in Texas on April 21st of 2006 as a -- to operate in Texas.  Is  that -- do you have –

A.     I wouldn't know one way or the other.

Q.     Okay.

Exhibit B

A.     But I'm not going to disagree with that.

Q.     Okay.  The remainder of number one, do you have any reason to doubt those?

A.     No, sir.

Q.     Okay.  And then it says Watermark -- in number two, it says, "Watermark became a member of The Preserve at Mustang Island, LLC, effective as of  November 9th, 2006." Can you describe to me what that means?

A.     It became a member of The Preserve at Mustang Island, LLC, effective as of November 9th, 2006.

Q.     All right.  Now, it's -- was that -- did it become a limited partner in that entity?  Is that –

       MR. HARRELL:  Object.  Form.

A.     It says "a member."  Best of my recollection, LLCs have members, not limited partners.

Q.     (BY MR. DUNCAN)  Okay.  All right.  That's why -- we were talking wth a corporation.  I got you.

       All right.  Now, the, the next one is where I want to focus a little more, the Galveston property transaction.  It says, "Park Lake  Communities" -- "a Royce affiliate, purchased the Galveston tract from Lake Como Club on April 19th, 2006, for $1,550,000."

       Do you see that?

A.     Yes, sir.

Q.     Does that jibe with your recollection?

A.     I don't have a recollection as to the dates or exact dollar amount.

Q.     But you understood that initially Park Lake purchased these -- some tracts down in Galveston, and it was the Pirates Beach area; is that correct?

A.     My recollection regarding this was that they closed it in the wrong entity, but that's a different -- yes, sir.

Q.     Okay.  So, why did they close it in the wrong entity?

Exhibit B

A. It was supposed to have been closed into Watermark.

Q. All right. So, the Park Lake Community had purchased these Pirates Beach lots for development from Lake Como Club sometime in early 2006; is that -

MR. HARRELL: Object. Form.

Q. (BY MR. DUNCAN) Is that correct?

A. That's what it says.

Q. Okay. Then Watermark purchased the Galveston tracts, these Pirate Beach tracts, from Park Lake December 29th of 2006 for 1.8 million. Does that sound correct?

A. That, that may very well be.

Q. Well, do you have any reason to doubt that?

A. No, sir.

Q. And you're saying that you, you believe that the lots should have been in Watermark to start with; is that –

A. Yes, sir.

Q. All right. And then: Pursuant to a contract dated December 29th, 2006, Watermark sold lots to Texas Colonial for $107,056 per lot for a total of 18 $1,816,952 in a series of closings on May 30th, 2007; June 14th, 2007; and June 18th of 2007.Does that jibe with your recollection?

A. I wouldn't remember specific dates, but that's what it says.

Q. All right. If that's what it says, is -- generally do you understand that Watermark sold lots to Texas Colonial?

A. Yes, sir.

Q. Okay. And these were the Pirates Beach –

A. It –

Q. -- lots?

A. It was some of those, yes, sir.

Exhibit B

Q. All right. All right. Let's look at Exhibit 206.

(Exhibit No. 206 marked.)

MR. TOW: No. John needs one.

MR. HARRELL: Oh, I'm giving them all away.

MR. TOW: This is the original. Give that to John.

(Sotto voce discussion off the record.)

Q. (BY MR. DUNCAN) All right. If we can look at Exhibit 206, does that appear to be the contract for the sale of the Pirates Beach lots?

A. Yes, sir.

Q. All right. And who is the seller, and who is the buyer?

A. The seller is Watermark Land, LP, a Delaware Limited Partnership, and Texas Colonial Homes, LP, a Texas Limited Partnership, as the buyer.

Q. And if you could, change -- if you could, turn to Bates Stamp 52117 of Exhibit 206. And who are the contact people for each of the –

A. It's –

Q. -- for the, for the seller?

A. It says "To Seller: George Kopecky, Watermark Land, LP," and "To Buyer: John Speer," for "Texas Colonial Homes, LP."

Q. Okay. And if you go back to the front, the first page, it appears that we're talking about 9 single-family lots in the Pirates Beach subdivision; is 10 that correct?

A. Yes, sir.

Q. And in Paragraph 2, the purchase price appears to be $107,056 per lot?

A. Yes, sir.

Q. And if you go to the last page of Exhibit "106," it appears that this transaction is -- it was signed on 12/29 of 2006; is that correct?

A. Yes, sir.

(Sotto voce discussion off the record.)

Q. (BY MR. DUNCAN) Yeah. This is -- we've been referring to Exhibit 206, 206. If we go back to 203 for a second, Paragraph 3(c), does that appear to correspond to what we're looking at?

MR. TOW: 3(c) or 3(b)?

MR. DUNCAN: Well -

Q. (BY MR. DUNCAN) Yeah, 3(c). Does 3(c) on Exhibit 203, in general, correspond to what we're looking at on Exhibit 206?

A. It appears to.

Q. Okay. Let's look at Exhibit 204.

(Exhibit No. 204 marked.)

Q. (BY MR. DUNCAN) If you look at Page 3 of Exhibit 204 -- go back one -- does that appear to identify the, the lots that we're -- the 17 lots that we're talking about in the Watermark, Galveston transaction?

A. It lists a series of lots. I would have no knowledge of whether or not they refer to Pirates Beach, though. I wouldn't have any reason to believe otherwise.

Q. All right. If you go to Page 4 of Exhibit 204, does this appear to be a closing statement dated 5/30 of '07?

A. Yes, sir.

Q. Okay. And does the seller appear to be Watermark Land?

A. Yes, sir.

Q. And if you go back to Exhibit 203, Paragraph 3(c), it talks about in -- a closing on May 30th of 2007, does it not?

A. Yes, sir.

Q. And –

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 518
Back to Table of Contents

Exhibit B

A. May 30th, June 14th, and June 18th.

Q. Okay. And does Exhibit 4 -- 204, Exhibit 204, fourth page, appear to be the closing statement -- to be the, the first page of the closing statement that Mr. Kopecky would be referring to?

MR. HARRELL: Object to form.

A. It refers to some lot numbers in that, in that community. So, I'm guessing it would be.

Q. (BY MR. DUNCAN) All right. If you could, take a look at Bate Stamp 52127 of Exhibit 204. And does that appear -- again, does it appear that the seller is Watermark Land and the closing date is 6/14 of '07?

A. Yes, sir.

Q. And if we look at Bate No. 52133 of Exhibit 204, again, does that appear that Watermark Land is the seller –

A. Yes.

Q. -- and the closing date is 6/18 of '07?

A. Yes, sir.

Q. Okay. And if we look at 203, it appears that those dates in -- correspond –

A. It appears so.

Q. -- okay, in Exhibit 203, Paragraph 3(c)? All right. What I want you to do, on each of the closing statements that we just looked at attached to Exhibit 204 -- and they appear on the, for example, on the fourth page of Exhibit 204 and on Bates Stamp 52127 and Bates Stamp 52133 of Exhibit 204. Whodoes it -- which entity appears to be borrowing the funds in order to acquire these lots?

A. It says Royce Homes, LP.

Q. Okay. Therefore, even though the property is being transferred -- is -- it's not being transferred to Royce Homes, LP; is that correct?

MR. HARRELL: Object. Form.

Q. (BY MR. DUNCAN) The property?

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 519
Back to Table of Contents

Exhibit B

A. It was -- in -- no. Texas Colonial was buying them.

Back to Watermark Asset Stripping General Partner
Back to Watermark Asset Stripping Limited Partner
Back to Watermark Asset Stripping Purchase Price
Back to Watermark Asset Stripping Purchase by Watermark

**Speer Excerpt 61** (Speer 2004 Examination, Volume 2, Page 48, Line 14 to Page 49, Line 18.)

Q. (BY MR. DUNCAN) That's a contract for sale of lots; is that correct?

A. Yes, sir.

Q. Who were the lots being sold to?

MR. HARRELL: Object. Form.

A. The contract says Texas Colonial Homes.

Q. (BY MR. DUNCAN) All right. And if we look at Mr. Kopecky's Exhibit 203, Exhibit 203 --

A. Yes, sir.

Q. -- and if we go down to Paragraph 3(c), it says, "pursuant to a contract dated December 29th, 2006, Watermark sold 17 lots to" who?

A. It says Texas Colonial Homes.

Q. Okay. All right. Let's take a look at Exhibit 205.

(Exhibit No. 205 marked.)

Q. (BY MR. DUNCAN) Does Exhibit 205 appear to be an appraisal for the Pirates Beach Circle property in Galveston that was referred to in Paragraph 3 of Exhibit 203, Mr. Kopecky's exhibit?

MR. HARRELL: Objection to form.

A. That's what it says.

Q. (BY MR. DUNCAN) All right. This is one of the properties included in the, the Watermark sale; is that correct?

Exhibit B

A. I would have to go back and reference a specific address, but I wouldn't think otherwise.

Q. And, again, who is represented as the borrower, if you go to the appraisal, itself, Page 3?

A. It says "borrower, Royce Homes."

**Speer Excerpt 62** (Speer 2004 Examination, Volume 2, Page 50, Line 12 to Page 52, Line 7.)

Q. (BY MR. DUNCAN) Now, Exhibit 207 is an e-maildated 8/14 of '08 from Scott Cunningham to you and your counsel; is that right?

A. That's that it appears to be.

Q. All right. And Mr. Cunningham was counsel for Mr. Kopecky; is that correct?

A. Yes, sir.

Q. And attached to the e-mail is a compromise/settlement communication from Mr. Cunningham to your counsel?

A. Yes, sir.

Q. And let's turn to Page 2 of Exhibit 207, and please read the second paragraph.

A. "This firm has been retained by George Kopecky to secure immediate distribution on his 33 and a third -- 33.3 percent limited partnership interest in and to Texas Colonial Homes, LP."

Q. All right. Read the next paragraph, the, the third paragraph on Exhibit -- Page 2 of Exhibit 207.

A. "Upon information and belief, Mr. Speer has wrongfully commingled and/or misappropriated over $10 million in available partnership cash resources and, otherwise, wrongfully converted partnership assets to fund a lavish and highly publicized personal lifestyle, including the ownership and operation of the Magueyitos Ranch property. Further, upon information and belief, Mr. Speer has diverted said funds to and through multiple entities he owns or controls, including but not limited" --

Q.      You don't need to read all the different entities.  It's all -- it's a number of different entities --

A.      Yes, sir.

Q.      -- including the Royce entities, Magueyitos,  and a number of different Royce entities; is that correct?

A.      There's no –

MR. HARRELL:  Object to form.

Q.      (BY MR. DUNCAN)  And general partners and so on and so forth?

A.      There are some entities I've never heard of here, but –

Q.      Okay.  And then it also says "as well as to  cover non-partnership debt obligations to Amegy Bank." Is that correct?

A.      Yes, sir.

Back to Watermark Asset Stripping
Back to Fraud/Fraud Scheme


**Speer Excerpt 63** (Speer 2004 Examination, Volume 2, Page 52, Line 8 to Page 58, Line 8.)

Q.      Now, let me ask you this:  Did -- at the end of 2007, did Mr. Kopecky come to you and ask for a, a sizable distribution from Texas Colonial Homes?

A.      At the end of 2007.  I don't remember one at the end of 2007.

Q.      When do you remember that he asked you for a distribution --

A.      I think --

Q.      -- a sizable --

A.      -- the end, end of January of '08 he asked for -- and there might have been another one in 2007. I'm not recollecting the -- January of '08, he asked for $100,000.  It was either '06 or '07 that he asked for $800,000.

Q.      Okay.  And you had been providing him, as well as your lenders, with financial statements relating to the Royce entities; is that correct?

Exhibit B

A.      He got them every month.

Q.      And the same ones that you were sending to your lenders?

A.      All the, all the internal ones and the same ones that were sent in to lenders and that kind of thing.

Q.      Okay.  I'd like you to take a look at Exhibit 208.

        MR. TOW:  Oh, okay.  I see.

        (Exhibit No. 208 marked.)

Q.      (BY MR. DUNCAN)  Is Exhibit 208, 208, an example of a financial statement that you would have provided to Mr. Kopecky as well as your other lenders related to the Royce entities?

A.      I, I --

        MR. GIBSON:  Objection.  Form.

A.      I don't know.  I have no way of knowing.

Q.      (BY MR. DUNCAN)  Does that appear to be the, the financials that -- of Royce as of 12/31 of 2007?

A.      It appears to be some format of that.  I'm not sure of the genesis of this.

Q.      All right.  Now, does it reflect that at the end -- the year end 2007, that Texas Colonial had in excess of $11 million in cash?

        MR. HARRELL:  Object to the form.

A.      Yes, sir.

Q.      (BY MR. DUNCAN)  And Mr. Kopecky had requested a distribution from Texas Colonial in order for him to pay certain expenses, property taxes or some other expenses; is that correct?

A.      I don't recall timing of that.

Q.      Well, you just said in January of 2008 he asked for about $800,000; is that correct?

        MR. HARRELL:  Object to form.

Exhibit B

A. I said in January of 2008 he asked for a hundred thousand dollars at the end of January.

Q. (BY MR. DUNCAN) When did he ask for the 800,000?

A. I think I said I couldn't remember whether it was the summer of 2006 or summer of 2007.

Q. All right. Well, he had requested a distribution from Texas Colonial in order to pay some expenses in January of 2008; is that correct?

A. Yes, sir.

Q. All right. And you informed him that there was no cash in Texas Colonial; is that right?

A. That wasn't what I told him. I told him there was cash was -- company -- was tight companywide and we wouldn't be making any distributions.

Q. Was there in excess of $11 million in Texas Colonial at the end of 2007?

A. There was one -- I've subsequently found out there was one common bank account, and, so, those two numbers get merged between Royce Homes and Texas Colonial.

Q. Well, if we look at Royce Homes, it says there's a negative $11 million, right?

A. Yes, sir. I'm just telling you that they were operating out of the same bank account.

Q. So, there was no money?

A. Oh, whatever --

MR. GIBSON: Objection. Form.

Q. (BY MR. DUNCAN) I mean, there -- hold on. Let's, let's get this clarified. So, was there $11million in an account?

A. Not to my knowledge.

Q. All right. So, when Mr. Kopecky was getting his financials in regards to Texas Colonial and it's saying that there was $11 million in cash in an account related to Texas Colonial, that was not correct; is that right?

MR. HARRELL: Object to form.

Exhibit B

MR. GIBSON: Objection. Form.

A. To the best of my knowledge, it was not.

Q. (BY MR. DUNCAN) All right. Can you tell me why you have a positive 11 million in Texas Colonial and a negative 11 million in Royce Homes?

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. The only thing I can think of, it was internal accounting differentiating between the two.

Q. (BY MR. DUNCAN) Differentiating between the two?

A. Yes, sir.

Q. In what re -- what do you mean by that?

A. I -- as I said, I've subsequently found out that there was one operating account that was for both entities.

Q. Did the 11 million get spent?

MR. HARRELL: Object to the form.

Q. (BY MR. DUNCAN) Is that --

MR. GIBSON: Objection. Form.

A. If you combine the two dollar amounts, that would reflect what was there.

Q. (BY MR. DUNCAN) Was there supposed to be 11 million in Texas Colonial?

MR. HARRELL: Object to the form.

MR. GIBSON: Objection. Form.

A. What there should have been was -- there should have been an accounts receivables from Royce Homes, LP, to Texas Colonial Homes, is what there should have been.

Q. (BY MR. DUNCAN) Okay. But at the -- when Mr. Kopecky came to you in January of 2008, you were unable to make a distribution to him as he had requested;

is that right?

A.      Right.

        MR. HARRELL:  Object to the form.

Q.      (BY MR. DUNCAN)  And what you told him is, "Well, I'll, I'll see what I can do," and over the next couple of months, you gave him tens of thousands of dollars -- is that correct --

        MR. HARRELL:  Object to the form.

A.      I --

        MR. GIBSON:  Objection.  Form.

Q.      (BY MR. DUNCAN)  -- in different distributions?

A.      I instructed him to work out what would work cashflowwise with James Hunter and Bill Gathmann and whatever agreement they came to would be fine with me and I think he ultimately received the hundred thousand dollars over the next two or three months.

Q.      Okay.  What about the 800 -- when -- you said he also requested $800,000 from you; is that --

        MR. HARRELL:  Object --

A.      I -

        MR. HARRELL:  -- to the form.

A.      I remember that as a general round number, and I said that I didn't remember whether that was in the summer of '06 or '08 -- '07.  I'm sorry.

Q.      (BY MR. DUNCAN)  Okay.  And what did you tell Mr. Kopecky in regards to the -- when he wanted the 800,000?

A.      We gave him the distribution.

Back to Watermark Asset Stripping
Back to Fraud/Fraud Scheme

Exhibit B

**Speer Excerpt 64** (Speer 2004 Examination, Volume 2, Page 60, Line 1 to Line 11.)

Q. All right. Let's, let's just get this one issue clarified. At the end of 2007, Texas Colonial did not have $11,179,933 in a bank account; is that correct?

A. No, sir.

Q. And it didn't have -- there was -- would you agree that there was basically no cash or pretty close to no cash at that time frame at the end of 2007?

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. Comparatively speaking, yes, sir.

Back to Watermark Asset Stripping
Back to Fraud/Fraud Scheme

**Speer Excerpt 65** (Speer 2004 Examination, Volume 2, Page 62, Line 11 to Page 70, Line 19.)

(Exhibit No. 209 marked.)

MR. HARRELL: John's got one.

MR. TOW: I'm sorry.

MR. SHURN: Hand one back here to George.

Q. (BY MR. DUNCAN) All right. Exhibit 209 is a letter from Mr. Cunningham to Mr. Wilk, dated August 25th, 2008; is that correct?

A. It says August 25th, 2008.

Q. All right. Now, again, who is Mr. Wilk?

A. Mr. Wilk was my attorney.

Q. Okay. So, Mr. Kopecky's attorney is sending a letter to your attorney on August 25th, 2008; is that correct?

A. That's what it says, yes, sir.

Q. And the title of the document is "Compromise/Settlement Communication," correct?

A. Yes, sir.

Q. And it appears, if you read the -- hold on.

Did Wilk represent Royce, too?

A. I might have gratuitously had him do that. He was my attorney.

Q. But he also represented Royce; is that correct?

A. In the fact that they listed Royce in the suit, I, I, I believe so.

Q. Okay.

A. Royce didn't pay him anything; I paid him.

Q. It says: "I have reviewed your counteroffer of August 21st, 2008, with Mr. Kopecky."

Do you see that?

A. Yes, sir.

Q. Okay. So, we look at that earlier letter, which is Exhibit 207, and that was on August 14th of 2008 and then it says that a counteroffer apparently was made on August 21st of 2008, correct?

A. Well, I'd have to go back --

Q. Yeah.

A. -- to that and see. I'm sorry. Where are you reading?

Q. All right. What we're doing is we're looking -- I'm trying to get the context of when this letter is received and how it -- and why it was received.

A. Oh, I'm sorry.

Q. We have --

A. It says: "I have reviewed your counteroffer of August 21st."

Q. You see that?

A. Yes, sir, I do.

Q. Okay. So, apparently we have -- in Exhibit 207, there was an offer made August --

(Interruption.)

MR. DUNCAN: Sorry.

Q. (BY MR. DUNCAN) If we look at Exhibit 207, the second page, there is an offer letter of August 14th of 2008, correct? 207. Look at 207.

A. We're on 207 now?

Q. Yes, sir. Look at 207.

A. Yes, sir.

Q. We have an offer being made on August 14th of 2008, correct?

A. An offer being made? You mean the demand that they're making?

Q. Yes.

A. Okay.

Q. And that is being made by Mr. Kopecky to your counsel, correct?

A. It appears to be, yes, sir.

Q. All right. Then we look at Exhibit 209.

A. Okay.

Q. And in the second paragraph, it refers to a counteroffer that was made on August 21st of 2008.

A. Okay.

Q. And now it appears that Mr. Kopecky's attorney is responding to that counteroffer. Does that appear reasonable?

A. That appears to be reasonable.

Q. Okay. And that is on August 25th of 2008?

A. Yes, sir.

Q. All right. If you could read Paragraph 3 on the first page of Exhibit 209, read the, read the first two sentences to start.

A. "The Watermark Land, LP, is plagued with several problems that negatively impact its value: First, marketing coastal properties is at best speculative, particularly in this restrictive financial environment."

Q. Next sentence?

A. "Second, some of the direct or indirect funding and/or recoupment of the initial 20-acre acquisition costs, inclusive of the 2-acre, 17-lot carve-out, was derived from Royce and may be at risk as a preference and/or fraudulent transfer in the event of any Royce chapter filing."

Q. Okay. Stop there. If we go back to Exhibit 206, we see that that refers to the 17 lots that were sold to Watermark; is that correct?

A. Yes, sir, I would believe so.

Q. All right. And we also saw in Exhibit 204 – it appears that in excess of $1.8 million for the acquisition cost of the 17 lots came from Royce Homes, LP; is that correct?

A. Well, all of the Texas Colonial construction activities were funded through Royce Homes, LP --

Q. Okay. If you --

A. -- 100 percent of them.

Q. I'm talk –

A. So, that would be the case here, also.

Q. All right. I'm talking about the acquisition cost. If you look at Exhibit 204, there's in excess of $1.8 million borrowed by Royce Homes to acquire --

A. Yes, sir.

Q. -- the 17 lots?

Exhibit B

A.     Yes, sir.

Q.     Okay.  And it says in Exhibit 209, the third paragraph, it says, "Second, some of the direct" and "indirect funding and/or recoupment of the initial 20-acre acquisition costs, including -- inclusive of the 2 acres, the 17-lot carve-out, were derived from Royce and may be at risk as a preference and/or fraudulent transfer in the event of any Royce chapter filing."

You see that?

A.     Yes, sir.

Q.     Correct?

Do you understand that Mr. Kopecky was referring to the fact that the consideration paid for the lots was paid for -- by Royce Homes, LP?

MR. HARRELL:  Object to the form.

A.     I would suspect in this case he was looking at Royce in its entirety, including Texas Colonial.

Q.     (BY MR. DUNCAN)  Well, it doesn't -- it says -- okay.  So, you're, you're interpreting that not to mean Royce Homes, the, the entity --

A.     Well --

Q.     -- that actually was the borrower under the acquisition?

MR. HARRELL:  Object.  Form.

A.     I, I would -- you know, what I was trying to say a minute ago is all of Royce Homes' lot -- I mean, all of Texas Colonial Homes' lot acquisition and construction activities were funded by Royce Homes, LP. Texas Colonial Homes did not have its own borrowing capacity.

Q.     (BY MR. DUNCAN)  How about Park Lake?

A.     Park Lake had separate borrowing.

Q.     Okay.  So, in other words, Royce Homes would have paid for these particular lots, the, the Pirates Beach lots?

A.     Yes, sir.

Exhibit B

Q.    Okay.  And it says here that if Royce Homes files bankruptcy the trustee would likely seek to recoup this consideration of the preference or fraudulent transfer.  You see that?

A.    I --

      MR. HARRELL:  Object.  Form.

A.    I do see that.

Q.    (BY MR. DUNCAN)  All right.  Let's continue reading where it says "my client." We're on Exhibit 209.

A.    Okay.

Q.    Start with the fourth paragraph.

A.    All right.  "My client's liquid losses are substantial.  In addition to the 3 and a half million dollars diverted from the partnership account, my client has previously paid approximately 1 and a half million in income taxes on those now diverted profits over the past several years."

Q.    All right.  Stop there.  What is your understanding of the 3 and a half million dollars diverted from the partnership account that Mr. Kopecky is referring to here?

      MR. HARRELL:  Object to form.

A.    That would have been his perception of his equity position at the time.

Q.    (BY MR. DUNCAN)  His position is that you took $10 million out of the company; is that correct?

      MR. HARRELL:  Object to form.

      MR. GIBSON:  Objection.  Form.

A.    Well, he's "allegating" that I personally did that.

Q.    (BY MR. DUNCAN)  Okay.  And his position is that 3 and a half million of the money that you allegedly took out of the company belonged to him?

      MR. HARRELL:  Object to form.

A.    I believe that's what he's alleging.

Exhibit B

Q. (BY MR. DUNCAN) Okay. And he's also alleging that he had to pay their -- this -- let's, let's get it clear here. The profits were on the books of the company, and he paid taxes on those, those amounts that were on the books of the company; is that correct?

MR. HARRELL: Object to the form.

A. No, sir. He would have received distributions to pay those taxes, and that would have reduced his capital account.

Q. (BY MR. DUNCAN) Well, he would have received a tax distribution. Is, is that what you're saying?

MR. HARRELL: Objection. Form.

A. He'd receive a distribution, and then he'd pay taxes with it, just as I would.

Q. (BY MR. DUNCAN) All right. Without me trying to figure out what's going on here, you tell me what was being alleged by Mr. Kopecky and what your position was on it.

MR. HARRELL: Object to the form.

MR. GIBSON: Objection. Form.

A. His allege was -- his "allegement" was that I personally removed money from the company to his detriment.

Back to Watermark Asset Stripping Purchase by Watermark
Back to Watermark Asset Stripping Settlement Consideration

**Speer Excerpt 66** (Speer 2004 Examination, Volume 2, Page 71, Line 2 to Line 20.)

Q. (BY MR. DUNCAN) All right. Let's continue to read. Go to the next paragraph on Page 1 of "2009," starting with, "My client is not interested" --

MR. TOW: It's 209.

MR. DUNCAN: It's 209. Yeah.

A. "My client is not interested in a" --

Q. (BY MR. DUNCAN) Oh, go ahead.

Exhibit B

A. "My client is not interested in a settlement that does not include a substantial cash payment. In order to effectuate an expedited resolution, we proffer the following counteroffer."

You want me to continue reading?

Q. Yes.

A. "Number one, Mr. Speer will pay or cause to be paid at closing certified funds in the amount of $1 million to George Kopecky. The source of the funding must be documented and cannot be funded or derived directly or indirectly from Royce Homes, LP, or any of its affiliated companies."

Back to Watermark Asset Stripping

**Speer Excerpt 67** (Speer 2004 Examination, Volume 2, Page 72, Line 20 to Page 75, Line 23.)

Q. Okay. All right. Go to Paragraph -- on Page 2 of Exhibit 209 --

A. Okay.

Q. -- and start reading number two on that page --

A. Okay.

Q. -- the paragraph.

A. "Mr. Speer will transfer and assign to Mr. Kopecky his partnership interests in Watermark Land, LP. The transfer and assignment would include both the general partnership unit owned by Hammersmith Group, Inc., and Class A limited partnership units owned by Mr. Speer. Mr. Kopecky will clear the deed restriction."

Q. Okay. Let's stop there. Now, if you remember, on the first page, Mr. Kopecky is either insinuating or saying that there is a problem with that particular asset -- is that correct -- in that there may be a preference or a fraudulent transfer claim?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. There is some wording denigrating that particular asset.

Q. (BY MR. DUNCAN) Okay. But what he's saying is but he'd be willing to take it.

Exhibit B

Is that your understanding?

MR. HARRELL:  Object.  Form.

MR. GIBSON:  Objection.  Form.

A.      That was it.

Q.      (BY MR. DUNCAN)  Okay.  All right.  Let's go to -

A.      "I don't like it, but I'll take it."

Q.      That's right.  Okay.  Let's go to Exhibit 209, Page 2, No. 4.  Go to Paragraph 4 on Page 2 of Exhibit 209.

A.      Okay.  "Number four, In the event all or any portion of the settlement consideration is challenged or deemed to be a preference or fraudulent transfer, Mr. Speer will indemnify and hold Mr. Kopecky harmless of and from any liabilities and/or losses, including but not limited to attorney's fees."

Q.      Okay.  So, if he gets caught with the asset, he -- you know, you're back on the hook again, is kind of where he's coming from?

MR. HARRELL:  Object.  Form.

MR. GIBSON:  Objection.  Form.

A.      It's like everything else with George Kopecky. He wanted all the good and none of the, none of the responsibility or liability.

Q.      (BY MR. DUNCAN)  Got you.  Okay.  Go to the next -- on Exhibit 209, Page 2, Paragraph 5.

A.      "In the event all or any portion of the settlement consideration is deemed a preference and/or fraudulent conveyance, the settlement agreement shall be terminated, and all claims and causes of action Mr. Kopecky may have shall be revived and may be fully prosecuted.  Statutes of limitations on any claim shall be tolled during the pendency of the settlement agreement."

Q.      Same, same --

A.      Best of all worlds.

MR. HARRELL:  Object.  Form.

Exhibit B

MR. GIBSON: Objection. Form.

A. I'm sorry. Best of all worlds.

Q. (BY MR. DUNCAN) All right. So, it looks like on Page 1 of 2000 -- 209 Mr. Kopecky is, in essence, saying these are ill-gotten gains, but he'll take them.

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

Q. (BY MR. DUNCAN) And if he gets caught with them, he wants to open it up again.

MR. HARRELL: Object to form.

MR. GIBSON: Object. Form.

Q. (BY MR. DUNCAN) He wants to open up the settlement.

A. I don't know that he's saying they're ill-gotten gains, but I, I think what he's saying is in the event that something's negatively impacted by subsequent events he doesn't want responsibility.

Back to Watermark Asset Stripping Purchase by Watermark
Back to Watermark Asset Stripping Settlement Consideration

**Speer Excerpt 68** (Speer 2004 Examination, Volume 2, Page 77, Line 11 to Page 79, Line 3.)

Q. (BY MR. DUNCAN) My assumption is that the August 27th, 2008, date came and went and there was not a settlement between you and Mr. Kopecky at that point; is that correct?

A. No, sir, there wasn't.

Q. Okay. And then I want you to take a look at Exhibit 210, and that appears to be a lawsuit that Mr. Kopecky filed against you; Hammersmith Group; and Royce Homes, LP; is that correct?

A. Yes, sir.

Q. And if you look at the top right-hand corner, it says October 30th of 2008; is that correct?

A. Yes, sir.

Q. And does, does that jibe with your recollection of about the time frame in which Mr. Kopecky filed suit against you?

A. Around that time, yes, sir.

Q. All right. If you could, go to Page 4 – Paragraph 14 on Page 4 of Exhibit 210. And can you read that paragraph aloud?

A. "Number 14, As late as May 2008, the Texas Colonial Homes balance sheet showed approximately 10 and a half million in available cash and distributable income to Kopecky in the amount of 3.4 million."

Q. Do you admit or deny that that's a correct statement?

MR. HARRELL: Object. Form.

A. I, I -- we looked at a statement. I haven't seen recently the actual financial statements, but I'm not going to disagree with that.

Q. (BY MR. DUNCAN) All right. If you could, take look at Paragraph 15 on Page 4 of Exhibit 210 and read that one.

A. "Without Kopecky's knowledge or consent, the available cash and distributable partnership income was converted and/or diverted by Speer, leaving Kopecky with no distributable income and the partnership with no available cash assets."

Q. Okay. Same question: What is your position on that statement?

MR. HARRELL: Object to the form.

A. It was without my knowledge, also. So, I couldn't have possibly taken it.

Back to Watermark Asset Stripping

**Speer Excerpt 69** (Speer 2004 Examination, Volume 2, Page 82, Line 2 to Line 20.)

Q. (BY MR. DUNCAN) Okay. If you could, read Paragraph 18 on Page 4 of 2000 and -- I'm sorry, 210, Exhibit 210.

A. It says, "Speer, a former certified public accountant, controlled the accounting functions of the partnership from Royce's corporate offices, controlled the issuance

Exhibit B

of consolidated financial statements for all the Royce entities, including the partnership."

You want me to continue?

Q. What is your position on that statement?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. I was a former certified accountant, and I controlled the company. So, I guess I controlled the accounting functions, and I -- and, thereby, I guess I controlled the issuance of consolidated financial statements.

Q. For the Royce entities?

A. Yes, sir.

Back to Westwood Asset Stripping
Back to Fraud/Fraud Scheme

**Speer Excerpt 70** (Speer 2004 Examination, Volume 2, Page 99, Line 9 to Line 14.)

Q. (BY MR. DUNCAN) All right. Let's go to Exhibit 212. This is a string of e-mails between Michael Wilk, which is counsel for you, and Scott Cunningham, which is Mr. Kopecky's attorney, dated November 20th of 2008; is that correct?

A. Yes, sir.

Back to Watermark Asset Stripping

**Speer Excerpt 71** (Speer 2004 Examination, Volume 2, Page 100, Line 1 to Line 16.)

A. The one that starts with "Michael" and goes to the next page?

Q. Yes, that's correct.

A. "Michael, David Donnelly and John Ransom spoke last Thursday, 11/13/08. John essentially indicated that Royce, as part of an overall settlement, was willing to prepare the TCH 2007 return showing a loss on the intercompany balance sheet to

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd
Page 538
Back to Table of Contents

Exhibit B

support George's amended return."

Q. Okay. Stop there for a second. So, what your counsel had apparently offered is that you would amend the Texas Colonial Homes tax return in order to show a loss, resulting in the intercompany debt; is that correct?

MR. HARRELL: Object to form.

A. It says something like that here.

Back to Watermark Asset Stripping

**Speer Excerpt 72** (Speer 2004 Examination, Volume 2, Page 100, Line 25 to Page 102, Line 17.)

Q. Okay. If you could, go to the first page of Exhibit 212 and read the e-mail from Mr. Wilk to Mr. Cunningham, and I'll stop you at the appropriate time.

A. Okay. "Scott, we would like to settle, but believe it or not, Speer does not have the cash to pay Kopecky. I have been advised by tax counsel that Kopecky's chance of getting a prompt tax refund, refund by TCH taking a bad debt deduction far exceeds Kopecky's chances of successfully taking a theft loss."

Q. All right. Stop there. He got a – Mr. Kopecky got a million-and-a-half-dollar refund; is that correct --

MR. HARRELL: Object.

Q. (BY MR. DUNCAN) -- from your understanding?

MR. HARRELL: Object to form.

A. That's what I was told.

Q. (BY MR. DUNCAN) Okay. And which method did he ultimately use in order to get that refund, to your understanding?

MR. HARRELL: Object. Form.

A. This is dated as of November 20th, 2008. It was my understanding that he had already filed claiming a theft and had already received a refund.

Q. (BY MR. DUNCAN) Okay. All right. Let's go to Exhibit 213.

(Exhibit No. 213 marked.)

Q. (BY MR. DUNCAN) And I -- what I'd like you to do -- this is a string of e-mails between Mike Wilk and Scott Cunningham, dated 12/5 of '08; is that correct?

A. Yes, sir.

Q. And if you look at the bottom e-mail on Exhibit 213, it's an e-mail from Mr. Cunningham to your counsel, dated 12/5 of '08, correct?

A. Yes, sir.

Q. And can you tell me what Mr. Kopecky's counsel is telling your counsel? Please read it.

A. It says: "Michael, I have spoken at length with Donnelly and Kopecky about the tax issues. Their consensus is that the tax issue is not of sufficient concern to warrant settlement and/or mediation. Additionally, we cannot be complicit in any manipulation of your client's tax returns."

Back to Watermark Asset Stripping

**Speer Excerpt 73** (Speer 2004 Examination, Volume 2, Page 105, Line 11 to Page 114, Line 16.)

Q. Did, did you modify the Texas Colonial Homes tax return -- or not tax return, the financials in order to allow Mr. Kopecky to receive a, a refund?

MR. HARRELL: Object to form.

A. No, sir.

Q. (BY MR. DUNCAN) Okay. Let's go to Exhibit 215. And I guess you won't be able to guess what this document is here. All right.

(Exhibit No. 215 marked.)

Q. (BY MR. DUNCAN) Now, Exhibit 215 was produced to us by Mr. Kopecky in production. And does this appear to be the settlement agreement that you and Mr. Kopecky ultimately entered into on 12/31 of 2008?

A. Without reading the entirety of it, there is -- it, it appears that could very well be.

Q. All right. And if you could turn to Bate No. 51677 of Exhibit 215, does that appear

to be your signature for yourself, for Hammersmith Group, for Royce Homes, LP?

A.      Yes, sir.

Q.      And it appears that it -- it's dated 12/31 of '08, correct?

A.      Yes, sir.

Q.      And then there is signatures for Kelly, Grant, William Speer; is that correct?

A.      Yes, sir.

Q.      And were they present in the mediation?

A.      I don't think the mediation took place this day.  I -- that's not my --

Q.      Okay.

A.      -- memory at all.

Q.      All right.  And if you go to the next page, Marisa is also signing the document?

A.      Yes, sir.

Q.      And then the next page, which is 51679, that appears -- does that appear to be Mr. Kopecky's signature?

A.      Yes, sir.

Q.      All right.  All right.  Go to Page 2 of Exhibit 215.  I'm sorry.  It's the -- it's actually the third page, and it's the one numbered 2 at the bottom --

A.      Okay.

Q.      -- which is Bate No. 51666.

A.      All right.

Q.      It shows consideration to each of the parties under the settlement agreement.  Is that what it appears to be?

A.      That's -- its first numeration is titled "Consideration."

Q.      Okay.  And if you could read, it says:  The consideration for the compromise and

Exhibit B

settlement of the Kopecky lawsuit is as follows, and if you could start with A, what does that say?

A.  "Speer shall pay Kopecky the sum of $50,000, cash consideration.  Such pay" -- "such" -- "shall be made by check on Speer's account, payable to Kopecky."

Q.  Okay.  So, you paid Mr. Kopecky $50,000; is that correct?

A.  Yes, sir.

Q.  All right.  And, B, it says that Mr. Kopecky shall abandon his limited partnership interests in Texas Colonial Homes; TH Homes Land, LP; and TCH Financial, LP, correct?

A.  Yes, sir.

Q.  And that appears to have occurred; is that correct?

A.  Yes, sir.

Q.  Then we go to C, and let's look at that more, more closely.  If you could, read that, and we're on Exhibit 215, Bate No. 51667, and it's Paragraph C.

A.  You want me to read the entirety of it?

Q.  Yeah.  Yeah.  I'll, I'll stop you --

A.  Okay.

Q.  -- at the appropriate time.

A.  All right.  "Speer and Kopecky, as limited partners of Watermark Land, LP, Watermark, and Hammersmith, as sole general partner of Watermark, agree that Watermark shall be converted into a Delaware limited liability company, New Watermark.  The ownership interest of New Watermark shall be 1 percent owned by Hammersmith, 39 percent by Speer, 40 percent by Kopecky, and 20 percent by James Hunter.  Kopecky shall be the manager of New Watermark.  Kopecky acknowledges that income tax returns, Form 1065, for New Watermark have not been prepared and filed for 2007 and 2008.  As manager of New Watermark, Kopecky agrees to prepare and file the tax returns for 2007 and 2008 for New Watermark and to distribute K-1s to the owners of the ownership interests of New Watermark promptly but no later than April 1st, 2009.  Speer and his accountants shall cooperate with Kopecky and his accountants in producing all information necessary to complete and file said tax returns.  New Watermark shall organize under

Exhibit B

Delaware law a new limited liability company called Watermark Tortuga, LLC, and shall transfer to Tortuga the entirety of New Watermark's ownership interests in The Preserve at" park -- "at Mustang Island, LLC, 'Mustang Company.' The manager of Tortuga shall be James Hunter."

Q.      Okay.  Let's stop there for a second.  Why was there a new entity created, the New Watermark?  What was the purpose, the business purpose for that?

A.      I think that we'll see later on --

Q.      Okay.

A.      -- that it was to separate out the difference between the ownership of Galveston -- to separate out the, the --

Q.      Galveston --

A.      -- Tortuga properties, which is in Corpus, versus the Galveston property.

Q.      Okay.  So, basically the New Watermark would handle the Tortuga project, and Watermark would retain the Galveston operation?

A.      Yes, sir, and I would continue to have an interest in the New Water -- in the Tortuga but not the, the other one.

Q.      The one -- all right.  So --

A.      That's my remembrance.

Q.      Okay.  Let's go on to -- on Exhibit 215, Bate 51668, and at the top we have Exhibit -- I'm sorry, Paragraph D, and if you could, read that.

A.      "D, New Watermark shall transfer 100 percent of its interest in Tortuga to the owners of New Watermark; i.e., 1 percent for Hammersmith, 39 percent for Speer, 40 percent for Kopecky, and 20 percent for James Hunter.  The limited liability operating agreement for Tortuga shall reflect the ownership interests in Tortuga and grant the following priority distributions:

"Number one, The first 500,000 that would otherwise be allocated to Speer shall be allocated and distributed to Kopecky.

"Number two, The next $1 million that would otherwise be allocated to Speer shall be allocated and distributed 50 percent to Speer and 50 percent to Kopecky."

Exhibit B

Q. All right. Stop there just one second. Has there been any distributions from New Watermark?

A. No, sir.

Q. Okay. If you go down to "E," it says --

A. Not to my -- let me rephrase that. Not to my knowledge, I haven't received any.

Q. All right. And from this, it appears that Mr. Kopecky was going to get your first half million; is that correct?

A. Yes, sir.

Q. All right. And if you go to E on Bate 51668 of Exhibit 215 and read that.

A. "E, Speer shall transfer his 39 percent ownership interest in New Watermark to Kopecky, and Hammersmith shall transfer its 1 percent ownership interest in New Watermark to Kopecky."

Q. All right. Describe to me what you're trying to accomplish there.

MR. HARRELL: Object. Form.

A. I wasn't trying to accomplish anything.

Q. (BY MR. DUNCAN) Well --

A. I was just following directions for the way it was structured. I wasn't -- this was all lined out by --

Q. Got you.

A. -- attorneys and tax people.

Q. Were you -- it -- you know, I'm a little confused here. It appears that you're giving your New Watermark interest to Mr. Kopecky.

A. My 39 percent, yes, sir.

Q. What did you retain?

A. What I ended up retaining was Watermark Tortuga, an interest in that. 39 percent is my recollection.

Q.      All right.  Just clear this for up for me. Which entity owned the Galveston operation?

A.      Initially or later?

Q.      After this trans -- after this settlement.

A.      After this transaction it's my understanding that New Watermark would own Galveston and Watermark Tortuga would own Tortuga -- well, its interest in the project in Corpus.

Q.      Got you.  Okay.  So, Watermark Land, was that still an operating entity?

A.      I don't know.

Q.      Okay.  But there was a new entity that was created and that was Tortuga and that's where the, the other operation, the Corpus operation, was in?

A.      Yes, sir.

Q.      Okay.  I got you.  All right.

        If you can, go back to Exhibit 209 for a second, back in that stack, and this is that same one, the, the settlement offer being put forth by Mr. Kopecky.  And on the first page he's talking about, you know, there's a problem.  He, he perceives a problem with the Watermark Land, LP, because -- and it says in the third paragraph on Page 1 of 2 -- 209: Some of the direct or indirect funds -- funding or – and/or recoupment of the initial 20-acre acquisition, inclusive of the 2 acres and 17-lot carve-out, were derived from Royce and may be at risk as a preference and/or fraudulent transfer in the event of a Royce chapter filing.

        Do you see that?  Correct?

A.      Yes, sir.

        MR. HARRELL:  Object to form.

Q.      (BY MR. DUNCAN)  Can you tell me how that issue was resolved?

        MR. HARRELL:  Object.  Form.

A.      I have no understanding if or -- or whether it was or that it was.  I guess Mr. Kopecky and his attorneys changed their opinion between then and the end of December.

Q.     (BY MR. DUNCAN)  Okay.  Because did Mr. Kopecky take -- and just clear this up for me. Mr. Kopecky took New Watermark.  Is that what you're saying?

A.     Yes, sir.

Q.     He didn't -- he had -- do you have any interest in New Watermark at this point?

A.     No, sir.

Q.     All right.  And New Watermark, again, is the Galveston interest?

A.     Yes, sir.

Q.     All right.

A.     It's my understanding.

Q.     And what you did was you used your interest in the New Watermark -- or in the Galveston operation, you transferred that to Mr. Kopecky as part of the settlement?

A.     Yes, sir.

Q.     And that was, that was part of the consideration to resolve your differences?

A.     Yes, sir.

Back to Watermark Asset Stripping


**Speer Excerpt 74** (Speer 2004 Examination, Volume 2, Page 118, Line 10 to Line 19.)

Q.     Okay.  And what, what percentage interest do you own in the Watermark Tortuga?

A.     I -- as I recall -- and if we -- we can go back to the settlement agreement, I guess, but as I recall, it was a 39 percent interest subject to the preferences that Mr. Kopecky had pursuant to our settlement agreement.

Q.     And that's where he was going to receive the first half million?

A.     Yes, sir.

**Speer Excerpt 75** (Speer 2004 Examination, Volume 1, Page 18, Line 14 to Page 27, Line 13.)

Q. Okay. Very good. What I'd like you to do is take a look at Exhibit 22. That's in here. All right. If you can take a look at Exhibit 22, at the bottom e-mail, that appears to be an e-mail from a representative of Citigroup; is that correct? The bottom e-mail.

A. Yes, sir.

Q. All right. And that's to Pam Tyler, correct?

A. Yes, sir.

Q. All right. Could you please read that into the record?

A. Which, the bottom e-mail?

Q. The bottom e-mail.

A. It says, "Dear John, Thanks for your letters of August 16th and August" -- of -- "18th regarding your plan to acquire the interest of Mike Manners in Royce Homes, LP, and related entities. Steve Oglesby asked me to be your contact person in this matter. My telephone number is (713) 260-3072. "We asked our attorney, John Adkins of Strasburger & Price, LLP, to review your request along with the contribution agreement and the interest purchase agreement referenced in your letter of August16th. He has requested drafts of these documents from Joyce Soliman, who indicated last week that she was checking with you before releasing these documents to Citibank. "Other information that we need is quarterly financial statements of Royce Homes, LP, as of June 30th, 2006. We also would like to see detailed projections on how anticipated distributions to you as the 100 percent owner of Royce Holdings, LP, would enable you to pay the Amegy and Manners notes in 2006 and 2007. What effect to the provisions of the loan agreement related to tangible net worth, Section 6.15, and ratio of total liabilities to tangible net worth would these payments have?

"We appreciate your assistance in this matter, and many thanks for sending the information requested. "Sincerely, Chuck Bolton."

Q. Now, Citibank was one of the construction line lenders for Royce Homes; is that correct?

A. Yes, sir.

Q. And it appears in August of 2006 they're expressing concern regarding Royce's

Exhibit B

ability to make the distributions necessary to make your payments on the Amegy and "Manner" buy-out notes –

MR. HARRELL:  Object.  Form.

Q.    (BY MR. DUNCAN)  -- correct?

A.    I didn't see anything that expresses concern.

Q.    Well, they want information, what effect -- well, let's, let's reread, then, Paragraph 3 of the bottom e-mail in Exhibit 22.

A.    Okay.  "Other information that we need is  quarterly financial statements for Royce Homes, LP, as of June 30th, 2006.  We also would like to see detailed projections on how anticipated distributions to you as the 100 percent owner of Royce Homes, LP, would enable  you to pay the Amegy and Manners notes in 2006 and  2007.  What effect to the provisions of the loan  agreement relating to tangible net worth" -- seek - "Section 6.15, and ratio of total liabilities to tangible net worth, Section 6.12, would these payments have?"

Q.    All right.  Let's rephrase that question, then.

A.    Okay.

Q.    They -- in August of 2006, Citibank is asking for financial information projections from Royce Homes, correct?

A.    Yes, sir.

Q.    And the, the reason that they're asking you  for this is they want to see, from the projections, what effect that the distributions to pay the Manners  note and the Amegy buy-out notes will have upon the debt-to-equity ratios –

MR. HARRELL:  Object.  Form.

Q.    (BY MR. DUNCAN)  -- correct?

A.    That's not the way I read this.

Q.    Tell me how you read it.

A.    I -- exactly as it says:  We also would like to see  detailed projections on how anticipated distributions to you as the 100 percent owner of Royce  Homes, LP, would enable you to pay the Amegy and Manners notes in 2006 and 2007.

Exhibit B

Q. And, What effect to the provisions of the loan agreement relating to tangible net worth and ratios of total liabilities to tangible net worth would these payments have? What do you take that last sentence to mean?

MR. HARRELL: Object to form.

MR. GIBSON: Object to form.

A. What impact the transaction would have on those, those aspects.

Q. (BY MR. DUNCAN) Okay. And the aspects are your debt-to-net -- debt-to-equity ratios, right? One of the, the factors they're looking at is how the payments on those notes would affect the debt-to-equity ratios of the company?

MR. HARRELL: Object. Form.

MR. GIBSON: Object to form.

A. That is one of the aspects they would be looking at.

Q. (BY MR. DUNCAN) Okay. If we look at the top e-mail on Exhibit No. 22, this is an e-mail from PamTyler to you; is that correct?

A. Yes, sir.

Q. And this is on August 29th, 2006, and can you read that e-mail?

A. Yes, sir.

It says, "John, in response to Chuck's e-mail below, Chuck received our June" financial statements -- "June financials yesterday afternoon. Regarding his request for projections illustrating that their covenants are maintained, I am attaching projections for your review. We are comfortably well within the covenant restrictions. James has reviewed. "If you approve the attached projections, then I will forward them to Chuck and get an ETA on our consent letter. "Hard copy is in your box. P."

Q. So, what Pam is doing is she's forwarding you the projections -- is that correct -- for your review?

A. That's what it says.

Q. Okay. And she wants you to approve them in order to forward them on to Citibank;

is that correct?

A. That's what it says.

Q. And, again, if we read it, "regarding his request for projections illustrating that their covenants are maintained," again, we're talking about they want to look at the projections to make sure that if you make these payments, that you will be able to maintain their covenants, their, their debt-to-equity ratios, correct?

MR. HARRELL: Object to form.

A. It says "covenants" --

MR. GIBSON: Object to form.

A. -- "covenant."

Q. (BY MR. DUNCAN) Okay. And what covenants were we talking about in the -- I do not recall all the -- you know, whatever list of covenants they might have had in their agreements.

Q. If, if you look at the bottom e-mail, which covenants are they specifically talking about?

A. Well, they specifically –

MR. HARRELL: Object to form.

A. -- mention two of them.

Q. (BY MR. DUNCAN) And which are those two?

A. Tangible net worth and the ratio of liabilities to tangible net worth.

Q. And they're commonly -- the one that -- tangible net worth to liabilities is commonly referred to as a debt-to-equity ratio; is that correct?

A. Yes, sir.

Q. Okay. All right. Turn to Exhibit 23. Now, what we have is an e-mail from Pam to, let's see, Lloyd Colby Bolton; is that correct?

A. Are you talking about the bottom one –

Q.     Yeah.

A.      -- or the top one?

Q.     The bottom one.

A.     Okay.  Yes, sir.

Q.     Okay.  And she refers to him as Chuck?

A.     Yes, sir.

Q.     Is that who you -- is that Lloyd Colby Bolton?

A.     I only knew him as Chuck.

Q.     Okay.  And in your earlier e-mail on, on  Exhibit 22, Pam is saying, in response to Chuck's e-mail -- is that -- we -- I assume this is the same Chuck we were talking about in Exhibit 22.  She's going to "re" -- she's going to forward these projections on  to Chuck, and now she's   doing that?

       MR. HARRELL:  Object.  Form.

       MR. GIBSON:  Objection.  Form.

A.     that appears to be the case.

Q.     (BY MR. DUNCAN)  Okay.  So, Exhibit 23 is Pam forwarding the projections that you had reviewed on to Citibank; is that correct?

A.     That appears to be the case.

Q.     Okay.  And this was in August of 2006?

A.     Yes, sir, August 30th.

Q.     All right.  And if we go to Exhibit 4, I'm sorry, Exhibit 23, Page 3, these are the actual projections that are being forwarded on?

A.     That appears to be the case.

Q.     All right.  If you could, go to Page 4 of  Exhibit 23.

       MR. HARRELL:  Why don't you give us a  Bates label.  There's not really a Page 4.

Exhibit B

Q. (BY MR. DUNCAN) All right. It is -- there is no Bate. It's -- it says at the bottom of the page "2 of 7." Do you see that? On the bottom there.

A. Yes, sir.

Q. And that's of Exhibit 23, and that's of the attachment –

A. Yes, sir.

Q. -- to Exhibit 23.Now, these projections were made on a combined balance sheet as opposed to a consolidated balance sheet; is that correct?

A. That's what it says.

Q. Okay. So, the projections for the end of 2006 were that Royce would have over 44 million in equity; is that correct?

A. That appears to be the case. Combined entities would.

Q. Yeah. Combined as opposed to a, a consolidated balance sheet; is that correct?

A. I'm not sure that -- in this circumstance how -- I, I don't know how these were prepared. I didn't prepare them. It says "combined."

Q. Right. Well, you don't see any subtraction for, like, minority interests or anything on this balance, do you?

A. Or there wouldn't be.

Q. If it was a combined; is that correct?

A. That might be one of the nuances.

Q. Okay. So, in response to Citibank's inquiry on August 30th, a combined balance sheet was used to reflect the projected financial position of Royce for 2006 and 2007; is that right?

A. That appears to be the case.

Back to Breach of Fiduciary Duty
Back to Fraud/Fraud Scheme

**Speer Excerpt 76** (Speer 2004 Examination, Volume 1, Page 132, Line 24 to Page 133, Line 7.)

Q. Okay. In the bottom e-mail in Exhibit 22,you're being told that Citibank had requested certain information in "rely" -- in regards to the buy-out transaction?

A. Yes, sir.

Q. Okay. Then Pam is forwarding you the financials that she is intending to send to Citi in response to their inquiry; is that correct?

A. It looks that way.

Back to Breach of Fiduciary Duty
Back to Fraud/Fraud Scheme

**Speer Excerpt 77** (Speer 2004 Examination, Volume 1, Page 136, Line 1 to Line 12.)

Q. Okay. All right. So, you had approved it going to the lenders, correct?

A. Sure.

Q. Okay. And would that be -- would you -- would there be any variation from your response from what you see in Exhibit 23 if any of the lenders had requested information as to the effect that this transaction would have upon Royce?

A. I wouldn't –

MR. HARRELL: Object to form.

A. I wouldn't have them tell one lender one thing and another one something else.

Back to Breach of Fiduciary Duty
Back to Fraud/Fraud Scheme

**Speer Excerpt 78** (Speer 2004 Examination, Volume 1, Page 137, Line 8 to Page 138, Line 2.)

Q. Okay. All right. So, I just want to get it -- a clean response here. We are talking about Exhibit 23. You had no problem in Exhibit 23 beingsent to Citi; is that correct?

A. I don't recall having a problem with it.

Q. Okay. And you would have no problem if that same response to Exhibit -- that same response represented in Exhibit 23 was sent to any of your lenders in describing the financial effect of the Manner buy-out transaction –

MR. HARRELL: Object. Form.

Q. (BY MR. DUNCAN) -- on Royce Homes?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. You mean the Manners buy-out –

Q. (BY MR. DUNCAN) Yeah.

A. -- transaction?

Q. Yeah.

A. Generally speaking, I don't have a problem with it.

Back to Breach of Fiduciary Duty
Back to Fraud/Fraud Scheme

**Speer Excerpt 79** (Speer 2004 Examination, Volume 1, Page 154, Line 17 to Page 159, Line 11.)

Q. Okay. So, my question, though, is: You understood that there were debt-to-equity ratios contained within your covenants with your, your construction line lenders?

A. Sure.

Q. And that you should not and -- you would be violating your construction line lenders if you took distributions out of the company, out of the Royce entities that would cause violations of those particular covenants?

A. I disagree with that.

Q. You disagree. Why do you disagree?

A. Because they understood that I would take them out and they had agreed to that.

Q.    So, they had waived their debt-to-equity ratios with you?

A.    I didn't say that.

Q.    What did you say? I'm –

A.    I said they had agreed that I was going to be taking -- approved that I was going to be taking the distributions out and that might have an impact.

Q.    Okay.  So, my question, though, is:  You understood that there were debt-to-equity ratios contained within your covenants with your, your construction line lenders?

A.    Sure.

Q.    And that you should not and -- you would be violating your construction line lenders if you took distributions out of the company, out of the Royce entities that would cause violations of those particular covenants?

A.    I disagree with that.

Q.    You disagree.  Why do you disagree?

A.     Because they understood that I would take them out and they had agreed to that.

Q.    So, they had waived their debt-to-equity ratios with you?

A.    I didn't say that.

Q.    What did you say?  I'm –

A.    I said they had agreed that I was going to be taking -- approved that I was going to be taking the distributions out and that might have an impact.

Q.    Okay.  Now, if we looked at Exhibit No. 23, for example, you were telling -- it says: Attached please find the 2006, 2007 projections as requested. The distributions from equity that would enable John to pay both Amegy and Manner notes are covered primarily  by net income -- what's your understanding of what net income is?

A.    It's the profits that the company makes.

Q.    Okay -- in those years, and as a result, equity remains consistently over 40 million. So, are you telling the banks that the distributions would be primarily made out of your profits and it would not bring your equity level below $40 million?

Exhibit B

MR. HARRELL:  Object.

A.      That was an –

MR. HARRELL:  Form.

MR. GIBSON:  Objection.  Form.

A.      That was an e-mail that was sent, I believe, by Pamela Tyler, and I did not word it that way.

Q.      (BY MR. DUNCAN)  Okay.  But you said that you approved it.

A.      I said I -- I think that's the one that I said I approved James' review of it.

Q.      All right.  And it says:  In addition, both  the tangible net worth and total liability to tangible net worth are also projected to remain very comfortably within the bank's requirements, correct?

A.      That's what it says.

Q.      Okay.  So, when you're telling me that the  banks were okay with it, they were okay with you making the distributions so long as it didn't interfere with their debt-to-equity ratios, correct?

A.      They were –

MR. HARRELL:  Object to form.

A.      We had a minimum net worth requirement for a  reason, and they wanted us to not go below the minimum net worth requirement.  That was the part that would be applicable here.

Q.      (BY MR. DUNCAN)  Well, and, also, the total  liability to tangible net worth.  That's your debt-to-equity ratio, correct?

A.      That was another covenant, but it wasn't  affected by this particular transaction.

Q.      Why wasn't it affected?

A.      They knew about it, and they approved the distributions.

Q.      Oh, so, would -- when you would, like, for example, make the 10-million-dollar distribution in January of 2007, did you call all your lenders and say, "I'm, I'm going

Exhibit B

to make the distribution" --

MR. HARRELL: Object to form.

Q. (BY MR. DUNCAN) -- to myself?

A. We had told them in advance that that would happen, and it did.

Q. Okay. When, when did you tell them in advance?

A. When we structured the deal and when we were seeking their consent.

Q. For example, in Exhibit 23, when you were structuring the deal, you -- they wanted to know how the distributions would affect the financial affairs of Royce Holdings, correct?

MR. HARRELL: Object. Form.

A. That was –

MR. GIBSON: Objection. Form.

A. -- one of their questions, to evaluate the overall transaction.

Q. (BY MR. DUNCAN) And what you're representing to the bank -- what Royce is representing to the banks is that you do not have to worry, the distributions will come out of profits and it will not reduce our equity in the company –

A. They were –

Q. -- correct?

MR. HARRELL: Object to form.

A. They're speaking generally that we're expecting enough profits to cover that, but that doesn't necessarily mean that the distributions are coming out of my equity account. They're not coming out of income.

Q. (BY MR. DUNCAN) Can you show me where you're saying that here? I mean, I mean, it –

A. This is an isolated -- you know, one e-mail from a lower level accountant that –

Q. That you approved?

MR. HARRELL:  Just –

A.      -- that I -

        MR. HARRELL:  Don't interrupt him, Counsel, please.  Let him finish his answer, okay?  Could you do that, please?

A.      -- that, that is an isolated circumstance, and you can try to make it into something other than what it is.  It's an e-mail an accounting clerk sent, okay?

Q.      (BY MR. DUNCAN)  That you approved?

A.      That I said I reviewed somebody else's -- I --  the company sent it out.

Q.      And you –

A.      Okay?  And I was responsible for the company.

Back to Breach of Fiduciary Duty
Back to Fraud/Fraud Scheme

**Speer Excerpt 80** (Speer 2004 Examination, Volume 2, Page 253, Line 10 to Page 255, Line 11.)

Q.      Okay.  Well, you, you did the model homes transaction in 2007, right?

A.      Yes, sir.

Q.      Okay.  And you sold -- Royce Homes sold the model homes to RH Model Homes 2007 in the year of 2007, correct, December of 2007?

A.      Yes, sir, but that's not exactly a bulk sale.

Q.      How many homes were sold?

A.      That particular situation, it was, I believe, 55 or 56.

Q.      And that's not bulk?

A.      It was to a Royce entity.

Q.      Okay.  So, you made a profit on that transaction; is that correct?

        MR. HARRELL:  Object to the form.

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 558
Back to Table of Contents

Exhibit B

Q.      (BY MR. DUNCAN)  Royce Homes made a profit on that transaction?

MR. GIBSON:  Objection.  Form.

A.      I know we generated some cash off of it.  I, I think there was a calculator for how much profit would be recognized at some point when those ultimately got sold out to individuals.

Q.      (BY MR. DUNCAN)  Well, wasn't it reflected on the tax return as a, a profit, or on the –

A.      It –

Q.      -- financials?

A.      It may have been.

Q.      Of about $2.8 million?

A.      As I recall, 2.8 million was the amount of additional cash that was generated.

Q.      Okay.  And then the Holigan transaction, were they sold at a profit by Royce Homes?

A.      The lots, I believe that they were.

Q.      Okay.  And that was a couple-million-dollar profit on that particular transaction?

A.      I, I don't remember exactly, but it, it would have been some profit number.

Q.      Okay.  And that also was in 2007, earlier in the year in 2007?

A.      It, it might have been sometime in 2007.  I'm not sure.

Q.      Okay.  Other than those two transactions and the Allard Investment lot sales, were there any others by Royce Homes in 2007?

A.      There were others to other independent individuals that I can't recall names of.

Q.      Was it early or late 2007?

A.      I don't have any recollection.  It was normal business.

Q.      Okay.  Do you know whether they were sold by Royce Homes as a -- with a profit?

Exhibit B

A. I'm sure they were.

**Speer Excerpt 81** (Speer 2004 Examination, Volume 1, Page 180, Line 17 to Page 181, Line 19 followed by Speer 2004 Examination, Volume 1, Page 182, Line 5 to Page 183, Line 13.)

Q. Okay. She was your -- Donnie Lou was your ex-wife, correct?

A. Yes, sir.

Q. And you were married to her from when to when?

A. From May 22nd of 1971 until December something of 2005.

Q. Okay. All right. If you could, take a look at Exhibit 180.

(Exhibit No. 180 marked.)

Q. (BY MR. DUNCAN) And are you familiar generally with these documents?

A. It would be very general.

Q. Okay. And as part of your divorce, you executed certain documents with Donnie Lou regarding your acquisition of her community property interest in certain of the Royce entities; is that right?

A. Yes, sir.

Q. And does Exhibit 180 appear to be true and correct copies of the purchase agreement and then the note -- and the note with regard to the buy-out of your ex-wife's community interest in the Royce entities?

A. Without reading every bit of it, it appears to be that.

Q. And does it appear to be executed December 11th of 2005?

A. Yes, sir.

Q. All right. If we could take a look at Exhibit 181.

**********************************

Exhibit B

Q.      (BY MR. DUNCAN)  Do you recognize Exhibit 181?

A.      Generally, yes.

Q.      Yeah.  Is that a -- is this document a consent from Donnie Lou Speers regarding your buy-out of Mike Manners' interest in the Royce entities?  Is that what it appears to be?

A.      Yes, sir.

Q.      And in that consent, you actually disclosed that there will be a 20-million-dollar and a 15-million-dollar note related to the buy-out?

A.      Approximately.

Q.      Okay.  All right.  If you could go on Exhibit 181, starting at Bate No. 127626, and does that appear to be a secured negotiable promissory note -- nonnegotiable promissory note?

A.      "This note is not assignable or negotiable," and it says "Secured Nonnegotiable Promissory Note."

Q.      And this is the 3-million-dollar promissory note payable from you to your ex-wife; is that correct?

A.      Yes, sir.

Q.      And if you go to Paragraph 4 of the promissory note attached to Exhibit 181, it calls for payments of $50,000 per month; is that correct?

A.      Yes, sir.

Q.      And were payments made to Donnie Lou in -- the 50,000-dollar payments?

A.      For a time period, yes, sir.

Q.      Up till what point?

A.      Till the company shut down.

Q.      Okay.  So, they were paid up until something like September of –

A.      August, September, something like that.

Exhibit B

Q. Of '08?

A. Yes, sir.

Back to Fraudulent Transfers Donnie Lou Speer

**Speer Excerpt 82** (Speer 2004 Examination, Volume 1, Page 184, Line 7 to Line 23.)

Q. Okay. How would you make the -- what was the mechanism for making the payments?

A. I'd write her a check.

Q. Okay. And this was from money that you received out of Royce Homes; is that correct?

A. Through earnings, one type of another.

Q. Okay. And your earnings were through the Royce entities; is that correct?

A. Yes, sir.

Q. All right. So, in other words, you would be receiving some either -- some type of check from the Royce entities which you would -- either your compensation or a distribution, and then you would, in turn, use some of that money to pay your ex-wife the $50,000 per month; is that correct?

A. There was no correlation at all between the two.

Back to Fraudulent Transfers Donnie Lou Speer

**Speer Excerpt 83** (Speer 2004 Examination, Volume 1, Page 186, Line 10 to Line 22.)

Q. (BY MR. DUNCAN) On Exhibit 182, can you go to the second page, the second page of 182, and this is an e-mail from Jim Oyer, the CFO of Royce, dated 4/11 of '06; is that correct?

A. Yes, sir.

Q. Please read numbered Paragraph 3 out loud.

A. Is this the one that says "Re No. 3"?

Q. Yeah.

A. "Re No. 3: We are going to go forward and cut the distribution to John as though there is no effect. He will then make whatever payments are necessary under the decree. You will direct him as to the payments which he will make."

Back to Fraudulent Transfers Donnie Lou Speer

**Speer Excerpt 84** (Speer 2004 Examination, Volume 1, Page 187, Line 9 to Line 21.)

Q. And please read the numbered Paragraph 3.

A. "Marital status: My understanding is that we need to wait for an answer before we can cut checks today? I infer from that we would be making a distribution to a non-partner?

"The distribution is technically to John." When "the check is written to Donnie Speer, or paid to the IRS for the benefit of Donnie Speer, the distribution will be" done "as if it were to John. John is obligated under the divorce decree to pay the taxes for Donnie. Also, technically, Donnie was a partner under community property laws in the state ofTexas until 12/13/2006."

Back to Fraudulent Transfers Donnie Lou Speer

**Speer Excerpt 85** (Speer 2004 Examination, Volume 1, Page 188, Line 24 to Page 189, Line 5.)

Q. Well, it says, "The distribution is technically to John," right? "Even if the check is written to Donnie Speer, or paid to the IRS for her benefit" --

A. It says, "John is obligated under the divorce decree to pay the taxes for Donnie." So, I'm obligated to pay those taxes.

Back to Fraudulent Transfers Donnie Lou Speer

**Speer Excerpt 86** (Speer 2004 Examination, Volume 1, Page 189, Line 21 to Page 190, Line 13.)

Q. And if you could, go to Page 1 of Exhibit 182, and that is an e-mail from Jim Oyer, the CFO, to David; is that correct? And who is David?

A. I don't know.

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd
Page 563
Back to Table of Contents

Exhibit B

Q. Okay.

A. It looks like he probably works with BKD.

Q. And what is his response to David?

A. Is this the one I started to read –

Q. Yeah.

A. -- at first?

Q. Right.

A. It says, "David, Re No. 3: We are going to go forward and cut the distribution to John as though there is no effect. He will then make whatever payments are necessary under the decree. You will direct him as to the payments which he will make."

Q. Okay.

A. "Please confirm. Jim."

Back to Fraudulent Transfers Donnie Lou Speer

**Speer Excerpt 87** (Speer 2004 Examination, Volume 1, Page 15, Line 18 to Page 16, Line 17.)

Now, if we can go to Exhibit 160 again and if you can go back to Bate 8499, and if you look down there, Donnie "Speers" is listed as a manager; is that correct?

A. Yes, sir.

Q. When did she begin with that title?

A. I don't remember the exact date, but it should be a -- it says 12/31/04.

Q. Okay. So, at the end of '04, it –

A. I thought it was 12/31/05, but this says, 12/31/04.

Q. Okay. Was that -- was she on the payroll? You had a buy-out agreement with –

A. Yes.

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd
Page 564
Back to Table of Contents

Exhibit B

Q.      -- your ex-wife –

A.      Yes, sir.

Q.      -- is that correct, sir?

        MR. HARRELL:  Object.  Form.

        (BY MR. DUNCAN)  Okay.  You had a buy-out agreement with your ex-wife for her community interest in the Royce entities; is that correct?

A.      Yes, sir.

Q.      And as part of that agreement, did you have it where she would receive a salary from the company?

A.      Yes, sir.

Back to Fraudulent Transfers Donnie Lou Speer


**Speer Excerpt 88** (Speer 2004 Examination, Volume 1, Page 192, Line 5 to Line 16.)

Q.      (BY MR. DUNCAN)  Now, this is an e-mail from John Speer to you, dated -- it's -- I'm sorry.  It's a -- Exhibit 185 is an e-mail from John Ransom to you, dated January 12th of 2007, correct?

A.      Yes, sir.

Q.      And the subject line is "marital agreement" --

A.      Yes, sir.

Q.      -- which is your prenuptial -- you had a prenuptial with your current wife –

A.      Yes, sir.

Q.       -- Donna, correct?

A.      Yes, sir.

Exhibit B

**Speer Excerpt 89** (Speer 2004 Examination, Volume 1, Page 193, Line 10 to Line 15.)

Q. And what was her job title or description with the Royce entities?

A. She handled anything related to charitable activities –

Q. Okay.

A. -- which we did a lot of.

**Speer Excerpt 90** (Speer 2004 Examination, Volume 1, Page 177, Line 16 to Line 25.)

Q. Did you understand that -- now, let, let's get a clarification here.

Mr. Ransom represented Royce Homes in the Credit Suisse deal; is that correct?

A. Myself and Royce Homes, both.

Q. Okay. So, they -- Royce -- Mr. Ransom was Royce Homes' attorney in the, the Credit Suisse deal?

A. And my attorney.

Q. Right. Both of yours?

A. Yes, sir.

Back to Westwood Gardens

**Speer Excerpt 91** (Speer 2004 Examination, Volume 2, Page 30, Line 2 to Line 11.)

Q. (BY MR. DUNCAN) Okay. You paid a retainer to Porter & Hedges in the amount of $125,000 in October of 2008; is that correct?

A. No, sir.

Q. Who did?

A. Royce Homes.

Q.      Okay.  And, so, the money -- the $125,000 in October of 2008 to pay a retainer to Porter & Hedges came from Royce Homes, LP, correct?

A.      Yes.

Back to Westwood Gardens


**Speer Excerpt 92** (Speer 2004 Examination, Volume 1, Page 119, Line 8 to Line 12.)

Q.      Uh-huh.  All right.  Let's look in Exhibit 172, Page 3.  Now, that is the five-year projection -- is that correct -- of Royce Homes as of 6/13 of '06?

A.      That's what it appears to be.

Back to Breach of Fiduciary Duty Projections off to Greater Degree
Back to Breach of Fiduciary Duty Distributions Sealed Fate of Royce


**Speer Excerpt 93** (Speer 2004 Examination, Volume 1, Page 121, Line 2 to Page 122, Line 19.)

Q.      (BY MR. DUNCAN) Oh, it is?  Okay.  If you look at the attachment to Exhibit 172, at the bottom of the page, it will say "3 of 24."  Do you see that?

A.      Yes, sir.

Q.      And it's projected that there will be 50 million in total equity by year end 2006; is that  correct?

A.      Yes, sir.

Q.      And that is after making a 22-million-dollar partnership distribution; is that correct?

A.      21 million.

Q.      Okay.  And that would result in a debt-to-equity ratio of 2.58, is the projection?

A.      Yes, sir.

Q.      All right.  Again, on that same page, which is Page 3 of the attachment to Exhibit 172, the projection is for a -- 61,564,000 in partnership equity by the year end 2007, correct?

A.      That's what it says.

Exhibit B

Q.      And that would be after making an approximate $20 million in partnership distributions?

A.      Just a little bit less, but, yes, sir.

Q.      All right.  And that would result in a debt-to-equity ratio of 2.75?

A.      Yes, sir.

Q.      And, again, on Page 3 of the attachment to Exhibit 172, it was projected that there would be 94,180,000 in partnership equity by year end 2008, correct?

A.      Yes, sir.

Q.      And that would be after making approximately 20 million in partnership distributions, correct?

A.      I don't see that.  It says 12,373,000.

Q.      Okay.  12 million -- that's after making 12,373,000 in partnership distributions.  And that  would result in a debt-to-equity ratio of 1.86?

A.       That's what it says.

Q.      Would you agree with me that the, the business came nowhere near any of those projections for 2006, 2007, and 2008?

A.      I don't have a point of reference for that. They certainly didn't in 2008 or 2007.  I'm unsure  about 2006.

Back to Breach of Fiduciary Duty Projections off to Greater Degree
Back to Breach of Fiduciary Duty Distributions Sealed Fate of Royce


**Speer Excerpt 94** (Speer 2004 Examination, Volume 1, Page 123, Line 7 to Line 21.)

Q.      Okay.  The actual partnership equity for the year end 2006 was 34,500,000; is that correct?

A.      That's what it says here, yes, sir.

Q.      And that 34,500,000 does not include the 10-million-dollar partnership distribution that was  made on January 4th of 2007; is that right?

Exhibit B

A.    Correct.

Q.    And the 10-million-dollar distribution was supposed to be made in 2006, according to the loan document that you had with Royce -- with Amegy Bank -- is that correct -- supposed to be made December 31st, 2006?

MR. GIBSON:  Objection.  Form.

A.    The payment to Amegy was supposed to have been made then.

Back to Breach of Fiduciary Duty Projections off to Greater Degree
Back to Breach of Fiduciary Duty Distributions Sealed Fate of Royce

**Speer Excerpt 95** (Speer 2004 Examination, Volume 1, Page 124, Line 19 to Page 125, Line 8.)

Q.    Okay.  So, the answer to my question is that the projections covered by Exhibit 172 did indicate that the 10-million-dollar distribution was to be made in December, basically, December of 2006?

A.    Yes, sir.

Q.    Okay.  Now, had that 10-million-dollar payment been made, been made as projected and as required by the loan document with Amegy Bank, would you agree that our equity would not be 34,500,000, it would be 24,500,000?

MR. HARRELL:  Object.  Form.

MR. GIBSON:  Objection.  Form.

A.    I would have to go back and look at the financial statements.  I'm not sure what the impact would be.

Back to Breach of Fiduciary Duty Distributions Sealed Fate of Royce

**Speer Excerpt 96** (Speer 2004 Examination, Volume 1, Page 125, Line 25 to Page 126, Line 10.)

Q.    (BY MR. DUNCAN)  If we take $10 million off of 34,500 -- 34,500,000 we've got 24,500,000, right?

A.    If you're asking me to do that math and you take 30 -- you take 34 million and you subtract 10 million, the number's 24 million.

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd
Page 569
Back to Table of Contents

Exhibit B

Q. Okay. And, so, you're -- you have a problem with the assumption that if you made an additional 10-million-dollar partnership distribution to yourself in 2006, that that would reduce the partnership equity in the Royce entities?

A. But I didn't.

Back to Breach of Fiduciary Duty Distributions Sealed Fate of Royce

**Speer Excerpt 97** (Speer 2004 Examination, Volume 2, Page 88, Line 14 to Page 90, Line 3.)

Q. (BY MR. DUNCAN) Okay. Okay. Go on to, let's see, to Exhibit 210, Page 5, Paragraph 21. Read that.

A. "In addition to mounting losses experienced by the Royce entities, Speer individually exacerbated the company's cash flow positions by utilizing corporate and partnership resources to finance a lavish and highly publicized lifestyle, which included expensive homes and ranch property, the purchase of lavish and expensive purses, jewelry, and other personal expenses that were paid for with corporate and partnership funds."

Q. Okay. Let's talk about that for a second.

A. Okay.

Q. I have seen, you know, American Express statements for hundreds of thousands of dollars on a monthly basis, some purchases at –

MR. DUNCAN: What's that art store?

MS. JONES: Valobra.

THE REPORTER: Excuse me?

MR. DUNCAN: Valobra.

A. Valobra is a jewelry company.

Q. (BY MR. DUNCAN) Right. Were any of those expenses or purchases made with company funds?

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. If they were, they were reimbursed.

Q. (BY MR. DUNCAN) And you have documentation to show that they were reimbursed?

A. I would certainly expect that.

Q. Are you saying they were reimbursed by you cutting a check to the company, or are you saying that you're taking an in kind distribution that offsets the –

A. No.

Q. -- the payment?

A. I'd say –

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. -- in that particular scenario, I probably would have written a check to the company.

Back to Breach of Partnership Agreement
Back to Breach of Fiduciary Duty
Back to Fraudulent Transfers Lavish Lifestyle

**Speer Excerpt 98** (Speer 2004 Examination, Volume 1, Page 9, Line 21 to Page 10, Line 11.)

Q. (BY MR. DUNCAN) Could you please state your name for the record?

A. John Speer.

Q. And just tell me your formal education you obtained beyond high school.

A. I have a degree in accounting and an MBA with an emphasis in accounting.

Q. All right. And where did you get that from?

A. Texas A & M.

Q. What year did you graduate?

A.    '71 and '73.

Q.    All right.  And are you a CPA?

A.    I was at one time.

Q.    From when to when?

A.    Gosh.  1974, I believe, to 1992 or '3.  I don't remember the exact year.

**Speer Excerpt 99** (Speer 2004 Examination, Volume 2, Page 129, Line 13 to Line 24.)

Now, Hammersmith Group was the general partner for both Royce Homes, LP, and Park Lake, correct?

A.    Hammersmith Group, Inc., I believe, was the general partner for both.

Q.    And you were the president of Hammersmith Group, Inc., correct?

A.    I believe so.

Q.    And you owned a hundred percent interest in Hammersmith Group, Inc.?

A.    I, I'd have to go back and check the schedules, but I believe so.

**Speer Excerpt 100** (Speer 2004 Examination, Volume 1, Page 12, Line 3 to Line 12.)

Q.    (BY MR. DUNCAN)  All right.  In 2006, 2007,  2008, does Page 2 of exhibit 159 represent the officers of Royce Homes, LP?

A.    It appears to.

Q.    Okay.  And you were, you were the president of Royce Homes, LP; is that correct?

A.    Yes, sir.

Q.    All right.  And that was in 2006, 2007, and 2008?

Exhibit B

A. Yes, sir.

**Speer Excerpt 101** (Speer 2004 Examination, Volume 1, Page 13, Line 1 to Line 19.)

Q. (BY MR. DUNCAN) All right. And you are the president and chief executive officer for Royce Homes,LP, from 2006 through 2008; is that correct?

A. Yes.

Q. And you were also -- for Park Lake Community, you were the president and CEO -- or you were the CEO of Park Lake Community; is that correct?

A. Yes.

Q. Okay. And that was for –

A. Let me clarify that I was the CEO. I wasn't the president.

Q. Right. You were the chief executive officer for Park Lake Community in 2006, 2007, and 2008; is that correct?

A. I don't remember the exact dates, but I wouldn't disagree with that.

Q. Okay. Well, you were for sure in 2007 and 2008?

A. I believe so.

**Speer Excerpt 102** (Speer 2004 Examination, Volume 1, Page 14, Line 3 to Line 14.)

Q. Okay. If you go to -- on Page -- I'm sorry. Exhibit 160, go to Bates Stamp No. 8499, and, again, if you look down at the bottom, this is a list of employees and their titles for Royce Homes, LP, that was provided by your counsel, Mr. Stephen –

A. Okay.

Q. -- Shurn.

MR. HARRELL: Object to the form.

Q.      (BY MR. DUNCAN)  You were the -- again, you were the president and CEO of Royce Homes, LP; is that correct?

A.      Yes, sir.

**Speer Excerpt 103** (Speer 2004 Examination, Volume 2, Page 82, Line 2 to Line 20.)

Q.      (BY MR. DUNCAN) Okay.  If you could, read Paragraph 18 on Page 4 of 2000 and -- I'm sorry, 210, Exhibit 210.

A.      It says, "Speer, a former certified public accountant, controlled the accounting functions of the partnership from Royce's corporate offices, controlled the issuance of consolidated financial statements for all the Royce entities, including the partnership." You want me to continue?

Q.      What is your position on that statement?

MR. HARRELL:  Object.  Form.

MR. GIBSON:  Objection.  Form.

A .     I was a former certified accountant, and I controlled the company.  So, I guess I controlled the accounting functions, and I -- and, thereby, I guess I controlled the issuance of consolidated financial statements.

Q.      For the Royce entities?

A.      Yes, sir.

**Speer Excerpt 104** (Speer 2004 Examination, Volume 2, Page 15, Line 1 to Line 17.)

Q.      Okay.  So, from 1998 to the date the, the bankruptcy was filed for Royce Homes, LP, you were the president of -- and chief executive officer for Royce Homes, LP?

A.      No, sir.

Q.      Okay.  You were president?

Exhibit B

A. No, sir.

Q. Okay.

A. I was until the company shut down –

Q. Okay.

A. -- which is in August of '08.

Q. Okay. All right. But you were the president of -- okay. From 1998 forward, you were -- you -- 15 that's when you became president?

A. Yes, sir.

Q. Okay. Of Royce Homes, LP.

**Speer Excerpt 105** (Speer 2004 Examination, Volume 2, Page 260, Line 16 to Page 261, Line 12.)

Q. Are you -- what's your relationship to Park Lake at this point?

A. I have no interest in it.

Q. Are you still an officer, director -- I'm sorry, an officer or any -- are you an officer of Park Lake?

A. No, sir.

Q. Are you -- do you still have an interest, an ownership interest in Park Lake?

A. No, sir.

Q. Who, to your understanding, is the present owner of Park Lake?

A. I, I have no knowledge of that.

Q. Okay. But for sure, you're not an owner in Park Lake?

A. Absolutely not.

Q. At what point did you no longer become an owner in Park Lake?

A.      December 31st, 2008.

Q.      And how did you do that?

A.      Porter & Hedges prepared some abandonment documents, and I signed them.

**Speer Excerpt 106** (Speer 2004 Examination, Volume 2, Page 264, Line 25 to Page 265, Line 4.)

Q.      Are you still the president of Hammersmith Group?

A.      No, sir.

Q.      As of when?

A.      December 31st, 2008.

**Speer Excerpt 107** (Speer 2004 Examination, Volume 1, Page 13, Line 20 to Page 14, Line 2.)

Q.      Okay.  All right.  If you go to -- if we look  again at Exhibit 160, on the top, Mike Manners is listed as a partner; is that correct?

A.      Yes, sir.

Q.      And what is the date of this organizational chart?

A.      It says as of 7/15/08, but that certainly couldn't be accurate in that terminology.

**Speer Excerpt 108** (Speer 2004 Examination, Volume 1, Page 259, Line 21 to Page 260, Line 13.)

Q.      Okay.  Now, at the -- let's see.  At the end of 2007, you put together the RH Model Homes 2007 deal; is that correct?

A.      Okay.  So, we're no longer talking about this?

Exhibit B

Q. Well, I'm, I'm asking you a question. Is that correct?

A. There was a model home deal put together at the end of 2007.

Q. And as part of that deal, the model homes of Royce Homes were sold to a newly created company called RH Model Homes 2007?

A. As best I can recall. Some of the models were, not all of them.

Q. All right. And the model homes were purchased by Royce Homes -- I'm sorry, RH Model Homes 2007 by borrowing money?

A. Yes, sir, a combination of borrowing and equity.

**Speer Excerpt 109** (Speer 2004 Examination, Volume 1, Page 260, Line 24 to Page 261, Line 10.)

Q. Okay. Now, a portion of the proceeds from the sale of the model homes from Royce Homes to RH Model Homes 2007 was used to repay the previous loan, correct?

A. In some instances, there was an existing loan, you know, on, on a model, and it would have been paid off at that closing.

Q. And there remained approximately $2.6 million that was paid over to Royce Homes at the end of 2006 -- or 2007; is that correct?

A. I thought it was 2.8 million, but somewhere in that neighborhood.

**Speer Excerpt 110** (Speer 2004 Examination, Volume 1, Page 261, Line 23 to Page 262, Line 17.)

In January of 2008, a distribution was made to you in the amount of approximately 2 and a half million dollars from Royce Homes, LP; is that correct?

A. Round numbers, yes, sir.

Q. And the 2 and a half million dollars that was distributed from you would -- you were able to do that because of the Royce model homes -- the RH Model Homes 2007 transaction; is that correct?

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. Well, we were able to do that because of the dollar amounts that were put into RH Models 2007 by myself and for about $2 million of that -- and of that 2 and a half million, I think a half a million came from Hammersmith Financial.

Q. (BY MR. DUNCAN) Okay. There was -- you, you -- the money came from, the money came from the RH Model Homes 2007 transaction into Royce Homes, the $2.8 million, correct?

A. Something like that, yes, sir.

**Speer Excerpt 111** (Speer 2004 Examination, Volume 1, Page 263, Line 21 to Line 25.)

Q. Okay. So, when you -- after you paid off the preexisting loans for the model homes, there was about $2.8 million left over -- is that correct -- from the Royce -- of the RH Model Homes 2007 transaction?

A. Yes, sir.

**Speer Excerpt 112** (Speer 2004 Examination, Volume 1, Page 264, Line 14 to Page 265, Line 9.)

Q. All right. So, if it's the appraised value and you pay off the existing loan –

A. Yes, sir.

Q. -- what is left over is what? Is it equity?

A. It may be, and it was also a combination -- it might be cash that was in that. So, it's a combination of things.

Q. When you say "cash that was in that," into the construction of these homes?

A. It could be.

Q. Okay. And that's equity?

              MR. HARRELL: Object to the form.

A.       Either income or equity.

Q.       (BY MR. DUNCAN) Okay.

A.       It would be, it would be a cash differential.

Q.       So, when the 2 and a half -- or the $2.8 million was put into Royce Homes, LP –

A.       Yes, sir.

Q.       -- it -- you took equity, and you turned it into cash?

A.       Basically.

**Speer Excerpt 113** (Speer 2004 Examination, Volume 2, Page 22, Line 16 to Page 23, Line 11.)

Q.       (BY MR. DUNCAN) You didn't have anything to do with setting that up?

A.       It was primarily set up and established by Bill Gathmann and John Ransom and James Hunter.  I put money into it.

Q.       Okay.  So, you had no control over that entity?

A.       Probably had control over it, but that doesn't necessarily mean I know exactly what happened on every single house that was there.

Q.       Okay.  Who ran Royce -- I'm sorry, RH Model Homes 2007?

A.       There wasn't anything to run.

Q.       Well, there was, you know, income going in and money going out.  Who, who handled all those affairs?

A.       It was handled by our accounting department.

Q.       What accounting department?

A.       Royce Homes' accounting department.

Exhibit B

Q. So, it was handled internally through Royce Homes, LP?

A. Yes, sir.

**Speer Excerpt 114** (Speer 2004 Examination, Volume 1, Page 195, Line 8 to Page 198, Line 14.)

Q. Okay. Now, you presently reside at 16427 Telge Road; is that right?

A. Telge, yes, sir.

Q. All right. And that's property that you acquired through Royce Homes; is that correct?

A. Yes, sir.

Q. And when I refer to the Telge property, can we have an understanding that I'm referring to the property located at 16427 Telge Road that you acquired from Royce Homes?

A. Yes, sir, but it's a long "E," Telge.

Q. Telge. All right. I'll try to remember that. I want you to turn to Exhibit 30. That would be in this book here. Now, that is the audit for 2006 prepared by Ernst & Young; is that right?

A. It appears to be, yes, sir.

Q. All right. Now, from your recollection, even though it's an audit for 2006, that would have been actually completed sometime in maybe September of '07? Does that sound right?

A. This financial statement?

Q. Yeah.

A. I don't remember the exact months, but it would have been done -- it would have been completed sometime in '07.

Q. Okay.

A. It wouldn't have even been started until April.

Third Amended Complaint
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd

Page 580
Back to Table of Contents

Exhibit B

Q. Okay. It wouldn't have even been started until April of 2007?

A. Right.

Q. Okay. If you could, go to Page 11 of Exhibit No. 30.

A. Is this physical 11 or numbered 11?

Q. If there -- at the bottom of the page on Exhibit No. --

A. All right.

Q. -- 30, there's a Page No. 11.

A. All right.

Q. And if you could, read the last paragraph on Page 11 of Exhibit No. 30.

A. It says: In 2006 the partnership recorded a distribution of equity of $5 million related to the cost of a home built for the partnership's controlling partner. This transaction is reflected as a noncash distribution to partner on the consolidated statement of cash flows. The partner contributed cash to the partnership of approximately 3 and a half million during 2006 and an additional amount of approximately 1 and a half in 2007 related to the home.

Q. Okay. And you were the controlling partner that they are referring to there; is that correct?

A. Yes, sir.

Q. Okay. If you could, go to Page 5 of Exhibit No. 30, and on Page 5, it reflects a noncash distribution to you of $5 million; is that correct?

A. Yes, sir.

Q. Okay. And then there is a partner contribution by you of 3 and a half million dollars in 2006; is that correct?

A. That's what it says.

Q. All right. Can you tell me -- is -- what a noncash -- let's see what the term -- noncash distribution to a partner means?

A.     I have no idea.  This is their -- it was their  terminology and their entry.

Q.     Do you understand that it's basically a book entry as opposed to cash going out and cash coming in –

A.     I –

MR. HARRELL:  Object to form.

Q.     (BY MR. DUNCAN)  -- as an accountant?

A.     I'm thinking it meant something other than cash went out.

Q.     Because there wasn't 5 million that came out and 5 million –

A.     Right.

Q.     Okay.

A.     Well, 5 million came in, but 5 million didn't go out –

Q.     All right.

A.     -- in terms of cash.

Back to Fraudulent Transfer


**Speer Excerpt 115** (Speer 2004 Examination, Volume 1, Page 198, Line 23 to Page 199, Line 2.)

Q.     Okay.  That $5 million referred to in the last paragraph of the -- of Page 11 of Exhibit 30 didn't actually get distributed to you.  It's merely a book entry; is that right?

A.      Yes, sir.

Back to Fraudulent Transfer


**Speer Excerpt 116** (Speer 2004 Examination, Volume 1, Page 199, Line 11 to Page 205, Line 13.)

Q.     (BY MR. DUNCAN)  All right.  Now, Exhibit 186  is an appraisal of real property prepared by Robert Bradley & Associated -- Associates related to the Telge Road property; is that correct?

Exhibit B

A. Telge, yes, sir.

Q. And it's effective August 25th of 2006?

A. Yes, sir.

Q. And this was an appraisal commissioned by you through Hammersmith Financial; is that correct?

A. It may have been.

Q. And Hammersmith Financial is a, a company that you controlled back in August of 2006; is that correct?

A. Yes, sir.

Q. And if you could turn to the bottom of Page 3 of Exhibit 186, does the appraisal indicate that the value of the Telge property, based on a sales comparison approach, was 4.8 million?

A. Yes, sir.

Q. And on the next page the appraiser also did a cost approach of the Telge property as of August 25th, 2006, which was $4,879,350; is that correct?

A. That's what it says, yes, sir.

Q. All right. If we could go to Exhibit 187.

Exhibit No. 187 marked.)

(Sotto voce discussion off the record.)

MR. SHURN: You got promoted, George.

MR. GIBSON: I know. I'm working on it.

MR. HARRELL: Oh, sorry.

Q. (BY MR. DUNCAN) Now, Exhibit 187 is a series of documents beginning with Bate No. 8530 and ending with Bate No. 8568; is that correct?

A. Yes, sir.

Q. And if you turn to the third page of Exhibit 187, that's a HUD statement, settlement statement, for the Telge property; is that right?

A. Yes, sir.

Q. And it shows you as the borrower, purchaser of the property; is that correct?

A. Yes, sir.

Q. And it shows Royce Homes, LP, is the seller?

A. Yes, sir.

Q. And Amegy Bank is the lender?

A. Amegy Mortgage is, is the lender.

Q. Okay. And it shows a contract price for the Telge property to be $3 and a half million; is that right?

A. Yes, sir.

Q. And you were to put down approximately $900,000 as the borrower, correct?

A. I believe so.

Q. And if we turn to Page 1 of Exhibit 187, this is a check from you to Stewart Title, dated 12/15 of '06 in the amount of 900,000, right?

A. Yes, sir.

Q. And you obtained that 900,000 to make that payment from a distribution from Royce Homes, LP, correct?

A. No, sir.

Q. Where did you get the 900,000?

A. Previous years' earnings.

Q. From who?

A. Royce Homes –

Q.     Okay.

A.      -- or Royce entities.

Q.     All right.

A.     It might have been Phoenix.  I'm not sure which one.

Q.     Okay.  All right.  Now, since the appraisal on  the Telge Road property came back at 4.8, 4.9 million and you only paid 3 and a half million dollars, were you required in 2007 to pay the difference between the appraisal and the, and the 3 and a half million that you, you paid for the Telge Road property?

A.     It was always –

       MR. HARRELL:  Object to form.

A.     -- 5 million.  It was always 5 million.

Q.     (BY MR. DUNCAN)  Okay.  So, you were always going to pay $5 million?

A.     No, sir.  I was always going to pay whatever the cost was.

Q.     All right.  So, that's why you were going to make this additional payment in 2007 of approximately a million and a half dollars; is that correct?

A.     I don't remember the exact reason for the timing differential but it was always going to be for the total cost, whatever that came out to.

Q.     Okay.  The appraised value?

A.     That isn't what I said.

Q.     Oh, you didn't say that?

A.     No, sir.

Q.     What did you say?

A.     I said the total cost, whatever it cost Royce to build.

Q.     Okay.  So, that was the, the 5-million-dollar figure?

A.      Yes, sir.

Exhibit B

Q. All right. If you could turn to Page 2 of Exhibit 187, do you see the check to Royce Homes in the amount of $1,459,831.28?

A. Yes, sir.

Q. And that is dated 4/12 of '07, correct?

A. Yes, sir.

Q. And that check is made payable to Royce Homes?

A. Yes, sir.

Q. And would the source of the approximately $1.4 million have come from a distribution from Royce Homes –

A. No, sir.

Q. -- as indicated in the audit?

MR. HARRELL: Object to form.

A. No, sir.

MR. GIBSON: Objection. Form.

Q. Where did that 1.4 come from?

A. (BY MR. DUNCAN) Previous earnings or previous distributions in prior years.

Q. From?

A. The companies I worked -- the companies I controlled and owned.

Q. Royce entities?

A. That -- Royce Homes, LP, would be one of those.

Q. Okay. And -- all right. So, you have a check there as Exhibit -- on the second page of Exhibit 187, and it's in the -- there's a check there for 1.4 -- $1,459,831.28, and it's dated 4/12 of '07, correct?

A. Yes, sir.

Q. Okay. What I'd like you to do is go to Exhibit 21, and what I'd like you to do is go to the twelfth page of Exhibit 21.

MR. SHURN: Do you have a Bates number?

MR. DUNCAN: Let me see about that.

Q. (BY MR. DUNCAN) Bate No. 2020.

MR. SHURN: 2020 or 2820?

MR. DUNCAN: Well, we're going to have to see here. Let me see. I'll give you a number. It's 2820, yes.

Q. (BY MR. DUNCAN) All right. So, for the consideration to buy the Telge Road -- the $1,459,831.28, you paid that into Royce Homes on 4/12 of '07; is that correct?

A. That's what it says, yes, sir.

Q. And then if we take a look at Exhibit 21, Bate No. 2820, on 4/13 of '07, a check is written to you in the amount of 1 million, 587 dollars and 9 -- $1,587,009?

A. $87,009. Yes, sir, it was.

Q. Okay. So, one day later you're writing a check for basically the same amount right back to yourself?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. No, this is for more than the check that I wrote to Royce Homes.

Back to Fraudulent Transfer

**Speer Excerpt 117** (Speer 2004 Examination, Volume 1, Page 206, Line 10 to Line 24.)

Q. (BY MR. DUNCAN) Okay. Okay. You take -- you put in, on 4/12 of '07, $1,459,831.28 into Royce Homes, correct to, to pay the consideration for the Telge property?

A. Okay.

Q. Is that correct?

A. It says 1,459,871.28.

Q. And that's what you put into Royce Homes, LP, on 4/12 of '07 to pay the consideration for the purchase of the Telge Road property?

A. The remaining consideration, yes, sir.

Q. Okay. Then on 4/13 of '07, a check is written from Royce Homes for $1,587,009 to you out of Royce Homes, correct?

A. Yes, sir.

Back to Fraudulent Transfer

**Speer Excerpt 118** (Speer 2004 Examination, Volume 1, Page 212, Line 15 to Page 213, Line 5.)

Q. (BY MR. DUNCAN) Exhibit 191 is an e-mail from Nancy Boothe to you, dated June 3rd of 2005; is that correct?

A. Yes, sir.

Q. And the subject line is "billiard table"?

A. Yes, sir.

Q. Is this a billiard table that was paid for by Royce Homes and then installed at the Telge property?

A. I don't remember. There were, there were some things that were put in the house that were paid for by Royce and then later I paid for when I closed. I don't remember whether or not this was one of those. It may very well have been.

Q. You got it -- you got a pool table from the Billiard Factory?

A. Yes, sir.

**Speer Excerpt 119** (Speer 2004 Examination, Volume 1, Page 213, Line 15 to Page 214, Line 9.)

Q. Okay. So, if we look at the, the sale documents, there should be something referring to that you were also purchasing all the personalty items that had been purchased by Royce Homes?

A. I don't know.

Q. What was your understanding of -- was there items within the, the Telge property, furnitures and fixtures, that had been paid for by Royce Homes?

A. Well, certainly there would be fixtures. I'm not sure how much furniture, if any. There were some things, but I don't remember which ones. Whatever it was, it was paid back when I paid the total 5 million.

Q. Okay. And if we look at the closing statement or some of the other documents, it should talk about you were also buying personalties?

A. I doubt that would be on there.

Q. Okay. Is there some document that you're saying would indicate that you were also buying personalities when you purchased the home?

A. I don't -- not that I know of.

**Speer Excerpt 120** (Speer 2004 Examination, Volume 1, Page 219, Line 1 to Page 220, Line 22.)

How long had you lived in the Telge property before you purchased it?

A. I moved in before it was completed. Probably a year.

Q. And when did you move in?

A. October 2005, November 2005, something like that.

Q. Okay. What other houses did you buy from Royce?

A. I bought two houses in the subdivision directly behind our office building called Heron Lake Estates.

Q. In what time frame?

A. It looks to me like it was 2004, 2005.

Q.      Okay.  During the time frame you lived at the Telge property, did you pay Royce Homes any rent?

A.      No, sir.

Q.      Who lived in the other houses that you're referring to in the e-mails?

A.      My father and my ex's mother.

Q.      Okay.  And they were owned by Royce at the time, apparently?

A.      At the time when they first moved in, yes, sir –

Q.      Okay.

A.      -- until they closed.

Q.      And they didn't pay any rent to Royce; is that correct?

A.      No, sir.

Q.      It states that there had to be a reduction in the equity to Royce Homes because these homes were occupied and not being offered for sale.  Do you see that?

A.      It says, "They feel this should be treated as a reduction of equity, either via noncash distribution or by the establishment of a contra-equity account.  I have expressed to them that I am not aware of any  intent to treat" -- okay.

Q.      All right.  Were you aware of whether Royce reduced the equity on the balance sheet as opposed --as a, as a result of you and others living in these homes?

A.      No, sir.  I purchased them.

Q.      Okay.  But before you purchased them, you don't know whether they reflected that on the balance sheet as a reduction –

A.      No.

**Speer Excerpt 121**   (Speer 2004 Examination, Volume 1, Page 82, Line 5 to  Line 24)

Q.      (BY MR. DUNCAN)  If you can, go to Page 4 of Exhibit 166, and at the bottom of

Third Amended Complaint                                                                    Page 590
Z:\Royce\Complaints, Responses etc\Complaint Amended 3d\Complaint Third Amended 5.wpd                      Back to Table of Contents

Exhibit B

the page on Page 4 of Exhibit 166, there's an e-mail from John Ransom to Sid Andrews and to you; is that correct?

A. A copy to me, yes, sir.

Q. And the title is terms of the note to Mike Manners; is that right?

A. Yes, sir.

Q. And the -- if you could, read the first sentence.

A. "I need to specify for Royce how we can structure the terms of the note from Royce Holdings to Mike Manners so it is not required to be included in the financial statements of Roycebuilders.com and its subsidiaries. Please see the attached schematic for reference."

Q. Okay. So, what your attorney is asking, I guess -- Sid Andrews is a, an accountant with, with PriceWaterhouse; is that correct?

A. He's a partner at PriceWaterhouse, yes, sir.

Back to Fraud/Fraud Scheme

**Speer Excerpt 122** (Speer 2004 Examination, Volume 1, Page 85, Line 4 to Page 87, Line18)

Q. Okay. All right. Okay. If you could go to the first page of Exhibit 166, the bottom of the page, it starts -- the e-mail, this is from Sid Andrews. It's to your attorney, and you are a recipient of the e-mail; is that correct?

. A. Are you talking about the, the very bottom, where it says "Subject: Terms of note to Mike Manners"?

Q. Exactly.

A. Yes, sir.

Q. Okay. And then the e-mail starts on the next page; is that correct?

A. Yes, sir.

Q. Can you read that e-mail?

A. "John, I was referring to the purchase accounting when I mentioned John Speer's basis, which is his purchase price. I wanted to see what your goals were other than

Exhibit B

trying to avoid purchase accounting on Roycebuilders.com in the future financial reporting. I presume that you are also trying to keep the debt to Mike off the financial reporting as well as to alleviate the leverage, or is that not a priority? Sid."

Q. "I presume that you are" -- "trying to keep the debt to Mike off the financial reporting as well"as -- "alleviate the leverage, or is that not a priority?" Do you know what he's referring to?

MR. HARRELL: Object to form.

A. I can only suppose exactly what it says.

Q. (BY MR. DUNCAN) And what is your supposing?

A. That he presumes that John Ransom is also -- or was also trying to keep the debt to Mike off the financial reporting as well as to alleviate the leverage, or is that not a priority?

Q. Okay. And Mr. Ransom was your attorney; is that correct?

A. Yes, sir.

Q. He was representing your interest?

A. Yes, sir.

Q. All right. Let's go to Page 1 of Exhibit "161," and this is an e-mail from --

MR. HARRELL: 61 or 66?

MR. DUNCAN: 166. I'm sorry. Thank you.

Q. (BY MR. DUNCAN) Exhibit 166, Page 1, the top e-mail is from Mr. Ransom to Sid Andrews and to you, dated May 9th of 2006, apparently in response to the e-mail we just read. Can you read that, please?

MR. HARRELL: Object to the form.

A. You want the top of the page?

Q. (BY MR. DUNCAN) Yes.

A. "Dear Sid, we would like to see treatment similar to that when the original 50 percent

Exhibit B

was purchased in 1998" and "no debt pushdown and no associated reduction in partners' capital. Regards, John Ransom."

Q. Okay. So, it does appear that one of the concerns is -- no associated reduction in partners' capital is a, is a concern?

MR. HARRELL: Object to form.

A. It depends on what entity they're referring to.

Q. (BY MR. DUNCAN) Okay.

A. At that time we were reporting on a combined basis, and that might be an issue; consolidated, not so.

Back to Fraud/Fraud Scheme

**Speer Excerpt 123** (Speer 2004 Examination, Volume 1, Page 88, Line 9 to Line22)

Q. Okay. So, Exhibit 167 has an executive summary attached. That is a document that you would have prepared?

A. Yes, sir.

Q. All right. And the document was prepared by you. The purpose was to help you obtain a loan from Amegy; is that correct?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. Yes, sir, I believe so.

Q. (BY MR. DUNCAN) Okay. If we could go to Exhibit 115.

MR. GIBSON: Was that one you used with Chris Denison?

MR. DUNCAN: Yeah.

(Discussion off the record.)

(Interruption.)

MR. GIBSON: Off the record.

MR. DUNCAN:  Off the record.

(Recess from 11:17 a.m. to 11:30 a.m.)

Q.    (BY MR. DUNCAN)  All right.  If we could take  a look at Exhibit 115, and does it appear that your executive summary was incorporated into this loan request, which is represented by Exhibit 115?

A.    Yes, sir.

Q.    Okay.  So, Exhibit 167 was incorporated into Exhibit 115 to -- as part of the loan request that you had made to Amegy Bank, correct?

A.    It appears so.

Q.    All right.  If you could, turn to Page 3 of Exhibit 115, and that's where the executive summary prepared by you appears to begin; is that right?

A.    Yes, sir.

Q.    And in the first three paragraphs of Exhibit -- Page 3 of Exhibit 115, Bates Stamp 76011,  you're merely stating your objective is -- in buying out Mike Manners in the -- his interest in Royce Homes; is that right?

A.    To finish purchasing it, yes, sir.

**Speer Excerpt 124**   (Speer 2004 Examination, Volume 1, Page 93, Line 13 to Line 22)

Q.    You were concerned that the, the -- a debt would get pushed down to Royce Homes, LP?  Is that what you're saying?

A.    It's -- to me, it would be cleaner to not have that happen.

Q.    Right.  And why?  Why would you be concerned  that the, the debt got pushed down to Royce Homes, LP?

MR. HARRELL:  Object to form.

MR. GIBSON:  Objection.  Form.

A.    Because I was buying it, not the company.

Exhibit B

**Speer Excerpt 125** (Speer 2004 Examination, Volume 1, Page 98, Line 10 to Page 100 Line 19)

Q. All right. Go to Exhibit 168.

(Exhibit No. 168 marked.)

Q. (BY MR. DUNCAN) All right. We're going to read the e-mail that appears on Page 3 of Exhibit 168, but it actually begins at the bottom of Page 2. And this appears to be an e-mail from Sid Andrews of PriceWaterhouse to John Ransom and to you; is that correct? You're, you're not on the right page.

MR. HARRELL: I think he's trying to go to –

Q. (BY MR. DUNCAN) Page –

MR. HARRELL: This -- it's at the very bottom of –

THE WITNESS: Okay.

MR. HARRELL: -- number two.

A. I'm sorry. This -

Q. (BY MR. DUNCAN) All right. Again, we're on Exhibit 168, Page 2. At the very bottom an e-mail starts from Sid Andrews of PriceWaterhouse, dated May 9th of 2006 to John Ransom, and it was cc'd to you; is that correct?

A. Yes, sir.

Q. And the subject matter is Royce commercial bank buy-out alternative; is that correct?

A. That's what it says.

Q. All right. If you could, read that e-mail.

A. This is to John Ransom, I believe?

Q. And to you, cc'd, right.

A. Well, it's copied to me, but the primary deal is –

Q. Okay.

A. Clear reference says that -- the title says "John." I didn't want there to be confusion.

This is John Ransom.

"John, you realize that while we are leaving the equity in the entities at their original carrying value, the balance over time" -- "in essence" -- "will, in essence, shrink to probably where John would have been on purchase accounting and pushdown of the debt due to the additional distributions he will take out of the company to pay the personal debt. We are just buying a little extra time so hopefully we can offset with future profits. At least we don't have to deal with purchase accounting. One of my guys said it would be later on this evening before he could have any comments. What time is John's meeting with Mike?"

Q. All right. So, balance sheets are provided to lenders to determine if they want to lend money to the company, right?

MR. HARRELL: Object. Form.

A. That's one of the reasons, yes, sir.

Q. (BY MR. DUNCAN) Okay. And if the plan is carried out to make the distributions to pay the 20-million-dollar note and the 13-million-dollar note, that would reduce equity on the balance sheet; is that right?

A. It -- if I wrote him a check that day, that -- and I took it out of the equity positions, yes, sir, it would.

Back to Fraud/Fraud Scheme

**Speer Excerpt 126** (Speer 2004 Examination, Volume 1, Page 101, Line 8 to Page 101 Line 22)

Q. What it says right here is that if you carry out the plan of making distributions out of the Royce entity over time it's going to reduce the equity in the company, right?

A. If I make any distribution, it reduces the equity in the company.

Q. Very good. Okay.

So, what he's telling you is: Over time if you make these $33 million worth of distributions out of the company, it's going to reduce the equity in the company?

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

Q. (BY MR. DUNCAN) Common sense?

A.   That's not rocket science.

Back to Fraud/Fraud Scheme

**Speer Excerpt 127**   (Speer 2004 Examination, Volume 1, Page 103, Line 13 to Page 105 Line 6)

Q.   (BY MR. DUNCAN)  Okay.  Well, maybe we go to  the first page of Exhibit 160 -- no, I'm sorry, the second page of Exhibit 168, and this is an e-mail from Sid Andrews -- I'm -- yeah.  No, it's an e-mail from John Ransom to Sid Andrews and you again; is that correct?

A.   This is to Sid Andrews, and it was carbon copied to me.

Q.   All right.  And if you could read that e-mail.

A.   It says:  Dear Sid, we met -- we meet with Mike Wednesday at 1:00 p.m.

And, yes, any distributions to John  funded with Royce level debt will pull down partners' capital, but this will occur after the debt funds.  The historic balance sheet will not reflect purchase accounting, and there is no minority interest carve-out for Royce, Phoenix, and PLC.  As and when any Royce  level debt is paid off with Royce level earnings, partners' capital will rebuild.

Query, what is involved issuing consolidated financials for Royce Holdings once it holds all of John and Mike's interests?  And can prior periods be restated to include Phoenix and PLC in the consolidated financials without a minority interest carve-out?

Regards John Ransom, Porter & Hedges,1000 Main, 36th Floor, Houston, Texas 77 --

Q.   Okay.

A.    -- 00 –

Q.   Okay.  All right.  So, not -- let's go beyond the address there, and let's talk about the substance of the e-mail:  And, yes, any distribution to John  funded with Royce level debt will pull down partner capital, but this will occur after the debt funds.  The historical balance sheet will not reflect the purchase accounting.

So, is, is it your understanding of what  you're being told here is that the creditors won't realize that the -- all this money is going to be coming out of the company until after they've lent the money?

Exhibit B

MR. HARRELL:  Object.  Form.

MR. GIBSON:  Objection.  Form.

A.        You're implying something I just don't get.

Back to Fraud/Fraud Scheme

**Speer Excerpt 128**   (Speer 2004 Examination, Volume 1, Page 111, Line 20 to Page 112 Line 7)

Q.        (BY MR. DUNCAN)  Let me see something.  All  right.  Now, on Page -- or on Exhibit 171, Page 2, that is the e-mail we spoke of earlier in -- what exhibit was that -- in Exhibit 168.  That's the John Ransom  to -- Sid Andrews to John Ransom, to you e-mail where you're talking about over time the equity would be decreased; is that correct?

MR. HARRELL:  Object.  Form.

MR. GIBSON:  Objection.  Form.

A.        What they're talking about is, is any time I make a -- any time an addition -- any time a distribution is made equity will be reduced, any time it's funded.

Back to Fraud/Fraud Scheme

**Speer Excerpt 129**   (Speer 2004 Examination, Volume 1, Page 82, Line 5 to Page 82, Line 24)

Q.        (BY MR. DUNCAN)  If you can, go to Page 4 of Exhibit 166, and at the bottom of the page on Page 4 of  Exhibit 166, there's an e-mail from John Ransom to Sid Andrews and to you; is that correct?

A.        A copy to me, yes, sir.

Q.        And the title is terms of the note to Mike Manners; is that right?

A.        Yes, sir.

Q.        And the -- if you could, read the first  sentence.

A.         "I need to specify for Royce how we can structure the terms of the note from Royce Holdings to Mike Manners so it is not required to be included in  the financial statements of Roycebuilders.com and its subsidiaries.  Please see the attached schematic for reference."

Exhibit B

Q. Okay. So, what your attorney is asking, I guess -- Sid Andrews is a, an accountant with, with PriceWaterhouse; is that correct?

A. He's a partner at PriceWaterhouse, yes, sir.

**Speer Excerpt 130** (Speer 2004 Examination, Volume 1, Page 85, Line 4 to Page 87, Line 18)

Q. Okay. All right. Okay. If you could go to the first page of Exhibit 166, the bottom of the page, it starts -- the e-mail, this is from Sid Andrews. It's to your attorney, and you are a recipient of the e-mail; is that correct?

. A. Are you talking about the, the very bottom, where it says "Subject: Terms of note to Mike Manners"?

Q. Exactly.

A. Yes, sir.

Q. Okay. And then the e-mail starts on the next page; is that correct?

A. Yes, sir.

Q. Can you read that e-mail?

A. "John, I was referring to the purchase accounting when I mentioned John Speer's basis, which is his purchase price. I wanted to see what your goals were other than trying to avoid purchase accounting on Roycebuilders.com in the future financial reporting. I presume that you are also trying to keep the debt to Mike off the financial reporting as well as to alleviate the leverage, or is that not a priority? Sid."

Q. "I presume that you are" -- "trying to keep the debt to Mike off the financial reporting as well"as -- "alleviate the leverage, or is that not a priority?" Do you know what he's referring to?

MR. HARRELL: Object to form.

A. I can only suppose exactly what it says.

Q. (BY MR. DUNCAN) And what is your supposing?

A. That he presumes that John Ransom is also -- or was also trying to keep the debt to Mike off the financial reporting as well as to alleviate the leverage, or is that not a priority?

Q.      Okay.  And Mr. Ransom was your attorney; is that correct?

A.      Yes, sir.

Q.      He was representing your interest?

A.      Yes, sir.

Q.      All right.  Let's go to Page 1 of  Exhibit "161," and this is an e-mail from –

        MR. HARRELL:  61 or 66?

        MR. DUNCAN:  166.  I'm sorry.  Thank you.

Q.      (BY MR. DUNCAN) Exhibit 166, Page 1, the top e-mail is from Mr. Ransom to Sid Andrews and to you, dated May 9th of 2006, apparently in response to the e-mail we just read.  Can you read that, please?

        MR. HARRELL:  Object to the form.

A.      You want the top of the page?

Q.      (BY MR. DUNCAN) Yes.

A.      "Dear Sid, we would like to see treatment similar to that when the original 50 percent was   purchased in 1998" and "no debt pushdown and no  associated reduction in partners' capital.  Regards, John Ransom."

Q.      Okay.  So, it does appear that one of the concerns is -- no associated reduction in partners' capital is a, is a concern?

        MR. HARRELL:  Object to form.

A.      It depends on what entity they're referring to.

Q.      (BY MR. DUNCAN) Okay.

A.      At that time we were reporting on a combined basis, and that might be an issue; consolidated, not so.


**Speer Excerpt 131**   (Speer 2004 Examination, Volume 1, Page 88, Line 9 to Page 89, Line 22)

Q.      Okay.  So, Exhibit 167 has an executive summary attached.  That is a document that

you would have prepared?

A.      Yes, sir.

Q.      All right.  And the document was prepared by you.  The purpose was to help you obtain a loan from Amegy; is that correct?

          MR. HARRELL:  Object.  Form.

          MR. GIBSON:  Objection.  Form.

A.      Yes, sir, I believe so.

Q.      (BY MR. DUNCAN)  Okay.  If we could go to Exhibit 115.

          MR. GIBSON:  Was that one you used with Chris Denison?

          MR. DUNCAN:  Yeah.

          (Discussion off the record.)

          (Interruption.)

          MR. GIBSON:  Off the record.

          MR. DUNCAN:  Off the record.

          (Recess from 11:17 a.m. to 11:30 a.m.)

Q.      (BY MR. DUNCAN)  All right.  If we could take  a look at Exhibit 115, and does it appear that your executive summary was incorporated into this loan request, which is represented by Exhibit 115?

A.      Yes, sir.

Q.      Okay.  So, Exhibit 167 was incorporated into Exhibit 115 to -- as part of the loan request that you had made to Amegy Bank, correct?

A.      It appears so.

Q.      All right.  If you could, turn to Page 3 of Exhibit 115, and that's where the executive summary prepared by you appears to begin; is that right?

A.      Yes, sir.

Exhibit B

Q. And in the first three paragraphs of Exhibit -- Page 3 of Exhibit 115, Bates Stamp 76011, you're merely stating your objective is -- in buying out Mike Manners in the -- his interest in Royce Homes; is that right?

A. To finish purchasing it, yes, sir.

**Speer Excerpt 132** (Speer 2004 Examination, Volume 1, Page 93, Line 13, to Line 22)

Q. You were concerned that the, the -- a debt would get pushed down to Royce Homes, LP? Is that what you're saying?

A. It's -- to me, it would be cleaner to not have that happen.

Q. Right. And why? Why would you be concerned that the, the debt got pushed down to Royce Homes, LP?

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

A. Because I was buying it, not the company.

**Speer Excerpt 133** (Speer 2004 Examination, Volume 1, Page 98, Line 10 to Page 100, Line 19, Followed by Speer 2004 Examination, Volume 1, Page 101, Line 8 to Line 22, Followed by Speer 2004 Examination, Volume 1, Page 103, Line 13 to Page 105, Line 6, Followed by Speer 2004 Examination, Volume 1, Page 111, Line 20 to Page 112, Line 7)

Q. All right. Go to Exhibit 168.

(Exhibit No. 168 marked.)

Q. (BY MR. DUNCAN) All right. We're going to read the e-mail that appears on Page 3 of Exhibit 168, but it actually begins at the bottom of Page 2. And this appears to be an e-mail from Sid Andrews of PriceWaterhouse to John Ransom and to you; is that correct? You're, you're not on the right page.

MR. HARRELL: I think he's trying to go to --

Q. (BY MR. DUNCAN) Page –

MR. HARRELL: This -- it's at the very bottom of –

THE WITNESS: Okay.

MR. HARRELL: -- number two.

A I'm sorry. This -

Q. (BY MR. DUNCAN) All right. Again, we're onExhibit 168, Page 2. At the very bottom an e-mail starts from Sid Andrews of PriceWaterhouse, dated May 9th of 2006 to John Ransom, and it was cc'd to you; is that correct?

A Yes, sir.

Q. And the subject matter is Royce commercial bank buy-out alternative; is that correct?

A That's what it says.

Q. All right. If you could, read that e-mail.

A This is to John Ransom, I believe?

Q. And to you, cc'd, right.

A Well, it's copied to me, but the primary deal is --

Q. Okay.

A Clear reference says that -- the title says "John." I didn't want there to be confusion. This is John Ransom.

> "John, you realize that while we are leaving the equity in the entities at their original carrying value, the balance over time" -- "in essence" -- "will, in essence, shrink to probably where John would have been on purchase accounting and pushdown of the debt due to the additional distributions he will take out of the company to pay the personal debt. We are just buying a little extra time so hopefully we can offset with future profits. At least we don't have to deal with purchase accounting. One of my guys said it would be later on this evening before he could have any comments. What time is John's meeting with Mike?"

Q. All right. So, balance sheets are provided to lenders to determine if they want to lend money to the company, right?

MR. HARRELL: Object. Form.

A That's one of the reasons, yes, sir.

Exhibit B

Q. (BY MR. DUNCAN) Okay. And if the plan is carried out to make the distributions to pay the 20-million-dollar note and the 13-million-dollar note, that would reduce equity on the balance sheet; is that right?

A. It -- if I wrote him a check that day, that -- and I took it out of the equity positions, yes, sir, it would.

*******************

Q. What it says right here is that if you carry out the plan of making distributions out of the Royce entity over time it's going to reduce the equity in the company, right?

A. If I make any distribution, it reduces the equity in the company.

Q. Very good. Okay. So, what he's telling you is: Over time if you make these $33 million worth of distributions out of the company, it's going to reduce the equity in the company?

MR. HARRELL: Object to form.

MR. GIBSON: Objection. Form.

Q. (BY MR. DUNCAN) Common sense?

A That's not rocket science.

***********************

Q. (BY MR. DUNCAN) Okay. Well, maybe we go to the first page of Exhibit 160 -- no, I'm sorry, the second page of Exhibit 168, and this is an e-mail from Sid Andrews -- I'm -- yeah. No, it's an e-mail from John Ransom to Sid Andrews and you again; is that correct?

A This is to Sid Andrews, and it was carbon copied to me.

Q. All right. And if you could read that e-mail.

A It says: Dear Sid, we met -- we meet with Mike Wednesday at 1:00 p.m.

And, yes, any distributions to John funded with Royce level debt will pull down partners' capital, but this will occur after the debt funds. The historic balance sheet will not reflect purchase accounting, and there is no minority interest carve-out for Royce, Phoenix, and PLC. As and when any Royce level debt is paid off with Royce

Exhibit B

level earnings, partners' capital will rebuild.

Query, what is involved issuing consolidated financials for Royce Holdings once it holds all of John and Mike's interests? And can prior periods be restated to include Phoenix and PLC in the consolidated financials without a minority interest carve-out?

Regards John Ransom, Porter & Hedges,1000 Main, 36th Floor, Houston, Texas 77 --

Q. Okay.

A. -- 00 --

Q. Okay. All right. So, not -- let's go beyond the address there, and let's talk about the substance of the e-mail: And, yes, any distribution to John funded with Royce level debt will pull down partner capital, but this will occur after the debt funds. The historical balance sheet will not reflect the purchase accounting.

So, is, is it your understanding of what you're being told here is that the creditors won't realize that the -- all this money is going to be coming out of the company until after they've lent the money?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. You're implying something I just don't get.

***************************

Q. (BY MR. DUNCAN) Let me see something. All right. Now, on Page -- or on Exhibit 171, Page 2, that is the e-mail we spoke of earlier in -- what exhibit was that -- in Exhibit 168. That's the John Ransom to -- Sid Andrews to John Ransom, to you e-mail where you're talking about over time the equity would be decreased; is that correct?

MR. HARRELL: Object. Form.

MR. GIBSON: Objection. Form.

A. What they're talking about is, is any time I make a -- any time an addition -- any time a distribution is made equity will be reduced, any time it's funded.

Exhibit B

Back to Fraud/Fraud Scheme

Exhibit B