# APPENDIX 1

## Affidavit of Michael G. Manners

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(HOUSTON DIVISION)

| | | |
|---|---|---|
| RODNEY TOW, TRUSTEE | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:11-CV-03700 |
| | § | |
| JOHN H. SPEER, ET AL, | § | JURY DEMANDED |
| | § | |
| DEFENDANTS. | § | |

## AFFIDAVIT OF MICHAEL G. MANNERS

STATE OF TEXAS §
COUNTY OF HARRIS §

Before me, the undersigned authority, personally appeared Michael G. Manners, who, after being by me duly sworn did depose and state as follows:

1. My name is Michael G. Manners. I am over the age of eighteen (18), have never been convicted of a felony or a misdemeanor involving moral turpitude and am in always competent to make this affidavit. I have personal knowledge of the facts stated herein and they are true.

2. In April, 1984, I founded Royce Homes, Inc., a company that evolved into Royce Homes, L.P. ("Royce"). From founding until July 1998, I acted as Royce's chief executive officer. On that date, I sold fifty per cent (50%) of the equity in Royce and its affiliated companies (collectively "Royce") to John Speer ("Speer"). A true copy of that sales agreement is attached as Exhibit C to Michael G. Manners and Manners Related Defendants' Motion to Dismiss Certain Claims and/or for Summary Judgment as to Certain Claims ("Motion"). In connection with that sale, I relinquished executive control of Royce to Speer by agreeing that a company wholly owned by Speer would be Royce's general partner. After the sale, I left for vacation and my secretary moved all my belongings from the Royce offices and I never again had an office at Royce. I withdrew from all management functions and, although I was paid a salary and provided benefits, I became a passive investor in Royce. After the sale, I continued to receive distributions from the profits of Royce. Royce was an extremely profitable company. During the years 2002 through 2005, it made distributions to partners in amounts that totaled approximately $43,000,000; yet, as of December 31, 2006, Royce's equity still exceeded $36,000,000. Attached to the Motion as Exhibits E, F & G are true copies of Royce's year-end financial statements for the years 2004 through 2007.

3. I also owned one-third of the equity in Texas Colonial Homes, L.P. ("TCH"), a company in which George Kopecky and Speer each owned a third. Kopecky and Speer operated TCH, and I never participated in management.

4. In Spring 2006, Speer and I began negotiating for Speer to buy all of my interest in Royce, including the TCH interest. The price was based on my equity, approximately $18,000,000 plus a multiple, 75% of my equity, and undistributed profit of $2,000,000. The total was approximately $33,300,000. The 75% multiple of equity was common in the industry for acquisition of home building companies as of 2006. The final agreement had the two basic facets – a lump sum of $20,000,000 paid at the date of purchase with an additional $13,000,000 potential payout based on Royce's continued profitability. In connection with the purchase by Speer, I resigned from all positions with all Royce entities, but, in exchange for my agreement to a three year non-compete and allowing Royce to continue to use my name, I was awarded the honorary position of Chairman Emeritus with my old salary of $160,000 per year and benefits continuing for three years. These terms were negotiated between myself and Speer in Harris County, Texas. A true copy of those resignations is attached to the Motion as Exhibit D. The position of Chairman Emeritus carried with it no responsibilities or duties of any sort. In connection with this litigation, the Plaintiff has produced consents from every Royce lender to Speer's purchase of my interests. A true copy of those consents is attached to the Motion as Exhibit I.

5. The purchase price had two components. One, $20,000,000 in cash and $13,500,000 to be in the form of a promissory note. Speer borrowed the cash paid at closing from Amegy Bank, N.A. ("Amegy"). In connection with that borrowing, DWM, Saracen and myself entered into an Intercreditor Agreement with Amegy. A true copy of that agreement is attached to the Motion as Exhibit H. Payments on the note were triggered by the take down of lots by Royce for construction and the closing of the sale of each home after construction. A $1,500 payment was due for each lot taken down where construction commenced during the month and $1,500 was due for every funded closing during the same month. Both the original cash payment and the note were absolute obligations of Speer. Royce had no obligations to me. Every payment received on the note came from Speer. Payment on the note, however, was contingent upon the continued profitability of Royce. If at any time Royce was in default, monetary or otherwise, to any lender, no payment could be made to me on the note. Speer made his last payment in June 2007 and, ultimately, in 2008, Royce failed. I received approximately $3,000,000 in note payments before all payments from Speer ceased.

6. From October 2006 to June 2007, Speer paid approximately $3,000,000 on the note. Every payment was made by personal check from Speer. No payment ever came from Royce, and I do not know the source of the funds Speer used. In June 2007, Speer advised me that due to cash flow problems, payments on the note had to be suspended. Payments never resumed. Neither Amegy nor any other Royce lender ever made demand upon me for the turnover of any funds received on the note.

7. Prior to filing this suit, the trustee served a subpoena on me and in response, I produced 6,009 pages of documents. In addition, I was examined by the trustee's counsel and that examination exceeded 200 pages when produced by the reporter.

_____
Michael G. Manners

Subscribed and sworn to before me on the 19th day of November, 2012.

_____
Notary Public for State of Texas.

Patricia D McGehee
My Commission Expires
02/23/2013