# APPENDIX 4

**Exhibit "B"**
**Interest Payment Agreement**

## INTEREST PURCHASE AGREEMENT

THIS INTEREST PURCHASE AGREEMENT (the *"Agreement"*) is made effective as of 12:00 am Houston, Texas time on September 2D , 2006 (the *"Effective Time"*), by and among MICHAEL G. MANNERS, an individual residing in Montgomery County, Texas (*"Mr. Manners"*), and his wholly-owned entities, DWM HOLDINGS, L.P., a Delaware limited partnership and successor in interest to DWM Holdings, Inc. (*"DWM"*) and SARACEN HOLDINGS, L.P., a Delaware limited partnership and successor in interest to Saracen Holdings, Inc. (*"Saracen"*) and JOHN H. SPEER, an individual residing in Harris County, Texas (the *"Buyer"*). Mr. Manners, DWM and Saracen are each individually a *"Seller"* and collectively, *"Sellers."*

WITNESSETH:

WHEREAS, the Mr. Manners and DWM, in exchange for an aggregate 50.58% equity interest as a limited partner (the *"Royce Holdings Interests"*) in ROYCE HOLDINGS, L.P., a Delaware limited partnership (*"Royce Holdings"*), contributed all of their ownership interests in various businesses pursuant to a contribution agreement among Mr. Manners, DWM, Buyer and First Duvall Group, Inc. dated September 19, 2006 (the *"Contribution Agreement"*), the interests contributed by Mr. Manners and DWM consisting of the following:

(a)     a fifty percent (50%) equity interest as a limited partner in Royce Homes, LP, a Delaware limited partnership;

(b)     a fifty percent (50%) equity interest as a limited partner in Park Lake Communities, L.P., a Texas limited partnership;

(c)     a fifty percent (50%) equity interest as a limited partner in Royce Model Homes, LP, a Texas limited partnership;

(d)     a fifty percent (50%) membership interest in Royce Homes-Phoenix, LLC, a Delaware limited liability company;

(e)     a fifty percent (50%) membership interest in Royce Homes Construction, LLC, a Delaware limited liability company; and

(f)     a 33.33% equity interest as a limited partner in TCH Financial, L.P., a Delaware limited partnership.

The above referenced entities, including all direct or indirect subsidiary entities in which any such entity has a direct or indirect majority ownership interest are referred to herein as the *"Contributed Entities"* and Mr. Manners and DWM's ownership interests in such Contributed Entities are referred to herein collectively as the *"Contributed Interests."*

WHEREAS, Saracen owns a forty percent (40%) equity interest as a limited partner (the *"Hammersmith Interests"*) in Hammersmith Financial, L.P., a Delaware limited partnership

("*Hammersmith*"), and Mr. Manners owns fifty percent (50%) of the stock of (the "*RTI Interests*") in RTI Reinsurance, Inc., a Nevis corporation ("*RTI*");

WHEREAS, the Royce Holdings Interests, Hammersmith Interests and RTI Interests are now directly owned by the Sellers in the manner set forth above and are referred to herein as the "*Purchased Interests*" and Royce Holdings, Hammersmith and RTI are referred to herein as the "*Purchased Entities*".

WHEREAS, Buyer desires to purchase the Purchased Interests and the Seller desires to sell such Purchased Interests in the Purchased Entities to the Buyer;

NOW THEREFORE, in consideration of the representations, warranties, covenants, agreements and undertakings hereinafter made, the parties hereto have agreed as follows:

ARTICLE 1
PURCHASE OF INTERESTS

1.1   *Agreement of Seller.* Each Seller hereby agrees to sell, transfer, assign and deliver to Buyer, and Buyer agrees to purchase from said Seller, at the Closing provided for in Section 2 hereof, the Purchased Interests, free and clear of all liens, claims, charges, limitations (except for limitations on sale under the Federal securities laws, if any), encumbrances, agreements and restrictions, in exchange for the consideration set forth below. At the Closing, each Seller will deliver to Buyer a certificate or certificates representing its respective Purchased Interests (and indirectly the Contributed Interests), duly endorsed for transfer. Such documents will be accompanied by such other documents as may be necessary to effect the valid transfer of the Purchased Interests (and indirectly the Contributed Interests) to Buyer.

1.2   *Purchase Price.* The total consideration paid for the Purchased Interests, including net operating income allocable to the Sellers through the Effective Time is $33,342,405. Such amounts are paid and characterized as follows:

(a)   Gross cash at closing in the amount of $20,000,000, reduced by the Interim Distributions in Section 1.4 below of $1,421,314, for a net amount of cash due at Closing of $18,578,686; and

(b)   A promissory note in the amount $13,342,405 as provided in Section 1.3, which is the remaining consideration for the Purchased Interests.

1.3   *Promissory Note.* The promissory note shall be in the form attached hereto as Exhibit A (the "*Note*"). Security for the Note shall include the Purchased Interests, as evidenced by a Pledge Agreement in the form attached hereto as Exhibit B.

1.4   *Reduction for Interim Distributions.* The purchase price and the amount of cash paid at Closing for the Purchased Interests shall be reduced by an amount equal to all distributions of cash to the Seller from any Purchased Entity or Contributed Entity after March 31, 2006, but excluding distributions from any Purchased Entity or Contributed Entity to fund income taxes of the Sellers on income allocable to Sellers from such entities for the tax periods ending on or before March 31, 2006 as set forth on Schedule 1.4. Interim distributions made

through the date of this Agreement which reduce the purchase price are as further listed on Schedule 1.4.

    1.5    *Allocation of Operating Income & Purchase Price.*

        (a)    The Parties shall take all reasonable steps required to specially allocate $2,000,000 of taxable income from the operations of the Contributed Entities to the Sellers for the period April 1, 2006 through the Effective Time of the sale. Sellers shall not be entitled to any distributions, including tax distributions, from any amounts that are specially allocated to Sellers pursuant to this Section 1.5(a), except as set forth in Schedule 1.4.

        (b)    The remaining consideration of $31,342,405 shall be the purchase price of the Purchased Interests, of which $3,000,000 shall be allocated to houses under construction (giving rise to ordinary income to the Sellers under IRC Section 751) and all remaining amounts shall be allocated so as to create capital gain to the Sellers (and goodwill with respect to the Purchased Interests under IRC Section 197).

        (c)    The purchase price and gain amounts shall be allocated for income tax purposes among the Purchased Interests as set forth on Schedule 1.5, and shall be further allocated among the Purchased Entities in accordance with the relative values set forth in the Contribution Agreement. The Buyer shall cause Royce Holdings to prepare a detail allocation of the purchase price among the assets of each of the Purchased Entities and Contributed Entities in accordance with the above allocations and Section 755 and the applicable asset acquisition rules of the Internal Revenue Code. The Buyer shall cause Royce Holdings to prepare and file the income tax returns of the Purchased Entities and Contributed Entities in accordance with such allocations. Each of the Sellers and Buyer agree to be bound by such allocations and to report same consistently on his or its income tax returns.

ARTICLE 2

CLOSING

    2.1    *Closing.* The closing of the sale of the Purchased Interests from Seller to Buyer (the "*Closing*") shall take place at 1:00 p.m., Houston, Texas Time, at the offices of Buyer or its counsel, on September 20, 2006, or such other date and/or time as may be mutually acceptable to Buyer and to Seller ("*Closing Date*"), but shall be effective as of the Effective Time.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLER

    Each Seller, jointly and severally, unconditionally represents and warrants to Buyer that each of Section 3.1 through 3.4 below are true. Each Seller, jointly and severally, represents and warrants to Buyer that Sections 3.5 through 3.15 are true to the best knowledge of Mr. Manners (except as specifically set forth in Section 3.9) and for this purpose, the knowledge of John H. Speer or any employee of any Contributed Entity (excluding persons employed by Elan Development or any Seller whose payroll is processed by a Contributed Entity) shall not be imputed to any Seller. No Seller has a duty to perform, and has not performed, any due diligence with respect to the representations and warranties in Sections 3.5 through 3.15. With respect to Sections 3.5 through 3.15, Mr. Manners has relied on the best knowledge of Mr. Manners and on

3

the Certificate of John H. Speer delivered to Sellers as of the date of this Agreement (the "*Speer Certificate*").

3.1     *Title to Purchased Interests.*

(a)     The Sellers have, and will have on the Closing Date, good and marketable title to the Purchased Interests, free and clear of any pledge, lien, security interests, encumbrance, claim or restriction on transfer or other defect in title. The Sellers have full right, power and authority to sell, transfer and deliver the Purchased Interests and upon delivery of such Purchased Interests to Buyer, Buyer will acquire good and marketable title to such Purchased Interests, free and clear of any pledge, lien, security interests, encumbrance, claim or restriction on transfer or other defect in title (except those granted to Mr. Manners for the benefit of Sellers to secure the Note). The Purchased Interests represent one hundred percent (100%) of the Sellers' ownership rights in the Purchased Entities and 100% of the Sellers' indirect ownership rights in the Contributed Entities.

(b)     The Seller had, at the time of the contribution to Royce Holdings, good and marketable title to the Contributed Interests, free and clear of any pledge, lien, security interests, encumbrance, claim or restriction on transfer or other defect in title. The Seller had full right, power and authority to sell, transfer and deliver the Contributed Interests and upon delivery of such Contributed Interests Royce Holdings acquired good and marketable title to such Contributed Interests, free and clear of any pledge, lien, security interests, encumbrance, claim or restriction on transfer or other defect in title. The Purchased Interests represents one hundred percent (100%) of the Sellers' ownership rights in the Contributed Entities.

(c)     No person or entity claiming by, through or under any Seller has any ownership interest in, or claim against, a Purchased Entity or Contributed Entity, except as will be acquired by Buyer at Closing.

3.2     *No Claims of Seller.*

(a)     No Seller, and no person or entity controlled by, which controls, which is under common control, directly or indirectly, with or which is related to any Seller, has any claim against, or contract or relationship with, any Purchased Entity or Contributed Entity except as listed on <u>Schedule 3.2</u> hereto.

(b)     No Purchased Entity or Contributed Entity is in violation of any agreement subject to Section 3.2(a) and Schedule 3.2 lists all amounts outstanding under such agreements.

(c)     Except for the items set forth in Schedule 3.2, each Seller has received all distributions due it from any Purchased Entity or Contributed Entity (including tax distributions) or otherwise has any direct or indirect claim against Buyer or any Purchased Entity or Contributed Entity except as listed on Schedule 3.2.

3.3     *Contribution Agreement.* Each Seller represents and warrants to Buyer that his or its representations and warranties made in the Contribution Agreement are true and correct.

3.4    *No Brokers or Finders.*  Sellers have not employed any broker or finder, or incurred any liability for any brokerage fees, commissions or finders' fees, in connection with the transactions contemplated herein or in the Contribution Agreement.

3.5    *Organization and Existence.*  Each Purchased Entity and Contributed Entity is duly organized, validly existing and in good standing under the laws of its state of formation and has all requisite power and authority to own, operate and lease its properties and to carry on its business as now being conducted.  Each Purchased Entity and Contributed Entity is duly qualified to do business and is in good standing in every jurisdiction where the ownership of its property or the character of its business makes such qualification necessary.

3.6    *Capitalization.*  All of the issued and outstanding Purchased Interests in each Purchased Entity and Contributed Entity have been duly authorized and validly issued and are fully paid and non-assessable and have not been issued in violation of any preemptive rights. There are no outstanding subscriptions, options, warrants, calls or other agreements or commitments obligating any Purchased Entity or Contributed Entity to issue additional ownership rights.

3.7    *Financial Statements.*  The audited financial statements of the Purchased Entities and/or Contributed Entities for each of the last three calendar years are true and accurate, have been prepared in accordance with generally accepted accounting principles applied on a consistent basis and fairly present the financial position of the Purchased Entities and/or Contributed Entities as of the respective dates thereof, and the results of the Purchased Entities and Contributed Entities' operations and changes in financial position for the periods then ended.

3.8    *Licenses and Permits.*  Each Purchased Entity and Contributed Entity holds all licenses, permits and other governmental authorizations ("*Licenses*") necessary to conduct the business of each such Purchased Entity and Contributed Entity.  The Licenses are valid, and neither any Purchased Entity, Contributed Entity nor any Seller has received any notice that any person intends to cancel, terminate or not renew any such License. Each Purchased Entity and Contributed Entity has conducted and is conducting its business in compliance in all material respects with the requirements, standards, criteria and conditions set forth in the Licenses and is not in violation of any of the foregoing in any material respect.  The consummation by Sellers of the transactions contemplated by this Agreement will not result in a default under or a breach or violation of, or adversely affect the rights and benefits afforded any Purchased Entity and Contributed Entity by any such Licenses.

3.9    *Environmental Matters.*  (i) Each Purchased Entity and Contributed Entity has conducted its business in compliance with all applicable environmental laws, and has all environmental permits, licenses and other approvals and authorizations necessary for the operation of its business as presently conducted, (ii) neither any Purchased Entity, Contributed Entity nor any Seller has received any notices, demand letters or requests for information from any Federal, state, local or foreign governmental entity or third party indicating that any Purchased Entity or Contributed Entity may be in violation of, or liable under, any environmental law in connection with the ownership or operation of its business, (iii) there have been no environmental investigations, studies, audits, tests, reviews or other analyses regarding compliance or non-compliance with any applicable environmental laws conducted by or which

are in the possession of any Purchased Entity, Contributed Entity or any Seller relating to the activities of any such Purchased Entity or Contributed Entity prior to the date hereof, (iv) (A) there are no underground storage tanks on, in or under any properties owned by or leased to any Purchased Entity or Contributed Entity and (B) no underground storage tanks have been closed or removed from any of such properties during the time such properties were owned, leased or operated by any Purchased Entity or Contributed Entity, (v) (A) there is no asbestos or asbestos-containing material present in any material quantity in any of the properties owned by or leased to any Purchased Entity or Contributed Entity, and (B) no asbestos has been removed from any of such properties during the time such properties were owned, leased or operated by any Purchased Entity or Contributed Entity, and (vi) neither any Purchased Entity, Contributed Entity nor any of its properties is subject to any liabilities or expenditures (fixed or contingent) relating to any suit, settlement, court order, administrative order, regulatory requirement, judgment or claim asserted or arising under any environmental law.

3.10  *Insurance.*  Each Purchased Entity's and Contributed Entity's present insurance policies evidence all of the insurance such Purchased Entity and Contributed Entity is required to carry pursuant to all of its contracts and other agreements and pursuant to all applicable laws. All of such insurance policies are currently in full force and effect, and no insurance carried by any Purchased Entity or Contributed Entity has been canceled by the insurer, and no Purchased Entity or Contributed Entity has been denied coverage under any other policy.

3.11  *Labor Matters.*  No Purchased Entity or Contributed Entity is bound by or subject to (and none of its assets or properties is bound by or subject to) any arrangement with any labor union, and no campaign to establish such arrangement is in progress.  There are no claims, actions or proceedings pending or threatened against any Purchased Entity or Contributed Entity by any Purchased Entity or Contributed Entity's employees.  Each Purchased Entity and Contributed Entity has complied in all material respects with all laws relating to the employment of labor, including, without limitation, any provisions thereof relating to wages, hours, and the payment of social security and similar taxes.  No Purchased Entity, Contributed Entity or any Seller has received notice from any person asserting that any Purchased Entity or Contributed Entity is liable for any arrearages of wages or any taxes or penalties for failure to comply with any of the foregoing.

3.12  *Employee Plans.*  All employee benefit plans of each Purchased Entity and Contributed Entity and the administration thereof are in compliance in all material respects with their terms and all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder, as well as with all other applicable federal, state and local statutes, ordinances and regulations.

3.13  *Conformity with Law; Litigation.*  There are no claims, actions, suits or proceedings, pending or, to the knowledge of each Seller, threatened against any Seller, or against any Purchased Entity or Contributed Entity, at law or in equity, or before or by any Federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality and no written notice of any claim, action, suit or proceeding, whether pending or threatened, has been received by any Seller or any Purchased Entity or Contributed Entity, and to the knowledge of each Seller, there is no valid basis for any such claim, action, suit or

proceeding that could reasonably be expected to have a material adverse effect on any Purchased Entity or Contributed Entity.

3.14    *Taxes.* Each Purchased Entity and Contributed Entity has timely filed all requisite Federal, state and other tax returns or extension requests for all fiscal periods ended on or before the date hereof; and there are no examinations in progress or claims pending against any Purchased Entity or Contributed Entity for Federal, state and other taxes (including penalties and interest) for any period or periods prior to and including the date hereof and no notice of any claim for taxes, whether pending or threatened, has been received. All taxes, including interest and penalties (whether or not shown on any tax return), due from each Purchased Entity or Contributed Entity have been paid.

3.15    *Liabilities and Obligations.* All indebtedness of each Purchased Entity and Contributed Entity as of March 31, 2006 is set forth on the financial statements of each such Purchased Entity and Contributed Entity as of such date, and no Purchased Entity or Contributed Entity has incurred any liabilities or obligations of any kind, character or description, whether accrued, absolute, secured or unsecured, contingent or otherwise since such date except for liabilities and obligations incurred in the ordinary course of business.

3.16    *Survival.* The representations and warranties of each Seller contained herein shall survive the Closing Date for a period of twenty-four (24) months after the Closing Date except for the representations and warranties in Sections 3.9 and 3.14 relating to Environmental Matters and Taxes which shall survive until the applicable statute of limitations.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

4.1    *Authority; Binding Agreement.* The execution and delivery by each Buyer of this Agreement and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all necessary action on the part of Buyer, and this Agreement is a valid and binding obligation of Buyer enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy or debtor relief laws and general principles of equity. Buyer's execution and delivery hereunder will not result in a default under, or a breach or violation of, any other agreement to which he is a party, or any legal restriction which has been imposed upon him. All documents executed by Buyer in connection with this Agreement, including the Note and Pledge Agreement, shall be valid and enforceable obligations of Buyer in accordance with their terms, except as enforceability may be limited by applicable bankruptcy or debtor relief laws and general principles of equity.

4.2    *No Brokers of Finders.* Buyer has not employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated herein.

4.3    *Survival.* The representations and warranties of Buyer contained herein shall survive the Closing Date for a period of twenty-four (24) months after the Closing Date.

## ARTICLE 5
## COVENANTS

5.1    *Efforts to Consummate Transactions.*  Subject to the terms and conditions herein provided, each of the parties hereto shall take, or cause to be taken, all action, or do, or cause to be done, all things reasonably necessary, proper, or advisable under applicable law to consummate and make effective the transactions contemplated by this Agreement; provided, however, that nothing in this sentence shall be construed to require any party to waive a condition to such party's obligations hereunder or to waive the breach of any obligations of any other party hereunder or a breach of fiduciary duty owing by any Seller to Buyer or any Purchased Entity, Contributed Entity or to their respective partners or shareholders, or a breach of fiduciary duty owing by Buyer to its respective partners or affiliates.  Prior to consummation of the transactions contemplated by this Agreement or termination of this Agreement, each Seller shall vote its Purchased Interests in a manner consistent with consummation of the transactions contemplated by this Agreement.

5.2    *Confidentiality.*  Prior to Closing, except as otherwise required by law, none of Buyer, Sellers, any Purchased Entity or any Contributed Entity will make any public announcement of the transactions or the terms of the transactions contemplated by this Agreement.

5.3    *Further Assurances.*  At any time and from time to time after the Closing, at Buyer's request and without further consideration, Sellers agree to cooperate with Buyer in taking any actions reasonably required to be taken by Buyer, and to execute and deliver any additional documents or certificates reasonably required by Buyer to be executed in order to consummate and make effective the transactions contemplated by this Agreement, provided such actions are consistent with the terms hereof as they pertain to Sellers.  The obligations of each Seller hereunder shall survive the Closing Date.

## ARTICLE 6
## CONDITIONS TO CLOSING

6.1    *Conditions to Obligations of Buyer.*  The obligations of Buyer to perform this Agreement are subject to the satisfaction or waiver of each of the following conditions:

(a)    The representations and warranties of each Seller set forth in this Agreement shall be true and correct in all material respects on and as of the date of this Agreement and on and as of the Closing Date as though made on and as of the Closing Date as evidenced by a certificate to Buyer to that effect.  Each Seller shall have performed or complied with, prior to or on the Closing Date, all agreements and conditions required to be performed or complied with by each such Seller under this Agreement prior to or on the Closing Date.

(b)    Each Seller (and each other party) shall have executed and complied with the terms of the Contribution Agreement.

(c)    All actions necessary to authorize the execution, delivery and performance of this Agreement by each Seller shall have been duly and validly taken.

(d)     Buyer or his affiliates shall have obtained financing to fund the cash portion of the purchase price paid at Closing which is acceptable in all respects to Buyer in his sole and absolute discretion.

(e)     Buyer shall have received written approval from any lender(s), lessor(s) and/or governmental authority(ies) (including lenders or lessors to any of the Purchased Entities or Contributed Entities) whose approval is required or deemed advisable in order to consummate the transactions contemplated by this Agreement.

6.2     *Conditions to Obligations of Sellers.*  The obligation of each Seller to perform this Agreement is subject to the satisfaction or waiver of the following conditions:

(a)     The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects on and as of the date of this Agreement and on and as of the Closing Date as though made on and as of the Closing Date as evidenced by a certificate to Seller to that effect.  Buyer shall have performed or complied with, prior to or on the Closing Date, all agreements and conditions required to be performed or complied with by Buyer under this Agreement prior to or on the Closing Date; and

(b)     All actions necessary to authorize the execution, delivery and performance of this Agreement by Buyer shall have been duly and validly taken.

## ARTICLE 7
## INDEMNIFICATION

7.1     *Indemnification by Sellers.*

(a)     Subject to the provisions of Section 7.1(b), Sellers shall, jointly and severally, protect, defend, indemnify and hold harmless Buyer, each Purchased Entity, each Contributed Entity and their respective successors and assigns, against and in respect of any and all loss, cost, damage, charge or expense, including, without limitation, all reasonable out-of-pocket expenses, investigation expenses and fees and disbursements of counsel and accountants, (collectively, "*Damages*") resulting from any events, circumstances, conditions, actions or inactions that cause a breach of the representations or warranties of any Seller contained in Article 3 hereof.

(b)     Sellers shall be jointly and severally liable for 100% of any Damages relating to or resulting from the failure to convey good title to the Purchased Interests to Buyer or any other breach or inaccuracy of the representations and warranties in any of Sections 3.1 through 3.4.  The Sellers shall be jointly and severally liable for fifty percent (50%) of any Damages relating to or resulting from the representations in Sections 3.5 through 3.15, except in circumstances where such representations were made by Sellers both (i) in reliance upon any false or inaccurate information pertaining to the pertinent representation contained in the Speer Certificate, and (ii) without knowledge by any Seller of any such falsehood or inaccuracy.  Any Damage may, at the Buyer's discretion, first be deducted from the payments required to be made by Buyer to Seller pursuant to Section 1.2 or the Note upon at least 30 days prior written notice to Mr. Manners of Buyer's intent to do so (to the extent not already paid by Buyer) prior to initiating any lawsuit against Seller.

7.2   *Notification of Claims.* Buyer will, after the receipt of notice of any claim against Buyer in respect of which indemnity may be sought from any Seller on account of the indemnification of Sellers set forth in Section 7.1, notify Mr. Manners in writing of the receipt of such claim but Buyer's failure to give such notice shall not relieve Sellers of their obligations hereunder except to the extent of any harm actually caused by such failure. Mr. Manners will be entitled to participate in the negotiation or administration of any such claims, but in no way shall Sellers' indemnification of Buyer be limited, reduced or adversely affected in any way as a result of Mr. Manners' participation in the defense of any such claim(s).

7.3   *Indemnification by Buyer*

(a)   Subject to the provisions of Section 7.3(b), Buyer shall protect, defend, indemnify and hold harmless Sellers and their respective successors and assigns, against and in respect of any and all Damages resulting from any events, circumstances, conditions, actions or inactions that cause a breach or the representations or warranties of Buyer contained in Article 4.

(b)   Buyer shall be liable to Sellers for 100% of any damages relating to or resulting from his breach or inaccuracy of or in the representations and warranties by him in Article 4 hereof.

7.4   *Notification of Third Party Claims.* Sellers will, after the receipt of notice of any third party claim against Seller in respect of which indemnity may be sought from Buyer on account of the indemnification of Buyer set forth in Section 7.3, notify Buyer in writing of the receipt of such claim but Seller's failure to give such notice shall not relieve Buyer of his obligations hereunder except to the extent of any harm actually caused by such failure. Buyer will be entitled to participate in the negotiation or administration of any third party claims, but in no way shall Buyer's indemnification of Seller be limited, reduced or adversely affected in any way as a result of Buyer's participation in the defense of any such claim(s).

7.5   *Waiver.* Any term or provision of this Agreement may be waived at any time by the party which is entitled to the benefits thereof.

## ARTICLE 8
## SELLERS' RESTRICTIVE COVENANTS

8.1   *Agreement Not to Compete.* Except as provided in Sections 8.4 and 8.5, each Seller agrees that during the three-year period beginning on the Closing Date and ending on the thirty-six month anniversary of the Closing Date (the "*Restricted Period*"), Seller will not, directly or indirectly anywhere within the States of Arizona, Texas, Georgia and North Carolina:

(a)   engage in the business of the construction or sale of new single family residential residences, or the origination of mortgages or other financing of same (the "*Restricted Business*"), either directly or indirectly, including by the ownership, financing or providing assistance to another person or entity. The Restricted Business excludes the construction and sale of lots to builders of new single family residences, including sales to homebuilders who directly compete with Royce Holdings and its subsidiaries, and further excludes the construction, ownership, rental and/or sale or development of multi-family residences containing four or more units per building;

984850_5.DOC

(b)     engage in the Restricted Business for his own account in competition with Buyer or any Purchased Entity, Contributed Entity or any entity (whether now existing or hereafter organized or acquired) owned by, which owns or is under common control, directly or indirectly, with Buyer or any Purchased Entity or Contributed Entity; or

(c)     enter the employ of, or render any services to, any person or entity engaged in competition with Buyer or any Purchased Entity, Contributed Entity or any entity (whether now existing or hereafter organized or acquired) owned by, which owns or is under common control, directly or indirectly, with Buyer or any Purchased Entity or Contributed Entity; or become an owner, investor or manager in any such entity in any capacity, including as a partner, member, manager, shareholder, officer, director, principal, agent or trustee.

8.2     *Confidential Information.*  Both during and after the Restricted Period, Sellers shall keep secret and retain in strict confidence, and shall not use for the benefit of himself or others, all confidential matters of Buyer or any Purchased Entity or Contributed Entity, including trade secrets, "know how," customer lists, details of customer or vendor contracts, house plans, subcontractor terms, pricing policies, operational matters, manufacturing processes and techniques, marketing plans and strategies, product development techniques or plans, business acquisition plans, methods of production and distribution, technical processes, designs and design projects, product specifications, inventions, engineering techniques, drawings, and research and development projects of Buyer or any Purchased Entity or Contributed Entity.

8.3     *Employees.*  During the Restricted Period, Seller shall not directly or indirectly hire or solicit any employee or independent sales agent away from Buyer or any Purchased Entity or Contributed Entity, or encourage any such employee or agent to leave his employment or terminate his agency relationship with Buyer or any Purchased Entity or Contributed Entity. This provision shall not apply to any present employee of Elan Development whose payroll is processed by a Contributed Entity.

8.4     *Permitted Competition.*  Notwithstanding the provisions of Section 8.1, Seller or its wholly owned entity shall be permitted to engage in any and all of the following activities at any time subsequent to the Closing:

(a)     Construction of single family houses of any value for sale to the public within the boundaries of the city limits of Willis, Texas, and Panorama Village in Montgomery County, Texas, as defined now or in the future.

(b)     Construction and sale of single family homes within a 150 mile radius of the main city hall building in each of Dallas, Fort Worth, Galveston, Houston and San Antonio, Texas, or Phoenix, Arizona, Atlanta, Georgia or Charlotte, North Carolina, so long as closed sales or transfers of such homes by or on behalf of Seller do not exceed, and the minimum closing sales price of each home is not less than, the amounts set forth for the applicable year below:

| Year | # of Closings/Transfers | Minimum closing sales price per house |
|------|-------------------------|----------------------------------------|

| 2006 | 30  | $350,000 |
| 2007 | 60  | $300,000 |
| 2008 | 90  | $300,000 |
| 2009 | 120 | $250,000 |

(c)     Nothing in this Article 8 shall prohibit Seller from owning, solely as an investment, the securities of any entity traded on any national securities exchange or over-the-counter market if Seller is not a controlling person of, or a member of a group which controls, such entity, and Seller does not directly or indirectly own ten percent (10%) or more of any class of securities of such entity.

(d)     Seller may invest in any partnerships managed by Larry Debose, his successors or assigns, for the purchase and lease back of model homes from any builder located anywhere, even if said builder is a competitor of Royce Holdings.

8.5     *Additional Permitted Competition.*  Seller is free to engage directly or indirectly, in any way, including investment, financing, ownership, management, operation, control or participation or otherwise in any of the following activities:

(a)     manufacture and sale of modular housing on a wholesale basis and to individuals for use on their own lots including use as their personal residence.  Seller will not be permitted to either individually or through an affiliated party sell such manufactured houses on a retail basis in any subdivision within the noncompete area;

(b)     construction of single family houses for lease or sale on a wholesale basis and which are not in competition with Royce;

(c)     construction of multi-family buildings for lease or for sale as a merchant builder.  Multi-family as used herein means four (4) or more units per building;

(d)     development of land for use as developed land for single or multi-family built-for-sale or lease housing, to be sold to home builders or the general public;

(e)     development and sale of all forms of commercial property;

(f)     construction of commercial buildings for sale or lease;

(g)     any trade contracting to home builders, but not to the detriment of Royce Holdings, such as framing, drywalling, etc.; and

(h)     research, development and sale of home building products, methods and systems.

8.6     *Acknowledgments by Sellers.*  The Sellers acknowledge that:

(a)     as the founder, former President and an owner of the Purchased Entities and Contributed Entities, Mr. Manners has been highly instrumental in the development of the

Purchased Entities and Contributed Entities, and the business operated by the Purchased Entities, Contributed Entities and their subsidiaries;

(b)     the Purchased Entities and Contributed Entities make sales to customers throughout Arizona, Texas, Georgia and North Carolina;

(c)     the agreements made by Sellers in this Article 8 are essential to protect the business and goodwill of the Purchased Entities and Contributed Entities and to enable Buyer to derive the full benefit of its purchase and ownership of the Purchased Interests; and

(d)     Mr. Manners has the means to support himself and any dependents other than by engaging in the Restricted Business in Arizona, Texas, Georgia and North Carolina.

## ARTICLE 9
## MISCELLANEOUS

9.1     *Expenses.* Except as otherwise expressly provided herein, Buyer and Sellers shall pay their respective expenses whether or not the purchase of the Purchased Interests is consummated.

9.2     *Entire Agreement.* This Agreement and the other agreements referred to herein or executed in connection herewith contain the entire agreement among Buyer and Sellers with respect to the purchase of the Purchased Interests and supersedes all prior arrangements or understandings with respect thereto.

9.3     *Amendment.* This Agreement may be amended only by a written instrument duly executed and delivered by all of the parties hereto.

9.4     *Descriptive Headings.* Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

9.5     *Counterparts.* For the convenience of the parties, any number of counterparts of this Agreement may be executed by one or more parties hereto, and all such executed counterparts shall be one and the same instrument. Different parties may execute this Agreement on different counterparts.

9.6     *Notices.* All notices, consents, requests, instructions, approvals and other communications provided for herein and all legal process in regard hereto shall be validly given, made or served, if in writing and delivered by hand or overnight courier or sent by certified or registered mail, postage prepaid, if to:

BUYER:

Mr. John H. Speer
c/o Royce Holdings, L.P.
7850 North Sam Houston Parkway West
Houston, Texas 77064

SELLERS:

Michael G. Manners
211 Highland Cross Drive, Suite 101
Houston, Texas 77073-1700

or to such other address as any party hereto may, from time to time, designate in writing delivered in a like manner. Notice given by mail as set out above shall be deemed delivered three (3) days after the date the same is postmarked.

9.7    *Successors and Assigns.*  This Agreement may not be assigned by a party without the written consent of all other parties hereto.  This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the successors and assigns of the parties hereto.

9.8    *Severability.*  Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective or to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.9    *Law Applicable.*  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas with venue in Harris County, Texas.

9.10   *Conflict Waiver.*

(a)    Each Seller expressly acknowledge and confirm that (a) Porter & Hedges, L.L.P. is representing Buyer in this transaction and that Porter & Hedges, L.L.P. is not representing, and has not represented, Sellers or given Sellers legal advice in connection with this transaction, (b) Sellers have been advised to seek independent counsel with respect to this transaction as Porter & Hedges, L.L.P. cannot represent Sellers, and (c) Sellers have consented to the representation of Buyer by Porter & Hedges, L.L.P. and hereby waive any conflict of interest arising from any prior representation by Porter & Hedges, L.L.P. of either of Seller, any of the Purchased Entities, Contributed Entities or any entities owned or controlled or under common control, directly or indirectly, with either of Sellers, including tax planning advice given for the benefit of Mr. Manners or entities controlled by him with respect to other transactions or matters.

(b)    Sellers acknowledge that Porter & Hedges, L.L.P. has not, and will not, provide any tax planning or other legal advice to any Seller in connection with the transactions contemplated hereby and any statements made by attorneys who are members of, or associated with, Porter & Hedges, L.L.P. during the course of the negotiation, documentation, execution and delivery of this Agreement or between the date of this Agreement and the Closing Date are not intended as legal advice to any Seller.

*[Signatures on following page.]*

IN WITNESS WHEREOF, Buyer and each Seller have caused this Agreement to be duly executed this 20ᵗʰ day of September, 2006, but this Agreement is effective as of the Effective Time as herein provided.

SELLERS:

_____
Michael G. Manners

DWM HOLDINGS, L.P.

    By:  DWM Holdings GP, L.L.C., its sole general partner

        By: _____
            Michael G. Manners, its sole member

SARACEN HOLDINGS, L.P.

    By: Saracen Holdings GP, L.L.C., its sole general partner

        By: _____
            Michael G. Manners, its sole member

BUYER:

_____
John H. Speer

Schedule 1.4 – Schedule of regular distributions which reduce the purchase price and tax distributions made after March 31, 2006 to Sellers for Sellers' allocable taxable partnership income through March 31, 2006.

Schedule 1.5 – Allocation of purchase price among the Purchased Interests

Schedule 3.2 – Schedule of existing contracts and relationships between Sellers and the Purchased Entities and Contributed Entities and all outstanding amounts thereunder, and other claims of Sellers against any Purchased Entity or Contributed Entity.

Exhibit A - Promissory Note

Exhibit B - Pledge Agreement

## Schedule 1.4
to the Interest Purchase Agreement
by and between John Speer, Mike Manners and their respective Affiliates

| | |
|---|---|
| Total cash payable | $20,000,000.00 |
| | |
| plus tax distributions due for first quarter 2006 | $1,052,686.00 |
| less regular partner distributions for second quarter 2006 | ($474,000.00) |
| less May 2006 partner distribution | ($2,000,000.00) |
| Net Interim Distributions | ($1,421,314.00) |
| | |
| Net cash payable at Closing | $18,578,686.00 |

982931_1.DOC

# Schedule 1.5 to the Interest Purchase Agreement

| | Mike Manners | DWM | Saracen | Total |
|---|---|---|---|---|
| Operating income for April 1, 2006 through the effective date | | | | $ 2,000,000 |
| Royce Holdings, LP - limited partnership interests | $ 5,788,169 | $ 24,554,236 | $ - | $ 30,342,405 |
| RTI - 50% of stock | $ 156,502 | $ - | $ - | $ 156,502 |
| Hammersmith Financial, LP - 40% limited partnership interests | $ - | $ - | $ 843,498 | $ 843,498 |
| Totals | $ 5,944,671 | $ 24,554,236 | $ 843,498 | $ 33,342,405 |

# Schedule 3.2 - Claims of Seller

All amounts due pursuant to the Nominee Agreement by and among Park Lake Communities, LP, Michael G. Manners and Karen G. Manners dated December 1, 2004, which reflects advances by Mike Manners to Park Lake of $1,000,000 which are due back to Manners pursuant to the terms of such agreement. Park Lake Communities is in compliance with the agreement at this time.

Michael G. Manners owns an 18.75% limited partnership interest in Ashford Gardens, Ltd., a Texas limited partnership. Ashford Gardens is in compliance with its obligations to Manners at this time.

## SUMMARY OF ELAN LOT DEVELOPMENT PROJECTS
### CURRENTLY UNDER CONTRACT WITH ROYCE

Royce is in compliance with all contracts at this time.

Date Prepared: 7/28/06

| PROJECT NAME | SELLER | PURCHASER | DATE OF EM CONTRACT | NUMBER OF LOTS | COST PER LOT | CONTRACT AMOUNT | LOTS REMAINING AS OF 7/28/06 | DOLLARS* REMAINING AS OF 7/28/06 |
|---|---|---|---|---|---|---|---|---|
| Atascocita Trace, Section 1 | Elan | PLC | 12/9/04 | 142 | 20,000 | 2,840,000 | 76 | 1,520,000 |
| Bammel Trace, Section 1 | Alamein | PLC | 8/1/05 | 201 | 17,150 | 3,447,150 | 201 | 3,447,150 |
| Bammel Village, Section 2 | Elan | PLC | 7/10/04 | 240 | 20,000 | 4,800,000 | 159 | 3,180,000 |
| Fox Run, Section 12 | Elan | Royce | 2/11/04 | 81 | 19,300 | 1,563,300 | 10 | 193,000 |
| Grant's Trace, Section 1 | Elan | PLC | 7/10/04 | 166 | 27,500 | 4,565,000 | 103 | 2,832,500 |
| Highland Creek Ranch, Section 1 | Elafrey | Royce | 8/20/02 | 92 | 14,800 | 1,361,600 | 3 | 44,400 |
| Highland Creek Ranch, Section 5 | Elafrey | PLC | 12/21/05 | 75 | 18,360 | 1,377,000 | 75 | 1,377,000 |
| Imperial Trace, Section 1 | Elan | PLC | 1/20/05 | 208 | 20,000 | 4,160,000 | 115 | 2,300,000 |
| Klein Meadows, Section 1 | Elan | Royce | 10/7/03 | 133 | 24,500 | 3,258,500 | 21 | 514,500 |
| Willow Trace, Section 1 | Elan | PLC | 3/30/06 | 159 | 26,500 | 4,213,500 | 159 | 4,213,500 |
| Woodland Oaks | Elan | PLC | 6/21/06 | 27 | 31,500 | 850,500 | 25 | 787,500 |
| REMAINING AS OF 7/28/06 | | | | | | | 947 | 20,409,550 |

* DOLLARS REMAINING AS OF 7/28/06 EXCLUDE ESCALATION AND PRORATIONS

EXHIBIT A

THIS NOTE IS NON-NEGOTIABLE

## SUBORDINATED NON-NEGOTIABLE SECURED PROMISSORY NOTE

$13,342,405.00                    Houston, Texas                    September 20, 2006

1.    AGREEMENT TO PAY.   FOR VALUE RECEIVED, the undersigned, JOHN HOPKINS SPEER, an individual residing in Harris County, Texas (hereinafter referred to as the "*Debtor*"), promises to pay to the order of MICHAEL G. MANNERS, in his capacity as trustee and agent (in such capacity "*Payee*," and the Payee and each successive permitted owner and holder of this Note from time to time being referred to generally as the "*Holder*") for the benefit of himself (individually, "*Mr. Manners*"), DWM HOLDINGS, L.P., a Delaware limited partnership and successor in interest to DWM Holdings, Inc. ("*DWM*"), and SARACEN HOLDINGS, L.P., a Delaware limited partnership and successor to Saracen Holdings Inc. ("*Saracen*"), the principal sum of THIRTEEN MILLION THREE HUNDRED FORTY-TWO THOUSAND FOUR HUNDRED FIVE AND NO/100  DOLLARS ($13,342,405), together with simple annual interest on the principal balance from time to time remaining unpaid hereon, computed daily on the basis of a year of 365 or 366 (as applicable) days for the actual number of days elapsed, at the Effective Rate of Interest in effect from time to time, or, if applicable, at the Default Rate of Interest hereinafter provided.  All payments of principal  and interest on this Note shall be made to the Payee at 211 Highland Cross Drive, Suite 101, Houston, Texas 77073-1700, or at such other place or places as the Payee hereof may direct to Debtor in writing.  This Note is non-negotiable.

2.    INTEREST RATE PRIOR TO DEFAULT.   Outstanding principal balances hereof prior to Default shall bear interest at a daily rate equal to eight percent (8.0%) simple annual interest using a 365 or 366 (as applicable) day year (herein called "*Effective Rate of Interest*").

3.    DEFAULT RATE.  In the event that there shall occur any Default hereunder, or the maturity of the indebtedness evidenced hereby, whether by passage of time, acceleration, declaration or otherwise, then, in any such event, until the Default is cured, or the indebtedness evidenced hereby is paid or satisfied in full, the entire unpaid principal amount hereof shall bear interest at the rate which is equal to the Effective Rate of Interest *plus* four percent (4.0%) simple annual interest (the "*Default Rate of Interest*").

4.    PAYMENTS OF CLOSING FEE, PRINCIPAL AND INTEREST.  Principal and interest on this Note, together with the Closing Fee, shall be paid by the Debtor to Payee as follows:

(a) Interest shall begin accruing on this Note on September 20, 2006 and continuing until all amounts are due under this Note are paid in full, all at the Effective Rate of Interest (unless the Default Rate of Interest is in effect).

(b) Debtor shall pay to the Payee, a one-time closing and administrative fee in the amount of $236,873 (the "*Closing Fee*"), which fee shall accrue on the date of this Note, and is payable pursuant to *Sections 4(c) and 4(d)* hereof.

(c) On October 2, 2006, the Debtor shall make a single payment to the Payee equal to the sum of (i) $1,500 per lot acquired for which home construction is started by the Royce Entities (defined below) after June 30, 2006 and on or before September 30, 2006, and (ii) $1,500 per home for which construction was started after June 30, 2006 and for which closing and transfer of title to such home by the Royce Entities to a customer occurs on or before September 30, 2006. Such payment will be applied on October 2, 2006, first, to the Closing Fee, second, to any accrued but unpaid interest, and third, to the outstanding principal balance of this Note.

(d) Commencing as of October 1, 2006 and continuing until all amounts due under this Note are paid in full, the Debtor shall make payments to the Payee equal to the sum of (i) $1,500 per lot acquired for which home construction is started by the Royce Entities (defined below) on or after October 1, 2006, and (ii) $1,500 per home for which construction was started after June 30, 2006 and for which closing and transfer of title to such home by the Royce Entities to a customer occurs on or after October 1, 2006. Commencing October 1, 2006, the Debtor shall cause the Royce Entities to instruct all title companies to pay such $1,500 amount directly to the Payee at the closing of each lot or home described in preceding *clauses (i) and (ii)*, pursuant to wiring instructions provided by the Payee to Debtor in writing. On the last day of each calendar month, commencing with the month ended October 31, 2006, and continuing on the last day of each month thereafter, all payments received by the Payee during such calendar month pursuant to this *clause (c)*, shall be aggregated and applied as if a single payment was received by the Payee as of the 15th day of the month (for interest accrual purposes) as follows: first, to any remaining Closing Fee, second, to any accrued but unpaid interest arising under this Note, and third, to the outstanding principal balance of this Note. All direct payments to the Payee transmitted from the various title companies shall be treated as a distribution of capital by Royce Holdings, L.P. to the Debtor and as a payment by the Debtor to the Payee of Closing Fee, principal and interest due hereunder.

(e) Any outstanding Closing Fee, principal and accrued but unpaid interest shall be due and payable on June 30, 2010.

(f) Notwithstanding any provision hereof to the contrary, any payment of Closing Fee, interest or principal otherwise payable hereunder (other than any payment due and payable at final maturity) may be deferred for a period not exceeding four months at the option of Debtor to the extent, at the time such payment is due, if under the subordination provisions of this Note or any note, indenture, loan agreement or other similar arrangement or agreement to which any Royce Entity is a party (i) the Debtor is prohibited from making payments under this Note, (ii) any Royce Entity is prohibited from making dividends and other distributions, or (iii) there is an event of default under any of this Note or any note, indenture, loan agreement or other similar arrangement or agreement to which any Royce Entity is a party.

5.      CREDIT DOCUMENTS.

(a) This Note is executed and delivered by the Debtor under and in accordance with that certain Interest Purchase Agreement dated September 20, 2006 (the "*Purchase Agreement*") among the Debtor, Mr. Manners, DWM and Saracen, providing for, among other things, the purchase and sale of (i) a 50.58% equity interest as a limited partner in Royce Holdings, L.P, a Delaware limited partnership, (ii) 50% of the issued and outstanding shares of RTI Reinsurance, Inc., and (iii) a 40% equity interest as a limited partner in Hammersmith Financial, L.P.  Unless otherwise defined herein, capitalized terms are used as defined in the Purchase Agreement. All direct and indirect ownership interests held by the Purchased Entities, the Contributed Entities, and their respective direct and indirect subsidiaries, are collectively referred to as the "*Royce Entities.*"

(b) This Note is secured by that certain Pledge Agreement of even date herewith from the Debtor, as pledgor, to the Payee, as pledgee, pursuant to which the Debtor pledged to the Payee, among other collateral therein described, a second lien and subordinated security interest in the "Collateral" defined in such Pledge Agreement (the "*Pledge Agreement*"), which has been executed and delivered to the Payee. The Holder is entitled to all benefits and security provided for or referred to in the Pledge Agreement, to which reference is hereby made for a statement of the terms hereof.

6.   SUBORDINATION.

(a) The Debtor's obligations with respect to the principal of and interest on this Note shall be subordinate and junior in right of payment, to the extent and in the manner set forth herein, to any indebtedness of the Debtor with respect to "Senior Debt," whether now existing or hereafter incurred.  The term "*Senior Debt*" shall mean at any time any and all obligations of the Debtor or any entity of which the Debtor owns, directly or indirectly, a majority equity interest at such time with respect to any principal, interest (including interest accruing on or after the filing of any bankruptcy case or any case for reorganization relating to the Debtor or any such subsidiary, whether post-petition interest is allowed in any such case), premium, penalties, fees, indemnifications, reimbursements and other amounts owed with respect to any Indebtedness of the Debtor or any such subsidiary unless such indebtedness expressly provides that such Indebtedness is *pari pasu* or subordinate in right of payment to this Note.  The term "*Indebtedness*" shall mean with respect to any specified Person, any indebtedness of such Person, whether or not contingent, in respect of: (i) borrowed money; (ii) evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof); (iii) banker's acceptances; (iv) any obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with generally accepted accounting principles; (v) the balance deferred and unpaid of the purchase price of any property, except any such balance that constitutes an accrued expense or trade payable; (vi) any obligations of such Person under: (x) interest rate swap agreements, interest rate cap agreements and interest rate collar agreements and (y) other agreements or arrangements designed to protect such Person against fluctuations in commodity prices, interest rates or the value of foreign currencies purchased or received by the such Person; (vii) obligations of special purpose entities formed to borrow money that are secured or financed by accounts receivable of such Person or any of its majority owned subsidiaries; (viii) all Indebtedness of others secured by a mortgage, lien or security interest on any asset of the specified Person (whether such Indebtedness is assumed by the specified Person); and (ix) to the extent not otherwise included, the guarantee by

such Person of any Indebtedness of any other Person.  The term "*Person*" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

(b) No payment of principal or interest on this Note shall be made at any time (i) when a default or event of default (however defined) has occurred and is continuing under the terms of any Senior Debt (or if such a payment of principal or interest would result in such a default or event of default), and (ii) when a payment or distribution to the Debtor by one of its Controlled Entities is not permitted under the terms of any Senior Debt.  If, notwithstanding the foregoing provisions of this *Section 6(b)*, any such payment is made, then the Holder of this Note will hold the same in trust and pay it over to the holders of the Senior Debt.

(c) In the event of any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization, arrangement, readjustment, composition or similar proceedings in connection therewith, relative to the Debtor or to its creditors, as such, or to its property, or in the event of any proceedings for voluntary liquidation, dissolution or other winding-up of the Debtor, whether or not involving insolvency or bankruptcy, or in the event of any assignment by the Debtor for the benefit of creditors or in the event of any other marshaling of the Debtor's assets, then the holders of Senior Debt shall be entitled to receive payment in full, in cash of all principal, premium, interest, fees and charges on all Senior Debt (including interest thereon accruing after the commencement of any such proceedings) before the Holder of this Note  is entitled to receive any payment on account of principal or interest upon this Note, and to that end the holders of Senior Debt shall be entitled to receive for application in payment thereof any payment or distribution of any kind or character, whether in cash or property or securities, which may be payable or deliverable in any such proceedings in respect of this Note.

(d) Notwithstanding the occurrence of a Default (as defined below) under circumstances when the provisions of the foregoing paragraphs (b) or (c) are inapplicable, the holders of the Senior Debt outstanding at any time during the existence of a Default shall be entitled to receive payment in full of all principal of, and premium, interest, fees and charges on, all Senior Debt before the Holder of this Note  is entitled to receive any payment on account of the principal of, or the interest on, this Note.

(e) No present or future holder of Senior Debt shall be prejudiced in his right to enforce the subordination of this Note by any act or failure to act on the part of the Debtor.  The subordination of this Note, and the rights of the holders of Senior Debt with respect thereto, shall not be affected by any amendment or other modification of any Senior Debt or any exercise or nonexercise of any right, power or remedy with respect thereto.

(f) The holders of Senior Debt may, at any time, in their discretion, renew or extend the time of payment of Senior Debt so held or exercise any of their rights under the Senior Debt, including, without limitation, the waiver of defaults thereunder and the amendment of any of the terms or provisions thereof (or any notice evidencing or creating the same), all without notice to or assent from the Holder of this Note.   No compromise, alteration, amendment, modification, extension, renewal or other change of, or waiver, consent or other action with respect to any liability or obligation under or with respect to, any terms, covenants or

conditions of the Senior Debt (or any instrument evidencing or creating the same) and no release of property subject to the lien of the Senior Debt (or any instrument evidencing or creating the same), whether or not such release is in accordance with the provisions of the Senior Debt (or any instrument evidencing or creating the same) shall in any way alter or affect any of the provisions of this Note, *provided that,* until this Note is paid in full, Debtor agrees that it may not grant liens or security interests in any of the "Collateral" as defined in the Pledge Agreement, other than such liens, security interests or encumbrances that constitute Permitted Liens. The term *"Permitted Liens"* means (i) any lien, encumbrance, pledge, assignment, or security interest granted by Debtor to secure Senior Debt up to the principal amount of $20,000,000 at any time outstanding, whether such Senior Debt is incurred pursuant to that certain Loan Agreement dated September 20, 2006, between Debtor, as borrower, and Amegy Bank National Association, as lender, as amended, restated, refinanced, renewed, or replaced from time to time or otherwise, (ii) restrictions upon the transfer of Collateral pursuant to applicable state or federal securities laws, or (iii) restrictions upon the transfer of Collateral pursuant to the terms of the organizational documents of the Purchased Entities.

    (g) Restrictions on Holder of this Note.

        (i)    The terms of this Note shall not be modified in any manner adverse to the holders of Senior Debt then outstanding without the prior written consent of the holders of such Senior Debt.

        (ii)    The Holder of this Note shall not take any action against the Debtor or any collateral with respect to any Default until and unless (i) any event described in paragraph 6(c) has occurred, or (ii) a holder of Senior Debt shall have accelerated payment of any Senior Debt obligation of the Debtor, or (iii) all Senior Debt shall have been paid in full, in cash.

        (iii)    The Holder of this Note shall provide to the Debtor, at any time and from time to time, at the Debtor's written request and at no expense to the Holder, a written acknowledgment by the Holder addressed to any Person which is a holder of Senior Debt to the effect that such Person is a holder of Senior Debt, provided that prior to furnishing such acknowledgment, the Holder shall have received from the Debtor such information as the Holder shall reasonably request demonstrating to the Holder reasonable satisfaction that such Person is a holder of Senior Debt.

    7.    <u>PREPAYMENT PRIVILEGE AND PREPAYMENT REQUIREMENT</u>. The Debtor may prepay all or any part of the principal sum hereof at any time, and from time to time, upon not less than five (5) days prior written notice of such prepayment, without payment of any penalty or premium on account of such prepayment, all such prepayments to be applied first to the interest then due and then to the outstanding principal balance of this Note.

    8.    <u>DEFAULT</u>. The entire unpaid principal amount of, and all accrued interest on, this Note shall immediately become due and payable at the option of the Holder hereof upon the occurrence of any one or more of the following events of default (individually or collectively, herein called a *"Default"*):

(a) The failure or refusal of the Debtor to pay all or any part of the principal amount of, or accrued interest on, this Note as and when same becomes due and payable in accordance with the terms hereof and such failure remains uncured for a period of four consecutive months after written notice from the Holder; or

(b) The breach or nonperformance by the Debtor of any other term or provision contained in this Note (other than for payment of principal and interest when due) or the Pledge Agreement and such breach or nonperformance remains uncured for a period of four consecutive months after written notice from the Holder; or

(c) The breach or nonperformance by the Debtor or any other party (other than the Payee) of any of the terms or provisions of the Pledge Agreement, or any event occurs or condition exists which is specified as a default or an event of default thereunder, which is not cured within the applicable cure period, if any, set forth therein; or

(d) The Debtor shall (i) become insolvent within the meaning of the Bankruptcy Code of the United States, as amended, (ii) admit in writing its inability to pay or otherwise fail to pay its debts generally as they become due, (iii) voluntarily seek, consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law, or (iv) be made the subject of any proceeding provided for by any Debtor Relief Law that could suspend or otherwise affect any of the rights of the Holder hereof. As used herein, *"Debtor Relief Law"* means any provision of the Bankruptcy Code of the United States, as amended and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief law from time to time in effect affecting the rights of creditors generally.

Subject to the restrictions contained in *Section 6(g)* hereof, upon the occurrence of a Default, the Holder of this Note, without further notice or demand of any kind, may (i) declare the entire portion of the unpaid principal amount of, plus accrued interest and other sums due on, this Note immediately due and payable, (ii) exercise its rights and remedies under the Pledge Agreement; and (iii) proceed to protect and enforce its rights either by suit in equity and/or by action at law, or by other appropriate proceedings, whether for the specific performance of any covenant or agreement contained in this Note or the Pledge Agreement or any other document or instrument executed and delivered by the Debtor in connection with this Note.

9.     COST OF ENFORCEMENT AND DEFENSE. In the event that (a) proceedings at law, in equity or bankruptcy, receivership or other legal proceedings are instituted or threatened in connection herewith, or (b) the Holder is made a party to or is threatened with being made a party to any such proceedings, or (c) this Note is placed in the hands of an attorney for collection or upon Default hereunder or under any other document or instrument given as security for, or related to, the indebtedness evidenced hereby, then in any such event the Debtor hereby agrees to pay all reasonable out-of-pocket costs of collection and/or attempting to collect this Note, and/or defending the rights of the Holder in any such proceedings or threatened proceedings and/or protecting or enforcing such rights, including, without limitation, reasonable attorneys' fees (whether or not suit is brought), in addition to all principal, interest and other amounts payable hereunder.

10.    NOTICES.  All notices or other communications hereunder shall be sufficiently given and shall be deemed given when given in accordance with Section 9.6 of the Purchase Agreement to Debtor, at the address for the "Buyer" specified in the Purchase Agreement, and to Payee, at the address for "Sellers" specified in the Purchase Agreement.

11.    WAIVERS.  Except as expressly provided in *Section 8* hereof, the Debtor expressly waives presentment for payment, notice of nonpayment, protest, notice of protest, bringing of suit, and diligence in taking any action to collect amounts owing hereunder, shall be liable for the full amount of all sums owing and to be owing herein, and agrees that this Note, or any payment hereunder, may be extended from time to time without affecting such liability.

12.    CUMULATIVE REMEDIES.  Subject to the provisions of *Section 6* hereof, the remedies of the Holder, as provided herein, in the Pledge Agreement, or in any other instrument securing this Note, shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall arise.  No act of omission or commission by the Holder, including specifically any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same, such waiver or release to be affected only through a written document executed by the Holder and then only to the extent specifically recited therein.  A waiver or release with reference to any one event shall not be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse as to a subsequent event.

13.    SEVERABILITY.  Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

14.    CONFLICTS.  In the event of a conflict of any of the terms and provisions of this Note with the terms and provisions of any other instrument or agreement given to evidence or secure the indebtedness evidenced by this Note, and the terms and provisions of this Note shall prevail.

15.    GENERAL.

(a)  This Note shall be governed by and construed in accordance with the laws of the State of Texas.

(b)  Time is of the essence of this Note and each of the provisions hereof.

(c)  The captions to the Sections of this Note are for convenience only and shall not be deemed part of the text of the respective sections and shall not vary, by implication or otherwise, the provisions of this Note.

[Signature page follows.]

EXHIBIT B

## PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT ("*Agreement*") is made effective as of the ____ day of September 2006, by and among John Hopkins Speer ("*Pledgor*"), and Michael G. Manners ("*Mr. Manners*"), DWM Holdings, L.P., a Delaware limited partnership and successor to DWM Holdings, Inc. ("*DWM*"), and Saracen Holdings, L.P., a Delaware limited partnership and successor to Saracen Holdings, Inc. ("*Saracen*"). The term "*Pledgee*" means Mr. Manners in his capacity as trustee and collateral agent for the benefit of himself, DWM and Saracen (each a "*Seller*" and collectively, "*Sellers*"). Unless otherwise defined herein, capitalized terms used in this Agreement are used as defined in the Purchase Agreement (defined below).

## W I T N E S S E T H:

WHEREAS, the Pledgor and Sellers are parties to that certain Interest Purchase Agreement dated effective as of September 20, 2006 (the "*Purchase Agreement*"), pursuant to which, among other things, the Pledgor agreed to purchase from Sellers, all of their respective ownership interests in Royce Holdings, L.P., RTI Reinsurance, Inc., and Hammersmith Financial, L.P., in exchange for the issuance by the Pledgor of its Subordinated Non-Negotiable Secured Promissory Note of even date herewith in the aggregate principal amount of $13,342,405 (the "*Note*");

WHEREAS, pursuant to the terms of the Interest Purchase Agreement, and to secure the obligations of the Pledgor to make payment of the Note, the Pledgor agreed to enter into this Agreement, and to pledge to the Pledgee, for the benefit of Sellers, the interest acquired by the Pledgor from Sellers as security for the repayment of the Note, as more particularly described on *Exhibit A* (collectively, the "*Interest*");

WHEREAS, concurrent with the execution of this Agreement, Pledgor, as borrower, is entering into (i) that certain Loan Agreement dated of even date herewith with Amegy Bank, N.A., as lender and (ii) that certain Security Agreement, Pledge and Collateral Agreement executed by Pledgor in favor of Amegy Bank, N.A. dated of even date herewith;

WHEREAS, pursuant to the terms and conditions of the Amegy Pledge Agreement, Pledgor has granted a prior lien and security interest in favor of Amegy Bank, N.A., and its permitted successors and assigns ("*Amegy Bank*"), in all of Pledgor's right, title and interest in the Interest and other collateral specified therein; and

WHEREAS, this Agreement and the rights and interests granted herein are subject in all respects to the terms of that certain Intercreditor Agreement dated of even date herewith among Pledgor, Sellers, and Amegy Bank (as the same may be amended or modified from time to time).

NOW, THEREFORE, in consideration of the premises, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the Pledgor, Pledgee and Sellers agree as follows:

1.      Pledge.  As security for the Obligations (as hereinafter defined), the Pledgor hereby pledges and grants to the Pledgee a security interest in the Interest (the "*Collateral*") for the benefit of Sellers.

2.      <u>Obligations</u>.  The obligations secured by this Agreement are the following:

A.      All agreements, covenants, liabilities and obligations of the Pledgor under the terms of the Note.

B.      All agreements, covenants, liabilities and obligations of the Pledgor under the Interest Purchase Agreement, this Agreement or the Note.

C.      All reasonable out-of-pocket expenses incurred by the Pledgee in the preservation of any of the Collateral, including, without limitation, any sum or sums advanced by the Pledgee in order to preserve the Collateral.

D.      In the event of any proceeding to enforce the collection of the Obligations (as hereinafter defined), or any of them, after an Event of Default (as hereinafter defined), the reasonable out-of-pocket expenses of collecting or enforcing payment of the Obligations or of retaking, holding, preparing for sale, selling or otherwise disposing of any or all of the Collateral upon exercise by the Pledgee of its rights hereunder, including reasonable attorneys' fees and court costs related to any of the foregoing.

All of the indebtedness, obligations and liabilities referred to in subparagraphs A through D above are hereinafter sometimes collectively referred to as the "*Obligations*."

3.      <u>Representations, Warranties and Agreements</u>.  The Pledgor represents and warrants to, and agrees as follows:

A.      The Pledgor is the sole owner of the Collateral, and all rights thereto, and there are no restrictions upon the transfer of the Collateral, other than Permitted Liens.  The term "*Permitted Liens*" is used herein as defined in the Note.  The Pledgor has the right to transfer the Collateral in accordance with the terms of this Agreement, free of any encumbrances, except Permitted Liens.

B.      Subject to Permitted Liens, the Pledgor is the owner of the Collateral free and clear of any lien, security interest, encumbrance or claim of any kind other than the security interest granted herein.  Subject to Permitted Liens, the Pledgor will at all times defend the Collateral against any and all claims of any person adverse to the claim of the Pledgee.

C.      The Pledgor has the full power and authority to enter into this Agreement, and this Agreement has been duly executed and delivered by the Pledgor.

D.      The Pledgor will not hereafter suffer or allow any lien, security interest, encumbrance or claim to arise against or with respect to the Collateral in favor of any other person, other than Permitted Liens.

E.      The Pledgor will take such action and execute such documents as the Pledgee may from time to time request to maintain a perfected security interest on the part of the Pledgee in the Collateral (free of all other liens, security interests, encumbrances or claims whatsoever, other than the Permitted Liens) to secure payment of the Obligations.

F.      In the event that the Pledgor shall fail to keep the Collateral or any part thereof free from other liens, security interests, encumbrances or claims (other than Permitted Liens), the Pledgee may make such expenditures for such purposes and the amount so expended shall be and become immediately due and payable by the Pledgor to the Pledgee and shall have the benefit of and be secured by the security interest herein granted.

4.      Rights of Pledgor.  Unless and until an Event of Default (as hereinafter defined) has occurred and is continuing:

A.      The Pledgor shall be entitled to exercise all voting and/or consensual powers pertaining to the Interest or any part thereof, for all purposes not inconsistent with the terms of this Agreement; and

B.      The Pledgor shall be entitled to receive and retain all distributions paid with respect to the Interest.

5.      Events of Default.  The occurrence of a "Default" as defined in the Note shall constitute and be defined as an *"Event of Default"* hereunder.

6.      Rights of Parties upon Default.  Upon the occurrence of an Event of Default hereunder, all Obligations or any one or more of the Obligations as the Pledgee may determine shall, at the election of the Pledgee, become immediately due and payable, without further notice to the Pledgor, and all rights of the Pledgor in respect of the Collateral, including all rights of the Pledgor under the terms of paragraph 4 hereof, shall, subject to Permitted Liens, immediately vest in the Pledgee.  In addition to having all the rights and remedies provided under other provisions hereof or provided in Article 9 of the Uniform Commercial Code of the State of Texas and any other applicable law, the Pledgee may, subject to the rights of any secured party that has a Permitted Lien, sell the Collateral in such manner and for such price as the Pledgee deems appropriate without any liability for any loss due to decrease in the market value of the Collateral during the period held.  At any bona fide public sale, the Pledgor or the Pledgee shall be free to purchase all or any part of the Collateral.  Out of the proceeds of any sale or disposition of the Collateral to which Pledgee is entitled, the Pledgee may retain an amount equal to all outstanding Obligations, plus the amount of the expenses of the sale, and shall pay any balance of such proceeds to the Pledgor.  In the event that the proceeds of any sale are insufficient to cover the Obligations plus the expenses of the sale, the Pledgor shall remain liable to the Pledgee for any deficiency.

7.      Notice.  All notices, certificates or other communications hereunder shall be sufficiently given and shall be deemed given when given in accordance with Section 9.6 of the Purchase Agreement.

8.      Waiver.  A waiver by the Pledgee of any Event of Default hereunder, or of any breach of the provisions of this Agreement by the Pledgor, shall not constitute a waiver of any other Event of Default or breach, nor of the same Event of Default or breach on a future occasion.  No delay or omission on the part of the Pledgee in the exercise of any right or remedy, nor shall the exercise of any right or remedy preclude later or further exercise thereof.  All rights or remedies of the Pledgee on account of the Collateral or on account of any of the Obligations,

whether arising under this Agreement or otherwise, shall be cumulative and nonexclusive of each other, and may be exercised by the Pledgee at such times and in such order as the Pledgee may determine.

The Pledgor hereby waives presentment, demand, diligence, protest and notice of dishonor and protest and any other notice with respect to any and all of the Obligations and waives acceptance of this Agreement by the Pledgee and consents to and agrees that its obligations hereunder and the Pledgee's rights hereunder shall not be affected by one or more extensions or renewals or modifications of any of the Obligations or the exercise of any and all rights, powers, options, privileges and authorities granted to the Pledgee by law or by the terms of any instruments evidencing the Obligations or otherwise, or the release, substitution and resubstitution of any Collateral for the payment of the Obligations. The Pledgee may exercise its rights with respect to any of the Collateral without resorting or regard to any other Collateral or sources of payment of the Obligations. No waiver or modification or amendment of the terms of this Agreement shall be effective as against the Pledgee unless the same is in writing and signed by the Pledgee.

9. <u>Law Governing</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

10. <u>Duration</u>. This Agreement shall remain and continue in effect as long as there is any unpaid principal amount of the Note. Thereafter, the Pledgee shall transfer to the Pledgor all of Pledgee's or any Seller's interest in the Collateral then remaining and shall immediately execute any release documents reasonably requested by the Pledgor.

11. <u>General</u>. This Agreement may not be amended or changed except in writing signed by the Pledgor and the Pledgee. This Agreement shall be binding upon the Pledgor and its successors and permitted assigns and shall inure to the benefit of the Pledgee and its heirs, personal representatives, successors and permitted assigns, including each and every subsequent holder of the Obligations. This Agreement shall not be assigned by any party hereto without the prior written consent of the others.

12. <u>Financial Statements</u>. So long as the Note is unpaid and outstanding, Pledgor shall promptly, after preparation, provide Mr. Manners with copies of the monthly summary income statement and balance sheet for Royce Operating, LP, a Delaware limited partnership. Mr Manners covenants and agrees to keep all such information regarding Pledgor, the Collateral, and any direct and indirect subsidiaries of Royce Operating, LP confidential, unless required to be disclosed by law.

13. <u>Possession of Collateral</u>. Pledgee is entitled to possession of the Collateral at any time the Note is unpaid and outstanding and such Collateral is not pledged to a senior lender pursuant to Section 6(f) of the Note, and at all other times the parties agree that such Collateral will be held in the possession of the senior lender.

*[Signature Page Follows]*

EXHIBIT A

INTERESTS

All of Pledgor's right, title and interest to:

a)      a 50.58% equity interest as a limited partner of Royce Holdings, LP, a Delaware limited partnership; and

b)      a 40% equity interest as a limited partner of Hammersmith Financial, L.P., a Delaware limited partnership.