# APPENDIX 5

## Exhibit "C"
## The Manners Note



THIS NOTE IS NON-NEGOTIABLE

<u>SUBORDINATED NON-NEGOTIABLE SECURED PROMISSORY NOTE</u>

$13,342,405.00               Houston, Texas               September 20, 2006

1. AGREEMENT TO PAY. FOR VALUE RECEIVED, the undersigned, JOHN HOPKINS SPEER, an individual residing in Harris County, Texas (hereinafter referred to as the "*Debtor*"), promises to pay to the order of MICHAEL G. MANNERS, in his capacity as trustee and agent (in such capacity "*Payee*," and the Payee and each successive permitted owner and holder of this Note from time to time being referred to generally as the "*Holder*") for the benefit of himself (individually, "*Mr. Manners*"), DWM HOLDINGS, L.P., a Delaware limited partnership and successor in interest to DWM Holdings, Inc. ("*DWM*"), and SARACEN HOLDINGS, L.P., a Delaware limited partnership and successor to Saracen Holdings Inc. ("*Saracen*"), the principal sum of THIRTEEN MILLION THREE HUNDRED FORTY-TWO THOUSAND FOUR HUNDRED FIVE AND NO/100 DOLLARS ($13,342,405), together with simple annual interest on the principal balance from time to time remaining unpaid hereon, computed daily on the basis of a year of 365 or 366 (as applicable) days for the actual number of days elapsed, at the Effective Rate of Interest in effect from time to time, or, if applicable, at the Default Rate of Interest hereinafter provided. All payments of principal and interest on this Note shall be made to the Payee at 211 Highland Cross Drive, Suite 101, Houston, Texas 77073-1700, or at such other place or places as the Payee hereof may direct to Debtor in writing. This Note is non-negotiable.

2. INTEREST RATE PRIOR TO DEFAULT. Outstanding principal balances hereof prior to Default shall bear interest at a daily rate equal to eight percent (8.0%) simple annual interest using a 365 or 366 (as applicable) day year (herein called "*Effective Rate of Interest*").

3. DEFAULT RATE. In the event that there shall occur any Default hereunder, or the maturity of the indebtedness evidenced hereby, whether by passage of time, acceleration, declaration or otherwise, then, in any such event, until the Default is cured, or the indebtedness evidenced hereby is paid or satisfied in full, the entire unpaid principal amount hereof shall bear interest at the rate which is equal to the Effective Rate of Interest *plus* four percent (4.0%) simple annual interest (the "*Default Rate of Interest*").

4. PAYMENTS OF CLOSING FEE, PRINCIPAL AND INTEREST. Principal and interest on this Note, together with the Closing Fee, shall be paid by the Debtor to Payee as follows:

(a) Interest shall begin accruing on this Note on September 20, 2006 and continuing until all amounts are due under this Note are paid in full, all at the Effective Rate of Interest (unless the Default Rate of Interest is in effect).



947313_5.DOC
10/1/2009               DJ Production





(b) Debtor shall pay to the Payee, a one-time closing and administrative fee in the amount of $236,873 (the "*Closing Fee*"), which fee shall accrue on the date of this Note, and is payable pursuant to *Sections 4(c) and 4(d)* hereof.

(c) On October 2, 2006, the Debtor shall make a single payment to the Payee equal to the sum of (i) $1,500 per lot acquired for which home construction is started by the Royce Entities (defined below) after June 30, 2006 and on or before September 30, 2006, and (ii) $1,500 per home for which construction was started after June 30, 2006 and for which closing and transfer of title to such home by the Royce Entities to a customer occurs on or before September 30, 2006. Such payment will be applied on October 2, 2006, first, to the Closing Fee, second, to any accrued but unpaid interest, and third, to the outstanding principal balance of this Note.

(d) Commencing as of October 1, 2006 and continuing until all amounts due under this Note are paid in full, the Debtor shall make payments to the Payee equal to the sum of (i) $1,500 per lot acquired for which home construction is started by the Royce Entities (defined below) on or after October 1, 2006, and (ii) $1,500 per home for which construction was started after June 30, 2006 and for which closing and transfer of title to such home by the Royce Entities to a customer occurs on or after October 1, 2006. Commencing October 1, 2006, the Debtor shall cause the Royce Entities to instruct all title companies to pay such $1,500 amount directly to the Payee at the closing of each lot or home described in preceding *clauses (i) and (ii)*, pursuant to wiring instructions provided by the Payee to Debtor in writing. On the last day of each calendar month, commencing with the month ended October 31, 2006, and continuing on the last day of each month thereafter, all payments received by the Payee during such calendar month pursuant to this *clause (c)*, shall be aggregated and applied as if a single payment was received by the Payee as of the 15th day of the month (for interest accrual purposes) as follows: first, to any remaining Closing Fee, second, to any accrued but unpaid interest arising under this Note, and third, to the outstanding principal balance of this Note. All direct payments to the Payee transmitted from the various title companies shall be treated as a distribution of capital by Royce Holdings, L.P. to the Debtor and as a payment by the Debtor to the Payee of Closing Fee, principal and interest due hereunder.

(e) Any outstanding Closing Fee, principal and accrued but unpaid interest shall be due and payable on June 30, 2010.

(f) Notwithstanding any provision hereof to the contrary, any payment of Closing Fee, interest or principal otherwise payable hereunder (other than any payment due and payable at final maturity) may be deferred for a period not exceeding four months at the option of Debtor to the extent, at the time such payment is due, if under the subordination provisions of this Note or any note, indenture, loan agreement or other similar arrangement or agreement to which any Royce Entity is a party (i) the Debtor is prohibited from making payments under this Note, (ii) any Royce Entity is prohibited from making dividends and other distributions, or (iii) there is an event of default under any of this Note or any note, indenture, loan agreement or other similar arrangement or agreement to which any Royce Entity is a party.

5. <u>CREDIT DOCUMENTS</u>.

**Exhibit 89 Page 2**



(a) This Note is executed and delivered by the Debtor under and in accordance with that certain Interest Purchase Agreement dated September 20, 2006 (the *"Purchase Agreement"*) among the Debtor, Mr. Manners, DWM and Saracen, providing for, among other things, the purchase and sale of (i) a 50.58% equity interest as a limited partner in Royce Holdings, L.P, a Delaware limited partnership, (ii) 50% of the issued and outstanding shares of RTI Reinsurance, Inc., and (iii) a 40% equity interest as a limited partner in Hammersmith Financial, L.P. Unless otherwise defined herein, capitalized terms are used as defined in the Purchase Agreement. All direct and indirect ownership interests held by the Purchased Entities, the Contributed Entities, and their respective direct and indirect subsidiaries, are collectively referred to as the *"Royce Entities."*

(b) This Note is secured by that certain Pledge Agreement of even date herewith from the Debtor, as pledgor, to the Payee, as pledgee, pursuant to which the Debtor pledged to the Payee, among other collateral therein described, a second lien and subordinated security interest in the "Collateral" defined in such Pledge Agreement (the *"Pledge Agreement"*), which has been executed and delivered to the Payee. The Holder is entitled to all benefits and security provided for or referred to in the Pledge Agreement, to which reference is hereby made for a statement of the terms hereof.

6. SUBORDINATION.

(a) The Debtor's obligations with respect to the principal of and interest on this Note shall be subordinate and junior in right of payment, to the extent and in the manner set forth herein, to any indebtedness of the Debtor with respect to "Senior Debt," whether now existing or hereafter incurred. The term *"Senior Debt"* shall mean at any time any and all obligations of the Debtor or any entity of which the Debtor owns, directly or indirectly, a majority equity interest at such time with respect to any principal, interest (including interest accruing on or after the filing of any bankruptcy case or any case for reorganization relating to the Debtor or any such subsidiary, whether post-petition interest is allowed in any such case), premium, penalties, fees, indemnifications, reimbursements and other amounts owed with respect to any Indebtedness of the Debtor or any such subsidiary unless such indebtedness expressly provides that such Indebtedness is *pari pasu* or subordinate in right of payment to this Note. The term *"Indebtedness"* shall mean with respect to any specified Person, any indebtedness of such Person, whether or not contingent, in respect of: (i) borrowed money; (ii) evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof); (iii) banker's acceptances; (iv) any obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with generally accepted accounting principles; (v) the balance deferred and unpaid of the purchase price of any property, except any such balance that constitutes an accrued expense or trade payable; (vi) any obligations of such Person under: (x) interest rate swap agreements, interest rate cap agreements and interest rate collar agreements and (y) other agreements or arrangements designed to protect such Person against fluctuations in commodity prices, interest rates or the value of foreign currencies purchased or received by the such Person; (vii) obligations of special purpose entities formed to borrow money that are secured or financed by accounts receivable of such Person or any of its majority owned subsidiaries; (viii) all Indebtedness of others secured by a mortgage, lien or security interest on any asset of the specified Person (whether such Indebtedness is assumed by the specified Person); and (ix) to the extent not otherwise included, the guarantee by






such Person of any Indebtedness of any other Person. The term *"Person"* shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

(b) No payment of principal or interest on this Note shall be made at any time (i) when a default or event of default (however defined) has occurred and is continuing under the terms of any Senior Debt (or if such a payment of principal or interest would result in such a default or event of default), and (ii) when a payment or distribution to the Debtor by one of its Controlled Entities is not permitted under the terms of any Senior Debt. If, notwithstanding the foregoing provisions of this *Section 6(b)*, any such payment is made, then the Holder of this Note will hold the same in trust and pay it over to the holders of the Senior Debt.

(c) In the event of any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization, arrangement, readjustment, composition or similar proceedings in connection therewith, relative to the Debtor or to its creditors, as such, or to its property, or in the event of any proceedings for voluntary liquidation, dissolution or other winding-up of the Debtor, whether or not involving insolvency or bankruptcy, or in the event of any assignment by the Debtor for the benefit of creditors or in the event of any other marshaling of the Debtor's assets, then the holders of Senior Debt shall be entitled to receive payment in full, in cash of all principal, premium, interest, fees and charges on all Senior Debt (including interest thereon accruing after the commencement of any such proceedings) before the Holder of this Note is entitled to receive any payment on account of principal or interest upon this Note, and to that end the holders of Senior Debt shall be entitled to receive for application in payment thereof any payment or distribution of any kind or character, whether in cash or property or securities, which may be payable or deliverable in any such proceedings in respect of this Note.

(d) Notwithstanding the occurrence of a Default (as defined below) under circumstances when the provisions of the foregoing paragraphs (b) or (c) are inapplicable, the holders of the Senior Debt outstanding at any time during the existence of a Default shall be entitled to receive payment in full of all principal of, and premium, interest, fees and charges on, all Senior Debt before the Holder of this Note is entitled to receive any payment on account of the principal of, or the interest on, this Note.

(e) No present or future holder of Senior Debt shall be prejudiced in his right to enforce the subordination of this Note by any act or failure to act on the part of the Debtor. The subordination of this Note, and the rights of the holders of Senior Debt with respect thereto, shall not be affected by any amendment or other modification of any Senior Debt or any exercise or nonexercise of any right, power or remedy with respect thereto.

(f) The holders of Senior Debt may, at any time, in their discretion, renew or extend the time of payment of Senior Debt so held or exercise any of their rights under the Senior Debt, including, without limitation, the waiver of defaults thereunder and the amendment of any of the terms or provisions thereof (or any notice evidencing or creating the same), all without notice to or assent from the Holder of this Note. No compromise, alteration, amendment, modification, extension, renewal or other change of, or waiver, consent or other action with respect to any liability or obligation under or with respect to, any terms, covenants or



**Exhibit 89 Page 4**

conditions of the Senior Debt (or any instrument evidencing or creating the same) and no release of property subject to the lien of the Senior Debt (or any instrument evidencing or creating the same), whether or not such release is in accordance with the provisions of the Senior Debt (or any instrument evidencing or creating the same) shall in any way alter or affect any of the provisions of this Note, *provided that*, until this Note is paid in full, Debtor agrees that it may not grant liens or security interests in any of the "Collateral" as defined in the Pledge Agreement, other than such liens, security interests or encumbrances that constitute Permitted Liens. The term *"Permitted Liens"* means (i) any lien, encumbrance, pledge, assignment, or security interest granted by Debtor to secure Senior Debt up to the principal amount of $20,000,000 at any time outstanding, whether such Senior Debt is incurred pursuant to that certain Loan Agreement dated September 20, 2006, between Debtor, as borrower, and Amegy Bank National Association, as lender, as amended, restated, refinanced, renewed, or replaced from time to time or otherwise, (ii) restrictions upon the transfer of Collateral pursuant to applicable state or federal securities laws, or (iii) restrictions upon the transfer of Collateral pursuant to the terms of the organizational documents of the Purchased Entities.

(g) Restrictions on Holder of this Note.

(i) The terms of this Note shall not be modified in any manner adverse to the holders of Senior Debt then outstanding without the prior written consent of the holders of such Senior Debt.

(ii) The Holder of this Note shall not take any action against the Debtor or any collateral with respect to any Default until and unless (i) any event described in paragraph 6(c) has occurred, or (ii) a holder of Senior Debt shall have accelerated payment of any Senior Debt obligation of the Debtor, or (iii) all Senior Debt shall have been paid in full, in cash.

(iii) The Holder of this Note shall provide to the Debtor, at any time and from time to time, at the Debtor's written request and at no expense to the Holder, a written acknowledgment by the Holder addressed to any Person which is a holder of Senior Debt to the effect that such Person is a holder of Senior Debt, provided that prior to furnishing such acknowledgment, the Holder shall have received from the Debtor such information as the Holder shall reasonably request demonstrating to the Holder reasonable satisfaction that such Person is a holder of Senior Debt.

7. PREPAYMENT PRIVILEGE AND PREPAYMENT REQUIREMENT. The Debtor may prepay all or any part of the principal sum hereof at any time, and from time to time, upon not less than five (5) days prior written notice of such prepayment, without payment of any penalty or premium on account of such prepayment, all such prepayments to be applied first to the interest then due and then to the outstanding principal balance of this Note.

8. DEFAULT. The entire unpaid principal amount of, and all accrued interest on, this Note shall immediately become due and payable at the option of the Holder hereof upon the occurrence of any one or more of the following events of default (individually or collectively, herein called a *"Default"*):

**Exhibit 89 Page 5**



(a) The failure or refusal of the Debtor to pay all or any part of the principal amount of, or accrued interest on, this Note as and when same becomes due and payable in accordance with the terms hereof and such failure remains uncured for a period of four consecutive months after written notice from the Holder; or

(b) The breach or nonperformance by the Debtor of any other term or provision contained in this Note (other than for payment of principal and interest when due) or the Pledge Agreement and such breach or nonperformance remains uncured for a period of four consecutive months after written notice from the Holder; or

(c) The breach or nonperformance by the Debtor or any other party (other than the Payee) of any of the terms or provisions of the Pledge Agreement, or any event occurs or condition exists which is specified as a default or an event of default thereunder, which is not cured within the applicable cure period, if any, set forth therein; or

(d) The Debtor shall (i) become insolvent within the meaning of the Bankruptcy Code of the United States, as amended, (ii) admit in writing its inability to pay or otherwise fail to pay its debts generally as they become due, (iii) voluntarily seek, consent to, or acquiesce in the benefit or benefits of any Debtor Relief Law, or (iv) be made the subject of any proceeding provided for by any Debtor Relief Law that could suspend or otherwise affect any of the rights of the Holder hereof. As used herein, *"Debtor Relief Law"* means any provision of the Bankruptcy Code of the United States, as amended and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief law from time to time in effect affecting the rights of creditors generally.

Subject to the restrictions contained in *Section 6(g)* hereof, upon the occurrence of a Default, the Holder of this Note, without further notice or demand of any kind, may (i) declare the entire portion of the unpaid principal amount of, plus accrued interest and other sums due on, this Note immediately due and payable, (ii) exercise its rights and remedies under the Pledge Agreement; and (iii) proceed to protect and enforce its rights either by suit in equity and/or by action at law, or by other appropriate proceedings, whether for the specific performance of any covenant or agreement contained in this Note or the Pledge Agreement or any other document or instrument executed and delivered by the Debtor in connection with this Note.

9. COST OF ENFORCEMENT AND DEFENSE. In the event that (a) proceedings at law, in equity or bankruptcy, receivership or other legal proceedings are instituted or threatened in connection herewith, or (b) the Holder is made a party to or is threatened with being made a party to any such proceedings, or (c) this Note is placed in the hands of an attorney for collection or upon Default hereunder or under any other document or instrument given as security for, or related to, the indebtedness evidenced hereby, then in any such event the Debtor hereby agrees to pay all reasonable out-of-pocket costs of collection and/or attempting to collect this Note, and/or defending the rights of the Holder in any such proceedings or threatened proceedings and/or protecting or enforcing such rights, including, without limitation, reasonable attorneys' fees (whether or not suit is brought), in addition to all principal, interest and other amounts payable hereunder.



**Exhibit 89 Page 6**

947313_5.DOC
10/1/2009
6
DJ Production
0008404



10. NOTICES. All notices or other communications hereunder shall be sufficiently given and shall be deemed given when given in accordance with Section 9.6 of the Purchase Agreement to Debtor, at the address for the "Buyer" specified in the Purchase Agreement, and to Payee, at the address for "Sellers" specified in the Purchase Agreement.

11. WAIVERS. Except as expressly provided in *Section 8* hereof, the Debtor expressly waives presentment for payment, notice of nonpayment, protest, notice of protest, bringing of suit, and diligence in taking any action to collect amounts owing hereunder, shall be liable for the full amount of all sums owing and to be owing herein, and agrees that this Note, or any payment hereunder, may be extended from time to time without affecting such liability.

12. CUMULATIVE REMEDIES. Subject to the provisions of *Section 6* hereof, the remedies of the Holder, as provided herein, in the Pledge Agreement, or in any other instrument securing this Note, shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall arise. No act of omission or commission by the Holder, including specifically any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same, such waiver or release to be affected only through a written document executed by the Holder and then only to the extent specifically recited therein. A waiver or release with reference to any one event shall not be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse as to a subsequent event.

13. SEVERABILITY. Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

14. CONFLICTS. In the event of a conflict of any of the terms and provisions of this Note with the terms and provisions of any other instrument or agreement given to evidence or secure the indebtedness evidenced by this Note, and the terms and provisions of this Note shall prevail.

15. GENERAL.

(a) This Note shall be governed by and construed in accordance with the laws of the State of Texas.

(b) Time is of the essence of this Note and each of the provisions hereof.

(c) The captions to the Sections of this Note are for convenience only and shall not be deemed part of the text of the respective sections and shall not vary, by implication or otherwise, the provisions of this Note.

[Signature page follows.]



Exhibit 89 Page 7

947313_5.DOC
10/1/2009

7

DJ Production

0008405

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed as of the day and year first above written.

DEBTOR:

_____
John Hopkins Speer

PAYEE:

_____
Michael G. Manners, in his capacity as trustee and agent for the benefit of himself, DWM and Saracen

SELLERS:

**DWM HOLDINGS, L.P.**
(successor in interest to DWM Holdings, Inc.)

By: DWM Holdings GP, L.L.C., its general partner

By: _____
Michael G. Manners, its sole member

**SARACEN HOLDINGS, L.P.**
(successor in interest to Saracen Holdings, Inc.)

By: Saracen Holdings GP, L.L.C., its general partner

By: _____
Michael G. Manners, its sole member

_____
Michael G. Manners, individually