# APPENDIX 12

## Exhibit "J"
## Royce Agreement of Limited Partnership

AGREEMENT

OF

LIMITED PARTNERSHIP

OF

ROYCE HOLDINGS, LP

PARTNERSHIP INTERESTS IN ROYCE HOLDINGS, LP HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD OR OTHERWISE TRANSFERRED UNLESS SUBSEQUENTLY REGISTERED UNDER SUCH ACTS OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. THIS AGREEMENT CONTAINS ADDITIONAL RESTRICTIONS ON SALES AND OTHER TRANSFERS OF PARTNERSHIP INTERESTS.

TABLE OF CONTENTS

Page

ARTICLE 1
ORGANIZATION

Section 1.1   Formation ........................................................................................................ 1
Section 1.2   Name .............................................................................................................. 1
Section 1.3   Filings ............................................................................................................ 1
Section 1.4   Location of Principal Place of Business ........................................................ 1
Section 1.5   Business and Purpose .................................................................................... 2
Section 1.6   Registered Office and Agent ......................................................................... 2
Section 1.7   Term ............................................................................................................... 2
Section 1.8   Partnership Interests of Limited Partners ..................................................... 2

ARTICLE 2
CAPITALIZATION AND ADDITIONAL FINANCING

Section 2.1   Limited Partner Capital ................................................................................. 3
Section 2.2   Contributions of General Partner .................................................................. 7
Section 2.3   Partnership Borrowing .................................................................................. 7
Section 2.4   Additional Financing ..................................................................................... 8
Section 2.5   Retention and Reinvestment of Revenues ..................................................... 8
Section 2.6   Partnership Capital ........................................................................................ 8
Section 2.7   Capital Accounts ........................................................................................... 8
Section 2.8   Additional Partners and Securities ................................................................ 9

ARTICLE 3
ALLOCATIONS AND DISTRIBUTIONS

Section 3.1   Allocations of Income and Loss .................................................................. 11
Section 3.2   Special Allocations ...................................................................................... 11
Section 3.3   Excess Nonrecourse Liabilities ................................................................... 12
Section 3.4   Allocations of Taxable Income or Loss ....................................................... 12
Section 3.5   Acknowledgment of Allocation Rules ......................................................... 13
Section 3.6   Distributions ................................................................................................. 14
Section 3.7   Restrictions on Distributions ....................................................................... 15

ARTICLE 4
RIGHTS AND DUTIES OF THE GENERAL PARTNER

Section 4.1   Management ................................................................................................. 15
Section 4.2   Reliance by Public ....................................................................................... 16
Section 4.3   Liabilities; Indemnification ......................................................................... 17
Section 4.4   Title to Partnership Property ........................................................................ 18
Section 4.5   Transfer of Partnership Interest of General Partner ..................................... 19
Section 4.6   Compensation ............................................................................................... 19

## ARTICLE 5
## RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

Section 5.1    Limitation of Liability...................................................................... 19
Section 5.2    Management of Business ................................................................ 19
Section 5.3    Outside Activities........................................................................... 20
Section 5.4    Transfer of Units............................................................................ 20
Section 5.5    Permitted Transfers ....................................................................... 23

## ARTICLE 6
## WITHDRAWAL OF THE GENERAL PARTNER;
## ADMISSION OF ADDITIONAL GENERAL PARTNERS

Section 6.1    Withdrawal...................................................................................... 24
Section 6.2    Admission of Additional General Partner ....................................... 24

## ARTICLE 7
## FISCAL YEAR; BOOKS OF ACCOUNT;
## BANK ACCOUNTS; AND REPORTS

Section 7.1    Books and Records. ....................................................................... 24
Section 7.2    Examination of Partnership Records .............................................. 25
Section 7.3    Bank Accounts ............................................................................... 25
Section 7.4    Tax Elections. ................................................................................ 25
Section 7.5    Annual Reports. ............................................................................. 27
Section 7.6    Quarterly Reports........................................................................... 27
Section 7.7    Tax Reporting Information .............................................................. 27
Section 7.8    Reporting Expenses ....................................................................... 27

## ARTICLE 8
## DISSOLUTION, WINDING UP AND TERMINATION; CONTINUATION

Section 8.1    Events of Dissolution...................................................................... 27
Section 8.2    Winding Up and Liquidation ........................................................... 28
Section 8.3    Application of Partnership Assets................................................... 28
Section 8.4    Reasonable Time for Winding Up .................................................. 28
Section 8.5    Return of Contributions .................................................................. 28
Section 8.6    Clawback........................................................................................ 29
Section 8.7    Waiver of Partition.......................................................................... 29
Section 8.8    Allocations During Liquidation ....................................................... 29
Section 8.9    Character of Liquidating Distributions ............................................ 29

## ARTICLE 9
## DEFINITIONS

Section 9.1    Defined Terms ................................................................................ 29
Section 9.2    Section Headings, Gender.............................................................. 29

## ARTICLE 10
### BUY-SELL PROVISIONS

Section 10.1   General .................................................................................... 29
Section 10.2   Death of a Profit Partner ......................................................... 30
Section 10.3   Termination of Employment of a Profit Partner. ........................ 30
Section 10.4   Divorce or Death of Spouse of a Profit Partner ......................... 31
Section 10.5   Profit Partner Buy-Out Event.................................................... 31
Section 10.6   Death of a Class A Limited Partner ........................................... 32
Section 10.7   Incapacity of a Class A Limited Partner ..................................... 33
Section 10.8   Divorce or Death of Spouse of a Class A Limited Partner ............ 34
Section 10.9   Class A Limited Partner Buy-Out Event ..................................... 34
Section 10.10  General Partner's Unit Purchase Options. ................................. 35
Section 10.11  Terms of Purchase..................................................................... 36

## ARTICLE 11
### MISCELLANEOUS PROVISIONS

Section 11.1   Representations and Warranties of the Limited Partners.............. 37
Section 11.2   Appointment of General Partner as Attorney-in-Fact.................. 38
Section 11.3   Scope of Power of Attorney....................................................... 39
Section 11.4   Notices .................................................................................... 39
Section 11.5   Execution and Counterparts ...................................................... 39
Section 11.6   Waiver of Partition.................................................................... 39
Section 11.7   Governing Law, Successors, Severability .................................... 40
Section 11.8   Mediation and Arbitration......................................................... 40
Section 11.9   Integrated Agreement................................................................ 41
Section 11.10  Amendment.............................................................................. 41
Section 11.11  No Waiver ................................................................................ 41
Section 11.12  Presumptions............................................................................ 41
Section 11.13  No Third Party Beneficiaries ...................................................... 41
Section 11.14  Time of Essence........................................................................ 41

ANNEXES:

ANNEX A   Limited Partner Information
ANNEX B   Glossary of Terms
ANNEX C   Form of Unit Certificate

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## ROYCE HOLDINGS, LP

THIS AGREEMENT OF LIMITED PARTNERSHIP is made and entered into as of September 19, 2006 (the "*Effective Date*") by and among Hammersmith Group, Inc., a Delaware corporation (the "*General Partner*"), and those Limited Partners listed on <u>Annex A</u> hereto.

## ARTICLE 1
### ORGANIZATION

Section 1.1    Formation. The Partnership was formed on September 15, 2006 upon the filing of its Certificate of Limited Partnership with the Delaware Secretary of State and is being continued pursuant to the terms in this Agreement and the Act.

Section 1.2    Name. The name of the partnership is Royce Holdings, LP.  Subject to all applicable laws, the business of the Partnership shall be conducted in the name of the Partnership unless, under the law of some jurisdiction in which the Partnership does business, such business must be conducted under another name or unless the General Partner determines that it is advisable to conduct Partnership business under another name.  In such a case, the business of the Partnership in such jurisdiction or in connection with such determination may be conducted under such other name or names as the General Partner shall determine to be necessary.  The General Partner shall cause to be filed on behalf of the Partnership such partnership or assumed or fictitious name certificate or certificates or similar instruments as may from time to time be required by law.

Section 1.3    Filings.  Upon the request of the General Partner, each Limited Partner shall promptly execute and deliver all such certificates and other instruments conforming hereto as shall be necessary for the General Partner to accomplish all filing, recording, publishing and other acts appropriate to comply with all requirements for the formation and operation of a limited partnership under the laws of the State of Delaware and for the qualification and operation of a limited partnership (or a partnership in which the Limited Partners have limited liability) in all other jurisdictions where the Partnership shall propose to conduct business.  Prior to conducting business in any jurisdiction, the General Partner shall use its reasonable good faith efforts to cause the Partnership to comply with all requirements for the qualification of the Partnership to conduct business as a limited partnership (or a partnership in which the Limited Partners have limited liability) in such jurisdiction.   The General Partner may amend the Certificate of Limited Partnership of the Partnership from time to time for any proper purpose and shall amend the Certificate of Limited Partnership of the Partnership if so required by this Agreement or the Act.

Section 1.4    Location of Principal Place of Business. The principal place of business of the Partnership shall be 7850 North Sam Houston Parkway West, Houston, Texas  77064 or such other place as the General Partner may from time to time designate.  The General Partner shall promptly notify each Limited Partner of any change in the principal place of business of the

Partnership.  The Partnership may maintain other offices at such other places as the General Partner deems appropriate.

Section 1.5    Business and Purpose.  The business and purpose of the Partnership shall be, whether directly or through subsidiary entities, to conduct any business activities permitted to be conducted by a limited partnership formed under the Act.  The business and purpose of the Partnership shall include any activities contemplated by the rights and powers of the General Partner described in this Agreement.

Section 1.6    Registered Office and Agent.  The address of the registered office of the Partnership in the State of Delaware is in care of The Corporation Trust Company, 1209 Orange Street, Wilmington, County of New Castle, Delaware 19801.  The name of the registered agent for service of process on the Partnership in the State of Delaware is The Corporation Trust Company.  The General Partner may change the registered office and the registered agent from time to time.  The General Partner shall promptly notify each Partner of any change in the registered office or registered agent of the Partnership.

Section 1.7    Term.  The term of the Partnership began on the date the Certificate of Limited Partnership was filed with the Delaware Secretary of State, and shall continue indefinitely thereafter, unless sooner terminated as hereinafter provided.

Section 1.8    Partnership Interests of Limited Partners.

(a)    *Classes of Limited Partners*.  The Partnership Interests of the Limited Partners shall be divided into three classes: Class A Limited Partners; Class B Limited Partners; and Class C Limited Partners.  The relative rights and obligations of each class of Limited Partner with respect to each other class of Limited Partner, the General Partner and the Partnership shall be as set forth in this Agreement.

(b)    *Classes of Units*.  The Partnership Interests of each class of Limited Partners shall be divided into units ("*Units*"): (*i*) The Partnership Interests of Class A Limited Partners shall be divided into up to 100,000 Units designated as "*Class A Units*"; (*ii*) The Partnership Interests of Class B Limited Partners shall be divided into up to 100,000 Units designated as "*Class B Units*"; and (*iii*) The Partnership Interests of Class C Limited Partners shall be divided into up to 20,000 Units designated as "*Class C Unit*."  Each series of Class C Units will be assigned a Value Hurdle and such Value Hurdle shall be set forth on Annex A for such series.  Each Unit within a class of Units shall have rights and obligations identical to each other Unit within the same class, except as otherwise expressly provided in this Agreement with respect to different series of Class C Units.

(c)    *Identity and Class of Each Limited Partner*.  Set forth on Annex A to this Agreement is the following information with respect to each Limited Partner:  the Limited Partner's name; mailing address; telephone number; fax number; class of Partnership Interest and number and class (and series, if applicable) of Units owned by the Limited Partner; the Book Basis of each Limited Partner's Units; the Value Hurdle, if any, applicable to such Units; the Limited Partner's Capital Contributions; and the percentage of all Units outstanding represented by the Units owned by each Limited Partner.  Each Limited Partner agrees to promptly notify the

General Partner of any changes to the information in Annex A regarding such Limited Partner. The General Partner shall, and is hereby authorized to, amend Annex A from time to time to reflect changes in the information contained in Annex A, in each case only if such changes are not prohibited by this Agreement or the Act. A copy of any such amendment to Annex A shall be promptly provided to any Limited Partner upon request.

(d)     *Unit Certificates.* To evidence the number and class (and series, if applicable) of Units owned by each Limited Partner and General Partner, the Partnership shall issue to each Limited Partner and General Partner one or more certificates in substantially the form attached hereto as Annex C (each such certificate being a "*Unit Certificate*") in such Partner's name and signed by such representatives of the General Partner as authorized or prescribed by the General Partner. The General Partner may prescribe rules and regulations relating to (i) the registration of the transfer and exchange of Unit Certificates not inconsistent with the terms of this Agreement pertaining to the Transfer of Units (ii) the replacement of mutilated, destroyed, lost or stolen Unit Certificates, and (iii) the posting of bond or other form of indemnity of the Partnership and the Partners by a person to whom any replacement Unit Certificate is issued.

(e)     *Capital Account Adjustment.* Upon the issuance of an additional series of Class C Units, the Capital Accounts of the Partners shall be adjusted as set forth in Section 2.7(b) and as otherwise provided in this Agreement.

## ARTICLE 2
### CAPITALIZATION AND ADDITIONAL FINANCING

Section 2.1     Limited Partner Capital.

(a)     *Class A Limited Partner Capital Contributions.* Upon execution of this Agreement, each Class A Limited Partner shall make an initial Capital Contribution to the Partnership of various limited partnership and limited liability company interests pursuant to the Contribution Agreement of even date herewith by and among the parties hereto. In exchange for such contributions, each Class A Limited Partner will be issued the number of Class A Units set forth opposite the name of such Class A Limited Partner on Annex A. The Partners acknowledge and agree that the information on Annex A with respect to the Class A Limited Partners and Class A Units issued at the Effective Date is correct.

(b)     *Class B Limited Partner Capital Contributions.* Upon execution of this Agreement, each Class B Limited Partner shall make an initial Capital Contribution to the Partnership of various limited partnership and limited liability company interests pursuant to the Contribution Agreement of even date herewith by and among the parties hereto. In exchange for such contributions, each Class B Limited Partner will be issued the number of Class B Units set forth opposite the name of such Class B Limited Partner on Annex A. The Partners acknowledge and agree that the information on Annex A with respect to the Class B Limited Partners and Class B Units issued at the Effective Date is correct.

(c)     *Class C Limited Partner Capital Contribution.* Class C Limited Partners shall not be required to make a Capital Contribution to the Partnership in respect of their Class C Units.

No Class C Units are issued at the Effective Time, but are reserved for later issuance at the direction of the General Partner.

(d)     *Capital Calls.*

(1)     In addition to their respective initial Capital Contributions, each Limited Partner shall make further Capital Contributions to the Partnership upon request by the General Partner made from time-to-time with the written consent of Class A Limited Partners holding at least 60% of all Class A Units (each such request, a "*Capital Call*").

(2)     The percentage of each Capital Call to be borne by each Limited Partner shall be the percentage equivalent of a fraction the numerator of which is the number of Units held by such Limited Partner and the denominator of which is the number of Units held by all Limited Partners.

(3)     Each Capital Call shall be in writing (a "*Call Notice*"). The Call Notice shall be sent and shall be deemed received as provided in <u>Section 11.4</u>. Each Call Notice shall contain:

(A)     the total amount of the Capital Contribution;

(B)     the amount of the Capital Contribution due from the Limited Partner to which the Call Notice is sent;

(C)     a brief summary of the proposed purpose or purposes for which the Capital Call is made; and

(D)     the Capital Call Due Date, as hereinafter defined.

(4)     Each Limited Partner shall cause its Capital Contribution required by each Capital Call to be received by the General Partner on or before the tenth Business Day after the day on which such Limited Partner is deemed to have received such Call Notice (the "*Capital Call Due Date*").

(5)     An "*Event of Default*" shall be deemed to have occurred if any Limited Partner (a "*Defaulting Partner*") fails or refuses to make the full amount of the Capital Contribution required of such Defaulting Partner by the applicable Capital Call Due Date. A "*Default*" shall be deemed to have occurred if such failure or refusal to make the required Capital Contribution has continued, in whole or in part, through the fifth Business Day after such Defaulting Partner is deemed to have received a written notice from the General Partner to the Defaulting Partner stating that an Event of Default has occurred. Limited Partners who are not Defaulting Partners, are hereinafter referred to as "*Non-Defaulting Partners*".

(e)     *Default of Capital Call.* Upon the occurrence of a Default:

(1)     For a period of 90 days after the Default, the Partnership shall have the right, but not the obligation, pursuant to written notice, to require the Defaulting Partner

to sell all of its Units to the Partnership at a price equal to the lesser of (A) 75% of its Capital Contributions or (B) 75% of the fair market value of such Units as determined in good faith by the agreement of the General Partner and the Defaulting Partner or if such parties are unable to agree on the fair market value of the Defaulting Partner's Units within 10 days of the receipt of notice by the Defaulting Partner from the General Partner of the Partnership's exercise of its rights hereunder, then such fair market value shall be determined in accordance with the procedure set forth in Section 11.8 of this Agreement. Following the determination of the fair market value of the Defaulting Partner's Units, the sale of the Defaulting Partner's Units shall occur automatically and without further action by Defaulting Partner upon the tender to the Defaulting Partner by the Partnership of the purchase price for such Defaulting Partner's Units (and not upon the acceptance of such purchase price by the Defaulting Limited Partner) whereupon such Defaulting Partner shall be fully divested of all interest in the Partnership. THE ACCEPTANCE OF SUCH PAYMENT (EVEN IF ACCEPTED UNDER PROTEST, RESERVATION OF RIGHTS OR OTHER CONDITIONAL ACCEPTANCE) BY THE DEFAULTING PARTNER SHALL CONSTITUTE A COMPLETE WAIVER AND RELEASE OF ALL RIGHTS, CLAIMS AND CAUSES OF ACTION, KNOWN OR UNKNOWN, THAT THE DEFAULTING PARTNER OR ITS AFFILIATES MAY HAVE AGAINST ANY THE PARTNERSHIP, ANY PARTNER OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, LIMITED PARTNERS, MANAGERS, CONSULTANTS, COUNSEL, AGENTS OR OTHER AFFILIATES (EACH, A *"RELEASED PARTY"*) INCLUDING CLAIMS AGAINST ANY RELEASED PARTY FOR SUCH RELEASED PARTY'S OWN BREACH OF CONTRACT, MISREPRESENTATION, FRAUD, BREACH OF FIDUCIARY DUTY, NEGLIGENCE, OR STRICT LIABILITY.

(2)    The Defaulting Partner shall have no right to vote on, consent to or approve any matter thereafter submitted to Limited Partners.

(3)    The Partnership may, in the sole discretion of the General Partner, pursue any other rights and remedies available at law or in equity.

(4)    In lieu of the remedies set forth in clauses (1) through and including (3), the General Partner by written notice to the Defaulting Partner, may exercise any one of the following rights and remedies:

(A)    The General Partner may declare 25% of the Defaulting Partner's Units forfeited, whereupon:

(i)    The Defaulting Partner shall continue to have the right and obligation to make Capital Contributions in response to each Capital Call made after such forfeiture, each in an amount equal to 75% of the Capital Contribution that the Defaulting Partner would have been required by this Agreement to make immediately prior to the forfeiture of Units.

(ii)     All other rights and obligations of the Defaulting Limited Partner with respect to its then remaining Units shall remain intact in proportion to the number of such then remaining Units.

(iii)     Twenty-five percent (25%) of all Capital Contributions of the Defaulting Partner made prior to the forfeiture of such Units shall be reallocated to the Capital Accounts of the Limited Partners who are not Defaulting Partners in proportion to their relative sharing of distributions under Section 3.6(a) as of the time the General Partner declares the Defaulting Partner's Units forfeited, and their respective Capital Percentages shall be deemed accordingly increased.   The Capital Percentages of the Defaulting Partner shall be correspondingly decreased.

(iv)     The forfeited Units shall cease to be outstanding, shall be cancelled and shall be disregarded for all purposes; or

(B)     Upon written notice to the Defaulting Partner of the failure to make such Capital Contribution, the General Partner may, but shall not be obligated to, advance the Defaulting Partner's Capital Contribution to the Partnership on behalf of the Defaulting Partner, and such advance shall be repaid by the Defaulting Partner to the General Partner with interest thereon at the Default Interest Rate from the Capital Call Due Date until the date that the Defaulting Partner repays the loan to the General Partner.   To the extent the General Partner advances funds to the Partnership on behalf of a Defaulting Partner, all Partnership distributions otherwise payable to the Defaulting Partner shall be paid to the General Partner until all amounts payable to the General Partner by the Defaulting Partner pursuant to this Section 2.1(e)(4)(B) (including interest) have been repaid; or

(C)     The General Partner, by written notice to all Non-Defaulting Partners describing the material facts and circumstances associated with the default and proposing the adoption of the remedy set forth in this Section 2.1(e)(4)(C), may allow the Non-Defaulting Partners to advance funds to the Partnership to satisfy the Defaulting Partner's capital contribution obligation. Such advances shall constitute loans owed by the Defaulting Partner to the Non-Defaulting Partners, and shall bear interest at the rate of the lesser of (i) five (5) percentage points over the Prime Rate or (ii) the maximum lawful rate that may be charged under applicable state or federal law.   For any period during which such loans are outstanding, all cash distributions otherwise distributable to the Defaulting Partner under this Agreement shall instead be paid to the Non-Defaulting Partners making such loans until the loans and interest thereon are paid in full.   Such loans shall be evidenced by promissory notes, and shall be due and payable by the Defaulting Partner one year from the date on which the loans are made.   Any amounts repaid on such loans shall first be applied to interest and thereafter to principal.   Effective upon a Partner becoming a Defaulting Partner, the Defaulting Partner hereby grants to the Non-Defaulting Partners who advance funds pursuant to this Section 2.1(e)(4)(C) a security interest in the Defaulting

Partner's Partnership Interests to secure the Defaulting Partner's obligation to repay such advances, and hereby agrees to execute and deliver a promissory note as described herein together with a security agreement and such financing statements and other instruments as the Non-Defaulting Partners may reasonably request. All Non-Defaulting Partners shall have the right and be given the opportunity to make the advances contemplated by this Section 2.1(e)(4)(C). The advances made pursuant to this Section 2.1(e)(4)(C) shall be made in proportion to the Units then held by the Non-Defaulting Partners making such advances, except as such Non-Defaulting Partners otherwise agree. If a Non-Defaulting Partner does not indicate to the General Partner acceptance of its option under this Section 2.1(e)(4)(C) to advance funds to the Partnership to satisfy the Defaulting Partner's capital contribution obligation within five Business Days after delivery of such notice, the Non-Defaulting Partner will be conclusively presumed to have rejected such option; or

(D)     The General Partner, by written notice to all Non-Defaulting Partners describing the material facts and circumstances associated with the default and proposing the adoption of the remedy set forth in this Section 2.1(e)(4)(D), may allow the Non-Defaulting Partners to purchase the Defaulting Partner's Units in proportion to the Units then held by the Non-Defaulting Partners, or as otherwise agreed by the General Partner and the Non-Defaulting Partners. If a Non-Defaulting Partner does not indicate to the General Partner acceptance of its option to purchase Units of a Defaulting Partner under this Section 2.1(e)(4)(D) within five Business Days after delivery of such notice, the Non-Defaulting Partner will be conclusively presumed to have rejected such option.

Section 2.2    Contributions of General Partner. The General Partner has contributed $10,000 to the capital of the Partnership the Capital Contribution as set forth on Annex A hereto in exchange for 16 General Partner Units.

Section 2.3    Partnership Borrowing

(a)     *Authority of General Partner.* The General Partner may cause the Partnership to borrow money from time to time, from third parties or from the General Partner, and may mortgage or pledge Partnership property to obtain and secure the repayment of such loans. The proceeds of Partnership loans may be used for any Partnership purpose. The General Partner has authority to obtain any such loans without any further consent of the Partners.

(b)     *Loans by General Partner.* The General Partner is not obligated to lend or advance funds to the Partnership. If the General Partner loans or advances money to the Partnership, it will receive interest at the lesser of (i) two (2) percentage points over Prime Rate or (ii) the maximum lawful rate that may be charged under applicable state or federal law. Loans by the General Partner to the Partnership shall be treated as indebtedness to a non-Partner lender and will be payable prior to any distributions to the Partners.

Section 2.4    Additional Financing.  Except as provided herein, no Limited Partner shall be required to make any contribution to the capital of the Partnership in excess of its initial Capital Contribution.  This provision shall not be deemed a limitation, however, on the General Partner's right to cause the Partnership to borrow or to retain, use or pledge so much of the undistributed revenues and other assets of the Partnership as in its sole, unfettered discretion the General Partner may deem advisable.

Section 2.5    Retention and Reinvestment of Revenues.  Revenues and other assets received by the Partnership may be retained, accumulated, and used by the Partnership for any Partnership purpose including, but not limited to, payment of Partnership expenses (including establishment of reserves for contingencies), repayment of borrowings by the Partnership, reinvestment in the Partnership's business and properties.

Section 2.6    Partnership Capital.

(a)    No interest shall be paid by the Partnership on any Capital Contributions to the Partnership or on Capital Account balances.

(b)    Except as may be specifically otherwise permitted in this Agreement, no Partner shall have the right to: (i) withdraw from the Partnership; (ii) withdraw any part of such Partner's Capital Contribution to the Partnership; (iii) withdraw any part of such Partner's Capital Account, or (iv) receive any return of any portion of such Partner's Capital Contribution or such Partner's Capital Account.

(c)    Except for Capital Contributions made pursuant to Section 2.1, advances of money by a Partner to the Partnership will be considered loans to the Partnership and not Capital Contributions.

Section 2.7    Capital Accounts.

(a)    A Capital Account will be established for each Partner and will be maintained in accordance with Treasury Regulation Sections 1.704-1(b) and 1.704-2.  Consistent with such Treasury Regulations:

(1)    There will be credited to each Partner's Capital Account:

(A)    the amount of such Partner's Capital Contributions (including the Book Value of the Capital Contributions made on the Effective Date);

(B)    such Partner's share of Net Income (as determined in accordance with Section 3.1) and any items of income or gain allocated to a Partner pursuant to Section 3.2;

(C)    the amount of any Partnership liabilities assumed by such Partner or which are secured by any property distributed to such Partner;

(D)    any amounts from time to time added to the Capital Account of such Partner pursuant to Section 3.2; and

(E)   the   amounts   reallocated   in   accordance   with   Section 2.1(e)(4)(A)(iii) to Partners who are not Defaulting Partners.

(2)   There will be debited to each Partner's Capital Account:

(A)   the amount of any cash and the fair market value of any property distributed by the Partnership to such Partner;

(B)   such Partner's share of Net Loss (as determined in accordance with Section 3.1), and any items of loss or deduction allocated to such Partner pursuant to Section 3.2;

(C)   the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership; and

(D)   any amounts from time to time subtracted from the Capital Account of such Partner pursuant to Section 3.2.

(b)   *Capital Account Adjustment Upon the Issuance of Class C Units.*  The issuance of a new series of Class C Units shall be a Revaluation Event and the Capital Accounts attributable to Units outstanding immediately before such issuance shall be adjusted to reflect any difference between the fair market value of the Partnership as reflected by the Value Hurdle for such issuance and the existing aggregate Net Capital Account Balances immediately before such issuance, as follows:

(1)   If the Value Hurdle for such issuance is greater than the aggregate Net Capital Account Balances immediately before such issuance, such excess shall be allocated among the Partners in proportion to their Units; and:

(2)   If the Value Hurdle for such issuance is less than the aggregate Net Capital Account Balances immediately before such issuance, the Capital Accounts shall be reduced by such difference in proportion to the Capital Account balances, but not less than zero with respect to any Unit.

All determinations made under this Section 2.7(b) shall be made by the General Partner in its sole and absolute discretion.

(c)   Such Capital Accounts shall otherwise be adjusted in accordance with the tax accounting principles set forth in Treasury Regulations Section 1.704-1(b)(2)(iv) and the definition of "*Book Basis*" set forth in Annex B.

Section 2.8   Additional Partners and Securities.

(a)   The General Partner is hereby authorized to cause the Partnership to issue additional Units, or classes or series thereof, or options, rights, warrants or appreciation rights relating thereto, securities convertible into equity securities, or any other type of equity security that the Partnership may lawfully issue ("*Additional Partnership Equity Securities*").

(b)     The General Partner is hereby authorized to cause the Partnership to issue any unsecured or secured debt obligations of the Partnership or debt obligations of the Partnership convertible into any class or series of equity securities of the Partnership ("*Partnership Debt Securities*" and collectively, with the Additional Partnership Equity Securities, the "*Partnership Securities*").

(c)     Partnership Securities may be issuable in one or more classes, or one or more series of any of such classes, with such designations, preferences and relative, participating, optional or other special rights, powers, and duties, including rights, powers, and duties senior to existing classes and series of Partnership Securities, all as shall be fixed by the General Partner in the exercise of its sole and complete discretion, subject to Delaware law and the terms of this Agreement, including, without limitation, (i) the allocations of items of Partnership income, gain, loss and deduction to each such class or series of Partnership Securities; (ii) the right of each such class or series of Partnership Securities to share in Partnership distributions; (iii) the rights of each such class or series of Partnership Securities upon dissolution and liquidation of the Partnership; (iv) whether such class or series of additional Partnership Securities is redeemable by the Partnership and, if so, the price at which, and the terms and conditions upon which, such class or series of additional Partnership Securities may be redeemed by the Partnership; (v) whether such class or series of additional Partnership Securities is issued with the privilege of conversion and, if so, the rate at which, and the terms and conditions upon which, such class or series of Partnership Securities may be converted into any other class or series of Partnership Securities; (vi) the terms and conditions upon which each such class or series of Partnership Securities will be issued and assigned or Transferred; and (vii) the right, if any, of each such class or series of Partnership Securities to vote on Partnership matters, including matters relating to the relative rights, preferences and privileges of each such class or series.

(d)     Subject to the terms of this Agreement the General Partner shall have sole discretion to determine to what Person Partnership Securities may be issued and the consideration and terms and conditions with respect to any future issuance of Partnership Securities. No Limited Partner shall have any preemptive or similar right to acquire Partnership Securities.

(e)     Subject to the terms of this Agreement, the General Partner is hereby authorized and directed to take all actions which it deems appropriate or necessary in connection with each issuance of Partnership Securities pursuant to this Section 2.8 and to amend this Agreement in any manner which it deems appropriate or necessary without the joinder of any other Partner to provide for each such issuance, to admit additional Limited Partners in connection therewith and to specify the relative rights, powers and duties of the holders of the Partnership Securities being so issued. The General Partner shall do all things necessary to comply with the Act and is authorized and directed to do all things it deems to be necessary or advisable in connection with any future issuance of Partnership Securities, including compliance with any statute, rule, regulation or guideline of any federal, state or other governmental agency.

## ARTICLE 3
### ALLOCATIONS AND DISTRIBUTIONS

Section 3.1    Allocations of Income and Loss.  Except as otherwise provided in this Agreement, Net Income or Net Loss of the Partnership for a taxable year shall be allocated among the Partners in such manner as shall cause the Capital Accounts of the Partners to equal, as nearly as possible, the amounts such Partners would receive if all cash on hand at the end of such year were distributed to the Partners under Section 3.6(a) and all assets on hand at the end of such year were sold for cash at the Book Basis of such assets, all Partnership liabilities were satisfied to the extent required by their terms (limited, with respect to any Partnership nonrecourse liabilities to the Book Basis of the assets securing each such liability) and any remaining cash were distributed to the Partners under Section 3.6(a).

Section 3.2    Special Allocations.  For each fiscal year, the following items of Income or Loss shall, to the extent not previously reflected in the Partners' Capital Accounts, be specially allocated to the Capital Accounts of the Partners, in the following order and priority:

(a)    If there is a net decrease in "partnership minimum gain" (as defined in Treasury Regulations § 1.704-2(b)(2)) for the fiscal year, then, to the extent required by the Treasury Regulations, items of Income (determined in accordance with the provisions of Treasury Regulations § 1.704-2(f)(6)) shall be specially allocated to the Partners in an amount equal to each Partner's share of the net decrease in partnership minimum gain (determined in accordance with the provisions of Treasury Regulations § 1.704-2(g)).  This Section 3.2(a) shall be interpreted consistently with, and subject to the exceptions contained in, Treasury Regulations § 1.704-2(f).

(b)    If there is a net decrease in "partner nonrecourse debt minimum gain" (as defined in Treasury Regulations § 1.704-2(i)(2)) for the fiscal year, then, to the extent required by Treasury Regulations, items of Income (determined in accordance with the provisions of the Treasury Regulations § 1.704-2(i)(4)) shall be specially allocated to the Partners in an amount equal to each Partner's share of the net decrease in partner nonrecourse debt minimum gain (determined in accordance with the provisions of Treasury Regulations § 1.704-2(i)(5)).  This Section 3.2(b) shall be interpreted consistently with, and subject to the exceptions contained in, Treasury Regulations § 1.704-2(i)(4).

(c)    If any Partner unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Income (including gross income) shall be specially allocated to the Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit balance in the Partner's Adjusted Capital Account as quickly as possible; provided that an allocation pursuant to this Section 3.2(c) shall be made only to the extent that the Partner has a deficit balance in its Adjusted Capital Account after all other allocations provided for in Section 3.1 and this Section 3.2 have been tentatively made as if this Section 3.2(c) was not in this Agreement.

(d)    "Nonrecourse deductions" (as defined in Treasury Regulations §§ 1.704-2(b)(1) and (c)) shall be specially allocated to the Partners in proportion to their respective Capital Percentages.

(e)   "Partner nonrecourse deductions" (as defined in Treasury Regulations § 1.704-2(i)(2)) shall be specially allocated to the Partners who bear the economic risk of loss for the liability to which the deductions are attributable, determined in accordance with the principles of Treasury Regulations § 1.704-2(i)(l).

(f)   To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Internal Revenue Code §§ 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Treasury Regulations § 1.704-1(b)(2)(iv)(m), the amount of the adjustment shall be included as an item of Income (if positive) or Loss (if negative) and shall be specially allocated to the Partners consistent with the manner in which their Capital Accounts are required to be adjusted by such Treasury Regulation.

(g)   Notwithstanding anything contained in this Agreement, Losses shall not be allocated to a Partner to the extent such allocation would cause or increase a deficit in such Partner's Adjusted Capital Account. Instead, any such Losses shall, subject to such limitation, be allocated among the other Partners in accordance with their respective Capital Percentages.

(h)   To minimize any distortions in the manner that the Partners would have shared distributions if the special regulatory allocations required by paragraphs (a) through (g) above (for purposes of this Section, the "*Regulatory Allocations*") had not been part of this Agreement, the Partners may, in their discretion, specially allocate to the Partners offsetting items of Income or Loss so that the net amounts allocated to each Partner pursuant to Sections 3.1 and 3.2 will, to the extent possible, equal the net amounts that would have been allocated to each Partner pursuant to Section 3.l(a) if the Regulatory Allocations had never occurred. In exercising such discretion, the Partners may consider any expected future Regulatory Allocations which are likely to offset other Regulatory Allocations previously made.

Section 3.3    Excess Nonrecourse Liabilities.

(a)   The Partnership's "excess nonrecourse liabilities" (as defined in Treasury Regulations § 1.752-3(a)(3)) shall be allocated among the Partners in proportion to their Capital Percentages.

Section 3.4    Allocations of Taxable Income or Loss.

(a)   Except as provided in Section 3.4(d) below (with respect to Code Section 704(c)) or as otherwise required by the Code or Treasury Regulations, solely for federal income tax purposes, items of Partnership taxable income, gain, loss and deduction for each fiscal year shall be allocated among the Partners in the same manner as each correlative item of income, gain, loss and deduction, as determined for Capital Account purposes, is allocated pursuant to Sections 3.1, 3.2 and 3.3.

(b)   The General Partner shall make the tax allocations in this Article 3 as of the last day of each fiscal year; *provided, however,* that if during any fiscal year of the Partnership there is a change in any Partner's interest in the Partnership, the General Partner shall make such allocations as of the date of each such change in a manner which takes into account the varying interests of the Partners and in a manner the General Partner reasonably deems appropriate.

(c)     Losses allocated pursuant to Section 3.1 hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Partner to have a deficit in their Adjusted Capital Account at the end of any Allocation Year. In the event some but not all of the Partners would have a deficit in their Adjusted Capital Account as a consequence of an allocation of Losses pursuant to Section 3.1 hereof, the limitation set forth in this Section 3.4(c) shall be applied on a Partner by Partner basis and Losses not allocable to any Partner as a result of such limitation shall be allocated to the other Partners in accordance with the positive balances in such Partner's Capital Accounts so as to allocate the maximum permissible Losses to each Partner under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(d)     In accordance with Code Section 704(c) and the Treasury Regulations thereunder, solely for federal income tax purposes, items of taxable income, gain, loss and deduction with respect to any Partnership asset having a Book Basis that differs from its adjusted basis for federal income tax purposes shall be allocated among the Partners in a manner that takes into account the amount of such difference at the time it arose. Such allocations shall be made by the Partners using the "remedial method" described in Treasury Regulations § 1.704-3(d). Allocations pursuant to this Section 3.4(d) are solely for federal income tax purposes and shall not affect the Partners' Capital Accounts.

(e)     In the event the Tax Matters Partner makes the election contemplated by Section 7.4(d), Profits and Losses shall be allocated in a manner that satisfies the requirements for such election, including any forfeiture allocations required by proposed Section 1.704-1(b)(4)(xii)(*b*)(*1*) of the Regulations and the revenue procedure contemplated by IRS Notice 2005-43 (or the corresponding provisions of any final Regulations and associated guidance by the Treasury Department and IRS regarding the tax consequences associated with the issuance or transfer of Interests in exchange for the performance of services).

(f)     The parties intend that the foregoing tax allocation provisions of this Article 3 shall produce final Capital Account balances of the Partners that will permit liquidating distributions that are made in accordance with final Capital Account balances to be made (after unpaid loans and interest thereon, including those owed to Partners, have been paid) in a manner identical to the order of priorities set forth in Sections 3.6. To the extent that the tax allocation provisions of this Article 3 would fail to produce such final Capital Account balances, (i) such provisions shall be amended by the General Partner if and to the extent necessary to produce such result and (ii) taxable income and taxable loss of the Partnership for prior open years (or items of gross income and deduction of the Partnership for such years) shall be reallocated by the General Partner to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years, as approved by the General Partner. This Section 3.4(f) shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

Section 3.5     Acknowledgment of Allocation Rules.     THE PARTNERS ARE AWARE OF THE INCOME TAX CONSEQUENCES OF THE ALLOCATIONS MADE BY THIS ARTICLE 3 AND HEREBY AGREE TO BE BOUND BY THE PROVISIONS OF THIS ARTICLE 3 IN REPORTING THEIR SHARES OF PARTNERSHIP INCOME AND LOSS FOR INCOME TAX PURPOSES.

Section 3.6   Distributions.

(a)   *Regular Distributions*. The General Partner shall, to the extent permitted by the Act and the other provisions of this Agreement, cause the Partnership to distribute Available Cash or other property to the Partners in the following order of priority, at such times and in such amounts as the General Partner shall determine in its sole discretion:

(1)   first, to the Class A Limited Partners in proportion to their Class A Units, until the cumulative amount distributed under this Section 3.6(a)(1) equals the Priority Distribution Amount;

(2)   second, to the Class B Limited Partners and the General Partner in proportion to their Class B Units and General Partner Units, until the cumulative amount distributed under this Section 3.6(a)(2) equals the Catch Up Amount;

(3)   third, after the distribution of the maximum amounts contemplated by Section 3.6(a)(1), to the Partners in proportion to their latest Net Capital Account Balances until the aggregate distributions under this Section 3.6(a)(2) are equal to the Value Hurdle for each applicable class or series of Units; and

(4)   fourth, after the Value Hurdle has been reached for all Class C Units, to the Limited Partners and the General Partner in proportion to their Units.

(b)   *Tax Advances*. No later than (a) ten (10) days after the end of each period for which an individual estimated federal income tax payment is due, and (b) ninety (90) days after the end of each fiscal year (either period under (a) or (b) being an "*Allocation Period*"), the General Partner may, in its sole discretion, cause the Partnership to make a cash distribution out of Available Cash to each Partner in the smallest amount necessary so that the aggregate amount of all distributions under Section 3.6 (a), (b), and (c) from the Partnership to such Partner as of the end of any Allocation Period equals each such Partner's Hypothetical Tax Amount. "*Hypothetical Tax Amount*" shall mean, with respect to each Partner, an amount equal to the product of (i) the combined maximum prevailing federal and highest state and local income tax rates applicable to any Partner for individuals (taking into account the deductibility of state and local taxes and the character of income and loss allocated as it effects the applicable tax rate), times (ii) the cumulative sum of Net Income and Net Losses allocated for tax purposes since inception of the Partnership with respect to the Units of such Partner (or his predecessor interest holder) pursuant to this Agreement. Any distribution under this Section 3.6(b) shall be credited against and shall reduce any subsequent distributions under this Agreement except distributions pursuant to Section 3.6(a)(1).

(c)   *Income Tax Withholding*. All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution, or allocation to the Company or the Partners and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in respect of any Partner or any Person owning an interest, directly or indirectly, in such Partner shall be treated as amounts actually distributed to the Partner with respect to which such amount was withheld pursuant to this Section 3.6 for all purposes under this Agreement. The General

Partner is authorized to withhold from distributions, or with respect to allocations, to the Partners and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law, and shall allocate any such amounts to the Partners with respect to which such amount was withheld.

Section 3.7   Restrictions on Distributions. No distribution shall be made pursuant to this Article 3 unless, after such distribution is made, the value of Partnership assets shall equal or exceed all liabilities of the Partnership.

ARTICLE 4
RIGHTS AND DUTIES OF THE GENERAL PARTNER

Section 4.1   Management.   The General Partner shall have the full and exclusive power and authority on behalf of the Partnership to manage, control, administer and operate the business and affairs of the Partnership, and to do or cause to be done any and all acts which it deems to be necessary or appropriate thereto, and the scope of such power and authority shall encompass all matters in any way connected with or incident to such business, including, but not limited to, the power and authority:

(a)   to expend the Partnership's capital and revenues in furtherance of the business of the Partnership;

(b)   to borrow monies from time to time in the form of recourse or non-recourse borrowings or otherwise to draw, make, execute and issue promissory notes and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of the sums so borrowed and to mortgage, pledge, or assign in trust all or any part of the Partnership's property, or to assign any monies owing to the Partnership;

(c)   to lend money to the Partnership on a recourse basis and charge the Partnership interest as provided in Section 2.3;

(d)   to employ or retain on behalf of the Partnership agents, employees, consultants, accountants, lawyers, clerical personnel, and such other assistance and services as may be necessary or convenient and to pay therefor such remuneration as the General Partner deems advisable reasonable;

(e)   to purchase, lease, rent, or otherwise acquire or obtain the use of machinery, equipment, tools, material, and all other kinds and types of real or personal property in connection with carrying on the business of the Partnership;

(f)   to incur expenses for travel, entertainment, telephone, business machines, insurance, and for such other things, whether similar or dissimilar, as may be deemed necessary or appropriate for carrying on the business of the Partnership;

(g)   to guarantee the payment of money or the performance of any contract or obligation by any person, firm or corporation on behalf of the Partnership;

(h)     to sue and be sued, complain and defend in the name and on behalf of the Partnership and enter into such agreements, receipts, releases, and discharges with respect to any such matters as the General Partner deems advisable;

(i)     to make such classifications, determinations and allocations as are deemed advisable, having due regard for relevant generally accepted accounting standards;

(j)     to purchase insurance, or extend the General Partner's or its Affiliates' insurance, at the Partnership's expense, to protect Partnership property and the business of the Partnership against loss, and to protect the Partners against liability to third parties arising out of Partnership activities, such insurance, if any, to be in such limits, subject to such deductibles and to cover such risks as the General Partner deems appropriate;

(k)     to appear and transact business before regulatory authorities, make any and all applications, filings, submittals, reports, notices or take any other action needed on behalf of the Partnership to effect regulatory matters for Partnership activities;

(l)     to designate one or more persons from time to time, who may or may not be partners in the Partnership, as officers of the Partnership, who shall have such rights and duties as may be designated by the General Partner;

(m)    to cause the Partner to merge or consolidate with or into any other entity without the consent or approval of any other Partner;

(n)     to cause the Partnership to convert to any other form of entity without the consent or approval of any other Partner;

(o)     to cause the Partnership to transfer to, or domesticate in, any jurisdiction and in connection with such transfer or domestication to continue the existence of the Partnership in its state of formation if the General Partner determines continuation to be advisable;

(p)     to compromise the Capital Contribution of any Partner on such terms as the General Partner deems advisable;

(q)     to create, issue, redeem, repurchase and reissue Partnership Interests of any character, including Partnership Interests having rights superior to any then outstanding Partnership Interests; and

(r)     to enter into, perform and carry out contracts, agreements and to do any other acts and things necessary, appropriate or incidental to the accomplishment of the purposes of the Partnership.

Section 4.2     Reliance by Public.

(a)     In order to expedite the handling of the Partnership's business and affairs, it is understood and agreed that any action taken, or document delivered, by the General Partner while acting in the name and on behalf of the Partnership shall be deemed to be the action of the Partnership as to any third parties (including all Limited Partners or their assignees as third

parties for such purpose). Any person dealing with the Partnership or the General Partner shall be entitled to rely upon a certificate of the General Partner as to:

(1)     the identity of the Partners;

(2)     the existence or nonexistence of any fact or facts that constitute conditions precedent to acts by the party delivering or receiving such certificate or which are in any other manner related to the affairs of the Partnership;

(3)     the persons who are authorized to execute and deliver any instrument or document of the Partnership;

(4)     any act or failure to act by the Partnership; or

(5)     any other matter whatsoever involving the Partnership or any Partner.

(b)     Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser shall be required to look to the application of proceeds hereunder or to verify any representation by the General Partner. Any such lender or purchaser shall be entitled to rely exclusively on the representations of the General Partner as to its authority to enter into such financing or sale arrangements and shall be entitled to deal with the General Partner, as if it were the sole party in interest therein, both legally and beneficially.

Section 4.3     Liabilities; Indemnification.

(a)     FOR SO LONG AS JOHN H. SPEER CONTROLS THE GENERAL PARTNER AND ANY ADDITIONAL OR SUBSTITUTED GENERAL PARTNER;

(1)     NO GENERAL PARTNER OR JOHN H. SPEER SHALL HAVE ANY FIDUCIARY DUTIES TO THE PARTNERSHIP OR TO ANY OTHER PARTNER, IT BEING THE INTENT OF ALL PARTNERS TO COMPLETELY ELIMINATE ALL SUCH FIDUCIARY DUTIES TO THE MAXIMUM EXTENT PERMITTED BY THE ACT, INCLUDING SECTION 17-1101 THEREOF; *PROVIDED, HOWEVER*, THAT THIS SECTION SHALL NOT BE DEEMED TO ELIMINATE ANY IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING THAT IS DEEMED TO EXIST WITH RESPECT TO THIS AGREEMENT UNDER DELAWARE LAW;

(2)     NO GENERAL PARTNER OR JOHN H. SPEER SHALL BE LIABLE TO THE PARTNERSHIP OR ANY PARTNER FOR ANY BREACH OR CLAIMED BREACH OF ANY FIDUCIARY DUTY (IF ANY) FOR SUCH GENERAL PARTNER'S OR JOHN H. SPEER'S GOOD FAITH RELIANCE ON THE PROVISIONS OF THIS AGREEMENT; AND

(3)     ALL LIABILITIES OF ANY GENERAL PARTNER OR JOHN H. SPEER (IF ANY) FOR BREACH OF CONTRACT AND BREACH OF DUTIES (INCLUDING FIDUCIARY DUTIES) TO THE PARTNERSHIP OR ANY PARTNER ARE ELIMINATED; *PROVIDED, HOWEVER*, THAT THIS PROVISION SHALL NOT LIMIT OR ELIMINATE LIABILITY FOR ANY ACT OR OMISSION THAT

CONSTITUTES A BAD FAITH VIOLATION OF ANY IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING THAT UNDER DELAWARE LAW IS DEEMED TO EXIST WITH RESPECT TO THIS AGREEMENT.

(b)    THE GENERAL PARTNER AND ITS AFFILIATES SHALL NOT BE LIABLE TO THE PARTNERSHIP OR THE PARTNERS FOR ANY LOSS OR DAMAGE INCURRED BY THE PARTNERSHIP OR ANY PARTNER BY REASON OF ANY ACT OR OMISSION (INCLUDING THE SOLE OR CONCURRENT NEGLIGENCE OF THE GENERAL PARTNER OR ITS AFFILIATES BUT EXCLUDING THE INTENTIONAL MISCONDUCT, FRAUD OR BAD FAITH OF THE GENERAL PARTNER OR ITS AFFILIATES) PERFORMED OR OMITTED BY THE GENERAL PARTNER OR ITS AFFILIATES IN GOOD FAITH AND IN A MANNER REASONABLY BELIEVED BY THE GENERAL PARTNER TO BE WITHIN THE SCOPE OF THE AUTHORITY GRANTED TO THE GENERAL PARTNER BY THIS AGREEMENT. THE PARTNERSHIP SHALL INDEMNIFY AND HOLD HARMLESS THE GENERAL PARTNER AND ITS AFFILIATES TO THE FULLEST EXTENT NOW OR HEREAFTER PERMITTED BY THE ACT, INCLUDING INDEMNIFICATION FOR ALL LOSS OR DAMAGE THAT RESULTS FROM THE NEGLIGENCE OF THE GENERAL PARTNER OR ITS AFFILIATES OR THAT ARISES UNDER ANY THEORY OF STRICT LIABILITY; PROVIDED THAT THIS INDEMNITY SHALL NOT INCLUDE ANY LOSS OR DAMAGE THAT RESULTS FROM THE INTENTIONAL MISCONDUCT, FRAUD OR BAD FAITH OF THE GENERAL PARTNER OR ITS AFFILIATES.

(c)    THE GENERAL PARTNER SHALL INDEMNIFY THE PARTNERSHIP AND THE PARTNERS, TO THE FULLEST EXTENT NOW OR HEREAFTER PERMITTED BY THE ACT, FROM AND AGAINST ALL LOSSES, COSTS, LIABILITIES, DAMAGES, SETTLEMENTS AND EXPENSES (INCLUDING COSTS OF SUIT AND ATTORNEY'S FEES) THEY MAY INCUR PROXIMATELY RESULTING FROM THE INTENTIONAL MISCONDUCT, FRAUD OR BAD FAITH OF THE GENERAL PARTNER.

(d)    Legal expenses and other costs incurred by the General Partner and its Affiliates shall be reimbursed on a monthly basis by the Partnership in advance of the final disposition of claims for which the General Partner or its Affiliates may be entitled to be indemnified or held harmless, provided that each person to whom reimbursement is to be made undertakes to repay funds so advanced if it is later determined by final, non-appealable judgment of a court of competent jurisdiction that such person is not entitled to be indemnified or held harmless by the Partnership. The right of the General Partner and its Affiliates to be indemnified and held harmless shall continue after the General Partner ceases to be a Partner. All rights of the General Partner and its Affiliates under this Section 4.3(c) shall inure to their respective successors and assigns.

Section 4.4    Title to Partnership Property.  All property owned by the Partnership, whether real or personal, tangible or intangible, shall be deemed to be owned by the Partnership as an entity, and no Partner, individually, shall have any ownership of such property.  The Partnership may hold its property in its own name or in the name of a nominee which may be the General Partner or any of its Affiliates or any trustee or agent designated by it.

Section 4.5    Transfer of Partnership Interest of General Partner.

(a)    The General Partner may transfer its share of the profits and distributions from the Partnership without the approval or the consent of any other Partner or class of Partners.

(b)    The General Partner may Transfer all or any portion of its Partnership Interests in the Partnership to any General Partner or any additional general partner admitted to the Partnership pursuant to Article 6.

(c)    Notwithstanding the foregoing, nothing in this Agreement shall be deemed to prevent (and all Limited Partners hereby expressly consent to) the transfer by the General Partner of all of its rights and Units in the Partnership, and the delegation of all its obligations to the Partnership and the Partners to one or more persons that have, as the result of a merger, consolidation, asset purchase, corporate reorganization, or other similar transaction, acquired all/or substantially all of the assets of the General Partner, and have assumed the obligations of the General Partner hereunder.

Section 4.6    Compensation.

(a)    The Partnership shall pay or reimburse the General Partner for all Organizational Expenses.  The Partnership shall pay or reimburse the General Partner for all other expenses incurred on behalf of the Partnership. Any amounts due to the General Partner pursuant to subsection (a) of this Section which are not paid to the General Partner within 30 days after such payment was due as the result of the Partnership having insufficient funds to pay such costs and meet other anticipated operating expenses shall, after such 30 day period, bear interest until paid at the lesser of (i) two (2) percentage points over the Prime Rate or (ii) the maximum lawful interest rate which may be charged to a limited partnership under federal or applicable state law.

(b)    The Partnership may compensate the General Partner at any time and from time to time provided that the method or amount of such compensation is approved or ratified by the General Partner and the Class A Limited Partners holding at least 60% of all Class A Units. Such General Partner compensation may be made by any method and in any amount including by cash payments, issuance to the General Partner of additional general or limited partnership interests in the Partnership of any class, issuance of evidences of Partnership indebtedness or by any other means.

## ARTICLE 5
### RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

Section 5.1    Limitation of Liability.  No Limited Partner shall be liable to the Partnership for the debts, liabilities, contracts, or any other obligations of the Partnership, except to the extent of his Partnership Interest in the Partnership and as provided in the Partnership's Certificate of Limited Partnership or herein.

Section 5.2    Management of Business.  No Limited Partner as such shall take part in the operation, management, or control of the Partnership business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership.

983985_5.DOC

Section 5.3    Outside Activities.   Without the prior written consent of the General Partner, no Class C Limited Partner may, nor may they permit any Person which, at the relevant time, is an Affiliate of such Limited Partner to directly or indirectly, engage in business activities similar to or competitive with the business activities of the Partnership, in whole or in part, in the Restricted Region, or act as an employee, employer, consultant, agent, lender, principal, corporate officer, director or in any other individual or representative capacity, or own, manage, operate, control or participate as a 5% or greater shareholder, partner, member or joint venturer of any Person which engages in business activities similar to or competitive with the business activities of the Partnership in the Restricted Region. Additionally, each Class C Limited Partner agrees that so long as such Person is a Limited Partner and for a period of one year after such Person ceases to be a Limited Partner, neither such Limited Partner nor any of his, her or its Affiliates will, by themselves or in conjunction with any Person, (1) solicit or recruit for employment any employee of the Partnership or any of its Affiliates, or (2) solicit or call on as a client, customer or supplier or attempt to solicit or call on as a client, customer or supplier, for the purpose of engaging in business activities similar to or competitive with the business activities of the Partnership, any Person that is or has been a client, customer or supplier of the Partnership or any of its Affiliates.

Section 5.4    Transfer of Units.

(a)    *Unit Register*.  The General Partner shall maintain at the principal office of the Partnership as a Partnership record a register reflecting: (i) the name and address of each Limited Partner admitted to the Partnership in compliance with this Agreement; (ii) the class (and series, if applicable) and number of Units owned of record by each such Limited Partner; and (iii) the date each Limited Partner acquired such Units (the "*Unit Register*"). Each Person in whose name ownership of a Unit is recorded in the Unit Register as of the close of business on any date is referred to as a "*Record Holder*."

(b)    *Record Holders*.  Except as otherwise required by non-waivable provisions of the Act, the Partnership and the General Partner shall be entitled to recognize the exclusive right of the Record Holder of a Unit to: (i) receive distributions; (ii) be allocated items of income, gain, loss, deduction or credit for federal and state tax purposes; (iii) vote such Units or give or withhold consent with respect to matters submitted to Limited Partners; or (iv) exercise or refrain from exercising any other rights of a Limited Partner. Neither the Partnership nor the General Partner shall be obligated to recognize any equitable or other claim to or an interest in Units on the part of any Person who is not the Record Holder of such Units.

(c)    *General Restrictions on Transfer*.  Except for Permitted Transfers and as otherwise required by this Agreement, no Limited Partner shall Transfer all or any portion of such Limited Partner's Units or permit an Indirect Transfer of all or any portion of such Units to occur without the prior written consent of the General Partner and the prior approval of Class A Limited Partners holding at least 60% of all Class A Units, which consents may be given, withheld or conditioned in the sole discretion of such Partners. Any Transfer of a Unit or any Indirect Transfer of a Unit shall be subject to satisfaction of the other conditions of this Section and the provisions of Article 10.

(d)     *Transfer Notice.*  Any Limited Partner proposing to make a Transfer of Units or to permit an Indirect Transfer of Units to occur (other than Permitted Transfers) shall notify the General Partner in writing at least 20 days prior to the proposed Transfer or Indirect Transfer (such notification being herein referred to as a *"Transfer Notice"*).  The Transfer Notice shall describe with particularity all terms, conditions and ancillary agreements and arrangements, whether written or unwritten, in any way relating to the proposed Transfer or Indirect Transfer, including all parties that will have a direct or beneficial interest in the Units following the proposed Transfer or Indirect Transfer, the nature and amount of the consideration to be paid and received by all parties and the proposed closing date of the transaction.  In the event that the information concerning a Transfer or Indirect Transfer contained in a Transfer Notice changes in any material respect, and on each occasion of such a material change, the Limited Partner shall submit a revised Transfer Notice at least 20 days prior to the proposed Transfer or Indirect Transfer.

(e)     *Additional Conditions to Transfer.*  If the General Partner consents to a Transfer:

(1)     The Limited Partner and his purchaser, transferee or assignee shall execute, acknowledge, and deliver to the General Partner such instruments of transfer and assignment and an execution in counterpart of this Agreement with respect to such transactions as are in form and substance reasonably satisfactory to the General Partner;

(2)     Such Limited Partner and his transferee or assignee shall be jointly and severally liable to the Partnership for, and shall promptly pay or reimburse the Partnership for, all expenses of the Partnership in connection with such transaction, including attorney's fees and expenses;

(3)     The purchaser, transferee or assignee of such Limited Partner's Units represents, in writing, to the General Partner and the Partnership that such Person will not resell or otherwise dispose of the Units acquired except in accordance with the provisions this Article 5; and

(4)     The transfer shall not be in violation of any applicable federal or state securities laws, including the Securities Act of 1933, as amended, and applicable state securities laws; it being understood and agreed that the General Partner may require as a further condition to any such Transfer or Indirect Transfer that the Partnership will be furnished with an opinion of counsel to the transferor or transferee, which counsel and opinion shall be satisfactory to the General Partner, to the foregoing effect.

(f)     *Required Acts of Limited Partners.*  Each Limited Partner agrees that such Limited Partner will, upon request of the General Partner, execute such certificates and other documents and perform such acts as the General Partner deems appropriate whether before or after a Transfer of Units by that Limited Partner to preserve the limited liability status of the Partnership under the laws of the jurisdictions in which the Partnership is doing business, to preserve the taxation of the Partnership as a partnership for federal income tax purposes, or to otherwise comply with applicable laws.

(g)    *Mandatory Unit Sale*

(1)    With the prior approval of Class A Limited Partners holding at least 60% of all Class A Units, the General Partner may require all Limited Partners (and not less than all Limited Partners) to sell an equal percentage (which may be 100%) of all classes of their Units to any Person or Persons for such consideration and on such terms and conditions as may be consented to by the General Partner and approved by Class A Limited Partners holding at least 60% of all Class A Units (a "*Mandatory Unit Sale*").

(2)    In the event that a Mandatory Unit Sale is consented to by the General Partner and approved by Class A Limited Partners holding at least 60% of all Class A Units, the General Partner shall promptly notify each Limited Partner in writing of all material terms of the proposed Mandatory Unit Sale but the failure to do so shall not in any way impair the authority of the General Partner or the Partnership to consummate a Mandatory Unit Sale.

(3)    Promptly upon written or oral request by the General Partner in connection with a proposed Mandatory Unit Sale, but in no event later than five Business Days thereafter, each Limited Partner shall:

(A)    deliver to the General Partner all Unit Certificates representing such Limited Partner's Units, each duly endorsed for transfer as instructed by the General Partner or, if requested by the General Partner, accompanied by a blank Unit transfer power of attorney, and in any case with the Limited Partner's signature guaranteed by a national banking institution or broker-dealer registered with the Securities and Exchange Commission;

(B)    deliver to the General Partner such agreements, instruments of transfer, approvals, certificates, consents or resolutions of the Limited Partners as the General Partner may request of Limited Partners; *provided, however,* that no Limited Partner shall be required to make any representations or warranties in connection with a Mandatory Unit Sale other than representations or warranties as to (i) such Limited Partner's ownership of Units to be transferred pursuant to the Mandatory Unit Sale free and clear of all liens, claims and encumbrances, (ii) such Limited Partner's power and authority to effect such transfer pursuant to the Mandatory Unit Sale and (iii) such matters pertaining to compliance with securities laws as the transferee shall reasonably require; and

(C)    take such further actions as the General Partner may request of Limited Partners.

(4)    In the event that any Limited Partner fails or refuses to timely execute any document or take any action requested by the General Partner, the General Partner may, but shall not be required to, take such action or execute any such document on behalf of the Limited Partner acting pursuant to the Limited Partner's irrevocable power of attorney set forth in Section 11.2 hereof.  Any actions taken or documents executed by the General Partner in connection with proposed or consummated Mandatory Unit Sale

pursuant to such power of attorney shall have the same force and effect as if taken or executed by the Limited Partner.

(5)     Notwithstanding anything in this Agreement to the contrary, all proceeds from a Mandatory Unit Sale of all of the Units of the Partnership shall be received, held and distributed by the General Partner (and not by any Limited Partner) as if (i) all of the assets of the Partnership (rather than Units) had been sold in a single transaction consented to by all Partners and the Partnership after such sale, (ii) the Partnership had dissolved, and (iii) aggregate net proceeds from such Mandatory Unit Sale constituted the aggregate proceeds of such deemed asset sale net of all expenses and all liabilities of the Partnership other than liabilities of the Partnership to Partners for distributions under Section 3.6.

Section 5.5   Permitted Transfers.

(a)     Neither the approval of the General Partner nor any Limited Partner shall be required, but satisfaction of the requirements of Sections 5.4(d) shall be deemed a condition to, the following Transfers (each, a *"Permitted Transfer"*):

(1)     by any Limited Partner, of all or part of its Units, to an Affiliate of such Limited Partner, provided that the transferee agrees in writing to be bound by the terms and conditions of this Agreement;

(2)     by any Limited Partner that is a natural person during his lifetime to any of his or her parents, siblings, spouse during marriage and not incident to a divorce, adult lineal descendants (including those by adoption) and adult spouses of lineal descendants;

(3)     by any Limited Partner that is a natural person during his lifetime to a guardian of the estate of the Limited Partner; and

(4)     by any Limited Partner that is a natural person during his lifetime to (1) an inter vivos trust for the sole benefit of his spouse during marriage and not incident to divorce, and/or his lineal descendants (including lineal descendants by adoption), or (2) to a family limited partnership whose only partners are his spouse during marriage and not incident to divorce, and/or his lineal descendants (including lineal descendants by adoption), provided that the Partnership is notified in writing at least thirty (30) days prior to the proposed Transfer and, provided, further that the notice shall specify the exact name of the trust or partnership and its federal tax identification number (or indicate that the number has been applied for but not received), and the name, address and relationship to the Limited Partner of all trustees and beneficiaries of the trust or trusts, or partners of the partnership, and their respective federal tax identification or social security numbers (or indicate that the numbers have been applied for but not received).

(b)     Despite anything in this Agreement to the contrary, the following Transfers shall constitute Permitted Transfers not requiring the consent or approval of any Partner and such Permitted Transfers shall not be subject to the prior notice requirements of Section 5.4(d):

983985_5.DOC

(1)     any Transfer by Michael G. Manners or DWM Holdings, LP (or both) to John H. Speer or his designee;

(2)     any voluntary Transfer by John H. Speer to members of his family, trusts for the benefit of his family or entities owned by members of Mr. Speer's family;

(3)     the grant of any security interest by any Partner in all or a portion of such Partner's Units of any class to secure indebtedness of John H. Speer to any Person, in any amount, and for any purpose (including for purposes not related to the Partnership's business), including to secure the indebtedness of John H. Speer to Amegy Bank National Association and any extensions, modifications, renewals or refinancings of such indebtedness at any time and from time to time; and

(4)     the Transfer of any Units in connection with the foreclosure of any security interest granted pursuant to Section 5.5(b)(3) above in such Units.

## ARTICLE 6
### WITHDRAWAL OF THE GENERAL PARTNER;
### ADMISSION OF ADDITIONAL GENERAL PARTNERS

Section 6.1     Withdrawal.  The General Partner may withdraw from the Partnership in its sole discretion at any time.

Section 6.2     Admission of Additional General Partner.  The General Partner may cause the Partnership to admit as an additional General Partner any person controlling, controlled by or under common control with the General Partner.  The Limited Partners hereby consent in advance to such an admission of an additional General Partner pursuant to this Section 6.2; *provided, however,* that such admission shall not in any manner reduce the Partnership Interest of the Class A Limited Partners, the Class B Limited Partners or the Class C Limited Partners in the Partnership.  Unless otherwise agreed by the General Partner and the person to be admitted as an additional General Partner, the additional General Partner so admitted shall have the same rights and responsibilities as the General Partner under this Agreement.  Any such successor or additional General Partner shall, as a condition of receiving any interest in the Partnership, also agree to be bound by any contracts, leases, instruments or other documents theretofore executed and delivered on behalf of the Partnership to the same extent and on the same terms and conditions as the prior General Partner.

## ARTICLE 7
### FISCAL YEAR; BOOKS OF ACCOUNT;
### BANK ACCOUNTS; AND REPORTS

Section 7.1     Books and Records.

(a)     The Partnership shall adopt the calendar year as its fiscal year.

(b)     The General Partner, at the expense of the Partnership, shall maintain for the Partnership books and records of account prepared on an accrual basis.  The Partnership's books

and records of account shall include Capital Accounts for each Partner kept in accordance with the provisions of Section 2.7.

(c)    The General Partner, at the expense of the Partnership, shall prepare monthly, quarterly and annual financial statements. Such financial statements shall be maintained on an accrual basis.

(d)    The financial statements of the Partnership as of and for the twelve months ended December 31 of each year beginning December 31, 2006, may, in the sole discretion of the General Partner, be audited annually by an independent public accounting firm designated by the General Partner. The cost of such audit services shall be an expense of the Partnership.

(e)    The General Partner, in its sole discretion, shall designate the preparer of the Partnership's federal income tax returns. All costs of such tax return preparation or review shall be an expense of the Partnership.

Section 7.2    Examination of Partnership Records.    The Limited Partners and their agents may examine, audit and obtain copies of the books, records and accounts of the Partnership, including federal, state, and local income tax returns for each year as and when they become available, inspect its properties, or otherwise make reasonable inquiry as to Partnership affairs. Any such inspections shall be conducted during the normal business hours of the General Partner. The General Partner may, however, keep confidential from other Partners for such period of time as the General Partner deems reasonable, any information which the General Partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner in good faith believes is not in the best interest of the Partnership or could damage the Partnership or its business or which the Partnership or General Partner is required by law or agreement with a third party to keep confidential all such information being referred to as *"Confidential Information."* In the event the General Partner discloses to other Partners information which the General Partner deems Confidential Information, the General Partner shall so advise the other Partners in writing and thereafter the Partner to whom such Confidential Information is disclosed shall thereafter maintain such Confidential Information in strictest confidence unless and to the extent otherwise agreed in writing by the General Partner. All obligations to maintain the confidentiality of Partnership information arising under this Agreement or by virtue of applicable statutory or common law shall survive the withdrawal or removal of a Partner or the assignment of his interest in the Partnership.

Section 7.3    Bank Accounts.    All funds of the Partnership shall be deposited in its name in such bank account or accounts as may be designated by the General Partner. The General Partner and any persons authorized in writing by it to do so shall be authorized to draw checks on the bank accounts of the Partnership. Each bank in which a Partnership account is maintained shall be relieved of any responsibility to inquire into the authority of the General Partner to deal with such funds.

Section 7.4    Tax Elections.

(a)    The parties agree that the General Partner shall make the following elections for the Partnership in the first and subsequent tax years:

(1)     To recover the basis of recovery property pursuant to Section 168(b)(1) and (2) of the Code, rather than pursuant to Section 168(b)(3), and to compute depreciation with respect to other property using the maximum declining balance method;

(2)     To elect December 31st as the end of the fiscal year of the Partnership;

(3)     To elect the accrual method of accounting;

(4)     To elect to have the General Partner be the "tax matters partner" pursuant to Section 6231(a)(7)(A) of the Code;

(5)     To deduct expenses incurred in organizing the Partnership ratably over a 60-month period as provided in Code Section 709; and

(6)     To elect to book up the tax basis of Partnership assets under Code Section 754.

(b)     Subject to the other provisions of this Section 7.4, all other elections required or permitted to be made by the Partnership under the Code shall be made by the General Partner in its sole discretion.

(c)     In the event of a Transfer of all or any part of the interest of a General Partner or of a Limited Partner, the General Partner may, but shall not be required to, elect, pursuant to Section 754 of the Code (or any corresponding provision or succeeding law), to adjust the basis of the Partnership property. If such election is made, the General Partner may require the transferee of any Partnership Interest to reimburse the Partnership for the costs of compliance with this election, including any third party valuation and accounting services.

(d)     Following the promulgation, if any, of final regulations and associated guidance by the Treasury Department and IRS regarding the tax consequences associated with the issuance or transfer of Partnership Interest in exchange for the performance of services, the Partnership and each Partner shall make the election contemplated by proposed Section 1.83-3(l) of the Regulations and by the revenue procedure contemplated by IRS Notice 2005-43 (or the corresponding provisions of any such final Regulations or associated guidance) in connection with the issuance or transfer by the Partnership of any Partnership Interest for the performance of services.  It is the intention of the parties for such Class C Units to be taxed as profits interests in accordance with Rev. Proc. 93-27 and 2001-43, particularly as permitted by the elective provisions of applicable proposed or final regulations.   The Partnership and each Partner (including the Partner obtaining an Interest in exchange for the performance of services) shall comply with all requirements associated with any such election while the election remains effective.

(e)     No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code, or from any similar provisions of any state tax laws.

Section 7.5   Annual Reports.   The General Partner shall use its commercially reasonable efforts to furnish to the Limited Partners, as soon as practicable after the Partnership's fiscal year end, an annual report containing, among other things, financial statements of the Partnership as at and for the period ending December 31st of the preceding fiscal year end, including a balance sheet and statement of income and Partners' equity and changes in financial position;

Section 7.6   Quarterly Reports.   As soon as is practicable after the end of each calendar quarter other than the fourth fiscal quarter, the General Partner shall use its commercially reasonable efforts to provide to the Limited Partners as of the end of such calendar quarter a report containing, among other things, the unaudited financial statements of the Partnership for the quarter then ended.

Section 7.7   Tax Reporting Information.   The General Partner shall use its commercially reasonable efforts to furnish the Limited Partners a report within 90 days after the close of the Partnership's fiscal year containing all tax reporting information reasonably necessary for federal income tax purposes.

Section 7.8   Reporting Expenses.   All expenses incurred by the General Partner in preparing (or causing to be prepared) reports to Limited Partners shall be paid by the Partnership as a Partnership expense.

## ARTICLE 8
### DISSOLUTION, WINDING UP AND TERMINATION; CONTINUATION

Section 8.1   Events of Dissolution.

(a)   The Partnership shall be dissolved and its affairs wound up upon the first to occur of the following:

(1)   the events, circumstances or date described in a written notification by the General Partner that the Partnership will be dissolved upon the occurrence of such event, circumstances or such date;

(2)   the sale of all or substantially all of the assets of the Partnership; or

(3)   any other event that requires dissolution of the Partnership under the Act.

(b)   Neither the death, dissolution, mental incompetency, nor bankruptcy of any Limited Partner or General Partner nor the admission or substitution of a Person as a Limited Partner in accordance with the terms hereof shall dissolve, or be deemed to dissolve, the Partnership or cause any interruption in or affect the continued existence of the Partnership and its business.

(c)   Any dissolution of the Partnership shall be effective as of the date on which the event occurs giving rise to such dissolution, but the Partnership shall not terminate unless and until all its affairs have been wound up and its assets distributed as provided in this Article 8.

(d)    No Partner or Partners shall have authority to continue the business of the Partnership pursuant to this Agreement, the Act or otherwise following the occurrence of an event described in Section 8.1(a) without the written consent of all of the other Partners (other than a wrongfully withdrawing Partner).

Section 8.2    Winding Up and Liquidation.   In the event that the Partnership is dissolved pursuant to Section 8.1, the Liquidator shall promptly commence to wind up the affairs of the Partnership. In winding up the affairs of the Partnership, the Liquidator may take any and all actions that it determines to be in the best interests of the Partners including but not limited to, any actions relating to (i) the payment, settlement or compromise of existing claims against the Partnership, (ii) the making of reasonable provisions for payment of contingent claims against the Partnership and (iii) the sale or disposition of the properties and assets of the Partnership.

Section 8.3    Application of Partnership Assets.

(a)    In winding up the affairs of the Partnership, the properties and assets of the Partnership (other than those described in Section 8.3(b)) shall be applied to pay the claims of all creditors of the Partnership, including Partners to the extent they are creditors other than in respect of distributions from the Partnership (*provided, however*, that (i) such claims may be provided for through the assumption thereof and (ii) if any liability is contingent or uncertain in amount, reasonable provisions for payment of such liabilities may be made by the Liquidator), and then shall be distributed to the Partners in accordance with Section 3.6. The Liquidator is authorized to allocate or reallocate income (including gross income), gain, loss and deductions as set forth in Article 3.

(b)    Notwithstanding anything in this Agreement to the contrary, the Partnership shall convey all its rights, titles and interests in Intellectual Property to the General Partner or its successor and assigns upon dissolution and liquidation of the Partnership.   Neither the Partnership nor any of the Limited Partners shall have any rights to compensation, profits or property interests or other rights as a result of the use of Intellectual Property by the General Partner or its Affiliate for their separate benefit.

Section 8.4    Reasonable Time for Winding Up.  A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Partnership and the liquidation of the properties and assets of the Partnership in order to minimize any losses otherwise attendant upon such winding up.

Section 8.5    Return of Contributions. The General Partner shall not be liable for the return of all or any portion of any contribution to the capital of the Partnership made by a Limited Partner, it being expressly understood that any such return shall be made solely from the properties and assets of the Partnership.

Section 8.6    Clawback.  Immediately after the distribution of liquidation proceeds, a determination shall be made of the hypothetical amount (the "*Target Cumulative Distribution Amount*") each Partner would receive under Section 3.6(a) if, immediately after the distribution of the liquidation proceeds, the cumulative amount of distributions made by the Partnership to all Partners over the entire term of the Partnership were apportioned among the Partners in

accordance with the provisions of Section 3.6(a) at such time. If the cumulative amount of distributions actually made by the Partnership to the General Partner or any Limited Partners exceeds such Partner's Target Cumulative Distribution Amounts, such Partner shall promptly pay such excess to the Partner or Partners which received less than their Target Cumulative Distribution Amounts.

Section 8.7   Waiver of Partition. Each Partner hereby waives until termination of the Partnership any and all rights that it may have to maintain an action for partition of the properties and assets of the Partnership.

Section 8.8   Allocations During Liquidation. During the period commencing on the first day of the tax period during which a dissolution occurs and ending on the date on which all of the assets of the Partnership have been distributed to the Partners pursuant to this Article 8, the Partners shall continue to share Net Income and Losses and items thereof and distributions in the manner provided in Article 3 hereof and Section 3.4(f) in particular.

Section 8.9   Character of Liquidating Distributions.   All payments made in liquidation of the interest of a Partner in the Partnership shall be made in exchange for the interest of such Partner in Partnership property pursuant to Section 736(b)(1) of the Code, including the interest of such Partner in Partnership goodwill.

ARTICLE 9
DEFINITIONS

Section 9.1   Defined Terms. For purposes of this Agreement, the terms set out in Annex B to this Agreement shall have the meanings given them in Annex B to this Agreement.

Section 9.2   Section Headings, Gender. The headings in this Agreement are inserted for convenience of reference only and shall not affect interpretation of this Agreement. Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine or the neuter gender shall include the masculine, the feminine and the neuter. The terms "*hereof*," "*herein*" or "*hereunder*" shall refer to this Agreement as a whole and not to any particular Article or Section and (a) reference in this Agreement to "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation"; (b) reference in this Agreement to "herein," "hereby" or "hereunder," or any similar formulation, shall be deemed to refer to this Agreement as a whole, including all Annexes to this Agreement; (c) reference in this Agreement to "and" and "or" shall be deemed to mean "and/or"; (d) references in this Agreement to Articles and Sections refer to Articles and Sections of this Agreement; and (e) references in this Agreement to Annexes are to the Annexes attached to this Agreement, each of which is made a part hereof for all purposes.

ARTICLE 10
BUY-SELL PROVISIONS

Section 10.1   General. Notwithstanding anything to the contrary in Article 5 (or otherwise in this Agreement), each Limited Partner and each Unit shall be subject to the rights and obligations set out in this Article 10; *provided, however,* that, subject to Section 10.2

through and including Section 10.11 nothing in this Article 10 is intended to limit the right and opportunity for a Partner to make the Permitted Transfers contemplated by Section 5.5. Accordingly, notwithstanding the restrictions on Transfer provided by Section 5.4, a Partner shall be obligated to Transfer a Partnership Interest in compliance with the requirements of this Article 10.

Section 10.2   Death of a Profit Partner.   If a Profit Partner dies, the executor or administrator of such deceased Profit Partner's estate shall promptly give written notice of such death to the Partnership.

(a)   For a period of 180 days following the delivery of notice under this Section 10.2, the Partnership shall have the exclusive right and option, exercisable at any time during such period, to purchase all or any portion of the decedent's Profit Units subject to this Section 10.2. The Partnership shall exercise the option by giving written notice of the Partnership's intentions to purchase such Profit Units to the personal representative of the decedent's estate before the option period described in this paragraph expires. The notice shall set out the maximum portion of the decedent's Profit Units subject to this Section 10.2 that the Partnership is willing to purchase.  Any such purchase shall occur on the terms set out in this Section 10.2 and Section 10.11.

(b)   The spouse of the deceased Profit Partner and the personal representative of the deceased Profit Partner's estate shall sell all or any portion of the deceased Profit Partner's Profit Units to the Partnership in accordance with the option established by this Section 10.2, and shall execute and deliver such documents as the General Partner determines are necessary or appropriate for purposes of effectuating the sales to the Partnership in accordance with this Section 10.2.

(c)   For purposes of the rights and obligations provided under this Section 10.2, the purchase price shall be the Book Value of the Profit Units, and the manner of payment shall be as provided in Section 10.11.

(d)   In addition to the Profit Units owned by a Profit Partner at the time of his or her death, the rights and obligations provided by this Section 10.2 shall apply to any Profit Unit held by any Person at the time of the decedent's death that was obtained, directly or indirectly, from the decedent, whether as a Permitted Transfer or otherwise.  The holder of any such Profit Units shall sell all or any portion of such Person's Profits Units to the Partnership in accordance with the options and obligations established by this Section 10.2, and shall execute and deliver such documents as the General Partner determines are necessary or appropriate for purposes of effectuating the sales to the Partnership in accordance with this Section 10.2.

Section 10.3   Termination of Employment of a Profit Partner.

(a)   If a Profit Partner's employment with the Partnership or a Wholly Owned Affiliate of the Partnership terminates for any reason (except for death), with or without cause, including expiration of an employment agreement, the General Partner shall promptly give written notice of such termination to all remaining Partners.  The Partnership shall have the option to purchase, and the former Profit Partner-employee shall have the obligation to sell, any

or all of the Profit Units of the former Profit Partner-employee under terms and conditions comparable to those provided under Section 10.2 (including the time periods therein designated).

(b)      For purposes of the rights and obligation provided under this Section 10.3, the purchase price shall be the Book Value of the Profit Units, and the manner of payment shall be as provided in Section 10.11.

(c)      In addition to the Profit Units owned by a Profit Partner at the time of his or her termination of employment, the rights and obligations provided by this Section 10.3 shall apply to any Profit Unit held by any Person that was obtained, directly or indirectly, from the former Profit Partner-employee, whether as a Permitted Transfer or otherwise. The holder of any such Profit Unit shall sell all or any portion of such Person's Profits Units to the Partnership in accordance with the options and obligations established by this Section 10.3, and shall execute and deliver such documents as the General Partner determines are necessary or appropriate for purposes of effectuating the sales to the Partnership in accordance with this Section 10.3.

Section 10.4   Divorce or Death of Spouse of a Profit Partner.   If the marital relationship of a Profit Partner is terminated either by death of the Profit Partner's spouse or by divorce, the Profit Partner shall have the right and obligation to promptly purchase all of his or her former spouse's interest in such Profit Partner's Profit Units, and his or her former spouse, or the personal representative of a deceased spouse's estate, shall be obligated to promptly sell to the Profit Partner the former spouse's interest in the Profit Units, if one or more of the following Persons do not, either individually or collectively, succeed to the all the Profit Units that the Profit Partner's spouse held during the marital relationship: (a) to such Profit Partner; or (b) to a trust in which all legal and beneficial interests are held solely by such Profit Partner.

(a)      The Persons holding the former spouse's interest in the Profit Units (whether the spouse or the personal representative of a deceased spouse's estate) shall sell all of the former spouse's interest in the Profit Units, and shall execute and deliver to the Partnership such documents, including certificates evidencing such Profit Units, as the General Partner shall determine are necessary or appropriate.

(b)      For purposes of the right and obligation provided under this Section 10.4, the purchase price shall be the portion of the Book Value of the Profit Units attributable to the former spouse's interest in the Profit Units, and the manner of payment shall be as provided in Section 10.11.

(c)      In the event that a Profit Partner fails to obtain his or her former spouse's interest in Profit Units pursuant to this Section 10.4, the Partnership shall have the right and power to obtain the former spouse's interest in the Profit Units under terms and conditions comparable to those provided under Section 10.2(a) (subject to Section 10.4(a) and Section 10.4(b)).

Section 10.5   Profit Partner Buy-Out Event. Upon the occurrence of a Buy-Out Event with respect to any Profit Partner ("*Selling Profit Partner*"), the Partnership shall have the option to purchase any or all of the Profit Units of the Selling Profit Partner, and the Selling Profit Partner shall have the obligation to sell such Profit Units upon an exercise of any such option,

under terms and conditions set forth in this Section 10.5. The Partnership shall send notice to all Partners of a Buy-Out Event promptly upon learning of its occurrence ("*Buy-Out Notice*").

(a)     For a period of 180 days following the delivery of the Buy-Out Notice, the Partnership shall have the exclusive right and option, exercisable at any time during such period, to purchase all or any portion of the Selling Profit Partner's Profit Units subject to this Section 10.5. The Partnership shall exercise the option by giving written notice of the Partnership's intentions to purchase such Profit Units to the Selling Profit Partner before the option period described in this paragraph expires. The notice shall set out the maximum portion of the Selling Profit Partner's Profit Units subject to this Section 10.5 that the Partnership is willing to purchase. Any such purchase shall occur on the terms set out in this Section 10.5 and Section 10.11.

(b)     The Selling Profit Partner shall sell all or any portion of the Selling Profit Partner's Profit Units to the Partnership in accordance with the options or obligations established by this Section 10.5, and shall execute and deliver such documents as the General Partner may determine are necessary or appropriate for purposes of effectuating the sales to them in accordance with this Section 10.5.

(c)     For purposes of the rights and obligations provided under this Section 10.5, the purchase price shall be 75% of the Book Value associated with the Profit Units, and the manner of payment shall be as provided in Section 10.11.

Section 10.6   Death of a Class A Limited Partner. If a Class A Limited Partner dies, the executor or administrator of such deceased Class A Limited Partner's estate shall promptly give written notice of such death to the Partnership. For so long as John H. Speer personally controls the General Partner and is not Incapacitated, or if John H. Speer is Incapacitated or deceased, for so long as his executor or personal representative controls the General Partner, the following shall apply:

(a)     For a period of 180 days following the delivery of notice under this Section 10.6, the Partnership shall have the exclusive right and option, exercisable at any time during such period, to purchase all or any portion of the decedent's Class A Units subject to this Section 10.6. The Partnership shall exercise the option by giving written notice of the Partnership's intentions to purchase such Class A Units to the personal representative of the decedent's estate before the option period described in this paragraph expires. The notice shall set out the maximum portion of the decedent's Class A Units subject to this Section 10.6 that the Partnership is willing to purchase. Any such purchase shall occur on the terms set out in this Section 10.6 and Section 10.11.

(b)     The spouse of the deceased Class A Limited Partner and the personal representative of the deceased Class A Limited Partner's estate shall sell all or any portion of the deceased Class A Limited Partner's Class A Units to the Partnership in accordance with the option established by this Section 10.6, and shall execute and deliver such documents as the General Partner determines are necessary or appropriate for purposes of effectuating the sales to the Partnership in accordance with this Section 10.6.

(c)     For purposes of the rights and obligations provided under this Section 10.6, the purchase price shall be the Fair Market Value of the Class A Units, and the manner of payment shall be as provided in Section 10.11.

(d)     In addition to the Class A Units owned by a Class A Limited Partner at the time of his or her death, the rights and obligations provided by this Section 10.6 shall apply to any Class A Unit held by any Person at the time of the decedent's death that was obtained, directly or indirectly, from the decedent, whether as a Permitted Transfer or otherwise.  The holder of any such Class A Units shall sell all or any portion of such Person's Class A Units to the Partnership in accordance with the options and obligations established by this Section 10.6, and shall execute and deliver such documents as the General Partner determines are necessary or appropriate for purposes of effectuating the sales to the Partnership in accordance with this Section 10.6.

Section 10.7  Incapacity of a Class A Limited Partner.  If a Class A Limited Partner becomes Incapacitated, the personal representative or guardian of such Incapacitated Class A Limited Partner shall promptly give written notice of such incapacity to the Partnership. For so long as John H. Speer personally controls the General Partner and is not Incapacitated, or if John H. Speer is Incapacitated or deceased, for so long as his executor or personal representative controls the General Partner, the following provisions shall apply:

(a)     For a period of 180 days following the delivery of notice under this Section 10.7, the Partnership shall have the exclusive right and option, exercisable at any time during such period, to purchase all or any portion of the Incapacitated Class A Limited Partner's Class A Units subject to this Section 10.7. The Partnership shall exercise the option by giving written notice of the Partnership's intentions to purchase such Class A Units to the personal representative or guardian of the Incapacitated Class A Limited Partner before the option period described in this paragraph expires. The notice shall set out the maximum portion of the Incapacitated Class A Limited Partner's Class A Units subject to this Section 10.7 that the Partnership is willing to purchase.  Any such purchase shall occur on the terms set out in this Section 10.7 and Section 10.11.

(b)     The personal representative or guardian of the Incapacitated Class A Limited Partner shall sell all or any portion of the Incapacitated Class A Limited Partner's Class A Units to the Partnership in accordance with the option established by this Section 10.7, and shall execute and deliver such documents as the General Partner determines are necessary or appropriate for purposes of effectuating the sales to the Partnership in accordance with this Section 10.7.

(c)     For purposes of the rights and obligations provided under this Section 10.7, the purchase price shall be the Book Value of the Class A Units, and the manner of payment shall be as provided in Section 10.11.

(d)     In addition to the Class A Units owned by a Class A Limited Partner at the time he or she became Incapacitated, the rights and obligations provided by this Section 10.7 shall apply to any Class A Unit held by any Person at the time such Class A limited Partner's became Incapacitated that was obtained, directly or indirectly, from such Class A limited Partner, whether as a Permitted Transfer or otherwise.  The holder of any such Class A Units shall sell all

or any portion of such Person's Class A Units to the Partnership in accordance with the options and obligations established by this <u>Section 10.7</u>, and shall execute and deliver such documents as the General Partner determines are necessary or appropriate for purposes of effectuating the sales to the Partnership in accordance with this <u>Section 10.7</u>.

Section 10.8   Divorce or Death of Spouse of a Class A Limited Partner.   If the marital relationship of a Class A Limited Partner is terminated either by death of the Class A Limited Partner's spouse or by divorce, the Class A Limited Partner shall have the right and obligation to promptly purchase all of his or her former spouse's interest in such Class A Limited Partner's Class A Units, and his or her former spouse, or the personal representative of a deceased spouse's estate, shall be obligated to promptly sell to the Class A Limited Partner the former spouse's interest in the Class A Units, if one or more of the following Persons do not, either individually or collectively, succeed to all the Class A Units that the Class A Limited Partner's spouse held during the marital relationship: (a) to such Class A Limited Partner; or (b) to a trust in which all legal and beneficial interests are held solely by such Class A Limited Partner.

(a)     The Persons holding the former spouse's interest in the Class A Units (whether the spouse or the personal representative of a deceased spouse's estate) shall sell all of the former spouse's interest in the Class A Units, and shall execute and deliver to the Partnership such documents, including certificates evidencing such Class A Units, as the General Partner shall determine are necessary or appropriate.

(b)     For purposes of the right and obligation provided under this <u>Section 10.8</u>, the purchase price shall be the portion of the Book Value of the Class A Units attributable to the former spouse's interest in the Class A Units, and the manner of payment shall be as provided in <u>Section 10.11</u>.

(c)     In the event that a Class A Partner fails to obtain his or her former spouse's interest in Class A Units pursuant to this <u>Section 10.8</u>, the Partnership shall have the right and power to obtain the former spouse's interest in the Class A Units under terms and conditions comparable to those provided under <u>Section 10.6(a)</u> (subject to <u>Section 10.8(a)</u> and <u>Section 10.8(b)</u>).

Section 10.9   Class A Limited Partner Buy-Out Event.   Upon the occurrence of a Buy-Out Event with respect to any Class A Partner ("*Selling Class A Limited Partner*"), the Partnership shall have the option to purchase any or all of the Class A Units of the Selling Class A Limited Partner, and the Selling Class A Limited Partner shall have the obligation to sell such Class A Units upon an exercise of any such option, under terms and conditions set forth in this <u>Section 10.9</u>. The Partnership shall send a Buy-Out Notice to all Partners of a Buy-Out Event with respect to a Class A Limited Partner promptly upon learning of its occurrence.

(a)     For a period of 180 days following the delivery of the Buy-Out Notice, the Partnership shall have the exclusive right and option, exercisable at any time during such period, to purchase all or any portion of the Selling Class A Limited Partner's Class A Units subject to this <u>Section 10.9</u>. The Partnership shall exercise the option by giving written notice of the Partnership's intentions to purchase such Class A Units to the Selling Class A Limited Partner

before the option period described in this paragraph expires. The notice shall set out the maximum portion of the Selling Class A Limited Partner's Class A Units subject to this Section 10.9 that the Partnership is willing to purchase. Any such purchase shall occur on the terms set out in this Section 10.9 and Section 10.11.

(b)      The Selling Class A Limited Partner shall sell all or any portion of the Selling Class A Limited Partner's Class A Units to the Partnership in accordance with the options or obligations established by this Section 10.9, and shall execute and deliver such documents as the General Partner may determine are necessary or appropriate for purposes of effectuating the sales to them in accordance with this Section 10.9.

(c)      For purposes of the rights and obligations provided under this Section 10.9, the purchase price shall be 75% of the Book Value associated with the Class A Units, and the manner of payment shall be as provided in Section 10.11.

Section 10.10  General Partner's Unit Purchase Options.

(a)      For so long as John H. Speer personally controls the General Partner and is not Incapacitated or, if John H. Speer is Incapacitated or deceased, for so long as his executor or personal representative controls the General Partner, the following shall apply:

(1)      The General Partner shall have the right to purchase some or all of the Units of any Class of any one or more Limited Partners for the Book Value of such Units.

(2)      The General Partner shall have the right to purchase some or all of the community property interest or other direct or beneficial interest of any character of the spouse of any Limited Partner in any Units of any Class for the Book Value of such Units, regardless of whether the General Partner also purchases all or any part of the Units of such Limited Partner.

(3)      The General Partner shall be entitled to purchase some or all of the Units of any Class of any one or more Limited Partners for 75% of the Book Value of such Units if either of such Limited Partner or such Limited Partner's spouse has breached this Agreement in any respect.

(4)      The General Partner shall be entitled to purchase some or all of the community property interest or other direct or beneficial interest of any character of the spouse of any Limited Partner in any Units of any Class for 75% of the Book Value of such Units, if either of such spouse or the Limited Partner has breached this Agreement in any respect, regardless of whether the General Partner also purchases all or any part of the Units of such Limited Partner.

(5)      If any Limited Partner proposes to Transfer Units of any Class in a Transfer that is not a Permitted Transfer, then for a period of 20 days after receipt of a Transfer Notice that is fully compliant with this Agreement, the General Partner shall have the exclusive right to purchase from the transferor or transferee some or all of the Units proposed to be Transferred at the same price, on a per Unit basis, as set forth in the Transfer Notice. At the election of the General Partner the Units so purchased may be

purchased either on substantially the same terms as set forth in the Transfer Notice or on the terms set forth in Section 10.11.

(b)     For purposes of this Section, the determination of the Book Value of the Units to be purchased by the General Partner shall made, at the election of the General Partner:

(1)     as of the end of the calendar month in which the General Partner notifies the Limited Partner of the General Partner's exercise of the General Partner's purchase rights under this Section; or

(2)     as of the end of the calendar month immediately preceding the month in which the General Partner notifies the Limited Partner of the exercise by the General Partner's of the purchase rights granted under this Section.

(c)     Any right to purchase Units granted by this Section shall be exercised by written notification to the Person from whom such Units will be purchased.  The decision of whether the Book Value of such Units will be determined pursuant to Section 10.10(b)(1) or Section 10.10(2) shall be made by the General Partner at any time at or before the closing of the acquisition as provided in Section 10.11, at the election of the General Partner.

(d)     In the event that any Limited Partner fails or refuses to timely execute any document or take any action requested by the General Partner pursuant to this Section, the General Partner may, but shall not be required to, take such action or execute any such document on behalf of the Limited Partner by acting pursuant to the Limited Partner's irrevocable power of attorney set forth in Section 11.2 hereof.  Any actions taken or documents executed by the General Partner in connection with any proposed or consummated sale under this Section pursuant to such power of attorney shall have the same force and effect as if taken or executed by the Limited Partner.

(e)     All purchases of Units pursuant to this Section shall be for the account of and at the cost of the General Partner only, and not for the account of or cost of any other Partner or the Partnership.  The General Partner shall be permitted (but not required) to Transfer all or any part of its rights under this Section to any other Partner or Partners or to the Partnership.

Section 10.11 Terms of Purchase.

(a)     Unless the parties agree to the contrary, and except as otherwise specifically provided herein, a closing of an acquisition under the terms and provisions of this Article 10 shall be held in Houston, Texas no more than 60 calendar days after written notification is given to the selling party of the election by the purchasing parties to purchase Units under this Article 10; provided, however, that if a legal impediment exists that prevents the selling party from effectively transferring title to the Units to the purchaser herein provided, then the closing date shall be extended until any such legal impediment is removed, so long as the selling party or other person responsible for having such impediment removed continues diligently and in good faith to remove it. The selling party shall deliver the Units to be purchased at closing free and clear of any liens, claims or encumbrances.

(b)     At the election of the purchasing party(ies), payment of the purchase price for any Units acquired pursuant to this Article 10, shall be made to the selling party pursuant to either of the following two methods:

(1)     cash on the closing date equal in amount to the full purchase price otherwise determined under this Article 10; or

(2)     cash on the closing date in an amount equal to 20% of the full purchase price otherwise determined under this Article 10, and (B) the issuance by the purchasing party of a promissory note for the remaining 80% of the purchase price, the terms of which shall (i) all outstanding principal and all accrued and unpaid interest shall be due and payable on the 5th anniversary of the closing date, (ii) the original principal amount of the promissory note shall fully amortize over five years and shall be payable in equal quarterly installments on the 15th day of each March, June, September and December beginning on the first such date to occur after the closing date, (iii) interest shall accrue on the unpaid portion of the promissory note at variable annual rate equal to the sum of the Prime Rate plus 1%, adjusted after the closing date on the first day of each March, June, September, and December (with the initial interest rate equal to the Prime Rate plus 1% in effect on the closing date) and compounding quarterly, (iv) accrued interest shall be due and payable on the 15th day of each March, June, September and December beginning on the first such date to occur after the closing date, and (5) provide such other commercially reasonable terms and conditions as are customary and appropriate for transactions of this nature and character.

(c)     THE ACCEPTANCE OF ANY PAYMENT (EVEN IF ACCEPTED UNDER PROTEST, RESERVATION OF RIGHTS OR OTHER CONDITIONAL ACCEPTANCE) BY THE SELLING PARTY UNDER THIS ARTICLE 10 SHALL CONSTITUTE A COMPLETE WAIVER AND RELEASE OF ALL RIGHTS, CLAIMS AND CAUSES OF ACTION, KNOWN OR UNKNOWN, THAT THE SELLING PARTY OR ITS AFFILIATES MAY HAVE AGAINST THE PARTNERSHIP, ANY PARTNER OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, LIMITED PARTNERS, MANAGERS, CONSULTANTS, COUNSEL, AGENTS OR OTHER AFFILIATES (EACH, A "*RELEASED PARTY*") INCLUDING CLAIMS AGAINST ANY RELEASED PARTY FOR SUCH RELEASED PARTY'S OWN BREACH OF CONTRACT, MISREPRESENTATION, FRAUD, BREACH OF FIDUCIARY DUTY, NEGLIGENCE, OR STRICT LIABILITY, BUT NOT FOR THE PAYMENT OF ANY DEFERRED PURCHASE PRICE PAYABLE TO THE SELLING PARTY PURSUANT TO THE APPLICABLE TERMS OF PURCHASE.

## ARTICLE 11
### MISCELLANEOUS PROVISIONS

Section 11.1  Representations and Warranties of the Limited Partners.   Each Limited Partner hereby severally represents and warrants to the General Partner and the Partnership as follows:

(a) The Limited Partner is an *"accredited investor"* within the meaning of Rule 501 of Regulation D under the Securities Act. The Units to be received by the Limited Partner upon execution and delivery of this Agreement will be held by the Limited Partner for its own account for the purpose of investment and not with a present view to the distribution thereof in violation of the Securities Act of 1933, as amended (the *"Securities Act"*). The Limited Partner was not formed, reconstituted or reorganized in contemplation of acquiring Units, or if the Limited Partner was so formed, reconstituted or reorganized, all of its equity owners are accredited investors.

(b) The Limited Partner understands that the Units to be received by it pursuant to this Agreement have not been registered under the Securities Act or applicable state securities laws in reliance upon specific exemptions from registration thereunder. The Limited Partner agrees that the Units to be received by it may not be sold, offered for sale, exchanged, transferred, pledged or otherwise disposed of except pursuant to a registration statement under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act and in compliance with state securities laws. There can be no assurance that any public market will exist for such Units.

Section 11.2 Appointment of General Partner as Attorney-in-Fact. By his execution of this Agreement, each Limited Partner irrevocably appoints the General Partner (and, after his appointment pursuant to Article 8, the Liquidator) his true and lawful attorney-in-fact and agent with full power and authority to act in his name and place in any way which he could do if personally present to the extent permitted by law to:

(a) make, execute, swear to and acknowledge, amend, file, record, deliver and publish:

(1) any amendments to this Agreement entered into in accordance with Section 2.8(e) hereof;

(2) any certificate of limited partnership or amended certificate of limited partnership required or permitted to be filed on behalf of the Partnership pursuant to the Act;

(3) all certificates and other instruments necessary to qualify or continue the Partnership as a limited partnership (or a partnership wherein the Limited Partners have limited liability) in the jurisdictions where the Partnership may be doing business, including, but not limited to, any fictitious or assumed name certificates required or permitted to be filed by or on behalf of the Partnership;

(4) all conveyances and other certificates or other instruments evidencing the dissolution or termination of the Partnership when such shall be appropriate in accordance with Article 8 of this Agreement;

(5) all other filings with agencies of the federal government, of any state or local government or of any other jurisdiction, which the General Partner considers necessary or desirable to carry out the purposes of this Agreement and the business of the Partnership;

(6)    all such other instruments as may be required by law or as the General Partner may deem reasonably necessary or desirable fully to carry out the provisions hereof; and

(b)    take such actions and execute and deliver such documents as the General Partner may deem necessary or appropriate in connection with a proposed or consummated obligatory sale of Units by a Limited Partner to the Partnership, the General Partner or any other person pursuant to a Mandatory Unit Sale, Article 10, or any other provision of this Agreement.

Section 11.3   Scope of Power of Attorney.   The power of attorney granted in Section 11.2 above is hereby declared to be irrevocable and a power coupled with an interest, and it shall survive and not be affected by the subsequent death, incompetency, disability, incapacity, dissolution, bankruptcy or termination of any Limited Partner and the transfer of all or any portion of his Units and shall extend to such Limited Partner's heirs, successors, assigns and personal representatives. Each such Partner hereby agrees to be bound by any representations made by the General Partner or the Liquidator, acting in good faith pursuant to such power of attorney; and each such Limited Partner hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the General Partner or the Liquidator, taken in good faith under such power of attorney. Each Limited Partner shall execute and deliver to the General Partner or the Liquidator within fifteen (15) days after receipt of the General Partner's or the Liquidator's request therefor, such further designations, powers of attorney and other instruments as the General Partner or the Liquidator deems necessary to effectuate this Agreement and the purposes of the Partnership.

Section 11.4   Notices.   Any notices, requests, demands or other communications herein required or permitted to be given shall be in writing and may be personally served or sent by facsimile transmission, or mail or by over night courier and shall be deemed to have been given as follows: (i) if personally served, when served; (ii) if by facsimile transmission on the second day after transmission thereof on a facsimile transmission machine to the proper number with a confirmation of receipt generated by the facsimile transmission machine used to send the notice, (iii) if mailed, on the third day after deposit in first class mail with postage pre-paid and properly addressed or (iv) if by overnight courier, 48 hours after being sent by a reputable overnight courier service with all charges prepaid.  For purposes of this Section 11.4, the address and fax number of each Limited Partner shall be as shown on Annex A hereto or such other address and fax number as may later be provided to the General Partner by such Limited Partner in writing. The address and fax number of the General Partner shall be as shown on Annex A, until changed by written notice to the Limited Partners.

Section 11.5   Execution and Counterparts.   This Agreement may be executed in any number of counterparts with the same effect as if all parties hereunder had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

Section 11.6   Waiver of Partition.   Each Partner hereby irrevocably waives during the term of the Partnership any right that it or he may have to maintain any action for partition with respect to any Partnership property.

Section 11.7   Governing Law, Successors, Severability. This Partnership Agreement and the relative rights of the parties to this Agreement shall (i) be governed by the laws of the State of Delaware and (ii) subject to the restrictions on transferability set forth herein, bind and inure to the benefit of the heirs, executors, legal representatives, successors and assigns of the parties hereto. If any provision of this Agreement shall be held to be invalid, the remainder of this Agreement shall not be affected thereby.

Section 11.8   Mediation and Arbitration.

(a)     *General.* Any claim, action, dispute or controversy of any kind arising out of or relating in any way to this Agreement, the relationships of the Partners, the rights and duties of the Partners or the business and affairs of the Partnership ( each, a *"Dispute"*) shall first be submitted to non-binding mediation in Harris County, Texas with a mediator selected by the General Partner. In the event such mediation fails to result in a written settlement within 30 days of the date of the start of mediation, then any remaining Dispute shall be resolved by mandatory and binding arbitration administered by the American Arbitration Association (the *"AAA"*) pursuant to the Federal Arbitration Act (Title 9 of the United States Code) in accordance with this Agreement and the then-applicable Commercial Arbitration Rules of the AAA. The Partners acknowledge and agree that the transactions evidenced and contemplated hereby involve "commerce" as contemplated in Section 2 of the Federal Arbitration Act. If Title 9 of the United States Code is inapplicable to any such Dispute for any reason, such arbitration shall be conducted pursuant to this Agreement and the then-applicable Commercial Arbitration Rules of the AAA. To the extent that any inconsistency exists between this Agreement and the foregoing statute or rules, this Agreement shall control. Judgment upon the award rendered by the arbitrators acting pursuant to this Agreement may be entered in, and enforced by, any court having jurisdiction, absent manifest disregard by such arbitrators of applicable law; *provided, however*, that the arbitrators shall not amend, supplement or reform in any manner any of the rights or obligations of any Partner hereunder or the enforceability of any of the terms or provisions of this Agreement. Any arbitration proceedings under this Agreement shall be conducted in Houston, Texas, before three (3) arbitrators (selected as set forth in clause (b) below), who have no direct or indirect relationship with any Partner or any Partner's Affiliates.

(b)     *Appointment of Arbitrators.* The arbitration shall be conducted by three (3) arbitrators. The Partnership or Partner(s) initiating arbitration (the *"Claimant"*) shall appoint its arbitrator in its request for arbitration (the *"Request"*). The other parties to the Dispute (the *"Respondent"*) shall appoint its arbitrator within thirty (30) days after receipt of the Request and shall notify the Claimant of such appointment in writing. If the Respondent fails to appoint an arbitrator within such thirty (30) day period, the AAA shall appoint an arbitrator on behalf of the Respondent, which arbitrator shall be deemed to have been appointed by the Respondent. The two (2) Partner-appointed arbitrators shall not be required to be neutral. The two Partner-appointed arbitrators shall appoint a third arbitrator within thirty (30) days after the appointment of the Respondent's arbitrator. When the third arbitrator has accepted the appointment, the two Partner-appointed arbitrators shall promptly notify the Partners of the appointment. If the two Partner-appointed arbitrators fail to appoint a third arbitrator or to notify the Partners within the time period prescribed above, then the appointment of the third arbitrator shall be made by the AAA, which shall promptly notify the Partners of the appointment. The third arbitrator shall act as chair of the panel.

(c)    *Expenses; Limit on Liability.* The Claimant and Respondent shall each bear their own expenses of the arbitration, including, without limitation, fees and expenses of counsel incident to any arbitration. The fees and expenses of the mediation and arbitrators and the AAA shall be borne equally by the Claimant and the Respondent. The arbitrators shall have the power and authority to award expenses to the prevailing Partner if the mediators and arbitrators elect to do so, but in no event shall any Partner be liable to another Partner, except with respect to a liability imposed as a result of a third-party claim or allegation, for any exemplary, punitive, special, indirect, consequential, remote, or speculative damages, even if caused by the sole, joint, and/or concurrent negligence, strict liability, or other fault of such Partner.

Section 11.9  Integrated Agreement. This Agreement constitutes the entire agreement among the parties. This Agreement supersedes any prior agreement or understandings among them, oral or written, all of which are hereby canceled.

Section 11.10 Amendment. This Agreement may be amended only with the consent of the General Partner.   The General Partner shall be entitled to, and shall amend the Annexes to this Agreement from time to time as necessary to reflect changes therein as a consequence of the operation and effect of the other provisions of this Agreement.

Section 11.11 No Waiver. The failure of any Partner to seek redress for violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

Section 11.12 Presumptions. Any act or omission performed or omitted by the General Partner or an Affiliate of the General Partner on advice of legal counsel or an independent consultant who has been employed or retained by the Partnership shall be presumed to have been performed or omitted in good faith. The termination of any action, suit or proceeding by judgment, order, or settlement shall not, of itself, create a presumption that any such party did not act in good faith and in the best interests of the Partnership.

Section 11.13 No Third Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the Partners and their respective successors and assigns, it being understood and agreed that, except as expressly provided herein, nothing contained in this Agreement is intended to confer upon any other Person any rights, benefits or remedies of any kind or character.

Section 11.14 Time of Essence. Time shall be of the essence in the performance of this Agreement.

[Signatures on following pages]

SIGNATURE PAGE

Attached to and made a part of the
AGREEMENT OF LIMITED PARTNERSHIP OF
ROYCE HOLDINGS, LP

dated as of September 19, 2006

IN WITNESS WHEREOF, the parties have entered into this Agreement of Limited Partnership as of the date first above set forth.

GENERAL PARTNER:

Hammersmith Group, Inc.,
a Delaware corporation

By: _____
John H. Speer, President

SIGNATURE PAGE

Attached to and made a part of the
AGREEMENT OF LIMITED PARTNERSHIP OF
ROYCE HOLDINGS, LP

dated as of September 19, 2006

IN WITNESS WHEREOF, the parties have entered into this Agreement of Limited Partnership as of the date first above set forth.

CLASS A LIMITED PARTNER:

John H. Speer

SIGNATURE PAGE

Attached to and made a part of the
AGREEMENT OF LIMITED PARTNERSHIP OF
ROYCE HOLDINGS, LP

dated as of September 19, 2006

IN WITNESS WHEREOF, the parties have entered into this Agreement of Limited
Partnership as of the date first above set forth.

CLASS A LIMITED PARTNER:

By: _____
Michael G. Manners

SIGNATURE PAGE

Attached to and made a part of the
AGREEMENT OF LIMITED PARTNERSHIP OF
ROYCE HOLDINGS, LP

dated as of September 19, 2006

IN WITNESS WHEREOF, the parties have entered into this Agreement of Limited Partnership as of the date first above set forth.

CLASS A LIMITED PARTNER:

DWM Holdings, LP

By:   DWM Holdings GP, L.L.C.,
      its sole general partner

By: _____
      Michael G. Manners,
      its sole member

SIGNATURE PAGE

Attached to and made a part of the
AGREEMENT OF LIMITED PARTNERSHIP OF
ROYCE HOLDINGS, LP

dated as of September 19, 2006

IN WITNESS WHEREOF, the parties have entered into this Agreement of Limited
Partnership as of the date first above set forth.

CLASS B LIMITED PARTNER:

First Duvall Group, Inc.

By: _____
        John H. Speer, President

ANNEX A
To Agreement Of Limited Partnership
Of Royce Holdings, LP

| Name and Address of Partner | Initial Capital Contribution | Book Basis of Units | Number and Class of Units | Percentage of all Units |
|---|---|---|---|---|
| General Partner: | $10,000 | $10,000 | 17 General Partner Units | 0.02% |
| Hammersmith Group, Inc. 7850 North Sam Houston Pkwy. West Houston, Texas 77064 Fax No.: _____ | | | | |
| Class A Limited Partners: | | | | |
| John H. Speer 7850 North Sam Houston Pkwy. West Houston, Texas 77064 Fax No.: 281-440-2975 | $5,699,601 | $3,256,915 | 9,501 Class A Units | 9.50% |
| Michael G. Manners 211 Highland Cross Drive, Suite 101 Houston, Texas 77073-1700 Fax No.: _____ | $5,788,169 | $3,307,525 | 9,649 Class A Units | 9.65% |
| DWM Holdings, LP 211 Highland Cross Drive, Suite 101 Houston, Texas 77073-1700 Fax No.: _____ | $24,554,236 | $14,030,992 | 40,932 Class A Units | 40.93% |
| Totals for Class A Limited Partners: | $36,042,006 | $20,595,432 | 60,082 | 60.08% |
| Class B Limited Partners: | | | | |
| First Duvall Group, Inc. 7850 North Sam Houston Pkwy. West Houston, Texas 77064 Fax No.: _____ | $23,935,455 | $13,677,403 | 39,901 Class B Units | 39.90% |
| Class C Limited Partners: | None | None | None | - 0 - |
| Totals for all Partners: | $59,987,461 | $34,282,835 | 100,000 Units | 100% |

ANNEX B
TO AGREEMENT OF LIMITED PARTNERSHIP
OF ROYCE HOLDINGS, LP

GLOSSARY OF TERMS

As used in this Agreement, the following terms have the respective meanings set out below:

"*AAA*" has the meaning set forth in Section 11.8(a).

"*Act*" shall mean the Delaware Revised Uniform Limited Partnership Act (6 Del. C. § 17-101 et seq.), as the same may be amended from time to time, or any successor statute thereto.

"*Additional Partnership Equity Securities*" has the meaning set forth in Section 2.8(a).

"*Adjusted Capital Account*" means, as of the end of each fiscal year, the balance in a Partner's Capital Account (i) increased by (A) any additional Capital Contributions the Partner is obligated to make, or is treated as obligated to make pursuant to the provisions of Treasury Regulations § 1.704-1(b)(2)(ii)(c), (B) the amount of the Partner's share of any "partnership minimum gain" (as defined in Treasury Regulations § 1.704-2(b)(2), and (C) the amount of the Partner's share of any "partner nonrecourse debt minimum gain" (as defined in Treasury Regulations § 1.704-2(i)(2)), and (ii) decreased by any adjustments, allocations or distributions described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6). This definition shall be interpreted and applied consistently with the provisions of Treasury Regulations § 1.704-1(b)(2)(ii)(d).

"*Affiliate*" means, with respect to any Person (other than a natural person) (i) any Person directly or indirectly owning, controlling or holding the power to vote ten percent (10%) or more of the outstanding voting securities of such Person; (ii) any Person ten percent (10%) or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by such Person; (iii) any Person directly or indirectly controlling, controlled by or under common control with such Person; (iv) any officer, director, or partner (other than a limited partner in a partnership managed by such Person) of such Person; and (v) any partnership or joint venture in which such Person is a partner or joint venturer.

"*Agreement*" shall mean this Agreement of Limited Partnership as originally executed and as amended, modified, supplemented or restated from time to time.

"*Allocation Period*" has the meaning set forth in Section 3.6(b).

"*Available Cash*" means the amount of cash (including cash equivalents and temporary investments of cash) held by the Partnership from time to time in excess of amounts required, in the sole discretion of the General Partner, to pay or provide for payment of existing and projected obligations, capital expenditures and acquisitions, and to provide a reserve for working capital and contingencies.

"*Bankruptcy*" means, with respect to any Person, a Voluntary Bankruptcy or an Involuntary Bankruptcy, as hereinafter defined.

"*Book Basis*" means, with respect to each Partnership asset, the adjusted basis of the asset for federal income tax purposes, except that (i) the initial Book Basis of an asset other than money contributed by a Partner to the Partnership shall be the fair market value of the asset on the date of contribution, as agreed by the contributor and the General Partner, (ii) upon the occurrence of a Revaluation Event, the Book Basis of all Partnership assets (including intangibles) shall be adjusted to their respective fair market values on such date, as determined by the General Partner (including the date of issuance of any Class C Units), and (iii) if the Book Basis of any Partnership asset has been determined pursuant to the preceding subsections, the Book Basis of the asset shall thereafter be adjusted by Book Depreciation in lieu of any depreciation, amortization or other cost recovery deductions otherwise allowable for federal income tax purpose.

"*Book Depreciation*" means an amount which bears the same ratio to the Book Basis of a Partnership asset as the amount of depreciation, amortization or other cost recovery deductions with respect to the asset, computed for federal income tax purposes, bears to the adjusted tax basis of the asset; provided that, if the adjusted tax basis of the asset is zero, Book Depreciation shall be determined under any reasonable method selected by the General Partner.

"*Book Value*" means, with respect to Units, the Capital Account with respect to such Units on the date of determination.

"*Business Day*" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Delaware are closed.

"*Buy-Out Event*" means with respect to any Limited Partner, the first to occur of any of the following: (a) the Bankruptcy of the Limited Partner; (b) the breach by the Limited Partner of any material provision of this Agreement and the failure of the Limited Partner to cure such breach within 30 Days after notice thereof from the Partnership; or (c) the occurrence of a Change in Control with respect to such Limited Partner and the failure of the Limited Partner to cure such breach within 30 Days after notice thereof from the Partnership.

"*Call Notice*" has the meaning set forth in <u>Section 2.1(d)(3)</u>.

"*Capital Account*" means, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the provisions of <u>Section 2.7</u>.

"*Capital Call*" has the meaning set forth in <u>Section 2.1(d)(1)</u>.

"*Capital Call Due Date*" has the meaning set forth in <u>Section 2.1(d)(4)</u>.

"*Capital Contribution*" means the total amount of money and/or the initial Book Basis of any property (net of any liabilities assumed or taken subject to) that is actually contributed to the Partnership by all of the Partners or any class of Partners or any one Partner, as the context requires. A Limited Partner's Capital Contribution includes the cash price paid to the

Partnership and the initial Book Basis of property contributed (net of any liabilities assumed or taken subject to) for the Partnership Interest by the Limited Partner.

"*Capital Percentage*" means, with respect to any Partner, the ratio which (i) the total amount of the Capital Contributions made by such Partner to the Partnership bears to (ii) the total amount of Capital Contributions made by all Partners to the Partnership.

"*Catch Up Amount*" means an amount equal to the amount of the Priority Distribution Amount distributed with respect to each Class A Unit *plus* such additional amount or amounts (if any) of Available Cash as the General Partner determines would be equitable to distribute to Class B Limited Partners and to the General Partner. The amount of such additional Available Cash, if any, shall in the General Partner's sole discretion based on such facts and circumstances as the General Partner may deem relevant, including the period of time required to distribute the Priority Distribution Amount to holders of Class A Units, past and expected future results of operations, assets and liabilities and cash flow of the Partnership, past and expected future interest rates, and general economic conditions.

"*Change of Control*" means the acquisition by any Person or group of Persons (within the meaning of Sections 13(d) or 14(a) of the Securities Exchange Act of 1934, as amended) of either (a) the beneficial ownership (within the meaning of Rule 13d-3 promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended) of 50% or more of the ownership interests in the Partner, or (b) the right to otherwise control the conduct and operation of the Partner's business activities.

"*Claimant*" has the meaning set forth in Section 11.8(b).

"*Class A Limited Partner*" means a Limited Partner owning Class A Units.

"*Class A Units*" means the Units of the Partnership into which the Partnership Interests of Class A Limited Partners are divided as provided in Sections 1.8(b) and 2.1(a).

"*Class B Limited Partner*" means a Limited Partner owning Class B Units.

"*Class B Units*" means the Units of the Partnership into which the Partnership Interests of Class B Limited Partners are divided as provided in Sections 1.8(b) and 2.1(b).

"*Class C Limited Partner*" means a Limited Partner owning Class C Units.

"*Class C Units*" means the Units of the Partnership into which the Partnership Interests of Class C Limited Partners are divided as provided in Sections 1.8(b) and 2.1(c).

"*Code*" means the Internal Revenue Code of 1986, as amended, or any successor statute thereto.

"*Confidential Information*" has the meaning set forth in Section 7.2.

"*Default*" has the meaning set forth in Section 2.1(d)(5).

"*Default Interest Rate*" means a varying per annum rate equal at any given time to the lesser of (i) two percentage (2) points over the Prime Rate or (ii) the maximum lawful interest rate which may be charged to a limited partnership under federal or applicable state law.

"*Defaulting Partner*" has the meaning set forth in Section 2.1(d)(5).

"*Dispute*" has the meaning set forth in Section 11.8(a).

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Agreement.

"*Event of Default*" has the meaning set forth in Section 2.1(d)(5).

"*Fair Market Value*" means the fair market value mutually agreed to by the buyer and the seller, or, failing the ability of the buyer and the seller to agree upon such value within a 10-day period, the fair market value determined by a single independent appraiser, mutually acceptable to a buyer and a seller, or, failing the ability of the buyer and the seller to agree upon a single independent appraiser within a 10-day period, means the fair market value determined by a single independent appraiser, mutually acceptable to two other independent appraisers one of which was chosen by each of the buyer and the seller.

"*General Partner*" means Hammersmith Group, Inc., a Delaware corporation. The term "General Partner" also includes any other person who is duly admitted to the Partnership as an additional or successor general partner.

"*Hypothetical Tax Amount*" has the meaning set forth in Section 3.6(b).

"*Incapacitated*" means, the loss of an individual's legal, physical, or intellectual capability or competence to make his or her own decisions for a period of 90 days or more due to a physical or mental illness, disability or condition.

"*Income*" means, for each fiscal year, each item of income and gain as determined, recognized and classified for federal income tax purposes, provided that (i) items of income or gain exempt from federal income tax shall be included in Income, (ii) income or gain arising from a disposition of any Partnership asset shall be computed by reference to the asset's Book Basis at the time of the disposition, and (iii) Unrealized Gain shall be treated as an item of Income.

"*Indirect Transfer*" means with respect to any Limited Partner that is a corporation, limited liability company, trust, partnership or other entity, any transfer of the equity ownership of, or voting rights associated with, the equity or other ownership interests in such Limited Partner; *provided, however,* that an Indirect Transfer shall not occur with respect to a particular Limited Partner for so long as no change occurs in the number or identity of the Person or Persons who on the date the Limited Partner is admitted to the Partnership ultimately have the right (directly or indirectly through one or more intermediaries) to control the Limited Partner.

"*Intellectual Property*" means any trademark, service mark, trade name, product designation, logo, slogan, invention, patent, trade secret, copyright, know-how, proprietary

design or process, computer software (other than commercially available, shrink-wrap software used in connection with the Partnership's business) and database, internet address or domain name (including any registrations or applications for registration or renewal of any of the foregoing), research in progress, or any other similar type of proprietary intellectual property right, in each case which is used or held for use or otherwise necessary in connection with the conduct of the Partnership's business.

"*Involuntary Bankruptcy*" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or other similar relief under any present or future bankruptcy, insolvency, or similar statute, law, or regulation, or the filing of any such petition against such Person, which petition shall not be dismissed within ninety (90) days, or without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person, which order shall not be dismissed within 90 days.

"*Limited Partner*" means any person who is admitted to the Partnership as a limited partner pursuant to the terms of this Agreement.

"*Liquidator*" means during the dissolution, winding up and liquidation of the Partnership (i) the General Partner or, if there is no General Partner, (ii) such other Person or Persons as may be appointed by the Limited Partners.

"*Loss*" means, for each fiscal year, each item of loss or deduction as determined, recognized and classified for federal income tax purposes, provided that (i) expenditures of the Partnership described in Internal Revenue Code § 705(a)(2)(B) or treated as Internal Revenue Code § 705(a)(2)(B) expenditures pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(i) shall be treated as an item of Loss, (ii) loss or deduction arising from a disposition of any Partnership asset shall be computed by reference to the asset's Book Basis at the time of the disposition, (iii) Unrealized Loss shall be treated as an item of Loss, and (iv) the Book Basis of any Partnership asset with an adjusted tax basis different from its Book Basis shall be adjusted by Book Depreciation in lieu of depreciation, amortization or other cost recovery deductions otherwise allowed for federal income tax purposes.

"*Net Capital Account Balances*" means the balances of the Partners' Capital Accounts at the time of a Value Hurdle determination net of any then remaining Section 3.6(a)(1) distributions, as determined by the General Partner.

"*Net Income*" and "*Net Loss*" mean, for each fiscal year, the positive or negative difference, respectively, between all items of Income and all items of Loss for the year, provided that items of Income or Loss specially allocated to a Partner pursuant to Section 3.2 shall be excluded from the computation of Net Income and Net Loss.

"*Organizational Expenses*" means all expenses incurred by the Partnership, the General Partner or its Affiliates in connection with the formation of the Partnership and the offering of Units in the Partnership including: (i) filing fees, including fees and expenses of

qualifying the Partnership and General Partner to do business in states where the General Partner deems such qualifications appropriate in light of the Partnership's business; (ii) fees and expenses of legal counsel and other advisors to the General Partner in connection with the formation of the Partnership, preparation of this Agreement, the offering of Units and compliance with federal and state securities laws; (iii) travel expenses and expenses of courier services; and (iv) fees and expenses of the registered agent for the Partnership.

"*Partners*" means both the General Partner and the Limited Partners who are admitted as partners in the Partnership, unless otherwise indicated.

"*Partnership*" means Royce Holdings, LP, a Delaware limited partnership, as such limited partnership may be constituted from time to time.

"*Partnership Debt Securities*" has the meaning set forth in <u>Section 2.8(b)</u>.

"*Partnership Interest*" means the entire ownership interest and rights of a Partner in the Partnership at any particular time as a General Partner or a Limited Partner, including, but not limited to, the right of such Partner to any and all rights and benefits to which a Partner is entitled pursuant to the terms of this Agreement.

"*Partnership Securities*" has the meaning set forth in <u>Section 2.8(b)</u>.

"*Permitted Transfers*" has the meaning set forth in <u>Section 5.5</u>.

"*Person*" means a natural person, corporation, limited liability company, partnership, limited partnership, joint venture, trust, estate, unincorporated association, or other person, including a governmental entity.

"*Prime Rate*" means the fluctuating per annum rate of interest reported in the *Wall Street Journal* as the "Prime Rate".

"*Priority Distribution Amount*" means an aggregate amount equal to the original principal balances of the promissory notes made by John H. Speer to Amegy Bank National Association ($20,000,000) and Michael H. Manners and DWM Holdings, LP (collectively $13,342,405) plus all interest due on such notes.

"*Profit Partners*" means Class C Limited Partners.

"*Profit Units*" means Class C Units.

"*Record Holder*" has the meaning set forth in <u>Section 5.4(a)</u>.

"*Regulatory Allocations*" has the meaning set forth in <u>Section 3.2(h)</u>.

"*Request*" has the meaning set forth in <u>Section 11.8(b)</u>.

"*Respondent*" has the meaning set forth in <u>Section 11.8(b)</u>.

"*Restricted Region*" means the territory within 75 miles of any office or facility from which the Partnership or any of its existing or future subsidiaries or Affiliates now or at any time hereafter engages in the business of the Partnership.

"*Revaluation Event*" means, except as otherwise agreed by the General Partner, (i) the acquisition from the Partnership of an additional Partnership Interest by any new or existing Partner (including the of issuance of any Class C Units), (ii) a distribution by the Partnership of money or other property in reduction or liquidation of a Partnership Interest, or (iii) the liquidation of the Partnership (as defined in Treasury Regulations § 1.704-1(b)(2)(ii)(g)).

"*Securities Act*" has the meaning set forth in Section 11.1(a).

"*Selling Class A Limited Partner*" has the meaning set forth in Section 10.9.

"*Selling Profit Partner*" has the meaning set forth in Section 10.5.

"*Target Cumulative Distribution Amount*" has the meaning set forth in Section 8.6.

"*Transfer*" or "*Transferred*" means, as a noun, any voluntary or involuntary, direct or indirect, transfer, sale, assignment, gift, pledge, hypothecation, encumbrance or other disposition whether by operation of law or otherwise and, as a verb, voluntarily or involuntarily, directly or indirectly, to transfer, sell, assign, give, pledge, hypothecate, encumber or otherwise dispose of an item whether by operation of law or otherwise.  When referring to Units, "Transfer" also includes the Transfer of any interest in a Unit, including voting and rights to distributions, and the Transfer of any derivative instrument or agreement the rights and/or obligations of the holders of which are determined by reference to any Unit or the rights and obligations relating to a Unit.

"*Transfer Notice*" has the meaning set forth in Section 5.4(d).

"*Unit*" has the meaning set forth in Section 1.8(b).

"*Unit Certificate(s)*" has the meaning set forth in Section 1.8(d).

"*Unit Register*" has the meaning set forth in Section 5.4(a).

"*Unrealized Gain*" and "*Unrealized Loss*" mean, with respect to a Partnership asset distributed to a Partner (whether or not in connection with the liquidation of the Partnership) or each Partnership asset in the case of a Revaluation Event, the positive or negative difference, respectively, between the fair market value, as determined by the General Partner, and Book Basis of the asset or, in the case of a Revaluation Event, each Partnership asset. Unrealized Gain or Loss shall be treated as an item of Income or Loss and shall be allocated to the Partners' Capital Accounts in the manner provided in Article 3 immediately before the distribution or Revaluation Event giving rise thereto.

"*Value Hurdle*" means a dollar amount representing the liquidation value of the Partnership as determined by the General Partner at the time of issuance of a Class C Unit

(applying the concepts of IRS Revenue Procedure 93-27 or successor provisions) less any amounts remaining to be distributed under Section 3.6(a)(1).

"*Voluntary Bankruptcy*" means, with respect to any Person, (a)(i) the inability generally to pay its debts as they become due, (ii) the failure generally to pay its debts as such debts become due, or (iii) an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors, (b) the filing of any petition or answer by such Person seeking to adjudicate it a bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for such Person or for any substantial part of its property, or (c) corporate action taken by such Person to authorize any of the actions set forth above.

"*Wholly Owned Affiliate*" means, with respect to any Person, (a) an Affiliate of such Person 100% of the ownership interests of which is owned beneficially (i) by such Person, directly or indirectly (through one or more Wholly Owned Affiliates), or (ii) by any Person who, directly or indirectly, owns beneficially 100% of the capital stock (or its equivalent in the case of entities other than corporations) of such Person, and (b) an Affiliate of such Person who, directly or indirectly, owns beneficially 100% of the ownership interests of such Person; *provided, however*, that, for purposes of determining the ownership of the capital stock of any Person, *de minimis* amounts of stock held by directors, nominees and similar persons pursuant to statutory or regulatory requirements shall not be taken into account.

[END OF ANNEX B]

ANNEX C
TO AGREEMENT OF LIMITED PARTNERSHIP
OF ROYCE HOLDINGS, LP

---

The securities represented by this Certificate have not been registered under the Securities Act of 1933, as amended, or the securities or blue sky acts of any state (collectively, the "*Acts*"), and may not be offered or sold, and no transfer of them may be made, in the absence of an effective registration statement covering such securities under all applicable Acts, or the delivery to the issuer of an opinion of counsel satisfactory to the issuer that such registrations are not required.

This Certificate and the Units evidenced hereby are subject to restrictions on transfer in accordance with the terms of the limited partnership agreement of Royce Holdings, LP.

A LIMITED PARTNERSHIP
ORGANIZED UNDER THE LAWS
OF THE STATE OF DELAWARE

ROYCE HOLDINGS, LP

UNIT CERTIFICATE

No. _____                                                                 _____ Units

*This Certifies that* _____ *is the registered owner of* _____ *[Class A] [Class B] [Class C Series #] [General Partner] Units of Limited [General] Partnership Interests ("Units") of Royce Holdings, LP, a Delaware limited partnership (the "Partnership"). The rights, obligations, preferences and limitations of the Units, including limitations on transfer, are set forth in the agreement of limited partnership of the Partnership, as the same may, from time to time, be amended or restated (the "Agreement"), a copy of which is on file at the principal office of the Partnership in Houston, Texas.*

*In Witness Whereof, the Partnership has caused this Certificate to be signed by its General Partner as of the* _____ *day of* _____, *200__.*

Royce Holdings, LP

By:  Hammersmith Group, Inc.,
     *Its sole general partner*


By: _____
    [name], President

[Form of Reverse Side of Certificate]

The Partnership will furnish to the holder and each assignee of this Certificate and the Units evidenced hereby, without charge, on written request to the Partnership at the Partnership's principal place of business, a copy of the Partnership's limited partnership agreement, as amended or restated from time to time.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

## ASSIGNMENT OF UNITS

FOR VALUE RECEIVED, the undersigned (the "*Assignor*") hereby assigns, conveys, sells and transfers unto

_____

[print or type name]

_____

[taxpayer identification no.]

_____

[address]

all right and interest of the Assignor in the aforementioned Units and the Partnership Interests represented thereby, and irrevocably constitutes and appoints the General Partner of Royce Holdings, LP (the "*Partnership*"), as its attorney-in-fact with full power of substitution to transfer the same on the books of the Partnership.

Date:_____, 20__.

Signature:_____

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

The securities represented by this Certificate have not been registered under the Securities Act of 1933, as amended, or the securities or blue sky acts of any state (collectively, the "Acts"), and may not be offered or sold, and no transfer of them may be made, in the absence of an effective registration statement covering such securities under all applicable Acts, or the delivery to the issuer of an opinion of counsel satisfactory to the issuer that such registrations are not required.

This Certificate and the Units evidenced hereby are subject to restrictions on transfer in accordance with the terms of the limited partnership agreement of Royce Holdings, LP.

A LIMITED PARTNERSHIP
ORGANIZED UNDER THE LAWS
OF THE STATE OF DELAWARE

ROYCE HOLDINGS, LP

UNIT CERTIFICATE

9,501 Units

No. A-1

This Certifies that John H. Speer is the registered owner of 9,501 Class A Units of Limited Partnership Interests ("Units") of Royce Holdings, LP, a Delaware limited partnership (the "Partnership"). The rights, obligations, preferences and limitations of the Units, including limitations on transfer, are set forth in the agreement of limited partnership of the Partnership, as the same may, from time to time, be amended or restated (the "Agreement"), a copy of which is on file at the principal office of the Partnership in Houston, Texas.

In Witness Whereof, the Partnership has caused this Certificate to be signed by its General Partner as of September 19, 2006.

Royce Holdings, LP

By:   Hammersmith Group, Inc.,
      Its sole general partner

By: John H. Speer, President

The securities represented by this Certificate have not been registered under the Securities Act of 1933, as amended, or the securities or blue sky acts of any state (collectively, the "Acts"), and may not be offered or sold, and no transfer of them may be made, in the absence of an effective registration statement covering such securities under all applicable Acts, or the delivery to the issuer of an opinion of counsel satisfactory to the issuer that such registrations are not required.

This Certificate and the Units evidenced hereby are subject to restrictions on transfer in accordance with the terms of the limited partnership agreement of Royce Holdings, LP.

A LIMITED PARTNERSHIP
ORGANIZED UNDER THE LAWS
OF THE STATE OF DELAWARE

ROYCE HOLDINGS, LP

UNIT CERTIFICATE

No. A-2

9,649 Units

This Certifies that Michael G. Manners is the registered owner of 9,649 Class A Units of Limited Partnership Interests ("Units") of Royce Holdings, LP, a Delaware limited partnership (the "Partnership"). The rights, obligations, preferences and limitations of the Units, including limitations on transfer, are set forth in the agreement of limited partnership of the Partnership, as the same may, from time to time, be amended or restated (the "Agreement"), a copy of which is on file at the principal office of the Partnership in Houston, Texas.

In Witness Whereof, the Partnership has caused this Certificate to be signed by its General Partner as of September 19, 2006.

Royce Holdings, LP

By:   Hampersmith Group, Inc.,
      Its sole general partner

By: _____
    John H. Speer, President

© GOES 342
All Rights Reserved

Litho. in U.S.A.

The securities represented by this Certificate have not been registered under the Securities Act of 1933, as amended, or the securities or blue sky acts of any state (collectively, the "*Acts*"), and may not be offered or sold, and no transfer of them may be made, in the absence of an effective registration statement covering such securities under all applicable Acts, or the delivery to the issuer of an opinion of counsel satisfactory to the issuer that such registrations are not required.

This Certificate and the Units evidenced hereby are subject to restrictions on transfer in accordance with the terms of the limited partnership agreement of Royce Holdings, LP.

A LIMITED PARTNERSHIP
ORGANIZED UNDER THE LAWS
OF THE STATE OF DELAWARE

ROYCE HOLDINGS, LP

UNIT CERTIFICATE

No. A-3

40,932 Units

This Certifies that DWM Holdings, L.P. is the registered owner of 40,932 Class A Units of Limited Partnership Interests ("*Units*") of Royce Holdings, LP, a Delaware limited partnership (the "*Partnership*"). The rights, obligations, preferences and limitations of the Units, including limitations on transfer, are set forth in the agreement of limited partnership of the Partnership, as the same may, from time to time, be amended or restated (the "*Agreement*"), a copy of which is on file at the principal office of the Partnership in Houston, Texas.

In Witness Whereof, the Partnership has caused this Certificate to be signed by its General Partner as of September 19, 2006.

Royce Holdings, LP

By:   Hammersmith Group, Inc.,
      *Its sole general partner*

By:   John H. Speer, President

The securities represented by this Certificate have not been registered under the Securities Act of 1933, as amended, or the securities or blue sky acts of any state (collectively, the "*Acts*"), and may not be offered or sold, and no transfer of them may be made, in the absence of an effective registration statement covering such securities under all applicable Acts, or the delivery to the issuer of an opinion of counsel satisfactory to the issuer that such registrations are not required.

This Certificate and the Units evidenced hereby are subject to restrictions on transfer in accordance with the terms of the limited partnership agreement of Royce Holdings, LP.

A LIMITED PARTNERSHIP
ORGANIZED UNDER THE LAWS
OF THE STATE OF DELAWARE

ROYCE HOLDINGS, LP

UNIT CERTIFICATE

No. B-1                                                                                          39,901 Units

This Certifies that First Duvall Group, Inc. is the registered owner of 39,901 Class B Units of Limited Partnership Interests ("*Units*") of Royce Holdings, LP, a Delaware limited partnership (the "*Partnership*"). The rights, obligations, preferences and limitations of the Units, including limitations on transfer, are set forth in the agreement of limited partnership of the Partnership, as the same may, from time to time, be amended or restated (the "*Agreement*"), a copy of which is on file at the principal office of the Partnership in Houston, Texas.

In Witness Whereof, the Partnership has caused this Certificate to be signed by its General Partner as of September 19, 2006.

Royce Holdings, LP

By:     Hammersmith Group, Inc.,
        *Its sole general partner*

By: _____
        John H. Speer, President

The securities represented by this Certificate have not been registered under the Securities Act of 1933, as amended, or the securities or blue sky acts of any state (collectively, the "*Acts*"); and may not be offered or sold, and no transfer of them may be made, in the absence of an effective registration statement covering such securities under all applicable Acts, or the delivery to the issuer of an opinion of counsel satisfactory to the issuer that such registrations are not required.

This Certificate and the Units evidenced hereby are subject to restrictions on transfer in accordance with the terms of the limited partnership agreement of Royce Holdings, LP.

A LIMITED PARTNERSHIP
ORGANIZED UNDER THE LAWS
OF THE STATE OF DELAWARE

ROYCE HOLDINGS, LP

UNIT CERTIFICATE

No. GP-1

17 Units

*This Certifies that Hammersmith Group, Inc., a Delaware corporation is the registered owner of 17 Units of General Partnership Interests ("Units") of Royce Holdings, LP, a Delaware limited partnership (the "Partnership"). The rights, obligations, preferences and limitations of the Units, including limitations on transfer, are set forth in the agreement of limited partnership of the Partnership, as the same may, from time to time, be amended or restated (the "Agreement"), a copy of which is on file at the principal office of the Partnership in Houston, Texas.*

*In Witness Whereof, the Partnership has caused this Certificate to be signed by its General Partner as of September 19, 2006.*

Royce Holdings, LP

By:   Hammersmith Group, Inc.,
       *Its sole general partner*

By:   _____
       John H. Speer, President