IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 09-32467-H4-7 |
| ROYCE HOMES, L.P., | § | (Chapter 7) |
|     Debtor. | § | |

_____

| | | |
|---|---|---|
| RODNEY TOW, TRUSTEE, | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| JOHN H. SPEER, AMEGY BANK, N.A., | § | |
| AMEGY MORTGAGE COMPANY, L.L.C., | § | |
| MICHAEL MANNERS, | § | |
| DONNIE LOU SPEER, VESTALIA, LLC, | § | CIVIL ACTION NO. 4:11-cv-03700 |
| HAMMERSMITH GROUP, LLC, | § | JURY DEMANDED |
| f/k/a HAMMERSMITH GROUP, INC., | § | |
| PARK LAKE COMMUNITIES, L.P., | § | |
| WATERMARK LAND, LLC, | § | |
| WATERMARK LAND, LP, | § | |
| WATERMARK TORTUGA, LLC, | § | |
| ALLARD INVESTMENT COMPANY, | § | |
| LLC, DWM HOLDINGS, INC., | § | |
| MGM MOTOR SPORTS, L.L.C., | § | |
| SARACEN HOLDINGS, INC., and | § | |
| GEORGE KOPECKY, | § | |
|     Defendants. | § | |

## AMEGY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE CLAIMS REGARDING VESTALIA

Amegy Bank National Association ("Amegy Bank") and Amegy Mortgage Company, L.L.C.

("Amegy Mortgage") (together, "Amegy") file this Motion for Partial Summary Judgment on the

Claims Regarding Vestalia.

# I.

## Summary of argument

1.      The claims related to Vestalia, LLC ("Vestalia") coalesce to one fine point: foreclosure sales cannot be fraudulent transfers under the law.  Whatever interest of Royce Homes, L.P. ("Royce Homes") that Vestalia received, if any, was acquired at a regularly conducted, noncollusive, and valid foreclosure sale.  Merely talking about bids in advance of a foreclosure does not as a matter of law invalidate the sale or constitute collusion.  Moreover, reasonably equivalent value was received at the foreclosure as a matter of law.  The Trustee does not allege any procedural or other defect or irregularity in the foreclosure sale.  For these reasons, Amegy is entitled to summary judgment on the Vestalia allegations.

# II.

## Statement of the nature and stage of the proceeding

2.      The above-styled action is an adversary proceeding.  This proceeding is in the pre-trial stage.

# III.

## Statement of the issue to be ruled on by the Court and the standard

3.      The issue to be ruled on by the Court is whether this Motion for Partial Summary Judgment on the Claims Regarding Vestalia should be granted.  A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56; *Echavarria v. Pitts*, 641 F.3d 92, 94 (5th Cir. 2011).

**IV.**

**Background**

**A.     Trustee's allegations**

4.      The allegations from the Third Amended Complaint [Dkt. No. 77] that form the basis

of the Trustee's claims regarding the Vestalia transaction are:

- In August 2008, Royce Homes owed to Amegy Bank
$975,000 for a letter of credit, and John Speer ("Speer") owed
to Amegy Bank $5 million on his personal loan.   The
personal loan, which closed on September 20, 2006, had an
original principal sum of $20,000,000.

- Westwood Gardens was a subdivision developed by Park
Lake Communities, L.P. ("Park Lake"), and Westwood
Gardens was pledged as collateral for a note made by Park
Lake payable to Wachovia Bank, National Association
"Wachovia").   Speer was the chief executive officer of Park
Lake. Park Lake owed Royce Homes approximately $4.9
million.

- In August 2008, Westwood Gardens had 163 residential lots
and a contractual claim of $2.9 million for reimbursement
from a Municipal Utility District ("MUD").   Speer indicated
to Amegy that the proceeds from the lots and the MUD
reimbursement could be used to pay down the debts owed to
Amegy Bank.   Speer's plan was to (1) have Amegy purchase
the Wachovia note and foreclose on Westwood Gardens, and
(2) form a new company, into which he could transfer the
Westwood Gardens assets and the $975,000 debt.

- The new company's name was Vestalia.   Speer and Amegy
agreed that the Westwood Gardens assets would be moved,
through the foreclosure sale, to Vestalia, and, as Vestalia sold
homes, it would pay down Speer's personal loan.   Amegy
Mortgage agreed to finance Vestalia's purchase of Westwood
Gardens at the foreclosure sale, and discussed in advance the
price at the sale.

-3-

- •    Amegy Mortgage purchased the note from Wachovia in January 2009.

- •    Vestalia purchased the Westwood Gardens lots at a public foreclosure sale on March 3, 2009. The equity in the lots plus the value of the MUD reimbursement totaled $3,542,550. Because Park Lake owed money to Royce Homes, Trustee should be permitted to recover the equity transferred from Park Lake to Vestalia.

Third Amended Complaint, at 67-74.

5.     Since this is a summary judgment proceeding, this Court should take every fact alleged by Trustee as true. But even if it does, there is no liability here because foreclosure sales cannot be fraudulent transfers as a matter of law.

**B.**    **The mechanics of the foreclosure sale to Vestalia**

6.     Park Lake executed that certain Promissory Note (the "Note") in the original principal sum of $6,100,000 dated February 3, 2006, payable to Wachovia. Exhibit 1 is a true and correct copy of the Note. The maturity date of the Note is March 1, 2009. Park Lake executed the Development Loan Deed of Trust, Security Agreement, and Financing Statement (the "Deed of Trust"), dated February 3, 2006, and recorded on February 14, 2006, under County Clerk's File No. Z091512 of the Official Real Property Records of Harris County, Texas, pledging three tracts of real property to secure the indebtedness of Park Lake under the Note. Exhibit 2 is a true and correct copy of the Deed of Trust. Amegy Mortgage purchased the Note on January 29, 2009. Exhibit 3 is a true and correct copy of the Loan Purchase Contract between Wachovia and Amegy. The lien created by the Deed of Trust was transferred, assigned, granted and conveyed by Wachovia to Amegy Mortgage pursuant to that certain Transfer of Debt and Liens ("Transfer of Debt and Liens") dated January 29, 2009, recorded under County Clerk's File No. 20090040469 of the Official Real

-4-

Property Records of Harris County, Texas. <u>Exhibit 4</u> is a true and correct copy of the Transfer of Debt and Liens.

7.      On or about March 3, 2009, the Substitute Trustee appointed under the Deed of Trust held a foreclosure sale beginning at 10:51 o'clock a.m. and concluding at 11:20 o'clock a.m. in the lobby of the Family Law Center located at 1115 Congress Avenue, Houston, Harris County, Texas. The foreclosure sale was performed in accordance with the Deed of Trust, the Texas Property Code, and the common law of Texas.

8.      A substitute trustee must be appointed according to terms of the deed of trust. *See Johnson v. Koenig*, 353 S.W.2d 478, 484 (Tex. Civ. App.–Austin 1962, writ ref'd n.r.e); *Tex. Osage Co-Operative Royalty Pool, Inc. v. Crighton*, 188 S.W.2d 230, 234 (Tex. Civ. App.–Austin 1945, writ ref'd). The Deed of Trust states that a Substitute Trustee may be appointed for any reason. The Substitute Trustee has "all of the right, title, power and duties of the Trustee named in . . . " the Deed of Trust. On February 6, 2009, TRSTE, Inc. was removed as Trustee under the Deed of Trust and Anna P. Mayer was appointed Substitute Trustee. The Appointment of Substitute Trustee is dated February 6, 2009, and is recorded under County Clerk's File No. 20090051192 of the Official Real Property Records of Harris County, Texas. <u>Exhibit 5</u> is a true and correct copy of the Appointment of Substitute Trustee.

9.      Amegy "stepped into the shoes" of Wachovia and complied with the notice requirements contained in Chapter 51 of the Texas Property Code and the Deed of Trust when it foreclosed on the three tracts of real property securing the indebtedness of Park Lake relating to the Note. *See Olivares v. Nix Trust*, 126 S.W.3d 242, 246 (Tex. App.–San Antonio 2003, pet. denied) ("the power of a trustee to sell the property is derived solely from the deed of trust and can only be

exercised in strict compliance with the note and conditions of sale"), *cert. denied*, 543 U.S. 871

(2004).  The Deed of Trust states that where there is a default by the borrower, the Trustee shall

enforce the Deed of Trust in the following manner:

> The Trustee shall advertise the time, place and terms of the sale of the Property for at least twenty-one (21) days preceding the day of sale by posting written or printed notice of it at the courthouse door of the county where the Property, or any part of the Property, is situated; the notice may be posted by the Trustee, or by any person acting for Trustee and by filing a copy of the notice in the office of the County Clerk of the county in which the sale is made at least twenty-one (21) days preceding the date of sale; the Trustee shall then sell the Property in accordance with the notice on the first Tuesday of the month designated in the notice, at the time and place set forth therein, or not later than three (3) hours after such time (but in no event earlier than 10:00 o'clock a.m. or later than 4:00 o'clock p.m.) to the highest bidder for cash, selling all of the Property as an entirety or in such parcels as the Trustee may elect, and the Trustee may make due conveyance to the purchaser, with general warranty binding the Borrower, its heirs, successors and assigns, subject to the Permitted Encumbrances.   The Trustee may, in Trustee's sole and absolute discretion, determine that a credit bid may be in the best interest of the Borrower and Lender, and elect to sell the Property for credit or for a combination of cash and credit; provided, however that the Trustee shall have no obligation to accept any bid except an all cash bid.  Furthermore, the criteria under which any credit portion of any bid may be made shall be determined by Trustee, in his sole and absolute discretion . . . The proceeds of this sale shall be applied by Trustee in the following order and priority: (1) first, to the payment of all expenses of advertising, selling, and conveying the Property or part thereof, and/or prosecuting or otherwise collecting rents, proceeds, premiums or other costs including reasonable attorneys' fees, whether incurred by Lender or Trustee or both, and a reasonable fee or commission to Trustee, not to exceed five percent of the proceeds thereof or costs so received; (2) second, to that portion, if any, the full amount of principal, interest, attorneys' fees and other charges due and unpaid on the Note with respect to which no person or entity has personal or entity liability for payment (the Exculpated Portion), and with respect to the Exculpated Portion as follows: first, to accrued by unpaid interest, second, to matured principal, and third, to unmatured principal in inverse order of maturity; (3) third, to the remainder of the full amount of principal, interest, attorneys' fees and other charges due and unpaid on the Note as follows: first, to the remaining accrued by unpaid interest, second, to the matured portion of principal of the said indebtedness, and third, to prepayment of the unmatured portion, if any, of principal of said indebtedness applied to installments of principal in inverse order of maturity; (4) then, the residue, if any, to the persons legally entitled thereto if Trustee is able to determine, to his own satisfaction, what amounts are due which parties; however, if, in the Trustee's sole discretion, (a) Trustee determines there exist any

competing claims for the balance of the proceeds after the full amount of principal, interest, attorneys' fees and other charges due and unpaid on the Note and Trustee, or (b) Trustee is unable to determine, to his own satisfaction what amounts should be paid to which parties, Trustee shall have the right to institute a Bill of Interpleader in any court of competent jurisdiction to determine the rights of any persons claiming an interest therein and Trustee shall recover from the proceeds so interpled, before and distribution to the claimants, all costs incurred in instituting said Bill of Interpleader including without limitation, attorneys' fees and costs of court.  Trustee will give written notice to each debtor who, according to the records of the Lender, is obligated to pay the indebtedness secured by this Deed of Trust, of Trustee's intention to interplead the remaining proceeds, but no further consent of any such debtor shall be required other than that evidenced by this Deed of Trust.  Lender shall have the right to purchase at any sale of the Property if it is the highest bidder and it shall have the right to have the amount for which the Property is sold credited on its indebtedness then owing . . . In addition to the printed notice described above, Lender, at least twenty-one (21) days preceding the date of sale, shall serve written notice of the proposed sale by certified mail on each debtor who, according to Lender's records is obligated to pay the indebtedness secured by this Deed of Trust. Notice shall be complete upon deposit of the notice, enclosed in a postpaid wrapper, addressed to such debtor at the most recent address as shown by Lender's records, in a post office or official depository under the care and custody of the United States Postal Service, as provided in the paragraph of this Deed of Trust entitled "NOTICES."

Exhibit 2, at Section 17.

10.    Amegy notified Park Lake of the foreclosure sale.  Amegy sent notice to Park Lake by certified mail.  *See* TEX. PROP. CODE § 51.002(b)(3).  Service by certified mail is complete when the notice is deposited in the United States mail, postage prepaid and addressed to the debtor at the debtor's last known address as shown by the records of the creditor.  *Id.* at § 51.002(e).  Although the Deed of Trust did not require it, Amegy also copied creditors of Park Lake.  *See* Exhibit 6.

11.    Exhibit 7 is a true and correct copy of the Correction Notice of Substitute Trustee's Foreclosure Sale, dated February 10, 2009, and executed by Anna P. Mayer, as Substitute Trustee

(the "Notice").[1]  February 10, 2009 is twenty-one (21) days preceding March 3, 2009, the date of

the sale.  The Substitute Trustee hand delivered the Notice to Harris County Constable Jack F.

Abercia's office on February 10, 2009, with instructions to post the Notice in his usual and

customary manner at the officially designated place for the posting of notices of nonjudicial

foreclosure sales in Harris County, Texas.  *See Natali v. Witthaus*, 135 S.W.2d 969, 977-78 (Tex.

1940); *Birdwell v. Kidd*, 240 S.W.2d 488, 491 (Tex. Civ. App.–Texarkana 1951, no writ); *Vail v.

First Gibraltar Bank, F.S.B.*, No. 05-93-00055-CV, 1994 WL 121108, at *3 (Tex. App.–Dallas Apr.

7, 1994, writ denied) (not designated for publication).  Exhibit 8 is a true and correct copy of the

Posting and Filing Affidavit for Representative of Substitute Trustee.  Within such exhibit is a copy

of the document evidencing the receipt by the Constable's office of the Notice and a check for $20

as the fee to post such Notice.  Such exhibit also includes the receipt from the County Clerk for the

$2 filing fee.  *See* Tex. Prop. Code § 51.002(b)(2) (requiring that the notice be filed in the office

of the clerk of the county in which the real property is located).  The Notice was posted and filed

twenty-one (21) days before the date of the sale.

12.     The Notice describes the real property to be sold and includes a statement of the date,

time, and location of the sale.  *See id.* at § 51.002.  The Notice also states the terms and manner of

the sale – that the sale will be conducted as a public auction and that bidders will need to

demonstrate their ability to pay cash on the day of the sale.  Additionally, Substitute Trustee notified

the public that the real property will be sold in "as is, where is" condition, without any warranties.

---

[1]     A corrected notice was issued to make non-substantive corrections to the notice dated, posted, and filed on February 9, 2009.  Corrections were made to the date of the Deed of Trust and to the sums of unpaid principal and accrued interest under the Note.  The foreclosure sale was conducted pursuant to the Notice.  Trustee admits that the Substitute Trustee's Deed with Bill of Sale was corrected prior to the foreclosure sale and presents no case law indicating that the correction would affect the validity or propriety of the foreclosure sale.

*See id.* at § 51.009.  The Notice states the name and address of Substitute Trustee.  *See id.* at § 51.0075.  Finally, the Notice describes the instrument to be foreclosed, identifies the lien, and describes the debt.  *See Mercer v. Bludworth*, 715 S.W.2d 693, 700 (Tex. App.–Houston [1st Dist.] 1986, writ ref'd n.r.e.), *disapproved on other grounds*, *Sumway v. Horizon Credit Corp.*, 801 S.W.2d 890 (Tex. 1991).

13.     Substitute Trustee sold on March 3, 2009 the property in accordance with Section 51.002 of the Texas Property Code, the Deed of Trust, and the Notice.  Substitute Trustee sold the property on the first Tuesday of the month designated in the Notice, at the time and place set forth therein to the highest bidder for cash, selling all of the property as an entirety.  The Substitute Trustee conveyed the property to the purchaser, with general warranty binding Park Lake, its heirs, successors and assigns, subject to the permitted encumbrances listed.  Substitute Trustee performed the foreclosure sale.  *See Sullivan v. Hardin*, 102 S.W.2d 1110, 1113 (Tex. Civ. App.–Amarillo 1937, no writ) (a sale by a person other than the designated trustee or appointed substitute trustee is void).  Exhibit 9 is a true and correct copy of the Foreclosure Sale Transcript. Substitute Trustee took no affirmative steps to adversely affect the sales price at foreclosure.  *See Pentad Joint Venture v. First Nat'l Bank of La Grange*, 797 S.W.2d 92, 96 (Tex. App.–Austin 1990, writ denied). Substitute Trustee did nothing to "chill" the bidding.  Substitute Trustee conducted the sale properly. *RTC v. Westridge Court Joint Venture*, 815 S.W.2d 327, 332 (Tex. App.–Houston [1st Dist.] 1991, writ denied).  Substitute Trustee spoke loudly enough to be heard at a reasonable distance.  The property was struck off and sold to Vestalia, LLC, the highest bidder for cash, for the sum of $2,633,953.28.  *See Key v. Pierce*, 8 S.W.3d 704, 708 (Tex. App.–Fort Worth 1999, pet. denied). There were no irregularities.  After the sale, Substitute Trustee issued Substitute Trustee's Deed with

Bill of Sale, a true and correct copy of which is <u>Exhibit 10</u>.  *See also* Affidavit of Chris Denison and Affidavit of Marie Herrin.

## V.

**Argument and authority: foreclosure sales cannot be fraudulent transfers under the law**

**A.    Texas law**

14.    The Trustee must prove that the relevant transfer meets the definition of "fraudulent" in one of the following provisions to recover on his constructive fraudulent transfer claim:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . *without receiving a reasonably equivalent value* in exchange for the transfer or obligation . . .

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation *without receiving a reasonably equivalent value* in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

TEX. BUS. & COM. CODE §§ 24.005(a)(2) and 24.006 (emphasis added), Texas Uniform Fraudulent Transfer Act ("TUFTA").  But the Trustee in this case cannot satisfy these elements because a foreclosure sale cannot be a fraudulent transfer under TUFTA:

> For the purposes of Sections 24.005(a)(2) and 24.006 of this code, a person gives a *reasonably equivalent value* if the person acquires an interest of the debtor in an asset pursuant to a *regularly conducted, noncollusive foreclosure sale* or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

*Id*. at § 24.004 (emphasis added).

15.     Using the Trustee's narrative, Vestalia acquired an interest of Royce Homes. However, that interest was acquired pursuant to a "regularly conducted, noncollusive foreclosure sale." *Id.* at § 24.004(b).  As set forth in detail above, the foreclosure sale was regularly conducted in that all of the provisions and notice requirements contained in the Deed of Trust and the Texas Property Code applicable to nonjudicial foreclosure sales were followed.  The foreclosure took place in the lobby of the Family Law Center in Harris County, and was a valid and proper public proceeding.  *See id.*; *Yokogawa Corp. of Am. v. Skye Int'l Holdings, Inc.*, 159 S.W.3d 266, 269 (Tex. App.–Dallas 2005, no pet.) ("A secured party is entitled to foreclose its liens in the event of a default"); *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 414-15 (5th Cir. 2009).

16.     Trustee did not plead any legally significant reason why the foreclosure at issue should be set aside.  To invalidate a foreclosure sale a debtor must prove that some defect or irregularity in the process caused the property to be sold for a grossly inadequate price.  *See First State Bank v. Keilman*, 851 S.W.2d 914, 927 (Tex. App.–Austin 1993, writ denied); TEX. PROP. CODE § 51.002.  The Royce Homes Trustee did not assert there was a defect in the process, or that the property sold for a grossly inadequate price.  Instead, the crux of Trustee's argument seems to be that Speer and Amegy communicated about bids before the foreclosure sale, but there is nothing improper about that – as shown by *Tarrant Sav. Ass'n v. Lucky Homes, Inc.,* 390 S.W.2d 473 (Tex. 1965).  *Lucky Homes* was a post-foreclosure deficiency suit in which the debtor argued that the subject sale should have been set aside due to "inadequacy of price coupled with some wrongdoing, misconduct or unfairness."  *Id.* at 475.  The opinion explained what was meant by that phrase, and why it was not enough to invalidate a sale:

> The record shows that Conley recommended to another exployee
> [sic] of Tarrant what said employee should bid for Tarrant at the

> foreclosure sale.  Respondents contend that such action on the party
> of Conley constitutes improper conduct.  We do not agree.  The rule
> is well settled in this state that a mortgagee with power to sell may
> purchase at his own sale made at public auction. [Citation omitted]
> Since this is the law in Texas, it must follow that the mere fact that
> Conley, an officer of Tarrant, the mortgagee, requested another
> employee of Tarrant to come to the sale and to bid $1,200 on
> Tarrant's behalf does not constitute an impropriety on Conley's part.
> Finding no evidence of unfair or wrongful conduct on Conley's part
> that could combine with the alleged inadequate price so as to void the
> foreclosure sale, we overrule this point.

*Id.* at 476.  *Lucky Homes* is on point and stands for the proposition that Trustee's allegations against

Amegy do not rise to the level of wrongful conduct.

17.    Moreover, the foreclosure was noncollusive as a matter of law.  In *Intervest Capital*

*Group, Ltd. v. Lightfoot*, J. Patrick O'Connell ("O'Connell") and Roger Maley ("Maley") purchased

a 142-acre tract of land from William Atwell ("Atwell") with the use of a ranch note.  No. 03-97-

00452-CV, 1998 WL 818037, at *1 (Tex. App.–Austin Nov. 30, 1998, pet. denied).  Atwell later

sold the note to Oscar Waymond Lightfoot ("Lightfoot").  *Id.*  O'Connell and Maley were behind

on their payments, and on the same day Lightfoot purchased the note, he informed them that he

would foreclose.  *Id.* at *2.  Lightfoot appointed Frank Alexander ("Alexander") as the substitute

trustee and conducted a nonjudicial foreclosure sale.  *Id.*  No other individuals attended the sale, and

Alexander made a bid on the property on behalf of Lightfoot.  *Id.*  The second lienholder on the

ranch then sued Lightfoot, O'Connell, and Maley for (1) engaging in a civil conspiracy to effect the

fraudulent transfer of the Atwell note, and (2) wrongful foreclosure.  *Id.*  The cause of action

asserted against O'Connell and Maley was brought under TUFTA and based on the assertion that

the defendants' scheme was "collusive."  *Id.* at *2-4 ("Intervest . . . argues that the collusive scheme

was a 'transfer' within the meaning of the Uniform Fraudulent Transfer Act").

18.     On appeal, Justice Smith held as follows:

> The transfer here was by Atwell, who transferred his interest in the note and the property to Lightfoot. O'Connell and Maley did not transfer their interest in the ranch to Lightfoot. It was Lightfoot who foreclosed on O'Connell's and Maley's interests in the ranch . . . ***Additionally, we have been cited to no authority, nor are we aware of any, that restricts the holder of a note from foreclosing on property so long as the holder abides by the terms of the deed of trust.***

*Id.* at *6-7 (emphasis added). As in *Lightfoot*, there was no improper collusion associated with the sale of Westwood Gardens to Vestalia; Amegy abided by the terms of the Deed of Trust and had the undisputed right to foreclose on the property as the successor to the rights of Wachovia.

**B.     Delaware law**

19.     The relevant portions of the Delaware Uniform Fraudulent Transfer Act are virtually the same as the parts of TUFTA quoted above. *See* 6 DEL. C. §§ 1304(a)(2) and 1305. In order for the Trustee to recover on his constructive fraudulent transfer claim, he must establish a lack of reasonably equivalent value.

20.     But, as in Texas, a foreclosure sale cannot be a fraudulent transfer in Delaware:

> For the purposes of §§ 1304(a)(2) and 1305, a person gives a ***reasonably equivalent value*** if the person acquires an interest of the debtor in an asset pursuant to a ***regularly conducted, noncollusive foreclosure sale*** or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust or security agreement.

*Id.* at § 1303(b) (emphasis added). As mentioned above, Vestalia's "interest of Royce Homes" was acquired through a regularly conducted, noncollusive foreclosure sale. Trustee did not plead any allegations about the foreclosure that rise to the level of wrongful or collusive acts. *See Cent. Nat'l Bank of Wilmington v. Indus. Trust Co.*, 51 A.2d 854, 857-58 (Del. Super. Ct. 1947) (indicating that

-13-

parties must show "collusion amounting to fraud" and "gross inadequacy" to attack foreclosure sales); *Fisher v. Smith*, No. 4531, 1980 WL 3042, at *3 (Del. Ch. Sept. 30, 1980) (quoting CYCLOPEDIA CORPORATIONS for the proposition that "[e]ven a stockholder and director who is also the mortgagee may purchase at the [foreclosure] sale"). Trustee's pleadings do not support any legitimate attack on the foreclosure sale. He did not plead that any fraudulent misrepresentations occurred in association with the sale. He did not plead that Vestalia's purchase price was grossly inadequate. And finally, since Amegy itself "standing in the shoes of Wachovia" had the right to bid in at the foreclosure sale (as mortgagee), there is nothing in the law that prevents it from *financing* a bid made by a third party. Trustee's claim regarding the foreclosure is a shot in the dark that is (1) not supported by the evidence or the pleadings and (2) precluded by both Texas and Delaware law.

## C.    The Bankruptcy Code

21.    Finally, Trustee's claim regarding the foreclosure is also precluded by the federal case law interpreting the Bankruptcy Code. Under 11 U.S.C. § 548, a trustee may avoid any transfer of an interest of a debtor in property that was made on or within two years before the date of the filing of the petition, if the debtor:

(B)    (i) received less than a ***reasonably equivalent value*** in exchange for such transfer or obligation; and

(ii)    (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred

-14-

such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

Emphasis added.  As under Texas and Delaware law, the opinions construing Section 548 make it clear that the price received at foreclosure – whatever that price is – is reasonably equivalent value. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994) (the "reasonably equivalent value" for a foreclosed property "is the price in fact received at the foreclosure sale, so long as all requirements of the state's foreclosure law have been complied with"); *see also In re FIBSA Forwarding, Inc.*, 230 B.R. 334, 336-37 (Bankr. S.D. Tex. 1999) ("Both parties agree that this foreclosure is not a fraudulent transfer avoidable under Bankruptcy Code § 548"), *aff'd*, 244 B.R. 94 (S.D. Tex. 1999). For these reasons, Trustee's allegations regarding the Vestalia foreclosure sale cannot satisfy the elements in Section 548, as a matter of law.

## VI.

### Conclusion and prayer

22.     Amegy Bank National Association and Amegy Mortgage Company, L.L.C. request that this Court grant this Motion for Partial Summary Judgment on the Claims Regarding Vestalia. Amegy Bank National Association and Amegy Mortgage Company, L.L.C. also request that the Court grant all other relief to which they are entitled.

Dated:  November 28, 2012.

Respectfully submitted,


By:   /s/ George R. Gibson
        George R. Gibson
        Texas Bar No. 00793802
        Southern District of Texas No. 19879
        Attorney-in-Charge for Amegy Bank
        National Association and Amegy Mortgage
        Company, L.L.C.
        2800 Post Oak Boulevard, 61st Floor
        Houston, Texas 77056
        Telephone: 713.960.0303
        Facsimile:   713.892.4800

OF COUNSEL:

NATHAN SOMMERS JACOBS
A Professional Corporation
Kent Altsuler
Texas Bar No. 24001646
Southern District of Texas No. 23424
Seth A. Miller
Texas Bar No. 24055977
Southern District of Texas No. 724733
2800 Post Oak Boulevard, 61st Floor
Houston, Texas 77056
Telephone: 713.960.0303
Facsimile:   713.892.4800

-16-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Amegy's Motion for Partial Summary Judgment on the Claims Regarding Vestalia was electronically transmitted to the District Clerk for the United States District Court, Southern District of Texas, for filing on November 28, 2012, and electronic notice was given to the following ECF registrants:

**For Rodney Tow, Trustee**
Rodney Tow                                      By E-Mail (rtow@towkoenig.com)
Julie Koenig                                    By E-Mail (jkoenig@towkoenig.com)
Tow & Koenig, P.L.L.C.                                             and ECF
26219 Oak Ridge Drive
The Woodlands, Texas 77380

Michael Duncan                                  By E-Mail (mikedunc@cagehill.com)
Cage Hill & Niehaus, L.L.P.                                        and ECF
5851 San Felipe, Suite 950
Houston, Texas 77057

Erin E. Jones                                   By E-Mail (erin@jmkllp.com)
Jones Morris Klevenhagen, L.L.P.                                   and ECF
6363 Woodway, Suite 570
Houston, Texas 77057

**For Allard Investment Company, LLC,**
**MGM Motor Sports, Inc., DMW Holdings,**
**Inc., Saracen Holdings, Inc., Saracen Holdings,**
**L.P., and Saracen Holdings GP, L.L.C.**
Eugene B. Wilshire                              By E-Mail (ewilshire@wilshirescott.com)
Wilshire & Scott, P.C.                                             and ECF
1221 McKinney Street, Suite 3840
Houston, Texas 77010

**For Michael Manners**
William C. Ferebee                              By E-Mail (wferebee@ofmklaw.com)
O'Donnell, Ferebee, Medley & Keiser, P.C.                          and ECF
450 Gears Road, Suite 800
Houston, Texas 77067

| | |
|---|---|
| Peter Johnson | By E-Mail (pjlawecf@pjlaw.com) |
| Law Offices of Peter Johnson | and ECF |
| Eleven Greenway Plaza, Suite 2820 | |
| Houston, Texas 77046 | |

**For John H. Speer and Vestalia, LLC**

| | |
|---|---|
| Steven Shurn | By E-Mail (sshurn@hwallp.com) |
| C. Ed Harrell | By E-Mail (eharrell@hwallp.com) |
| Hughes Watters Askanase, L.L.P. | and ECF |
| 333 Clay Street, 29th Floor | |
| Houston, Texas 77002 | |

**For Donnie Lou Speer**

| | |
|---|---|
| Christopher D. Johnson | By E-Mail (cjohnson@mckoolsmith.com) |
| McKool Smith | and ECF |
| 600 Travis Street, Suite 7000 | |
| Houston, Texas 77002 | |

**For Park Lake Communities, L.P.**
**and Hammersmith Group, LLC**
**f/k/a Hammersmith Group, Inc.**

| | |
|---|---|
| Randall A. Rios | By E-Mail(rrios@munsch.com) |
| Timothy A. Million | By E-Mail (tmillion@munsch.com) |
| David Mattka | By E-Mail (dmattka@munsch.com) |
| Munsch Hardt Kopf & Harr, P.C. | and ECF |
| 700 Louisiana, 46th Floor | |
| Houston, Texas 77002 | |

**For Watermark Land, LLC f/k/a**
**Watermark Land, LP, Watermark**
**Tortuga, LLC, and George Kopecky**

| | |
|---|---|
| Marc J. Magids | By E-Mail (mail@zbsllp.com) |
| Pascal P. Piazza | By E-Mail (mail@zbsllp.com) |
| David C. Martin | By E-Mail (mail@zbsllp.com) |
| Zukowski, Bresenhan & Sinex, L.L.P. | and ECF |
| 1177 West Loop South, Suite 1100 | |
| Houston, Texas 77027 | |

*/s/ George R. Gibson*
George R. Gibson

W:\Amegy Bank\Royce-Civil Action\MSJ.v2.wpd