**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **Rodney Tow, Trustee** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action 11-cv-3700** |
| | § | |
| **John Speer, Amegy Bank, N.A. et. al.** | § | |
| **Debtor.** | § | |

**RESPONSE TO AMEGY'S MOTION FOR PARTIAL SUMMARY
<u>JUDGMENT ON THE CLAIMS REGARDING VESTALIA</u>**
(Relates to Docket No. 117)

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE LEE ROSENTHAL:

Rodney Tow, Trustee/Plaintiff, files this *Response to Amegy's Motion for Partial Summary Judgment on the Claims Regarding Vestalia* ("Response") and in support thereof would respectfully show the following:

**TABLE OF CONTENTS**

I.    SUMMARY OF ARGUMENT ..................................................................... 3

II.    STATEMENT OF NATURE AND STAGE OF PROCEEDING ........................ 4

III.    STATEMENT OF ISSUES AND THE STANDARD ................................. 8

IV.    FACTUAL BACKGROUND ...................................................................... 9

   A.   Bankruptcy Case ........................................................................... 9

   B.   Relationship of Parties to Case ................................................... 10

   C.   The Westwood Gardens Scheme ............................................... 11

V.    ARGUMENTS AND AUTHORITIES ....................................................... 19

   A.   Amegy Misconstrues Fraudulent Transfer Law - A "Collusive" or Otherwise Fraudulent Foreclosure Sale Can Be a Constructive Fraudulent Transfer or an Actual Fraudulent Transfer .......... 19

      1.  *Actual Fraudulent Transfers* ................................................ 20

      2.  *Constructive Fraudulent Transfers* ...................................... 24

B.   The Cases Cited by Amegy are Inapposite Under the Facts of This Case and Do Not Support
Amegy's Conclusion that a Foreclosure Cannot be a Fraudulent Transfer as a Matter of Law ............27

1.   Whether the Westwood Gardens Foreclosure Sale Was Collusive Can Not Be Determined As
Matter of Law ................................................................................................................................27

2.   There is No Requirement Under TUFTA/DUFTA that Misconduct Must Cause a Grossly
Inadequate Price ...........................................................................................................................30

3.   The Trustee Has Not Asserted Claims Under 11 U.S.C. § 548 ....................................................32

## TABLE OF AUTHORITIES

**Cases**

*BFP v. Resolution Trust Corp.,* 511 U.S. 531, 545-546 (1994)................................... 22,23,25,30

*Central Nat. Bank of Wilmington v. Indus. Trust Co.,* 51 A.2d 854, 857-858 (Del. Super. Ct.
  1947).......................................................................................................................... 28, 29

*Chiari v. City of League City,* 920 F.2d 311, 314 (5th Cir. 1991) ...................................... 23

*Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 902 (5th Cir. 2000).............................. 8

*Cullwell v. City of Fort Worth,* 468 F. 3d 868, 871 (5th Cir. 2006). ..................................... 9

*First State Bank v. Keilman,* 851 S.W.2d 914, 927 (Tex.App.—Austin, 1993).......................... 30

*Fisher v. Smith,* 1980 WL 3042 (Del. Ch. Sept. 30, 1980)....................................... 29, 30

*Harvill v. Westward Communications, L.L.C.,* 433 F.3d 428, 436 (5th Cir. 2005)...................... 8

*In re Gregorio B. Villareal,* 413 B.R. 633, 638-639 (Bankr. S.D.T.X. 2009)........................... 23

*In re Sherlyn Alcazar,* 2008 WL 1767006 * 2-3 (Bankr. E.D. La. 2008).................................. 23

*Intervest Capital Group, Ltd./Oscar Waymond Lightfoot v. Lightfoot,* 1998 WL 818037
  (Tex.App.—Austin 1998) ............................................................................................... 31, 32

*Kee v. City of Rowlett,* 247 F.3d 206, 210 (5th Cir. 2001) .................................................. 8

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000)......................................... 8

*Skotak v. Tenneco Resins, Inc.,* 953 F.2d 900, 913 (5th Cir 1992)............................................ 23

*Tarrant Sav. Ass'n v. Lucky Homes, Inc.,* 390 S.W.2d 473 (Tex. 1965) ..................................... 28

*Transco Leasing Corp. v. United States,* 896 F.2d 1435, 1444 (5th Cir. 1990), *amended in part,*
  905 F.2d 61 (5th Cir. 1990)............................................................................................... 23

**Statutes**

11 U.S.C. § 548.......................................................................................................... 19, 25

6 Del. C. § 13.03 ............................................................................................................. 26

6 Del. C. §1303 et. seq. ................................................................................................... 23

FED. R. CIV. P. 56(c) .......................................................................................................... 8

FED. R. CIV. P. 56(c) .......................................................................................................... 8

TEX. BUS. & COM. C. §24.001 ............................................................................................ 25

TEX. BUS. & COM. CODE § 24.005 ...................................................................................... 21

TEX. BUS. & COM. CODE § 24.010 ................................................................... 21, 25
TEX. BUS. & COM. CODE § 26.006(A) ...................................................................... 24
TEX. BUS. & COMM. C. § 24.004(b) ........................................................................ 25
Tex. Bus. & Comm. C.§ 24.004 .............................................................................. 26
Tex. Bus. Comm. C. 24.001........................................................................................ 21

**Treatises**

3d Deeds of Trust and Mortgages § 191 .................................................................... 26
63 Tex. Jur. 3d Real Estate Sales § 466; 30 Tex. Jur. ............................................... 26

# I.      SUMMARY OF ARGUMENT

1.      Amegy colluded with Speer and Vestalia to foreclose on the Westwood Gardens subdivision, including purchasing the underlying note at a negotiated discount from Wachovia, fixing the price that Vestalia would pay at the foreclosure sale, providing bidding instructions to Vestalia, assisting Speer in forming Vestalia and helping him determine how to compensate himself in the new entity, and providing Vestalia with financing to pay for Westwood Gardens at the foreclosure sale.  There is substantial evidence to raise a genuine issue of material fact as to the collusive and fraudulent nature of this transaction.  Whether Amegy colluded, how it colluded, and with whom it colluded are all factual issues that cannot be determined on summary judgment because they are issue of fact; not law.  Whether the Westwood Gardens foreclosure sale was collusive is not just "a" fact issue – it is "the" fact issue with regard to the fraudulent transfer claims asserted by the Trustee against Amegy relating to Westwood Gardens.  Where there is a genuine issue of material fact, summary judgment is not proper.

2.      Amegy's version of the facts surrounding the Westwood Gardens transaction starts mere weeks before the foreclosure sale.  What Amegy excluded from its factual recitation are the six months of planning and scheming that it did with Speer to arrive at the moment of the

foreclosure sale.  Amegy provides an incomplete version of entire history leading up to the Westwood Gardens foreclosure.

3.      There is no law to support Amegy's sweeping assertion that a foreclosure sale cannot be a fraudulent transfer as a matter of law.   First, the law is clear that if there is actual fraud in connection with a foreclosure sale – a cause of action for a fraudulent transfer with actual intent can be asserted.  Second, under the plain language of the fraudulent transfer statutes, a constructive fraudulent transfer in connection with a foreclosure can be a fraudulent transfer if the sale was *irregular* or *collusive* (assuming all other elements of the statute can be met).  The Trustee has raised a genuine issue of material fact as to the extent of the fraud and collusion between Amegy, Speer and Vestalia in connection with the Westwood Gardens foreclosure.  For the foregoing reasons, the Amegy MSJ should be denied in its entirety.

## II.      STATEMENT OF NATURE AND STAGE OF PROCEEDING

4.      Currently pending before the Court is *Amegy's Motion for Partial Summary Judgment on the Claims Regarding Vestalia* ("Amegy MSJ") (District Court Docket No. 117).

5.      John Speer ("Speer"), Amegy Bank, N.A. and Amegy Mortgage Company, LLC ("Amegy"), and Vestalia, LLC ("Vestalia") (collectively the "Westwood Gardens Defendants") colluded to foreclose on the Westwood Gardens development to pay Speer's personal debt.  In doing so, the Westwood Gardens Defendants stripped Royce Homes's affiliate Park Lake Communities, L.P. ("Park Lake") of a significant equity interest in the Westwood Gardens subdivision, which should have been used to pay Park Lake's multi-million dollar debt to Royce Homes.

6.      The Amegy MSJ currently before the Court, is not the first time that one of the Westwood Gardens Defendants has attempted to obtain a dismissal of claims relating to the

Westwood Gardens foreclosure scheme.  Despite many rulings to the contrary, Amegy persists in making the same exact argument that has failed on prior attempts.  Amegy believes that the Trustee's claims relating to Westwood Gardens should be dismissed because Amegy claims that a foreclosure sale cannot be a fraudulent transfer as a matter of law.  This is absolutely an incorrect statement of the law.

7.     The following prior pleadings have been filed by Westwood Gardens Defendants seeking dismissal of the Westwood Gardens claims on identical grounds as in the Amegy MSJ now before the Court:

a.     <u>Relating to the First Amended Complaint:</u>

i.     Vestalia's Motion to Dismiss the First Amended Complaint (Bankruptcy Adversary Docket No. 113).

ii.     Order Granting in Part and Denying in Part Vestalia's Motion to Dismiss the First Amended Complaint (Bankruptcy Adversary Docket No. 181).

iii.     Trustee's Motion to Reconsider (Bankruptcy Adversary Docket No. 184).

iv.     Vestalia Response to Trustee's Motion to Reconsider (Bankruptcy Adversary Docket No. 190).

v.     Amegy Response to the Trustee's Motion to Reconsider (Bankruptcy Adversary Docket No. 189).

vi.     On September 30, 2011, the Bankruptcy Court held a hearing on the Trustee's Motion to Reconsider and entered an order vacating its prior order.  The Bankruptcy Court denied Vestalia's Motion to Dismiss the Trustee's First Amended Complaint (Bankruptcy Adversary Docket No. 200).  Notably, at page 14 of that order, Judge Bohm states that if the Trustee's facts are taken as true, there was a deliberate intent to defraud Park Lake's creditors:

"*In the Amended Complaint, in paragraphs 262 and 286, the Trustee alleges, with good detail, that Amegy, Speer, Park Lake and Vestalia formulated and carried out a plan to transfer Westwood Gardens from Park Lake to a new company created express for that purpose (i.e. Vestalia), so that Speer could pay off his personal loan to Amegy. [Adv.*

5

*Doc. No. 89. Para 266-286].  The Trustee also alleges, through attaching the transcript of certain testimony, deliberate dishonesty on the part of these particular defendants in concocting a scheme to use Park Lake's assets to pay off Speer's personal obligations to Amegy, instead of using these assets to pay Park Lake's legitimate creditors (such as Royce Homes).  Indeed, the Trustee alleges by attaching the transcript of certain testimony, that these defendants were aware that the Transfer would be problematic when Royce Homes filed for bankruptcy [Adv. Doc. No. 89, Denison Excerpt 74].  These allegations, if taken as true, demonstrate a deliberate intent of Amegy, Speer, Park Lake and Vestalia to defraud Park Lake's creditors; instead of paying off Park Lake's debts, the defendants purposefully conspired to transfer a $6.77 million asset with substantial equity (i.e. Westwood Gardens) to Vestalia so that Speer could use this equity to pay off his personal loan to Amegy.*

*In sum, this Court concludes that the Trustee has pleaded with sufficient particularity under Rule 9(b) to go forward with his actual fraud cause of action under TUFTA.  Therefore, the Court denies the Motion to Dismiss as to this claim."*

b.  <u>Relating to the Second Amended Complaint:</u>

    i.  On October 4, 2011, shortly before the reference was withdrawn[1], the Trustee filed his Motion to Authorize the Filing of the Second Amended Complaint (Bankruptcy Adversary Docket No. 195).

    ii.  Vestalia filed an Objection to the Trustee's Motion to File the Second Amended Complaint (Bankruptcy Adversary Docket No. 208) arguing that the amendments to the complaint would be futile.

    iii.  The Trustee filed a Reply to Vestalia's Objection to the filing of the Second Amended Complaint (District Court Docket No. 18).

    iv.  Before the Trustee's Motion to file the Second Amended Complaint was ruled upon, the Trustee sought leave to file a Third Amended Complaint pursuant to this Court's scheduling order (District Court Docket No. 59).

c.  <u>Relating to the Third Amended Complaint:</u>

    i.  Vestalia filed another objection to the Trustee's Motion for Leave to File Third Amended Complaint arguing that amending was futile because no

---

[1]  The Order Withdrawing Reference was entered on October 11, 2011 (Bankruptcy Adversary Docket No. 211).

plausible claim was pled as to Westwood Gardens (District Court Docket No. 68).

ii.     The Trustee replied to Vestalia's Objection to the Trustee's Motion for Leave File Third Amended Complaint (District Court Docket No. 72).

iii.    The Court entered an Order granting the Trustee's Motion to File Third Amended Complaint (Docket No. 76) finding that amendments would not be futile.

iv.     Vestalia then filed a Motion to Dismiss the Trustee's Third Amended Complaint (District Court Docket No. 93) on the same exact grounds.

v.      The Trustee filed a Response to Vestalia's Motion to Dismiss (District Court Docket No. 105). Vestalia's Motion to Dismiss is still pending.

8.      The Amegy MSJ is the sixth "bite at the apple" by Westwood Gardens Defendants seeking dismissal of the Trustee's fraudulent transfer claims relating to Westwood Gardens. Each prior failed attempt was based on the same arguments raised again in the Amegy MSJ.

9.      To date, the Trustee has sent and received written discovery from each of the defendants in this case. The Trustee has participated in the depositions of Pamela Mitchell (Royce Homes corporate planner), William Gathmann (Royce Homes CFO), and James Hunter (Royce Homes COO). Before any additional depositions were taken, the parties participated in mediation on November 27 and November 30, 2012. The parties did not settle at mediation.

10.     Pursuant to this Court's Scheduling Order (District Court Docket No. 23), discovery does not close in this case until July 1, 2013. The Trustee still intends to conduct many depositions, including but not limited to: (i) Chris Denison (Amegy banker), (ii) corporate representatives of Amegy, (iii) various members of the Amegy credit committee, (iv) various Royce Homes lenders, (v) Donnie Lou Speer, (vi) John Speer, (vii) Michael Manners, (viii) corporate representatives of Manners Entities, (ix) Royce Homes accountants, (x) various former

employees of Royce Homes; and (xi) experts.  There is still a significant amount of discovery to be conducted.

11. Trial in this case is set for January 2014.

### III.   STATEMENT OF ISSUES AND THE STANDARD

12.    Amegy seeks partial summary judgment as to the Trustee's fraudulent transfer claims relating to the Westwood Gardens foreclosure, a fraudulent scheme devised by Speer, Amegy, and Vestalia to defraud Park Lake's creditors, including Royce Homes.

13.    A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).

14.    A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000). The Court may not make credibility determinations or weigh the evidence.  *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005).

15.     Where a summary judgment is filed before a party has had the opportunity to pursue necessary discovery relating to its theory of the case, the court should grant any Rule 56(f) motion freely.  Rule 56(f) discovery motions are "broadly favored and should be liberally granted" because the rule is designed to "safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Cullwell v. City of Fort Worth,* 468 F. 3d 868, 871 (5th Cir. 2006).  Contemporaneously with filing this Response, the Trustee has also filed a Rule 56(f) motion and respectfully requests that if the Trustee has not provided enough evidence in this response to sustain his summary judgment burden that the Court reserve any ruling on the Amegy MSJ until discovery is closed and the Trustee has had an opportunity to supplement his response.

## IV.     FACTUAL BACKGROUND

### A.     Bankruptcy Case

16.     On April 7, 2009 (the "Petition Date"), four of Royce Homes' creditors, Wisenbaker Builder Services, Inc., Suncoast Post Tension, Ltd., Builders Mechanical, Inc., and Luxury Baths by Arrow (collectively, the "Petitioning Creditors") filed a chapter 7 involuntary petition against Royce Homes. On April 30, 2009, the Court entered the Order for Relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

17.      There are over $40 million in claims filed by creditors in the Royce Homes claims register in the bankruptcy case.[2]

18.     On April 28, 2011, the Trustee filed his Original Complaint ("Original Complaint") (Bankruptcy Adversary Docket No. 1), initiating Adversary Proceeding No. 11-

---

[2]   *See* Official Claims Register filed in Bankruptcy Case No. 09-32467 pending in the United States Bankruptcy Court Southern District of Texas, Houston Division.

03191 ("Adversary Proceeding") against John H. Speer, Amegy Bank, N. A., Amegy Mortgage Company LLC, Michael Manners, Donnie Lou Speer, Vestalia, LLC, Hammersmith Group, LLC f/k/a Hammersmith Group, Inc., Park Lake Communities, L.P., Watermark Land, LLC, Watermark Land, LP, Watermark Tortuga, LLC, Allard Investment Company, L.L.C., DWM Holdings, Inc., MGM Motor Sports, L.L.C., Saracen Holdings, Inc. and George Kopecky.

## B.   Relationship of Parties to Case

19.     John Speer ("Speer") is the former president and CEO of Royce Homes, L.P. (the "Debtor").  He was also the sole shareholder and an officer of Hammersmith Group, LLC, fka Hammersmith Group, Inc. ("Hammersmith"), the general partner of Royce Homes and Park Lake Communities, L.P. ("Park Lake").  Typically, Park Lake developed subdivisions and would sell the lots to Royce Homes to develop the lots with homes.  At all times relevant to this case Speer was a control person of and fiduciary to Royce Homes, Park Lake, and Hammersmith.

20.     Vestalia, LLC is the entity formed by Speer after bankrupting Royce Homes so that he would have an entity in which he could continue to operate with opportunities usurped from Royce Homes and affiliates.

21.     Amegy is the bank that financed Speer's $20 million buyout of his partner in Royce Homes.  When Royce Homes failed, Amegy financed Speer in his newly formed entity – Vestalia – to purchase the Westwood Gardens subdivision at the sham foreclosure sale.  Chris Denison is a loan officer at Amegy.

C.     The Westwood Gardens Scheme

22.     Speer was the chief executive officer and fiduciary of Park Lake.[3]  Park Lake was insolvent at all times relevant to this claim.[4]  Royce Homes was a creditor of Park Lake at all times relevant to this claim.[5]

23.     After Royce Homes closed its doors Speer continued his search for Royce Homes assets and assets of related entities which could be used to pay Speer's personal obligation to Amegy.  Speer turned his focus to the one significant remaining asset – the Westwood Gardens subdivision.

24.     Westwood Gardens was a successful subdivision developed by Park Lake, a sister company to Royce Homes.  Royce Homes was the guarantor of Park Lake's loans.[6]  Royce Homes was the largest of the Royce entities and possessed the revenues and equity needed to guarantee the Park Lake loans.[7]  Park Lake owed Royce Homes approximately $4.4 million.[8] This debt was not repaid and remains unpaid today.[9]  Royce Homes was the primary purchaser of developed lots from Park Lake.[10]

---

[3]  Attached hereto as Exhibit "A" is a true and correct copy of the 2004 Examination of John Speer ("Speer 2004 Examination"); For the convenience of the Court, the Trustee has also attached as Exhibit "B" excerpts from the 2004 examination of John Speer and will refer to them herein as "Speer Excerpt __".  *See* Exhibit B, Speer Excerpt 2, 3, 4 and 5; *See* Exhibit C, a true and correct copy of Exhibit 160 used at the 2004 examination of John Speer; *See* Exhibit D, a true and correct copy of Exhibit 159 used in the 2004 examination of John Speer.

[4]   *See* Exhibit B, Speer Excerpt 11, 12; *See* Exhibit E, a true and correct copy of Exhibit 134 used at the 2004 examination of Chris Denison and John Speer.

[5]   *See* Footnotes 8 and 9, *infra*

[6]   *See* Exhibit B, Speer Excerpt 7

[7]   *See* Exhibit B Speer Excerpt 5, 7

[8]   Attached hereto as Exhibit "F" is a true and correct copy of the 2004 Examination of Chris Denison ("Denison 2004 Examination"); For the convenience of the Court, the Trustee has also attached as Exhibit "G" excerpts from the 2004 examination of Chris Denison and will refer to them herein as "Denison Excerpt __".  *See* Exhibit G, Denison Excerpt 57; *See* Exhibit H, a true and correct copy of Exhibit 156 used in the 2004 examination of Chris Denison; *See* Exhibit I, a true and correct copy of Exhibit 137 used in the 2004 examination of Chris Denison; *See* Exhibit J, a true and correct copy of Exhibit 138 used in the 2004 examination of Chris Denison; *See* Exhibit K, a true and correct copy of Exhibit 139 used in the 2004 examination of Chris Denison.

[9]   *See* Exhibit B, Speer Excerpt 9, 14; *See* Exhibit I, 2004 Exam Exhibit 137; *See* Exhibit J, 2004 Exam Exhibit 138.

[10]  *See* Exhibit B, Speer Excerpt 5; *See* Exhibit G, Denison Excerpt 43

25.     Park Lake had developed Westwood Gardens which had 163 lots remaining to be sold.[11]   In addition, Westwood Gardens had an expected $2.9 million MUD reimbursement.[12]   MUD reimbursement refers to an instance where the developer installs utilities such as water, sanitary sewers, and storm sewers in a subdivision it develops.   Once the subdivision is built the municipal utility district for the subdivision will reimburse the developer a portion of the development cost for the installation of the utilities.[13]

26.     In approximately August 2008, Speer approached Denison about an opportunity for Speer and Amegy regarding Westwood Gardens.[14]   Speer advised Amegy about the existence of the lots and the $2.9 million MUD receivable.[15]   He advised that the proceeds from Westwood Gardens could be used to pay his personal loan.[16]   At this time, Speer still owed Amegy approximately $5 million.[17]   Royce Homes owed Amegy $975,000, which Amegy knew was not likely to be repaid since Royce Homes was closed.[18]   Speer advised he was going to set up a new company and transfer Westwood Gardens to the new company.[19]   Denison acknowledged the elements of the plan so Amegy and Speer could take advantage of the opportunity in Westwood Gardens.[20]

---

[11]   *See* Exhibit B, Speer Excerpt 6; *See* Exhibit G, Denison Excerpt 44; *See* Exhibit L, a true and correct copy of Exhibit 133 used at the 2004 examination of John Speer and Chris Denison.

[12]   *See* Exhibit G, Denison Excerpt 45; *See* Exhibit L, 2004 Exam Exhibit 133.

[13]   *See* Exhibit B, Speer Excerpt 8; *See* Exhibit G, Denison Excerpt 45; *See* Exhibit L, 2004 Exam Exhibit 133.

[14]   *See* Exhibit G, Denison Excerpt 48, 49; *See* Exhibit M, a true and correct copy of Exhibit 135 used at the 2004 examination of Chris Denison; *See* Exhibit N, a true and correct copy of Exhibit 136 used at the 2004 examination of Chris Denison.

[15]   *See* Exhibit G, Denison Excerpt 47, 48, 49; *See* Exhibit M, 2004 Exam Exhibit 135; *See* Exhibit N, 2004 Exam Exhibit 136.

[16]   *See* Exhibit G, Denison Excerpt 48, 49; *See* Exhibit M, 2004 Exam Exhibit 135; *See* Exhibit N, 2004 Exam Exhibit 136.

[17]   *See* Exhibit G, Denison Excerpt 48, 49; *See* Exhibit M, 2004 Exam Exhibit 135; *See* Exhibit N, 2004 Exam Exhibit 136.

[18]   *See* Exhibit G, Denison Excerpt 48, 49; *See* Exhibit M, 2004 Exam Exhibit 135; *See* Exhibit N, 2004 Exam Exhibit 136.

[19]   *See* Exhibit G, Denison Excerpt 50; *See* Exhibit N, 2004 Exam Exhibit 136.

[20]   *See* Exhibit G, Denison Excerpt 47 and 48; *See* Exhibit M, 2004 Exam Exhibit 135; *See* Exhibit N, 2004 Exam Exhibit 136.

27.     The plan included Amegy purchasing the Wachovia Bank note secured by Westwood Gardens.[21]  Wachovia's lien included the MUD reimbursements.[22]  Amegy would then foreclose on Westwood Gardens, financing Speer through a new company so he could purchase the property at the foreclosure sale.[23]  Once purchased, Speer agreed to turn over a substantial portion of the equity to Amegy to satisfy the remaining $5 million of Speer's personal Amegy loan and the $975,000 debt Vestalia assumed from Royce Homes.[24]  Without the Westwood Gardens deal these debts were likely not collectible.[25]

28.     The repayment of Amegy was detailed in Denison's testimony.  Speer and Amegy agreed that Vestalia would assume the $975,000 debt of Royce Homes and use the MUD reimbursement to pay this debt plus, if necessary, use the reimbursement to pay down Speer's personal Amegy loan.[26]  Also, it was agreed that the Westwood Gardens equity would be moved, through the foreclosure sale, to Vestalia.[27]  As Vestalia sold homes, it would pay down Speer's personal Amegy loan.[28]

29.     Amegy agreed to extend a loan to Speer for the purchase, at foreclosure, of the Westwood Gardens subdivision then provide Speer with a line of credit so he could continue

---

[21]  *See* Exhibit G, Denison Excerpt 44, 46, 48, 50, 53, 63, 69, 71, 76, 77; *See* Exhibit B, Speer Excerpt 6, 13, 21, 22; *See* Exhibit L, 2004 Exam Exhibit 133; *See* Exhibit M, 2004 Exam Exhibit 135; *See* Exhibit N, 2004 Exam Exhibit 136; *See* Exhibit O, a true and correct copy of Exhibit 142 used at the 2004 examination of Chris Denison; *See* Exhibit P, a true and correct copy of Exhibit 144 used at the 2004 examination of Chris Denison and John Speer; *See* Exhibit Q, a true and correct copy of Exhibit 145 used at the 2004 examination of Chris Denison and John Speer; *See* Exhibit R, a true and correct copy of Exhibit 146 used at the 2004 examination of Chris Denison and John Speer; *See* Exhibit S, a true and correct copy of Exhibit 149 used at the 2004 examination of Chris Denison.
[22]  *See Id.*
[23]  *See Id.*
[24]  *See Id.*
[25]  *See* Exhibit G, Denison Excerpt 48, 49; *See* Exhibit N, 2004 Exam Exhibit 136.
[26]  *See* Exhibit G, Denison Excerpt 44, 46, 48, 50, 53, 63, 69, 71, 76, 77; *See* Exhibit B, Speer Excerpt 6, 13, 21, 22; *See* Exhibit L, 2004 Exam Exhibit 133; *See* Exhibit M, 2004 Exam Exhibit 135; *See* Exhibit N, 2004 Exam Exhibit 136; *See* Exhibit O, 2004 Exam Exhibit 142; *See* Exhibit P, 2004 Exam Exhibit 144; *See* Exhibit Q, 2004 Exam Exhibit 145; *See* Exhibit R, 2004 Exam Exhibit 146; *See* Exhibit S, 2004 Exam Exhibit 149.
[27]  *See* Exhibit G, Denison Excerpt 46, 50, 51, 63, 65, 67, 69, 70, 71; *See* Exhibit B, Speer 6, 17, 18, 21, 22; *See* Exhibit L, 2004 Exam Exhibit 133; *See* Exhibit M, 2004 Exam Exhibit 135; *See* Exhibit N, 2004 Exam Exhibit 136; *See* Exhibit O, 2004 Exam Exhibit 142; *See* Exhibit P, 2004 Exam Exhibit 144; *See* Exhibit Q, 2004 Exam Exhibit 145; *See* Exhibit R, 2004 Exam Exhibit 146; *See* Exhibit S, 2004 Exam Exhibit 149.
[28]  *See* Exhibit G, Denison Excerpt 49, 50, 51, 52, 53 and 54; *See* Exhibit N, 2004 Exam, Exhibit 136.

building homes in Westwood Gardens.[29]   Denison testified Speer could do the deal because Amegy participated and that Amegy would not have done the deal without Speer being involved.[30]

30.     Speer and Amegy then began negotiating the creation of the new company which would be used to purchase Westwood Gardens.[31]   The new company was eventually named Vestalia.[32]

31.     During these negotiations, Amegy was well aware of the fact that Speer was in control of and was the president of Hammersmith.[33]   Hammersmith was the general partner for both Royce Homes and Park Lake.[34]   Speer was the chief executive officer of Park Lake.[35] Amegy knew Speer was an officer of Park Lake.[36]   Amegy verified Park Lake owed Royce Homes approximately $4.4 million.[37]

32.     By August 2008, Park Lake was insolvent.[38]   Amegy investigated and discovered that Park Lake was insolvent and that Royce Homes was a creditor of Park Lake prior to entering into the Westwood Gardens transaction.[39]   Amegy clearly knew Speer owed a fiduciary duty to

---

[29] *See* Exhibit B, Denison Excerpt 46
[30] *See* Exhibit G, Denison Excerpt 55
[31] *See* Exhibit G, Denison Excerpt 46, 47, 50, 53; *See* Exhibit M, 2004 Exam Exhibit 135; *See* Exhibit N, 2004 Exam Exhibit 136.
[32] *See* Exhibit G, Denison Excerpt 46, 47, 50, 53; *See* Exhibit M, 2004 Exam Exhibit 135; *See* Exhibit N, 2004 Exam Exhibit 136.
[33] *See* Exhibit G, Denison Excerpt 42
[34] *See* Exhibit B, Speer Excerpt 1
[35] *See* Exhibit B, Speer Excerpt 2, 3, and 4;  *See* Exhibit D, 2004 Exam Exhibit 159; *See* Exhibit C, 2004 Exam Exhibit 160.
[36] *See* Exhibit G, Denison Excerpt 43
[37] *See* Exhibit B, Speer Excerpt 10; *See* Exhibit D,  Denison Excerpt 57;  *See* Exhibit H, 2004 Exam Exhibit 156; *See* Exhibit I, 2004 Exam Exhibit 137; *See* Exhibit J, 2004 Exam Exhibit 138; *See* Exhibit K, 2004 Exam Exhibit 139.
[38] *See* Exhibit B, Speer Excerpt 11, 12;  *See* Exhibit T, a true and correct copy of Exhibit 134 used at the 2004 examination of Chris Denison and John Speer.
[39] *See* Exhibit B, Speer Excerpt 14; *See* Exhibit G, Denison Excerpt 56; *See* Exhibit I, 2004 Exam Exhibit 137;  *See* Exhibit J, 2004 Exam Exhibit 138; *See* Exhibit E, 2004 Exam Exhibit 134.

Royce Homes and to Park Lake.  Speer testified he owed a duty to Park Lake to protect its interest but he chose Vestalia's interest over Park Lake's.[40]

33.     Amegy essentially sought to create a straw-man company to purchase Westwood Gardens giving the impression Speer was not involved.[41]  Denison testified Amegy's attorneys strongly preferred Speer not be an owner of Vestalia and that its capitalization would come from a source other than Speer.[42]  Speer guessed Amegy wanted no one from Royce Homes involved in the new company.[43]  Amegy and Speer discussed different ways the new company could be established--Amegy did not want Speer to be an owner.[44]  Amegy even helped plan how Speer could be compensated in his new entity.[45]  Denison acknowledged Amegy did not typically get involved in the ownership of companies.[46]  He agreed this transaction was not typical because a) Speer was taking assets from Park Lake which he controlled and placing them in Vestalia, another company he controlled, b) Park Lake owed Royce Homes a substantial amount of money, and c) the asset being transferred from Park Lake to Vestalia had substantial equity.[47]

34.     Speer testified he ultimately created Vestalia with him, his wife Donna Speer, his son Shawn Speer, and his daughter-in-law Shonna Speer, as the owners.[48]

35.     By October 2008, Speer had retained bankruptcy counsel for Royce Homes and other entities, but Speer never filed either Royce Homes or Park Lake into bankruptcy.[49]  Instead, Speer worked toward the completion of the Westwood Gardens transaction and

---

[40] *See* Exhibit B, Speer Excerpt 13, 19, 20, and 21.
[41] *See* Exhibit G, Denison Excerpt 61; *See* Exhibit U, a true and correct copy of Exhibit 141 used at the 2004 examination of Chris Denison; *See* Exhibit V, a true and correct copy of Exhibit 153 used at the 2004 examination of Chris Denison
[42] *See* Exhibit G, Denison Excerpt 58 and 59; *See* Exhibit U, 2004 Exam Exhibit 141.
[43] *See* Exhibit B, Speer Excerpt 15 and 16
[44] *See* Exhibit G, Denison Excerpt 58 and 59; *See* Exhibit U, 2004 Exam Exhibit 141
[45] *See* Exhibit G, Denison Excerpt 62
[46] *See* Exhibit G, Denison Excerpt 60
[47] *Se*e Exhibit G, Denison Excerpt 60
[48] *See* Exhibit B, Speer Excerpt 23
[49]  ECF/PACER indicate that Royce Homes never voluntarily filed a bankruptcy case for either Royce Homes or Park Lake.  It is a matter for which judicial notice can be taken under FRE 201

managed to complete the Westwood Gardens transaction just before Royce Homes's creditors filed an involuntary bankruptcy case.[50]

36.     Since the inception of the Westwood Gardens plan, Speer and Denison had been discussing the opportunity available through Westwood Gardens.  Part of that opportunity was an ability to negotiate down the price of the Wachovia note and lien.[51]  By December 2008, Speer and Amegy had almost completely succeeded in their negotiations to purchase the Wachovia note and they were working on the final purchase price.[52]  Speer considered the final negotiated price a great deal for Amegy and Speer.[53]  Speer completely disregarded his obligations to Park Lake and Royce Homes.

37.     The note purchase was closed in January 2009.  By January 27, 2009 Amegy detailed the steps of the plan in a Credit Modification.[54]  This modification clarified the plan was to move almost $3 million in equity from Park Lake to Vestalia and use it to pay off Speer's personal loan and the remaining $975,000 of the Royce Homes debt.[55]  Amegy's counsel, Anna Mayer of Nathan Sommers Jacobs, not only advised Amegy regarding the Westwood Gardens transaction but then acted as the substitute trustee at the foreclosure sale to carry out Amegy and Speer's collusive scheme.[56]

38.     Speer and Amegy had negotiated the terms of the line of credit for Vestalia and the terms under which Speer would purchase Westwood Gardens at the foreclosure sale.[57]

---

[50] *See* Exhibit B, Speer Excerpt 90 and 91
[51] *See* Exhibit G, Denison Excerpt 46
[52] *See* Exhibit G, Denison Excerpt 46, 63
[53] *See* Exhibit G, Denison Excerpt 63; *See* Exhibit O, 2004 Exam Exhibit 142.
[54] *See* Exhibit G, Denison Excerpt 64; *See* Exhibit W, a true and correct copy of Exhibit 143 used at the 2004 examination of Chris Denison.
[55] *See* Exhibit G, Denison Excerpt 64; *See* Exhibit W, 2004 Exam Exhibit 143.
[56] *See* Amegy MSJ at para. 8 and Exhibit 5, which are incorporated by reference herein.
[57] *See* Exhibit G, Denison Excerpt 66, 70; *See* Exhibit P, 2004 Exam Exhibit 144; *See* Exhibit Q, 2004 Exam Exhibit 145.

Amegy provided Speer with bidding instructions to purchase of Westwood Gardens at the foreclosure sale.[58]  Amegy actually calculated the bid amount for Speer to bid at the foreclosure sale.[59]

39.     But, before the foreclosure could occur, Amegy required Speer pay a mechanics lien filed against the Westwood Gardens subdivision.[60]  Like he had done prior to the closing of Royce Homes, Speer went to the Royce Homes bank account to pay the Park Lake creditor but the creditor balked at taking the payment because it believed a Royce Homes bankruptcy was imminent.[61]

40.     By February, Westwood Gardens was posted for foreclosure and on March 3, 2009 a foreclosure sale occurred with Vestalia as the purchaser.  On that date, Amegy deposited $2,058,750 into Vestalia's account and then immediately pulled $2,633,953.28 out of the account.  This included the Amegy loan proceeds plus Speer's added capital.[62]

41.     Denison testified that the Amegy loan committee approved the Speer/Amegy plan.[63]

42.     At the inception of the plan, Amegy obtained an appraisal of the Westwood Gardens property and MUD reimbursement.[64]  In addition, Amegy prepared an internal

---

[58]  *See* Exhibit G, Denison Excerpt 65, 66, 67, and 68; *See* Exhibit B, Speer Excerpt 18; *See* Exhibit X, a true and correct copy of Exhibit 154 used at the 2004 examination of Chris Denison; *See* Exhibit P, 2004 Exam Exhibit 144.
[59]  *See* Exhibit G, Denison Excerpt 69; *See* Exhibit P, 2004 Exam Exhibit 144.
[60]  *See* Exhibit G, Denison Excerpt 71 and 72; *See* Exhibit Q, 2004 Exam Exhibit 145;  *See* Exhibit R, 2004 Exam Exhibit 146.
[61]  *See* Exhibit B, Speer Excerpt 22; *See* Exhibit Q, 2004 Exam Exhibit 145;  *See* Exhibit R, 2004 Exam Exhibit 146.
[62]  *See* Exhibit G, Denison Excerpt 70; See Exhibit P, 2004 Exam Exhibit 144; *See* Exhibit Q, 2004 Exam Exhibit 145.
[63]  *See* Exhibit G, Denison Excerpt 73
[64]  *See* Exhibit G, Denison Excerpt 44, 45, 46, 69, 75; *See* Exhibit P, 2004 Exam Exhibit 144;  *See* Exhibit L, 2004 Exam Exhibit 133; *See* Exhibit W, 2004 Exam Exhibit 143 used at the 2004 examination of Chris Denison; *See* Exhibit Y, a true and correct copy of Exhibit 148 used at the 2004 examination of Chris Denison.

verification of the appraisal.[65]   Finally, Speer counseled Amegy regarding the value of the property and MUD reimbursement.  These establish the loss to Park Lake and, ultimately, Royce Homes as a result of the Westwood Gardens plan.

43.   Denison testified the appraiser established a discounted value for the lots and MUD reimbursements of $5,405,000.[66]  The appraisal stated a willing purchaser existed for the lots at $3,872.550.[67]  That, added to the value of the MUD reimbursements of $2.9 million, established a value to Park Lake of $6,772,550.[68]  Denison testified that the Amegy internal review of the appraisal gave it a four out of possible five rating.[69]  As part of the review, Amegy internally a) verified the appraiser complied with USPAP, FIRREA, Amegy's reporting requirements, b) checked the adequacy and relevance of the data and the propriety of any adjustments, c) checked the adequacy and relevance of appropriate appraisal methods and techniques, and d) checked the reasonableness of the analysis and opinion value.[70]  Speer provided Amegy with an acquisition analysis establishing the equity in the lots and MUD reimbursement at a value of $3,542,550.[71]

44.   Notwithstanding the careful planning by Amegy and Speer, the notice of the foreclosure sale and the subsequent deed issued at the foreclosure sale had an error.  They incorrectly referred to film code 617088 instead of 617091, which would cause confusion

---

[65]  *See* Exhibit G, Denison Excerpt 44, 45, 46, 69, 75; *See* Exhibit P, 2004 Exam Exhibit 144;  *See* Exhibit L, 2004 Exam Exhibit 133; *See* Exhibit W, 2004 Exam Exhibit 143 used at the 2004 examination of Chris Denison; *See* Exhibit Y, 2004 Exam Exhibit 148.

[66]  *See* Exhibit G, Denison Excerpt 75; *See* Exhibit L, 2004 Exam Exhibit 133; *See* Exhibit W, 2004 Exam Exhibit 143 used at the 2004 examination of Chris Denison; *See* Exhibit Y, 2004 Exam Exhibit 148.

[67]  *See* Exhibit G, Denison Excerpt 75; *See* Exhibit L, 2004 Exam Exhibit 133; *See* Exhibit W, 2004 Exam Exhibit 143 used at the 2004 examination of Chris Denison; *See* Exhibit Y, 2004 Exam Exhibit 148.

[68]  *See* Exhibit G, Denison Excerpt 75; *See* Exhibit L, 2004 Exam Exhibit 133; *See* Exhibit W, 2004 Exam Exhibit 143 used at the 2004 examination of Chris Denison; *See* Exhibit Y, 2004 Exam Exhibit 148.

[69]  *See* Exhibit G, Denison Excerpt 75; *See* Exhibit L, 2004 Exam Exhibit 133; *See* Exhibit W, 2004 Exam Exhibit 143 used at the 2004 examination of Chris Denison; *See* Exhibit Y, 2004 Exam Exhibit 148.

[70]  *See* Exhibit G, Denison Excerpt 75; *See* Exhibit L, 2004 Exam Exhibit 133; *See* Exhibit W, 2004 Exam Exhibit 143 used at the 2004 examination of Chris Denison; *See* Exhibit Y, 2004 Exam Exhibit 148.

[71]  *See* Exhibit G, Denison Excerpt 76 and 77; *See* Exhibit S, 2004 Exam Exhibit 149.

regarding which property was foreclosed. The errors in the Notice of Appointment of Successor Trustee and Notice of Substitute Trustee's Foreclosure Sale were not corrected. The Substitute Trustee's Deed with Bill of Sale was corrected twice–February 24, 2010 and March 10, 2010-indicating the change of the film code number.[72]

45.    Amegy, Speer, and Vestalia conspired to transfer Westwood Gardens to Vestalia through a sham foreclosure. There is ample evidence to raise a genuine issue of material fact as to the issue of fraud and collusion. Whether Amegy colluded, how it colluded, and with whom it colluded are all factual issues that cannot be determined on summary judgment. Where there is a genuine issue of material fact, summary judgment is not proper.

## V.    ARGUMENTS AND AUTHORITIES

### A.    Amegy Misconstrues Fraudulent Transfer Law - A "Collusive" or Otherwise Fraudulent Foreclosure Sale Can Be a Constructive Fraudulent Transfer or an Actual Fraudulent Transfer

46.    As a starting point, it is worth noting that in the Third Amended Complaint paragraphs <u>267</u> to <u>292</u> and <u>665</u> to <u>679</u>, the Trustee has asserted claims against Amegy, Speer, and Vestalia (in connection with the Westwood Gardens foreclosure) for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conspiracy, TUFTA/DUFTA fraudulent transfer (actual intent), TUFTA/DUFTA fraudulent transfer (constructive fraudulent transfer), constructive trust, and equitable lien.[73] The Trustee has not asserted a fraudulent transfer under 11 U.S.C. § 548. The Trustee has also named MUD District 11 as a nominal defendant because it is in possession of the disputed funds relating to the Westwood Gardens transaction. The

---

[72] *See* Exhibit Z; *See* Exhibit AA; *See* Exhibit BB; *See* Exhibit CC; *See* Exhibit DD

[73] The Trustee incorporates by reference the Third Amended Complaint (District Court Docket No. 77). Amegy's Motion for Partial Summary Judgment does not address any of the Trustee's claims relating to Westwood Gardens other than the claims for fraudulent transfer. Amegy's Motion for Partial Summary Judgment does not seek dismissal of the Trustee's Westwood Gardens claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conspiracy, constructive trust, or equitable lien. The Trustee is not addressing those arguments in this response.

Trustee describes in detail in the Third Amended Complaint how Amegy, Speer and Vestalia conspired to foreclose on Westwood Gardens for their own benefit and in doing so stripped Park Lake of its significant equity interest in Westwood Gardens.

47.     Amegy argues that a foreclosure sale cannot be a fraudulent transfer as a matter of law.  This is an absolutely incorrect statement of fraudulent transfer law.  This issue has been tested in this case now six times – each time a Westwood Garden Defendant stating that a foreclosure sale cannot be a fraudulent transfer as a matter of law.  And each time the Court rejected that argument because Amegy and other Westwood Gardens Defendants grossly misconstrue the law on this point.  If as a matter of law, a foreclosure sale could not be a fraudulent transfer, this claim would have been dismissed a long time ago.  A fraudulent transfer claim most certainly <u>can</u> be a fraudulent transfer under certain circumstances (i.e. fraud, collusion, irregularity).  Whether the circumstances surrounding a foreclosure give rise to a fraudulent transfer is most certainly a question of fact and is not appropriate for summary judgment where there exists a genuine issue of material fact.

      1.     *Actual Fraudulent Transfers*

48.     In its sweeping misstatement of the law regarding foreclosure sales and fraudulent transfers, Amegy wholly fails to distinguish between fraudulent transfers with actual intent and constructively fraudulent transfers.  Amegy lumps all types of fraudulent transfers into one category.  The law is clear that where there is fraud in connection with a foreclosure sale, a cause of action for an actual fraudulent transfer can be maintained.  The Trustee has sued Amegy and the other Westwood Gardens Defendants for an actual fraudulent transfer in the Third Amended Complaint.

49.     First, the Trustee will address fraudulent transfer with actual intent.  In sum, the elements of an actual fraudulent transfer are:

    (a)  the transfer was made by the debtor with actual intent to hinder, delay, or defraud any creditor of the debtor; [74]

    (b)  a creditor exists whose claim arose before the occurrence of the transfer; and

    (c)  the cause of action arose within four years after the transfer was made.[75]

*See* Tex. Bus. Comm. C. 24.001 et. seq.

---

[74]  TEX. BUS. & COM. CODE § 24.005 states in pertinent part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor

* * *

(b) In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[75] TEX. BUS. & COM. CODE § 24.010 states in pertinent part:

(a) Except as provided by Subsection (b) of this section, a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:

* * *

(2) under Section 24.005(a)(2) or 24.006(a) of this code, within four years after the transfer was made or the obligation was incurred;

50.     As described in the fact section above, which are incorporated by reference, Speer as the control person and fiduciary of Park Lake, caused Westwood Gardens to be transferred to Vestalia through a sham foreclosure with actual intent to hinder, delay, or defraud its creditors, including but not limited to Royce Homes.  Speer participated in and perpetrated a scheme to ensure that all the equity in Westwood Gardens would go to Amegy (his personal lender) and that none of it would go to Park Lake's creditors (i.e. Royce Homes).

51.     Royce Homes is a creditor and had claims against Park Lake on the date of the fraudulent transfer of Westwood Gardens to Vestalia.

52.     The transfer of Westwood Gardens occurred on March 3, 2009.  This claim was asserted by the Trustee on April 28, 2011.[76]   Thus, the claim was brought against Vestalia well within the four year look-back period provided under TUFTA.[77]

53.     As described in the fact background section herein, the Westwood Gardens transaction was more than just a plain vanilla arms-length foreclosure between a disinterested lender and a typical debtor.  The Westwood Gardens transaction was a fraudulent scheme devised by Amegy, Vestalia, and Speer to strip a multi-million dollar asset out of a defunct company laden with debt and place it into a new company (with the same ownership) that had no debt so that all of the equity could be pledged to Amegy to pay Speer's personal debts.  In the fact section above, the Trustee describes this fraudulent scheme in detail and is supported by documents and sworn testimony.

54.     As a basic premise, a foreclosure sale that is collusive, bid chilling, or that fails to comply with state law requirements can be avoided as an actual fraudulent transfer.  *See e.g. BFP v. Resolution Trust Corp.,* 511 U.S. 531, 545-546 (1994)(stating that a foreclosure sale that

---

[76]   *See* Bankruptcy Adversary Docket No. 1; Adv. Proc. 11-3191.
[77]   *See* Footnote 11, *supra.*

fails to comply with state law requirements or that is a collusive foreclosure sale may be avoided as a fraudulent transfer); *In re Gregorio B. Villareal,* 413 B.R. 633, 638-639 (Bankr. S.D.T.X. 2009); *In re Sherlyn Alcazar,* 2008 WL 1767006 * 2-3 (Bankr. E.D. La. 2008)(unreported decision); Tex. Bus. Comm. C. §24.004 et. seq.; 6 Del. C. §1303 et. seq.  In *BFP*, the Court expressly preserves the actual fraudulent transfer cause of action as to foreclosed property in which the foreclosure sale is collusive or fails to comply with state law requirements.

55.     There is <u>no</u> authority to support Amegy's argument that a foreclosure sale conducted under fraudulent circumstances cannot be a fraudulent transfer as a matter of law.

56.     As set forth in detail above, the Westwood Gardens sale was collusive to its core. Amegy, Speer, and Vestalia conspired to foreclose on Westwood Gardens and to fix the price obtained from Vestalia at the foreclosure sale.  This collusive sale stripped Park Lake of an asset with millions of dollars of equity that could have been used to pay legitimate creditors of Park Lake (i.e. Royce Homes).  In the Amegy MSJ, Amegy is asking this Court to find that as a matter of law the Westwood Gardens foreclosure sale was not collusive – but that determination cannot be made as a matter of law because it is a fact question.  The Trustee has adduced enough evidence to present "sufficient disagreement" on the fraud element of his claim for an actual fraudulent transfer.[78]

57.     The Trustee has sufficient evidence to demonstrate that a genuine issue of material fact exists as to each element of the Trustee's fraudulent transfer claims against Amegy and/or the other Westwood Gardens Defendants.  For this reason, it would not be appropriate to grant summary judgment in Amegy's favor as to the Trustee's claim for an actual fraudulent transfer relating to the Westwood Gardens transaction.

---

[78] *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 900, 913 (5th  Cir 1992); *Chiari v. City of League City,* 920 F.2d 311, 314 (5th Cir. 1991); *Transco Leasing Corp. v. United States,* 896 F.2d 1435, 1444 (5th Cir. 1990), *amended in part,* 905 F.2d 61 (5th Cir. 1990).

2.        *Constructive Fraudulent Transfers*

58.      Amegy does not distinguish between actual and constructive fraudulent transfers in the Amegy MSJ when it argues that foreclosures cannot be fraudulent transfers as a matter of law.  In the section above, the Trustee addresses actual fraudulent transfers.  In this section, the Trustee will address constructive fraudulent transfers and foreclosure sales.

59.      In sum, the elements of a constructive fraudulent transfer are: [79]

(a)      the transfer was made without the debtor receiving a reasonably equivalent value in exchange for the transfer;

(b)      the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer;

(c)      the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(d)      the debtor intended to incur, or believed, or reasonably should have believed that the Debtor would incur, debts that would be beyond its ability to repay;

---

[79] Tex. Bus. & Com. Code § 24.005 states in pertinent part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

* * *

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code § 26.006(A) states:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(e)    a creditor's claim arose before the transfer was made; and the cause of action arose within four years after the transfer was made. [80]

TEX. BUS. & COM. C. §24.001 *et. seq.*

60.    The plain language of TUFTA expressly addresses what constitutes "reasonably equivalent value" in a fraudulent transfer case.[81]   There is no such provision under federal fraudulent transfer law.[82]   The *BFP* case establishes through case law what TUFTA establishes expressly in the statute.   Amegy seeks partial summary judgment as to the Trustee's constructive fraudulent transfer claim because it argues that the price paid at the Westwood Gardens foreclosure sale by Vestalia constitutes *per se* reasonably equivalent value to Park Lake based upon the Supreme Court's ruling in the *BFP* case and the plain language of TUFTA 24.004(b).

61.    The Trustee acknowledges that the *BFP* case stands for the proposition that the price obtained at a *non-collusive* foreclosure sale that otherwise *complies with state court requirements* for foreclosure constitutes *per se* reasonably equivalent value.   The plain statutory language of TUFTA/DUFTA says the same thing.   However, under *BFP* and TUFTA/DUFTA certain conditions must be present before a party is entitled to a presumption of reasonably

---

[80] TEX. BUS. & COM. CODE § 24.010 states in pertinent part:

> (b)   Except as provided by Subsection (b) of this section, a cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:
>
> * * *
>
> (2)   under Section 24.005(a)(2) or 24.006(a) of this code, within four years after the transfer was made or the obligation was incurred;

[81] TEX. BUS. & COMM. C. § 24.004(b) states:

> (b)   for the purposes of Sections 24.005(a)(2) and 24.006 of this code, a person gives reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of a sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

[82] 11 U.S.C. § 548

equivalent value.  If the foreclosure sale is *irregular* or *collusive,* the presumption of reasonably equivalent value does not arise.

62.     Amegy's argument is essentially that it is entitled to presumption of reasonably equivalent value under TUFTA/DUFTA and because of that presumption, the Trustee could never prove an essential element of his constructive fraudulent transfer claim as a matter of law. The problem with this argument is that the Trustee has evidence that the sale was collusive and irregular.  Whether the sale was collusive is not an issue that can be determined as a matter of law; rather it is a question of fact that must be determined by the trier of fact.

63.     A foreclosure sale that is collusive will never be a properly conducted foreclosure sale that complies with state law requirements for foreclosure and the price paid may be attacked as a fraudulent transfer under TUFTA/DUFTA.[83]  As set forth in the fact section above, the Westwood Gardens foreclosure sale was collusive and it did not comply with state court requirements for a foreclosure sale.[84]  Thus, reasonably equivalent value is not presumed as suggested by Amegy.  The Westwood Gardens foreclosure sale resulted in Park Lake receiving less than reasonably equivalent value because $3,542,550 million in equity belonging to Park Lake was transferred to Vestalia in exchange for no consideration.  The pre-arranged purchase price, agreed upon between Amegy and Vestalia prior to the foreclosure sale, resulted in Park Lake receiving less than reasonably equivalent value at the foreclosure sale.

64.     The fact question of whether there was "collusion" or "irregularity" only goes to determine whether Amegy is entitled to a presumption of reasonably equivalent value under the fraudulent transfer statutes.   Without the statutory presumption of reasonably equivalent value,

---

[83] *See* Tex. Bus. & Comm. C.§ 24.004; 6 Del. C. § 13.03; 63 Tex. Jur. 3d Real Estate Sales § 466; 30 Tex. Jur. 3d Deeds of Trust and Mortgages § 191.
[84] In addition to being a collusive sale, the notice of sale contained a technical defect which would cause confusion as to the description of the property actually being sold.

the Trustee can maintain an action against Amegy for a constructive fraudulent transfer relating to the Westwood Gardens transaction.   Accordingly, summary judgment should be denied.

**B.     The Cases Cited by Amegy are Inapposite Under the Facts of This Case and Do Not Support Amegy's Conclusion that a Foreclosure Cannot be a Fraudulent Transfer as a Matter of Law**

65.     Amegy has not cited authority to support its arguments that: (i) foreclosure sales cannot be fraudulent transfers as a matter of law (discussed in Section A(2) herein); (ii) the specific facts of this case do not amount to collusion as a matter of law; or (iii) that the Trustee must show misconduct caused a grossly inadequate price in order to invalidate the foreclosure sale.  There are no such cases.

*1.     Whether the Westwood Gardens Foreclosure Sale Was Collusive Can Not Be Determined As Matter of Law*

66.     Amegy cites 6 paragraphs from the Third Amended Complaint as forming the basis of the Trustee's fraudulent transfer claims regarding the Westwood Gardens transaction. Amegy falls short by about 33 paragraphs.  There are a total of 39 paragraphs in the Third Amended Complaint detailing the fraudulent scheme devised by Amegy, Speer, and Vestalia to fraudulently transfer Westwood Gardens away from Park Lake.

67.     In the Amegy MSJ, Amegy argues that "merely talking about bids in advance of a foreclosure does not as a matter of law invalidate the sale or constitute collusion."  Amegy did a lot more than "merely talk" about bids in advance of the Westwood Gardens foreclosure sale. Amegy planned the foreclosure with Speer and Vestalia down to the very last detail.  Amegy and Speer negotiated with Wachovia to purchase the underlying note at a discount so that they could set up the foreclosure.   Amegy helped Speer set up a new company to transfer Westwood Gardens to after the foreclosure sale.   Amegy helped Speer figure out how he could be

27

compensated in that new entity.  Amegy helped Speer calculate the price that he would bid at the foreclosure sale with his new entity Vestalia.  Amegy financed the purchase of Westwood Gardens by Vestalia at the foreclosure sale.  The Substitute Trustee who conducted the foreclosure sale is the very same attorney that advised Amegy as to the Westwood Gardens scheme and was at all times acting as Amegy's agent to that end. Amegy's gross oversimplification of the facts of this case can be the only explanation as to its misunderstanding of the law as applied to the facts of this case.

68.     Amegy cites *Tarrant Sav. Ass'n v. Lucky Homes, Inc.,*[85] as authority for the proposition that its actions in connection with Westwood Gardens are not collusive as a matter of law.  The *Lucky Homes* case is a wrongful foreclosure case and does not address the meaning of "collusive" under TUFTA/DUFTA.  Furthermore, the *Lucky Homes* case analyzes "misconduct" of participants to a foreclosure sale and does not address "collusion" in the context of a fraudulent transfer.  Finally, the holding in *Lucky Homes,* is specific to the facts of that case.  The nature and extent of misconduct in that case does not even come close to resembling the extent of the collusive actions undertaken by Amegy, Speer, and Vestalia in connection with the Westwood Gardens transaction.  It should be noted that in the context of a wrongful foreclosure case, the Court in *Lucky* requires the sale to be conducted legally and fairly.[86]  In light of the fraudulent and collusive nature of the Westwood Gardens transaction, the Trustee submits that it was neither legal nor fair.

69.     Amegy cites *Central Nat. Bank of Wilmington v. Indus. Trust Co.*[87]*,* with the following parenthetical following the citation:

---

[85] *Tarrant Sav. Ass'n v. Lucky Homes, Inc.,* 390 S.W.2d 473 (Tex. 1965)
[86] *Tarrant Sav. Ass'n,* 390 S.W.2d at 475.
[87] *Central Nat. Bank of Wilmington v. Indus. Trust Co.,* 51 A.2d 854, 857-858 (Del. Super. Ct. 1947)

(indicating that parties must show "collusion amounting to fraud" and "gross inadequacy" to attack foreclosure sales)

Amegy MSJ at para. 20, pg.13-14.

70.     The parenthetical is misleading as the *Central Nat. Bank of Wilmington* case does not enunciate a test that requires "collusion amounting to fraud" <u>and</u> "gross inadequacy" to attack foreclosure sales.  The *Central Nat. Bank* case discusses some of those concepts as they have been developed in other courts.  But this Court does not hold that a party must show both "collusion mounting to fraud" and "gross inadequacy" to attack a foreclosure sale as a fraudulent transfer.  The *Central Nat. Bank* is not a fraudulent transfer case and is not in any way interpreting the requirements to demonstrate collusion under DUFTA.  The claims asserted and the facts of the *Central Nat. Bank of Wilmington* case bear absolutely no resemblance to the facts of the case before this Court and is therefore neither applicable nor instructive.

71.     Amegy cites *Fisher v. Smith,*[88] ostensibly to support their argument that Amegy, Speer, and Vestalia's conduct does not rise to the level of collusion necessary to negate the statutory presumption of reasonably equivalent value under DUFTA.  First, Amegy fails to note that the *Fisher* opinion is an unpublished opinion.  Second, the case is not a fraudulent transfer case and no fraudulent transfer claim is asserted.  Third, the facts are distinguishable from the facts before this Court.  In the *Fisher* case, a fifty percent shareholder purchased a judgment held by the mortgagee of the corporation and ultimately foreclosed on the underlying real property standing in the shoes of the mortgagee.  These facts are nothing like Westwood Gardens because in the *Fisher* case, the underlying debts of the corporation were paid by the shareholder when he purchased the judgment from the mortgagee.  In the Westwood Gardens transaction, Speer conspired with Amegy to purchase the debt from Wachovia, set up a foreclosure, finance him to

---

[88] *Fisher v. Smith,* 1980 WL 3042 (Del. Ch. Sept. 30, 1980)

purchase Westwood Gardens at the foreclosure sale, then use the proceeds from the development of the subdivision to pay off his personal (not corporate) debts.  Unlike the *Fisher* case, in the Westwood Gardens transaction, Park Lake received nothing in exchange for the transferred property.  The claims asserted and the facts of the *Fisher* case bear absolutely no resemblance to the facts of the case before this Court and is therefore neither applicable nor instructive.

> 2.    *There is No Requirement Under TUFTA/DUFTA that Misconduct Must Cause a Grossly Inadequate Price*

72.    Amegy attempts to expand the requirements under TUFTA/DUFTA by arguing that the Trustee has to prove that the "irregularity" or "misconduct" proximately caused the grossly inadequate price in order to prove as a matter of law that the transfer was made for less than reasonably equivalent value.  Amegy mixes and matches wrongful foreclosure concepts with fraudulent transfer law and in doing so cites cases that simply do not support its argument. Whether the irregularity and misconduct caused a grossly inadequate price is not an element of a fraudulent transfer claim under TUFTA/DUFTA.  The proper measure under TUFTA/DUFTA is "reasonably equivalent value" not "grossly inadequate price."  Those are elements of an action for wrongful foreclosure under state law; not a fraudulent transfer.[89]

73.    Amegy cites *First State Bank v. Keilman*[90] for the proposition that in order to invalidate a foreclosure sale, there has to be a defect or irregularity in the process that causes the property to be sold for a grossly inadequate price.  This case is not a fraudulent transfer case and has nothing to do with a claim arising under TUFTA; rather it is a case concerning the defenses raised by a debtor to a deficiency suit brought after a foreclosure sale.  Counsel for the Trustee cannot locate any authority under fraudulent transfer law to support Amegy's assertion that it is

---

[89]   *See BFP*, 511 U.S. at 541-546.
[90]   *See First State Bank v. Keilman,* 851 S.W.2d 914, 927 (Tex.App.—Austin, 1993)

entitled to a presumption of reasonably equivalent value unless the Trustee can prove that there was a defect or irregularity that caused the property to be sold for a grossly inadequate price. Amegy reads far more into the elements of a constructive fraudulent transfer claim than actually exists under TUFTA.

74.     Amegy also argues that "The Trustee does not allege any procedural or other defect or irregularity in the foreclosure sale."  This is an untrue statement.  As set forth in detail in the fact section above, the Trustee has alleged procedural irregularities in the sale.  The Trustee has also alleged a major defect in the sale – which is that it was a collusive sale.  A collusive sale will never be a "regularly" conducted sale as the law concerning non-judicial foreclosures does not allow for collusion as part of the sale process.

75.     Amegy cites *Intervest Capital Group, Ltd./Oscar Waymond Lightfoot v. Lightfoot,*[91] attempting to draw a factual parallel between that case and the Westwood Gardens transaction.  In the *Intervest* case, an existing creditor of two judgment debtors purchased a first lien position from a mortgagee and then foreclosed on the property and kept the property in partial satisfaction of debts owed to him by the two judgment creditors.   Later the successor in interest to the second lien position sued the two judgment debtors and the foreclosing creditor for a fraudulent transfer – alleging that they conspired to foreclose on the property to shut out the second lien holder's rights.   These facts are nothing like the facts in the Westwood Gardens transaction.   In the Westwood Gardens transaction, an existing creditor of a fiduciary of a corporation conspired with that fiduciary to purchase a note and deed of trust from another creditor, then foreclose on the property securing that note, then finance the fiduciary in a new entity to purchase the note at foreclosure so that he could use the equity in that property to pay

---

[91] *Intervest Capital Group, Ltd./Oscar Waymond Lightfoot v. Lightfoot,* 1998 WL 818037 (Tex.App.—Austin 1998) (not designated for publication).

off a personal debt.  The facts in *Interest* are nothing like the Westwood Gardens transaction and is therefore neither applicable nor instructive.

   3.    *The Trustee Has Not Asserted Claims Under 11 U.S.C. § 548*

   76.    All of Amegy's arguments in the Amegy MSJ regarding fraudulent transfers under the Bankruptcy Code § 548 should be ignored because the Trustee asserts no fraudulent transfer claim under the Bankruptcy Code in the Third Amended Complaint.

## PRAYER

   WHEREFORE, Rodney Tow, Trustee respectfully requests that the Court deny Amegy's Motion for Partial Summary Judgment (Docket No. 117) in its entirety and for such other and further relief to which the Trustee is entitled.

[Signature block appears on following page.]

Dated: December 28, 2012

**Respectfully Submitted,**

**JONES MORRIS KLEVENHAGEN, LLP**
By:    */s/ Erin E. Jones*
Erin E. Jones
Texas Bar No. 24032478
Jones Morris Klevenhagen, LLP
6363 Woodway Suite 570
Houston, TX 77057
Telephone:  (713) 589-5061
Fax:  (713) 589-5513

**CAGE HILL & NIEHAUS, LLP**
By:    */s/ Michael Duncan*
Michael Duncan
Texas Bar No. 06218700
Cage, Hill & Niehaus, L.L.P.
5851 San Felipe, Suite 950
Houston, TX 77057
Telephone:  (713) 789-0500
Fax:  (713) 74-0344

**TOW & KOENIG, PLLC**

By:    */s/ Julie Koenig*
Julie Koenig
Texas Bar No. 14217300
Rodney Tow
Texas Bar No. 20152500
26219 Oak Ridge Drive
The Woodlands, TX 77380
Telephone:  (281) 681-9100
Fax:  (832) 482-3979

**ATTORNEYS FOR RODNEY TOW,**
**CHAPTER 7 TRUSTEE FOR THE ESTATE**
**OF ROYCE HOMES, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served via first class U.S. Mail to those listed below and by ECF/PACER to those registered to receive such service on this 28th day of December 2012.

*/s/ Erin E. Jones*

| | |
|---|---|
| George R Gibson<br>Nathan Sommers Jacobs PC<br>2800 Post Oak Blvd,<br>61st Flr<br>Houston, TX 77056-6102<br>**COUNSEL FOR AMEGY BANK, N.A., AMEGY MORTGAGE COMPANY, LLC** | C Ed Harrell<br>Steven Douglas Shurn<br>Hughes Watters & Askanase<br>Three Allen Center<br>333 Clay, 29th Floor<br>Houston, TX 77002<br>**COUNSEL FOR JOHN H. SPEER, VESTALIA, LLC** |
| Christopher Donald Johnson<br>McKool Smith P.C.<br>600 Travis St.<br>Suite 7000<br>Houston, TX 77002<br>**COUNSEL FOR DONNIE LOU SPEER** | Randall A. Rios<br>Timothy Million<br>David Mattka<br>Munsch Hardt Kopf & Harr P.C.<br>700 Louisiana, 46th Floor<br>Houston, TX 77002<br>**COUNSEL FOR HAMMERSMITH GROUP, LLC, PARK LAKE COMMUNITIES** |
| Marc J. Magids<br>David Martin<br>Zukowski, Bresenhan & Sinex, L.L.P.<br>1177 West Loop South Suite 1100<br>Houston, TX 77027<br>**COUNSEL FOR GEORGE KOPECKY, WATERMARK LAND LLC, WATERMARK TORTUGA, LLC** | Peter Johnson<br>Law Offices of Peter Johnson<br>Eleven Greenway Plaza Suite 2820<br>Houston, TX 77046<br>**COUNSEL FOR MICHAEL MANNERS, ALLARD INVESTMENT COMPANY, LLC, DMW HOLDINGS, INC., MGM MOTOR SPORTS, LLC, SARACEN HOLDINGS, INC.** |
| Eugene B. Wilshire<br>3840 One Houston Center<br>Houston, Texas 77010<br>**Attorney for Manners Related Entities** | William C. Ferebee<br>O'Donnell, Ferebee, Medley & Keiser, P.C.<br>Attorney for Michael Manners<br>450 Gears Road<br>Houston, TX 77067<br>**Attorney for Michael G. Manners** |