**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| RODNEY TOW, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:11-cv-03700 |
| | § | |
| AMEGY BANK N.A., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This Memorandum and Opinion addresses motions relating to the foreclosure and sale of Westwood Gardens. Rodney Tow, Trustee of the Royce Homes, L.P. bankruptcy estate, seeks to void that sale under the Texas and Delaware Uniform Fraudulent Transfer Acts ("TUFTA" and "DUFTA"). Wachovia Bank transferred its interest in Westwood Gardens to Amegy Bank, N.A. and Amegy Mortgage Company (together "Amegy"), and Amegy foreclosed on the property in March 2009. Defendant Vestalia LLC purchased that property at the foreclosure sale. Defendant Amegy has moved for partial summary judgment on claims arising from its purchase of Wachovia's security interest in Westwood Gardens and the subsequent sale of Westwood Gardens to Vestalia. Vestalia has moved to dismiss the claims arising from its purchase of Westwood Gardens.

Based on the pleadings; the motions, responses, and replies; the parties' submissions; the oral argument, the record; and the applicable law, the court grants Vestalia's motion to dismiss with prejudice and grants Amegy's motion for partial summary judgment. The reasons for these rulings are explained below.

## I.    Background

Royce Homes L.P., a Delaware limited partnership authorized to do business in Texas in 1998, built and sold single-family homes in the Houston area until August 2008.  Defendant Hammersmith Group, Inc., now Hammersmith Group, LLC, was Royce Homes's general partner. Defendant John H. Speer was Hammersmith's president and Royce Homes's president and chief executive officer.  Defendant Michael Manners owned a 50 % interest in Royce Homes.  Defendant Park Lake Communities, L.P. is a Texas limited partnership.  Hammersmith was Park Lake's general partner, and Speer was Park Lake's chief executive officer.  Park Lake, which owed Royce Homes between $4.4 and $5 million, owned Westwood Gardens, a housing development.

Park Lake's ownership of Westwood Gardens was encumbered by a lien held by Wachovia Bank (the "Wachovia Note").  Speer and Amegy negotiated Amegy's acquisition of the Wachovia Note from Wachovia.  When Park Lake defaulted on the Note, Amegy foreclosed on the property. The property was purchased at foreclosure by Vestalia LLC, another Speer entity.  Tow alleges that the transfer to Vestalia was fraudulent and that Amegy colluded with Speer to breach the fiduciary duties he owed Royce Homes and Park Lake.  Some of the allegations relating to those duties are addressed in a separate Memorandum and Order.

Royce Homes maintained certain equity levels so that it could borrow the money needed to operate its homebuilding business.  To protect the debt-to-equity ratios, Royce Homes's partnership agreement "prohibit[ed] distributions made from [l]oans to Royce Homes; require[d] [that] distributions leave sufficient working capital reserve, including amounts required to ensure full compliance with the terms of all loan covenants and agreements of [Royce Homes]; require[d] the General Partner to act consistently with its fiduciary responsibility for the safekeeping and use

of all Partnership Property; and limit[ed] the General Partner to expending the Partnership's capital and revenues in furtherance of the business of the Partnership."  (TAC ¶ 110 (internal quotation marks omitted).  The partnership agreement permitted distributions from Royce Homes's "Available Cash."  (TAC ¶ 111).

In 2006, Speer wanted to buy out Manners's 50 % interest in Royce Homes for about $33 million.  (TAC ¶¶ 32–33).  Speer planned a leveraged buy out ("LBO").  Royce Homes could not shoulder that debt and maintain the debt-to-equity ratios that kept the business operable.  (TAC ¶¶ 33–35).  If the debt-to-equity ratios fell outside "the range required by a lender, a homebuilder such as Royce Homes would be unable to borrow the funds needed to operate its business."  (TAC ¶ 36).

Speer, Amegy, and Manners allegedly "schemed" to devise a way to "take money out of Royce Homes to fund the [LBO] without having to reflect the loss of equity on the balance sheet of Royce Homes."  (TAC ¶ 37).  "The final scheme was for the [LBO] notes to be in Speer's name with the understanding that the payments on the notes would come from Royce Homes.  Thus, on paper[,] the obligation under the [LBO] notes would appear to be personal to Speer and the debt would not be reflected on the balance sheet of Royce Homes."  (TAC ¶ 38).

Speer entered into two personal obligations: a $20 million personal loan from Amegy (the "Amegy Loan") and a $13,342,405 promissory note to Manners (the "Manners Note").  Buying out Manners's 50 % interest in Royce Homes cost "$33,342,405 plus a loan fee of $236,386 with Manners receiving $18,578,686 of the $20 million borrowed from Amegy plus a promissory note in the amount of $13,342,405."  (TAC ¶ 40).  "Speer represented to Royce Homes's lenders that distributions to make the payments on the Amegy [L]oan[] would be made from same year profits;

3

would not reduce equity below $40 million; and would not cause Royce Homes to violate the lenders' debt-to-equity covenants contained within their loan documents." (TAC ¶ 44).

### A.      Speer's First Obligation: The Amegy Loan Principal and Interest Payments

In January 2007, Speer owed a $10,000,000 principal payment on the Amegy Loan. The "Royce Homes LP-Loan Account" shows that Royce Homes wired $10,000,000 to Speer's personal Amegy bank account on January 3, 2007. (TAC ¶¶ 129, 131). This money came from "draws on the Royce Homes lines of credit." (TAC ¶¶ 121, 127 (detailing which lines of credit were used)). This distribution allegedly breached the Royce Homes partnership agreement, Speer's fiduciary duty, and Speer's representations to Royce Homes's lenders because it was: made from funds Royce Homes had borrowed; violated loan covenants, including debt-to-equity ratio requirements; was not for a partnership purpose; was inconsistent with the fiduciary responsibility for safekeeping partnership property; and was not made in furtherance of partnership business. (TAC ¶¶ 48, 134–38).

Another principal payment of $2.5 million on the Amegy Loan was due in July 2007. Royce Homes was "required to borrow money in order to make this payment." (TAC ¶ 139). "Speer recognized making the payment caused a problem for Royce Homes and sought permission from Amegy to not make the July 2007 principal payment but[] Amegy insisted the payment be made. Despite the fact that Royce Homes was continuously breaching its debt-to-equity ratios with its lenders, Speer made the $2.5 million principal payment on July 2, 2007." (TAC ¶ 146). This "Amegy payment distribution was made from funds borrowed from Royce Homes lenders." (TAC ¶ 156).

4

William D. Gathmann, Royce Homes's former chief financial officer, anticipated that upcoming financial disclosures would reveal the breach of Royce Homes's covenants to its lenders. (TAC ¶ 141).  "On May 11, 2007, Gathmann sent Speer and James Hunter, the Royce Homes Chief Operating Officer, an email attaching a PowerPoint presentation" requesting "waivers/amendments to the loan agreements."  (TAC ¶ 139).  The PowerPoint presentation stated that for "some banks, leverage ratio covenant and spec ratio covenant are not in compliance."  (TAC ¶ 140).  This presentation was not shown to Royce Homes lenders.  (TAC ¶ 142).  "Gathmann recreated the PowerPoint presentation in June 2007.  As with the May 2007 presentation, this one was never seen by a Royce Homes lender.  Instead it was sent to Amegy, Speer's lender, on September 11, 2007." (TAC ¶ 143).

In September 2007, another $2.5 million was due on Speer's Amegy Loan.  Speer requested and received a modification to the Amegy Loan agreement, postponing the September 2007 payment to December 31, 2007, with a final payment due on June 30, 2008.  "In early September 2007, the Royce Homes auditors were trying to release the audited financial statements but needed Royce Homes to go to its lenders to seek a waiver of the breach of the debt-to-equity ratios.  Some Royce Homes lenders provided the waivers or modified the loan covenants, temporarily, to accommodate the auditors' request." (TAC ¶ 159).  Royce Homes failed to comply with the modified debt-to-equity ratio requirements.  (*Id.*).

Royce Homes's finances continued to deteriorate.  Speer knew that Royce Homes did not have the money for the December 31, 2007 payment on his Amegy Loan.  He created a new company, RH Model Homes 2007, Inc., which purchased model homes from Royce Homes.  RBC

Bank, a Royce Homes lender, financed the purchases.  First Duval, the Royce Homes parent company, and the Speer Children's Trust, which co-owned First Duval with Speer, subsidized the transfer of the model homes from Royce Homes to RH Model Homes.  (TAC ¶ 160).  Through this arrangement, Royce Homes realized about $2.8 million in net proceeds.  (*Id.*).

At the end of December 2007, the debt-to-equity modifications that Royce Homes obtained from some of its lenders expired, again placing Royce Homes in breach of those loan covenants. Speer wired $2,554,854.17 from the Royce Homes LP-Loan Account to his personal Amegy account and made the principal payment of $2.5 million.  (TAC ¶¶ 161-64).  This distribution to Speer and payment to Amegy allegedly breached the partnership agreement.  (TAC ¶ 165).

Between October 2, 2006 and June 30, 2008, Speer's monthly interest payments on the Amegy Loan totaled about $1.5 million.  As with the principal payments, Royce Homes wired money from the Royce Homes LP-Loan Account into Speer's personal Amegy account.  (TAC ¶¶ 171-72).  These wire transfers allegedly breached the partnership agreement because Royce Homes was not preserving adequate working capital reserves and the transfers were made when Royce Homes was in breach of its loan covenants.  (TAC ¶ 173).

### B.    Speer's Second Obligation: The Manners Note

Speer and Manners allegedly devised a plan to make the payments on the $13,342,406 Manners Note through Royce Homes.  As with the Amegy Loan payments, the Manners Note was paid with money Royce Homes had borrowed, in violation of the partnership agreement.  (TAC ¶¶ 175-76).  The funds used to pay the Manners Note were billed to Royce Homes as a "management fee" for Manners.  Gathmann testified that Manners did not provide services for those fees.  (TAC ¶ 177).  By June 2007, when the payments stopped, Speer had reduced the balance owed on the

6

Manners Note to $11,165,661, and Manners had received $3,085,100 in Note payments.  (TAC ¶ 178).  These payments allegedly breached the partnership agreement.

### C.    The Westwood Gardens Claims

Speer was the chief executive officer of Park Lake, a Royce Homes sister company, and the president of Hammersmith, the general partner of both Royce Homes and Park Lake.  (TAC ¶¶ 13, 268, 270).  Park Lake was insolvent by August 2008 and owed Royce Homes about $4.9 million. (TAC ¶¶ 268, 270).[1]  Royce Homes was the primary purchaser of developed Park Lake lots.  (TAC ¶ 270).  Because of Park Lake's insolvency, Tow alleges that the fiduciary duties Speer owed to Park Lake extended to Royce Homes as a Park Lake creditor.  (TAC ¶ 278).

Park Lake developed Westwood Gardens, a subdivision with 163 unsold lots.  Westwood Gardens expected a $2.9 million Municipal Utility District ("MUD") reimbursement.  (TAC ¶¶ 270–71).  Wachovia Bank held a Note from Park Lake secured by Westwood Gardens, which included a lien on the expected $2.9 million MUD reimbursement.

In August 2008, Speer approached Amegy about using the Wachovia Note to help pay the Amegy Loan.  Speer "advised Amegy about the existence of the [unsold] lots and the $2.9 million MUD receivable [and suggested] that proceeds from Westwood Gardens could be used to pay [the $5 million outstanding on] his personal loan."  (TAC ¶ 272).  Royce Homes also owed Amegy $975,000.  Speer allegedly "colluded" with Amegy to transfer the Westwood Gardens equity from Park Lake to Amegy through a new Speer-owned company, Vestalia LLC.  The alleged plan called for Amegy to purchase the Wachovia Note.  Amegy would then loan Vestalia money, foreclose on

_____

[1] In his response to Amegy's motion for partial summary judgment, Tow stated that Park Lake owed Royce Homes $4.4 million.  (Docket Entry No. 141 at 11).

Westwood Gardens, and Vestalia, through Speer, would purchase the Westwood Gardens property. Once Vestalia purchased Westwood Gardens, Speer would turn over a "substantial portion of the equity to Amegy to satisfy" the $5 million he owed on the Amegy Loan. (TAC ¶ 273). "Speer and Amegy agreed that Vestalia would assume the $975,000 [Royce Homes] debt [and] use the MUD reimbursement to pay this debt plus, if necessary, use the reimbursement to pay down [the] Amegy [L]oan. (TAC ¶ 274). "[T]he Westwood Gardens equity would be moved, through the foreclosure sale, to Vestalia." (*Id.*) "Amegy agreed to extend a loan to Speer [through Vestalia] for the purchase, at foreclosure, of the Westwood Gardens subdivision then provide Speer with a line of credit so he could continue building homes in Westwood Gardens." (TAC ¶ 275). "As Vestalia sold homes, it would pay down [the] Amegy loan." (TAC ¶ 274).

According to Tow, Vestalia was a "straw" company used for a "straw" transaction. (TAC ¶ 279). Amegy "strongly preferred Speer not be an owner of Vestalia and that its capitalization would come from a source other than Speer." (TAC ¶ 279). "Amegy and Speer discussed different ways the new company could be established . . . . Amegy even helped plan how Speer could be compensated. [Amegy] acknowledged [that it] did not typically get involved in the ownership of companies [and that] this transaction was not typical because a) Speer was taking assets from Park Lake which he controlled and placing them in Vestalia, another company he controlled, b) Park Lake owed Royce Homes a substantial amount of money, and c) the asset being transferred from Park Lake to Vestalia had substantial equity." (TAC 279).

For the plan to work, Speer and Amegy had to negotiate a purchase price for the Wachovia Note. Tow alleged that by December 2008, they "had almost completely succeeded in their negotiations . . . . Speer considered the final negotiated price a great deal." (TAC ¶ 282). By the

end of January 2009, Amegy had purchased the Wachovia Note and "clarified [that] the plan was to move almost $3 million in equity from Park Lake to Vestalia and use it to pay off Speer's personal loan and the remaining $975,000 of the Royce Homes debt."  (TAC ¶ 283).  The alleged indicia of this collusion were that: Speer and Amegy negotiated the line of credit for Vestalia; Speer, through Vestalia, purchased Westwood Gardens at the foreclosure sale; and Amegy provided Speer bidding instructions and calculated the bid amounts.  (TAC ¶ 284).  Amegy approved this plan.  (TAC ¶ 287).  "Amegy [had] obtained an appraisal of the Westwood Gardens property and MUD reimbursement."  (TAC ¶ 288).  The appraiser "established a discounted value for the lots and MUD reimbursements of $5,405,000 [and a] willing purchaser existed for the lots at $3,872,550."  (TAC ¶ 289).  Adding the value of the MUD reimbursement established a value to Park Lake of $6,722,550."  (*Id.*).

Amegy posted Westwood Gardens for foreclosure in February 2009, and Vestalia purchased it on March 3, 2009.  (TAC ¶ 286).  "On that date, Amegy deposited $2,058,750 into Vestalia's account and then immediately pulled $2,633,953.28 out of the account which included the Amegy loan proceeds [and] Speer's added capital."  (*Id.*).

Tow alleges that this transfer of Westwood Gardens was actually and constructively fraudulent and seeks to avoid it under TUFTA and DUFTA and to recover from Amegy and Vestalia the value they received following the foreclosure and sale.  (TAC ¶¶ 604-05).[2]  "The Westwood Gardens [t]ransfer was made from assets of Park Lake.  There was substantial equity in Westwood Gardens and the MUD reimbursements, which was stripped from Park Lake through a collusive

---

[2] The complaint also cites 11 U.S.C. § 541.  Amegy moved for summary judgment under on the "Bankruptcy Code."  Tow answered that he had not intended to sue on this transaction under the Bankruptcy Code.  Accordingly, that claim has been abandoned.

foreclosure sale." (TAC ¶ 606). "Park Lake received less than a reasonably equivalent value in exchange for the transfer [of] its interest in Westwood Gardens. The transfer of Westwood Gardens to Vestalia and the corresponding benefit to Amegy was made through a collusive foreclosure sale which did not comply with state law requirements in that it was collusive and had imperfections. Reasonable equivalence is not presumed in a collusive foreclosure sale. Park Lake received nothing." (TAC ¶ 609). "As a result of the Westwood Gardens [t]ransfer, Vestalia 'purchased' Westwood Gardens [and] the MUD reimbursements at the Amegy foreclosure sale for a lower price than its value." (TAC ¶ 611). Speer and "Amegy conspired to breach Speer's fiduciary duty to allow Speer, Speer's new company, Vestalia, and Amegy to profit from Westwood Gardens and its MUD reimbursement." (*Id.*). The transfer was "for the benefit of Amegy and Vestalia. Amegy and Vestalia are initial transferees in th[e] transaction or, alternatively, immediate or mediate transferees under TUFTA and DUFTA." (TAC ¶ 612).

Vestalia has moved to dismiss the TUFTA and DUFTA claims, and Amegy has moved for partial summary judgment on the TUFTA and DUFTA claims. In response, Tow contends that all of the entities and individuals instrumental in the Wachovia negotiations and the Westwood Gardens foreclosure were so intimately related to Speer, a Speer entity, Amegy, or Royce Homes, that the Wachovia Note transfer and Westwood Gardens foreclosure must be tainted with impermissible collusion actionable under TUFTA and DUFTA.

Both motions, and the arguments in opposition, are analyzed below.

## II.     The Applicable Legal Standards

### A.     The Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. 544).  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint. . . . courts may also consider matters of which they may take judicial notice." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5thc Cir. 1996).  The court can "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001).

When a complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend before dismissing the action with prejudice unless it is clear that the defects

11

in the complaint are incurable.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion.") (internal citation omitted).  However, a court may deny leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face."  6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990) (footnote omitted); *see also Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999) ("A district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.") (footnote omitted).

The courts are divided over whether the Rule 8(a) notice-pleading requirements or the more demanding Rule 9(b) pleading standards apply to claims brought under TUFTA.  *See, e.g.*, *Taylor v. Frishberg*, No. 4:09-cv-3674 (NFA), 2012 WL 868718, at *6 (S.D. Tex. Mar. 13, 2012) ("TUFTA prohibits several types of fraudulent transfers, some of which require actual intent to defraud, and some of which do not. . . . [T]he Fifth Circuit has not decided whether Rule 9(b) applies to fraudulent transfers under TUFTA." (citing cases));  *Janvey v. Alguire*, 846 F. Supp.2d 662, 675 (N.D. Tex. 2011) ("The parties provide no controlling Fifth Circuit authority that applies a heightened pleading requirement to TUFTA claims.  The issue appears to be an open question in the Fifth and some other circuits." (citing cases)).  Because the claim fails under Rule 8, this court need not address the issue.

## B.      The Motion for Partial Summary Judgment

Summary judgment is appropriate if "no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Rule 56 "*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).

In deciding a motion for summary judgment, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). When the moving party has met its Rule 56 burden, the nonmoving party must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir.  2007).  "This burden is not satisfied with some metaphysical doubt as to the material facts, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted).  Factual controversies

13

resolve in the nonmoving party's favor, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Id.*

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[] citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. PRO. 56(c)(1)(A).  A party can also show that cited materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. PRO. 56(c)(1)(B).  The court is not limited the materials cited by the parties. FED. R. CIV. PRO. 56(c)(3).

Whether cited by the parties or found in the record, the evidence must be competent.  The evidence cannot be hearsay, *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 510 n.5 (5th Cir.), or unsubstantiated assertions, *VRV Dev. v. Mid-Content Cas. Co.*, 630 F.3d 451, 455 (5th Cir. 2011).  FED. R. CIV. PRO. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075.  Resolving actual disputes of material facts in favor of a nonmoving party "is a world apart from assuming that general averments embrace the specific facts needed to sustain the complaint. . . .  It will not do to presume the missing facts because without them the affidavits would not establish the injury that they generally allege."  *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888 (1990).

14

### C.    The Texas and Delaware Uniform Fraudulent Transfer Acts

The purpose of TUFTA is "to prevent debtors from defrauding creditors by placing assets beyond their reach." *Challenger Gaming Solutions, Inc. v. Earp,* 402 S.W.3d 290, 293 (Tex. App. —Dallas 2013, no pet.); *Citizens Nat. Bank of Tex. v. NXS Const., Inc.,* 387 S.W.3d 74, 79 (Tex. App. —Houston [14th Dist.] 2012) (citing *Wohlstein v. Aliezer,* 321 S.W.3d 765, 776 (Tex. App. —Houston [14thcDist.] 2010, no pet.));  (*Corpus v. Arriaga*, 294 S.W.3d 629, 634 (Tex. App. —Houston [1st. Dist.] 2009,  no pet.).  "TUFTA provides remedies to creditors of debtors who fraudulently transfer assets under certain circumstances." *Corpus*, 294 S.W.3d at 634.  An asset is property of a debtor not including "property to the extent it is encumbered by a valid lien." Tex. Bus. & Com. Code § 24.002(2)(A).  "In general, a determination of liability under TUFTA is a two step process: first, a finding that a debtor made an actual fraudulent transfer or a constructive fraudulent transfer; and, second, recovery for that fraudulent transfer, or its value, from the transferees." *Spring Street Partners IV v. Lam*, No. 12-20517,  — F.3d —,  2013 WL 5012436, at *6 (5th. Cir. Sept. 13, 2013) (internal citations omitted).

A transfer is actually fraudulent "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." Tex. Bus. & Com. Code § 24.005(a)(1); *see also Spring Street*, 2013 WL 5012436, at *7.  TUFTA "supplies a 'non-exclusive list of eleven factors, commonly known as badges of fraud, that courts may consider in determining whether a debtor actually intended to defraud creditors.'" *Spring Street*, 2013 WL 5012436, at *7 (quoting *In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008)); *see* Tex. Bus. & Com. Code § 24.005(b) (listing the eleven factors).  A transfer "is not voidable under [the actual fraud provision] against a person who

15

took in good faith *and* for a reasonably equivalent value or against any subsequent transferee or obligee." *Id.* at § 24.009(a) (emphasis added).

A transfer is constructively fraudulent if "the debtor made the transfer . . . without receiving a reasonably equivalent value." TEX. BUS. & COM. CODE § 24.005(a)(2). "For the purposes of [constructive fraud], a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an *asset* pursuant to a regularly conducted, *noncollusive* foreclosure sale." *Id.* § 24.004(b) (emphasis added). In regularly conducted, nonconclusive foreclosure sales, a reasonably equivalent value is value "within the range of values for which the transferor would have sold the assets in an arm's length transaction." *Id.* § 24.004(d).

## III.    Analysis

### A.    The Relevant Documents and the Summary-Judgment Evidence

The TAC went on for 606 pages. It enumerated 691 allegations. Attached to the TAC were: (1) 48 excerpts from Gathmann's 2004 Examination (TAC at 194–280); (2) 84 excerpts from Denison's 2004 Examination (*Id.* at 281–411); 41 excerpts from Manners's 2004 Examination (*id.* at 412–54); and 133 excerpts from Speer's 2004 Examination (*id.* at 455–606). The Royce Homes Partnership Agreement adopted on July 1, 1998 was attached to the TAC. The TAC incorporated by reference the Wachovia Note secured by Westwood Gardens, (TAC ¶ 273); the purchase agreement between Wachovia and Amegy for the Note and the lien transfer, (TAC ¶¶ 282–84); the Notice of Appointment of Successor Trustee (TAC ¶ 290); the Notice of Substitute Foreclosure Sale, (*id.*); and the Substitute Trustee's Deed with Bill of Sale, (*id.*). The TAC quotes at length email exchanges between Royce Homes and Amegy.

Amegy attached many of these same documents to its motion for partial summary judgment, including: the Wachovia Note secured by Westwood Gardens, (Docket Entry No. 117, Ex. 1); the Development Loan Deed of Trust, Security Agreement and Financing Statement, (*id.*, Ex. 2); the loan purchase contract between Wachovia and Amegy, (*id.*, Ex. 3); the Transfer of Debt and Liens transferring Wachovia's Westwood Gardens lien to Amegy, (*id.*, Ex. 4), the Appointment of Substitute Trustee, (*id.*, Ex. 5); the notice of foreclosure, (*id.*, Ex. 7); a posting and filing affidavit for the substitute trustee, (*id.*, Ex. 8); the foreclosure sale transcript, (*id.*, Ex. 9); and the Substitute Trustee's Deed with Bill of Sale, (*id.*, Ex. 10).  Tow also attached a voluminous amount of summary judgment evidence to his responses, including the depositions of Speer and Chris Denison.  The court has not considered the Rule 2004 Examinations of Chris Denison and John Speer.  Tow withdrew these from consideration to moot Amegy's motion to strike the evidence of these Examinations from the summary-judgment record.  (*See* Docket Entry No. 187).

### B.    Tow's Rule 56(d) Motion for a Continuance

A month after Amegy filed its motion for partial summary judgment in November 2012, Tow moved for a continuance to file a supplemental response to Amegy's motion at the close of discovery.  (Docket Entry No. 139).  A hearing was held on the summary judgment motion, and the parties filed supplemental materials.  On May 24, 2013, Tow filed its last supplemental response to Amegy's motion after deposing Speer and Chris Denison, Speer's contact at Amegy.

Rule 56(d) permits a court to grant a continuance when the nonmovant has not had the opportunity to conduct discovery that is essential to opposing a summary judgment motion.  *See Wright v. Blythe-Nelson*, 2001 WL 1012701, at *2 (N.D. Tex. Aug. 15 (2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.4 (1986)).  Rule 56(d) offers relief when the nonmovant

17

has not had a full opportunity to conduct essential discovery, not to complete *all* discovery. *See McCarthy v. United States*, 929 F.2d 1085, 1088 (5th Cir. 1991) (per curiam).

Tow has not clearly identified the discovery he lacked the opportunity to conduct that was needed to respond to Amegy's motion for partial summary judgment. Tow conducted additional discovery after Amegy's motion was filed and supplemented the record with the results. There is no basis to find that Tow needs additional discovery to oppose the partial summary-judgment motion. The motion for a continuance is denied as both moot given the additional discovery Tow conducted and as without basis.

## C.   The Claims under TUFTA and DUFTA

Park Lake, the debtor, owed Royce Homes, the creditor, between $4.4 million and $4.9 million dollars. Tow seeks to void the foreclosure sale of Westwood Gardens to Vestalia and recover Park Lake's equity in Westwood Gardens transferred through Vestalia to Amegy under TUFTA. The threshold questions are whether the foreclosure and transfer of Westwood Gardens is a TUFTA transfer and whether the transfer of the Wachovia Note and lien was fraudulent within the meaning of TUFTA.

Amegy's foreclosure of Westwood Gardens was not a TUFTA transfer. A TUFTA transfer is the disposition of an "asset." An "asset" does not include property subject to a valid lien. It is undisputed that the Wachovia Note and lien were valid, that Wachovia took the security interest in good faith and for reasonably equivalent value, and that Wachovia had the right to foreclose upon default. Amegy purchased Wachovia's security interest in an arm's-length transaction and acquired Wachovia's right to foreclose in the event of default. The foreclosure sale followed the Texas Property Code requirements. Whatever might be said about the circumstances and purposes of

18

Vestalia's creation and the role Speer played in facilitating Amegy's purchase of the Wachovia Note and lien, a "secured party is entitled to foreclose on its security interest in the event of default." *Yokogawa Corp. of Am. v. Sky Int'l Holdings, Inc.*, 159 S.W.3d 266, 269 ( Tex. App. —Dallas 2005, no pet.) (citing TEX. BUS. & COM. CODE § 9.601(a)(1)).

The facts of *Yokogawa* involve a foreclosure as well. The debtor in that case, Skye USA, failed to pay invoices issued by Yokogawa. In August 1999, Yokogawa, Skye USA, and Skye International entered into a settlement agreement under which Skye International guaranteed payment of the money Skye USA owed to Yokogawa. In May 1999, two individuals had loaned Skye International $600,000 in exchange for a first-lien security interest in Skye International's real and personal property. In March 2000, Yokogawa sued Skye USA and Skye International for failing to make the payments due under the settlement agreement. Five months later, in July 2000, the two individuals holding the security interest foreclosed on the Skye International properties securing the $600,000 loan for $400,000. The two individuals transferred those assets to a new company they called Skye Delaware. Yokogawa alleged in its lawsuit against Skye USA and Skye International that the creation of the security interest, the foreclosure of the lien, and the transfer of Skye International's assets to Skye Delaware were actually and constructively fraudulent under TUFTA. The court held that the foreclosure and subsequent transfer of assets to Skye Delaware were not covered by TUFTA because the property was encumbered by a valid lien and was therefore not an "asset" under the statute. *Id.* at 270 (citing TEX. BUS. & COM. CODE § 24.002(2)(A)). In this case, as in *Yokogawa*, the property foreclosed on was encumbered by a valid lien. The foreclosure following default was not a transfer of an "asset" under TUFTA.

Tow asserts the transfer of the Wachovia Note to Amegy and the transfer of Westwood Gardens to Vestalia following Amegy's foreclosure were the result of impermissible collusion, making the transfer subject to TUFTA's constructive-fraud provision. Tow correctly notes TUFTA's failure to define "noncollusion" as well as the case law's failure to provide guidance on what that term might mean. As evidence of collusion, Tow points to Speer's role in negotiating the Amegy purchase of the Wachovia Note, Amegy's role in financing Vestalia, and Amegy's role in Vestalia's bidding at the foreclosure sale of Westwood Gardens. Tow has not alleged facts or identified evidence in the summary judgment record showing that Westwood Gardens was a TUFTA asset or that the Westwood Gardens Note was not obtained in good faith and for reasonably equivalent value.

A related question is whether the transfer of Wachovia's security interest in Westwood Gardens was invalid under TUFTA. TUFTA governs "transfers" by debtors. It is undisputed that Wachovia's security interest in Westwood Gardens was obtained in good faith and for reasonably equivalent value from Park Lake. Wachovia, which is not the bankruptcy debtor, was free to transfer its security interest. There is no factual dispute about whether the value of Wachovia's security interest in Westwood Gardens was reasonably equivalent to the amount of debt it secured. The Texas Supreme Court has held that "as a matter of law, the value of the interest in an asset transferred for a security is reasonably equivalent to the amount of the debt that it secures." *First Nat'l Bank of Seminole v. Hooper*, 104 S.W.3d 83, 84 (Tex. 2003).

Tow argues that Speer-Amegy-Vestalia "collusion" allowed Amegy to obtain and foreclose on the Note — a valid lien created by Park Lake in Wachovia's favor — for less than the Note was worth and allowed Amegy to transfer it for less than its value. Had Wachovia foreclosed on the

Westwood Gardens property and had the property sold for more than the Wachovia security interest, any amounts above that interest would have benefitted Park Lake and its creditors. "[T]o the *extent that is encumbered by a valid lien*," property is not an "asset" under TUFTA. TEX. BUS. & COM. CODE § 24.002(2)(A) (emphasis added). "[T]he value of property in excess of a valid lien encumbering the property is an 'asset' as defined by [T]UFTA." *Citizens*, 387 S.W.3d at 82 (citing *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 610 n.6 (Tex. App —Houston [1st Dist.] 2002, no pet.)). In *Citizens National Bank of Texas*, a creditor sought to void a debtor's transfer of assets that were subject to a third-party lien. The court noted that "it would be absurd to conclude the Legislature intended to permit debtors to avoid unsecured creditors by transferring property encumbered by a lien worth a fraction of the property's value." *Id.* at 83. Accordingly, the court excluded from TUFTA only the value of the property transferred below the value of the lien. That is not this case, however, because the Wachovia Note was secured by property that sold for less than the Note's value. The value of the interest transferred was reasonably equivalent to the value of the Note.

Tow argues that Vestalia purchased the Westwood Gardens property for less than it was worth because Vestalia and Amegy "chilled" other bids. Tow repeatedly alleges that Amegy, Vestalia, Park Lake, and Speer colluded to carry out the Westwood Gardens foreclosure, including fixing the price at the foreclosure sale, providing bidding instructions, and providing Vestalia with the funds to pay for Westwood Gardens. The implicit argument seems to be that there may have been a TUFTA transfer had these conversations or events not taken place. Assuming that such an attenuated connection could give rise to a TUFTA claim, considering the TAC, including the documents quoted, attached, and incorporated by reference, Tow has failed to plead a plausible

21

claim that the foreclosure sale was illegal or unfair such that all or part of Westwood Gardens could qualify as a TUFTA asset.[3]  The TAC fails to state a TUFTA claim on which relief can be granted.

Expanding the analysis to consider the summary-judgment evidence leads to a similar result for Tow's TUFTA claim against Amegy.  Tow wants to ask the jury whether the Wachovia-Amegy-Speer-Vestalia arrangement was impermissible TUFTA collusion.  That assumes that the transactions Tow challenges are covered by TUFTA.  The TAC does not plead facts showing that there was a transfer of an asset under TUFTA, and Tow has not pointed to competent summary-judgment evidence raising factual disputes material to deciding whether TUFTA applies.

Amegy has, in great detail, explained and submitted documents showing how Wachovia obtained the security interest in Westwood Gardens and how Amegy obtained the Wachovia Note and followed the foreclosure requirements specified in the Texas Property Code.  The documents relevant to making that determination were incorporated by reference in the TAC.

"The rule is well settled in this state that a mortgagee with power to sell may purchase at his own sale made at public auction."  *Tarrant Sav. Ass'n v. Lucky Homes, Inc.* 390 S.W.2d 473, 476 (Tex. 1965).  Though *Tarrant* is a wrongful foreclosure case, the Westwood Gardens foreclosure was made public.  If Amegy could bid at its own sale, having an individual or entity closely affiliated with it do the bidding, even with Amegy's direction or guidance, does not raise a factual

---

[3]  The complaint points to an error in the notice of foreclosure sale and the subsequent deed issued at the foreclosure sale.  "They incorrectly referred to film code 617088 instead of 617091, which would cause confusion regarding which property was foreclosed.  The errors in the Notice of Appointment of Successor Trustee and Notice of Appointment of Substitute Trustee's Foreclosure Sale were not corrected." (TAC ¶ 290).  That error, however, does not make the complaint more plausible or create a genuine issue of material fact.  *See Dunham v. Elizondo*, No 03-97-00771-CV, 1998 WL 394209, at *2 (Tex. App. —Austin 1998, no pet.)(citing *Dixon v. Bennett*, 260 S.W.2d 372, 375 (Tex. App. —Waco 1953, no writ)).  Amegy provided the documents with the errors in its motion for summary judgment, which were necessarily incorporated by reference in the complaint.  The documents identify the land and the film code references were not needed to locate the property.  It is implausible that these errors caused an unfair or illegal foreclosure.

dispute material to determining the legality of the sale or amount to impermissible bid chilling.  Tow has neither alleged facts nor pointed to relevant summary-judgment evidence showing that had Wachovia foreclosed or sold the Note to another entity that foreclosed, the property would have sold above the Note's value.  "Mere inadequacy of consideration alone does not render a foreclosure sale void if the sale was legally and fairly made."  *Id.*  Tow has not alleged facts supporting an inference, or identified summary-judgment evidence raising disputes material to determining whether the foreclosure sale was actionable under TUFTA.

Because neither Westwood Gardens nor the Wachovia Note was a TUFTA "asset," Tow's claim against Vestalia is dismissed, and Amegy's motion for partial summary judgment is granted. The pleadings and evidence of the relationship of the parties does not alter the conclusion that there is no TUFTA transfer of an asset, as a matter of law.

Tow also sought to set aside the sale of Westwood Gardens as a fraudulent conveyance under the Delaware Uniform Fraudulent Transfer Act.  The parties have not identified meaningful differences between the TUFTA and DUFTA requirements.  In Delaware, as in Texas, a transfer "means . . . disposing of or parting with an asset or an interest in an asset." 6 DEL. CODE § 1301 (12) "'Asset' means property of a debtor, but the term does not include . . . property to the extent it is encumbered by a valid lien."  6 DEL. CODE § 1301 (12).  For the same reasons that the transfer of the Wachovia Note to Amegy and the following transfer of Westwood Gardens to Vestalia were not transfers of assets under TUFTA, the transfer of the Wachovia Note and of Westwood Gardens to Vestalia were not transfers of assets under DUFTA.  Vestalia's motion to dismiss the DUFTA claim is granted, and Amegy's motion for summary judgment on the DUFTA claim is granted.

Amegy also moved for summary judgment dismissing Tow's asserted claim under the Bankruptcy Code. Tow has explicitly waived that claim both in the papers he submitted in response to Amegy's motion for partial summary judgment and at oral argument on the motions. Amegy's motion for summary judgment on the Bankruptcy Code claim is granted.

**IV.   Conclusion**

For the foregoing reasons, the court grants Vestalia's motion to dismiss the Westwood Gardens claims under TUFTA and DUFTA (Docket Entry No. 93). The dismissal is with prejudice and without leave to amend. Tow has filed three complaints. The TAC incorporates by reference the documents necessary for full consideration of the claims. In addition, Tow has submitted a voluminous amount of summary-judgment evidence on the same transaction. Amending the complaint once again would be futile.

The court also denies Tow's motion for a continuance to permit additional discovery relating to Amegy's motion for partial summary judgment, (Docket Entry No. 139), and grants Amegy's motion for partial summary judgment on the Westwood Gardens claims under TUFTA and DUFTA, (Docket Entry No. 117).

SIGNED on September 30, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

24