IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RODNEY TOW, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:11-cv-03700 |
| | § | |
| AMEGY BANK N.A., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This Memorandum and Opinion addresses the motion for summary judgment on claims against Michael Manners and companies he owned or controlled. Manners founded Royce Homes, LP, and was a 50 % owner between1998 and 2006. The Trustee of the Royce Homes bankruptcy estate, Rodney Tow, alleges that Manners conspired to breach the fiduciary duties owed to Royce Homes by both Manners and by defendant John H. Speer, who was the president of Royce Homes's general partner and owned the other 50 % of Royce Homes until 2006, when Speer bought Manners's interest. Tow has sued Manners and his affiliated companies, Allard Investment Company, LLC, DWM Holdings, LP, DWM Holdings GP, LLC, MGM Motor Sports, LLC, Saracen Holdings, LP, Saracen Holdings, LLC, and Saracen Holdings GP, LLC (collectively, "Manners" and the "Manners Defendants").

Based on the pleadings; the motion, responses, and replies; the parties' submissions; the oral argument; the record; and the applicable law, this court grants the motion for summary judgment. The reasons are explained below.

I.      **Background**

Much of the relevant background is set out in the Memorandum and Opinion issued on October 1, 2013 and is set out here only as necessary.

In 1984, Manners founded Royce Homes, Inc., the predecessor to Royce Homes, L.P. (Docket Entry No. 117, Ex. 1 (Manners Affidavit) at 1). Manners was Royce Homes's chief executive officer until July 1998, when he sold 50 % of Royce Homes's equity to Speer and became a limited partner. (*Id.*). The parties entered into an Amended and Restated Agreement of Limited Partnership (the "1998 Agreement"), which replaced the previous limited partnership agreement. (Docket Entry No. 132, Ex. 4 at 18). The 1998 Agreement made Hammersmith Group, now Hammersmith Group, LLC, Royce Homes's general partner. Hammersmith had a 1 % interest in the partnership. Speer was Hammersmith's president. (TAC ¶ 61). Speer, as chief executive officer of First Duval Group, Inc., was Royce Homes's limited partner with a 49 % interest. Manners, through Royce Homes, Inc., retained a 50 % limited partnership interest. Speer, the president, sole director, and sole owner of Hammersmith, exercised Hammersmith's authority as general partner. (TAC ¶ 31).

The 1998 Agreement gave the general partner exclusive management rights and duties. "'General Partner' mean[t] Hammersmith Group, Inc." (Docket Entry No. 132, Ex. 4 at 21). Manners relinquished his executive control. The "General Partner [had] the full and exclusive power and authority on behalf of [Royce Homes] to manage, control, administer and operate the business and affairs of [Royce Homes], and to do or cause to be done any and all acts which it deem[ed] necessary or appropriate thereto, and the scope of such power and authority . . . encompass[ed] all matters in any way connected with or incident to such business." (*Id.* at 34). This included the power and authority to:

2

(a)     expend [Royce Homes's] capital and revenues in furtherance of the business of [Royce Homes];

(b)     to enter into any partnership agreement, sharing arrangement, or joint venture which is engaged in any business or transaction in which [Royce Homes was] authorized to engage;

(c)     to . . . draw, make, execute and issue promissory notes and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of the sums so borrowed and to mortgage, pledge, or assign in trust all or any part of [Royce Homes's] property;

. . .

(h)     to guarantee the payment of money or the performance of any contract or obligation by any          person, firm or corporation on behalf of [Royce Homes];

(i)     to sue and be sued, complain and defend, in the name and on behalf of [Royce Homes] and enter into such agreements, receipts, releases and discharges with respect to any such matters as the General Partner deems advisable;

. . .

(m)     to enter into, perform and carry out contracts, agreements and to do any other acts and things necessary, appropriate or incidental to the accomplishment of the purposes of [Royce Homes];

[and]

(n)     to cause [Royce Homes] to borrow funds or accept other capital contributions without the consent of the limited partners.

(*Id.* at 34-36).

The 1998 Agreement also stripped the limited partner of any managerial role and shielded him from related liabilities.  "No Limited Partner [was] liable to [Royce Homes] for the debts, liabilities, contracts, or any other obligations of [Royce Homes], except to the extent of his Interest

3

in [Royce Homes]." (*Id.* at 37). "No Limited Partner [was to] take part in the operation, management, or control of [Royce Homes] business, transact any business in [Royce Homes's] name, or have the power to sign documents or otherwise bind [Royce Homes]" except as might be required by the Delaware Revised Limited Partnership Act. (*Id.* at 38). The limited partner could "not withdraw from [Royce Homes] or sell, assign, transfer or subject to a security interest all or any portion of his Interest in [Royce Homes] unless [with] the written consent of the General Partner," who had sole and absolute discretion in deciding whether to grant or deny the withdrawal. (*Id.*). The 1998 Agreement also included a buyout provision outlining the procedures governing a voluntary buy out of a partner. (*Id.* at 48).

In the spring of 2006, Manners and Speer entered into negotiations for Speer to buy Manners's remaining interest in Royce Homes. Buying out Manners's 50 % interest cost Speer "$33,342,405 plus a loan fee of $236,386." (TAC ¶ 40). Speer entered into two personal obligations to finance this purchase: a $20 million personal loan from Amegy (the "Amegy Loan"), and a $13,342,405 promissory note to Manners (the "Manners Note"). (TAC ¶ 40). Before the buyout, Speer obtained lender consents. (Docket Entry No. 115, App. 11, Ex. I). "Speer represented to Royce Homes's lenders that distributions to make the payments on the Amegy [L]oan[] would be made from same year profits; would not reduce equity below $40 million; and would not cause Royce Homes to violate the lenders' debt-to-equity covenants contained within their loan documents." (TAC ¶ 44). Manners and Speer entered into a purchase agreement, the Manners Note, and an intercreditor agreement. Manners then submitted a formal resignation. Speer signed the Manners Note personally.

The purchase agreement between Speer and Manners became effective on September 20,

2006 (the "2006 Purchase Agreement").  (Docket Entry No. 116, App. 4, Ex. B, at 1).  The purchase price was $33,342,405, consisting of $20,000,000 paid in cash at closing and the $13,342,405 Manners Note.  The Manners Note was attached to the 2006 Purchase Agreement.  (*Id.*, App. 5, Ex. C).  Speer was to pay a $236,873 closing fee.  On October 2, 2006, Speer was to pay "$1,500 per lot acquired for which home construction [had] started by the Royce Entities . . . after June 30, 2006 and on or before September 30, 2006 and[] $1,500 per home for which construction was started after June 30, 2006 and for which closing and transfer of title to such home by the Royce Entities to a customer occurs on or before September 30, 2006."  (*Id.*).  After October 1, 2006 and until all amounts were fully paid, Speer was to pay Manners "$1,500 per lot acquired for which home construction [was] started by the Royce Entities . . . on or after October 1, 2006[] and $1,500 per home for which construction was started after June 30, 2006 and for which closing and transfer of title [was] to occur on or after October 1, 2006."  Speer was to "cause the Royce Entities to instruct all title companies to pay such $1,500 amounts directly to the [Manners] at the closing of each lot or home."  (*Id.*)  "All direct payments to [Manners] transmitted from the various title companies [were to] be treated as a distribution of capital by Royce Holdings, L.P. to [Manners] as a payment by [Speer].  (*Id.*).

The Manners Note also had a subordination provision, which stated that Speer's "obligations with respect to the principal of and interest on this Note shall be subordinate and junior in right of payment . . . to any indebtedness of [Speer] with respect to 'Senior Debt,' whether now existing or hereinafter incurred."  (*Id.* at 3).  Senior debt was defined to mean "any and all obligations of [Speer] or any entity of which [Speer] owns, directly or indirectly, a majority equity interest at such time with respect to any principal, interest . . . , premium, penalties, fees, indemnification,

5

reimbursements and other amounts owed with respect to any Indebtedness of the [Speer] or ay such subsidiary unless such indebtedness expressly provides that such Indebtedness is *pari pasu* or subordinate in right of payment to this Note." (*Id.*)  Indebtedness meant, among other things, borrowed money.  The Note stated:

> (b)    No payment of principal or interest on this Note shall be made at any time (i) when a *default* or event of default (however defined) has occurred and is continuing under the terms of any Senior Debt (or if such a payment or principal or interest would result in such a default or event of default), and (ii) when a payment or distribution to [Speer] by one of [his] Controlled Entities is not permitted under the terms of any Senior Debt.  If, notwithstanding the foregoing provisions of [this section] any payment is made, then [Manners] will hold the same in trust and pay it over to the holders of the Senior Debt.

(*Id.* at 6 (emphasis added)).

On September 20, 2006, Manners resigned as a Royce Homes officer, signing the following statement:

> I, Michael G. Manners, hereby resign any and all positions I hold as a director, officer, manager, consultant or in any other capacity of management of the below listed entities or any other direct or indirect subsidiaries of Hammersmith Group, Inc., a Delaware corporation, or Royce Holdings, LP, a Delaware limited partnership, effective as of September 20, 2006.  Provided that, this Notice of Resignation shall not apply to, and in no way affect, my honorary position, compensation or benefits with Royce Homes, L.P. as Chairman Emeritus.

(*Id.*, App. 6, Ex. D).  At closing, Manners received the $20,000,000 payment.  Speer and Manners signed the Manners Note.

## A.    Speer's First Obligation: Amegy Loan Principal and Interest Payments

In January 2007, Speer owed a $10,000,000 principal payment on his Amegy Loan.  The "Royce Homes LP-Loan Account" shows that Royce Homes wired $10,000,000 to Speer's personal

Amegy bank account on January 3, 2007.  (TAC ¶¶ 129, 131).  This money came from "draws on the Royce Homes lines of credit."  (TAC ¶¶ 121, 127 (detailing which lines of credit were used)).  Tow alleged that this distribution breached the Royce Homes partnership agreement, Speer's fiduciary duty, and Speer's representation to Royce Homes's lenders because it was made from funds Royce Homes had borrowed; violated  loan covenants, including debt-to-equity ratio requirements; was not for a partnership purpose; was inconsistent with the fiduciary responsibility for safekeeping partnership property; and was not made in furtherance of partnership business.  (TAC ¶¶  48, 134-38).

Speer owed another principal payment, of $2.5 million, in July 2007.  Tow alleged that Royce Homes was "required to borrow money in order to make this payment."  (TAC ¶ 139).  "Speer recognized making the payment caused a problem for Royce Homes and sought permission from Amegy to not make the July 2007 principal payment but[] Amegy insisted the payment be made.  Despite the fact that Royce Homes was continuously breaching its debt-to-equity ratios with its lenders, Speer made the $2.5 million principal payment on July 2, 2007." (TAC ¶ 146).  This "Amegy payment distribution was made from funds borrowed from Royce Homes lenders."  (TAC ¶ 156).

Tow alleged that William D. Gathmann, Royce Homes's former chief financial officer, anticipated that upcoming financial disclosures would reveal the breach of Royce Homes's covenants with its lenders.  (TAC ¶ 141).  "On May 11, 2007, Gathmann sent Speer and James Hunter, the Royce Homes Chief Operating Officer, an email attaching a PowerPoint presentation" requesting "waivers/amendments to the loan agreements."  (TAC ¶ 139).  The PowerPoint presentation stated that for "some banks, leverage ratio covenant and spec ratio covenant are not in

compliance." (TAC ¶ 140). This presentation was not shown to Royce Homes lenders. (TAC ¶ 142). "Gathmann recreated the PowerPoint presentation in June 2007. As with the May 2007 presentation, this one was never seen by a Royce Homes lender. Instead it was sent to Amegy, Speer's lender, on September 11, 2007." (TAC ¶ 143).

In September 2007, Speer owed another $2.5 million on his Amegy Loan. (TAC ¶ 157). Speer requested, and received, a modification to his loan agreement with Amegy, postponing the September 2007 payment to December 31, 2007, with a final payment due on June 30, 2008. According to Tow, in "early September 2007, the Royce Homes auditors were trying to release the audited financial statements but needed Royce Homes to go to its lenders to seek a waiver of breach of the debt-to-equity ratios. Some Royce Homes lenders provided the waivers or modified the loan covenants, temporarily, to accommodate the auditors' request." (TAC ¶ 159). Royce Homes failed to comply with the modified debt-to-equity ratio requirements. (*Id.*)

Royce Homes's finances continued to deteriorate. Speer knew that Royce Homes did not have the money for him to make the Amegy Loan payment due on December 31, 2007. Speer created a new company, RH Model Homes 2007, Inc., which purchased model homes from Royce Homes. RBC Bank, a Royce Homes lender, financed the purchases. First Duval, the Royce Homes parent company, and the Speer Children's Trust, which coowned First Duval with Speer, subsidized the transfer of the model homes from Royce Homes to RH Model Homes. (TAC ¶ 159). Through this arrangement, Royce Homes realized about $2.8 million.

At the end of December 2007, the debt-to-equity modifications that Royce Homes obtained from some of its lenders expired, again placing Royce Homes in breach of those loan covenants. (TAC ¶ 160). Nonetheless, Speer wired $2,554,854.17 from the Royce Homes LP-Loan Account

8

to his personal Amegy account and made the principal payment of $2.5 million on his Amegy Loan. (TAC ¶¶ 161-64).  This distribution to Speer and payment to Amegy allegedly breached the partnership agreement for the same reasons as the other distributions and payments.  (TAC ¶ 165).

Between October 2, 2006 and June 30, 2008, Speer's monthly interest payments totaled about $1.5.  (TAC ¶ 169).  As with the principal payments, Royce Homes wired money from the Royce Homes LP-Loan Account into Speer's personal Amegy account.  (TAC ¶¶ 171-72).  These wire transfers allegedly breached the partnership agreement because Royce Homes was not preserving adequate working capital reserves and made the transfers when Royce Homes was in breach of its loan covenants.  (TAC ¶ 173).

### B.   Speer's Second Obligation: The Manners Note

Speer and Manners allegedly devised a plan to make the payments on the $13,342,406 Manners Note through Royce Homes.  The Manners Note, like the Amegy Loan, was allegedly paid with money Royce Homes had borrowed, in violation of the partnership agreement.  (TAC ¶¶ 175-76).  The funds used for the Manners Note payments were billed to Royce Homes as a "management fee" for Manners.  Gathmann testified that Manners did not provide services for those fees.  (TAC ¶ 177).  "Calling the disbursement a management fee [allegedly] allowed it to be inconspicuously capitalized into the lot value so each payment could increase the value of a lot by making it appear it was a cost associated with enhancing the value of the lot."  (TAC ¶ 389).  By June 2007, when the payments stopped, Speer had reduced the balance owed on the Manners Note to $11,165,661; Manners had received $3,085,100 in payments on the Manners Note.  (TAC ¶ 178).  These payments allegedly breached the partnership agreement.

### C.   The Claims Against Manners and the Manners Defendants

Six causes of action against Manners and the Manners Defendants appear to be at issue in the pending motion for summary judgment.  The claims are that these defendants: (1) breached fiduciary duties owed to Royce Homes; (2) aided and abetted Speer in breaching the fiduciary duties he owed Royce Homes; (3) unjustly enriched Manners at the expense of Royce Homes or otherwise converted Royce Homes's assets; (4) aided and abetted Speer's conversion of Royce Homes assets and the  unjust enrichment of Speer at Royce Homes's expense; (5) breached the subordination provision in the Manners Note; and (6) bought 50 Royce Homes properties in a sham transaction through one of the Manners Defendants, Allard Investment.  The court addresses the motion and response for each cause of action.

## II.     The Applicable Legal Standards

### A.     The Motion for Summary Judgment

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).  When the moving party has met its Rule 56 burden, the nonmoving party must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir.  2007).  "This burden is not satisfied with some metaphysical doubt as to the material facts, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted).  Factual controversies resolve in the nonmoving party's favor, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Id.*

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[] citing to particular parts of materials in the record including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. PRO. 56(c)(1)(A). A party can also show that cited materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. PRO. 56(c)(1)(B). The court is not required to go beyond the parts of the record that the parties specifically cite. FED. R. CIV. PRO. 56(c)(3).

Summary-judgment evidence must be competent. The evidence cannot be hearsay, *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 510 n.5 (5th Cir.), or unsubstantiated assertions, *VRV Development v. Mid-Content Cas. Co.*, 630 F.3d 451, 455 (5th Cir. 2011). FED. R. CIV. PRO. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075. Resolving actual disputes of material facts in favor of a nonmoving party "is a world apart from assuming that general averments embrace the specific facts needed to sustain the complaint. . . . It will not do to presume the missing facts because without them the affidavits would not establish the injury that they generally allege." *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888 (1990).

### B.    The Summary-Judgment Evidence

The court has considered the TAC, the documents incorporated in the TAC by reference or attached to the TAC, and the documents quoted at length in the TAC. In addition, the court has considered the affidavit of Michael Manners, (Docket Entry No. 116, App. 1); the affidavit of Marc Schwartz, certified public accountant, (*id.* at App. 2); the deposition excerpts of Pamela Mitchell,

11

Royce Homes's director of corporate finance, provided by the parties; the interest-payment

agreement, (*id.*, App. 2, Ex. B); the Manners Note, (*id.*, App. 5, Ex. C); the Manners resignation

letter, (*id.*, App 6., Ex. D), Royce Homes financial statements for years 2004-2007, *id.* (App. 7-9);

the intercreditor agreement, (*id.*, App. 10, Ex. H.); and the lender consents to Speer's purchase of

Manners's interest, (*id.*, App. 11, Ex. I).  Tow relied on much of the same evidence that Manners

and the Manners Defendants submitted.  The court has also examined the additional summary-

judgment evidence Tow filed.

**III.    Analysis**

   **A.    The Claim that Manners Breached Fiduciary Duties**

   Tow alleged that Speer, Amegy, and Manners devised a scheme to take money out of Royce

Homes to finance Speer's 2006 buyout of Manners's interest in the partnership without reflecting

a loss in equity on Royce Homes's balance sheets.  (TAC ¶ 37).  Tow claims that Manners knew

about the scheme and cooperated to implement it.  (TAC ¶ 39).  Tow also argues that Manners

breached the duties of loyalty and care he owed as a limited partner by selling his ownership in

Royce Homes to Speer.  Tow claims that Manners knowingly breached the 1998 Agreement, (TAC

¶ 190), and the duties of care and loyalty he and Speer owed to Royce Homes, (TAC ¶ 204(a)-(b)).

Tow identifies Manners's status as "Chairman Emeritus of Royce Homes" as the position giving rise

to Manners's fiduciary duties after he sold his interest in Royce Homes in 2006.  (TAC ¶ 201).

   Delaware Law controls the fiduciary-duty claims.  Royce Homes is a Delaware limited

partnership.  The operative partnership agreement identifies Delaware law as controlling.  Under

Delaware law:

> A fiduciary relationship is a situation where one person reposes
> special trust in and reliance on the judgment of another or where a

> special duty exists on the part of one person to protect the interest of another. The relationship connotes a dependence. A fiduciary relation implies a condition of superiority of one of the parties over the other.

*Cheese Shop Int'l, Inc. v. Steele,* 303 A.2d 689, 690 (Del. Ch. 1973), *rev'd on other grounds*, 311 A.2d 870 (Del. 1973). "Unquestionably, the general partner of a limited partnership owes direct fiduciary duties to the partnership and to its limited partners." *Wallace ex rel. Cencom Cable Income Parnters II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999). "[D]irectors of a corporate general partner likewise may owe fiduciary duties to the partnership and to the limited partners." *Id.* Under the 1998 Agreement, Hammersmith was the general partner of Royce Homes. Speer was Hammersmith's president and a 49 % owner of Royce Homes; Hammersmith owned 1 %. Manners was the only other partner and owner of Royce Homes. Speer owed Manners, the only other partner in the partnership, a fiduciary duty.

Manners was a passive limited partner under his 1998 Agreement with Speer. "Passive limited partners do not owe default fiduciary duties, but under certain circumstances, they can assume fiduciary duties if they take on an active role in the management of the entity." *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) (citing *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *22 (Del. Ch. Mar. 13, 2000) (imposing fiduciary duties on limited partners based on circumstances of limited partnership's business); *KE Prop. Mgmt., Inc. v. 275 Madison Mgmt*., 19 Del. J. Corp. L. 805, 821–22, 1993 WL 285900, at *9 (Del. Ch. July 27, 1993) (imposing fiduciary duties on limited partner who exercised discretionary authority)). "[T]o the extent that a partnership agreement empowers a limited partner with discretion to take actions affecting the governance of the limited partnership, the limited partner may be subject to the obligations of a fiduciary, including the operation to act in good faith as to the other partners." *KE Prop. Mgmt.,*

1993 WL 285900, at *9.  Or, if the general partner and limited partner are nested financial institutions and the "general partner and a limited partner are controlled by the same entity, 'this might be sufficient to impose on [the limited partner] the same fiduciary duty' owed by the general partner." *In re Estate of Conaway*, No. 6056 (VCG), 2012 WL 524190, at * 8 (Del. Ch. Feb. 15, 2012) (quoting *KE Prop. Mgmt.*, 1993 WL 285900, at *8).

"By contrast, a limited partner owes no fiduciary duties to the partnership absent circumstances enabling the limited partner to exercise management or control over the partnership, thus creating a fiduciary relationship." *Id.* at *4.  This is because "the principle of fiduciary duty, stated most generally, [is] that one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner." *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del Ch. 1991).  "There are, of course, other aspects — a fiduciary may not waste property even if no self interest is involved and must exercise care even when his heart is pure — but the central aspect of the relationship is, undoubtedly, fidelity in the control of property for the benefit of another." *Id.* (citing Robert Flannigan, *The Fiduciary Obligation*, 9 Oxford J. Legal St. 285 1989)).

"When the provisions of the Uniform Partnership Act and the Uniform Limited Partnership Act are read together, it is clear that the general partner in a limited partnership owes a fiduciary duty to the limited partners." *Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del Ch. 1981).  "It is also clear that a partner owes a fiduciary duty to the other partners at common law." *Id.* (citing *Meinhard v. Salmon*, 249 N.Y. 458 (1928)).  "The duty of the general partner in a limited partnership to exercise the utmost good faith, fairness, and loyalty is, therefore, required both by statute and common law." *Id.*  As Chief Judge Cardozo famously stated:

14

> Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard behavior.

*Meinhard*, 249 N.Y. at 463–64.

Manners argues that he was not a fiduciary of Royce Homes at any time relevant to this law suit. Instead, he was a limited partner from 1998 to 2006, and the "Chairman Emeritus," an honorary position, after 2006. Both roles are examined in light of the evidence, arguments, and legal standards.

### 1.  Manners as Limited Partner: 1998 to 2006

Manners challenges Tow to identify summary-judgment evidence showing that Manners exercised discretionary control over Royce Homes's property or discretionary authority in Royce Homes governance after 1998. "[T]o the extent that a partnership agreement empowers a limited partner [with] discretion to take actions affecting the governance of the limited partnership, the limited partner may be subject to the obligations of a fiduciary, including the obligation to act in good faith as to the other partners," because "all partners owe each other fiduciary obligations" to the extent they have the power to take actions affecting the partnership. *Bond Purchase, L.L.C. v. Patriot Tax Credit Props., L.P.*, 746 A.2d 842, 863 (Del. Ch. 1999) (quotation omitted). Tow must point to summary-judgment evidence that raises a genuine factual dispute material to deciding whether Manners had or exercised discretionary control over Royce Homes management or property that gave rise to a fiduciary duty on his part.

During the relevant period, the Royce Homes partnership agreements expressly granted only

Hammersmith and its president, Speer, the control that gives rise to fiduciary obligations.  The 1998 Agreement identified Hammersmith as the General Partner.  (Agreement, Article 1.1(p) ("***General Partner***" means Hammersmith Group, Inc.)).  The TAC acknowledged that Speer was "[a]t all times relevant to the [TAC] the president, sole director, and sole owner of Royce Homes's general partner, Hammersmith."  (TAC ¶ 31).  The 1998 Agreement also outlined the general partner's "fiduciary responsibility" for safekeeping partnership property and gave to the general partner "full and exclusive power and authority on behalf of [Royce Homes] to manage, control, administer and operate the business and affairs of the [Royce Homes], and to do or cause to be done any and all acts which it deems to be necessary and appropriate."  (1998 Agreement, Article 5.1).  This included the exclusive power to expend capital and revenue, to enter into any other partnership agreement, to borrow money or "draw, make, execute and issue promissory notes and other negotiable or non-negotiable instruments and evidences of indebtedness," to lend money, to guarantee the payment of money, and to sue and be sued.  (*See id.*).

The 1998 Agreement identified Manners as a Royce Homes limited partner.  The 1998 Agreement stated that "[n]o Limited Partner as such shall take part in the operation, management, or control of the [Royce Homes's] business, transact any business in [Royce Homes's] name, or have the power to sign documents for or otherwise bind" Royce Homes.  (*Id.* at 6.2).  Under the plain terms of the 1998 Agreement, Manners did not have the discretionary control necessary to give rise to a fiduciary obligation.  The 1998 Agreement did not put Manners in a position of trust.  Rather, the 1998 Agreement expressly precluded Manners from exercising control over Royce Homes or its property.  Manners had no "default fiduciary duties" to Royce Homes.

Tow correctly notes that Manners could nonetheless have fiduciary obligations if he

16

undertook an active role at Royce Homes. Manners challenges Tow to point to summary-judgment evidence showing that he undertook a role in which he exercised discretion over Royce Homes's management or over Royce Homes's property. In response, Tow asserts that there is "a wealth of facts support[ing] the conclusion that Manners was a fiduciary of Royce Homes." (Docket Entry No. 146 at 46). But Tow points to little in the summary-judgment evidence. Tow asserts that "Manners was the founder and original president of Royce Homes and his name was valuable to Royce[; e]ven after selling 50 % of his interest to Speer in 1998, he remained a *limited partner* close to the company[; he] remained *involved* in the decision-making process of Royce Homes, as evidenced by his participation in annual planning meetings of Royce Homes." (*Id.* (emphasis added)). "Even stronger evidence is Manners's *coordination* with Speer and Amegy of the [b]uyout transactions, which w[ere] arranged to cause Royce [Homes] to make payments to fund the purchase of Manners's remaining 50 % interest." (*Id.* (emphasis added)). Tow alleges that "Manners actively participated *with* Speer by agreeing to place the Buyout obligations in Speer's personal name so the obligations would not be disclosed on Royce Homes's balance sheets." (*Id.* at 44 (emphasis added)). None of these allegations or the related summary-judgment evidence cited supports an inference that Manners exercised discretionary control over Royce Homes.

Tow filed a supplemental brief in which he claims that Manners had a fiduciary relationship between 1998 and 2006 based on: (1) Manners coming to the office 2-3 times per week; (2) having "closed door" meetings with upper management; (3) that Speer was interested in acquiring several out-of-town companies and asked Manners to "go down and look at them"; (4) Manners's receipt and review of financial reports "both orally and in hard copy form" which he could consult; (5) a purported discount Manners received for purchasing 50 homes from Royce Homes; and (6) having

been referred to as "President of Royce Homes" on *Extreme Makeover, Home Edition*.

The evidence that Manners went to meetings and discussed transactions with Speer, and that he agreed to Speer's purchase of Manners's interest in Royce Homes in Speer's name, do not raise a fact dispute that Manners exercised control over, or was acting on behalf of, Royce Homes. Employees usually go to their office, get paid, and have benefits. Those facts do not establish an inference of discretionary control over Royce Homes. Meetings with upper management and having access to corporate records do not evidence Manners's control over Royce Homes or its property. Tow does not point to competent summary-judgment evidence that Manners had or exercised discretionary control or authority over Royce Homes's governance or property from 1998 to 2006. Nor does Tow identify summary-judgment evidence that Manners was acting as a general agent on behalf of Royce Homes from 1998 to 2006.

### 2.    Manners as Chairman Emeritus: After 2006

Tow alleges that Manners's role as Chairman Emeritus gave rise to fiduciary obligations.[1] After the 2006 buyout, however, Manners was no longer a Royce Homes owner or limited partner. Instead, he was a salaried employee with the title of "Chairman Emeritus." Again, Tow correctly notes that an employee may have fiduciary obligations to the partnership works for fiduciary obligations requiring him to act loyally, with good faith, and with due care. A managerial employee might have fiduciary duties to his employer to the extent he has discretionary control or authority over the partnership. *See Triton Const. Co., Inc. v. Eastern Shore Elec. Servs., Inc.*, 2009 WL

---

[1]Manners argues that once he transferred his Royce Homes ownership, Texas law should apply to the duty and obligations he owed Royce Homes as a mere employee. Tow does not respond and cites both Texas and Delaware cases in response to the substantive argument regarding the duties of a chairman emeritus. The parties, however, have not parsed any meaningful difference between the application of Texas law here as opposed to the application of Delaware law. For present purposes, the distinction is without a difference.

1387115, at *10 (Del. Ch. May 18, 2009) (noting key employees akin to officer or director may have corporate fiduciary duties).  The hallmark of fiduciary duty is discretionary control.  *See id.* (noting that, in a small company, attending meetings and frequent contact with corporation's principals did not create fiduciary obligations).  Citing cases from Texas, Tow also correctly notes that an individual might have a fiduciary duty to a corporation under traditional agency principles.  "Under fundamental principles of agency law, an agent owes his principal a duty of good faith, loyalty, and fair dealing.  These duties encompass the corollary duties of an agent to disclose information that is relevant to the affairs to the agency entrusted to him and to refrain from placing himself in a position antagonistic to his principal concerning the subject matter of his agency."  *Id.*

As evidence that Manners had control as Chairman Emeritus, Tow points to the fact that management called Manners an "executive," that employees referred to Manners as "a partner" of the company, and that Manners had a salary, medical benefits, car, an expense account, and had received a W-2 Form. (Docket Entry No. 173 at 4).  None of this evidence shows that Manners exercised control over Royce Homes property or actively managed Royce Homes.[2]  A title does not give rise to a fiduciary duty unless Tow can show that Manners had or used the power and control typically associated with such a title.  Tow has pointed not pointed to summary-judgment evidence showing that Manners acted on behalf of Royce Homes, held property for the benefit of Royce Homes, or exercised control over Royce Homes governance as Chairman Emeritus.

### 3.    Other Fiduciary Duty Issues

Tow alleges only that "[a]s Chairman Emeritus of Royce Homes, Manners owed a fiduciary

---

[2] In addition, in asserting that the distributions Speer made to Manners were unlawful, the TAC states that Manners was not "require[d] to perform any services" and that "Manners did not perform any services." (TAC ¶ 591).

duty to Royce Homes." (TAC ¶ 201).  Tow also alleges that Speer owed fiduciary duties to Royce Homes. (*See* TAC ¶ 119 (Breach of Partnership Defendants "had a fiduciary duty to Royce Homes and Hammersmith"); *see also* TAC ¶ 199 ("Speer owed a fiduciary duty to Royce Homes as well as to Hammersmith"); TAC ¶ 212 ("The purchase of Manners's interest in Royce Homes by Speer, the financing of that transaction, making distributions to repay Speer's personal obligations to Amegy and Manners, the sale of Allard, the tax distributions, the payments to Donnie Lou Speer [and other] transaction[s] all breached the Fiduciaries' fiduciary duty to Royce Home and Hammersmith, breached the Fiduciaries' duty of loyalty and duty of care, were self-dealing, and in bad faith."); TAC ¶ 294 ("Speer . . . owed a fiduciary duty to Royce Homes."); TAC ¶ 310 ("Speer . . . owed a fiduciary duty to Royce Homes.  Manners as an employee, control person, Chairman Emeritus owed a fiduciary duty to Royce Homes."); TAC ¶ 321 ("The Allard Fiduciaries breached their fiduciary duty to Royce Homes . . . ."); TAC ¶ 323 ("The Fiduciaries' conduct was not authorized[, and they] totally abandoned Royce Homes's interest.  Their interests were adverse to Royce Homes and not for its benefit.") ; TAC ¶ 324 ("All of the Fiduciaries . . . owed fiduciary duties to Royce Homes. They violated this duty in failing to care for Royce Homes and safeguard its assets[;] failed to care and safeguard Royce Homes's assets they removed assets when they were not authorized . . . .)).  Tow does not allege that Manners or Speer were fiduciaries to Royce Homes creditors.

If Manners had discretionary control over Royce Homes, any resulting fiduciary duties would run to Speer, the only partner other than Manners from 1998 to 2006 and the only partner after 2006.  The Delaware Revised Limited Partnership Act, which expressly controls the 1998 Agreement, gives only the general partner the right to sue on behalf of the partnership.  Delaware

law provides that a "limited partner . . . may bring an action . . . in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action." 6 DEL. C. § 17-1001. This provision has been likened to the demand-futility requirement under Delaware's General Corporations Law. A shareholder cannot bring an action on behalf of the corporation unless the managers refused or a demand that the managers do so would have been futile. To bring a derivative action, however, "the plaintiff must be a partner." 6 DEL. C. § 17-1002. The partnership act "facially bar[s] any party other than a limited partner . . . from suing derivatively. Read literally, the provisions prevent creditors from suing on behalf of the partnership, and Delaware courts historically have interpreted" the provisions as giving the partners exclusive rights to sue for breach of another party's fiduciary duties to them. *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011). To the extent Tow sues Manners on the partnership's behalf, he lacks derivative standing. Tow neither pleads nor argues that Manners or Speer owed fiduciary duties to the creditors of Royce Homes to preserve assets for the creditors when Royce Homes was in the "zone of insolvency" or insolvent.

To the extent that Tow sues Manners directly for breach of fiduciary duty owing to Royce Homes, Tow appears to be suing Manners for breaching a fiduciary duty he owed to Speer by negotiating and entering into a transaction with Speer. Tow has not provided legal authority showing that, absent fraud, a partnership can sue a limited partner for breachig a fiduciary duty owed to a general partner by entering into an agreement with that general partner. *See, e.g.*, *In re Safety Intern., Inc.*, 775 F.2d 660, 662 (5th Cir. 1985) ("Yet, even when the transaction is detrimental to

the corporation, no cause of action will lie if all of the shareholders have ratified the transaction.").[3] That is particularly true here as between Speer and Manners, the agreement was fully disclosed and at arms-length.  Tow has provided no legal support for the proposition that a contract executed knowingly and voluntarily between a partnership's equity owners could be the basis for the partnership to sue for breach of a fiduciary duty the equity owners owed to the partnership.

In sum, the allegations, cited record evidence, and cited authorities do not support an inference that Manners owed Royce Homes a fiduciary duty that he breached.  Tow has not pleaded or cited a legal basis or record evidence showing that Manners owed a fiduciary duty to Royce Homes's creditors.  The claim that Manners, as a limited partner or "Chairman Emeritus," was liable to the partnership for the harms caused by how the general partner financed the buyout of Manners's interest lacks support on this record.  Whatever might be said about Manners's role in the demise of Royce Homes, Tow has not identified record evidence or cited a case supporting an inference that Manners had or breached fiduciary duties by entering into the 1998 Agreement or 2006 Purchase Agreement with Speer, Royce Homes's only other owner and partner.

## B.      Conspiracy to Breach Fiduciary Duty And Aiding Breach of Fiduciary Duty

Tow also alleges that Manners is liable for aiding and abetting Speer's breach of fiduciary

---

[3]  Manners vigorously asserts a ratification defense: because Speer and Manners were both the only equity owners and transacting parties they necessarily ratified the transaction.  Ratification, however, is more properly construed as an *ex post* decision of disinterested equity owners to accept a fiduciaries otherwise unlawful act.  "Ratification is a concept deriving from the law of agency which contemplates the *ex post* conferring upon or confirming of the legal authority of an agent in circumstances in which the agent had no authority or arguably no authority to act."  *Lewis v. Vogelstein*, 699 A.2d 327, 334 (Del. Ch. 1997); *see also In re Mesa Ltd. P'ship Preferred Unitholders Litig.*, Civ. A. No. 12243 (VCH), 1991 WL 262669, at *1256 (Del. Ch. 1991) ("Delaware case law holds that shareholders of a corporation, if fully informed, may ratify actions of the directors which would otherwise constitute breaches of fiduciary duty.").  The Manners-Speer transaction was not in breach of a fiduciary duty from the beginning, and Tow has not shown that the only two equity owners of a partnership can knowingly and freely contract with each other in breach of the duties that they owe to each other.

duties he owed to Royce Homes. (TAC ¶ 369).  Whether Speer breached a fiduciary duty to Royce Homes is a question of Delaware law; whether Manners conspired with Speer to breach that duty is a question of Texas law.  "Texas recognizes a cause of action for aiding and abetting a breach of fiduciary duty."  *Floyd v. Hefner*, 556 F. Supp. 2d 617, 654–55 (S.D. Tex. 2008).  "'To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship.'"  *Id.* (quoting *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007)).

Speer was the president and CEO of Royce Homes, and the sole director, sole shareholder, and president of Hammersmith, the general partner of Royce Homes.  Speer controlled Royce Homes and Hammersmith.  Speer and Hammersmith owed fiduciary duties to the Royce Homes partners.  "[T]he general partner in a limited partnership owes a fiduciary duty to the limited partners . . . and to the other partners at common law."  *Boxer*, 429 A.2d at 997.  To support an inference that Manners is liable to Tow for aiding Speer in breaching his fiduciary duties, Tow would have to show that there was an actionable breach by Speer and that Manners was aware that he was participating in the breach.

Tow argues that there is evidence that Manners "set into motion a series of transactions that crippled Royce [Homes]."  (Docket Entry No. 126 at 44).  Tow argues that "Manners and Speer conspired to put the debt in Speer's name, with Royce bearing the ultimate obligation for payments."  (*Id.*).  A limited partner can sue a general partner and, in certain situations, a general partner can sue a limited partner.  But, as pleaded, Tow's conspiracy claims appear to consist of either: (1) suing Manners on Manners's behalf for the role Manners played in helping Speer breach fiduciary duties

23

that Speer owed Manners or (2) suing Manners on Speer's behalf for the transaction that Speer negotiated for his own benefit.  Tow has not cited legal support for the proposition that a partnership's bankruptcy trustee may sue the only two partners for breaching the fiduciary duties they owed to each other by agreeing to an arm's-length transaction with disclosed terms.

Tow also argues that Manners conspired to breach the fiduciary duties Speer owed to Royce Homes after the 2006 buyout.  Tow alleges that Manners facilitated Speer's distributions of Royce Homes's borrowed funds to Amegy to pay for the Amegy Loan that financed the buyout.  Tow also alleges that Manners facilitated the unlawful distributions of Royce Homes funds to pay for the Manners Note.  But after the 2006 buyout, Speer was, in effect, Royce Homes's only owner. Delaware law is clear that a company's sole owner cannot breach fiduciary duties "owed to the companies he wholly owned."  *See Midland Food Services, LLC v. Castle Hill Holdings V, LLC*, 792 A.2d 920, n. 14 (Del. Ch. 1999) (citing *Goodman v. Futrovsky,* 213 A.2d 899, 902 (1965) (the defendants could not defraud company since they "were the sole owners . . . and could do with it as they wished"), *cert denied*, 383 U.S. 946 (1966). Tow has not cited legal support for the proposition that a nonowner can be liable for conspiring with the sole owner of a partnership for breaching duties that the owner owes himself.[4]

Tow has not pointed to relevant summary-judgment evidence showing that Speer breached fiduciary duties to Royce Homes itself – not its partners or creditors – through the 2006 buyout

---

[4] For example, in his response to Manners's motion for summary judgment, Tow insists that "Speer had a duty not to use control over the partnership's property to his advantage, he had a fiduciary duty of loyalty to Royce Homes, and a fiduciary duty to manage the Royce Homes assets in Royce Homes' interest." (Docket Entry No. 126 at 43).  But, as the controlling person of Hammersmith, Royce Homes's general partner, Speer would owe fiduciary duties only to the limited partners.  Before the buyout he was a limited partner alongside Manners.  After the buyout, he was the sole limited partner.  Tow is essentially suing Manners arguing that Speer either breached a duty of loyalty to himself or Manners through their arm's-length transaction.

transaction and its financing. Whatever might be said about Speer's questionable distributions and loan payments, Tow has not pointed to summary-judgment evidence of, or a legal basis for, finding that the buyout and related distributions gave rise to a breach of fiduciary duty. Speer owed a fiduciary duty to Manners when he was a limited partner, before 2006. After 2006, Speer was effectively the sole owner and partner of Royce Homes.

Tow has not raised a fact dispute or identified evidence supporting an inference that Manners conspired to breach fiduciary duties owed by Speer.

### C.      Unjust Enrichment and Conversion

Tow alleges that Manners unjustly enriched himself at the expense of Royce Homes's creditors. "A party may recover under an unjust enrichment theory where a person has obtained a benefit from another due to fraud, duress or taking of undue advantage." *Mowray v. Avery*, 76 S.W.3d 663, 679 (Tex. App. —Corpus Christi 2002) (citing *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998)).

Tow also alleges that Manners is liable for civil theft or conversion for facilitating the misappropriation of Royce Homes's assets in implementing the 2006 Purchase Agreement. Tow alleges that "Manners appropriated Royce [Homes's] property with the intent to deprive [and] unlawfully appropriated property of Royce Homes with intent to deprive Royce Homes of its property without its effective consent." (TAC ¶ 343).

 "'The unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights, is in law a conversion.'" *Ojeda v. Wal-Mart Stores, Inc.*, 956 S.W.2d 704, 707 (Tex. App. —San Antonio 1997, pet. denied) (quoting (*Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)).

"[P]laintiff must prove: (1) plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of an inconsistent with plaintiff's rights; (3) plaintiff made a demand for the property; and (4) defendant refused to return the property" *Id.*

As discussed above, the record evidence and applicable law do not support an inference that Manners had or exercised control as a limited partner from 1998 to 2006 or as Chairman Emeritus after 2006 to cause Royce Homes to distribute funds, to enter into any agreements, or to take certain management actions. The TAC alleges in great detail that Speer orchestrated the distributions. Tow has not pleaded or provided summary-judgment evidence suggesting that Manners tricked or coerced Speer or Royce Homes into making the distributions that paid the Amegy Loan or Manners Note. Neither Royce Homes's creditors nor Speer has asserted that Manners owed them fiduciary duties that he breached in connection with the 2006 Purchase Agreement. According to Tow, Speer arranged for Manners to be paid under the agreements that Speer negotiated on behalf of himself and Royce Homes. Tow has not identified summary-judgment evidence showing Manners's direct liability to Royce Homes for unjust enrichment, theft, or conversion.

Tow also argues that Manners is indirectly liable to Royce Homes for Speer's allegedly unlawful distributions after Manners relinquished his ownership in Royce Homes. Tow has not identified summary-judgment evidence showing that Manners participated in obtaining the Amegy Loan or the principal or interest payments made on the Amegy Loan or the Manners Note. To the contrary, the Manners Note included a subordination provision under which Manners agreed to protect Royce Homes's creditors by agreeing that his right to receive Note payments was subordinate to the payment obligations owed to other lenders.

26

Tow alleges that Manners was complicit in Speer's unlawful distributions which paid the Manners Note because the payments were billed as a "management fee." (TAC ¶ 389). Tow asserts in the TAC that calling "the disbursement a management fee allowed [the payments] to be inconspicuously capitalized into the lot value so each payment could increase the value of a lot by making it appear it was a cost associated with enhancing the value of the lot" thereby hiding the loss in equity each payment on the Manners Note caused. (TAC ¶¶ 389-90). Tow, however, has not identified summary-judgment evidence tending to show that Manners actually assisted or knowingly accomplished or aided an unlawful act in the 2006 buyout, including by accepting Speer's personal payment of $20,000,000 or accepting payments on the Manners Note. Manners did not control the distributions, how they were billed, or how they were reflected on Royce Homes's balance sheet. The summary-judgment record does not support an inference that Manners misappropriated Royce Homes funds or helped misappropriate Royce Homes funds.

### D.    The Claim that Manners Breached the Subordination Provision

Tow alleges that all payments on the Manners Note were to be held in trust because of Speer's default on the Amegy Loan and Royce Homes's default on its loans. Tow seeks declaratory relief and an order requiring Manners to turn over the money Royce Homes paid him on the Manners Note. (TAC ¶ 419).

The subordination provision states that "[n]o payment . . . shall be made at any time (i) when a default or event of default . . . has occurred *and* is continuing under the" the terms of the Senior Debt." (Docket Entry No. 116, App 5, Ex. C. at 4). In an event of default, any payment made was to be held "in trust and pa[id] over to the holders of the Senior Debt." Tow alleges that after September 30, 2006, Royce Homes and Speer defaulted on senior-debt obligations and that Manners

must turn over the payments he received on the Manners Note after September 30, 2006.  The issue is whether Tow, as the trustee of Royce Homes's bankrupt estate, can recover on this claim.

The Fifth Circuit has made clear that if "a claim belongs to the estate, then the bankruptcy trustee has exclusive standing to assert it."  *In re Seven Seas Pet., Inc.*, 522 F.3d 575, 584 (5th Cir. 2008) (citations omitted).  "Whether a particular state-law claim belongs to the bankruptcy estate depends on whether under the applicable state law the debtor could have raised the claim as of the commencement of the case."  *Id.* (citations omitted).  "As part of this inquiry, [the court] look[s] to the nature of the injury for which relief is sought and consider[s] the relationship between the debtor and the injury."  *Id.*  "If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct harm under the applicable law, then the cause of action belongs to the estate." (quotation omitted).  "Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate."  *Id.*  "[T]he trustee has no right to bring claims that belong solely to the estate's creditors."  *Id.*

Based on the present record, Royce Homes cannot pursue a breach of contract claim based on the subordination provision.  Speer entered into the Manners Note personally.  Speer – not Royce Homes – was Manners's debtor.  By claiming that Manners breached the subordination provision of the Manners Note, Tow is asserting breach of a contract to which neither Royce Homes nor Royce Homes's creditors were parties.  "Parties are presumed to contract for themselves and it follows that a contract will not be construed as having been made for the benefit of a third person unless it clearly appears that such was the intention of the contracting parties."  *Rep. Nat'l Bank of*

28

*Dallas v. Nat'l Bankers Life Ins. Co.*, 427 S.W.2d 76, 80 (Tex. App. —Dallas 1968). "Beneficiaries of contracts to which they are not parties are divided into three classes: (a) donee beneficiaries, (b) creditor beneficiaries, and (c) and incidental beneficiaries; and only those falling within the first two categories may enforce contracts made for their benefit." *Id.* "[A]n incidental beneficiary [is] one who will be benefitted only incidentally by the performance of the contract [and] cannot maintain an action thereon; an incidental beneficiary acquires, by virtue of the promise, no right either against the promisor or the promisee." *Id.*

"To qualify as an intended third-party beneficiary, a party must show that she is either a 'donee' or 'creditor' beneficiary of the contract." *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002). "An agreement benefits a 'donee beneficiary' if, under the contract, the performance promised will, when rendered come to him as a pure donation." *Id.* (quotation omitted). "[A]n agreement benefits a 'creditor' beneficiary if, under the agreement, that performance will come to him in satisfaction of a legal duty owed to him by the promisee." *Id.* "This duty may be an indebtedness, contractual obligation or other legally enforceable commitment owed to the third party." *Id.*

"The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce [it] . . . .  A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit." *MCI Telecommunications Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). "A court will not create a third-party beneficiary contract by implication . . . . The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied." *Id.* "Consequently, a presumption exists that

parties contracted for themselves unless it clearly appears that they intended a third party to benefit from the contract." *Id.*

Manners promised to abate payments Speer owed him on the Manners Note while Speer or a Speer entity was in default of a senior-debt obligation. Manners promised that if a Note payment was made while Speer or a Speer entity was in default on a senior-debt obligation, Manners would hold those payments in trust to be paid to the senior-debt holders. The subordination provision directly benefitted Speer and only incidentally benefitted his creditors or the entities that he owned. Royce Homes and its creditors were not the beneficiaries of the subordination provision in the Manners Note. Manners promised to abate the Note payments if Speer was in default on other obligations and to turn over to senior-debt holders payments made during the abatement. Even if Royce Homes creditors were beneficiaries as the holders of senior debt, Royce Homes was not due anything under the express or implied terms of the Note and would not have had standing to sue on the subordination provision of the Manners Note. Neither does Tow.

Tow cites *In re Schimmelpenninck*, 183 F.3d 347, 351 (5th. Cir. 1999), in support of his standing argument. In that case, the Fifth Circuit stated that a "trustee can assert the general claims of creditors, but is precluded from asserting those creditor claims that are personal. In other words, even if a claim 'belongs to' the creditor, the trustee is the proper party to assert the claim for the benefit of all creditors, provided the claim advances a generalized grievance." *Id.* at 359. Tow asserts that, as the Royce Homes trustee, he can assert claims on behalf of the Royce Homes bankruptcy estate if those claims generally affect all creditors. *Schimmelpennick*, however, does not stand for such a broad proposition. In *Seven Seas,* the Fifth Circuit explained the limit on the claims *Schimmelpennick* allows. The Fifth Circuit stated that there "'is a difference between a creditor's

interests in the claims of the [debtor] against a third party, which are enforced by the trustee, and the creditor's own direct–not derivative–claim against the third party, which only the creditor . . . can enforce.'" *Seven Seas*, 522 F.3d at 588–89 (quoting *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7thc Cir. 1994) (Posner, J.)).  The Fifth Circuit clarified that *"Schimmelpennick* was not meant to work a change to this well-established rule, even when the claims at issue may be brought by a number of creditors instead of just one." *Id.*  "Rather, [*Schimmelpennick*'s] point was that some claims that are usually brought by creditors outside of bankruptcy . . . are nonetheless vested exclusively in the trustee in bankruptcy . . . not merely because the claims are common to a number of creditors, but because they ultimately seek to recover *assets of the estate* that are not under the debtor's control–by reason of fraudulent transfer, for instance, or because of the existence of separate corporate entities that are a sham." *Id.* (emphasis added).  "It is actions by individual creditors asserting a generalized injury *to the debtor's estate*, which ultimately affects all creditors, that can be said to raise a generalized grievance, not actions by creditors that are merely common to a number of them.  *Id.* (emphasis in original, alterations and quotation marks omitted).

Here, even assuming a breach of the subordination provision in the Manners Note, Tow has not identified a legal or factual basis to find that breach of that provision created a legal cause of action for the Royce Homes bankruptcy estate.  Speer owed Manners money.  Whether Manners breached the subordination provision in his agreement with Speer, Tow has not identified a basis to find that the alleged breach of the subordination agreement created a cause of action on which Royce Homes creditors – much less the Royce Homes bankruptcy estate – could recover against Manners.    Manners's motion for summary judgment on the breach of the subordination provision is granted.

###### D.    The Claim of Fraudulent Transfers to Allard Investment

Tow alleges that Manners, through his company Allard Investment, caused Royce Homes to transfer 50 homes to Allard Investments for less than their reasonably equivalent value, in violation of the constructive-fraud provisions of the Texas Uniform Fraudulent Conveyances Act and the Delaware Uniform Fraudulent Conveyances Act.   In his summary-judgment motion, Manners argued that Tow could not show that the 50 homes were sold for less than their reasonably equivalent value.  In response, Tow argued that the issue was not ripe because he had no opportunity to appoint an appraiser.   In April 2013, Manners submitted a supplemental reply to Tow's supplemental response to the motion for summary judgment.  Manners pointed out that an appraiser had been designated but Tow still had not shown that the sales were unfair to Royce Homes.  Tow did not respond to this argument.  Manners has identified the lack of any summary-judgment evidence that the sales of the 50 homes to Allard Investment were for less than reasonably equivalent value within the meaning of TUFTA and DUFTA.  Tow has not responded, despite the opportunity to do so.  Summary judgment is appropriately granted on this claim.

## IV.    Conclusion

For the foregoing reasons, Manners's motion for summary judgment (Docket Entry No. 115) is granted.

SIGNED on September 30, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge