IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RODNEY TOW, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-11-3700 |
| | § | |
| JOHN SPEER, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

This adversary proceeding arises out of the Chapter 7 bankruptcy of Royce Homes, L.P., a large residential property developer and builder. Rodney Tow was appointed as bankruptcy trustee. Tow sued John Speer, the former owner of Royce Homes, and others, seeking to avoid, and to receive a money judgment for, allegedly fraudulent transfers from Royce Homes.

The claims against the defendants besides Speer were settled or resolved on motions. Speer was the only defendant to go to trial. A jury trial resulted in unanimous findings that some of the challenged transfers to Speer or for his benefit were fraudulent. The court accepted a partial verdict for the challenged transfers on which the jury unanimously agreed and declared a mistrial as to the others. A second jury trial on the remaining transfers resulted in a verdict. The verdicts in both trials resulted in findings that challenged transfers with a value totaling $20,001,907.29 were actually or constructively fraudulent, and findings that other transfers were not fraudulent.

Tow has moved for entry of judgment awarding the bankruptcy estate the monetary value of the transfers found to be fraudulent, as well as prejudgment and postjudgment interest, attorneys' fees, and costs. (Docket Entry Nos. 394, 398). Speer responded and filed a postverdict brief

1

challenging the legal and factual bases for the verdicts and proposed judgment and for the fees and costs Tow claimed.  Speer also moved to conduct discovery into alleged jury misconduct, based on a juror's online comments posted after the trial ended and the jury had been excused. (Docket Entry No. 395).

Based on the motions, responses, and replies; the postverdict briefs; the arguments of counsel; the record; and the applicable law, the court:

- denies Speer's motion to conduct discovery into alleged jury misconduct;

- grants Tow's motion for entry of judgment in the amount of $12,129,006.90 for the transfers the jury determined to be fraudulent;

- denies Tow's motion for attorneys' fees, without prejudice, and allows Tow to file, within 14 days after the judgment is entered, an amended motion for attorneys' fees containing additional information, including breaking out the number of hours for which a fee award is now sought for each of the 21 individual lawyers and legal assistants who worked on the case and the rates charged for those hours, because this is part of the information necessary to permit the court properly to conduct the lodestar analysis that the Fifth Circuit and Texas case law require;

- grants Tow's motion for an award of taxable costs, in the amount of $11,948.03; and

- rules on the rates for pre- and postjudgment interest.

The reasons for these rulings are set out below.

## I.    Background

Much of the relevant background is set out in detail in the court's earlier opinions issued in the extensive motions practice leading up to the trials and is only briefly summarized again here.

This background summary includes a brief description of trial evidence important to the issues raised in the posttrial motions as well.

Royce Homes was a Delaware limited partnership that built and sold single-family homes in the Houston area until August 2008. Manners founded Royce Homes and was its chief executive officer until July 1998, when he sold 50 percent of the equity to Speer and became a limited partner. Speer acted as general partner through the Hammersmith Group, a company he controlled.

In the spring of 2006, Speer bought Manners's remaining interest in Royce Homes, taking out a $2 million loan from Amegy Bank (the "Amegy Loan") and executing a $13,342,405 note payable to Manners (the "Manners Note") to finance the purchase. When Royce Homes took on the debt, Speer told Royce Homes's lenders that the Amegy Loan and the Manners Note would be repaid from Royce Homes's income, but Speer also assured them that Royce Homes would remain within the equity levels needed to comply with the lenders' debt-to-equity requirements and other loan covenants. The lenders consented to the payments on this basis.

## A.    The Amegy Loan Payments

Speer began paying the Amegy Loan in 2006. Speer made the payments using money he directed Royce Homes to transfer to his personal bank account. Royce Homes pulled this money from its lines of credit. As a result of these transfers to Speer, Royce Homes violated its loan covenants.

Speer made the first payment on the Amegy Loan using money transferred to him from Royce Homes on January 3, 2007. At trial, William D. Gathmann, Royce Homes's chief financial officer during this period, testified that Royce Homes and Speer delayed the transfer and payment from December 2006 until early January 2007 to avoid disclosing to Royce Homes's lenders in the

last quarter of 2006 the consequences of the transfer for Royce Homes's loan covenants. (Tr. 2, Vol. 1, pp. 113–14, 124). Delaying the transfer and payment the few days deferred the disclosure obligation from the end of December 2006 to the end of the first quarter of 2007. In May 2007, after the transfer and loan-covenant violations were disclosed, Royce Homes sought waivers or modifications of the covenants from its lenders. (Docket Entry No. 389, Tr. 2, Vol. 8, pp. 23–39). Some of the lenders waived the violations or agreed to modify the loan covenants. Royce Homes later failed to comply with the debt-to-equity ratio requirements under the modified covenants. (*Id.*).

B.     **The Manners Note Payments**

At Speer's direction, Royce Homes made Manners Note payments on Speer's behalf. The payments were billed to Royce Homes as "management fees" for Manners's work on home construction and home closings. Manners testified at trial that he did not provide services for these fees. Characterizing the disbursements as management fees allowed Royce Homes to capitalize the payments on the Manners Note as part of the lot values, enhancing those values and allowing Royce Homes to increase its stated revenues. By June 2007, Royce Homes had paid $3,085,100 in management fees on the Manners Note, discharging the obligations Speer owed to Manners for buying out his partnership interest.

C.     **Other Payments**

Besides the Manners Note payments, Royce Homes also paid Manners over $200,000 after he sold his remaining 50 percent interest to Speer. These payments included a $160,000 annual salary, health insurance, and other benefits.

Royce Homes also made salary and monthly $50,000 payments to Speer's now-deceased ex-wife, Donnie Lou Speer, through Royce Homes's parent company, First Duval, which Speer partly

owned. Speer used these payments to cover amounts he owed Donnie Lou Speer under their divorce decree.

Speer himself received additional distributions from Royce Homes. From September 2006 to January 2008, Speer received monthly $150,000 distributions from Royce Homes in addition to his salary. (Docket Entry No. 390, Tr. 2, Vol. 9, pp. 40, 223). Evidence at trial included testimony and exhibits describing various personal ways in which Speer used these distributions. (*Id.* at p. 254). Speer also received a $1,587,009 check from Royce Homes, which he used to purchase a property from the company.

### D.      Procedural History

Tow initiated adversary proceedings in October 2011 against Speer and Manners and companies affiliated with them, Donnie Lou Speer, and Amegy Bank. The court granted summary judgment dismissing some of the claims and defendants. The other defendants besides Speer settled.

The claims against Speer were tried in March 2014. The jury returned a partial verdict, unanimously finding that some of the challenged transfers were fraudulent and that others were not. The jury could not reach agreement on other challenged transfers. The court accepted a partial verdict based on the unanimous jury answers and declared a mistrial as to the remaining transfers at issue. (Docket Entry No. 372). The transfers not resolved in the first trial were the subject of a second jury trial in June 2014. This resulted in a unanimous verdict as to all the transfers Tow challenged.

The juries in the two trials found that the following transfers were made with the intent to hinder, delay, or defraud a creditor of Royce Homes, making them actually fraudulent:

**Transfers to John Speer for Payments to Amegy Bank for the Partner Buyout**

| Date | Amount |
|------|--------|
| 1/3/2007 | $ 10,000,000.00 |
| 4/2/2007 | $ 79,652.78 |
| 4/25/2007 | $ 77,083.33 |
| 5/29/2007 | $ 79,652.78 |
| 7/2/2007 | $ 2,577,083.33 |
| 7/25/2007 | $ 62,951.39 |
| 8/30/2007 | $ 59,739.59 |
| 9/28/2007 | $ 57,812.50 |
| 11/2/2007 | $ 55,260.41 |
| 11/29/2007 | $ 53,125.00 |
| 1/4/2008 | $ 2,553,854.17 |
| 2/13/2008 | $ 40,104.17 |
| 2/27/2008 | $ 27,187.50 |
| 3/28/2008 | $ 28,784.72 |
| 5/6/2008 | $ 26,041.67 |
| 6/2/2008 | $ 25,833.33 |
| 6/30/2008 | $ 25,000.00 |

**Transfers to Michael Manners for the Partner Buyout (Note Payments)**

| Date | Amount |
|------|--------|
| 4/4/2007 | $ 292,500.00 |
| 5/10/2007 | $ 271,500.00 |

**Transfers to Donnie Lou Speer from First Duval**

| Date | Amount |
|------|--------|
| 7/5/2007 | $ 50,000.00 |
| 8/2/2007 | $ 50,000.00 |
| 9/4/2007 | $ 50,000.00 |
| 10/1/2007 | $ 50,000.00 |
| 11/1/2007 | $ 50,000.00 |
| 12/3/2007 | $ 50,000.00 |
| 1/2/2008 | $ 50,000.00 |

**Transfers to Donnie Lou Speer for Salary**

| Date | Amount |
|------|--------|
| 1/12/2007 | $ 6,231.97 |
| 1/31/2007 | $ 6,231.98 |
| 2/15/2007 | $ 6,231.97 |
| 2/28/2007 | $ 6,231.97 |
| 3/15/2007 | $ 6,231.97 |
| 3/30/2007 | $ 6,231.98 |
| 4/13/2007 | $ 6,231.97 |
| 4/30/2007 | $ 6,231.98 |
| 5/15/2007 | $ 6,231.97 |

| | |
|---|---|
| 5/31/2007 | $ 6,357.53 |
| 6/15/2007 | $ 6,849.03 |
| 6/29/2007 | $ 6,849.02 |
| 7/13/2007 | $ 6,849.03 |
| 7/31/2007 | $ 6,849.03 |
| 8/15/2007 | $ 6,849.03 |
| 8/31/2007 | $ 7,184.03 |
| 9/14/2007 | $ 7,519.03 |
| 9/28/2007 | $ 7,519.03 |
| 10/15/2007 | $ 7,519.03 |
| 10/31/2007 | $ 7,519.02 |
| 11/15/2007 | $ 7,519.03 |
| 11/29/2007 | $ 7,519.03 |
| 12/14/2007 | $ 7,519.03 |
| 12/31/2007 | $ 7,519.03 |
| 1/15/2008 | $ 6,251.37 |
| 1/31/2008 | $ 6,251.38 |
| 2/15/2008 | $ 6,251.37 |
| 2/29/2008 | $ 6,251.38 |
| 3/14/2008 | $ 6,251.38 |
| 3/31/2008 | $ 6,251.38 |
| 4/15/2008 | $ 6,251.37 |
| 4/30/2008 | $ 6,251.38 |
| 5/15/2008 | $ 6,251.37 |
| 5/30/2008 | $ 6,251.38 |
| 6/13/2008 | $ 6,711.57 |
| 6/30/2008 | $ 6,868.12 |
| 7/15/2008 | $ 6,868.13 |
| 7/31/2008 | $ 8,018.80 |

**Transfers to John Speer as Other Distributions**

| Date | Amount |
|---|---|
| 1/4/2007 | $ 150,000.00 |
| 2/2/2007 | $ 150,000.00 |
| 3/17/2007 | $ 150,000.00 |
| 4/4/2007 | $ 150,000.00 |
| 4/13/2007 | $ 1,587,009.00 |
| 4/13/2007 | $ 870,128.00 |
| 5/1/2007 | $ 150,000.00 |
| 7/5/2007 | $ 150,000.00 |
| 8/6/2007 | $ 150,000.00 |
| 9/4/2007 | $ 150,000.00 |
| 10/2/2007 | $ 150,000.00 |
| 11/2/2007 | $ 150,000.00 |

| | |
|---|---|
| 12/4/2007 | $ 150,000.00 |
| 12/11/2007 | $ 156,428.00 |
| 1/4/2008 | $ 150,000.00 |

The juries also found that the following transfers left Royce Homes with an unreasonably small amount of capital and were made without Royce Homes receiving a reasonably equivalent value in exchange, making them constructively fraudulent:

**Transfers to John Speer for Payments to Amegy Bank for the Partner Buyout**

| Date | Amount |
|---|---|
| 1/3/2007 | $ 10,000,000.00 |
| 1/25/2007 | $ 87,361.11 |
| 2/21/2007 | $ 71,944.44 |
| 4/2/2007 | $ 79,652.78 |
| 4/25/2007 | $ 77,083.33 |
| 5/29/2007 | $ 79,652.78 |
| 7/2/2007 | $ 2,577,083.33 |
| 7/25/2007 | $ 62,951.39 |
| 8/30/2007 | $ 59,739.59 |
| 9/28/2007 | $ 57,812.50 |
| 11/2/2007 | $ 55,260.41 |
| 11/29/2007 | $ 53,125.00 |
| 1/4/2008 | $ 2,553,854.17 |
| 2/13/2008 | $ 40,104.17 |
| 2/27/2008 | $ 27,187.50 |
| 3/28/2008 | $ 28,784.72 |
| 5/6/2008 | $ 26,041.67 |
| 6/2/2008 | $ 25,833.33 |
| 6/30/2008 | $ 25,000.00 |

**Transfers to Michael Manners for the Partner Buyout (Note Payments)**

| Date | Amount |
|---|---|
| 1/8/2007 | $ 364,500.00 |
| 2/8/2007 | $ 291,000.00 |
| 3/9/2007 | $ 232,500.00 |
| 4/4/2007 | $ 292,500.00 |
| 5/10/2007 | $ 271,500.00 |

**Transfers to Donnie Lou Speer from First Duval**

| Date | Amount |
|---|---|
| 7/5/2007 | $ 50,000.00 |
| 8/2/2007 | $ 50,000.00 |
| 9/4/2007 | $ 50,000.00 |

| | |
|---|---|
| 10/1/2007 | $ 50,000.00 |
| 11/1/2007 | $ 50,000.00 |
| 12/3/2007 | $ 50,000.00 |
| 1/2/2008 | $ 50,000.00 |

**Transfers to Donnie Lou Speer for Salary**

| Date | Amount |
|---|---|
| 1/12/2007 | $ 6,231.97 |
| 1/31/2007 | $ 6,231.98 |
| 2/15/2007 | $ 6,231.97 |
| 2/28/2007 | $ 6,231.97 |
| 3/15/2007 | $ 6,231.97 |
| 3/30/2007 | $ 6,231.98 |
| 4/13/2007 | $ 6,231.97 |
| 4/30/2007 | $ 6,231.98 |
| 5/15/2007 | $ 6,231.97 |
| 5/31/2007 | $ 6,357.53 |
| 6/15/2007 | $ 6,849.03 |
| 6/29/2007 | $ 6,849.02 |
| 7/13/2007 | $ 6,849.03 |
| 7/31/2007 | $ 6,849.03 |
| 8/15/2007 | $ 6,849.03 |
| 8/31/2007 | $ 7,184.03 |
| 9/14/2007 | $ 7,519.03 |
| 9/28/2007 | $ 7,519.03 |
| 10/15/2007 | $ 7,519.03 |
| 10/31/2007 | $ 7,519.02 |
| 11/15/2007 | $ 7,519.03 |
| 11/29/2007 | $ 7,519.03 |
| 12/14/2007 | $ 7,519.03 |
| 12/31/2007 | $ 7,519.03 |
| 1/15/2008 | $ 6,251.37 |
| 1/31/2008 | $ 6,251.38 |
| 2/15/2008 | $ 6,251.37 |
| 2/29/2008 | $ 6,251.38 |
| 3/14/2008 | $ 6,251.38 |
| 3/31/2008 | $ 6,251.38 |
| 4/15/2008 | $ 6,251.37 |
| 4/30/2008 | $ 6,251.38 |
| 5/15/2008 | $ 6,251.37 |
| 5/30/2008 | $ 6,251.38 |
| 6/13/2008 | $ 6,711.57 |
| 6/30/2008 | $ 6,868.12 |
| 7/15/2008 | $ 6,868.13 |

7/31/2008       $ 8,018.80
**Transfers to John Speer as Other Distributions**
**Date            Amount**
12/11/2007      $ 156,428.00

Tow seeks entry of a judgment based on the verdicts against Speer for the monetary value of the transfers the juries determined to be fraudulent.  Tow also moves for an award of attorneys' fees and costs and for pre- and postjudgment interest.

Speer opposes all of Tow's motions.  Speer also moves to conduct discovery on alleged jury misconduct based on a postverdict comment one of the jurors left on a blog post critical of Speer and Royce Homes.  (Docket Entry No. 395).  Tow opposes this motion.

Each issue is addressed below.

## II.    Speer's Motion for Discovery into Jury Misconduct

The day the jury returned its verdict in the second trial, July 11, 2014, the court accepted the verdict and excused the jury.  Hours later, one of the jurors left a comment on a blog post on "www.swamplot.com."  The blog post, written in August 2008 and titled "17 Problems with Royce Builders: Lavish Spending, Loose Keys, and Roaming Rats," criticized Royce Homes and Speer. The juror, whose posting pseudonym matched a Twitter account bearing her photograph, added a comment on the 2008 blog post stating: "People, I know the facts, I served on the jury.  He will have to pay what he owes.  Problem is, the people won't see a red cent.  He is scum and you realize that when he opens his mouth.  If you have a claim you need to contact the trustee Rodney Tow." (Docket Entry No. 396-1, Ex. G).  Speer claims that the juror's online comment shows that she was exposed to extraneous prejudicial information during trial.  He asks the court to disclose the jurors' names and conduct an evidentiary hearing, presumably to hear jurors' testimony.

An evidentiary hearing "is not mandated every time there is an allegation of jury misconduct or bias. Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." *United States v. Smith*, 424 F.3d 992, 1011 (9th Cir. 2005). "[A] hearing is inappropriate when the alleged influence has to do with a juror's internal state of mind." *United States v. Cornelius*, 696 F.3d 1307, 1325 (10th Cir. 2012) (citing *Tanner v. United States*, 483 U.S. 107, 118–25 (1987)).

Rule 606(b) of the Federal Rules of Evidence prohibits juror testimony on the content of the jury's deliberations "or any juror's mental processes concerning the verdict or indictment." FED. R. EVID. 606(b). Under certain narrow circumstances, the rule permits juror testimony about whether "extraneous prejudicial information was improperly brought to the jury's attention," or "an outside influence was improperly brought to bear on any juror." FED. R. EVID. 606(b)(2). "[D]istrict courts should be reluctant 'to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.'" *United States v. Vitale*, 459 F.3d 190, 197 (2d Cir. 2006) (citation omitted).

The cases distinguish "between testimony related to influence caused by extrinsic factors, such as a bribe, which is admissible post-trial, and testimony about intrinsic factors, such as a juror's thought processes, which is inadmissible." *United States v. Scott*, 576 Fed. App'x 409, 413 (5th Cir. 2014). "[I]nformation is deemed 'extraneous' if it derives from a source 'external' to the jury." *Warger v. Shauers*, — U.S. —, 135 S. Ct. 521, 529 (2014) (citing *Tanner v. United States*, 483 U.S. 107, 117 (1987)). "'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences

that jurors are understood to bring with them to the jury room." *Id.* (internal citations omitted).

This record provides no basis to find potential misconduct or to require discovery or a hearing. There is no indication that the juror who posted the statement was exposed to extrinsic influences, conducted internet research, or discussed the case online during the trial. The jury deliberated on July 11, 2014 before reaching a verdict. The court excused the jury that afternoon. The juror's online comment is timestamped 11:14 p.m. on July 11, many hours after the court excused the jury and lifted the restrictions on the jurors' conduct and communications that had been imposed during the trial. Juror misconduct during trial cannot be implied from conduct occurring after the trial has ended. *See Scott*, 576 Fed. App'x at 415 (affirming the district court's decision not to hold an evidentiary hearing to examine the posttrial relationship between a juror and a prosecutor); *Cornelius*, 696 F.3d at 1325 (10th Cir. 2012) (the district court did not err by refusing to conduct an inquiry into a letter the foreperson sent to the prosecution, after the trial had ended, describing "gang-related activity [a]s a 'cancer' to our society.").

At most, the online comment shows that the juror reached a conclusion about Speer during the trial. Assuming that, the juror's online comment is not an appropriate subject of inquiry under Rule 606(b) or a basis for an evidentiary hearing. *See Scott*, 576 Fed. App'x at 414 ("We cannot equate an attraction that a juror developed during trial for one of the attorneys or parties, or a distaste for any of them, to situations of developed relationships such as those of family or professional connections."). "The subjective thoughts and emotions that may have influenced a juror's deliberations are shielded from inquiry." *Carson v. Polley*, 689 F.2d 562, 581 (5th Cir. 1982) (internal citations omitted) (a letter from a juror to the judge indicating that the juror thought the case was frivolous was not an appropriate subject of inquiry under Rule 606(b), because the letter

revealed only the juror's "internal mental processes.").

There is no indication that the commenting juror, or any other juror, disobeyed the court's instructions during trial or was affected during deliberations by improper extrinsic influences. No discovery or hearing is required. Speer's motion to conduct discovery into possible jury misconduct is denied.

## III.     Tow's Motion for Entry of Judgment

### A.     The Applicable Legal Standards

Section 544(b) of the Bankruptcy Code allows the trustee to step into a creditor's shoes to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law," including state fraudulent-transfer statutes.   11 U.S.C. § 544(b).

The applicable state law is the Texas Uniform Fraudulent Transfers Act ("TUFTA"), TEX. BUS. & COM. CODE § 24.001 *et seq.*   TUFTA recognizes two categories of voidable fraudulent transfers: actually fraudulent transfers, *id.* § 24.005(a)(1); and constructively fraudulent transfers, *id.* §§ 24.005(a)(2), 24.006(a).

A transfer is actually fraudulent "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* § 24.005(a)(1).   TUFTA supplies a non-exclusive list of eleven "badges of fraud" that indicate whether a debtor actually intended to defraud creditors under TUFTA. *In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008).   A transfer is not voidable if the recipient took it in good faith and for value.   11 U.S.C. § 550(b); TEX. BUS. & COM. CODE § 24.009.

A transfer is constructively fraudulent if it was made without the debtor receiving a

reasonably equivalent value in exchange and the debtor either:

> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE § 24.005(a)(2).

Section 24.008(a) of TUFTA allows a creditor to avoid a fraudulent transfer to the extent necessary to satisfy the creditor's claim. Section 24.008(a) also allows the court to impose "any other relief the circumstances may require." *Id.* § 24.008(a)(3)(C). A money judgment is appropriate under § 24.008(a)(3)(C) if avoiding the transfers comes too late to provide relief. *See In re Cowin*, 492 B.R. 858, 903 (Bankr. S.D. Tex. 2013). Under § 24.009 of TUFTA, if a transfer is voidable under § 24.008(a)(1), a creditor may recover a money judgment for the value of the transfer against either "the first transferee of the asset or the person for whose benefit the transfer was made," or "any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee." TEX. BUS. & COM. CODE § 24.009.

Determining liability under TUFTA is a two-step process. The first step is to determine whether a debtor committed a fraudulent transfer under § 24.005. The second step is to determine whether recovery of that fraudulent transfer, or its value, from the transferee is appropriate under §§ 24.008 and 24.009. *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 436 (5th Cir. 2013). The Bankruptcy Code also provides a two-step process for recovering a money judgment for a fraudulent transfer. Section 544 of the Bankruptcy Code permits a claim for avoidance of a transfer found fraudulent under state law. Section 550 allows the trustee to recover the fraudulently transferred

property or its value from the "initial transferee of such transfer, or the entity for whose benefit the transfer was made." 11 U.S.C. §§ 544, 550(a). Whether to enter such a judgment is "within the discretion of the court." *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 162 (S.D. Tex. 2009) (quoting *In re Vedaa*, 49 B.R. 409, 411 (Bankr. D.N.D. 1985)).

### B.    Tow Did Not Waive His TUFTA Claims for a Money Judgment

"[A] trustee may bring a cause of action for fraudulent transfers under either federal or state law, or both." *In re Supplement Spot, LLC*, 409 B.R. 187, 197–98 (Bankr. S.D. Tex. 2009) (citing *In re Houston Drywall, Inc.*, No. 06-03415, 2008 WL 2754526, at **30–31 (S.D. Tex. July 10, 2008)). Tow pleaded both state and federal law in his third amended complaint.

Tow seeks a money judgment under § 24.008(a)(3)(C) of TUFTA, which allows the court to enter judgment for "any other relief the circumstances may require." Speer objects that Tow has waived any claim for a money judgment under that TUFTA section because he did not plead it in his third amended complaint or include it in the joint pretrial order. Although Tow did not explicitly cite § 24.008(a)(3)(C) in those filings, he was clear that he sought to avoid the transfers and obtain a money judgment under TUFTA and § 550 of the Bankruptcy Code. In his reply in support of the motion for entry of judgment, Tow points out that he also sought a money judgment under § 24.009(b) of TUFTA and § 550 of the Bankruptcy Code.

Both § 24.009(b) of TUFTA and § 550 of the Bankruptcy Code, which Tow cited in his third amended complaint and in the joint pretrial order, allow a claim for a money judgment against either the initial transferee or the person for whose benefit the transfer was made. *See In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643, 678 (Bankr. S.D. Tex. 2009), *aff'd sub nom. Hsu v. W.*, No. ADV 08-03177, 2009 WL 7760300 (S.D. Tex. Dec. 30, 2009); *ASARCO*, 404 B.R. at 162–63.

Tow's failure in those filings to include express references to § 24.008(a)(3)(C) of TUFTA, which also allows recovery of a money judgment, does not waive his claims.

### C.    Tow Has Standing to Seek the Money Judgment

As the trustee, Tow has standing under both TUFTA and § 550 of the Bankruptcy Code to sue for a money judgment based on fraudulent transfers.  The Bankruptcy Code grants a trustee the right to recover a money judgment for avoidable transfers "if the court so orders." 11 U.S.C. § 550. Courts applying TUFTA have held that a bankruptcy trustee stands in the creditor's shoes and has standing to pursue the causes of action TUFTA creates for creditors. *See, e.g., Spring St.*, 730 F.3d at 440 (5th Cir. 2013) (allowing a creditor, as the trustee's successor-in-interest, to assert claims under TUFTA § 24.009); *In re Powers*, No. 83-05547-H3-7, 1990 WL 290210, at *12 (Bankr. S.D. Tex. Oct. 18, 1990) ("Pursuant to Section 24.009(b), the Trustee is entitled to a judgment against [the transferee] for the value of the assets transferred."); *In re Houston Drywall*, 2008 WL 2754526, at *29 (allowing the trustee to recover under § 24.008(a)(3)(C)); *Esse v. Empire Energy III, Ltd.*, 333 S.W.3d 166, 180 (Tex. App. — Houston [1st Dist] 2010, pet. denied) (allowing a trustee to recover under TUFTA § 24.009 against the persons for whose benefit the transfer was made).

Tow has standing to sue for and recover a money judgment under §§ 24.008(a)(3)(C) and 24.009 of TUFTA and § 550 of the Bankruptcy Code.

### D.    Tow Did Not Waive Money Judgment Claims by Failing to Submit Jury Questions

Speer argues that Tow waived his claims under 11 U.S.C. § 550 or § 24.009 of TUFTA because he did not submit them to the jury.  According to Speer, the absence of a jury finding that the challenged transfers were made for Speer's benefit bars Tow from recovering a money judgment

under either statute.

Some of the transfers at issue were made to Speer himself. Because both TUFTA and the Bankruptcy Code allow a trustee to recover against the initial transferee, *see* 11 U.S.C. § 550; Tex. Bus. & Com. Code § 24.009, Tow did not have to prove that the transfers to Speer were made for his benefit. *See Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 726 (Tex. App. — Houston [1st Dist.] 2005, pet. denied) (TUFTA "not only creates liability against 'the person for whose benefit the transfer was made,' such as the debtor, but also against 'the first transferee of the asset,' or any 'subsequent transferee.'"); *In re Red Dot Scenic, Inc.*, 293 B.R. 116, 121 (S.D.N.Y.), *aff'd*, 351 F.3d 57 (2d Cir. 2003) ("Section 550(a)(1) imposes liability on *both* initial transferees and beneficiaries of fraudulent transfers." (emphasis in original)).

Separate jury questions were not needed for the transfers made to Manners and Donnie Lou Speer. The trial evidence conclusively showed that these transfers were made for Speer's benefit. The uncontroverted evidence — including Speer's own testimony — showed that the Royce Homes payments to Donnie Lou Speer were made to pay amounts Speer owed her under their divorce settlement and decree. (Tr. 2, Vol. 5, pp. 189–92; Vol. 6, pp. 96–102; Tr. 1, March 10, 146–49, 212, 220). Speer also testified that the monthly $50,000 payments to Donnie Lou Speer from First Duval were made to satisfy his divorce obligations to her. Saul Solomon, an expert witness in accounting who testified on Tow's behalf, explained how the evidence showed that the payments Royce Homes made to Manners were for amounts Speer owed Manners to pay for the partner buyout. (Tr. 2, Vol. 7, pp. 138–39). There was no waiver in failing to ask the jury about undisputed facts.

## E.    The Evidence Was Sufficient

To avoid the transfers and obtain a money judgment, Tow had to show that the defendants

made either actually or constructively fraudulent transfers of Royce Homes's money. The jury in each trial found both elements of actual fraud as to a number of the transfers: that they were made with actual intent to hinder, delay, or defraud a creditor of Royce Homes, and that Royce Homes did not receive reasonably equivalent value in exchange. (Docket Entry Nos. 345, 388). Both juries also found that certain transfers were constructively fraudulent because Royce Homes did not receive reasonably equivalent value for them and each left Royce Homes with an unreasonably small amount of capital. (*Id.*).

Speer challenges the sufficiency of the evidence supporting these findings. Speer argues that Tow failed to establish that the money conveyed in the transfers the juries found to be fraudulent was Royce Homes's money, and that Tow failed to establish either actual or constructive fraud.

Tow contends that these challenges are waived because Speer did not raise them in a pre-verdict motion. Speer moved for judgment as a matter of law at trial on the grounds that Tow had failed to prove "any intent to hinder, delay or defraud a creditor of Royce Homes"; that "any transfer was made without reasonably equivalent value and at a time when there was unreasonably small capital"; and that the transfers were not "the money of Royce Homes." (Tr. 2, Vol. 8, pp. 124–25). Speer did not waive these objections, which are each analyzed below.

### 1.     The Transfers Were Transfers from Royce Homes's Funds

Speer argues that the trial evidence did not show that the transfers were of Royce Homes's money because Royce Homes had a negative cash balance when the transfers were made. (Docket Entry No. 297 at 1). Speer argues that Solomon's testimony confirmed that Royce Homes had a negative $9 million cash balance and that any funds transferred were therefore not Royce Homes's money, but rather the funds of Royce Homes's subsidiary, Texas Colonial.

Solomon testified as follows:

> Q. Where is it reflected on the book and record of Royce Homes, the operating account?
> A. Royce's general ledger and the audit show a negative $9 million cash balance. That is the Amegy account for Royce Homes.

(Tr. 2, Vol. 8, p. 60)

> Q. How is it that on July the 2nd, 2007; that there was a wire transfer from that account to the personal account of John Speer at Amegy Bank, if there was no money there?
> A. I didn't say there was no money there. The Bank statement reflected some money and part of that is Texas Colonial's money. That two-and-a-half million dollars, the funds that were there and on the bank was Texas Colonial's money that went to Mr. Speer.
> . . .
> Q. Just so it's clear, you're saying that the money was Texas Colonial's, true?
> A. Physically, yes. Because Royce Homes had no money.

(Tr. 2, Vol. 8, p. 67).

The parts of Solomon's testimony on which Speer relies address the July 2, 2007 balance in an Amegy Bank account that Royce Homes shared with its subsidiary, Texas Colonial. Solomon testified that although there was money in this shared bank account, Royce Homes's books showed that it had a negative cash balance on that date. But Texas Colonial's books showed that the subsidiary had a positive balance on that date. Solomon testified that Texas Colonial and Royce Homes commingled funds and did not distinguish between their respective balances in the shared Amegy Bank account. Solomon also testified that the money in the shared Amegy Bank account came from lines of credit Royce Homes — not Texas Colonial — had opened with construction lenders. (Tr. 2, Vol. 8, p. 125). Both Gathmann and Speer testified that the challenged transfers were made with Royce Homes's money and that Royce Homes took on debt to make the transfers.

The evidence was sufficient to allow a reasonable jury to conclude that the transfers were made with Royce Homes's money.

### 2. The Evidence Supported the Finding That Some Transfers Were Actually Fraudulent

Under TUFTA, a transfer is actually fraudulent "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1); *see also Spring St.*, 2013 WL 5012436, at *7. Whether the transfer was made with such an intent is a fact question for the jury. *See Coleman Cattle Co., Inc. v. Carpentier*, 10 S.W.3d 430, 433 (Tex. App. — Beaumont 2000, no pet.) (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *Quinn v. Dupree*, 157 Tex. 441, 303 S.W.2d 769, 774 (Tex. 1957)).

TUFTA "supplies a 'non-exclusive list of eleven factors, commonly known as badges of fraud, that courts may consider in determining whether a debtor actually intended to defraud creditors.'" *Spring St.*, 2013 WL 5012436, at *7 (quoting *In re Soza*, 542 F.3d at 1066); *see* TEX. BUS. & COM. CODE § 24.005(b) (listing the eleven factors). A transfer "is not voidable under [the actual fraud provision] against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." *Id.* § 24.009(a).

Whether a transfer was for a "reasonably equivalent value" is a factor in determining whether there was actual intent to defraud creditors, *id.* § 24.005(b)(8), and is an element of the defendant's good-faith defense to avoidance or a money judgment, *id.* § 24.009(a). TUFTA defines "value" as follows:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise to furnish support to the debtor or another person unless the

promise is made in the ordinary course of the promisor's business.

*Id.* § 24.004(a); *see also* 11 U.S.C. § 550 (stating that a trustee may not recover against "a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided" or any subsequent "good faith transferee"). "'Reasonably equivalent value' includes . . . a transfer or obligation that is within the range of values for which the transferor would have sold the assets at an arm's length transaction." TEX. BUS & COM. CODE § 24.004(d).

> The juries were instructed to consider whether the following four factors were present:
>
> > (1) the transfer or obligation was to an insider of Royce Homes;
> > (2) the transfer or obligation was concealed;
> > (3) Royce Homes removed or concealed assets; and
> > (4) the value of what Royce Homes received was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

Speer admits that there is evidence of one of these badge-of-fraud factors: the transfers were to an insider of Royce Homes. But he argues that there is insufficient evidence of the remaining three badges of fraud and that more than two badges of fraud must be proven to show actual fraudulent intent.

One badge of fraud is generally not enough to support a finding that a transfer is actually fraudulent. *Diamant v. Sheldon L. Pollack Corp.*, 216 B.R. 589, 591 (Bankr. S.D. Tex. 1995) ("[O]ne badge of fraud standing alone may amount to little more than a suspicious circumstance, insufficient in itself to constitute fraud *per se*.") (quoting *U.S. v. Fernon*, 640 F.2d 609, 613 (5th Cir. 1981)); *Walker v. Anderson*, 232 S.W.3d 899 at 914 ("An individual badge of fraud is not conclusive."); *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836 at 843 (stating same); *Roland v. U.S.*,

838 F.2d 1400, 1403 (5th Cir. 1988) (holding that an inference of fraud is proper only when several indicia are found).  But there is no bright-line rule that more than two badges of fraud must be found. *See Williams v. Houston Plants & Garden World, Inc.*, No. Civ. A. H-11-2545, 2014 WL 3665764, at **7–8 (S.D. Tex. July 22, 2014) (analyzing the cases Speer relies on and finding that they do not stand for a "bright-line" rule that three or fewer badges of fraud is insufficient).  Courts and juries must consider all the factors and the "totality" of the circumstances.

The evidence presented at the trials supported finding that the transfers were concealed. Speer argues that certain transfers to Manners were not concealed because they were disclosed to Royce Homes's lenders, who consented  and waived certain loan-covenant violations that resulted. But the trial evidence showed that Speer did not disclose all aspects of the transfers to the lenders, and that Speer delayed disclosing the first transfer and its financial consequences on Royce Homes's loan covenants.[1]  Gathmann testified that he knew the transfers would trigger covenant violations. (Tr. 2, Vol. 1, pp. 113–14, 124).  He also testified that Royce Homes delayed "pulling down" the money for the first transfer so that it did not occur until January 2 or 3, 2007, instead of December

---

[1]  Q. And you knew, at this point in time, that by booking another $10 million in debt, it was going to probably trigger additional covenant violations, correct?
A. I'm assuming that's why we did it.  Yeah.
Q. And by waiting until after the first of January to make the distributions, then it wouldn't be reflected until your March 31st, 2007 financials, correct?
A. Correct.
Q. And then those financials wouldn't have to be reported to your lenders until some time after March 31st of 2007, correct?
A. That's correct.
Q. And it delayed the reporting of this transaction to your lenders by some three months, correct?
A. Correct.
Q. And by making – pulling down the money on January 3rd or January 2nd as opposed to December 31st or December 29th, 2006, it allowed Royce Homes not to have to report the additional debt for some 90 days, correct?
A. Correct.
(Tr. 2, Vol. 1, pp. 113–14).

2006. This delay was to avoid reporting the financial consequences of the transfer — including increased debt-to-equity ratios and loan-covenant violations — for an additional 90 days. (*Id.*). The lenders were not asked to waive or to modify the loan covenants until after Royce Homes made the challenged transfer to Speer to pay the Amegy Loan. (Docket Entry No. 350, Gathmann Testimony, at pp. 73–74). The jury reasonably could have inferred, based in part on Gathmann's testimony about the transfer timing, that Speer concealed the transfer for at least a quarter to delay reporting. And Gathmann testified that in each month following the transfers Tow challenged, Royce Homes violated the debt-to-equity ratios required under its loan covenants. (*Id.*).

The evidence presented at trial also supported finding that Royce Homes removed assets, which is sufficient proof of this badge of fraud even without a finding of concealment. Speer does not dispute that the evidence showed that assets were removed from Royce Homes. And, as discussed above, Gathmann's testimony also allowed the jury to conclude that Speer concealed the effects of the first transfer for three months.

The evidence also supported finding a fourth badge of fraud: that Royce Homes did not receive reasonably equivalent value for the transfers. Value is determined as of the date of the transfer in question. *Mladenka v. Mladenka*, 130 S.W.3d 397, 407 (Tex. App. — Houston [14th Dist.] 2004, no pet.); *In re Viscount Air Servs., Inc.*, 232 B.R. 416, 435 (Bankr. D. Ariz. 1998). The factfinder examines all aspects of a transaction, including direct and indirect burdens to the debtor, and asks whether there is a reasonable and fair proportion between what the debtor surrendered and what the debtor received in return. *In re Pace*, 456 B.R. 253, 270 (Bankr. W.D. Tex. 2011); *In re IFS Fin. Corp.*, 417 B.R. 419, 442 (Bankr. S.D. Tex. 2009). The issue is whether, from the creditor's standpoint, the debtor's estate lost value. *Nat'l Loan Investors, L.P. v. Robinson*, 98

S.W.3d 781, 784 (Tex. App. — Amarillo 2003, pet. denied); *see also In re Prejean*, 994 F.2d 706, 708–09 (9th Cir. 1993). "The proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors." *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000) (quoting *In re Viscount Air Servs., Inc.*, 232 B.R. at 435); *S.E.C. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007).

The fraudulent-transfer statute states that "value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." TEX. BUS. & COM. CODE § 24.004(a); *see also In re Gerdes*, 246 B.R. 311, 314–15 (Bankr. S.D. Ohio 2000); *In re Uiterwyk Corp. v. Maher Terminals, Inc.*, 75 B.R. 33, 34 (Bankr. M.D. Fla. 1987). But the antecedent debt must be the debtor's own. *Res. Dev. Int'l*, 487 F.3d at 301–02 (citing *In re Whaley*, 229 B.R. 767, 775 (Bankr. Minn. 1999) ("A payment made solely for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor.")).

Speer claims that Royce Homes received reasonably equivalent value for each of the transfers because between 1998 and 2006, Royce Homes's equity grew from $5 million to $43 million. (Docket Entry No. 404 at 8; Tr. 2, June 4, pp. 28–29). Speer claims that the equity increase resulted from the partners' decision to reinvest profits rather than withdrawing them for the partners' personal benefit. Speer cites *In re Food & Fibre Protection, Ltd.*, 168 B.R. 408 (Bankr. D. Ariz. 1994), to support the argument that a partner's decision to reinvest profits in the company years earlier can be reasonably equivalent value for that partner's later withdrawal of money from the company.

In *Food & Fibre Protection*, the trustee sought to avoid $30,000 that Food & Fibre, the debtor, paid to Jonovich, its principal. Jonovich had taken out a $165,000 personal loan from a third

party, giving Food & Fibre $135,000 to ensure its solvency and using the remaining $30,000 for "unrelated personal purposes." *Id.* at 414. One year later, Food & Fibre paid Jonovich the full amount of the loan and accrued interest so that Jonovich could discharge his debt. The court found that Food & Fibre received reasonably equivalent value under § 548(a)(2) in exchange for its payment of $165,000 plus interest to Jonovich. The court found credible Jonovich's evidence that he had invested more than the $30,000 difference in the company during his prior eight years as its principal.

This case is, however, distinguishable both on the law and facts. On the law, the Fifth Circuit has held that a principal's prior loans to his company are not reasonably equivalent value for a later distribution to that principal. *See In re Eastmark Capital Corp.*, 73 Fed. App'x 79 (5th Cir. 2003); *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829 (5th Cir. 1959). On the facts, in *Food & Fibre*, Jonovich was the company's sole principal and the challenged amount was $30,000. Jonovich had paid the company $130,000 for the $165,000 he borrowed, which the company later gave him the money to repay. The court credited Jonovich's testimony that he had contributed more than $30,000 in the eight years he had served as principal.

Unlike the *Food & Fibre* case, the present case does not involve allegations and evidence that the value the debtor, Royce Homes, previously received from its principal, Speer, was close enough to the value of what Royce Homes transferred to Speer or for Speer's benefit to be reasonably equivalent. Instead, Tow alleged and submitted evidence that Royce Homes received no value for the challenged transfers. Tow also submitted evidence that Speer used all the challenged transfers — not just a relatively modest part of them — for unrelated personal purposes. And the evidence does not show that Speer put more into Royce Homes than the "difference the Trustee disputes."

*Food & Fibre*, 168 B.R. at 419.  Speer was not the only partner of Royce Homes during the relevant time.  Manners was a 50 percent owner through 2006, when Speer bought Manners's remaining interest.  (Tr. 2, Vol. 7, pp. 7–13).  And even if Royce Homes's capital increased before the challenged transfers in part because the partners reinvested some of the profits rather than making larger distributions to themselves, Speer did not show that the amounts he reinvested added more than the value later withdrawn in the challenged transfers, particularly given other economic pressures on home builders such as Royce Homes when the transfers occurred.  Moreover, the challenged transfer amounts at issue here far exceed the $30,000 difference at issue in *Food & Fibre*. The relatively small amount of that difference allowed the *Food & Fibre* court, once it found the principal's testimony about the value of his earlier contributions to the company to be credible, to cite those earlier contributions as "reasonably equivalent" to the company's payment to the principal. In this case, the jury apparently did not credit Speer's testimony about how his earlier role provided reasonably equivalent value to Royce Homes.

In sum, the record does not establish that the value of what Speer "put into" the company before 2007 was reasonably equivalent in value to the challenged transfers from Royce Homes to Speer or for his benefit in 2007 and 2008.

The evidence showed that Royce Homes decreased its equity and increased its debt when it made the challenged transfers, and these transfers resulted in Royce Homes violating the debt-to-equity ratios its loan covenants required.  (Plaintiff Exs. 28, 31, 143, 144, 155, 156, 157, 161, 162, 163, 164).  Solomon testified that the transfers were made without Royce Homes receiving reasonably equivalent value.  (Tr. 2,Vol. 7, pp. 125–26, 128, 130, 133, 156–36, 137–38, 140–41, 148–51; Plaintiff Ex. 163).  The jury in each trial could reasonably have concluded that Royce

Homes did not receive reasonably equivalent value in exchange for the transfers found to be fraudulent.

The evidence here supported finding three or perhaps four "badges of fraud," which has been found sufficient to find a transfer actually fraudulent under TUFTA.  *In re Cipolla*, 541 Fed. App'x 473, 479 (5th Cir. 2013); *In re Ritz*, 513 B.R. 510, 538 (S.D. Tex. 2014); *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, 421 B.R. 251, 299–300 (Bankr. W.D. Tex. 2009).  The trial evidence sufficiently supports the jury findings that certain of the transfers to Speer, Manners, and Donnie Lou Speer were actually fraudulent.

### 3.    The Evidence Supporting the Finding That Certain Transfers Were Constructively Fraudulent Transfers

The jury in each trial also found that certain of the transfers were constructively fraudulent. A transfer is constructively fraudulent if "the debtor made the transfer . . . without receiving a reasonably equivalent value," and the debtor was left with an unreasonably small amount of assets after the transfer.  TEX. BUS. & COM. CODE § 24.005(a)(2).

As discussed above, the evidence at trial supported the jury findings that Royce Homes did not receive reasonably equivalent value for the transfers.  The evidence also showed that Royce Homes was left with an unreasonably small amount of capital after each of the transfers found constructively fraudulent.  (Plaintiff Ex. 163; Tr. 2, Vol. 7, pp. 125–48).  The trial evidence was sufficient to support these findings.

### F.    The Record Presents No Basis to Withhold or Reduce Prejudgment Interest

A court may award prejudgment interest on fraudulent transfers from the date adversary proceedings are instituted to "compensate[] the estate for the time it was without use of the

transferred funds." *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1339–40 (5th Cir. 1995).

Speer asks the court not to award prejudgment interest because Tow failed to narrow the issues and defendants; prelawsuit discovery was excessive; and, in the first trial, Speer prevailed on most of the questions the jury did unanimously answer. (Docket Entry No. 404 at 13). These aspects of Tow's litigation conduct and the first jury verdict do not make prejudgment interest inappropriate. The purpose of prejudgment interest is to "make a plaintiff whole," *Williams v. Trader Pub. Co.*, 218 F.3d 481, 488 (5th Cir. 2000), not to reward or punish a party for its litigation conduct. The fact that the jury in the first trial did not find Speer liable for some of the challenged transfers reduced the damages Speer must pay and therefore reduced the prejudgment interest amount. Speer's arguments do not justify forgiving prejudgment interest or reducing it further. The court finds that an award of prejudgment interest is appropriate.

The parties also dispute the rate at which prejudgment interest should be calculated. Speer advocates using the Federal Reserve System prime rate, as federal law provides for calculating postjudgment interest. Tow asks the court to use the higher rate of five percent, as Texas law provides.

"Federal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute." *In re Tex. Gen. Petroleum Corp.*, 52 F.3d at 1339. Federal law does not set a statutory rate for prejudgment interest. When the federal law at issue is silent as to prejudgment interest but incorporates state law, as the Bankruptcy Code does with TUFTA, courts often look to state law to determine the appropriate prejudgment interest rate. *See Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991); *ASARCO*, 404 B.R. at 163–64; *In re Supplement Spot*, 409 B.R. at 208; *In re Advanced Modular Power Sys.*, 413 B.R. at 684; *In re Mega Sys., LLC*, No. 03-30190,

2007 WL 1643182, at *10 (Bankr. E.D. Tex. June 4, 2007).

Tow brought claims under both state and federal law. The parties have framed their arguments in terms of Texas law. The court applied Texas law to the substance of Tow's claims. The Bankruptcy Code requires reference to state law. Given the predominance of state-law issues in this case and the absence of a federal statute establishing a prejudgment interest rate, the court concludes that the Texas prejudgment interest rate should apply.

Under Texas law, prejudgment interest is normally calculated at the prime rate published by the Board of Governors of the Federal Reserve System. TEX. FIN. CODE § 304.003(c). If that rate is less than five percent, prejudgment interest is instead calculated at five percent per annum. Because the current prime rate is less than five percent, *see* Federal Reserve Statistical Release, H.15 Selected Interest Rates (Weekly), http://www.federalreserve.gov/releases/h15/current/default.htm (last visited March 9, 2015), under Texas law, the court applies a five percent interest rate. The record presents no basis for a lower rate or a reduction in the prejudgment interest amount.

### G.   Speer is Entitled to Have the Award Reduced by Settlement Credits

The award — the amount of the avoided transfers — must be offset by the settlements Tow received from other defendants in this case. *See* TEX. CIV. PRAC. & REM. CODE § 33.012(b). Tow received $100,000 from George Kopecky, $250,000 from Donnie Lou Speer, $9,300,000 from Amegy Bank, and $600,000 from Manners. (Docket Entry No. 394, Ex. C). Tow also received 19.25 acres of land in Galveston, Texas, as a settlement payment from Watermark, which Tow sold for $1 million. (Docket Entry No. 411). A $1 million settlement credit for the land is included in calculations, based on the evidence showing that the property given in settlement of claims was sold for $1 million. (Docket Entry No. 411, Ex. 1).

A settlement payment is applied first to the accrued prejudgment interest on the date the settlement payment was made, then to the principal amount of the award. *See Battaglia v. Alexander*, 177 S.W.3d 893, 912 (Tex. 2005). Applying the settlement credits Tow received to prejudgment interest and then to the principal amount reduces the amount by $11,250,000 plus prejudgment interest on these amounts. The result is a $12,129,006.90 award.

## H.      Postjudgment Interest

A court may also award postjudgment interest. *See Williams v. Trader Pub. Co.*, 218 F.3d 481, 488 (5th Cir. 2000) ("A district court has discretion to impose a pre and post-judgment interest award to make a plaintiff whole"); *In re Supplement Spot, LLC*, 409 B.R. at 208. Federal law allows a court to award postjudgment interest on a money judgment at the Federal Reserve System's prime rate. 28 U.S.C. § 1961(a). Texas law similarly allows an award of postjudgment interest on a fraudulent-transfer claim, using the same rate as for prejudgment interest. *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002). As with prejudgment interest, the court concludes that it is appropriate to refer to Texas law to determine the postjudgment interest rate in this case. Postjudgment interest is awarded at a rate of five percent per annum, or $1,619.36 per day, from the date judgment is entered until paid.

## III.    Tow's Motion for an Award of Attorneys' Fees and Costs

### A.      The Legal Standard for Fee Awards

TUFTA permits a court to award "costs and reasonable attorney's fees as are equitable and just." TEX. BUS. & COM. CODE § 24.013. The court must examine whether a fee award is reasonable and necessary. A contingency fee agreement specifying a percentage-of-recovery formula does not in itself show that the fees sought are reasonable. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945

S.W.2d 812, 818 (Tex. 1997) ("[W]e cannot agree that the mere fact that a party and a lawyer have agreed to a contingent fee means that the fee arrangement is in and of itself reasonable for purposes of shifting that fee to the defendant.").

Texas courts generally use the lodestar method for calculating attorneys' fees. *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 782 (Tex. App. — Fort Worth 2005, pet. granted, judgm't vacated w.r.m.); *see also Guity v. C.C.I. Enter.*, 54 S.W.3d 526, 528 (Tex. App. — Houston [1st Dist.] 2001, no pet.) ("In determining the reasonableness of attorney's fees, the fact finder must be guided by a specific standard. This standard is substantially similar under both federal law and state law."). The first lodestar step is to determine the reasonable hourly rate for the attorneys and nonlegal personnel who worked on the case. The reasonable hourly rate is based on "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). The second step is to determine the number of hours "reasonably expended." *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 284 (5th Cir. 2008).

When a plaintiff seeks to recover attorneys' fees in a case involving multiple claims, at least one of which supports a fee award and at least one of which does not, the plaintiff must offer evidence segregating the hours worked among the various claims. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–14 (Tex. 2006); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 298 (5th Cir. 2007). There is an exception to the duty to segregate when discrete legal services advance both a recoverable and unrecoverable claim that are so intertwined that they cannot be segregated. *Chapa*, 212 S.W.3d at 313–14. The party seeking to invoke this exception has the burden of demonstrating that it applies. *Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*, 269 S.W.3d 628, 642 (Tex. App. — San Antonio 2008, pet. granted, judgm't vacated by

agr.) (citing *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 455 (Tex. App. — Houston [1st

Dist.] 2007, no pet.)).  When such legal services are at issue, the fee applicant should identify the

percentage of the time spent that would have been necessary without the unrecoverable claim.

*Chapa*, 212 S.W.3d at 314.

One consideration in determining reasonableness is whether the party seeking attorneys' fees

exercised billing judgment.  "Billing judgment requires documentation of the hours charged and of

the hours written off as unproductive, excessive, or redundant." *Saizan v. Delta Concrete Products

Co.*, 448 F.3d 795, 799 (5th Cir. 2006).  "The proper remedy for omitting evidence of billing

judgment does not include a denial of fees but, rather, a reduction of the award by a percentage

intended to substitute for the exercise of billing judgment." *Id.* at 799; *see also Walker v. City of

Mesquite, Tex.*, 313 F.3d 246, 251 (5th Cir. 2002).

Another consideration is whether the hours claimed yield a fee that is excessive compared

to the amount at stake or owed.  *See Sibley v. RMA Partners, L.P.*, 138 S.W.3d 455, 459 (Tex. App.

— Beaumont 2004, no pet.).  "Attorney's fees must bear some reasonable relationship to the amount

in controversy." *Cordova v. Southwestern Bell Yellow Pages*, 148 S.W.3d 441, 448 (Tex. App. —

El Paso 2004, no pet.) (citing *Rep. Nat'l Life Ins. Co. v. Heyward*, 568 S.W.2d 879 (Tex. App. —

Eastland 1978, writ ref'd n.r.e.)).  Texas law, however, does not require precise proportionality

between the fees awarded and either the relief obtained or the original amount in controversy.

"[D]isproportion alone does not render the award of attorneys' fees excessive." *Northwinds

Abatement, Inc. v. Emp'rs Ins. of Wausau*, 258 F.3d 345, 355 (5th Cir. 2001) (affirming $712,000

in attorneys' fees on recovery of $74,570 in actual damages on various state statutory and common-

law claims); *see also Quanta Serv's Inc. v. Am. Admin. Grp. Inc.*, 384 Fed. App'x 291, 298 (5th Cir. 2008) (affirming $116,767.68 in attorneys' fees for a $100,000 damages award obtained in a contract suit).

After the court determines the reasonable hourly rate for the legal services provided and the number of hours reasonably expended, it multiplies the hours "reasonably expended" by the reasonable hourly rates to determine the lodestar. *Id.* The court then decides whether to increase or decrease the amount based on the factors set out in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974). The twelve *Johnson* factors are (1) the time and labor involved, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment due to this case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations, (8) the amount involved and results obtained, (9) the experience, reputation, and ability of counsel, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Id.* at 717–19. Texas courts weigh similar factors under Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct to determine reasonable fees. *See Arthur Andersen & Co.*, 945 S.W.2d at 818; *Brazos Elec. Power Co-op., Inc. v. Weber*, 238 S.W.3d 582, 585–87 (Tex. App. — Dallas 2007, no pet.).

**B.     The Fee Application**

Tow seeks $ 6,393,409.62, representing 31.964 percent of the total amount of transfers the jury found fraudulent. Tow contends that this amount is justified based on the 40-percent contingency fee agreement he had with the lawyers he retained to pursue and try the case. Alternatively, Tow seeks fees of $4,290,600.42, based on an undisclosed total number of hours at

an hourly rate of $425 for all the attorneys working on the case who had 7 or more years of experience, $350 for attorneys who had less than 7 years of experience, and $100 or $120 for legal assistants.

Tow submitted an affidavit from Timothy Micah Dortch, the lead trial attorney with Cooper & Scully; a 262-page spreadsheet of itemized bills showing the lawyer who performed the work, the time spent, and a brief description of the work; and an affidavit from Patrick Zummo, an attorney who Tow retained as a fee expert, opining on the reasonableness of the proposed fees. Tow replied to Speer's response to the motion for fees, and attached a revised 252-page spreadsheet that he claimed included additional write-offs and reductions. The amount requested was reduced from the $4,533,154.19 sought in the original motion to $4,290,600.42 in the reply. Tow still did not specify the total number of hours he claimed or explain in detail what was written off or reduced.

### C.   The Lodestar Calculation

#### 1.   The Hourly Rates

The contingency fee arrangement is not entitled to a presumption of reasonableness. *See Arthur Anderson*, 945 S.W.2d at 818. The lodestar analysis applies.

Tow asserts that the attorneys and legal assistants billed their time at the following hourly rates:

**Tow & Koenig:**
| | |
|---|---|
| Rodney Tow | $425 |
| Julie Koenig | $425 |
| Linda Wariner (Legal Asst.) | $120 |
| Shirley Ziegler (Legal Asst.) | $100 |

**Jones Morris:**
| | |
|---|---|
| Erin Jones | $350 |
| Charles Murmane | $350 |

**Cage, Hill & Niehaus:**

| | |
|---|---|
| Joseph Hill | $425 |
| Mike Duncan | $425 |
| **Cooper & Scully:** | |
| T. Micah Dortch | $425 |
| R. Brent Cooper | $425 |
| Michelle Robberson | $425 |
| Diana Faust | $425 |
| Eric Hines | $425 |
| Christopher Lindstrom | $425 |
| Elliott Cooper | $350 |
| Kyle Burke | $350 |
| Maryssa Simpson | $350 |
| Lauren Tow | $350 |
| Julie Warren (Legal Asst.) | $100 |
| Luisa Ulluela (Legal Asst.) | $100 |
| Donna Botello (Legal Asst.) | $100 |

Tow has submitted limited information about each attorney's experience and expertise in bankruptcy law, in litigating complex commercial cases, and in conducting jury trials. *See Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995) (per curiam) (noting that the documentation of attorneys' fees must be sufficient to allow the court to determine the reasonable award amount). Tow and Julie Koenig each have over 20 years of experience in representing bankruptcy estates. (Docket Entry No. 398, Ex. 2, at 16). Erin Jones has 14 years of experience practicing law in Texas and specializes in bankruptcy litigation. Charles Murname, an associate at Jones Morris, has four years of experience. Joseph Hill has over 30 years of experience in representing trustees. His partner, Mike Duncan, also has over 30 years of experience in civil litigation in Texas. At Cooper & Scully, the lead trial firm, Micah Dortch has 9 years of experience in practice, specializing in civil litigation. R. Brent Cooper has been licensed in Texas since 1977 and specializes in personal injury law and commercial litigation. Michelle Robberson has over 20 years of experience and specializes in appellate law. Diana Faust has 20 years of experience in

Texas litigation. Chris Lindstrom is a trial lawyer with 14 years of experience. Elliott Cooper, Maryssa Simpson, Kyle Burke, and Lauren Tow are Cooper & Scully associates with five years or less of experience in litigation in Texas. Eric Hines no longer works at Cooper & Scully; he has over 15 years of experience in civil litigation. The five legal assistants each have between 12 and 36 years of experience.

Tow seeks hourly rates of $425 for more experienced attorneys and $350 for attorneys with less experience. The court takes judicial notice of other recently filed fee applications by Cooper & Scully, in which the lawyers' hourly rates were $200 for less experienced lawyers and $325 to $375 for more experienced lawyers. The court concludes that a reasonable hourly rate is $350 for attorneys with seven or more years of experience and $200 for attorneys with less than seven years of experience. The court concludes that $100 is a reasonable hourly rate for legal assistants.

These hourly rates are consistent with the prevailing market rates for attorneys in Houston in civil commercial litigation. *See Miller v. Raytheon Co.*, 716 F.3d 138, 149 (5th Cir. 2013) ("The record shows that the reduced hourly rates of $577.50, $542.50, and $280 were reasonable, customary rates."); *Lotte Chem. Titan (M) Sendirian Berhad v. Wilder*, No. Civ. A. H-14-1116, 2014 WL 7151569, at *7 (S.D. Tex. Dec. 12, 2014) ($500 per hour for partners and $375 per hour for associates); *Omni USA, Inc. v. Parker-Hannifin Corp.*, No. Civ. A. H-10-4728, 2014 WL 710386, at *6 (S.D. Tex. Feb. 14, 2014) ($250 per hour for partners); *Preston Exploration Co., LP v. G.P., LLC*, No. Civ. A. H-08-3341, 2013 WL 3229678, at *5 (S.D. Tex. June 25, 2013) ($407.03/hour for partners, $224.27/hour for associates, and $132.84/hour for legal assistants); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 781 & n. 61 (S.D. Tex. 2008) (hourly rate of $630 for partners). These hourly rates are also consistent with the prevailing rates in Dallas. *See*

*SortiumUSA, LLC v. Hunger*, No. 3:11-CV-1656-M, 2015 WL 179025, at *5 (N.D. Tex. Jan. 14, 2015) ($325/hour for partner and $225/hour for associate); *Hernandez v. Aleman Const., Inc.*, No. 3:10-CV-2229-BN, 2013 WL 5873289, at *5 (N.D. Tex. Nov. 1, 2013) ($350/hour for partners); *Powell v. Procollect, Inc.*, No. 11-cv-846-B, Dkt. No. 30 (N.D. Tex. July 18, 2012) (finding an average hourly rate of $250, with hourly rates from $100 to $400 per hour for each attorney, to be reasonable); *Fluor Corp. v. Citadel Equity Fund Ltd.*, No. 3:08-cv-1556-B, 2011 WL 3820704, at *5 (N.D. Tex. Aug. 26, 2011)) (finding reasonable an hourly rate of $350 for a partner and $250 for an associate).

### 2.     The Number of Hours Expended

Dortch testified in his affidavit that Tow's attorneys, 21 lawyers and legal assistants, from four different firms, spent a total of 15,429 hours working on this case on issues as to which Tow prevailed.  Dortch provided the following breakdown:

| Law Firm | Hours |
|---|---|
| Tow & Koenig | 4,845 |
| James Morris Klevenhagen | 2,855 |
| Cage, Hill & Niehaus | 4,352 |
| Cooper & Scully | 3,377 |
| Total | 15,429 |

There is no summary of how much time each lawyer spent on the case, or how much of that time two or more lawyers spent working on the same task or service.

In his reply to Speer's response to the fee motion, Tow agreed not to seek additional fees, which he claimed totaled $269,875.16.  Tow claimed that the reduction was due to a decision to write off all hours associated with the Elan Development testimony,[2] which was used to impeach

---

[2] Royce Homes paid the payroll for Elan Development, a company Manners owned.  Speer testified that Elan Development reimbursed Royce Homes for this money.  Manners testified that this was incorrect.

Speer at trial; Tow's own attendance at trial; and correcting misplaced decimal points in the original 262-page spreadsheet of itemized billings. (Docket Entry No. 406). But Tow does not specify how many hours were written off or whether the hours written off for the Elan Development work were performed by more experienced lawyers or less experienced lawyers.

Although Tow's reply includes 252 pages of itemized records of thousands of time entries describing each item billed for, the billing attorney or legal assistant, and the time spent, Tow has not provided a summary or chart showing the hours each lawyer who worked on the case expended. The amount Tow seeks in the reply to the response is based on different hourly rates for 21 lawyers and legal assistants, and two reductions of the amount originally requested. Although the 252-page spreadsheet shows that two or more lawyers billed time for the same or overlapping work, there is no summary of when or how often that occurred, the total hours each lawyer spent on such potentially duplicative work, or the categories or types of legal services that justified two or more lawyers.

Reasonably accessible information on the hours the individual lawyers and legal assistants spent on the case and seek fees for is necessary for this court to conduct a meaningful review of the time spent, to verify that the number of hours billed was reasonable, and to calculate a lodestar amount. To calculate the lodestar amount on the current record, the court would have to manually add the itemized entries on the 252-page spreadsheet as to each of the 21 people who billed time on this case, multiply each lawyer's or legal assistant's total time by the reasonable hourly rate for that person, and then, based on Tow's stipulation, apply a 15 percent reduction, then a 10 percent further reduction. This is not a feasible task. *See Nat'l Elec. Ben. Fund v. AC-DC Elec., Inc.*, No. Civ. A.

---

Manners and Elan kept the money. (Docket Entry No. 406 at 3).

DKC 11-0893, 2013 WL 388986, at *3 (D. Md. Jan. 30, 2013) ("Because Ms. Hawkins has not provided the total number of hours she spent working on the case — much less a breakdown by specific task — the court cannot assess whether the number of hours was reasonable."); *Illinois Cent. R. Co. v. Harried*, No. 5:06CV160-DCB-JMR, 2011 WL 283925, at *8 (S.D. Miss. Jan. 25, 2011) (The prevailing party submitted the daily time entries of each attorney and paralegal, but this documentation was insufficient because the party "should have presented its supporting documentation to the Court in a more organized fashion, rather than expecting the Court to parse what appear to be hundreds of pages of individual time entries." The court ordered the prevailing party to submit a chart summarizing the number of hours billed by each attorney and the total dollar amount.); *Baker v. Washington Mut. Fin. Grp., LLC*, No. Civ. A 104CV137WJG-JMR, 2007 WL 571103, at *10 (S.D. Miss. Feb. 20, 2007) (dismissing the fee application for failure to summarize the number of hours claimed); *cf. Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 849 (6th Cir. 2013) (holding that the district court abused its discretion by denying fees entirely because the prevailing party failed to total the number of fees claimed, when the court could easily have summed the individual line items contained on a single billing sheet); *see also Rappaport v. State Farm Lloyds*, 275 F.3d 1079, at *3 (5th Cir. 2001) ("The fee applicant bears the burden of proof in showing the reasonableness of the hours applied for: It must provide documentation that will enable the district court to verify this showing, and a district court may reduce the number of hours awarded if the documentation is vague or incomplete.") (unpublished).

Tow's motion for attorneys' fees is denied, but without prejudice. He may resubmit an amended fee application within 14 days of this opinion that meets the requirements courts impose to enable a meaningful review of fee applications. The amended fee application must include at least

a summary of the hours each lawyer working on this case spent for which fees are sought, the total number of hours and fees sought for each lawyer, and the total. The amended application must also summarize the time that two or more lawyers spent working on the same task or service and the dates and types of those services.

### D.    Conditional Attorneys' Fees for Appeal

Tow requests conditional attorneys' fees for appeal. He seeks $100,000 if Speer unsuccessfully appeals to the Fifth Circuit, and $75,000 more if Speer unsuccessfully appeals to the Supreme Court. Speer argues that the evidence is insufficient to support a conditional award of attorneys' fees.

An award of attorneys' fees may include conditional fees for an appeal. *Solomon v. Steitler*, 312 S.W.3d 46, 59 (Tex. App. — Texarkana 2010, no pet.); *Keith v. Keith*, 221 S.W.3d 156, 169 (Tex. App. — Houston [1st Dist.], 2006, no pet.); *Tex. Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 400 (Tex. App. — Dallas 2000, pet. denied). But "there must be evidence of the reasonableness of fees for appellate work to support the award of appellate attorney's fees." *Keith*, 221 S.W.3d at 169. Tow does not provide a basis for the amounts he seeks. The request for appellate attorneys' fees is denied, without prejudice to refiling in the appellate court if appropriate. *Fid. & Deposit Co. of Md. v. Rodriguez*, Civ. A. No. 3:09-CV-76-KC, 2009 WL 2382979, at *5 (W.D. Tex. June 10, 2009) (denying a "speculative" award of appellate attorneys' fees before the party had incurred the fees without prejudice to refiling after a successful appeal); *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, No. Civ. A. 5:02-CV-101-C, 2003 WL 21662829, at *6–7 (N.D. Tex. July 15, 2003) (declining to award fees for an appeal before the services were rendered and noting that the Fifth Circuit could provide fees on appeal if appropriate (citing *Heasley*, 867 F.2d at 125)), *rev'd in part on other*

*grounds*, 382 F.3d 546 (5th Cir. 2003).

### E.    Costs

Tow seeks $77,437.42 in costs for copies, transcripts, subpoenas, and fees of the clerk. Rule

54(d)(1) of the Federal Rules of Civil Procedure states that "[u]nless a federal statute, these rules,

or a court order provides otherwise, costs — other than attorney's fees — should be allowed to the

prevailing party." There is a strong presumption under Rule 54(d)(1) that the prevailing party will

be awarded costs. *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 586 (5th Cir. 2006). Title 28 U.S.C.

§ 1920 allows the following categories of costs:

> (1) Fees of the clerk and marshal;
> (2) Fees of the court reporter for all or any part of the stenographic
> transcript necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and copies of papers necessarily obtained
> for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of
> interpreters, and salaries, fees, expenses, and costs of special
> interpretation services under section 1828 of this title.

28 U.S.C. § 1920. Rule 54(d)(1) does not authorize a court to award costs not included in the

statute. *Crawford Fitting Company v. J.T. Gibbons, Inc.*, 107 S. Ct. 2494, 2497 (1987).

Speer has filed objections to the bill of costs. Each of the challenged cost items is analyzed

below.

### 1.    Copies

Tow seeks $44,542.07 in copying costs. Under 28 U.S.C. § 1920, "disbursements for

printing" and "fees for exemplification and copies of papers necessarily obtained for use in the case"

are taxable costs. Costs are recoverable if the party making the copies had "a reasonable belief that

the documents w[ould] be used during trial or for trial preparation." *Rundus v. City of Dallas*, 634 F.3d 309, 316 (5th Cir. 2011). Copies "obtained simply for the convenience of counsel" are not recoverable under § 1920(4). *Fogleman v. ARAMCO (Arabian Amer. Oil Co.)*, 920 F.2d 278, 286 (5th Cir. 1991).

Speer objects to the copying costs because they are not sufficiently itemized. Tow submitted a list showing the date the copies were made, the number of pages, and the cost, but did not specify what was copied or why. (Docket Entry No. 393, Ex. 1). This detail is insufficient to award copying costs as taxable costs. *See Kellogg Brown & Root Int'l., Inc. v. Atlanmia Commercial Mktg. Co. W.L.L.*, No. 07-cv-2684, 2009 WL 1457632, at *6 (S.D. Tex. May 26, 2009). Although an item-by-item description is not required, there must be some information about the types or categories of documents copied and the reason for the copies. *See Montgomery Cty. v. Microvote Corp.*, No. 97-6331, 2004 WL 1087196, at **7–8 (E.D. Pa. May 13, 2004) ("The reports show the dates of the copies and the rate that was charged, however, the columns reserved for the description of what documents were copied are blank. Without providing a description of the documents that were copied, the Court is unable to evaluate the necessity of the costs."); *Pion v. Liberty Dairy Co.*, 922 F. Supp. 48, 53 (W.D. Mich. 1996) ("[T]he court will not endeavor to calculate the number of pages or documents for which costs are available; this task should have been performed by the defendant.").

A conclusory statement that the copying costs "were necessarily incurred in this action" is not enough to allow the court to determine that the copies were necessary and award them as taxable costs. *See Montgomery Cty.*, 2004 WL 1087196, at *8 ("As for the affidavit of counsel averring that the costs sought were actually incurred, its conclusory statement that copies were 'reasonably

necessary throughout the litigation' does not assist the Court in determining the nature, and the necessity, of the documents that were copied.").

Tow has failed to show that the costs of in-house copies he seeks were necessarily obtained. *See Crevier-Gerukos v. Eisai, Inc.*, No. Civ. A. H-11-0434, 2014 WL 108730, at *6 (S.D. Tex. Jan. 9, 2014); *Denner v. Tex. Dep't of Crim. Justice*, No. SA-05-CA-184-XR, 2007 WL 294191 at *7 (W.D. Tex. Jan. 29, 2007) ("The Court 'require[s] some demonstration that reproduction costs necessarily result from [the] litigation' beyond the mere conclusory recitation of the standard on the bill of costs."); *Pion*, 922 F. Supp. at 53 (disallowing copying costs where "[d]efendant's submissions . . . d[id] not identify the number, substance, or purpose of the copies made in a manner sufficient to demonstrate that the expenses were reasonable or necessary"); *see also Fogleman*, 920 F.2d at 286 (stating that although the unsuccessful party "should be taxed for the cost of reproducing relevant documents and exhibits for use in the case, [the party] should not be held responsible for multiple copies of documents, attorney correspondence, or any of the other multitude of papers that may pass through a law firm's xerox machines.").

### 2.    Deposition Transcripts and Video Recordings

Tow seeks $30,917.07 for the cost of deposition transcripts and videos. Deposition transcript costs are taxable "[i]f, at the time it was taken, a deposition could reasonably be expected to be used for trial preparation, rather than merely for discovery." *Fogleman*, 920 F.2d at 285. But some of the costs Tow seeks are for expedited or daily transcripts, or for video recordings in addition to the transcripts. These additional costs are generally not recoverable unless they were necessary for the litigation. *See Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 530 (5th Cir. 2001) (videotape deposition fees); *Cox v. Waste Mgmt. of Texas, Inc.*, No. Civ. A. H-10-1626, 2013 WL

690849, at *2 (S.D. Tex. Feb. 25, 2013) (awarding costs for videotaped depositions that "were necessarily obtained for use in the case."); *Baisden v. I'm Ready Prods.,* Inc., 793 F. Supp. 2d 970, 977–78 (S.D. Tex. 2011), *aff'd on other grounds*, 693 F.3d 491 (5th Cir. 2012) (awarding costs for video recordings that were played during trial); *Jones v. White*, No. Civ. A. H-03-2286, 2007 WL 2427976, at *10 (S.D. Tex. Aug. 22, 2007) (expedited transcript fees); *but see Corder v. Lucent Tech. Inc.*, 162 F.3d 924 (7th Cir. 1998) (finding that the case schedule required expedited delivery of transcripts).  Tow has not shown why expedited transcripts or video copies were required costs.

Tow is awarded costs for the deposition transcripts of Deborah LaDay, Sidney Evans, Matthew Gilby, Caroline Grahmann Gardner, Charlotte Lynne Barosh, Dale Andreas, Omar Khan, Chris Denlson, J.F. "Chip" Morrow, Joseph Henry Argue, Joseph Stanfield, Victor Davis, Saul Solomon, Scott Adam Bayley, Rodney Tow, and Tim Ashcraft.  These deposition costs total $9,969.75.  No costs are awarded for the expedited transcript or video recording fees sought.

## IV.    Conclusion

Speer's motion for discovery into jury misconduct, (Docket Entry No. 395), is denied.  Tow's motion for entry of judgment, (Docket Entry No. 394), is granted.  Tow's motion for attorneys' fees, (Docket Entry No. 398), is denied without prejudice.  Speer's objections to the bill of costs, (Docket Entry No. 402), are sustained in part.  Judgment is separately entered awarding Tow $12,129,006.90 for the fraudulent transfers and $11,948.03 in costs.  Postjudgment interest will accrue on the money judgment at a rate of $1,619.36 per day until the judgment is satisfied in full.

SIGNED on March 10, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge